United States District Court
Southern District of Texas
FILED

APR 0 4 2003

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **SUBMERSIBLE SYSTEMS, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. B-03-020** |
| | * | |
| **PERFORADORA CENTRAL, S.A. de C.V.** | * | **RULE 9(h) ADMIRALTY** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION TO DISMISS ON THE GROUND
## OF FORUM NON CONVENIENS

Defendant Perforadora Central S.A. de C.V. moves this Court for an order dismissing the plaintiff's complaint on the ground of *forum non conveniens* in that an alternative forum in Mexico is both available and adequate, and both private and public interest factors weigh heavily in favor of dismissal so that litigation of the issues arising from the events alleged in plaintiff's complaint can be litigated in Mexico, where all of those events occurred.

In support of this motion, Perforadora Central, S.A. de C.V. has attached the following exhibits:

1.    Affidavit of Carlos Loperena Ruiz, including Exhibits A-I, executed on April 3, 2003;

2.    Affidavit of Sergio J. Alarcon, executed on April 3, 2003;

3.    Excerpts of the Rule 30(b)6 deposition of Submersible Systems, Inc.;

4.    "Acta Informativa," executed by the officers of the M/V DON FRANCISCO on June 23, 1997;

5.    Memorandum Opinion issued on November 28, 1998, by Judge Walter Gex, United States District Court for the Southern District of Mississippi, Case No. 1:98cv251GR; and

6.    Opinion of Carlos Loperena Ruiz filed in the record of the Mississippi case on August 21, 1998.

If this matter is dismissed on the *forum non conveniens* grounds and Submersible Systems, Inc. re-files its claims in a court in Mexico, Perforadora Central will accept or waive service of process, will waive any defenses it may have before a Mexican court on grounds of jurisdiction or prescription, statute of limitations or laches, will post security and will pay any judgment against it rendered by the Mexican court.

This motion is filed with a full reservation of Perforadora Central, S.A. de C.V.'s right to assert additional defenses.

OF COUNSEL:

Respectfully submitted,

ROYSTON RAYZOR VICKERY
  & WILLIAMS L.L.P.

KEITH UHLES (#Texas BN 20371100)
Federal ID No. 1936
55 Cove Circle
Brownsville, TX 78523-3509
Telephone: (956) 542-4377
Facsimile: (956) 542-4370

MILLING BENSON WOODWARD L.L.P.

JAMES K. IRVIN (#7166)
BENJAMIN O. SCHUPP (#21074)
SERGIO J. ALARCON (#24740)
909 Poydras Street, Suite 2300
New Orleans, LA 70112-1010
Telephone: (504) 569-7000
Facsimile:  (504) 569-7001

Attorneys for Perforadora Central S.A. de C.V.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Motion to Dismiss on the Ground of

*Forum Non Conveniens* has been served upon all counsel of record by United States Mail, postage

prepaid and properly addressed, this _4th_ day of April, 2003.

wp296497(81928)

3

United Mexican States
Federal District
City of Mexico
Embassy of the United
States of America

## UNITED STATES DISTRICT COURT

**SOUTHERN DISTRICT OF TEXAS**

**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. B-03-020 |
| | * | |
| PERFORADORA CENTRAL, S.A. de C.V. | * | RULE 9(h) ADMIRALTY |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF CARLOS LOPERENA RUIZ
### IN SUPPORT OF
### MOTION TO DISMISS ON FORUM NON CONVENIENS GROUNDS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| AMERICAN EMBASSY, | * |
| MEXICO CITY | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BEFORE ME, the undersigned authority, notary public, personally came and appeared:

### CARLOS LOPERENA-RUIZ

who after being duly sworn, did depose and state that:

1.       In connection with the Motion to Dismiss on Grounds of Forum Non Conveniens of Perforadora Central, S.A. de C.V. in the above-referenced matter, I have been requested to make an affidavit concerning Mexican law and the availability and adequacy of Mexican courts to entertain the claims of Submersible Systems, Inc. fairly and reasonably promptly.

2.       My qualifications are that I graduated from Escuela Libre de Derecho (School of Law) in Mexico in the year 1978. I am a member of the Mexican Bar Association (Barra Mexicana, Colegio de Abogados), which I have served as a member of the Board of Directors from 1989 until last February when I ended my term as Vice President. I am currently the

Chairperson of the Commercial Law section. I served as Professor of Civil Law and Civil Procedure at the Universidad del Nuevo Mundo in Mexico City from 1978 to 1983, and as Professor of Civil Procedure at Escuela Libre de Derecho in Mexico City from 1979 to the present. I have served as visiting professor to the Universidad Iberoamericana, Universidad Panamericana, Universidad Bonaterra and the University of Florida. A more detailed Curriculum Vitae and a List of Publications is attached hereto as Exhibit "A."

3.      I am currently a member of the law firm of Loperena, Lerch, y Martin del Campo in Mexico City. I have practiced as a trial lawyer in Mexico for approximately 25 years, have appeared in more than 300 cases and am very familiar with the substantive and procedural law of Mexico and the courts of Mexico. I am admitted to practice, and in good standing, in all the courts of Mexico, including the courts in Campeche and Tabasco, as well as in Mexico City (D.F.) for local and federal matters.

4.      I have been recognized as an expert on Mexican law and procedure in the following cases:

    a.   *In the Matter of the Extradition of Mauricio Mardero O'Brien*, U.S. District Court, Southern District of Florida, Case No. 95-8057-CIV-VITUNAC.

    b.   *Mendoza v. Contico*, El Paso, Texas.

    c.   *Tapia v. Tapia*, Supreme Court Action No. F950020, Vancouver Registry, Canada.

    d.   *California Commerce Bank v. Estrategia Monetaria, S.A. de C.V.*, Los Angeles Superior Court, Case No. BC097868.

    e.   *Laboratorios AF Aplicaciones Farmaceuticas, S.A. de C.V. v. Rohne Poulenc Rorer, Inc., et al*, U.S. District Court, Eastern District of Pennsylvania, Case No. 95-CV-1844.

    f.   *Keith Johnson, Sr., et al v. Canadian Helicopters Limited, et al*, Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No. 94-15049(18).

    g.   International Chamber of Commerce, International Court of Arbitration, Case No. 9159/FMS (Name of parties withheld due to confidentiality).

2

h.     *Bouras v. Farrera*, Juzgado de Instruccion 24, Diligencias Previas 3877-97-C, Barcelona, Spain.

i.     *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*, United States District Court, Southern District of Mississippi, Civil Action No. 1:98CV251GR.

j.     *Grupo Condumex, S.A. de C.V. v. Sealed Power Technologies L.P. and Dana Corporation*, U.S. District Court for the Western District of Ohio Northern Division. 3:99CV7316.

k.     *Consultores en Computacion y Contabilidad, S.C. et al. v. Microsoft Corporation et al*, Superior Court of the State of California, County of Los Angeles, BC239418.

l.     *Bridgestone/Firestone Tire Litigation*, Sixth Circuit Court for Davidson County, Tennessee, Case No. 01 MD 2.

5.     In preparing this opinion, I have reviewed the record of the earlier proceedings before the Ministerio Publico and the court in Ciudad del Carmen, state of Campeche, Mexico (the forum in which the events and equipment involved in the current lawsuit were first addressed), the complaint filed by Submersible Systems, Inc. in the United States District Court for the Southern District of Texas, Brownsville Division, the complaint filed by Submersible Systems, Inc. in the United States District Court for the Southern District of Mississippi in 1998 and all other documents supplied to me during the course of my participation as an expert on behalf of Perforadora Central S.A. de C.V. in the previous Mississippi litigation filed by Submersible Systems, Inc. I have assumed the facts outlined in these pleadings and documents are accurate. Of course, I have no independent personal knowledge of these facts.

6.     It is my understanding that the events at issue between these parties involve a supposed wrongful taking, retention or conversion by Perforadora Central of certain equipment (owned by Submersible Systems, Inc. and imported into Mexico by a Mexican corporation by the name of Quantum Ingenieros), either while that equipment was located on board a Mexican flagged vessel docked in the Mexican port of Dos Bocas or on land within the territory of

the state of Mexico. The terms of the lease are set forth in Exhibit "L."

Mexico, either at the premises of Petroleos Mexicanos ("PEMEX") or at the premises of Perforadora Central and that the equipment at issue, at some point in time, was turned over at the direction of Perforadora Central's local Mexican counsel in Campeche, to the Ministerio Publico in Campeche, as part of a criminal investigation against Quantum Ingenieros for fraud and its consequences.

7.      Pursuant to Article 1910 of the Mexican Civil Code, the laws of Mexico provide a civil cause of action for a conversion of property and a remedy in the event such claims can be proven. Such civil claims may be brought either in the courts located in the States of Tabasco or Campeche where the events occurred, or in the federal or local court in Mexico City. SSI, if its case be proven, would have an adequate civil cause of action and remedy under Mexican law. See Mexican Civil Code Article 1910 and its translation, attached as Exhibit "B."

8.      In my opinion, should SSI be able to prove a conversion, it would be entitled to the restoration of the status that existed before the wrongful act through an award of the value of the equipment at the time it should have been returned. See Mexican Civil Code Articles 1915 and 2114 and their translations, attached as Exhibit "C."

9.      The disputes between SSI and Perforadora Central may properly be brought before the local and federal courts of Mexico City or of the State of Campeche in Mexico, and SSI, which we understand to be a corporation organized and existing pursuant to the laws of the State of Louisiana in the United States, would not in any way be prohibited or impeded from commencing the prosecution of such a civil suit and appearing in the courts of Mexico, and SSI would receive fair and impartial justice in the courts of Mexico. The laws that establish these rights are: Articles 1, 17 and 33 of the Constitution of Mexico (Article 1 of the Constitution provides that all persons are protected by Bill of Rights and Article 33 of the Constitution provides that the Bill of Rights is applicable to foreign nationals). See cited excerpts of the Mexican Constitution and Judicial Precedents and their translations, attached as Exhibit "D."

10.      SSI would also be entitled to appeal any adverse decisions. See translations of the relevant portions of the Mexican "Amparo" (appeal) process, attached as Exhibit "E."

4

11.     The duration for an ordinary commercial case in a Mexican court after the Amendments of May, 1996, must be of no more than six months in the lower court, three months in the Court of Appeals and no more than eight months in the Amparo (Federal) Court.

12.     The courts of Tabasco and Campeche and of Mexico City are easily accessible to non-Mexican witnesses, through the airports, located in Mexico City and in the States of Tabasco and Campeche, so that it would not be unduly burdensome for witnesses to come to Mexico to testify if necessary.

13.     Testimony can be obtained from witnesses in the United States by deposition transcribed and translated and then submitted as evidence in the courts of Mexico. The testimony may be obtained through letters rogatory pursuant to the Inter-American Convention on the Taking of Evidence Abroad or the Hague Convention on The Taking of Evidence Abroad, ratified by Mexico and the United States.

14.     With respect to the witnesses located in Mexico, who I have been informed constitute the majority of the witnesses in this case, whether Mexican citizens or foreigners residing in Mexico, the courts in Mexico have the authority, power and procedures in place to subpoena those witnesses and require their appearance in court to testify. Articles 1261 and 1262 of the Code of Commerce provide as follows:

"Article 1261 - All those who have knowledge of the facts that the parties must prove may be required to testify as witness."

"Article 1262 - The parties are required to produce their own witness for which they shall be given subpoenas. If, however, it is impossible for them to produce them, they shall so state under oath and request that they be summoned. The judge shall order the summoning of the witness with a forewarning that they shall be subject to arrest for up to 36 hours or fined for the equivalent of 15 days of general daily minimum wage in effect in the Federal District if they fail to appear without good cause or refuse to testify." See Code of Commerce Articles 1261, 1262 and 1269 and their translations, attached as Exhibit "F."

15.    If the witness does not reside within the jurisdiction of the court, the court may (at the request of a party) issue a letters rogatory to the competent court of the place of residence of the witness to receive the testimony, as established in Article 1269 of the Code of Commerce. See Exhibit "F."

16.    In my opinion, and for the reasons stated in paragraph 18 below, it is absolutely necessary that the entire record of the earlier Mexican criminal proceedings (consisting of approximately 750 pages), and not selective translation of excerpts of the record as was done in the Mississippi proceeding, be translated if justice is to be served and a fair adjudication of this dispute is to take place in a U.S. forum.

17.    Based upon my experience in international litigation, I am of the opinion that such large numbers of translations are always costly, burdensome and time consuming to carry out and, even if completed, legal and factual subtleties are often lost due to linguistic differences, resulting in diminished accuracy.

18.    Because, in judging the rights and liabilities of parties to civil litigation in the United States arising out of events occurring exclusively in Mexico, the federal court in Brownsville will be called upon to analyze and judge the impact of a) the criminal investigation and proceeding in Campeche, Mexico; b) the actions of the local Ministerio Publico in that proceeding; and c) the assertion of legal positions by both SSI's and Perforadora Central's local Mexican counsel in those proceedings, in effect passing judgment on a Mexican court's application of Mexican law to events occurring in Mexico, the international law concept of comity between co-equal sovereigns, as embodied in the many treaties between Mexico and the Untied States (See treaties attached as Exhibit "G"), provides the most important justification for the U.S. Federal Court in Brownsville to decline to exercise its jurisdiction in this case, should that jurisdiction be established.

19.    Should this dispute be deemed a maritime matter, a clear conflict is created between the jurisdiction of Mexican and United States Federal Courts, as actions arising within the internal waters of Mexico regarding commercial maritime matters are within the exclusive

6

jurisdiction of the Mexican Federal Courts and subject to the application of Mexican law, pursuant to Mexican Federal Code of Civil Procedure Article 568, the Law of Navigation Articles 3 and 4 and Article 104 Section II of the Mexican Constitution. See Mexican Federal Code of Civil Procedure Article 568, the Law of Navigation Articles 3 and 4 and Article 104 Section II of the Mexican Constitution and their translations, attached as Exhibit "H."

20.    Because SSI made allegations of theft and piracy in its previous suit filed in Mississippi, I note here that in addition to the civil remedies discussed above, SSI also has the legal means to seek criminal charges against Perforadora Central or Quantum or both and to have such allegations investigated by the Ministerio Publico.

21.    Unlike the civil/criminal dichotomy present in the legal system of the United States, claims for monetary reparation can be combined with criminal charges in a single action in the courts of Mexico. Perforadora Central's criminal complaint against Quantum included a demand for monetary reparation for costs incurred in connection with the removal, transportation and storage of the equipment left aboard the vessel.

22.    To the best of my knowledge based on the documents I have reviewed, SSI has never sought to institute a civil action for conversion pursuant to Mexican Civil Code Article 1910, nor has it sought to pursue criminal actions for theft or piracy against either Perforadora Central or Quantum, although it clearly possesses the right to do so under Mexican law and procedure.

23.    The record of the earlier proceeding in Campeche, Mexico, indicates only that SSI attempted to have the equipment released by the Ministerio Publico by appearing in order to show ownership. Although there are no reasons stated in the record by the Ministerio Publico or the court indicating why the equipment was not released at that time, it is clearly within the Ministerio Publico's powers to retain evidence in connection with criminal investigations. Furthermore, because Quantum was ultimately responsible in Mexico for the imported equipment of SSI, the Ministerio Publico would have been the appropriate official entrusted with

responsibility for resolving issues of custody, right of possession and compliance with customs regulations regardless of the issue of ownership.

24.    Ultimately, all the equipment that Quantum failed to remove from the vessel per the terms of its charter with Perforadora Central (including items owned by at least two individuals and/or entities other than SSI) was released at the conclusion of the Ministerio Publico's investigation and prosecution.

25.    I have been informed, should this matter be dismissed by the federal court in Brownsville, Texas, and refiled in the appropriate court in Mexico, Perforadora Central agrees to waive any defenses it may have in such a court based on lack of personal jurisdiction and prescription or the running of the applicable statute of limitations.  Pursuant to Articles 1141 of the Federal Civil Code and 1092 of the Code of Commerce, Mexican law would recognize such a waiver of those defenses by Perforadora Central.  See Article 1141 of the Mexican Federal Civil Code and 1092 of the Code of Commerce and their translations, attached as Exhibit "I."

In my long experience in the courts of Mexico, in which I have on many occasions represented foreign corporations and individuals, the courts of Mexico treat foreign citizens and corporations with equal fairness and justice as is required by the Constitution of Mexico as previously cited.

APR 0 3 ....

_____
CARLOS LOPERENA-RUIZ

_____
NOTARY PUBLIC

**Paul F. Schultz**
**Consul**

PRESIDENTIAL COMMISSIONS ARE PERMANENT

8

CURRICULUM VITAE

NAME: Carlos Loperena R.

DATE OF BIRTH: June 7, 1953.

PLACE OF BIRTH: Mexico City.

CITIZENSHIP: Mexican.

STUDIES:

ELEMENTARY: Instituto Patria, Mexico City.

SECONDARY: Instituto Patria, Mexico City.

PREPARATORY: Colegio Franco Español, Mexico City.

PROFESSIONAL: Escuela Libre de Derecho, Mexico City, 1971 - 1976.

OTHER STUDIES:

Amparo Trial Course, Universidad Iberoamericana, Mexico City, 1977.

Civil and Mercantile Contracts Course, Escuela Libre de Derecho, Mexico City, 1980.

Academy of American and International Law, program of the Southwestern Legal Foundation, Dallas, Texas 1982.

Legal Tech seminar, Houston, Texas, 1984.

International Commercial Arbitration seminar. Escuela Libre de Derecho, Mexico City, 1986.

International Commercial Arbitration seminar sponsored by the International Chamber of Commerce, Escuela Libre de Derecho, Mexico City, 1987.

International Commercial Arbitration seminar sponsored by ANADE (Enterprise Attorneys National Association). Mexico City, 1988.

Transnational Commercial Arbitration Workshop sponsored by The Institute for Transnational Arbitration. Dallas, Texas, 1990, 1991, 1993, 1995, 1996, 1997, 1998, 1999, 2000, 2001 and 2002.

International Commercial Arbitration seminar sponsored by the American Arbitration Association, San Antonio, Texas, 1990.

Advanced International Litigation and Arbitration Course, State Bar of Texas, Dallas 1991.

Constitutional Procedure Seminar, Mexican Supreme Court-Instituto Tecnológico Autónomo de México. Mexico City 1991.

PROFESSIONAL THESIS:

Mortgage on a Mercantile Enterprise.

TENURE:

Civil Law and Civil Procedure Professor. Universidad del Nuevo Mundo. Mexico City, 1978 to 1983.

Civil Procedure Professor. Escuela Libre de Derecho, Mexico City, 1979 to date.

Commercial Arbitration Professor, Graduate Program. Universidad Panamericana 1994 to 1998.

International Commercial Arbitration Professor, Graduate Program, Escuela Libre de Derecho-International Chamber of Commerce, 1994 to date.

International Commercial Arbitration Professor, Graduate program. Escuela Libre de Derecho, 1995 to date.

Visiting professor Universidad Autonoma Metropolitana, Universidad Bonaterra, Aguascalientes, Mexico, University of Florida, Gainesville, Florida.

ASSOCIATIONS:

Barra Mexicana, Colegio de Abogados (Mexican Bar Association). Member of the Board 1989 to 1995 1997 to date. Civil Law Section Chairman 1995-1996. Current Second Vice President.

Ilustre y Nacional Colegio de Abogados de México.

American Bar Association (International Associate).

The International Legal Fraternity of Phi Delta Phi.

Representative of the Barra Mexicana to the Joint Working Group of the American Bar Association, Canadian Bar Association and Barra Mexicana, in connection with the dispute resolution issues under the North-American Free Trade Agreement (1992-1993).

Advisor of the Mexican negotiating team for the North-American Free Trade Agreement on the subject of dispute resolution (1992-1993).

Full member of the Advisory Committee on Private Commercial Disputes established under NAFTA Article 2022.

Member of the International Advisory Board of the Center for Conciliation and Arbitration. St. Mary's University, San Antonio, Texas.

Member of the Advisory Board of the Institute for Transnational Arbitration, Dallas, Texas.

Member of the Advisory Board of the United States-Mexico Law Institute, Inc, The University of New Mexico School of Law. Albuquerque, New Mexico.

Member of the Copyright Academy of Mexico.


LEGAL PRACTICE:

General practice with the law firm of Hardin, Hess, Santos-Galindo & Hanhausen up to mid January, 1992 and currently with the law firm of Loperena, Lerch y Martin del Campo, both in Mexico City, with special emphasis on corporate law, mercantile contracts, arbitration and litigation. He has intervened in several international commercial arbitration cases under the rules of the ICC, the UNCITRAL, the ICSID, the AAA, the U.S. Mexico Dispute resolution Center and the IACAC as attorney, as expert witness and as arbitrator.

AUTHOR:

Amendments to the Civil Law, Civil Procedure and Mercantile Procedure as of December 27, 1983. Revista de Investigaciones Jurídicas, Mexico City, 1984.

Overview of Selected Mexican Treaties Affecting International Judicial Cooperation (paper presented to the State Bar of Texas, 1990).

Resolution of Commercial Disputes: Mexico and the United States. American Conference Institute. Los Angeles February 14, 1994) (co-authored with Professor Michael Wallace Gordon).

The Arbitral Procedure. Institute for International Research (Mexico City, April 12, 1994).

Home and Away, The Mexican Legal System Offers Benefits as Well as Pitfalls in Resolving Transborder Disputes, Los Angeles Lawyer, October 1995 (co-authored with Michael L. Owen).

Role of Mexican Courts in the Arbitral Process, Mexico-United States International Dispute Resolution Conference (Mexico City, November 9, 1995).

The International Rules of the American Arbitration Association, 1996.

The Process of Amparo in Commercial Matters. United States-Mexico Law Journal. The University of New Mexico School of Law, Albuquerque, New Mexico, Volume 6, Spring 1998.

Product Liability. United States-Mexico Law Institute Annual Meeting, Guanajuato Mexico, September 1999.

LECTURES:

Several lectures in Mexico and abroad on a variety of legal subjects.

Overview of Selected Mexican Treaties Affecting International Judicial Cooperation. State Bar of Texas. Houston, Texas, 1990.

Seminar on Bilateral Legal Issues Mexico-United States. L. A. Bar Association. Los Angeles, California. 1991.

Doing Business with Mexico seminars, 1993, 1994, New York, Chicago, Los Angeles.

Mexico-United States International Dispute Resolution Conference (Mexico City, November 9, 1995).

The Process of Amparo in Commercial Matters. Sixth Annual Conference of the United States-Mexico Law Institute, Inc, The University of New Mexico School of Law. Albuquerque, New Mexico 1997.

Enforcement of International Arbitral Awards in Mexico. Escriva. Toluca, 1998.

Legal Regime of the Alternative Dispute Resolution Means in the NAFTA Region, in Commercial Mediation and Arbitration in the NAFTA Countries, JurisNet LLC, 1999.

August, 2002.

PUBLICATION LIST.

Ammendements to the Civil Law, Civil Procedure and Mercantile Procedure as of December 27, 1993. Revista de Investigaciones Jurídicas. Escuela Libre de Derecho.

The Arbitral Procedure. Institute for International Research. April 12, 1994. Mexico city.

Overview of Selected Mexican Treaties Affecting International Judicial Cooperation. State Bar of Texas. Houston Texas, 1990. (It was not published, but the article was read at the conference).

Resolution of Commercial Disputes: Mexico and the United States, in Doing Bussines with Mexico-Recent Developments and Innovations: With or without NAFTA, February 14, 1994 Los Angeles. (Co-author with Professor Michael Wallace Gordon).

Home and Away, the Mexican Legal System offers benefits as well as pitfalls in resolving transborder disputes. Los Angeles Lawyer, October 1995. (co-author with Michael L. Owen).

Nature of Arbitration, General Aspects in Mexican Law in Arbitration in Consumer Relations. Procuraduría Federal del Consumidor. Mexico, 1997.

The Arbitral Procedure. Mexican Chapter of the ICC Informative Gazette, January-March 1997.

The Process of Amparo in Commercial Matters. United States-Mexico Law Journal. The University of New Mexico School of Law, Albuquerque, New Mexico, Volume 6, Spring 1998.

Dispute Resolution in Copyright Matters. Barra Mexicana, Colegio de Abogados (Mexican Bar Association), Mexico 1998.

The Process Communications and its Problems Domestic and Foreign (The Modern Means of Communication and the Enforcement of Resolutions). Procedural Law Congress, Universidad Panamericana Campus Guadalajara, 1997. Guadalajara, 1998.

Legal Regime in the the Alternative Dispute Resolution Means in the Nafta Region (Mexican Law) in Commercial Mediation and Arbitration in the NAFTA Countries. JurisNet LLC, New York, 1999.

Product Liability. United States-Mexico Law Institute Annual Meeting, Guanajuato Mexico, September 1999.

Perspective of the Mediation and Conciliation Procedures. National Medical Arbitration Comission. Mexico 1999.

Remedies and Ancilliary Procedures in the New Bankruptcy Law. Instituto de Investigaciones Jurídicas. Universidad Nacional Autónoma de México., Mexico, 2000. (Not published yet).

Enforcement of Foreign Commercial Arbitral Awards in Mexico. International Commercial Arbitration. Mexico, 2000

Advocacy in International Commercial Arbitration in Mexico. 2002 (Not published yet).

Arbitration in Securities Disputes in Mexico. American Bar Association, Disputes Resolution Section, San Antonio, Texas, 2003.

**Código Civil para El Distrito Federal
en Materia Común y para toda La República en Materia Federal**

**Libro 4 - De las obligaciones**

**Titulo Primero - Fuentes de las obligaciones
CAPITULO V**

**De las obligaciones que nacen de los actos ilicitos**

**Articulo 1910.** El que obrando ilicitamente o contra las buenas costumbres cause dano a otro, esta obligado a repararlo, a menos que demuestre que el dano se produjo como consecuencia de culpa o negligencia inexcusable de la victima

# Civil Code for the Federal District in Ordinary Matters
# and for the Republic in Federal Matters

**Book 4 - Of Obligations
First Title - Source of Obligations
CHAPTER V
Liabilities from Illicit Acts (Torts)**

**Article 1910.** Whoever, by acting illicitly or against good customs and habits, causes damage to another shall be obligated to compensate him, unless he can prove that the damage was caused as the result of the fault or inexcusable negligence of the victim.

### Código Civil para El Distrito Federal

### en Materia Común y para toda La República en Materia Federal

**Libro 4 - De las obligaciones**

Titulo Primero - Fuentes de las obligaciones

**CAPITULO V**

**De las obligaciones que nacen de los actos ilicitos**

**Articulo 1915.** La reparacion del dano debe consistir a eleccion del ofendido en el restablecimiento de la situacion anterior, cuando ello sea posible, o en el pago de danos y perjuicios.

**Libro 4 - De las obligaciones**

**Titulo Cuarto - Efectos de las obligaciones - Incumplimiento de las obligaciones**

**CAPITULO I**

**Consecuencias del incumplimiento de las obligaciones**

**Articulo 2114.** El precio de la cosa sera el que tendria al tiempo de ser devuelta al dueno, excepto en los casos en que la ley o el pacto senalen otra epoca.

### Civil Code for the Federal District in Ordinary Matters

### and for the Republic in Federal Matters

**Book 4 - Of Obligations**
**First Title - Source of Obligations**
**CHAPTER V**
**Liabilities from Illicit Acts (Torts)**

**Article 1915.** Damages shall, at the election of the injured party, shall be the restoration of the damaged item to its previous condition if possible or the payment of a liquidated amount for for the damage and loss.

**Book 4 - Of Obligations**
**First Title - Non-compliance with Obligations**
**CHAPTER V**
**Consequences of Non-compliance**

**Article 2114.** The price of the asset shall be the price it would have at the timeit is to be returned to its owner, unless otherwise provided by law or agreement.

# CONSTITUCION POLITICA DE LOS ESTADOS UNIDOS MEXICANOS
## TITULO PRIMERO

### CAPITULO I

#### De las Garantías Individuales

**Artículo 1o.** En los Estados Unidos Mexicanos todo individuo gozará de las garantías que otorga esta Constitución, las cuales no podrán restringirse ni suspenderse, sino en los casos y con las condiciones que ella misma establece.

**Artículo 17.** Ninguna persona podrá hacerse justicia por sí misma, ni ejercer violencia para reclamar su derecho.

Toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes, emitiendo sus resoluciones de manera pronta, completa e imparcial. Su servicio será gratuito, quedando, en consecuencia, prohibidas las costas judiciales.

Las leyes federales y locales establecerán los medios necesarios para que se garantice la independencia de los tribunales y la plena ejecución de sus resoluciones.

Nadie puede ser aprisionado por deudas de carácter puramente civil.

### CAPITULO III

#### De los Extranjeros

**Artículo 33.** Son extranjeros los que no posean las calidades determinadas en el articulo 30. Tienen derecho a las garantías que otorga el capítulo I, título primero, de la presente Constitución; pero el Ejecutivo de la Unión tendrá la facultad exclusiva de hacer abandonar el territorio nacional, inmediatamente y sin necesidad de juicio previo, a todo extranjero cuya permanencia juzgue inconveniente.

# POLITICAL CONSTITUTION OF THE UNITED STATES OF MEXICO

## FIRST TITLE

## CHAPTER I

### Regarding Individual Guarantees

**Article 1o.** All individuals in the United States of Mexico shall enjoy the guarantees granted by this Constitution which can not be restrained or suspended except in the cases and upon the conditions established by the Constitution.

**Article 17.** No person shall take the law into his own hands, nor commit violence in order to exercise his rights.

All persons shall have the right to the administration of justice by tribunals which shall be open for that purpose at such times and under such conditions as established by law, issuing their resolutions in a prompt, complete and impartial manner. Their services shall be free and all judicial costs are, accordingly, prohibited.

Federal and local laws shall establish the means necessary to guarantee the independence of the courts and the plenary enforcement of their decisions.

No one may be imprisoned for debts of a purely civil nature.

## CHAPTER III

### Regarding Aliens

**Article 33.** Aliens are those who do not possess the qualifications specified in Article 30. Aliens shall be entitled to the guarantees granted by Chapter I of Title I of this Constitution; however, the executive branch of the union shall have the exclusive power to immediately expel from national territory and without prior trial, any alien who's continued presence is judged inappropriate.

PRECEDENTS FROM MEXICAN FEDERAL COURTS AND MEXICAN SUPREME COURT REGARDING THE APPLICATION OF THE BILL OF RIGHTS AND ACCESS TO THE COURTS TO FOREIGN NATIONALS.

Ninth Period
Action:      Multi Judge Circuit Court
Source:      National Weekly Judicial Publication and its Official Journal
Volume:      April 1, 1995
Thesis:      8.2nd. 5k
Page:        152

FOREIGNERS, AD CAUSAM LEGALIZATION ACTION FOR RELIEF
When the ordinary judgment from which the demanded acts have recognized the quality on behalf of a foreigner, that only made him legitimate to be recognized as the third injured party in the action for relief supported by his co- party, without the necessity of demanding that they verify their legal status in the country, in conformity with what is arranged by the 5th Article, Section 3, subsection (a) of the relief act, by virtue of the fact that, in all cases, it should be by the power of the Court the Court of Equity that such a requirement is demanded.

SECOND MULTI JUDGE COURT OF THE 8TH CIRCUIT
Constitutional Civil Rights guarantee in revision 461/94. Marcos Lopez Lopez Lena. February 9, 1995. Unanimous votes. Author of opinion: Sergio Novales Castro. Secretary: Arcelia de la Cruz Lugo.

Sixth Period
Action:      3rd Court Room
Source:      Weekly Judicial Publication of the Federation
Volume:      CXXI, 4th Part
Page:        57

FOREIGNERS. THE FAILURE OF VERIFYING THEIR LEGAL STATUS IN THE COUNTRY DOES NOT DEPRIVE THEM OF THE RIGHT TO APPEAR BEFORE THE COURTS.
Article 71 of the General Population Code, and the relevant part, provides that all of the authorities of the Republic, be they federal, local, or municipal, are obliged to demand that foreigners bringing before them issues within their jurisdiction, give prior verification of their legal residence in the country and that their conditions and migratory quality permits them to complete the act or contract that is handled or, in its defect, the special permission of Secretary of Government. Now, the omission of that requirement, does not impair in any way the legitimation of the party to legally demand the completion of an obligation derived from a contract that was reached with full capacity and, hence, the lack of verification of their legal status in the country can only affect what concerns their stay in the same, but not in their right to appear before the courts.

Direct relief 9660/65. Esther Martinez de Torres. July 10, 1967. 5 votes.
Author of opinion:    Mariano Ramirez Vazques.

174351(74449)

Ninth Period
Action:      Multi Judge Circuit Court
Source:      National Weekly Judicial Publication and its Official Journal
Volume:      July 11, 1995
Thesis:      1.9th.T.6K
Page:        234

FOREIGNERS, APPLICATION OF CONSTITUTIONAL RIGHTS FOR LEGITIMATION. The first article of Federal Constitution does not distinguish between Mexican nationals and foreigners providing that: "In the United Mexican States all individuals will enjoy the guarantees that this Constitution grants, which cannot be restricted or suspended, except in the cases and under the conditions that the same establishes." Provision 33 of the Fundamental Law orders that foreigners "Have the right to the guarantees that Chapter 1, Title 1 grants in the current Constitution,. . ." within which the context of the ordinal 17, second paragraph, of the same great document, whose preamble says: "All persons have the right to have justice administered by the courts which will be expedited in order to give it the duration and terms that the laws fix, handing down its resolutions in a quick, complete and impartial manner." All of which it follows that foreigners enjoy the legitimation to appear at the court of rights, without which Article 67 of the General Population code is applicable to them, to the effect that they previously verify their legal status in the country and that their condition and migratory quality permits them to demand or, in its absence the special permission of the Secretary of Government for this end.

9TH MULTI JUDGE COURT IN MATTER OF WORK FROM THE FIRST CIRCUIT

Direct relief 5629/95. Luis Gonzalez and others. June 7, 1995. Unanimity of votes. Author of opinion: Jorge Rafael Olivera Toro and Alonso. Secretary: Ricardo Castillo Munoz.

Fifth Period
Action:      Second court
Source:      Weekly Judicial Publication of the Federation
Volume:      XLIII
Page:        3519

FOREIGNERS, GUARANTEES OF: If it is the truth that Constitutional article 33, provides that foreigners have the right to the guarantees that the Federal Constitution grants, foreigners, like Mexican nationals, are also obliged to comply with the laws of the country, without such compliance involving a violation of those guarantees since the same article 33, authorizes the Executive of the union to make all foreigners whose presence is judged inappropriate to  abandon the National Territory and undoubtedly what is the resistance to comply with the laws of the country.

VOLUME XLIII, Page 3519. Martin Vicente and co-author- March 30, 1935.

174351(74449)

Any official who violates this provision and the Article referred to in the foregoing paragraph shall be immediately turned over to the proper authorities.

Likewise, any attorney or agent hereof who, after an arrest has been made, fails to put the accused at the disposal of the ocurt within the next twenty-four hours, shall himself be turned over to the proper authorities.

If the detention be affected outside the place of residence of the judge, the time necessary to travel from said locality to that where the detention took place shall be added to the period referred to in the foregoing paragraph.

### AMPARO LAW
### (Constitutional Procedure Law)

RULES ARTICLES 103 AND 107 OF THE POLITICAL CONSTITUTION OF THE MEXICAN UNITED STATES.

ARTICLE 1o.- The purpose of "Amparo" proceeding is to resolve all controversy which may arise:

I.- By laws or acts of the authority that violate the individual guarantees.

ARTICLE 4o.- The "Amparo" proceedings can only be petitioned by the interested party to whom the law, international treaty, the ruling causes an injury, who may personally do so, by his attorney or by his counsel for the defense, if its a criminal case.....

ARTICLE  103.-  The Federal courts shall take cognizance of

      I.-  All controversies arising out of laws or acts of the authorities which violate any individual guarantees.

      II.- All controversies arising out of law or acts of the Federal authorities which limit or encroach on the sovereignty of the States.

      III.- All controversies arising out of laws or acts of the State authorities which invade the sphere of action of the Federal authorities.

ARTICLE 107.-  All the controversies mentioned in Article 103 shall be prosecuted by the injured party in accordance with  the judicial forms and procedure which a law shall establish, subject to the following conditions:

      I.- The judgment shall always be so drawn as to affect private individuals exclusively, and shall confine itself to affording them redress in the special case to which the complaint refers; but it shall make no general statement as to the law or arc which formed the basis for the complaint.

      II.- The civil or penal suits, excepting those mentioned in Clause IX hereof, the writ of "amparo" shall be applicable only against final judgments when no other ordinary recourse is available by which these judgments may be modified or amended, if the violation of the law shall have occurred in the judgment or, if committed during the course of the proceedings, objection was duly noted and protest entered against the denial of reparation, and provided further that, if committed in first instance, it has been invoked in second instance as a violation of the law.

      Notwithstanding the foregoing provision, the Supreme Court may, in penal cases, waive any defects in the petition when there has been a manifest violation of the law which has left the petitioner without recourse, or if he has been tried by a law not strictly applicable to the case, provided failure to take advantage of this violation has been merely an oversight.

      III.- In civil or penal suits the writ of "amparo" shall be applicable only if substantial portions of the rules of procedure have been violated, and provided said violation has deprived the petitioner of means of defense.

IV.-  In addition to the case mentioned in the foregoing Clause, the writ of "amparo" may only be petitioned against a final judgment in a civil suit - provided the requirements set forth in Clause II hereof have been complied with - if the judgment be contrary to the letter of the law applicable to the case or to its legal interpretation when it includes persons, actions, defenses or things which have not been the object of the suit, or when all these have not been included either through omission or express refusal.

When the writ of "damage" is sought against mesne judgments, in accordance with the provisions of the foregoing Clause, these rules shall be observed insofar as applicable.

V.-  The execution of a final sentence in penal suits shall be stayed by the authorities responsible if a writ of "amparo" has been sought; for this purpose the petitioner shall, within the period set by law, give notice under oath to the said authorities that said recourse has been interposed, and forward two copies of the petition, one to be delivered to the opposing party and the other filed.

VI.-  The execution of a final judgment in civil suits that only be stayed if the petitioner furnishes a bond to cover damage occasioned thereby, unless the other party gives a counterbond to guarantee that normal conditions and relations previously existing be restored, in the event of the "amparo" being granted, and to pay the corresponding damages.  In such case, the interposition of the recourse of "amparo" shall be made known as provided in the foregoing Clause.

VII.-  If a writ of "amparo" be sought against a final judgment, a certified copy of such portions of the record as the petitioner may desire shall be requested from the authority responsible for the violation; to this shall be added such portions as the other party may desire, and a clear and succinct statement by said authority justifying the act protested; note shall be made of this on the record.

VIII.-  When a writ of "amparo" is sought against a final judgment, the petition shall be brought before the Supreme Court; this petition, together with the copy required by the foregoing Clause, shall be either presented to the Supreme Court or sent through the authority responsible for the violation or through the District Court of the respective State.  The Supreme Court shall render judgment without any other formality or procedure than the petition, the document presented by the other party, and that of the Attorney General or the Public Attorney he may name in his stead, and shall comprise no other legal question than that contained in the complaint.

IX.- When the acts of an authority other than the judicial
are involved, or the acts of the judiciary exercised outside of
the suit or after the termination thereof, or acts committed
during the suit whose execution is of impossible reparation, or
which affect persons not parties to the suit, the writ of "amparo"
shall be petitioned from the District Judge having jurisdiction
over the place where the act protested was committed or attempted;
the procedure in the case shall be confined to the report of the
authority and to a hearing, the call for which shall be issued in
the same order of the court as that calling for the report.  The
hearing shall be held at the earliest possible date, the testimony
of both parties offered, arguments heard, which shall not exceed
one hour for each side, and judgment pronounced at the same
hearing.  The judgment of the District Court shall be final, if
the interested parties do not appeal to the Supreme Court within
the period set by law and in the manner prescribed in Clause VIII.

In case of a violation of the guarantees specified in
Article 16, 19 and 20, recourse shall be had through the appellate
court of the court which committed the breach, or through the
respective District Court.  An appeal against the decision of any
of these Courts may be taken to the Supreme Court.

Should the District Judge not reside in the same locality as
the official guilty of the violation, the judge before whom the
petition of "amparo" should be submitted shall be determined by
law; this judge shall be empowered to suspend temporarily the
execution of the act protested, in accordance with the terms
established by law.

X.- Any official who fails to suspend the execution of the
act protested, when in duty bound to do so, or if he admits an
insufficient or improper bond, shall be turned over to the proper
authorities; the civil an penal liability of the official shall,
in these cases, be a joint liability with the person offering the
bond and his surety.

XI.- If, after the granting of an "amparo", the guilty
official persists in the act or acts against which the petition
for "amparo" was filed, or seeks to evade compliance with the
judgment of the Federal authority, he shall be forthwith removed
from office and turned over for trial to the respective District
Judge.

XII.- Wardens and jailors who fail to receive a duly
certified copy of the order of commitment within the seventy-two
hours stipulated in Article 19, reckoned from the time the accused
is put at the disposal of the court, shall bring this fact to the
attention of the latter immediately upon expiration of this
period; and if the proper order is not receive within the next
three hours, the accused shall be set at liberty.

## CODIGO DE COMERCIO

**LIBRO QUINTO. De los juicios mercantiles.**

(REFORMADO, D.O. 24 DE MAYO DE 1996)
**ARTICULO 1261.** Todos los que tengan conocimiento de los hechos que las partes deben de probar, están obligados a declarar como testigos.

(REFORMADO, D.O. 24 DE MAYO DE 1996)
**ARTICULO 1262.** Las partes tendrán obligación de presentar sus propios testigos para cuyo efecto se les entregarán las cédulas de notificación. Sin embargo, cuando realmente estuvieren imposibilitadas para hacerlo, lo manifestarán así bajo protesta de decir verdad y pedirán que se les cite. El juez ordenará la citación con apercibimiento de arresto hasta por treinta y seis horas o multa equivalente hasta quince días de salario mínimo general diario vigente en el Distrito Federal, que aplicará al testigo que no comparezca sin causa justificada, o que se niegue a declarar.

(REFORMADO, D.O. 24 DE MAYO DE 1996)
**ARTICULO 1269.** Cuando el testigo resida fuera de la jurisdicción territorial del juez que conozca del juicio, deberá el promovente, al ofrecer la prueba, presentar sus interrogatorios con las copias respectivas para las otras partes, que dentro de tres días podrán presentar sus interrogatorios de repreguntas. Para el examen de estos testigos, se librará exhorto en que se incluirán en pliego cerrado, las preguntas y repreguntas.

Cuando se solicitare el desahogo de prueba testimonial o de declaración de parte para surtir efectos en un proceso extranjero, los declarantes podrán ser interrogados verbal y directamente en los términos que dispone este Código.

Para ello será necesario que se acredite ante el tribunal del desahogo, que los hechos materia del interrogatorio están relacionados con el proceso pendiente y que medie solicitud de parte o de la autoridad exhortante.

## MEXICAN COMMERCIAL CODE

**BOOK FIVE. Mercantile court trials.**

(Amended by Decree of April 29, 1996, published May 24, 1996, effective July 23, 1996)
**ARTICLE 1261.** All those who has knowledge of the facts that the parties must prove shall be obligated to testify as witnesses.

(Amended by Decree of April 29, 1996, published May 24, 1996, effective July 23, 1996)
**ARTICLE 1262.** The parties are required to produce their own witness for which they shall be given subpoenas. If, however, it is impossible for them to produce them, they shall so state under oath and request that they be summoned. The judge shall order the summoning of the witness with a forewarning that they shall be subject to arrest for up to 36 hours or fined for the equivalent of 15 days of general daily minimum wage in effect in the Federal District if they fail to appear without good cause or refuse to testify.

(Amended by Decree of April 29, 1996, published May 24, 1996, effective July 23, 1996)
**ARTICLE 1269.** When the witness resides outside of the territorial jurisdiction of the judge that is trying the case, the promoter must, upon offering the evidence, present his interrogatories with the respective copies to the other parties, who within three days may present their interrogatories of cross-examination. For the examination of those witnesses, a letters rogatory shall be delivered in which the questions and cross-examination shall be enclosed in a closed envelope.

When the airing of testimonial evidence or of a statement of a party is petitioned in order to be effective in a foreign process, the deponents may be interrogated verbally and directly in the terms that this Code provides.

For this purpose it shall be necessary that it should be authorized before the court in which the hearing will be held, that the material facts of the interrogatory are related to the pending process and that a petition of a party or of the petitioning court should be produced.

# CHARTER OF THE ORGANIZATION OF AMERICAN STATES

Bogota Conference of American States,
Charter of the Organization of American States;
March 30-May 2, 1948

## PART ONE

## CHAPTER 1: NATURE AND PURPOSES

### ARTICLE 1

The American States establish by this Charter the international organization that they have developed to achieve an order of peace and justice, to promote their solidarity, to strengthen their collaboration, and to defend their sovereignty, their territorial integrity and their independence. Within the United Nations, the Organization of American States is a regional agency.

### ARTICLE 4

The Organization of American States, in order to put into practice the principles on which it is founded and to fulfill its regional obligations under the Charter of the United Nations, proclaims the following essential purposes:

a) To strengthen the peace and security of the continent;

b) To prevent possible causes of difficulties and to ensure the pacific settlement of disputes that may arise among the Member States;

c) To provide for common action on the part of those States in the event of aggression;

d) To seek the solution of political, juridical and economic problems that may arise among them; and

e) To promote, by cooperative action, their economic, social and cultural development.

## CHAPTER II: PRINCIPLES

### ARTICLE 5

The American States reaffirm the following principles:

b) International order consists essentially of respect for the personality, sovereignty and independence of States, and the faithful fulfillment of obligations derived from treaties and other sources of international law;

g) Controversies of an international character arising between two or more American States shall be settled by peaceful procedures;

## ARTICLE 9

The political existence of the State is independent of recognition by other States. Even before being recognized, the State has the right to defend its integrity and independence, to provide for its preservation and prosperity, and consequently to organize itself as it sees fit, to legislate concerning its interests, to administer its services, and to determine the jurisdiction and competence of its courts. The exercise of these rights is limited only by the exercise of the rights of other States in accordance with international law.

## ARTICLE 12

The jurisdiction of States within the limits of their national territory is exercised equally over all the inhabitants, whether nationals or aliens.

# CHARTER OF THE UNITED NATIONS

Signed on 26 June 1945, in San Francisco, at the conclusion of the United Nations Conference on International Organization, and came into force on 24 October 1945.

## CHAPTER 1

## PURPOSES AND PRINCIPLES

### ARTICLE 1

The Purposes of the United Nations are:

1. To maintain international peace and security, and to that end: to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, and to bring about by peaceful means, and in conformity with the principles of justice and international law, adjustment or settlement of international disputes or situations which might lead to a breach of the peace;

2. To develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, and to take other appropriate measures to strengthen universal peace;

### ARTICLE 2

The Organization and its Members, in pursuit of the Purposes stated in Article 1, shall act in accordance with the following Principles.

1. The Organization is based on the principle of the sovereign equality of all its Members.

# CONVENTION ON RIGHTS AND DUTIES
# OF STATES (INTER-AMERICAN)

Convention signed at Montevideo December 26, 1933; Entered into force December 26, 1934; Proclaimed by the President of the United States January 18, 1935.

## ARTICLE 2

The federal state shall constitute a sole person in the eyes of international law.

## ARTICLE 3

The political existence of the state is independent of recognition by the other states. Even before recognition the state has the right to defend its integrity and independence, to provide for its conservation and prosperity, and consequently to organize itself as it sees fit, to legislate upon its interests, administer its services, and to define the jurisdiction and competence of its courts.

The exercise of these rights has no other limitation than the exercise of the rights of other states according to international law.

## ARTICLE 4

States are juridically equal, enjoy the same rights, and have equal capacity in their exercise. The rights of each one do not depend upon the power which it possesses to assure its exercise, but upon the simple fact of its existence as a person under international law.

## ARTICLE 5

The fundamental rights of states are not susceptible of being affected in any manner whatsoever.

## ARTICLE 9

The jurisdiction of states within the limits of national territory applies to all the inhabitants. Nationals and foreigners are under the same protection of the law and the national authorities and the foreigners may not claim rights other or more extensive than those of the nationals.

# INTER-AMERICAN CONVENTION ON GENERAL
# RULES OF PRIVATE INTERNATIONAL LAW

The Governments of the Member States of the Organization of American States, desirous of concluding a convention on general rules of private international law, have agreed as follows:

## ARTICLE 1

Choice of the applicable rule of law governing facts connected with foreign law shall be subject to the provisions of this Convention and other bilateral or multilateral conventions that have been signed or may be signed in the future by the States Parties.

In the absence of an international rule, the States Parties shall apply the conflict rules of their domestic law.

## ARTICLE 2

Judges and authorities of the States Parties shall enforce the foreign law in the same way as it would be enforced by the judges of the State whose law is applicable, without prejudice to the parties' being able to plead and prove the existence and content of the foreign law invoked.

DONE AT MONTEVIDEO, Republic of Uruguay, this eighth day of May, one thousand nine hundred and seventy-nine.

## CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES

**LIBRO CUARTO. De la Cooperacion Procesal Internacional**
**CAPITULO V.  Competencia En Materia De Ejecucion De Sentencias**

**Articulo 568.**  Los tribunales nacionales tendran competencia exclusiva para conocer de los asuntos que versen sobre las siguientes materias:

I. Tierras y aguas ubicadas en el territorio nacional, incluyendo el subsuelo, espacio aereo, mar territorial y plataforma continental, ya sea que se trate de derechos reales, de derechos derivados de concesiones de uso, exploracion, explotacion o aprovechamiento, o de arrendamiento de dichos bienes;

II. Recursos de la zona economica exclusiva o que se relacione con cualquiera de los derechos de soberania sobre dicha zona, en los terminos de la ley federal del mar;

III. Actos de autoridad o atinentes al regimen interno del estado y de las dependencias de la federacion y de las entidades federativas;

IV. Regimen interno de las embajadas y consulados de mexico en el extranjero y sus actuaciones oficiales; y

V. En los casos en que lo dispongan asi otras leyes.


## MEXICAN FEDERAL CODE OF CIVIL PROCEDURE

FOURTH BOOK.  Regarding International Procedural Cooperation

CHAPTER V.  Subject Matter Jurisdiction Over Issuance of Judgments

**ARTICLE 568.**  The national courts shall have exclusive jurisdiction over the following matters:

I.  Land and waters located in the national territory, including the subsurface, airspace, territorial seas and continental shelf involving real rights, rights derived from concessions of use, exploration, or lease of said right;

II.  Resources of the exclusive economic zone or that relate to all sovereign rights over said zone in accordance with the terms of the federal law of the sea;

III.  Acts of authority are related to the internal regime of the state and of the dependencies of the federation and federal entities;

IV. Internal regime of the embassies and consulates of Mexico abroad and their official action; and

V.  In all cases specified by other laws.

# LEY DE NAVEGACION

## DISPOSICIONES GENERALES

## CAPITULO I

## AMBITO DE APLICACION DE LA LEY

**ARTICULO 3o.**- Es de jurisdiccióón federal todo lo relacionado con las víías generales de comunicacióón por agua, la navegacióón y el comercio maríítimos en las aguas interiores y en las zonas marinas mexicanas.

Corresponde a los tribunales federales conocer de las controversias, actos de jurisdiccióón voluntaria y procedimientos especiales o de ejecucióón en asuntos relacionados con las víías generales de comunicacióón por agua, la navegacióón y el comercio maríítimos, sin perjuicio de que, en los téérminos de las disposiciones aplicables, las partes sometan sus diferencias a decisióón arbitral.

**ARTICULO 4o.**- Las embarcaciones y los artefactos navales mexicanos estaráán sujetos al cumplimiento de la legislacióón mexicana, aun cuando se encuentren fuera de las aguas de jurisdiccióón mexicana, sin perjuicio de la observancia de la ley extranjera, cuando se encuentren en aguas sometidas a otra jurisdiccióón.

Las embarcaciones extranjeras que se encuentren en aguas interiores y zonas marinas mexicanas quedan sujetas, por ese solo hecho, a la jurisdiccióón y al cumplimiento de la legislacióón mexicana.

# LAW OF NAVIGATION

## CHAPTER I
### Scope of Application

**ARTICLE 3.-** Everything related to general waterways, transportation, navigation and maritime commerce in interior waters and mexican maritime zones are of federal jurisdiction.

Controversies, actions of voluntary jurisdiction and special or enforcement proceedings in matters relating to transportation by water, navigation and maritime commerce shall be heard by the federal courts without prejudice to, the parties right to submit their differences to arbitration by the terms of applicable provisions.

**ARTICLE 4.-** Vessels and mexican naval appliances are subject to compliance with mexican legislation even when they are outside the jurisdiction of mexican waters without prejudice to the observance of foreign law when said vessels and appliances find themselves in water subject to another jurisdiction.

Foreign vessels that are within interior waters and mexican maritime zones are, for that very reason, subject to the jurisdiction of and compliance with mexican legislation.

## CONSTITUCION POLITICA DE LOS ESTADOS UNIDOS MEXICANOS
### TITULO TERCERO
### CAPITULO IV
### Del Poder Judicial

**Artículo 104.** Corresponde a los tribunales de la Federación conocer:

I. De todas las controversias del orden civil o criminal que se susciten sobre el cumplimiento y aplicación de leyes federales o de los tratados internacionales celebrados por el Estado Mexicano. Cuando dichas controversias sólo afecten intereses particulares, podrán conocer también de ellas, a elección del actor, los jueces y tribunales del orden común de los Estados y del Distrito Federal. Las sentencias de primera instancia podrán ser apelables para ante el superior inmediato del juez que conozca del asunto en primer grado.

II.     De todas las controversias que versen sobre derecho marítimo.


## POLITICAL CONSTITUTION OF THE UNITED STATES OF MEXICO
### THIRD TITLE
### CHAPTER IV
### Regarding the Power of the Judiciary

**Article 104.** The Federal Courts shall have jurisdiction over:

I. Of all controversies of a criminal and civil nature arising out of the application and enforcement of federal laws or out of treaties entered into by Mexico. When such controversies only affect private rights, at the election of the plaintiff, the courts of the States and the Federal District for local matters, may assume jurisdiction.

II. Of all controversies concerning maritime law.

<u>Código Civil para El Distrito Federal</u>
<u>en Materia Común y para toda La República en Materia Federal</u>

**Titulo Septimo – De la prescripcion**
**CAPITULO I**

**Disposiciones generales**

**Articulo 1141.** Las personas con capacidad para enajenar pueden renunciar la prescripcion ganada, pero no el derecho de prescribir para lo sucesivo.

## MEXICAN FEDERAL CODE OF CIVIL PROCEDURE

**Seventh Title – Regarding prescription**
**CHAPTER I**
**General Dispositions**

**Article 1141.**  Any person with the capacity to convey may renounce the limitations period attained, but not the right of adverse possession to accrue in the future.

## CODIGO DE COMERCIO

**LIBRO QUINTO. De los juicios mercantiles.**
**CAPITULO VIII.**

**De las competencias y excepciones procesales.**

**Articulo 1092.-** Es juez competente aquel a quien los litigantes se hubieren sometido expresa o tácitamente.

## MEXICAN COMMERCIAL CODE

**BOOK FIVE. Mercantile court trials.**
**CHAPTER VIII..   Jurisdiction and Procedural Exceptions**

**Article 1092.** The judge to whom the litigants have either expressly or tacitly submitted themselves is competent to try the case.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. B-03-020 |
| | * | |
| PERFORADORA CENTRAL, S.A. de C.V. | * | RULE 9(h) ADMIRALTY |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**AFFIDAVIT OF SERGIO J. ALARCON**
**IN SUPPORT OF**
**MOTION TO DISMISS ON FORUM NON CONVENIENS GROUNDS**

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned authority, notary public in and for the aforesaid state and parish, on the 3rd day of April 2003, personally came and appeared:

**SERGIO J. ALARCON**

who after being duly sworn, did depose and state that:

      1.     I am an attorney licensed to practice law in the State of Louisiana. Having been admitted to practice before this Court *pro hac vice*, I am counsel of record in this case for Perforadora Central S.A. de C.V.("Perforadora"), a corporation organized pursuant to the laws of Mexico, and I was counsel of record in a similar lawsuit previously filed by Submersible Systems, Inc. ("SSI") in the United States District Court for the Southern District of Mississippi, Civil Action No.: 1:98CV251GR.

      2.     In my capacity as an attorney for Perforadora in this matter and the previous litigation, I possess both sufficient knowledge regarding necessary witnesses and documentary

evidence and authority to bind Perforadora to the terms of the conditional dismissal referred to below.

3.      This lawsuit arises out of the detention or alleged seizure in the Mexican port of Dos Bocas by Perforadora of equipment used in the inspection of oilfield pipelines in Mexico for PEMEX. SSI had subcontracted with a Mexican engineering company, Quantum, to provide the inspection equipment and personnel for operations in Mexico.

4.      Quantum had entered into a charter for the use of Perforadora's vessel, the M/V DON FRANCISCO, during the pipeline inspections. The charter ended with Quantum owing both SSI and Perforadora substantial sums of money. Contrary to the terms of the charter, Quantum personnel failed to redeliver the vessel free of the equipment that had been put onboard at the commencement of the charter. Perforadora had to utilize the vessel's crew and other employees to perform the various maneuvers needed to offload the vessel and prepare it for a subsequent charter with PEMEX, the Mexican national oil company.

5.      SSI alleges that the captain of the DON FRANCISCO announced a seizure of the equipment while it was onboard the vessel. This allegation forms the only basis alleged for admiralty jurisdiction in this case. The equipment was subsequently stored, with the permission of PEMEX personnel, at the PEMEX yard in Dos Bocas. Several days later, PEMEX personnel instructed Perforadora to move the equipment at which time various employees of Perforadora were called upon to deal with the equipment.

6.      Several employees of the vessel agent came aboard the vessel while it was in port. The night the vessel docked at the port of Dos Bocas, the agent checked on the immigration documents of SSI's personnel as required by law. Local customs agents were also called to the vessel in connection with the imported equipment of SSI. The crew of the M/V DON

2

FRANCISCO notified Fausto A. Correa, Perforadora's superintendent of the marine division, regarding the foregoing events.

      7.      Mr. Correa, met SSI's president and SSI's marketing manager at the PEMEX yard several days after the vessel arrived at port. The parties dispute the nature of the meeting and what transpired. After PEMEX required Perforadora to move the equipment out of the yard in Dos Bocas, Perforadora contacted its local Mexican counsel who subsequently filed a criminal complaint against Quantum and submitted the equipment to the local Ministerio Publico as part of a criminal investigation of Quantum.

      8.      Dissatisfied with its attempt to obtain its equipment in the proceedings in Mexico, SSI has since 1998, filed two suits against Perforadora in the courts of the United States and has sought substantial damages in the form of lost profits and punitive damages.

      9.      Owners of the company Oceatec, S.A. de C.V. possess knowledge regarding for further work for SSI in Mexico which is relevant to both the issue of damages and the use to which SSI intended to put the equipment once it arrived in the port of Dos Bocas.

      10.     Perforadora intends to obtain trial testimony from the following witnesses, all of whom reside in Mexico;

| | | |
|---|---|---|
| a. | Captain Fernando Toledo Zepeda | - Captain of the M/V Don Francisco owned by Perforadora Central |
| b. | Miguel Angel Bauza Zumaya | - Principal of Oceatec, S.A. de C.V. |
| c. | Juan Antonio de la Torre Magdaleno | - Principal of Oceatec, S.A. de C.V. |
| d. | Nicolas Morales Cruz | - Vessel Agent |
| e. | Juan Luis Angulo Geronimo | - Vessel Agent |
| f. | Jose Patricio Poot Magana | - Customs Agent |
| g. | Oscar Barroso Hondall | - PEMEX Employee |
| h. | Oscar Olivera Villaneuva | - Optimum/SSI Marketing Manager |
| i. | Alberto Mendoza Izucar | - Perforadora Vessel Operations Supervisor |
| j. | Juan J. Gonzales Perez | - First Mate of the M/V Don Francisco |
| k. | Julio Cesar Trinidad Alejandro | - Vessel Agent – Night Manager |
| l. | Jose del Carmen Medina Toledo | - Quantum/Perforadora Employee |
| m. | Victor Fernando Brown Abreu | - Perforadora Machinery Supervisor |

| | | |
|---|---|---|
| n. | Jorge Rodriguez Dominguez | - Helmsman of the M/V Don Francisco |
| o. | Domingo Alberto Canabal Herrera | - Chief Engineer of the M/V Don Francisco |
| p. | Lino Garcia Cruz | - Perforadora Local Mexican Counsel |
| q. | Victor J. Fuentes Perez | - Asst. Engineer of the M/V Don Francisco |
| r. | Jose A. Carrillo Gutierrez | - Engineer of the M/V Don Francisco |
| s. | Raul A. Carrillo | - Helmsman of the M/V Don Francisco |
| t. | Fausto A. Correa Lepe | - Perforadora Supt. of Marine Division |
| u. | Jorge Villalpando | - Vice President of Perforadora |
| v. | Carlos Loperena Ruiz | - Mexican Law Expert |

Witnesses a through k are not employees of Perforadora Central or of any other party to this suit.

11.    I have been authorized by Perforadora to bind Perforadora to the following commitments and enter into such stipulations, consent judgments or other agreements necessary to formalize these commitments in the event, but only in the event, this action is dismissed on grounds of forum non conveniens and SSI agrees to bring no other suit in any court of the United States or of its several states based upon the events alleged in SSI's complaint in this Court:

    a.    Perforadora will consent to the re-filing of the suit against it by SSI in the federal or local courts in Mexico City or in the States of Campeche, Mexico, will waive any objection to the jurisdiction of those courts and will accept or waive service of process issued by any one of those courts;

    b.    Perforadora will waive any defenses it may have to SSI's claims based on the applicable statute of limitations, prescriptive period or laches;

    c.    Perforadora will pay any judgment that may be rendered against it in Mexico in any civil action brought by SSI on the claims it has asserted in this Court; and

4

d.          To insure the enforcement of any judgment obtained by SSI in Mexico, once the drilling rig currently held under seizure by the U.S. Marshal at the Amfels shipyard in Brownsville, Texas is ready to depart this jurisdiction, Perforadora will post security, with either the court in Mexico, this Court, or the United States District Court for the Eastern District of Louisiana, in an amount to be set by the court in Mexico in which SSI re-files the suit.


_____                    _____
NOTARY PUBLIC                                         SERGIO J. ALARCON


My Commission Expires at _death_


word297425

PAGE SHEET

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF MISSISSIPPI
3            SOUTHERN DIVISION
4
5  SUBMERSIBLE SYSTEMS, INC.
                           CIVIL ACTION
6  VERSUS         NO. 1:98CV251RG
                       JUDGE WALTER J.
7                     GEX, III
8  PERFORADORA CENTRAL,
   S.A. de C.V.
9
10
11      30(b)(6) Deposition of Submersible
   Systems, Inc., P.O. Box 1843, Patterson,
12 Louisiana 70392, through its designated
   representative, WOLFGANG BURNSIDE, 207
13 St. Peter Street, Patterson, Louisiana
   70392, taken in the offices of WAGNER &
14 BAGOT, Poydras Center, Suite 2660, 650
   Poydras Street, New Orleans, Louisiana
15 70130-6105, on Tuesday, the 4th day of
   August, 1998.
16
17
   APPEARANCES:
18
19  WAGNER & BAGOT
     (BY: MICHAEL H. BAGOT, JR.)
20    Poydras Center - Suite 2660
     650 Poydras Street
21    New Orleans, Louisiana  70130-6105
22        COUNSEL FOR PLAINTIFF
23
24
25
```

**Page 2**

```
1  MILLING, BENSON, WOODWARD, HILLYER,
   PIERSON & MILLER
2    (BY: NEAL D. HOBSON)
     (BY: SERGIO J. ALARCON)
3    909 Poydras Street
     Suite 2300
4    New Orleans, Louisiana  70112-1017
5        COUNSEL FOR DEFENDANT
6
7  ALSO PRESENT:
8  FAUSTO A. CORREA LEPE
9
10 REPORTED BY:
11  RHONDA C. LOUPE
     CERTIFIED COURT REPORTER
12   REGISTERED PROFESSIONAL REPORTER
13
14
15
16
17        E X A M I N A T I O N   I N D E X
18                                   PAGE
19 EXAMINATION BY MR. HOBSON          6
20
21
22
23
24
25
```

PAGE 3

**Page 3**

| | EXHIBIT INDEX | |
|---|---|---|
| | | PAGE |
| 3 | EXHIBIT NO. 1 | 27 |
| 4 | EXHIBIT NO. 2A | 27 |
| 5 | EXHIBIT NO. 2B | 27 |
| 6 | EXHIBIT NO. 3 | 27 |
| 7 | EXHIBIT NO. 4 | 27 |
| 8 | EXHIBIT NO. 5 | (not attached) |
| 9 | EXHIBIT NO. 6A | 29 |
| 10 | EXHIBIT NO. 6B | 30 |
| 11 | EXHIBIT NO. 7 | (not attached)  31 |
| 12 | EXHIBIT NO. 8 | 46 |
| 13 | EXHIBIT NO. 9 | 120 |
| 14 | EXHIBIT NO. 10 | 122 |
| 15 | EXHIBIT NO. 11 | 133 |
| 16 | EXHIBIT NO. 12 | 139 |
| 17 | EXHIBIT NO. 13 | 142 |
| 18 | EXHIBIT NO. 14 | 149 |

PAGE 4

**Page 4**

```
1          S T I P U L A T I O N
2
3        It is stipulated and agreed by
4  and among counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken for all
7  purposes allowed under the Federal Rules of
8  Civil Procedure, in accordance with law,
9  pursuant to notice;
10       That the formalities of reading
11 and signing are specifically not waived;
12       That the formalities of filing,
13 sealing and certification are specifically
14 waived;
15       That all objections, save those
16 as to the form of the question and the
17 responsiveness of the answer, are hereby
18 reserved until such time as this
19 deposition, or any part thereof, may be
20 used or sought to be used in evidence.
21       RHONDA C. LOUPE, Certified
22 Shorthand Reporter, in and for the
23 State of Louisiana, officiated in
24 administering the oath to the witness.
25
```

61

1    A.    Again, I'm not sure. I think
2  it's covered under seizure.
3    MR. BAGOT:
4        We have attached something, and
5  that may refer to it specifically. It's
6  going to be Item No. 26, I believe.
7  BY MR. HOBSON:
8    Q.    Who is your basic insurance
9  agency?
10    A.    Fisk Insurance here in New
11  Orleans. It's a broker.
12    Q.    Did they ever discuss with you
13  what I will call political risk insurance?
14  That's the normal term used for that type
15  of policy to cover the things I mentioned
16  earlier.
17    A.    Prior to us departing from
18  Mexico, I asked for an insurance policy to
19  make sure my insurance encompassed every
20  eventuality. I trusted him to make sure it
21  was done.
22    Q.    Mr. Burnside, what's your
23  understanding of who has custody of the
24  remaining equipment down there at the
25  present time?

62

1    A.    I don't understand what you
2  mean by "has custody."
3    Q.    Do you understand that whatever
4  equipment is there -- and I'm not sure
5  what's there -- has been turned in to a
6  Mexican tribunal to determine who is
7  entitled to ownership of the equipment?
8    A.    I am aware something of that
9  nature has happened and only very recently,
10  because I was not made aware of it
11  beforehand.
12    Q.    You have retained an attorney
13  in Mexico?
14    A.    Yes.
15    Q.    You indicated earlier that this
16  Attachment 13 to your Rule 26 Disclosure
17  was given to your attorney so that he could
18  hopefully convince the Mexican authorities
19  that this was your equipment?
20    A.    Yes, as well as other
21  documents.
22    Q.    What other documents did you
23  furnish to him?
24    A.    Just the magazine advertising,
25  you know, just little pieces that we had,

PAGE 63

63

1  the brochures, as you can see, my
2  photograph in the brochures, which clearly
3  show that I own the equipment.
4    Q.    Did you attend any hearings in
5  Mexico dealing with your attempts to prove
6  ownership?
7    A.    No.
8    Q.    Did anyone representing your
9  company other than your attorney attend?
10    A.    Other than my attorney?
11    Q.    Yes.
12    A.    No one that was employed by
13  Submersible Systems, no.
14    Q.    Did anyone else acting in some
15  capacity for Submersible Systems, Inc.,
16  attend?
17    A.    There is one person in del
18  Carmen who is just a colleague friend,
19  associate, basically, Mr. Oscar Olivera and
20  his wife both, I believe, testified on my
21  behalf stating that I actually own the
22  equipment.
23    Q.    To whom did they testify?
24    A.    I'm not sure.
25    Q.    Mr. Oscar Olivera and his wife

PAGE 64

64

1  are both citizens of Carmen?
2    A.    I believe so, yes.
3    Q.    He was employed by your company
4  at one time, was he not?
5    A.    He was never employed by
6  Submersible Systems. He was made -- I
7  printed some cards for Mr. Olivera as a
8  marketing manager in the event that if he
9  was awarded any contracts, ROV contracts in
10  Mexico, then he was to be paid on a
11  commission basis only. He had no authority
12  to do anything on behalf of SSI without my
13  permission.
14    Q.    Who is or who was Mr. Olivera?
15  Was he ever employed by Quantum?
16    A.    I know that he was actually
17  employed by Quantum in the early stages of
18  the contract, and I believe he terminated
19  his employment with Quantum on or around
20  the end of the year '96.
21    Q.    So you think it was around
22  December of '96, January of '97, somewhere
23  in that frame?
24    A.    Yes, sir.
25    Q.    After that, was he acting in

65

1 some capacity as marketing representative
2 for you?
3     A.   He was assisting us from time
4 to time.
5     Q.   Doing what?
6     A.   Basically just a liaison. He
7 was a contact. He knew a lot of people;
8 so he would just feed me information.
9     Q.   Did he get any compensation for
10 that from SSI?
11     A.   No, he did not. Although, I
12 did send some of $3,500 into his account,
13 which was supposed to be utilized to try
14 and recover the MAXROV.
15     Q.   Has he ever made any accounting
16 to you for what happened to those funds?
17     A.   I think he bought a car.
18     MR. BAGOT:
19          I think his question is a
20 little -- well, never mind.
21     MR. HOBSON:
22          I think that answers my
23 question, probably.
24 BY MR. HOBSON:
25     Q.   What did you understand he was

66

1 supposed to use that money for?
2     A.   It was to give somebody the
3 money to try and prompt a release.
4     Q.   Do you know who that money was
5 supposed to go to?
6     A.   No. I still don't know, no.
7     Q.   Did Mr. Olivera ever give any
8 report to you of what happened in the court
9 in Mexico when he and his wife went to
10 testify?
11     A.   I believe just verbally, just
12 to inform me that he had actually did that.
13     Q.   What did he report happened?
14     A.   That himself and his wife gave
15 testimony on my behalf, and that was all.
16     Q.   He didn't report any decision
17 by the tribunal there to not release the
18 equipment?
19     MR. BAGOT:
20          Let me just object to the form
21 of the question. I think the earlier
22 testimony was that he wasn't sure to whom
23 he gave testimony. I think now we are
24 suggesting it's the tribunal or court. I'm
25 not sure if this witness knows that as a

PAGE 67

67

1 matter of fact.
2          Subject to that objection, you
3 can respond.
4 BY MR. HOBSON:
5     Q.   I am really trying to find out
6 what Mr. Olivera reported to you.
7     A.   Mr. Olivera was very vague.
8 All I know is that he and his wife both
9 testified on my behalf. That was all,
10 just testified that I owned the equipment.
11 He was just trying to assist me in getting
12 my seized equipment returned to me.
13     Q.   Did you ever talk to
14 Mr. Olivera's wife about that?
15     A.   His wife doesn't speak English,
16 and I do not speak Spanish.
17     Q.   Mrs. Olivera, did she ever do
18 any work for you or SSI in Mexico?
19     A.   None.
20     Q.   Do you have any idea what the
21 basis of her knowledge to testify might be?
22     A.   Just like other people that
23 were involved with the contract. Everyone
24 down there knew that I owned the
25 equipment. I was there personally. I was

PAGE 68

68

1 the owner of Submersible Systems. Two of
2 the three vehicles, the ROVs on board the
3 DON FRANCISCO, were my belongings, my
4 equipment. Nobody disputed that at any
5 time throughout the whole contract.
6     Q.   Did anyone else give testimony
7 or evidence as to your ownership in
8 attempts to get possession of this
9 equipment?
10     A.   I'm not sure. Maybe my legal
11 counsel there, possibly. I'm not sure.
12     Q.   Who is your legal counsel
13 there?
14     A.   Well, it was my legal counsel.
15 They are no longer. It was a Mr. Jamie
16 Herrera and a Mr. Braulio Manzaneque
17 Rodriguez.
18     Q.   Now, you also contacted, I
19 guess, the Representative Tauzin's office.
20 Was it a consulate or ambassador in
21 Mexico? I guess we are looking at
22 documents that identify it.
23     MR. BAGOT:
24          Number 4, I think.
25 BY MR. HOBSON:

**69**

1  Q.   Did you write any letters to
2  Congressman Tauzin?
3  A.   Not to Mr. Tauzin directly.  We
4  wrote a letter to a woman called Jerrye
5  St. Martin, who, I believe, is the
6  secretary of Billy Tauzin.
7  Q.   Where is she located?
8  A.   Gonzales, Louisiana, I believe.
9  Q.   I see the letterhead.  I don't
10  see a copy of your letter to her in here.
11  MR. BAGOT:
12     We haven't been able to locate
13  that yet.  I have a call in to her to see
14  if she has it in her file.
15  BY MR. HOBSON:
16  Q.   What did you request of Jerrye
17  St. Martin?
18  A.   I requested from her that if
19  she could assist me in, A, trying to
20  recover the monies due to me by Quantum;
21  namely, approximately $750,000, which is
22  still outstanding; and, secondly, to
23  recover the equipment which was illegally
24  seized down in Mexico.
25  Q.   But you don't have that letter

**70**

1  at this time?
2  A.   We have it somewhere.  We are
3  trying to get it all together.
4  Q.   Did you have any direct contact
5  with the American consulate in Mexico?
6  A.   Only the one in Merida.  A
7  Mrs. Wendy Wheeler called me over the
8  telephone to inform me that she had talked
9  to, I believe, Fausto Correa and asked
10  about the equipment and if it would be
11  released.
12  Q.   I notice in here that -- I
13  guess this is some type of telex from Wendy
14  Wheeler.
15  MR. BAGOT:
16     It's the last two pages.
17  BY MR. HOBSON:
18  Q.   Or is that an E-mail.  I'm not
19  sure.  It looks like it went to Congressman
20  Tauzin, but I guess it was transmitted to
21  you.
22     Did Wendy Wheeler suggest
23  counsel that you eventually retained.
24  A.   That is why I retained counsel
25  in Mexico City.

**PAGE 71**

**71**

1  Q.   Did you ever talk directly to
2  Wendy Wheeler?
3  A.   Yes.  She actually called me.
4  Q.   Could you, as best you can,
5  tell us what you told her?
6  A.   What I told her regarding?
7  Q.   Regarding everything that you
8  can remember about the conversation.
9  A.   It was a very quick telephone
10  conversation.  She called me just to inform
11  me that she contacted Perforadora Central
12  and, I believe, that she talked to Fausto
13  Correa and that her efforts were fruitless,
14  uneventful.
15  Q.   Do you know if that was before
16  or after this, whether it's a telex or
17  voice mail or whatever?  In this -- you may
18  read it, of course -- she seems to say that
19  she was unable to reach anyone.
20  MR. BAGOT:
21     You want me to try and clear it
22  up from what I can read from these
23  documents, or do you want --
24  MR. HOBSON:
25     Are there more documents?

**PAGE 72**

**72**

1  MR. BAGOT:
2     If you go back to the last two
3  pages, it says at the top, "outgoing,
4  telex, 7/14/97."  Do you see that at the
5  top?
6  MR. HOBSON:
7     Yes.
8  MR. BAGOT:
9     If you refer to the first page
10  of this packet, it said, "Ms. St.Martin -
11  on July 16, I spoke with the Perforadora
12  representative."  Then it goes on to say,
13  "I relayed the information that I obtained
14  directly to Mr. Burnside on July 17th."  So
15  that would suggest that the telex came
16  first, and then she spoke to the
17  Perforadora representative, and then she
18  spoke to Mr. Burnside.
19  MR. HOBSON:
20     These documents, I think, are
21  already attached as Exhibit 4, or at least
22  referred to.
23  BY MR. HOBSON:
24  Q.   What did you retain the lawyer
25  to do?

PAGE 73 - SHEET 19

73

1    A.    A two-pronged approach: first
2 of all, to recover my equipment that
3 Central was in possession of; and,
4 secondly, to recover the funds owed to me
5 by Quantum, a client in Mexico.
6    Q.    Did anyone ever report to you
7 that Perforadora was holding the equipment
8 under the appointment from a Court or
9 tribunal of some sort?
10    A.    I was just made aware of that
11 very lately.
12    Q.    Have your lawyers down there
13 commenced any legal proceeding against
14 Quantum?
15    A.    Communication with my counsel
16 in Mexico City --
17    MR. BAGOT:
18       He wants to -- no, he doesn't
19 want to know what you have communicated to
20 them or they to you. He wants to know if
21 they have commenced any proceedings against
22 Quantum.
23    A.    I don't know if they have.
24 BY MR. HOBSON:
25    Q.    In the documents which your

74

1 counsel produced today, the supplemental
2 disclosure, there is a copy of a letter
3 addressed to Submersible Systems, Inc., on
4 the letterhead of Quantum dated January
5 8th, 1998 signed by Mr. Galvan, who is Luis
6 Miguel Galvan Cavazos.
7       Have you made any attempts to
8 contact Quantum or any of their personnel
9 since July of 1997?
10    A.    Yes.
11    Q.    What attempts have you made?
12    A.    With all the numbers I know,
13 all the telephones numbers and addresses I
14 know, I either telephoned, personally went
15 there; and I have not been able to track
16 anyone down.
17    Q.    Do you know what prompted --
18    MR. BAGOT:
19       I don't think that's accurate.
20 You did speak to Mr. Galvan.
21    THE WITNESS:
22       That was by accident, not by --
23    MR. BAGOT:
24       Yeah. But you need to tell
25 him.

PAGE 75

75

1 BY MR. HOBSON:
2    Q.    Tell us about speaking to
3 Mr. Galvan.
4    MR. BAGOT:
5       He wants to know about any
6 communications that you have had.
7       I think that's your question,
8 is any communication with any
9 representatives of Quantum at any time
10 since July of '97.
11       So you need to tell him about
12 that.
13    A.    I accidentally, fortunately,
14 bumped into Luis Miguel Galvan while I was
15 en route to go down to Mexico City to see
16 my lawyers.
17 BY MR. HOBSON:
18    Q.    Approximately what date?
19    A.    Early January, possibly.
20    Q.    Of this year?
21    A.    Of this year.
22       Do you want to know what the
23 conversation was about?
24    Q.    Yes. If I haven't asked that,
25 certainly.

PAGE 76

76

1    A.    I asked him, you know, if he's
2 ever going to pay me. He said that he's
3 still waiting payment from PEMEX and that
4 he had other contracts they were working
5 for PEMEX in the northern sector. As soon
6 as he got money, he would pay me.
7 Seemingly, the contract for PEMEX that we
8 had undertaken, he said to me that he had
9 submitted all the invoices to PEMEX, which
10 I questioned him as to why and how he
11 managed to do that. As Submersible Systems
12 had not received payment, we sent a letter
13 to Quantum stating that we would retain all
14 the videotapes for the second part of the
15 job until we were paid. And by us
16 retaining these videotapes, we would not
17 allow Quantum to submit the reports to
18 PEMEX and thereby get paid. So in other
19 words, we are trying to apply pressure.
20       So upon telling Luis Miguel
21 Galvan this, this fax that is -- would you
22 reference this as 25?
23    MR. BAGOT:
24       Right.
25    A.    This fax was sent to us, to our

97

1   Q.   Now, the MAXROV, on the other
2   hand, was insured at $165,000?
3   A.   That's correct.
4   Q.   How old was that?
5   A.   How old is it from now or from
6   when we started the contract?
7   Q.   When did you acquire it?
8   A.   Middle of '96.
9   Q.   Did it work on any jobs prior
10  to going to Mexico to work for Quantum?
11  A.   It did two jobs prior to
12  Mexico.
13  Q.   The original cost of that had
14  been how much?
15  A.   For the MAXROV, the MAXROV
16  itself is about 168, approximately. When
17  we were awarded the Mexican contract, I
18  ordered some additional spare parts because
19  logistics would be very difficult, spares
20  from Massachusetts to Mexico.
21  Q.   Mr. Burnside, some of this may
22  seem a little personal to me, but it seems
23  to me under your pleadings that it's
24  justified.
25       What is your own personal

98

1   financial situation at this time?
2   A.   At this moment?
3   Q.   Yes.
4   A.   Grim.
5   Q.   Do you own a house?
6   A.   I don't. My wife does.
7   Q.   Your wife owns a house?
8   A.   Yes, sir.
9   Q.   Where is that house located?
10  A.   In Patterson, Louisiana.
11  Q.   How long have you owned that
12  house or has she owned that house?
13  A.   She's owned that house since
14  the divorce with her ex-husband.
15  Q.   Do you have any idea of the
16  value of that house?
17  A.   Approximately $50,000.
18  Q.   Then the office where your
19  company is located, is that owned or
20  rented?
21  A.   We rent.
22  Q.   Who is that rented from?
23  A.   It's rented from John Chance &
24  Associates.
25  Q.   Are you employed at the present

PAGE 99

99

1   time in any way?
2   A.   No, I am not. I don't have the
3   time to.
4   Q.   How is your time occupied now?
5   A.   Well, at the moment, pursuing
6   this matter as best I can.
7   Q.   How about your wife? Is she
8   employed?
9   A.   By myself.
10  Q.   By SSI?
11  A.   Yes.
12  Q.   She has no other outside job?
13  A.   No.
14  Q.   Do either of you have any
15  accumulated savings?
16  MR. BAGOT:
17       Let me -- I really don't know
18  what relevance this has.
19  MR. HOBSON:
20       Well, Counsel, you have alleged
21  that because of the loss of this equipment,
22  the company can't carry on. It's a Sub S
23  company where money can flow freely in and
24  out. They are the sole shareholders. It
25  seems quite evident that if they were

PAGE 100

100

1   capable of buying new equipment, that the
2   company was capable of buying new
3   equipment. I think we are entitled to go
4   into that.
5   MR. BAGOT:
6       I was just inquiring.
7   BY MR. HOBSON:
8   Q.   Do you have any accumulated
9   savings?
10  A.   Just with Merrill Lynch with
11  some stock. That's all. Everything else
12  has been invested in the company.
13  Q.   What's the value of the stock
14  at Merrill Lynch?
15  A.   Approximately $90,000.
16  Q.   What was the derivation of the
17  money used to buy that stock?
18  A.   That came from savings from
19  previous years. We also have a lot of debt
20  with the bank. A bank loan on the MAXROV,
21  we still owe the bank about $230,000.
22  That's why we had to cease operation. We
23  had no income.
24  Q.   Now, until the SEA OWL was
25  lost, what sort of jobs did you have for

153

WITNESS'S CERTIFICATE

4     I have read or have had the foregoing
5 testimony read to me and hereby certify
6 that it is a true and correct transcription
7 of my testimony with the exception of any
8 attached corrections or changes.

13           --------------------
14           (Witness's signature)

154

REPORTER'S CERTIFICATE

2     I, RHONDA C. LOUPE, Certified
3 Shorthand Reporter, Registered Professional
4 Reporter, do hereby certify that the
5 above-named witness, after having been
6 first duly sworn by me to testify to the
7 truth, did testify as hereinabove set
8 forth;
9     That the testimony was reported by me
10 in computer shorthand and transcribed under
11 my personal direction and supervision;
12     That the preceding 152 pages are a
13 true and correct transcription of the
14 testimony to the best of my ability and
15 understanding;
16     That I am not of counsel, not related
17 to counsel or the parties hereto, and not
18 in any way interested in the outcome of
19 this matter.

22           --------------------------
23           RHONDA C. LOUPE
            CERTIFIED SHORTHAND REPORTER
24           REGISTERED PROFESSIONAL
            REPORTER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

FILED

J.T. NOBLIN, CLERK
BY _____ DEPUTY

SUBMERSIBLE SYSTEMS, INC.                                                    PLAINTIFF

VS.                                                      CIVIL ACTION NO. 1:98cv251GR

PERFORADORA CENTRAL, S.A. de C.V.                                        DEFENDANT

## MEMORANDUM OPINION

This cause is before the Court on the motion to dismiss for lack of admiralty jurisdiction [21-1];

the motion to dismiss for lack of personal jurisdiction [22-1]; and the motion to dismiss for *forum non*

*conveniens* [23-1]; all filed by the defendant, Perforadora Central, S.A. de C.V. [Perforadora],

pursuant to Rule 12 of the Federal Rules of Civil Procedure. Also, before the Court is a motion for

attachment [6-1] pursuant to Rule B of the Federal Rules of Civil Procedure, or, in the alternative, a

motion for attachment [6-1] pursuant to Rule 64 of the Federal Rules of Civil Procedure and

Mississippi Code Annotated § 11-31-1, *et seq.*, filed by the plaintiff, Submersible Systems, Inc.

[Submersible]. After due consideration of the evidence of record, the briefs of counsel, the applicable

law, and being otherwise fully advised in the premises, the Court finds as follows:

### Statement of Facts

Perforadora, a Mexican corporation, entered into a contract with Quantum Incorporated

[Quantum], another Mexican corporation, whereby Perforadora would supply a boat in order for

Quantum to perform oil related work. (Ct. R., Doc. 1, p. 3; Def.'s Mot. to Dismiss Admiralty Juris.,

Exh. A.) Quantum subsequently subcontracted with Submersible, an American corporation, for

underwater surveying services. (Ct. R., Doc. 1, p. 3.) Perforadora sent their boat and crew to

Morgan City, Louisiana to transport Submersible's men and equipment into Mexican waters. (*Id.* at p.

4; Def.'s Motion to Dismiss Admiralty Juris., Correa Aff., p. 5.)

Quantum continually fell behind in payments to Perforadora for the use of Perforadora's vessel. (Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. C, p. 106.) Perforadora's agent, Fausto Correa, stated that he threatened to shut down Quantum's operations on at least three occasions as a result of Quantum's sluggish payments. (Pl.'s Supp. Mem. in support of Attachment, Exh. A, p. 104.) After roughly eight months of work, Perforadora ultimately terminated its contract with Quantum on the basis of Quantum's deficient payments and because Perforadora contracted the vessel's use for another job. (Ct. R., Doc. 1, p. 4; Correa Aff., p. 6.) Once docked in the Port of Dos Bocas, Mexico on June 23, 1997, Perforadora allegedly seized Submersible's equipment without judicial process while the equipment was aboard Perforadora's boat in an alleged retaliation against Quantum for the arrearage owed by Quantum to Perforadora. (Ct. R., Doc. 1, p. 5; Pl.'s Supp. Mem. in support of Attachment, Exh. B, p. 3; Exh. C, p. 2.)

Specifically, Submersible's former employee, Michael Carlisle, stated that when he and his fellow co-worker, Willie Allen, awoke on June 23, 1997, their equipment was padlocked by Perforadora's employees aboard the deck of the vessel; that he and Allen were only allowed to retrieve their personal items; and that they were allegedly ordered to leave the vessel and told not to take Submersible's equipment. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4.) Thereafter, Submersible's employee hitchhiked into a nearby town and notified Wolfgang Burnside, the President of Submersible, about the incident. (*Id.* at p. 4.) Submersible contends that the "tort occurred when Submersible's personnel were denied access to the [equipment] and instructed to leave the vessel without it." (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., p. 6.) As further support, both Carlisle and Allen have asserted that the equipment was marked with Submersible's name and Submersible's rented equipment was marked "Welch."[1] (*Id.* at p. 4.)

------

[1]Correa admits that Submersible's equipment was loaded in Morgan City, Louisiana and marked with big letters "Submersible Systems, Inc." and "Welch Rentals." (Correa Aff., p. 5; Pl.'s

2

Burnside appeared in Mexico on or about June 26, 1997, to retrieve his company's equipment. He was allegedly told by Correa at that time that the equipment was being held until Quantum paid the arrearage owed to Perforadora. (Def.'s Mot. to Dismiss Admiralty Juris., p. 4; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.) Burnside protested the seizure of his company's equipment which was being held under lock and key on a dock in Dos Bocas, and was guarded by armed men. (Pl.'s Supp. Mem. in support of Attachment, Exh. C, p. 2; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.)

Thereafter, on or about July 4, 1997, Perforadora's representative entered into negotiations with Quantum's representatives to resolve the financial dispute between them. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exhs. D-1, D-2, p. 2.) Perforadora admits through an interoffice memorandum from Correa dated July 7, 1997, in which Correa notifies his superior of the July 4, 1997, meeting, that it had possession of Submersible's equipment and that the equipment was being held until Quantum paid Perforadora for the past due services. (*Id.* at pp. 2-3.) The very next day, Perforadora loaded the equipment by boat and transported it to a land based warehouse in Carmen, Mexico. (Correa Aff., p. 6.)

On July 7, 1997, Burnside traveled to Carmen with a Quantum representative, Oscar Olivera, who reiterated that the equipment belonged to Submersible. (Correa Aff., p. 7.) Burnside was allowed to inspect the equipment which he discovered was stored outside and exposed to the elements. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. A, p. 5.) Once again he protested the wrongful seizure, and Correa testified that Burnside was allowed to remove incidental parts of the equipment at that time. (Correa Aff., p. 7; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.) Perforadora, however, retained the bulk of the equipment including the

---

Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. B, pp. 71-72, 74-75, 115-116.)

3

rented "Welch" equipment as apparent leverage for payment from Quantum. (*Id.*)

On or about August 8, 1997, after Perforadora had been notified repeatedly of ownership of the equipment, Perforadora placed the equipment with the Agente Del Ministerio Publico Del Fuero Comun Adscrito a La Primera Delegacion, and have maintained that the Mexican tribunal must decide who owns the equipment. (Correa Aff., pp. 8, 10.)  Burnside appeared with his Mexican attorney to protest the seizure and to show proof of ownership. (*Id.* at p. 9.)  Even after showing proof of ownership, the Mexican court allowed Perforadora to retain the property as a depository apparently for Quantum's reluctance in paying the debt owed Perforadora. (*Id.*; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 7; Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B, p. 2.)  Before bringing the instant action, Burnside attempted to regain the property for nearly a year in the Mexican system, but his attempts were futile. (Pl.'s Supp. Mem. in support of Attachment, Burnside Aff., p. 5.)  Ironically, Perforadora maintains that it "has never claimed ownership of the equipment and has always been willing to turn it over to the true owner." (Correa Aff., p. 9.)

As a result of the alleged seizure of equipment, Submersible alleges that it has had to shut down its business. (Burnside Aff., p. 5.)  Eight of nine employees have been released from employment; Submersible has had to pay Mexican tariffs on the property being located in Mexico longer than six months; and Submersible has had to continue to pay rental fees to Welch. (*Id.* at pp. 5-6.)  Due to these losses, Submersible brings this action not to recover the property that was allegedly seized and is now worthless, but to seek damages and restitution for the alleged act of conversion, theft, or piracy committed by Perforadora on June 23, 1997. (Ct. R., Doc. 1, p. 5.)

Burnside discovered that Perforadora had entered into a contract with Halter Marine, Inc. [Halter], a Mississippi Corporation located in Pascagoula, Mississippi, whereby Halter would build an oil rig at a cost of roughly 65 million dollars to Perforadora. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. A, pp. 103, 105.)  Burnside contacted Halter Marine to confirm the

4

contract and was told that the rig was due for release at some point in 1999. (*Id.* at p. 104.)
Thereafter, Submersible's counsel contacted the Mississippi Secretary of State and were informed that
Perforadora was not registered to do business in Mississippi nor did they have a registered agent for
service of process. (Pl.'s Rebut. in support of Attachment, p. 4.) The attorneys then checked the local
phone directories and found no listing for Perforadora in the State of Mississippi. (*Id.*) Submersible
subsequently brought suit in May of 1998 for attachment under Rule B of the Federal Rules of Civil
Procedure, or in the alternative, Rule 64 of the Federal Rules of Civil Procedure of Perforadora's
property located in Mississippi as a result of Perforadora's alleged "theft, piracy and/or conversion."
(Ct. R., Doc. 1, p. 5.)

Perforadora, however, had three employees stationed in an office located at Halter since
September of 1997. (Correa Aff., p. 2; Pl.'s Supp. Mem. in support of Attachment, Exh. E.) A
phone list from Halter also indicates that two of Perforadora's employees were listed as "Owner
Representatives," and Perforadora states that Alejandro Castro, a registered engineer, was the officer in
charge. (Correa Aff., p. 2; Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp.
21-22; Exh. C.) There is no indication that Burnside or his attorneys attempted to discover the
whereabouts of any Perforadora employees or office located at Halter. (Def.'s Resp. to Pl.'s Supp.
Mem. in support of Attachment, Exh. A, pp. 103-109.) After suit was filed and upon Perforadora
discovering the lawsuit apparently through Halter, Perforadora appointed an agent for acceptance of
process. (Pl.'s Supp. Mem. in support of Attachment, Exh. E.)

Furthermore, Perforadora submitted a brief to the Court on July 31, 1998, in an attempt to
explain Mexican law while using a forum shopping technique to supply an expert's opinion nearly a
month after the fact. (Ct. R., Doc. 33.) Specifically, Perforadora stated to the Court that:

> All parties can be brought within the jurisdiction of the Mexican court. Opinion of ____
> ____. Perforadora is a Mexican corporation that does business in Dos Bocas, Mexico
> and maintains its principal place of business in Mexico City, Mexico. As shown in the

5

opinion of Mexican law expert, _____, the courts of Mexico are open to non-citizens such as SSI, who may in those courts seek redress for the alleged wrongdoing of both Perforadora and Quantum. If any sums remain due from Pemex to Quantum, those funds may be subject to attachment. Mexican law recognizes the tort of conversion and provides an adequate remedy. Opinion of _____, p. ___.

(Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3-4.) The Court notes that Perforadora was required to file the *forum non conveniens* motion by July 31, 1998, and that its Mexican legal expert was unable to deliver his opinion by that date. (*Id.* at p. 3.) The Court further notes, however, that Perforadora did not supply the name of its expert until August 21, 1998, at which time Perforadora submitted the opinion of Carlos R. Loperena pursuant to the Court's order. (Ct. R., Docs. 29, 33.)

Loperena testified that Mexican law allows Submersible a fair and reasonable opportunity to seek their equipment. (Def.'s Mot. to Dismiss on Forum Non Conveniens, Loperena Aff., pp. 3-4.) Further, Perforadora's expert after the fact testified that charges could be brought in Mexico for conversion or theft and that any such action would take no longer than 20 months to conclude.[2] (Loperena Aff., pp. 2, 4.)

In sum, there was no contract between Perforadora and Submersible. The first action to retrieve the property began on August 8, 1997, when Burnside and his attorney presented proof of ownership to the Mexican tribunal. (Correa Aff., pp. 8-10.) Since then, the property remains in the hands of Perforadora as apparent collateral against Quantum. (*Id.* at p. 9; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 7.)

### Standard of Review

A motion for lack of subject matter jurisdiction "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle [it] to relief."

---

[2]Submersible offers the affidavit of Enrique Garza who supplies the Court with the *criminal* act by which Perforadora could be held liable for theft or conversion. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 10.)

6

*Home Builders Assoc. of Miss., Inc., v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (*citing Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).) The case can be properly dismissed for lack of subject matter jurisdiction if the Court lacks statutory or constitutional power to adjudicate the cause of action. *Id.* (citation omitted). "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997) (citations omitted). Furthermore, a *forum non conveniens* determination is discretionary within the district court, and will be overruled only for abuse of discretion. *Command-Aire Corp., v. Ontario Mechanical Sales and Service Inc.*, 963 F.2d 90, 95 (5th Cir. 1992).

Legal Analysis

I.    Subject Matter Jurisdiction

Federal maritime tort jurisdiction is defined by a two-party "locality-plus-nexus" test as follows: (1) "[t]he tort must have occurred on or over navigable waters," and (2) "the wrong alleged must 'bear a significant relationship to traditional maritime activity.'" *Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 167 (5th Cir. 1994) (*citing Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).) The Court will separately analyze the situs test of whether the alleged acts occurred upon land or water and the nexus test of whether "theft, piracy, and/or conversion" of the transportation of cargo or equipment is a traditional maritime activity.

A.    Situs/Locality Test

Perforadora contends that any alleged acts, if proven, occurred upon land because they unloaded the vessel's cargo pursuant to the charter entered into between Quantum and Perforadora. (Def.'s Mot. to Dismiss Admiralty Juris., p. 7, Exhs. B, C, Part II, Clause 2(d).) Perforadora maintains that the right to unload the cargo was lawful. Correa testified, however, that "[w]hen the boat returned to Dos Bocas on June 23, 1997, no representatives of SSI or Quantum were present."

7

(Correa Aff., p. 6.)

Perforadora's argument is in direct conflict with the sworn affidavits of Submersible's former employees, Michael Carlisle and Willie Allen. (Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp. 3-4; Exh. C, p. 2.) A summation of Carlisle's testimony indicates that he and Allen were ordered to leave Perforadora's vessel and that they were not allowed to take Submersible's equipment that was on the deck and padlocked by Perforadora's employees. (*Id.* at Exh. B, pp. 3-4.) Furthermore, Submersible alleges in the complaint that, "[o]n or about June [23], [1997], plaintiff's equipment was seized by Perforadora without judicial process while aboard the DON FRANCISCO at the port in Dos Bocas, Mexico ostensibly as security for or in retaliation against Quantum for arrearages owed by Quantum to Perforadora." (Ct. R., Doc. 1, p. 5.)

As a result of Submersible's description of how the property was moved from Dos Bocas to Carmen, Perforadora states that, "[Submersible's] complaint alleges land-based torts and damages." (Def.'s Mot. to Dismiss Admiralty Juris., p. 8.) Perforadora attempts to persuade the Court that any alleged conversion could only have occurred after the property was located upon land. The Court does not agree. The Court finds that Submersible has presented sufficient proof and facts to warrant a finding that the alleged acts of conversion, theft, or piracy actually occurred over water.

Alternatively, Perforadora relies upon the argument that one of the reasons for locking up the equipment is because it was unsure whether the property belonged to Quantum or Submersible. (Def.'s Mot. to Dismiss Admiralty Juris., p. 4; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 106-107.) As support, the customs forms, as required by Mexican Law, listed Quantum as the importer of the equipment. (Ct. R., Doc. 25, Exh. G; Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. C, pp. 6, 9.) Again, Submersible has sufficiently plead and presented facts to show that Perforadora was aware of the ownership of the equipment at all times. (Ct. R., Doc. 1, p. 6.)

8

Correa admitted that he sent Perforadora's vessel and crew to Morgan City, Louisiana to pick up Submersible's men and equipment, and that the equipment was clearly marked "Submersible Systems, Inc." and "Welch Rentals." (Correa Aff., p. 5; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. B, pp. 71-72, 74-75, 115-116.)  Furthermore, Perforadora and Correa allowed Submersible's employees to retrieve their personal belongings out of the equipment that was detained. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4.)

Both Burnside and Allen state that Correa knew that the equipment belonged to Submersible, yet Perforadora retained possession as leverage against Quantum.  (Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83; Pl.'s Supp. Mem. in support of Attachment, Exh. C, p. 2.)  To further reiterate Perforadora's knowledge of ownership, the evidence indicates that Perforadora was notified of Submersible's ownership by Submersible's former employees on June 23, 1997, by Burnside on June 26, 1997, by Quantum on July 4, 1997, and again by Burnside on July 7, 1997. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4; Exhs. D-1, D-2, p. 2; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83; Correa Aff., p. 7.)  The most telling evidence is an interoffice memorandum written by Correa to his superiors referring to the July 4, 1997, meeting with Quantum officials in which Correa specifically states, "support equipment for inspection of submarine lines, property of Submersible Systems, Inc."  (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exhs. D-1, D-2, p. 2.)  The Court therefore finds Perforadora's lack of knowledge argument suspect, and that Submersible has sufficiently articulated that the alleged action took place upon water.

**B.**    Nexus Relationship to Traditional Maritime Activity

Perforadora and Submersible did not have a contract for the transportation of Submersible's men or equipment, nor did the parties supply the Court with a bill of lading.  Perforadora did contract, however, with Quantum to supply a vessel to transport Submersible's men and equipment into waters

9

located outside Mexico. (Ct. R., Doc. 1, p. 3; Def.'s Mot. to Dismiss Admiralty Juris., Exh. A.) The United States Supreme Court sets out a two-part test concerning nexus relationship as follows: (1) "whether the incident has a potentially disruptive impact on maritime commerce;" and (2) whether "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (*quotation marks and internal citations omitted*.)

Perforadora argues that there is no disruptive impact on maritime commerce. (Def.'s Mot. to Dismiss Admiralty Juris., p. 10.) Perforadora reasons that this case does not involve the collision of vessels, goods under bills of lading, marine insurance, or personal injuries which are the usual bases for maritime law suits. (*Id.*) The Court, however, finds that there is a sufficient impact on maritime commerce occurring when underwater surveying equipment was allegedly converted to Perforadora's own use thereby: (1) preventing Submersible from completing other underwater surveying contracts; and (2) hindering Welch Rentals from further rentals of oceanographic equipment. Further, the Court finds that the carriage of equipment is similar to the carriage of goods under a bill of lading in that Perforadora contracted with Quantum to transport the equipment in question prior to the alleged location where the act of piracy was ultimately committed.

Concerning whether there is a substantial relationship to traditional maritime activity, Submersible offers support that conversion committed upon the high seas is a maritime activity. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., p. 7.) Specifically, the Second Circuit has stated, "[t]he reason for the exercise of admiralty jurisdiction is that conversion is a tort, and a tort so elementary in its nature that it may be maintained even against an infant (*Vasse v. Smith*, 6 Cranch, 226, 3 L.Ed.207), and if that tort is committed on navigable waters, admiralty has jurisdiction." *The Lydia*, 1 F.2d 18, 23 (2nd Cir. 1924).

In a similar case, the seller of wheat contracted with a buyer, whereby the buyer chartered a

10

third party to supply a vessel, POLLUX, for the carriage of the wheat to the buyer's destination. *Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 85 (5th Cir. 1979). After the third party vessel owner placed a maritime lien on the wheat located aboard the vessel, the Fifth Circuit stated, "whatever rights to payment for the use of the POLLUX [third party vessel owner] may have had against [buyer], did not run against [seller] or its wheat." (*Id.* at p. 87.) The Court found that the third party vessel owner committed conversion as a result of an "unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner." (*Id.*) (*citations omitted.*) Thus, even though Perforadora and Submersible did not have a bill of lading for the carriage of goods, Perforadora allegedly converted Submersible's equipment in retaliation against Quantum for the arrearages owed by Quantum to Perforadora. (Ct. R., Doc. 1, p. 5; Pl.'s Supp. Mem. in support of Attachment, Exh. B, p. 3; Exh. C, p. 2.)

Alternatively, Perforadora argues that underwater surveying of pipelines are collateral to the oil and gas industry and fall outside the admiralty jurisdiction of this Court. (Def.'s Mot. to Dismiss Admiralty Juris., p. 10.) (*citing Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 955 (5th Cir. 1988).) The Courts, however, have continuously held that "[a]n agreement to transport people and supplies in a vessel to and from a well site on navigable waters is clearly a maritime contract." *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692, 696 (S.D. Tex. 1997) (*citing Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231-1232 (5th Cir. 1985); *see also, Hale v. Co-Mar Offshore Corp.*, 588 F. Supp. 1212, 1215 (W.D. La. 1984); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1111 (5th Cir. 1982) ("transporting person[s] over the seas is a maritime-type function").)

In *Grubart*, 513 U.S. at 541, the Court found that "[t]he substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." The Court finds that Perforadora performed a traditional maritime activity of transporting Submersible's men and

11

equipment much like the transportation of goods as described above, therefore, satisfying the substantial relationship test and conferring admiralty jurisdiction upon the Court.

Perforadora's final argument is that "the admiralty jurisdiction of the federal courts may not extend into the territorial waters of a foreign nation." (Def.'s Mot. to Dismiss Admiralty Juris., p. 12.) This proposition is simply not true. The Fifth Circuit has exercised jurisdiction over a personal injury action which occurred in the United Arab Emirates' territorial waters. *Coats v. Penrod Drilling*, 61 F.3d 1113 (5th Cir. 1995). Additionally, another court has held:

> [t]he term 'navigable waters' is not anywhere expressly limited to the navigable territorial waters of the United States and the high seas. . . The fact that the navigable waters at issue here are not within the territorial waters of the United States but are foreign territorial waters is only relevant to the determination of whether U.S. maritime law should be applied, not whether the tort is a maritime tort.

*Sevison v. Cruise Ship Tours, Inc.*, 1997 WL 530267, p. 6 (D.V.I. 1997). That court rejected the proposition that foreign territorial waters are outside the federal court's admiralty jurisdiction but found the fact relevant concerning what law should be applied. (*Id.*) The Court therefore finds that admiralty jurisdiction may extend into territorial waters of foreign nations. The Court further finds that Perforadora's motion to dismiss for lack of admiralty jurisdiction should be denied.

II. *Forum Non Conveniens*

The United States Supreme Court has stated, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843 (1947). There are three steps in a *forum non conveniens* analysis. *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir. 1993) The first step is whether there is an alternate forum. (*Id. citing Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981).) If so, then the second and third steps involve an evaluation of private and public interest factors. (*Baumgart*, 981 F.2d at pp. 835-837.)

Additionally, Perforadora bears the burden of persuasion which extends to all the elements of

12

the *forum non conveniens* analysis. *In re Air Crash Disaster Near New Orleans, La. v. Pan American World Airways, Inc.*, 821 F.2d 1147, 1164 (5th Cir. 1987), *vacated on other grounds, Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989). If Perforadora meets its initial burden of establishing an adequate and available forum, then it must prove that the "private and public interests weigh heavily on the side of trial in the foreign forum." (*Id.*) Consequently, Perforadora "must provide enough information to enable the district court to balance the parties interests." (*Id.* at p. 1165 *citing Reyno*, 454 U.S. at p. 258.) The alternate forum, private interest, and public interest factors are individually analyzed below.

### A.    Alternate Forum

For an alternate forum to be feasible, it must be both available and adequate. (*Baumgart*, 981 F.2d at p. 835.)

> A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum . . . A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly . . . even though they may not enjoy the same benefits as they might receive in an American court.

(*Id. citing In re Air Crash*, 821 F.2d at p. 1165.) The United States Supreme Court further states, "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." (*Reyno*, 454 U.S. at p. 254.)

### 1.    Available Forum

"The defendant's submission to the jurisdiction of an alternative forum renders that forum available for purposes of forum non conveniens analysis." *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728 (5th Cir. 1990) (*citations omitted*.) As a result of Perforadora's residence in Mexico and their arguments that Mexican law is applicable, Perforadora is apparently willing to submit to the jurisdiction of the Mexican courts. (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3-4.) Perforadora's

13

expert, Loperena, claims that the courts in Mexico have the authority and power to subpoena all of the witnesses located in Mexico under Articles 1261 and 1262 of the Mexican Code of Commerce. Loperena further provides the Court with the relevant provisions. (Loperena Aff., pp. 2-3.) The Court therefore finds that an alternate forum is available.

    2.   <u>Adequate Forum</u>

Perforadora continually asserts that the equipment in question has been turned over to the Public Attorney and, as a result, Mexico is the proper forum to resolve any dispute over the ownership of the equipment. (Loperena Aff., pp. 3-4; Correa Aff., pp. 8-9.) As previously stated, Submersible attempted to regain its property through the Mexican court system. Because Submersible's efforts were to no avail even after showing proof of ownership, and even though Perforadora had knowledge of the true ownership, Submersible brought this action. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B, p. 2; Correa Aff., pp.8-9; Ct. R., Doc. 1.)

Perforadora made the blind assertion on July 31, 1998, that "Mexican law recognizes the tort of conversion and provides an adequate remedy." (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 4.) In support, Loperena makes a general conclusion that "the laws of Mexico provide for recovery for 'theft, conversion or piracy' in the event such claims could be proved" and that "SSI . . . would have an adequate remedy under Mexican law." (Loperena Aff., p. 4.) Perforadora, however, fails to provide the Court with applicable provisions under Mexican law which purport to allow Submersible a civil action for "theft, piracy, and/or conversion."

On the other hand, Submersible offers the declaration of their legal expert, Enrique Garza, who supplies the Court with the criminal act by which Perforadora could be held liable for theft. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B.) The Court finds that a criminal remedy is clearly inadequate, effectively leaving Submersible with no remedy at all. (*See Piper*, 454 U.S. at p. 254 n. 22 *citing Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445 (Del. 1978).)

14

The Court finds that Perforadora has failed to establish that the Mexican court system would provide an adequate civil remedy of recovery to Submersible. The Court further finds that an adequate alternate forum does not exist and the defendant's motion for *forum non conveniens* should be denied. In an abundance of caution, however, the Court will address and balance the relevant factors of public and private interests in order to avoid the examples of abuse of discretion as outlined by the Fifth Circuit. (*In re Air Crash*, 821 F.2d 1147 at pp. 1166-1167.)

B.    Private Interests

"If the court determines that there is an available and adequate forum, then the court must consider the private interest factors." (*Quintero*, 914 F.2d at p. 727.) The factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; (3) probability of an opportunity to view the premises, if view would be appropriate to the action; and (4) other factors affecting the ease, speed, and expense of trial or the enforceability of a judgment if obtained. (*Baumgart*, 981 F.2d at pp. 835-836 *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).) To the list, the Fifth Circuit has added that deference to be given to the plaintiff's choice of forum. (*In re Air Crash*, 821 F.2d at p. 1165.)

Perforadora maintains that the action occurred in Mexico; that possible witnesses from Quantum, the Mexican Department of Customs, and Pemex[3] are located in Mexico; and that documents and the equipment in question are in Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.) Submersible, however, claims that testimony by Pemex employees is not needed because the relationship between Quantum and Pemex has no bearing on the claim of Submersible against Perforadora. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 6.)

---

[3]Pemex is a Mexican government owned oil company for which Quantum was working.

15

Submersible further argues that testimony of Mexican custom officials is unnecessary because the custom documents have already been produced to the Court and the legal experts have attested to their relevance. (*Id.*) Most importantly, Correa stated that the relevant Quantum representatives are nowhere to be found even though they allegedly reside in Mexico. (*Id.* at Exh. D, pp. 111-112; Correa Aff., pp. 10-11.)

Perforadora's only independent witness, Nicolas Morales, is a third-party marine agent who represented Quantum in Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.) Submersible submits that any Mexican witnesses that may not be available to give depositions or trial testimony in the United States, "can be required to give testimony in Mexico by Letters Rogatory as per the Inter-American Convention on the Taking of Evidence Abroad which was ratified by Mexico." (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 11; Loperena Aff., p. 2.) Submersible's independent witnesses include their former employees, Allen and Carlisle, who are willing to travel to a United States court, and Welch employees who are located in the United States. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 4-5; Exh. B, p. 2.)  In further support, there is no indication that any outstanding documents are not within the control of the Court. The Court, therefore, finds that the relative ease of access to sources of proof favor Submersible.

Concerning the second factor, Perforadora argues that witnesses not employed by Perforadora or Submersible, and hence not subject to the control of the parties, will be needed to testify at trial.[1] (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.)  Both Mexico and the United States courts have the power to compel witnesses only in their respective jurisdictions.  As noted above, Perforadora's possible independent witnesses are either irrelevant, cannot be found, or could be

---

[1]Specifically, Perforadora continues to maintain that Pemex employees, custom officials, and former Quantum employees who cannot be found, are possible witnesses whom neither party can compel to testify. (*Id.* at p. 6.)

16

deposed in Mexico pursuant to the process described above.  Considering Submersible's former employees apparent reluctance to travel to a Mexican court and the possibility of discovering the whereabouts of the Quantum witnesses, the Court finds that the compulsory process factor is neutral on behalf of both parties.

The Court finds the need to view the premises irrelevant because the equipment was either seized and converted while aboard Perforadora's vessel or it was not.  Any possible argument of a need to view the equipment is only relevant to mitigation of damages in the unlikely probability that Submersible's equipment is eventually returned.  Upon the unforseen return of the equipment, the calculation of damages could be provided to the Court by experts.  The Court finds the third factor neutral.

Perforadora contends that the ease, speed, and expense of trial are less burdened in Mexico on two bases:  (1) Perforadora's inability to implead Quantum as a third party, and (2) the cost of obtaining and translating evidence.  (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 6-7.) Perforadora reasons that a Mexican court can implead Quantum with "[t]he possibility of attaching any amounts due to Quantum by Pemex, or of attaching other property of Quantum located in Mexico." (*Id.*)

As previously stated, the present action by Submersible is against Perforadora for the alleged conversion that occurred on June 23, 1997, and is not an action to recover the equipment itself; nor is this an action to recover any amounts from Quantum by either party.  Perforadora's inclusion of Quantum for the purposes of obtaining a possible judgment for the unpaid amount owed by Quantum to Perforadora has no bearing on whether Perforadora committed an admiralty tort against Submersible. The Court finds that Quantum is not a necessary third party for the purposes of this action which would affect the ease, speed, and expense of this trial.

Concerning the translation of testimony and evidence from Spanish into English, the proof

17

shows that custom and court documents have already been translated into English and that Correa has already testified in English. (Ct. R., Doc. 25, Exhs. A--H-5; Correa Aff., p. 3; Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. D.)  Translation would be needed to facilitate Submersible in either a Mexican or United States court while Correa is apparently fluent in English and will be acting on behalf of Perforadora at a trial in this court.  (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 13; Correa Aff., p. 3.)

Perforadora offers cases where the courts have found the need for translation overwhelming, however, this Court finds that the only translation required would be of Perforadora's possible Spanish speaking witnesses.  Consequently, the Court finds that while translation from Spanish to English will affect the expense and speed of trial, the factor favors Submersible.

Perforadora does not address the factor that Submersible could obtain an attachment in Mississippi as is the case in Mexico, if a judgment were obtained in the jurisdiction of the United States or Mexican courts, respectively.  (Loperena Aff., p. 3.)  Perforadora has property located in both Pascagoula, Mississippi, and has its principal place of business in Mexico City, Mexico.  (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 1-3.)  Furthermore, the Court finds that there is a strong presumption in favor of Submersible's choice of forum as a result of it being an American corporation. (*See Baumgart,* 981 F.2d at p. 836 n. 12 *citing Reyno*, 454 U.S. at p. 256.)  The Court finds that the private factors are either neutral or favor Submersible.

C.   <u>**Public Interest Factors**</u>

If the private interests do not favor dismissal, the Court is mandated to consider the public interest factors. *Empresa Lineas Maritimas v. Schihau-Unterweser*, 955 F.2d 368, 376 (5th Cir. 1992) (*citing In re Air crash*, 821 F.2d at p. 1165.)  As noted above, however, the Court finds that an alternative and adequate forum does not exist in addition to the private interest factors favoring Submersible.  The Court will nevertheless consider the public interest factors which include: "(1) the

18

administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the interest in having the trial of a diversity case in the forum that is familiar with the law that must govern the action; (4) the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." (*Baumgart*, 981 F.2d at p. 827 *citing In re Air Crash*, 821 F.2d at pp. 1162-1163; *citing Gulf Oil*, 330 U.S. at p. 508.)

Perforadora asserts that the Mexican forum is not congested and could handle this matter in an expeditious manner. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 8.) Specifically, Loperena is of the opinion that an average commercial case in Mexico would take no longer than 20 months to conclude. (Loperena Aff., p. 2.) The Court, however, finds that the docket in the Southern District of Mississippi is no more congested than the docket of any Mexican tribunal and that the case can be heard in this Court by no later than February of 1999. The Court therefore finds that the administrative factor favors Submersible.

Concerning the local interest factor, Perforadora argues that the events occurred in Mexican territorial waters and that most of its witnesses reside in Mexico, thereby justifying having the controversy resolved in Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 9.) Perforadora goes on to state, "Mexican courts have an even greater interest in assessing the liability, if any, of Perforadora given the *potential criminal allegations* of conversion alleged by [Submersible]." (*Id.*) (emphasis added.) Perforadora's assertion that Submersible has the option of bringing criminal charges against Perforadora only reiterates the proposition that this Court has previously made: that there is no adequate forum in Mexico to address the civil remedy of conversion for which Submersible brings this action. While the actions may have occurred in Mexican territorial waters, there is no local interest in having the dispute resolved in Mexico and there is a strong interest for the United States in ensuring that its citizens are compensated for harms done to them. (*See Baumgart*, 981 F.2d at p 837

19

n. 15.)

"Choice of law is one of the *Gulf Oil* public interest factors; therefore choice of law is an integral part of the *forum non conveniens* determination." 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 6-13 at pp. 284-285 (2d ed. 1994); (*See also Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 880 (5th Cir. 1987).) In order to determine the third and fourth public factors described above, the choice of law must first be determined. Under the *Lauritzen-Rhoditis*[5] test, the following factors are to be considered: "(1) the place of the wrongful act, (2) the law of the flag; (3) allegiance or domicile of the injured party; (4) allegiance of the ship owner; (5) place of contract; (6) accessibility of a foreign forum; (7) law of the forum; (8) shipowner's base operations." (*Quintero*, 914 F.2d at p. 730.)

The act allegedly occurred in Mexican territorial waters while aboard a Mexican owned vessel bearing a Mexican flag with its principal base of operations in Mexico City, Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3, 10-11.) The neutral factor is that there is no contract between the parties. As the injured party, Submersible's allegiance is to the United States. As previously stated above, the law of the Mexican forum is totally inadequate to the action complained of, thereby, alienating the accessibility of a foreign forum. The Court therefore finds that American maritime law should apply where the parties have not contracted to submit to an alternate forum and the appropriate law is that of the United States.

The final public interest factor is inapplicable because no jury trial has been prayed for and this cause of action is to be decided by the Court. (Ct. R., Doc. 1.) The Court finds that the public interest factors favor Submersible. As a result of an inadequate alternate forum and both the private and public

---

[5]The test is derived from *Lauritzen v. Larsen*, 345 U.S. 571 (1953) and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970), and initially applied to actions involving injuries to foreign seaman under the Jones Act.

20

interest factors favoring Submersible, the Court finds that Perforadora's motion for *forum non conveniens* should be denied and jurisdiction should be retained by the Court.

III.    <u>Rule B Attachment</u>

As a result of the Court having admiralty jurisdiction, Submersible seeks a Rule B attachment of Perforadora's property located in Mississippi in order to satisfy any possible judgment that may be granted and because Perforadora's oil rig is due for completion in April of 1999.  (Ct. R., Doc. 6.) Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims provides:

> With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or the plaintiff's attorney that, to the affiant's knowledge, or to the best of the affiant's information and belief, the defendant cannot be found within the district. The verified complaint and affidavit shall be reviewed by the court and, if the conditions set forth in this rule appear to exist, an order so stating and authorizing process of attachment and garnishment shall issue.

(FED.R.CIV.P. B.)  Rule B essentially applies in cases where a maritime lien exists for a maritime tort which would support an *in personam* claim against the defendant when the defendant is not found within the district, but has property within the district.  *See Jarvis, An Introduction to Maritime Attachment Practice Under Rule B*, 20 J. Mar. L. & Com. 521, 526-530 (1989).

As previously stated, Perforadora's property is located at Halter.  (Ct. R., Doc. 1.)  A Rule B attachment, however, can be granted only if Perforadora "cannot be found within the district" when Submersible initiated the action.  *Heidmar, Inc. v. Anomina Ravennate Di Armamento SP.A. Of Ravenna*, 132 F.3d 264, 268 (5th Cir. 1998).  "A defendant is present in the district if 1) the defendant can be found within the district in terms of jurisdiction, and 2) the defendant can be found within the district for service of process."  (*Id. citing LaBanca v. Ostermunchner*, 664 F.2d 65, 67 (5th Cir 1981).)  "If the answer to both questions is affirmative, then the defendant can be found "within the

21

district" for the purposes of Rule B(1), and the process of attachment and garnishment is not available to the plaintiff." (*Id.* at p. 267.) Due to Perforadora's motion to dismiss for lack of personal jurisdiction and its relation to the first requirement cited above, the Court will discuss the two requirements separately.

A.    Personal Jurisdiction

Perforadora contradicts itself in an attempt to escape a Rule B attachment by claiming that it is "present" within the state while maintaining that the Court lacks personal jurisdiction for state purposes. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 6; Def.'s Mot. to Dismiss Personal Juris., pp. 5, 9-10.) Perforadora admits that "the presence of the rig in the district itself is sufficient to satisfy general personal jurisdiction in the district for purposes of Rule B." (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 6.) Perforadora, however, maintains that "Rule B is not subject to common law due process constraints." (*Id.*)

In order to resolve any doubt, the Mississippi minimum contacts statute for nonresident defendants provides:

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

MISS. CODE ANN. § 13-3-57. As previously discussed, Perforadora is doing business within Mississippi by paying a Mississippi corporation for the construction of an oil rig, by providing three full-time employees for oversight of that project, and by maintaining an office in Pascagoula since September of 1997. (Correa Aff., p. 2; Pl.'s Supp. Mem. in support of Attachment, Exh. E.)

Additionally, Perforadora stated that they are "present within the Southern District of

22

Mississippi by virtue of an office located at the Halter Marine shipyard in Pascagoula." (Pl.'s Resp. to Def.'s Mot. to Dismiss Personal Juris., Exh. A.) The Court finds that Perforadora maintains sufficient contacts with Mississippi so as to be "found within the district." Alternatively, the Court finds that the contacts confer personal jurisdiction in the subsequent event that a state law attachment is granted. The Court therefore finds that Perforadora's motion to dismiss for lack of personal jurisdiction should be denied.

> B.     Service of Process

In the memorandums of law provided to the Court, Submersible mentions that its counsel conducted a search for Perforadora in the State of Mississippi and were informed that: (1) Perforadora had no phone listing in either the 228 or 601 area codes; (2) that Perforadora was not licensed to do business in the State of Mississippi; (3) that Perforadora had no agent for service of process appointed within the state; and (4) that Perforadora did not maintain an office within the Southern District of Mississippi. (Pl.'s Rebut. in support of Attachment, p. 4; Pl.'s Supp. Mem. in support of Attachment, pp. 3-4.) After a careful review of the record, the Court finds that Submersible inadvertently failed to file an affidavit in the Court record verifying that the defendant could not be found within the district. Submersible consistently refers to the affidavit of Michael H. Bagot, Jr., one of the attorneys representing Submersible, allegedly filed on March 27, 1998, in connection with the complaint. (*Id.*) Because Rule B requires an affidavit in the record, and there being no affidavit found, the Court finds that a Rule B attachment should be denied.

Alternatively, even with an appropriate affidavit, Submersible's motion for a Rule B attachment must fail. Perforadora must be "susceptible to service" in order to be found within the district. (*LaBanca*, 664 F.2d at p. 68.) Rule 4(h) of the Federal Rules of Civil Procedure provides that service upon a corporation may be made by "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to

23

receive service of process." (FED.R.CIV.P. 4(h)(1).) The Fifth Circuit has stated, "[i]f a corporation's business is so substantial as to render the corporation amenable to suit in the state, its principal agent in charge of activities within that state meets the test of a 'managing agent.'" *Lone Star Package Car Co., Inc. v. Baltimore & O.R. Co.*, 212 F.2d 147, 152 (5th Cir. 1954); (*See also, Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582-583 (2nd Cir. 1963).)

Perforadora maintains that its chief operating engineer, Castro, is the officer in charge of the construction at Halter and that he resides in South Mississippi. (Correa Aff., p. 2; Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp. 21-22.) Because the Court finds that personal jurisdiction exists over Perforadora, it follows that the Court finds that Castro was a managing agent within the meaning provided by Rule 4(h) and *Lone Star*.

Even though Submersible discovered a rig being constructed by a Mississippi corporation on behalf of Perforadora, Submersible and its counsel failed to diligently search for an office or employees of Perforadora located within the state in order to effect service. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 7, Exh. A, pp. 103-109; *See Jarvis*, 20 J. Mar. L. & Com. 521 at pp. 521, 531 n. 31, 52 (1989); *Unites States of America v. CIA. Naviera Continental S.A.*, 178 F. Supp. 561, 565 (S.D.N.Y. 1959).) If Submersible had diligently searched, the Court finds that it would have discovered that Perforadora was within the district in order to serve process through Castro. The Court therefore finds that Submersible's motion for a Rule B attachment should be denied.

The argument proposed by Submersible, however, is that Perforadora appointed an agent for service of process on June 10, 1998, after the suit was filed. (Pl.'s Supp. Mem. in support of Attachment, p. 6; Exh. E, p. 1.) They analogize a Fifth Circuit case where the defendant appointed an agent for service of process within 15 minutes of the complaint being filed; the Court reasoned that the sole purpose was to defeat a Rule B attachment. (*Heidmar*, 132 F.3d at p. 268.) The distinguishing difference, as discussed above, is that Perforadora actually had an agent who could have been served

24

with process on the date that Submersible filed the complaint.  The Court therefore finds that Submersible's argument is without merit.

IV.    Federal Rule 64/State Law Attachment

Submersible alternatively moved for an attachment under state law pursuant to Rule 64 of the Federal Rules of Civil Procedure.  (Ct. R., Doc. 6.)  Rule 64 allows the Court to use  state law where the district court is held in order to grant an attachment of collateral for any possible judgment to Submersible.  (FED.R.CIV.P. 64.)  The relevant state law provisions for attachment of a nonresident defendant is Mississippi Code Annotated § 11-31-1, *et seq*.  The conversion of the equipment in question is allegedly worth $600,000 and Submersible's suit for damages is $3,500,000.  (Ct. R., Doc. 1.)  The Court therefore finds that Submersible can attach Perforadora's property pursuant to state law upon proper application to the Court and the posting of a $1,000,000 bond.

Conclusion

For the above reasons, the Court finds that Submersible has successfully alleged conversion of equipment committed over navigable waters thereby conferring admiralty jurisdiction upon the Court. Further, the Court finds that an adequate alternative forum does not exist, and that both private and public interest factors favor Submersible.  The Court further finds that Perforadora could be found within the district which nullifies a Rule B attachment, because personal jurisdiction exists over Perforadora and the fact that Perforadora's managing agent could have accepted process on behalf of Perforadora at the time the suit was filed by Submersible.  The Court also finds that Submersible can attach Perforadora's property pursuant to state law upon proper application to the Court and the posting of a $1,000,000 bond.

The Court therefore finds that Perforadora's motions to dismiss for lack of admiralty jurisdiction, lack of personal matter jurisdiction, and *forum non conveniens* should be denied.  The Court further finds that Submersible's motion for a Rule B attachment should be denied and that

25

Submersible's motion for a Rule 64 attachment pursuant to state law should be granted upon proper application to the Court.

A separate Order in accordance with this Memorandum Opinion shall issue this date.

DATED this the 23rd day of November, A.D., 1998.

UNITED STATES DISTRICT JUDGE

26

....A BORDO DEL BUQUE MOTOR NACIONAL DENOMINADO "DON FRANCISCO" PROPIEDAD
DE LA EMPRESA PERFORADORA CENTRAL SOCIEDAD ANONIMA DE CAPITAL VARIABLE --
CON DOMICILIO EN CALLE VENTICUATRO NUMERO CINCUENTA Y DOS ALTOS ,CIUDAD -
DEL CARMEN,CAMPECHE; Y DEL PORTE DE SEISCIENTAS OCHENTA Y SIETE PUNTO ---
CINCUENTA Y CUATRO TONELADAS DE REGISTRO BRUTO Y DOSCIENTAS SEIS PUNTO---
VEINTISEIS TONELADAS DE REGISTRO NETO,CON MATRICULA EN EL PUERTO DE CA---
DEL CARMEN CAMPECHE,SE REUNEN EN EL PUENTE DE MANDO LOS C.FERNANDO TOLEDO
ZEPEDA, JUAN JOSE GONZALEZ PEREZ Y RUBEN CASTRO LOPEZ,CAPITAN DEL BUQUE,-
PRIMER  OFICIAL DE CUBIERTA, Y SEGUNDO OFICIAL DE CUBIERTA RESPECTIVAMENTE
PARA HACER CONSTAR LOS SIGUIENTES ECHOS............................
...QUE SIENDO LAS ONCE HORAS TREINTAICINCO MINUTOS DEL DIA LUNES VEINTITRES
DE JUNIO DE MIL NOVECIENTOS NOVENTAISIETE QUEDAMOS COMPLETAMENTE ATRACADOS
AL MUELLE SUR DEL PUERTO DE DOS BOCAS TABASCO.....................
...QUE SIENDO LAS ONCE HORAS TREINTAISIETE MINUTOS SE INICIA LA DESCARGA-
DEL EQUIPO  ABORDO DE LA COMPAÑIA QUANTUM INGENIEROS SOCIEDAD ANONIMA DE-
CAPITAL VARIABLE Y QUE NO SE  PRESENTO REPRESENTANTE ALGUNO DE DICHA COMPA-
ÑIA AL MOMENTO DE EFECTUARSE LA DESCARGA DEL SIGUIENTE EQUIPO;.........
.UN CONTENEDOR HABITACIONAL PARA OCHO PERSONAS,INCLUYE OCHO CAMAS,INSTALA-
CIONES SANITARIAS,AIRES ACONDICIONADOS(DOS),EQUIPO DE COMPUTO(MONITORES,-
TECLADOS,EQUIPOS DE VIDEO,CPUS,CABLES PARA EQUIPO DE COMPUTO.)=========
.UN CONTENEDOR DE TRABAJO O REPARACION EL CUAL INCLUYE,UN VEHICULO OPERADO
A CONTROL REMOTO MAX ROVER,JUEGOS DECHERRAMIENTAS.=================
.UNA CABINA DE CONTROL CON BRAZO NATIONAL N-OCHENTAICINCO,----
INCLUYE EQUIPOS DE VIDEO Y COMPUTO(MONITORES,CPU Y TECLADOS)=========
.UN TANQUE PARA COMBUSTIBLE NUMERO MIL  CINCUENTAICINCO,MANGUERAS,======
.UNA UNIDAD DE GENERADOR DE CORRIENTE NUMEROCUATROSCIENTOS SETENTAISEIS.
.UNA CABINA DE CONTROL TIPO CONTENEDOR,INCLUYE AIRE ACONDICIONADO.======
.UN CARRETE CON CABLE UMBILICAL.==============================
...QUE DICHO EQUIPO NO SUFRIO DAÑO ALGUNO AL MOMENTO DE SER  DESMBARCADO,
Y  QUE DICHO EQUIPO SE ENCUENTRA EN RESGUARDO EN EL ALMACEN DE PEMEX DEL
PUERTO DE DOS BOCAS,TABASCO...................................
..QUE SIENDO LAS QUINCE HORAS DEL DIA LUNES  VEINTITRES DE JUNIO DE MIL--
NOVECIENTOS NOVENTAISIETE SE DA POR TERMINADA LA PRESENTE ACTA PARA -----
SALVAGUARDAR LOOS INTERESES DE LA EMPRESA ASI COMO DE LOS QUE EN ELLA ---
INTERVIENEN FIRMANDO AL CALCE,RESERVANDONOS EL DERECHO DE AMPLIARLA,RATI--
FICARLA O RECTIFICARLA UNA Y CUANTAS VECES SEA NECESARIO EN  TODAS Y CADA
UNA DE SUS PARTES,DAMOS FE.....................................

P. FERNANDO TOLEDO ZEPEDA
CAPITAN DEL  BUQUE

P.C. JUAN JOSE GONZALEZ PEREZ

PRIMER OFICIAL DE CUBIERTA

P.C. RUBEN CASTRO LOPEZ

SEGUNDO OFICIAL DE CUBIERTA

*Received copy of above statement
and photographs of ROV (Above) System.
located in Pemex facility in Dos Bocas
where it was off loaded by Central from the
MV. Don Francisco.    Wolfgang Russell    6/27/97*

## INFORMATIVE ACT

.... ABOARD THE NATIONAL MOTOR VESSEL NAMED "DON FRANCISCO" PROPERTY OF THE COMPANY "PERFORADORA CENTRAL SOCIEDAD ANOMINA" OF VARIABLE CAPITAL, DOMICILED IN "TWENTY-FOURTH STREET, NUMBER FIFTY-TWO AND DOS ALTOS, CITY OF DEL CARMEN, CAMPECHE; OF SIX HUNDRED EIGHTY SEVEN POINT FIFTY FOUR TONS OF GROSS REGISTRY AND TWO HUNDRED SIX POINT TWENTY-SIX TONS OF NET REGISTRY WITH REGISTRATION IN THE PORT OF CIUDAD DEL CARMEN, CAMPECHE, MEET AT THE COMMAND BRIDGE MESSRS. C. FERNANDO TOLEDO ZEPEDA, JUAN JOSE GONZALES PEREZ AND RUBEN CASTRO LOPEZ, CAPTAIN OF THE VESSEL, FIRST OFFICER OF DECK AND SECOND OFFICER OF DECK RESPECTIVELY TO GIVE EVIDENCE TO THE FOLLOWING EVENTS.................................................................................................................................................
THAT BEING THE ELEVEN HOURS THIRTY-FIVE MINUTES ON MONDAY THE TWENTY-THIRD OF JUNE OF NINETEEN HUNDRED NINETY SIX WE WERE COMPLETELY MOORED AT SOUTH DOCK NUMBER ONE OF THE PORT OF DOS BOCAS, TABASCO.................................................................................... THAT BEING THE ELEVEN HOURS THIRTY-SEVEN MINUTES THE OFFLOADING BEGAN OF EQUIPMENT ABOARD OF THE COMPANY QUANTUM ENGINEERS SOCIEDAD ANONIMA OF VARIABLE CAPITAL AND THAT NO REPRESENTATIVE OF SUCH COMPANY WAS PRESENT AT THE TIME OF PERFORMING THE OFFLOADING OF THE FOLLOWING EQUIPMENT................................................................................................: A DWELLING CONTAINER FOR EIGHT PERSONS, INCLUDING EIGHT BEDS, SANITARY INSTALLATIONS, AIR CONDITIONERS (TWO), COMPUTER EQUIPMENT (MONITORS, KEYBOARDS, VIDEO EQUIPMENT, CPUS, CABLES FOR COMPUTER EQUIPMENT)..........................................................................................A WORK OR REPAIR CONTAINER WHICH INCLUDES, A REMOTE CONTROL OPERATED VEHICLE MAX ROVER, SET OF TOOLS....................................................... A CLIMATE CONTROL CABIN WITH A NATIONAL BRANCH N-EIGHTY FIVE INCLUDING VIDEO EQUIPMENT AND COMPUTER (MONITORS, CPU AND KEYBOARDS), A FUEL TANK NUMBER ONE THOUSAND FIFTY FIVE, HOSES..............
A CURRENT GENERATOR UNIT NUMBER FOUR HUNDRED SEVENTY SIX, A CONTROL CABIN, CONTAINER TYPE , INCLUDING AIR CONDITIONER........................ A REEL WITH UMBILICAL CABLE................................................................. THAT SAID EQUIPMENT DID NOT SUFFER ANY DAMAGE AT THE TIME OF OFFLOADING AND THAT SAID EQUIPMENT IS FOUND UNDER THE CARE AT THE WAREHOUSE OF PEMEX OF THE PORT OF DOS BOCAS, TABASCO.............................
THAT BEING THE FIFTEEN HOURS OF MONDAY TWENTY-THIRD OF JUNE OF NINETEEN HUNDRED NINETY SEVEN THE PRESENT ACT IS DEEMED COMPLETED TO PROTECT THE INTERESTS OF THE COMPANY AS WELL AS THOSE INTERVENING ON ITS BEHALF, WE SUBSCRIBE, RESERVING THE RIGHT OF AMENDING, RATIFYING OR CORRECTING ONCE AND AS MANY TIMES AS NECESSARY IN EACH AND EVERY ONE OF ITS PARTS, WE ACKNOWLEDGE....................................................................................................

(Signature)
P. FERNANDO TOLEDO ZEPEDA
(Signature)
CAPTAIN OF THE VESSEL

(Signature)                                          (Signature)
P.C. JUAN JOSE GONZALEZ PEREZ              P.C. RUBEN CASTRO LOPEZ
FIRST OFFICER OF DECK                        SECOND OFFICER OF DECK



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| **SUBMERSIBLE SYSTEMS, INC.** | * | **CIVIL ACTION** |
| | * | |
| **versus** | * | **NO. : 1:98CV251GR** |
| | * | |
| **PERFORADORA CENTRAL, S.A. de C.V.** | * | **JUDGE WALTER J. GEX, III** |
| | * | |
| | * | **MAGISTRATE JUDGE** |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | | **JOHN M. ROPER** |

## LEGAL OPINION OF CARLOS LOPERENA R. CONCERNING MEXICAN LAW

TO:    The Honorable United States Judges
       United States District Court
       Southern District of Mississippi


I have been requested to state certain opinions concerning Mexican law and the availability of Mexican Courts to consider the matters involved in and to entertain the claims of Submersible Systems, Inc. fairly and responsibly promptly.

For your information, my qualifications are that I graduated from Escuela Libre de Derecho (School of Law) in Mexico in the year 1978.  I am a member of the Mexican Bar Association (Barra Mexicana, Colegio de Abogados), which I have served as a member of the Board of Directors from 1989 to the present, I have been recognized as an expert on Mexican law and procedure in the following cases: I.- U.S. District Court Southern District of Florida, In the matter of the Extradition of Mauricio Madero O'Brien. Case No. 95-8057-CIV-VITUNAC. II.- Mendoza v. Contico El Paso, Texas. III.- Tapia v. Tapia Supreme Court Action No. F950020, Vancouver Registry, Canada. IV.- California Commerce Bank v. Estrategia Monetaria, S. A. de C. V. Los Angeles Superior Court, Case Number BC 097 869. V.- Laboratorios A.F. Aplicaciones Farmaceuticas, S. A. de C. V. v. Rohne Poulenc Rorer, Inc. et Al. U.S. District Court Eastern District of Pennsylvania Case No. 95-CV-1844. VI.- Keith Johnson, Sr. et Al. v. Canadian Helicopters Limited et Al. In the Circuit Court of the 17th. Judicial Circuit in and for Broward County, Florida. Case No. 94-15049 (18). VII.- International Chamber of Commerce, International Court of Arbitration case 9159/FMS (Name of parties witheld due to confidentiality). VIII.- Bouras v. Ferrer. Juzgado de Instrucción 24, Diligencias Previas 3877-97-C, Barcelona, Spain, and am admitted to practice in all the courts of Mexico including the courts in Campeche and Tabasco, as well as in Mexico, D.F. local and federal. I am a member

33
3/16

of the firm of Loperena, Lerch y Martin del Campo in Mexico City. I served as Professor of Civil Law and Civil Procedure at the Universidad del Nuevo Mundo in Mexico City from 1978 to 1983, and as Professor of Civil Procedure at Escuela Libre de Derecho in Mexico City from 1979 to date. A more detailed Curriculum Vitae is attached hereto. I have practiced as a trial lawyer in Mexico, and have appeared in more than 300 cases. I have practiced law for 20 years, and am familiar with the procedures of the courts of Mexico.

In preparing this opinion, I have assumed that the facts as outlined in your letter to me, bearing date of July 27, 1998, are correct. Of course, I have no independent knowledge of these facts. In addition, I have reviewed the documents, now identified as H-1 through H-5, which comprise the record of proceedings of the Public Attorney in Carmen and the Complaint filed by Submersible Systems, Inc. in the United States District Court for the Southern District of Mississippi. Copies of these documents are attached hereto.

In my opinion, the disputes between Submersible Systems, Inc. and Perforadora Central, S.A. de C.V. may properly be brought before the local or federal courts of the City of Mexico or of the state of Campeche in Mexico, and that Submersible Systems, Inc., which we understand to be a corporation organized and existing pursuant to the laws of the state of Louisiana in the United States, is not prohibited or impeded from commencing and prosecuting such a suit and appearing in the courts in Mexico, and that SSI would receive fair and impartial justice in the courts of Mexico. The laws which established this right are: Articles 1, 17 and 33 of the Mexican Constitution (Article 1 of the Constitution provides that all persons are protected by the Bill of Rights and Article 33 of the Constitution provides that the Bill of Rights is applicable to foreign nationals).

I am further of the opinion that the courts of Mexico would likely be able to decide these disputes within a period of not more than 20 months after claim has been filed. The average duration for an ordinary commercial case after the amendments of May, 1996, must be of no more than 6 months in the lower court. No more than 3 months in the Court of Appeals and no more than 8 months in the Amparo (federal) court. The 3 remaining months may be used for sending the file from one court to the other.

The courts of Campeche and of Mexico city are available for travel by non-Mexican witnesses, through the airport located in Mexico City and at the city of Campeche, so that it would not be unduly disruptive for witnesses to come to Mexico to testify if necessary.

Testimony, if necessary, could be obtained from witnesses in the United States by deposition and transcribed and translated and then submitted as evidence in the courts of Mexico. The testimony may be obtained through letters rogatory as per the Inter American Convention on the taking of Evidence Abroad which was ratified by Mexico.

With respect to the witnesses located in Mexico, whether Mexican citizens or foreigners resident in Mexico, the courts in Mexico have the power and authority and procedures in place to subpoena those witnesses and require them to appear in court and to testify. Articles 1261 and 1262 of the Code of Commerce have the following provisions:



"Article 1261.- All those who have knowledge of the facts that the parties must prove may be required to testify as witness."

"Article 1262.- The parties are required to produce their own witness for which they shall be given subpoenas. If, however, it is impossible for them to produce them, they shall so state under oath and request that they be summoned. The judge shall order the summoning of the witness with a forewarning that they shall be subject to arrest for up to 36 hours or fined for the equivalent of 15 days of general daily minimum wage in effect in the Federal District if they fail to appear without good cause or refuse to testify."

If the witness does not reside within the jurisdiction of the court, the court may (at the request of the party), issue a letters rogatory to the competent court of the place of residence of the witness to receive the testimony, as established in Article 1269 of the Code of Commerce. This is a federal statute.

We are informed that there is a question that some funds may be due by Pemex to Quantum Ingenieros.  In our opinion, it would be possible for one or both of the parties  in this case, namely SSI and Perforadora Central, to bring a third party suit against Quantum in the courts of Mexico to assert claims against that company and if deemed to be desirable and necessary it would be possible in that suit, to attach sums which may be due to Quantum by Pemex in hopeful satisfaction of judgment. The justifications for this opinion is: Under Mexican procedural law, once a party is awarded with a given sum of money by a final judgement if the debtor does not comply voluntarily with the judgement, the creditor may request the court to issue an attachment order to secure assets belonging to the debtor. The attachment may include sums owed by third parties to the debtor. In that case, the court notifies that the owed monies are subject to attachment and that no payments should be made to the original creditor, but to the depository appointed by the attaching party who in turn will give those funds to the prevailing party.

Based on my understanding that the events at issue between these parties involve a supposed wrongful taking or retention by Perforadora Central of equipment claimed to be owned by Submersible Systems, Inc.  either while that equipment was located on board a Mexican flagged vessel located wholly in Mexican waters, or on land within Mexico, either at the premises of Pemex or at the premises of Perforadora Central, and that such equipment had been imported into Mexico by a Mexican corporation by the name of Quantum Ingenieros, and based on my further understanding that the equipment has been turned over to the Public Attorney with the request that proper ownership of that property be determined, I am of the opinion:

   1.  Under Mexican principals of conflicts of law that this dispute would be governed by Mexican law as provided by Article 12 of the applicable Civil Code;

   2.  That regardless of any decision which may be rendered by the courts of the United States, legal custody of the property at issue has been turned over to the Public Attorney in Campeche and,

because this property has been turned over to the Public Attorney that the opinion of the United States court would not be effective to award custody of the equipment, rather the Public Attorney, who is an official entrusted with determination of questions such as this, would decide the questions of the right to possession and possibly of compliance or non-compliance with Mexican customs laws irrespective of decisions of non-Mexican courts;

3.  The laws of Mexico provide for recovery for "theft, conversion or piracy" in the event such claims could be proved, and such claims may be brought either in the court located in the State of Campeche, or in the court in Mexico City. SSI, if its case be proven, would have an adequate remedy under Mexican law.

In my long experience in the courts of Mexico, in which I have on many occasions represented foreign (non-Mexican) corporations and individuals, it is my experience that the courts of Mexico treat foreign citizens and corporations with equal fairness and justice as is required by the Constitution of Mexico as already cited.

Yours very truly,

Carlos Loperena R.

STATE OF TEXAS          §
COUNTY OF BEXAR         §

BEFORE ME, Maria T. Ingram, Notary Public, on this day personally appeared CARLOS LOPERENA R., proved to me on the oath of Hope H. Camp, Jr., to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 24th day of August, 1998.

Notary Public, State of Texas

MARIA T. INGRAM
Notary Public, State of Texas
My Comm. Exp. 06/17/02