

United States District Court
Southern District of Texas
FILED

APR 2 3 2003

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO. B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

## RESPONSE TO MOTION TO DISMISS
## ON GROUND OF FORUM NON CONVENIENS

MICHAEL H. BAGOT, JR., Attorney - In - Charge
Tex. Bar No. 1512520 (S.D. Tex. No. 13474)
THOMAS A. RAYER, JR.
La. Bar. No. 20581
**WAGNER & BAGOT, L.L.P.**
Poydras Center, Suite 2660
650 Poydras Street
New Orleans, Louisiana  70130-6105
Telephone:  (504) 525-2141

ARTHUR L. SCHECTER
Tex. Bar No. 17735000 (S.D. Tex. No. 1454)
MATTHEW D. SHAFFER
Tex. Bar No. 18085600  (S.D. Tex No. 8877)
DENNIS M. MCELWEE
Tex. Bar No. 13587820 (S.D. Tex. No.7490 )
**SCHECHTER, MCELWEE &
     SHAFFER, L.L.P.**
3200 Travis
Houston, Texas 77006
Telephone:  (713) 524-3500
**Counsel for Submersible Systems, Inc.**

# TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues to Be Ruled Upon By The Court . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Relative Size of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Cost/Efficiency Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.    Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    The Federal Doctrine of *Forum Non Conveniens,* Including Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.    There Is a Question as to Whether There Is an Adequate/Available Alternative Forum . . . . . . . . . . . . . . . . . . . . . 12

        C.    Private And Public Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    *The Private Factors Mandate Retaining Jurisdiction* . . . . . . . . 14

            2.    *The Public Interest Factors Support Retaining Jurisdiction* . . 18

            3.    *Choice of Law Issues* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                a.    Admiralty Jurisdiction . . . . . . . . . . . . . . . . . . . . . 20

                b.    Effect of the *Hartford* Case . . . . . . . . . . . . . . . . . . 21

      **c.**  **Even if a choice of law analysis is performed,**
          **U.S. law applies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

FEDERAL CASES

American Dredging Co. v. Miller, 510 U.S. 443 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bailey v. Dolphin Int'l, Inc., 697 F.2d 1268 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . 20

Calhoun v. Yamaha Motor Corp., 216 F.3d 338 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 3

Coats v. Penrod Drilling Corp., 61 F.3d 1113 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fitzgerald v. Texaco, 521 F.2d 448 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Gilbert, Koster v. (American) Lumbermans Mut. Cas. Co., 330 U.S. 518 (1947) . . . . . . . . . . 11

Gonzales v. Chrysler Corporation, 301 F.3d 377 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 14

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-13, 15, 18

Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22

Hellenic Lines v. Rhoditis, 398 U.S. 306 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

In the Matter of the Arbitration Between Monegasque, etc., 311 F.3d 488 (2nd Cir. 2002) . . . . 12

In re Air Crash Disaster Near New Orleans, La., 821 F.2d 1147 at 1164, n. 26 (5th Cir. 1987) *vacated on other grounds sub nom* Pan American World Airways, Inc. v. Lopez, 490 U.S. 1032 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 12, 15, 24

Jerome B. Grubart, Inc. v. Great Lakes Dredge and Dock Co., 513 U.S. 527, 544 (1995) . . . . . 20

Karim v. Finch Shipping Co., Ltd., 94 F.Supp.2d 727 (E.D. La. 2000) . . . . . . . . . . . . . . . . . . 17

Lauritzen v. Larsen, 345 U.S 571 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Leetsch v. Freedman, 260 F3d 1100 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lehman v. Humphrey Caymen, Ltd., 713 F.2d 339 (8th Cir. 1983), cert. denied, 464 U.S. 1042 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lloyd's London v. Early Am. Ins. Co., 796 F.2d 821 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 13

Manu International, S.A. v. Avon Products, Inc., 641 F.2d 62 (2d Cir. 1981) . . . . . . . . . . . . . 17

Mediterranean Gulf, Inc. v. Hirsch, 783 F.Supp. 835 (D.N.J. 1991) . . . . . . . . . . . . . . . . . . . . . 11

Neely v. Club Med Management Services, Inc., 63 F.3d 166 (3rd Cir. 1995) . . . . . . . . . . . 3, 24

Pacific Employers Ins. Co. v. M/V CAPTAIN CARGILL, 751 F.2d 801 (5th Cir. 1985) . . . 2, 12

Phoenix Canada Oil Co., Ltd. v. Texaco, Inc., 78 F.R.D. 445 (D. Del. 1978) . . . . . . . . . . . . . 17

Quintero v. Klaveness Ship Lines, 914 Fed. 2d 717 (5th Cir. 1990), cert. denied, 499 U.S. 925 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Scottish Air In'l, Inc. v. British Caledonian Group, P.L.C., 81 F.3d 1224 (2nd Cir. 1996) . . . . 12

Societe Nationale Industrielle Aerospatiale v. U.S. District Court, 482 U.S. 522 (1987) . . . . . . 21

Sussman v. Bank of Israel, 801 F.Supp. 1068 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464 (5th Cir. 1966), cert. denied, 387 U.S. 908 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

Syndicate 420 at Lloyd's London v. Early Am. Ins. Co., 796 F.2d 821 (5th Cir. 1986) . . . . . . . 13

Torres v. Southern Peru Copper Corp., 113 F.3d 540 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 3

U.S. v. Flores, 289 U.S. 137 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Woodfield v. Bowman, 193 F.3d 354 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Yamaha Motor Corp. v. Calhoun, 516 U.S. 199 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

Zammer v. Diliddo, 1997 W.L. 578753 (W.D. N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FEDERAL STATUTES

46 U.S.C § 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

OTHER AUTHORITIES

71 U.S. L.W. 3489 (January 7, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Restatement. (Third) Foreign Relations. § 402(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Restatement. Foreign Relations. § 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Restatement (Second) of Conflict of Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO. B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

### RESPONSE TO MOTION TO DISMISS
### ON GROUND OF FORUM NON CONVENIENS

**MAY IT PLEASE THE COURT:**

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

This a case for maritime conversion of property belonging to the plaintiff, Submersible Systems, Inc. ("Submersible"), by Perforadora Central, S.A. de C.V. ("Perforadora"). This matter was previously tried before the United States District Court for the Southern District of Mississippi which found that U.S. admiralty jurisdiction applied, which denied Perforadora's Motion for *Forum Non Conveniens* and which ultimately applied U.S. substantive admiralty law to the conversion. Subsequently, Perforadora appealed the judgment and the Fifth Circuit reversed, holding that the district court erred in holding that Perforadora was subject to the personal jurisdiction of the court, but that Rule B attachment should not be allowed because Perforadora's property, a rig being constructed in Pascagoula, Mississippi, had never been attached and had left the jurisdiction before it could be attached. Subsequently, Submersible learned that Perforadora was building a rig at AMFELS shipyard in Brownsville, and filed this suit, advising the Court of the prior litigation and asking this Court to issue a Rule B attachment. The Rule B attachment was then issued, following

1

which Perforadora answered the complaint and has now filed a motion to dismiss the action on the ground of *forum non conveniens.*

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

When a Court has subject matter and jurisdiction over a suit and venue is properly laid, the Court may entertain a motion to dismiss a suit for *forum non conveniens* to allow the suit to be tried in an alternate forum which is (a) available and will allow an adequate remedy to the plaintiff, and (b) litigation in the chosen forum would be oppressive and vexatious to the plaintiff, out of all proportion to the plaintiff's convenience. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947). A motion to dismiss for *forum non conveniens* should not be granted unless the balance is strongly in favor of the defendant. *Id.* In ruling on such a motion, the Court should consider the convenience of all parties, not merely the convenience of the defendant. *Pacific Employers Ins. Co. V. M/V CAPTAIN CARGILL,* 751 F.2d 801 (5th Cir. 1985). In reaching such a decision, the courts are guided by a number of private and public factors described in the U.S. Supreme Court in *Gilbert, supra,* and by the Fifth Circuit in *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 at 1164, n. 26 (5th Cir. 1987), *vacated on other grounds sub nom. Pan American World Airways, Inc. v. Lopez,* 490 U.S. 1032 (1989). One of the factors which is implicated is the law which governs the underlying claim. *Gilbert,* 330 U.S. at 504. The Fifth Circuit has already held that admiralty jurisdiction applies in this case. With admiralty jurisdiction comes the application of U.S. admiralty law. *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206 (1996). There is no need for a choice of law analysis in this case as all parties agree that both U.S. and Mexican law condemn conversion of property. See *Hartford Fire Ins. Co. v. California,* 509 U.S. 764 (1993). However, even if a choice of law analysis is performed, U.S. law should apply to this case. See *Symonette Shipyards, Ltd. v.*

2

Clark. 365 F.2d 464, 467 (5th Cir. 1966), cert. denied, 387 U.S. 908 (1967). Calhoun v. Yamaha

Motor Corp., 216 F.3d 338, 347 (3rd Cir. 2000); Neely v. Club Med Management Services, Inc., 63

F.3d 166, 183 (3rd Cir. 1995).

The trial court's decision on forum non conveniens is reviewed under an abuse of discretion

standard. In re Air Crash Disaster, supra, at 1166. Decisions on choice of law are reviewed de novo

Woodfield v. Bowman, 193 F.3d 354, 358 (5th Cir. 1999).

## SUMMARY OF ARGUMENT

Defendant's motion largely ignores the most significant fact bearing on the forum non

conveniens issue, i.e., that this case has already been tried to judgment in a U.S. court in accord with

U.S. procedure and U.S. law. To dismiss this case on the basis of forum non conveniens would

grossly inconvenience Submersible, while not significantly conveniencing the defendant. At the

same time, such a dismissal will make it extremely unlikely that the suit of a U.S. corporation will

be decided according to substantive admiralty law of the United States, despite the strong interest

the United States has in having its law applied.[1]

Forum non conveniens is a discretionary doctrine which allows a court which has jurisdiction

and venue[2] over a suit to dismiss it to allow it to be tried in an alternate forum under certain

conditions. Forum non conveniens motions should only be granted when the balance weighs

_____

[1] Calhoun v. Yamaha Motor Corp., supra, 216 F.3d at 347, Neely v Club Med
Management Services, Inc., supra, 63 F.3d at 183; Restatement (Third) of Foreign Relations Law
§ 402 (1)(c).

[2] By its motion, Perforadora apparently concedes that the Court has subject matter
jurisdiction over the suit and venue is proper. Torres v. Southern Peru Copper Corp., 113 F.3d
540, 542 (5th Cir. 1997), citing Gulf Oil Corp. v. Gilbert, supra, at 504.

3

strongly in favor of the defendant against the plaintiff's choice of forum. Because (a) Perforadora has failed to show that it will sustain any significant, if any, inconvenience by litigating this case in the United States.

**ARGUMENT**

I.    **FACTS**

    A.    **Relative Size of the Parties.**

      Plaintiff, Submersible Systems, Inc. ("Submersible"), is a Louisiana corporation with its principal place of business in Patterson, Louisiana. It is owned by Wolfgang and Terri Burnside, a permanent resident and citizen, respectively, of the United States. Submersible is the Burnsides' primary source of income. The actions of Perforadora Central, S.A. de C.V. ("Perforadora"), which are described in plaintiff's complaint, effectively deprived Submersible of most of its productive equipment and almost put Submersible out of business. In fact, Submersible's payroll shrunk from nine employees to two employees [Wolfgang and Terri Burnside] as a result of Perforadora's actions. See Complaint at ¶ 30, 31. Presently, Submersible is continuing in its operations, but it has sustained and continues to sustain significant damages as a result of Perforadora's illegal and extrajudicial seizure of its equipment in June 1997.

      Perforadora is a Mexican corporation with its principal place of business in Mexico. It is a subsidiary of a company known as Groupo Industrial Atlantida, S.A. de C.V. which has hundreds of employees. See deposition of Fausto Correa, taken in the prior litigation, portions of which are attached as Exhibit "A" at pp. 12-13; 185. Perforadora has recently completed a $65 million rig in Pascagoula, Mississippi. See affidavit of Michael H. Bagot, Jr., attached as Exhibit "B". It is currently constructing another multi-million dollar rig at AMFELS's yard in Brownsville, Texas.

4

*Id.*   At the time of the last trial, Perforadora's financial statement was submitted under seal to the court as Exhibit P-92.  Based on its review of the facts and Perforadora's financial statement, the U.S. District Court for the Southern District of Mississippi awarded $1.5 million in punitive damages against Perforadora.    See July 19, 1999 Bench Opinion, attached as Exhibit "C", at p. 31. Submersible believes that Perforadora's financial position has improved significantly since that opinion was rendered against it.  Certainly, Perforadora has the wherewithal to defend this action in Brownsville, Texas or anywhere else in the world.

**B.    Cost/Efficiency Concerns.**

In the affidavit attached to the Motion to Dismiss for *Forum Non Conveniens*, counsel for Perforadora identifies twenty-two witnesses whom he intends to obtain trial testimony from, all of whom reportedly reside in Mexico.  Of those twenty-two witnesses, however, seventeen of them have already been deposed in Mexico under the Federal Rules of Civil Procedure, at the request of Perforadora in the prior action.  See table attached hereto as Exhibit "D".  The transcript of the depositions are only in English; they are available to be used in this case[3] without any further expense, including translation of hundreds of pages into Spanish.  Bagot affidavit.

Perforadora has indicated that additional witnesses will likely have to testify, including one or more employees of PEMEX (the state-owned oil company of Mexico), employees of Oeatec and personnel of the Mexican Department of Customs.  As a practical matter, however, there should be no need for any testimony by any employees of PEMEX, as the relationship between Quantum and

---

[3] F.R.Civ.P. 32(a)(4) provides ". . . when an action has been brought in any court of the United States . . . and another action involving the same subject matter is afterward brought between the same parties . . . all depositions lawfully taken and duly filed in the former action may be used in the latter as if originally taken therefor."

5

PEMEX has absolutely no bearing on the claim of Submersible against Perforadora. The testimony of employees of Oceatec is also irrelevant to the claim between Submersible and Perforadora, because Submersible's damages are not contingent on Submersible having a contract with Oceatec. See Memorandum Opinion of February 18, 2000, attached hereto as Exhibit "E" at pp. 4-6; see also affidavit of Panzeca, attached as Exhibit "H". Additionally, there is absolutely no reason to depose any Mexican customs official, as all customs documents have already been produced and the affect of those documents can be (and has been) attested to by the parties' legal experts.

Additionally, although counsel for Perforadora has indicated to undersigned counsel that he desired to take a few additional depositions in Mexico, the parties have agreed that these depositions can be completed in two or three days. See affidavit of Thomas A. Rayer, Jr., attached as Exhibit "F".

Submersible expects that it will call as many as four witnesses at trial, including Wolfgang Burnside, a resident of Louisiana, Michael Carlisle, a resident of Alabama, George Panzeca, a resident of Louisiana, and Enrique Garza, a Mexican law expert who resides in Mexico. As the affidavits of Mr. Burnside and Mr. Panzeca, attached as Exhibits "G" and "H" indicate, it is much more convenient for them to appear in Brownsville than in Mexico. Mr. Garza's deposition has already been taken and he has no problem traveling to Brownsville to give his testimony. See affidavit/declaration of Enrique Garza, attached as Exhibit "I".

The pre-trial order submitted to the U.S. District Court in Mississippi identified 127 exhibits for Submersible and 86 exhibits for Perforadora. While there was a significant overlap between those exhibits and while not every exhibit was used at the underlying trial, all exhibits that were used were in English, and it is anticipated that those same exhibits can be used in this case. Significant

costs would be incurred in translating those exhibits to Spanish if this case is transferred to Mexico. See Exhibit "B".

As Submersible has indicated at the preliminary conference on February 5, 2003, Submersible believes that this suit can be tried in the U.S. District Court for the Southern District of Texas in one or two days, assuming five or six live witnesses are called by the parties, and the rest of the testimony is produced through depositions.

Should this matter be transferred to Mexico, and the testimony produced from the twenty-eight different witnesses, will take significantly longer and will be more expensive to try. See Exhibit "I".

Indeed, Perforadora has frequently appeared in U.S. courts, including the Southern District of Texas, not only as a defendant, see *Falcon Drilling Co. v. Perforadora Central, S.A. de C.V.*, C.A. 96CV-2518 (S.D. Tex. 1996), but also as a plaintiff, see *Perforadora Central, S.A. de C.V. v. Grand Prideco, Inc., et al.*, C.A. 97-CV-4155 (S.D. Tex. 1997); *Perforadora Central, S.A. de C.V. v. Drill Pipe Industries, Inc.*, C.A. No. CV 96-2574 (W.D. La. 1997). Perforadora has sued U.S. companies in U.S. district courts seeking damages under U.S. admiralty law for collisions which occurred in Mexican territorial waters. See *Perforadora Central, S.A. de C.V. v. M/V GUILLOT TIDE*, C.A. 92-2170 (E.D. La. 1992); *Perforadora Central, S.A. de C.V. v. M/V BIG ORANGE XXI*, C.A. 92-1714 (S.D. Tex. 1992); *Perforadora Central, S.A. de C.V. v. M/V ROSIE, et al*, C.A. 99-2722 (E.D. La. 1999). Copies of the complaints in each of these matters are attached to Exhibit "B". As a review of the complaints indicate, Perforadora was represented in most of these cases by the same counsel who represent it in this case. Significantly, Perforadora averred in the *M/V ROSIE* case, filed on September 7, 1999, that U.S. admiralty and maritime jurisdiction and law applied to a collision

7

which occurred in Mexican waters, while it was continuing to allege in Submersible's case that only Mexican law could apply to a seizure which occurred in Mexican waters. See, e.g., Perforadora's Memorandum in Support of Motion to Dismiss for Lack of Admiralty Jurisdiction at pp. 3 and 12 ("...the admiralty jurisdiction of the United States does not extend into Mexican International [sic] waters," "The federal maritime jurisdiction...does not extend into the territorial waters of other nations"), filed in the Mississippi proceeding on July 31, 1998 and Perforadora's Fifth Circuit brief at p. 39 ("The international law of territoriality limits the prescriptive jurisdiction of the United States and requires the application of Mexican law to this controversy"), filed on June 22, 2000 See Exhibit "B". Incredibly, the same counsel who averred that U.S. admiralty jurisdiction and law applied to torts in Mexican waters are the same counsel who averred that U.S. admiralty jurisdiction and law could not apply in this case. Finally, Perforadora's filing of the various suits for Mexican-sited torts prove that Perforadora is not inconvenienced by litigation in the U.S. Rather, it generally prefers litigation in the U.S. to litigation in Mexico. It is only when it is defending a substantial maritime claim that it seeks to hide behind the argument that Mexican courts have exclusive jurisdiction and Mexican law has preemptive application to torts occurring in Mexican waters.

C.    **Applicable Law.**

To avoid offering "an inflammatory version of the facts," Perforadora Memorandum at p. 4, but to support its argument that U.S. admiralty law should apply (to the extent that same is necessary for a choice of law analysis), Submersible quotes verbatim the finding of the U.S. District Court for the Southern District of Mississippi regarding Perforadora's seizure of Submersible's equipment:

> When the vessel arrived in Dos Bocas during the early morning hours of June 23, 1997, Quantum personnel took their equipment off the vessel and left the dock. (Tr., p. 39.) Around 9 to 10 a.m., the captain of the vessel awoke Carlisle and Allen

8

and informed them that SSI's equipment aboard the vessel had been seized by Perforadora until Quantum paid the arrearage owed to Perforadora. (Tr., p. 40; Pl.'s Exh. P-96, pp. 73, 139; Def.'s Exh. D-54, pp. 70-72.) Thus, Carlisle and Allen moved the MAX ROV into the work van to protect it during the seizure. (Tr., pp. 40, 51.)

Contemporaneously, an agent of Perforadora, Angelo Geronimo, boarded the vessel on that morning and determined that Carlisle and Allen's work visas had expired. (Geronimo Depo., pp. 19-21.) Geronimo notified the Mexican immigration authorities who, in turn, ordered Carlisle and Allen to the local immigration office. (Tr., p. 40; Geronimo Depo., pp. 19-20.) After Carlisle and Allen went to the immigration office to correct the visa situation, they were released and told to return later that afternoon to pay a fine. (Tr., pp. 40-41; Geronimo Depo., pp. 21-22, 27.) Carlisle and Allen then returned to the vessel and discovered that SSI's equipment was being offloaded. (Tr., pp. 41, 43.) In response, Carlisle and Allen contacted Burnside and informed him that the equipment had been seized by Perforadora. (Tr., pp. 43, 114-15.) Upon returning to the vessel a second time, the vessel's captain, acting upon instructions from Correa, allowed Carlisle and Allen to retrieve their personal effects. (Tr., pp. 43, 310.) In fact, the captain had to unlock SSI's equipment for Carlisle and Allen to retrieve those items because the locks had been switched by Perforadora while the equipment was aboard the vessel. (Tr., pp. 40, 44-45.) After the seizure, Perforadora temporarily stored SSI's equipment in Pemex's fenced yard and hired an armed guard. (Tr., pp. 52, 314-15, 322.)

The pages of the trial transcripts and exhibits referred to above are attached *in globo* as Exhibit "J". See also the Court's explanation of its award of punitive damages at pp. 10-11 of Exhibit "D".

Although this may not be the time for a detailed discussion of the differences between U.S. and Mexican law, this Court should be aware that, to the extent a question exists as to the adequacy of a remedy under Mexican law, Mexican law would probably limit Submersible's recovery to the value of the converted equipment, as opposed to the full panoply of damages available under U.S. law, including the value of the converted equipment, consequential damages, loss of use/loss of earnings and punitive damages that could and were awarded by the Mississippi court. See, generally, Loperena affidavit and opinion attached as Exhibits 1 and 6 to Perforadora's

9

memorandum.

While the issue of applicable law was not ruled on by the U.S. Fifth Circuit Court of Appeal. the Fifth Circuit held Perforadora's arguments that U.S. admiralty jurisdiction did not apply was "without merit." see *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 420 at n. 3 (5th Cir. 2001).  While Submersible anticipates that Perforadora will move to have Mexican law applied to Submersible's claims.[4] Submersible believes that this Court should hold that Submersible's claims are governed by U.S. maritime law.

## II.    LAW

As the foregoing sets forth. then there are numerous contacts between this suit and the United States. and there is no overwhelming balance of contacts that would support the Court's dismissal of this case under *forum non conveniens*.

### A.    The Federal Doctrine of *Forum Non Conveniens*, Including Burden of Proof.

One of the most authoritative U.S. Supreme Court decisions on the issue of *forum non conveniens*. *Gulf Oil v. Gilbert. supra*. described *forum non conveniens* in the following manner:

> The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute. These statutes are drawn with a necessary generality and usually give a plaintiff a choice of courts. so that he may be quite sure of some place in which to pursue his remedy. But the open door may admit those who seek not simply justice but perhaps justice blended with some harassment. A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary. even at some inconvenience to himself.

---

[4] Ironically. Perforadora seeks to apply U.S. law as a defense.  See the Twenty Third defense in Perforadora's Answer. wherein Perforadora seeks limitation "under 46 U.S.C § 183. *et seq.*. and general maritime law."

*Gilbert* also states:

> It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. *But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. Id.* 330 U.S. at 508, 67 S.Ct. at 843 (italics added).

In another *forum non conveniens* case decided on the same day as *Gilbert, Koster v. (American) Lumbermans Mut. Cas. Co.,* 330 U.S. 518, 67 S.Ct. 828, at 831-32 (1947), the Court stated:

> Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establishes such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or non-existent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.

See also, *American Dredging Co. v. Miller,* 510 U.S. 443, at 447-8 (1994).[5]

---

[5] Perforadora seems to make much of the fact that Texas is not the "home forum" of Submersible, a Louisiana registered and based corporation. However, given the prior rulings of the Fifth Circuit, Submersible would not have jurisdiction over Perforadora in Louisiana and could only obtain jurisdiction by a asserting a *quasi in rem* claim against Perforadora pursuant to Rule B. Insofar as Perforadora has property in Texas, Submersible had to bring suit there. Moreover, as set forth in the affidavit of Wolfgang Burnside, it is much more convenient for Submersible to try this case in Texas than in Mexico. Under the circumstances, this case is substantially different from the cases cited by Perforadora wherein a plaintiff voluntarily chose to bring suit in a forum far distant from its home. See, *e.g., Mediterranean Gulf, Inc. v Hirsch,* 783 F.Supp. 835, 842 (D.N.J. 1991) (plaintiff brought suit in New Jersey although based in Florida). *Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1072 (S.D.N.Y. 1992), *aff'd,* 990 F.2d 71 (2nd Cir. 1993) (plaintiff brought suit in New York although based in California).

11

Indeed, given the fact that Submersible had to file suit against Perforadora in Texas to obtain jurisdiction over Perforadora, this Court should consider Texas plaintiff's home forum and afford plaintiff's choice in selecting the forum "great." *In the Matter of the Arbitration Between Monegasque, etc.,* 311 F.3d 488, at 498 (2nd Cir. 2002), and "considerable" deference, *Scottish Air In'l. Inc. v. British Caledonian Group, P.L.C.,* 81 F.3d 1224, at 1232 (2nd Cir. 1996).

Even if the Court will not consider the Southern District of Texas the "home forum" of the plaintiff, Submersible's choice of forum is still entitled to deference. *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 at 1164, n. 26 (5th Cir. 1987), *vacated on other grounds sub nom. Pan American World Airways, Inc. v. Lopez,* 490 U.S. 1032 (1989), and the case should not be dismissed unless Perforadora can establish that its inconvenience greatly outweighs the convenience afforded to Submersible. *Gilbert, supra,* 330 U.S. at 508.

Thus, the Court must consider the convenience of all parties, see *Fitzgerald v. Texaco,* 521 F.2d 448, at 451 (2d Cir. 1976), *Pacific Employers Ins. Co. v. M/V CAPTAIN W D CARGILL,* 751 F.2d 801, at 805 (5th Cir. 1985), *Zammer v. Diliddo,* 1997 W.L. 578753,*2 (W.D. N.Y. 1997). If the Court were not to consider the convenience of all parties, it would run the risk of exchanging the convenience of the party choosing the Court for the convenience of the party seeking to transfer the case to an alternative court.

**B.      There Is a Question as to Whether There Is an Adequate/Available Alternative Forum.**

A case should not be dismissed on *forum non conveniens* grounds unless the Court determines that an adequate, available forum exists. In making its decision, however, the Court must bear "always in mind that 'unless a balance is strongly in favor of the defendant, the plaintiff's

choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843, 91 L. Ed. at 1062." cited in *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, at 827 (5th Cir. 1986).

Initially, Perforadora suggests that Judge Walter Gex was "mislead" to believe that there was no civil remedy for Submersible's claims against Perforadora, which led to his incorrect denial of Perforadora's Motion for Forum Non Conveniens. However, if there was any misleading of Judge Gex, it resulted from the actions of Perforadora itself, which "used a forum shopping technique to supply an expert's opnion nearly one month after the fact." Opinion of November 28, 1998, attached as Exhibit 4 to Perforadora's Memorandum, at p. 5. Moreover, Perforadora itself failed to provide through its expert a sufficient explanation of what remedies were available under Mexican law. *Id.* at p. 6. If the judge was mislead, it was through the dilatory and incomplete actions of Perforadora.

Submersible admits that a number of cases have held that Mexican courts are legally available fora, which allow adequate remedies, generally. Submersible qualifies this concession with the word "legally" and "generally" because, as a practical matter, Mexico is not an available forum due to cost constraints. Perforadora's actions have financially devastated this small company. SSI cannot afford to hire new lawyers, translate all the documents, hire translators for trial, hire new experts (or pay travel and translator expenses), pay the travel expenses of its witnesses and, perhaps most importantly, stop its business (Wolfgang Burnside conducts most of the ROV operations) to attend testimony in Mexico. Thus, although legally available, Mexico is not practically available to Submersible - - primarily due to the effects of Perforadora's illegal conversion of SSI's equipment.

13

Submersible also concedes that, under current Fifth Circuit law, the fact that SSI may be stripped of most of its remedies if Mexican law is applied does not make Mexico as a forum, inadequate. See, *Gonzales v. Chrysler Corporation*, 301 F.3d 377 (5th Cir. 2002), *writ applied for*, 71 U.S. L.W. 3489 (January 7, 2003) (No. 02-0144). Further, under *Gonzales*, the fact that it is economically infeasible to pursue this claim in Mexico does not make the forum inadequate. *Id.* With this qualified concession, Submersible further avers that every time it turned to the Mexican government, through its court system and government officials, Perforadora illegally, but successfully, thwarted every effort to obtain justice. Thus, although Submersible strongly disagrees with the reasoning in *Gonzales*, Submersible concedes that Mexico, under current Fifth Circuit law, provides an adequate forum. However, even if Mexico is available and adequate, Perforadora cannot satisfy either the public or private interest factors which the court must next examine.

**C.      Private And Public Factors.**

Judge Gex's ruling on Perforadora's *forum non conveniens* motion did not depend on his finding that there was no adequate or available forum in Mexico. As indicated at p. 15 of the November 28, 1998 decision, attached as Exhibit 4 to Perforadora's memorandum, he addressed the balance of public and private interests and concluded that "the private factors are either neutral or favor Submersible," *id.* at p. 18, and that the "public interest factors favor Submersible." *Id.* at p. 20. This Court should do likewise.

**1.      *Private Factors Mandate Retaining Jurisdiction.***

Private factors included:

a.      Relative ease of access to sources of proof;

14

b.    Availability of compulsory process for attendance of unwilling, and the cost of obtaining the cost of willing, witnesses;

c.    Possibility of viewing the premises, if that would be appropriate to action; and

d.    All other practical problems that make trial of the case easy, expeditious and inexpensive.

*Gilbert*, 330 U.S. at 508. To this list, the Fifth Circuit has added that deference should be given to the plaintiff's choice of forum. *In re Air Crash Disaster, supra*, 821 F.2d at 1165.

With respect to access of sources of proof, most of the witnesses who are expected to give testimony in this case have already been deposed according to the Federal Rules of Civil Procedure, and their testimony can be presented without any further expense in a U.S. District Court. To the extent that Perforadora has identified five Mexican witnesses who are arguably not employed by it, *i.e.*, Captain Toledo, Miguel Bauza, Juan de la Torre, Oscar Barroso and Oscar Olivera, they can be required to give testimony in Mexico by letter rogatory as per the Inter-American Convention on the Taking of Evidence Abroad, which was ratified by Mexico.[6] The testimony of witnesses who may be located in the United States can be obtained by subpoena through the Federal Rules of Civil Procedure. Accordingly, this factor points to the United States.

The second private factor is availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses. This factor would appear to be neutral insofar as compulsory process is concerned as both Mexican and U.S. courts appear to

---

[6] See April 13, 2003 affidavit of Carlos Loperena, attached as Exhibit 1 to Perforadora's memorandum, at p. 5.

15

be able to compel the attendance of witnesses in their respective jurisdictions. It would be less expensive for Submersible to present its case in the United States, given the fact that over 80% of all witnesses[7] expected to give testimony have already been deposed or testified at trial, and their depositions or trial testimony can be submitted directly in the U.S. court proceedings. Exhibit "B". Moreover, it is believed that the costs of litigating this case in Mexico would be substantially greater. Exhibit "I". This factor greatly favors the United States.[8]

The third private factor is the possibility of viewing the premises. When it presented its *forum non conveniens* motion in Mississippi, Perforadora claimed that the case in Mississippi should be dismissed and refiled in Mexico, because the equipment which was the subject of the action and the premises were in Mexico. Now that Submersible recovered the equipment through the order of the U.S. Magistrate Judge for the Southern District of Mississippi, see Exhibit "C" at pp. 9-10, there is nothing to view there but the premises. Further, photographs were taken of the various premises while this action was pending in Mississippi. See Exhibit "B". Thus, this factor favors the United States.

The fourth private factor is practical problems that make trial easy, expeditious and inexpensive. For the reasons set forth above, Submersible believes that trial in the United States can be handled on a very easy, quick and inexpensive basis. The case has been tried before. The

---

[7] Seventeen of the twenty-two witnesses identified by Perforadora have already testified; all of the four witnesses identified by Submersible have already testified. Thus, eighty-four (84%) percent of all witnesses identified have testified. If non-relevant witnesses are excluded, only one arguably relevant witness, Captain Toledo, remains to be deposed.

[8] Moreover, Perforadora asks this Court to save it a few litigation dollars at the expense of Submersible, a company Perforadora devastated. Such a result would be patently unfair.

16

witnesses testimony has been preserved either in deposition or trial transcripts. The exhibits have been exchanged. All of these actions that have taken place in accord with the Federal Rules of Civil Procedure, and the evidence is ready to be submitted to this Court. While Perforadora has suggested that it may be inconvenienced by having to produce a number of witnesses in Brownsville, when the case was last tried, Perforadora only produced four live witnesses, Fausto Correa, Jorge Villapando, Carlos Loperena and John Theriot. It is anticipated that Perforadora will take the same approach when this case is tried this December in Brownsville.[9] However, to the extent that Perforadora elects, as a tactical matter, to bring other witnesses to trial, that is its own decision, and Submersible should be relegated to reforming its entire case, retaining Mexican counsel and doing everything else necessary to try this case in Mexico. In a similar case, where photographs and video recordings were available, depositions had been taken in the proceeding, counsel for both parties were based in the forum, and "a transfer of this case to another forum would entail tremendous expense and logistical problems from both parties since much of the evidence would have to be translated and reassembled in accordance with other procedures," the court denied a *forum non conveniens* motion. See *Karim v. Finch Shipping Co., Ltd.*, 94 F.Supp.2d 727, 737 (E.D. La. 2000), *aff'd*, 265 F.3d 258 (5th Cir. 2001).

Further, Perforadora is much more able to bear the costs of this litigation than can Submersible. The Court may consider these realities in ruling on Perforadora's motion. *Lehman v*

---

[9] Perforadora discusses difficulties of translation in its memorandum. Yet its two main trial witnesses, Correa, Loperena and Villapando, are fluent in English and testified in English in the prior trial. See Exhibit "B". Moreover, "Spanish is hardly an obscure and abtruse language that would provide extreme difficult in obtaining accurate translations." *Phoenix Canada Oil Co., Ltd v. Texaco, Inc.*, 78 F.R.D. 445, 454 (D. Del. 1978).

*Humphrey Caymen, Ltd.,* 713 F.2d 339 at 346 (8th Cir. 1983), *cert. denied,* 464 U.S. 1042 (1984).

As the Second Circuit stated in *Manu International, S.A. v. Avon Products, Inc.,* 641 F.2d 62, at 67 (2d Cir. 1981):

> It is almost a perversion of the *forum non conveniens* doctrine to remit a plaintiff, in the name of expediency, to a forum in which, realistically, it will be unable to bring suit when the defendant would not be genuinely prejudiced by having to defend at home in the plaintiff's chosen forum.

In the event that U.S. law is held to be applicable in this case, this Court's familiarity with U.S. law and Mexican court's unfamiliarity with U.S. law is a "weighty factor" which would support this Court's retaining jurisdiction. *Gulf Oil Corp v. Gilbert, supra,* 330 U.S. at 508, *Leetsch v Freedman,* 260 F3d 1100, 1103 (9th Cir. 2001).

Finally, Submersible's domicile and only place of business is in the United States. This factor is one which strongly points to this Court's retaining jurisdiction and trying the case.

This case has already been tried once in the United States. It can easily and inexpensively be tried in the United States again. Perforadora's suggestion that the case can be tried with less effort or expense in Mexico is, at least, wishful thinking. The private facts that apply strongly favor this Court's retaining jurisdiction.

### 2.    *The Public Interest Factors Support Retaining Jurisdiction*

Public interest factors include:

1.    Administrative difficulty when litigation piles up in congested centers instead of being handled at their points of origin;

2.    Jury duty being imposed on individuals who have no relation to the litigation;

18

3.    In cases which touch the affairs of many persons. trial being held in a remote area where individuals can learn about it by report only:

4.    Having localized controversies decided at home: and

5.    Having the trial diversity cases in a forum that is at home with the state law rather than having a court in some other forum untangle problems and conflicts of law in a law foreign to itself.

*Gilbert. supra,* 530 U.S. at 508-9.

As the following sets forth. and as was found by Judge Gex in the Southern District of Mississippi. the public interest factors do not weigh strongly in favor of dismissal of this action: instead. they favor retaining it.

With respect to the first public factor. there has been no showing that the docket of the Southern District of Texas is more congested than the docket of any Mexican tribunal that may handle this matter. Indeed. this Court has indicated that it is willing and able to try this case on a shortened scheduled and has advised the parties that trial will be held in December 2003. While Perforadora has submitted an affidavit from Mr. Loperena that "the duration of an ordinary commercial case" in a Mexican court must be no more than six months in a lower court. three months in the court of appeals and no more than eight months in the Amparo (Federal) Court. Loperena affidavit. ¶ 11. Mr. Loperena previously indicated that Mexican courts of Mexico would be able to decide these disputes in not more than twenty months after the claim was filed. *see* Legal Opinion submitted in the Southern District of Mississippi on August 21. 1998. attached as Exhibit 6 to Perforadora's memorandum. at p. 2. Moreover. the affidavit/declaration of Enrique Garza. suggests that it would take much more time to try the case in Mexico as opposed to Texas.

19

Accordingly, this point favors the United States.

The second factor deals with jury duty. Because no jury is involved in this case, this factor is irrelevant.

The third factor deals with cases with "trial being held in a remote area where individuals where individuals can learn about it by report only. "However, this is not a localized controversy. Instead, it involves a seizure of property aboard a vessel in navigable waters, equipment that was originally dispatched from Louisiana across international waters into Mexico. The controversy is more properly described as an admiralty or maritime controversy and is a proper subject of a suit in this admiralty court. Moreover, as was found by the U.S. District Court for the Southern District of Mississippi, "there is a strong interest for the United States in assuring that its citizens are compensated for harms done to them." See November 23, 1998 Memorandum attached as Exhibit "K" at page 19, citing *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, at 836 (5th Cir. 1993). Thus, this factor favors the U.S.

The final public interest factor is having the case decided in a court which is familiar with the governing law. Given that U.S. maritime law applies to this action (see below), the factor also favors the United States.

### 3.    *Choice of Law Issues.*

#### a.    **Admiralty Jurisdiction.**

As set forth above, the U.S. Fifth Circuit of Appeals held that Perforadora's argument that admiralty jurisdiction did not apply was "without merit." Under longstanding jurisprudence, with admiralty jurisdiction comes the application of substantive U.S. admiralty law. *See Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996). *Jerome B. Grubart, Inc. v. Great Lakes Dredge and*

*Dock Co.*, 513 U.S. 527, 544 (1995). Accordingly, U.S. maritime law should govern this case entirely.

### b.     Effect of the *Hartford* Case.

There is no dispute between Mexican and U.S. law relating to conversion. Accordingly, the Court need not apply any choice of law analysis to determine which law to apply.

*Hartford Fire Ins. Co v. California*, 509 U.S. 764 (1993), describes the analysis to be applied in determining whether U.S. law may be applied extraterritorially when actions in foreign jurisdictions have an impact within the U.S. In *Hartford*, foreign companies objected to the application of U.S. anti-trust laws to actions occurring solely in a foreign jurisdiction, i.e., actions to affect the U.S. insurance market. The Court made short shrift of these objections, stating that the only substantial question was whether "there is in fact a true conflict between domestic and foreign law." *Hartford*, 509 U.S. at 798 *(citing Societe Nationale Industrielle Aerospatiale v. U.S District Court*, 482 U.S. 522, 555 (1987). Although the Court accepted the London reinsurers' contention that their conduct was "perfectly consistent with British law and policy," the Court concluded that there was no conflict. *Id.* at 799. Specifically, the Court held that no conflict exists "where a person subject to regulation by two states can comply with the laws of both." *Hartford*, 509 U.S. at 799 *(citing Restatement, (Third) Foreign Relations*, § 403, Comment e). Because the defendants did not claim that compliance with the laws of both countries was impossible, the Court held that there was no conflict with British law and that there was "no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." *Id.* After reaching this conclusion, the Court did not apply *Lauritzen-*

*Rhoditis*[10] or other choice of law analysis.

Here, both experts agree that Perforadora's actions, as found by the District Court in Mississippi, were illegal under Mexican law. See Exhibit "E" at p. 10. The acts were certainly illegal under U.S. law. See *Goodpasture, supra*. Because Perforadora could comply with the laws of the U.S. and Mexico, there is no conflict for comity purposes, and no need for a choice of law analysis.

**c.    Even If a Choice of Law Analysis Is Performed, U.S. Law Applies.**

Historically, the U.S. courts have applied the *Lauritzen-Rhoditis* analysis in determining what law should be applied to maritime torts. This analysis requires the consideration and weighing of various contacts to determine the appropriate law to be applied. The *Lauritzen-Rhoditis* analysis is "not a mechanical" or mathematical analysis. See *Rhoditis*, 398 U.S. at 308 (citing *Lauritzen*, 345 U.S. at 582). Rather, "[t]he significance of one or more factors must be considered in light of the national interest served by the assertion of [maritime tort] jurisdiction." *Rhoditis*, 398 U.S. at 309. In this case, the analysis must be made in light of the national interest of protecting U.S. citizens and domiciliaries abroad.

All of the factors of significance and applicable to the facts at bar point to the application of U.S. substantive law. The first factor - the place of the wrongful act - is a minor one. The *Lauritzen* court explained that the place of the wrongful act "is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate." *Lauritzen*, 345 U.S. at 583; see also *Quintero v Klaveness Ship Lines*, 914 Fed. 2d 717, 722 (5th Cir. 1990), *cert. denied*, 499 U.S. 925 (1991). The M/V DON FRANCISCO was dispatched to and loaded Submersible's

---

[10]*Lauritzen v. Larsen*, 345 U.S 571 (1953), and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970).

equipment and personnel in Morgan City, Louisiana. Perforadora knew certainly that the conversion of equipment would directly impact Submersible in the United States. Indeed, the place of injury was the United States, in whose waters Submersible could no longer ply its trade as a result of Perforadora's actions. Under these circumstances, the place of the wrongful act should be accounted little, if any, weight *vis a vis* the place where the damages occurred. Moreover, this factor is built upon an outdated premise which no longer obtains, *lex loci delicti, Lauritzen,* 345 U.S. at 583. Today, *lex loci delicti* has been almost universally discarded in favor of interest analysis. *See, generally,* REST (TEMENT (SECOND) OF CONFLICT OF LAWS, *passim.*

The second factor is the law of the flag. This factor is of little relevance in the context of the conversion of property. Unlike *Lauritzen* (and virtually all of its progeny), this case does not involve a seaman under articles or otherwise, who voluntarily enters the employ of a ship owner to work on the latter's foreign-flagged vessel. Further, deference to the law of the flag extends to "only the vessel or those belonging to her." *Lauritzen,* 345 U.S. at 586, *citing U.S. v. Flores,* 289 U.S. 137, 158 (1933). The law of the flag is simply not instructive in this case.

The third factor is the domicile of the injured. It is undisputed that Submersible is domiciled in the U.S. Unlike the plaintiff in *Lauritzen* whose "presence in New York was transitory and created no such national interest in, or duty toward, him as to justify intervention of the law of one state on the shipboard of another." Submersible's presence in the United States is permanent and, consequently, creates significant interest in the application of U.S. law. *Lauritzen,* 345 U.S. at 587. In *Rhoditis,* the shipowner's base of operations in the U.S. was the sole and sufficient reason to apply U.S. law. The converse must also be true.

Submersible concedes the fourth factor to Perforadora - its allegiance is to Mexico. As with

23

the place of the flag, this factor is of limited relevance under our facts.

No direct contract existed between Perforadora and Submersible so this factor is neutral. However, Submersible's contract with Quantum was signed in Louisiana, required payment in Louisiana and provided for arbitration in Louisiana. (See Exhibit J-3 to underlying case, attached as Exhibit "L".)

The sixth factor - the inaccessibility of foreign forum - arguably only applies in the context of *forum non conveniens.* See *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, at 1120 (5th Cir. 1995). Nevertheless, a question exists as to whether the foreign forum is adequate. See discussion of pending petition for certiorari in *Gonzales* case, *supra,* at p. 14.

As to the seventh factor, the law of the forum is the general maritime law of the United States. Given the "overriding interests" of the U.S. in assuring adequate compensation to its residents and domiciliaries, and the numerous contacts between Perforadora and the U.S., *Neely,* 63 F.3d at 171-2, significant U.S. interests are implicated, and the application of U.S. law is reasonable under the circumstances. *Id.* at 182. Such a holding would comport with *Symonette Shipyards, Ltd v. Clark,* 365 F.2d 464, 467 (5th Cir. 1966), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 16 L.Ed.2d 625 (1967) ("In the context of this case, we believe the most significant choice of law factor to be the nationality of the injured and deceased seamen.") See also, *Bailey v. Dolphin Int'l, Inc.,* 697 F.2d 1268, 1278, n. 25 (5th Cir. 1987), *rev'd on other grounds, Air Crash, supra* ("one substantial contact" may suffice). Moreover, Perforadora's reliance on U.S. law in numerous other cases and in this case (see Perforadora's Twenty Third Defense, discussed at n. 4, *supra*), support the application of U.S. law. Accordingly, this Court should apply U.S. law to this case.

## CONCLUSION

24

**WHEREFORE**, because (1) Perforadora has shown that, at best, it will have to take a few depositions over the course of two to three days and, at worst, one deposition, in Mexico, (2) Perforadora has failed to show that there will be any significant savings in expense or time if this matter is transferred to Mexico, (3) U.S. maritime law should apply to this case, and (4) there will be substantial savings to the parties if this case is tried in the United States. Perforadora's Motion to Dismiss on the Grounds of *Forum non Conveniens* should be denied, and this case allowed to proceed to trial without further delay.

Respectfully submitted,

MICHAEL H. BAGOT, JR., Attorney - In - Charge
Tex. Bar No. 1512520 (S.D. Tex. No. 13474)
THOMAS A. RAYER, JR.
La. Bar. No. 20581
**WAGNER & BAGOT, L.L.P.**
Poydras Center, Suite 2660
650 Poydras Street
New Orleans, Louisiana  70130-6105
Telephone:  (504) 525-2141
Facsimile:  (504) 523-1587

AND

ARTHUR L. SCHECTER
Tex. Bar No. 17735000 (S.D. Tex. No. 1454)
MATTHEW D. SHAFFER
Tex. Bar No. 18085600  (S.D. Tex No. 8877)
DENNIS M. MCELWEE
Tex. Bar No. 13587820 (S.D. Tex. No.7490 )
**SCHECHTER, MCELWEE &**
**SHAFFER, L.L.P.**
3200 Travis
Houston, Texas 77006
Telephone: (713) 524-3500
**Counsel for Submersible Systems, Inc.**

25

## CERTIFICATE OF SERVICE

I hereby certify that on this **2 2** day of April, 2003, a copy of the above and foregoing

pleading has been sent to all counsel of record in this action, by Federal Express or hand delivery.

718-01 59049

26

## Table of Appendices

| **Appendix** | **Description of Appendix** |
|---|---|
| Exhibit "A" | Deposition of Fausto Correa |
| Exhibit "B" | Affidavit of Michael H. Bagot, Jr. |
| Exhibit "C" | July 19, 1999 Bench Opinion |
| Exhibit "D" | Table of Depositions |
| Exhibit "E" | Memorandum Opinion of February 18, 2000 |
| Exhibit "F" | Affidavit of Thomas A. Rayer, Jr. |
| Exhibit "G" | Affidavit of Mr. Burnside |
| Exhibit "H" | Affidavit of George Panzeca |
| Exhibit "I" | Affidavit/Declaration of Enrique Garza |
| Exhibit "J" | Trial Transcript and Trial Exhibits |
| Exhibit "K" | November 23, 1998 Memorandum |
| Exhibit "L" | Exhibit J-3 to underlying case |

59111

PAGE 1

1
1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF MISSISSIPPI
3           SOUTHERN DIVISION
4
5  SUBMERSIBLE SYSTEMS, INC.
                      CIVIL ACTION
6  VERSUS            NO. 1:98CV251RG
                   JUDGE WALTER J.
7                    GEX, III
8  PERFORADORA CENTRAL,
S.A. de C.V.
9
10
11      30(b)(6) Deposition of Perforadora
Central, S.A. de C.V., Calle 24 Number 52
12  Altos, Centrio 24100, del Carmen, Campeche,
through its designated representative,
13  Fausto Adrian Correa Lepe, taken in the
offices of MILLING, BENSON, WOODWARD,
14  HILLYER, PIERSON & MILLER, 909 Poydras
Street, Suite 2300, New Orleans, Louisiana
15  70112-1017, on Wednesday, the 5th day of
August, 1998.
16
17
APPEARANCES:
18
19  WAGNER & BAGOT
(BY: MICHAEL H. BAGOT, JR.)
20  (BY: THOMAS A. RAYER, JR.)
Poydras Center - Suite 2660
21  650 Poydras Street
New Orleans, Louisiana  70130-6105
22
COUNSEL FOR PLAINTIFF
23
24
25

PAGE 2

2
1  MILLING, BENSON, WOODWARD, HILLYER,
PIERSON & MILLER
2  (BY: NEAL D. HOBSON)
(BY: SERGIO J. ALARCON)
3  909 Poydras Street
Suite 2300
4  New Orleans, Louisiana  70112-1017
5      COUNSEL FOR DEFENDANT
6
7  ALSO PRESENT:
8      WOLFGANG BURNSIDE
9
10  REPORTED BY:
11  RHONDA C. LOUPE
CERTIFIED COURT REPORTER
12  REGISTERED PROFESSIONAL REPORTER
13
14
15
16
17      E X A M I N A T I O N   I N D E X
18                        PAGE
19  EXAMINATION BY MR. BAGOT        5, 211
20
21  EXAMINATION BY MR. HOBSON        201
22
23
24
25

PAGE 3

3
1      E X H I B I T   I N D E X
2                        PAGE
3  EXHIBIT NO. 1        46
4  EXHIBIT NO. 2        46
5  EXHIBIT NO. 3        69
6  EXHIBIT NO. 4        78
7  EXHIBIT NO. 5        129
8  EXHIBIT NO. 6        170
9  EXHIBIT NO. 7        197
10  EXHIBIT NO. 8        203
11  EXHIBIT NO. 9        203
12  EXHIBIT NO. 10       204
13  EXHIBIT NO. 11       220
14  EXHIBIT NO. 12       221
15  EXHIBIT NO. 13       221
16  EXHIBIT NO. 14       221
17  EXHIBIT NO. 15       221
18
19
20        EXHIBIT
21
22          A
23    _____
24
25

PAGE 4

4
1      S T I P U L A T I O N
2
3      It is stipulated and agreed by
4  and among counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken for all
7  purposes allowed under the Federal Rules of
8  Civil Procedure, in accordance with law,
9  pursuant to notice;
10      That the formalities of reading
11  and signing are specifically not waived;
12      That the formalities of filing,
13  sealing and certification are specifically
14  waived;
15      That all objections, save those
16  as to the form of the question and the
17  responsiveness of the answer, are hereby
18  reserved until such time as this
19  deposition, or any part thereof, may be
20  used or sought to be used in evidence.
21      RHONDA C. LOUPE, Certified
22  Shorthand Reporter, in and for the
23  State of Louisiana, officiated in
24  administering the oath to the witness.
25

9

1    Q.    What year did you get your
2 master's degree?
3    A.    1996.
4    Q.    How long have you been employed
5 by Perforadora Central?
6    A.    Eighteen years.
7    Q.    So approximately since 1980?
8    A.    Yes.
9    Q.    Detail for me your employment
10 from the time you completed your degree at
11 the Mexican Navy Academy in 1974 until you
12 went to work for Perforadora in 1980.
13    A.    Okay. I had to serve the Navy
14 for six years from 1974 to 1980.
15    Q.    You went directly from the Navy
16 to Perforadora?
17    A.    Perforadora Central on November
18 3rd.
19    Q.    What type of company is
20 Perforadora Central? Let me rephrase that
21 question. I understand that Perforadora
22 Central is a Mexican corporation; is that
23 correct?
24    A.    Yes.
25    Q.    Where is its principal place of

10

1 business?
2    A.    In Mexico.
3    Q.    D.F.?
4    A.    Mexico City.
5    Q.    What business is Perforadora
6 engaged in?
7    A.    It's in the energy business in
8 the drilling.
9    Q.    You are the manager of marine
10 operations for Perforadora?
11    A.    For the vessels division.
12    Q.    How long have you held that
13 position?
14    A.    1993.
15    Q.    Before that, what positions did
16 you hold with the company?
17    A.    It was operations
18 superintendent for the marine division in
19 Carmen since 1984.
20    Q.    What about before 1984?
21    A.    I went to Carmen also to act as
22 an advisor for the marine division in
23 Carmen.
24    Q.    Advisor or consultant?
25    A.    Consultant.

PAGE 11

11

1    Q.    Who were you working for? Who
2 were you advising in that four-year period?
3    A.    The operations superintendent
4 in those days, Mr. Oscar Blanco.
5    Q.    Is he still with the company?
6    A.    No, sir.
7    Q.    When did he leave?
8    A.    1991.
9    Q.    You have mentioned the vessel
10 or the marine division of Perforadora
11 Central. What other divisions does the
12 company have?
13    A.    The drilling division and the
14 marine division also and the Villahermosa
15 drilling division.
16    Q.    So there are two separate
17 drilling divisions, one based in
18 Villahermosa and the other is --
19    A.    -- in Carmen.
20    Q.    And then, simply, the marine or
21 vessel division?
22    A.    Yes.
23    Q.    So there are three divisions in
24 the company?
25    A.    That's correct.

PAGE 12

12

1    Q.    Does Perforadora Central have
2 any corporate affiliates or subsidiaries?
3    A.    No, sir.
4    Q.    Who are the principals of the
5 company?
6    MR. HOBSON:
7        When you say "affiliates," I am
8 not sure that Mr. Correa would know all
9 about related companies. There may be
10 some, but he's not designated to talk about
11 that.
12 BY MR. BAGOT:
13    Q.    Who are the owners of the
14 company?
15    A.    I don't know who are the
16 owners.
17    Q.    Who do you report to?
18    A.    Directly to the president.
19    Q.    Who is that?
20    A.    Mr. Patricio Alvarez Morphy.
21    MR. HOBSON:
22        Mike, if I can interrupt. The
23 parent company of Perforadora Central is a
24 company called Grupo Industrial Atlantida,
25 S.A., de C.V.

**13**

1 BY MR. BAGOT:

2 Q. To your knowledge, is

3 Perforadora a public corporation with

4 publicly-traded shares or a private

5 corporation?

6 MR. HOBSON:

7 It's private.

8 A. It's private.

9 MR. HOBSON:

10 In effect, S.A. de C.V. means

11 it's privately held. Sociedad Anonima is

12 the S.A. That's any corporation. C.V.

13 means variable capital. And that indicates

14 in Mexican a privately-held corporation

15 rather than publicly-held company.

16 BY MR. BAGOT:

17 Q. As manager of the marine

18 division, what equipment falls under your

19 control?

20 A. I manage four supply vessels

21 and one crew boat.

22 Q. And the DON FRANCISCO and the

23 DON RODRIGO would be two of the supply

24 vessels that you control?

25 A. Yes, they are.

**14**

1 Q. Do you have anything to do with

2 the construction of the rig in Halter's

3 yard in Mississippi, which is presently

4 going on?

5 A. No, I don't.

6 Q. Do you have any knowledge as to

7 what type of rig is being built there?

8 A. It's a drilling rig. That's

9 all I know.

10 Q. Do you happen to know if it's

11 what's called a semi-submersible rig or a

12 jack-up rig?

13 A. I think it's jack-up rig.

14 Q. Do you have any knowledge as to

15 the -- well, let me back up.

16 Who in the company is

17 responsible for supervising or monitoring

18 the construction of that rig?

19 A. There is one man over there. I

20 believe his name is Alejandro Castro.

21 Q. To your knowledge, does he

22 report directly to Mr. Morphy?

23 A. No. I think he reports

24 directly to Ricardo Cortina.

25 Q. Is Mr. Cortina the head of one

PAGE 15

**15**

1 of the drilling divisions?

2 A. Yes, he is.

3 Q. Carmen?

4 A. In Carmen.

5 Q. Do you know what is the

6 maximum water depth that the jack-up is to

7 operate in once it is completely

8 constructed?

9 A. No, I don't.

10 Q. Do you know anything about the

11 makeup of the rig in terms of the types of

12 blowout preventers, or BOPs, that may be

13 installed on it?

14 A. No, I don't.

15 Q. That would be information that

16 Mr. Castro or Mr. Cortina would have?

17 A. Yes.

18 Q. Presumably, that would be in

19 any contract that may exist between

20 Perforadora Central and Halter; is that

21 correct?

22 A. I don't know. It may be.

23 Q. Have you personally had any

24 business dealings in the United States on

25 behalf of Perforadora Central since you

PAGE 16

**16**

1 went to work for the company?

2 A. No.

3 Q. All of your work is based in

4 Mexico itself?

5 A. All of it, yes.

6 Q. Do you have any knowledge

7 whatsoever of the contacts that Perforadora

8 Central has with the United States?

9 A. No.

10 Q. By that, I mean in terms of

11 assets or bank accounts that Perforadora

12 Central may have in the United States,

13 individuals who may be employed by

14 Perforadora Central in the United States,

15 business dealings that Perforadora Central

16 may have in the United States, or anything

17 like that?

18 A. No. I don't know about that.

19 Q. We may come back to this a

20 little later on. I am just trying to get

21 an understanding as to what your

22 understanding is.

23 Do you know who with the

24 company would be able to testify concerning

25 the contacts of Perforadora Central, if

185

```
1        MR. HOBSON:
2        Again, you are talking about
3 just in connection with this contract?
4        MR. BAGOT:
5        Yes.
6        MR. HOBSON:
7        You have been given --
8        MR. BAGOT:
9        Right.
10 BY MR. BAGOT:
11   Q.   Nine, I think you indicated
12 that the only representatives from
13 Perforadora that are presently in the
14 United States are those three or four
15 individuals at Halter's facility?
16   A.   Yes.
17       MR. HOBSON:
18       I think there's one in
19 Mississippi and one also in Port Arthur.
20 BY MR. BAGOT:
21   Q.   What's going on in Port Arthur?
22   A.   It's some project or something.
23       MR. HOBSON:
24       They are doing some fabrication
25 over there.
```

186

```
1        MR. BAGOT:
2        In connection with this one
3 rig?
4        MR. HOBSON:
5        Yeah.
6        MR. BAGOT:
7        As you mentioned earlier, that
8 may be brought over to Mississippi, or the
9 rig may be brought to Orange or Port
10 Arthur?
11       MR. HOBSON:
12       The contract originally signed
13 was for the construction and fabrication
14 and assembly to take place in Texas.
15 Halter asked to move that to the Halter
16 yard in Pascagoula. As far as I know,
17 that's what they want to do. And I don't
18 see how that baby can be moved anyway.
19 There are some things being fabricated
20 other places, which presumably will be
21 brought to Mississippi.
22 BY MR. BAGOT:
23   Q.   Mr. Correa, you wouldn't have
24 information dealing with the location of
25 Perforadora assets, movable or immovable,
```

PAGE 187

187

```
1 would you?
2   A.   No.
3   Q.   That would be someone in the
4 finance or treasury department of the
5 company?
6   A.   No, sir. I don't know.
7       MR. HOBSON:
8       He would know about many of the
9 assets but not necessarily all of them.
10 BY MR. BAGOT:
11   Q.   Well, the assets, that you are
12 aware of, are basically the equipment owned
13 by the company that we have discussed, a
14 number of things that we have discussed;
15 for example, the barges, the crew boat, the
16 supply boats, etc.? Do you know of any
17 other assets or the location of any other
18 assets of the company?
19   A.   No, sir, I don't know any
20 others.
21   Q.   Do you know where the company
22 does its banking or has its funds?
23   A.   I don't handle that
24 information. I don't even know that.
25   Q.   Do you know if the company has
```

PAGE 188

188

```
1 designated an agent for service of process
2 in the United States?
3   A.   For what?
4       MR. HOBSON:
5       I don't think he probably even
6 knows what that is. We wrote you a letter
7 indicating who was designated in connection
8 with this Halter contract. There was no
9 one else.
10 BY MR. BAGOT:
11   Q.   Has the company ever filed suit
12 in the United States, that you know of?
13   A.   No, I don't know about that.
14   Q.   You have indicated who the
15 parent company is. Do you know if there
16 are any subsidiary, affiliated or related,
17 entities of Perforadora; in other words,
18 other companies, sister companies, of
19 Perforadora besides Grupo Industrial?
20   A.   No, I don't know.
21   Q.   Has Perforadora --
22       MR. HOBSON:
23       Who do you mean by an
24 affiliated company?
25       MR. RAYER:
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO.  B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF ORLEANS

**BEFORE ME**, the undersigned authority, a Notary Public in and for the Parish and State aforesaid, personally came and appeared:

### MICHAEL H. BAGOT, JR.,

who after being duly sworn, did depose and say that:

1.      I was lead counsel for Submersible Systems, Inc. ("Submersible") in "Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V. ("Perforadora"), C.A. No. 1:98CV251GR in the U.S. District Court for the Southern District of Mississippi;

2.      I am lead counsel for Submersible in the captioned matter;



EXHIBIT

**B**

3.    I am aware from testimony and pleadings filed in the suit pending in Mississippi that Perforadora built a rig in Pascagoula. Mississippi which was completed sometime after July 2000 at a cost of approximately $65 million:

4.    AMFELS has answered Maritime Garnishment and Attachment Interrogatories. stating that it is constructing a rig in Brownsville. Texas. for Perforadora for a contract price of $83.830,000:

5.    All the depositions included in the suit was then pending in the United States District Court for the Southern District of Mississippi were taken in English:

6.    The depositions of eighteen of the witnesses referred to in the affidavit of Sergio Alarcon attached to Perforadora's memorandum in support of its Motion to Dismiss on *Forum Non Conveniens* Grounds total 970 pages in length:

7.    In the trial held in the U.S. District for the Southern District of Mississippi. Perforadora presented four live witnesses. including Fausto Correra. Perforadora's Marine Manager. George Villapando. an executive assistant to Perforadora's president. Carlos Loperena. a Mexican law expert. and John Theriot:

8.    Although Correra. Loperena and Villapando were Mexican natives. they gave their testimony in English. without a translator;

9.    The transcript of the trial in Mississippi totals 627 pages in length. all of which is in English;

10.    Numerous exhibits were introduced in the U.S. District Court for the Southern District of Mississippi. almost all of which were in English:

11.    If this case is transferred to Mexico, I expect that significant costs will be incurred in translating all of the foregoing depositions, the trial transcript and the exhibits into Spanish;

12.    The quotations at page 8 of Submersible's Response are quotations from Perforadora's Memorandum in Support of its Motion to Dismiss for Lack of Admiralty Jurisdiction filed in the U.S. District Court for the Southern District of Mississippi on July 31, 1998 and Perforadora's Fifth Circuit brief filed on June 22, 2000;

13.    In connection with the case pending in Mississippi, numerous photographs were taken in Mexico of the equipment and premises and, to my knowledge, it will not be necessary for any additional photographs to be taken or any premises to be inspected in Mexico;

14.    All counsel involved in the captioned case both for Submersible and Perforadora are U.S. counsel who have been admitted to represent their respective clients in this matter;

15.    To my knowledge, none of the counsel of record in this matter are admitted to the bar in Mexico;

16.    Should this matter be transferred to Mexico, the parties will probably have to retain entirely new litigation counsel;

17.    Based on my discussions with counsel for Perforadora, very few, if any, additional depositions will need to be taken to present this case for trial in December 2003;

18.   It is much more convenient for Submersible as a party to try this case in Brownsville, Texas, instead of Mexico;

19.   Except for Enrique Garza, none of Submersible's witnesses are residents of Mexico, and any other witnesses Submersible calls at trial in Mexico will have to be flown to Mexico to testify;

20.   This case can be tried in one to three days with minimum expense if it is tried in Brownsville, Texas;

21.   It will be much more expensive and time consuming to try this case in Mexico than in Brownsville;

22.   A search of various court records reveals that Perforadora has filed and defended numerous suits in the United States, including:

   a.   *Perforadora Central, S.A. de C.V. v. M/V GUILLOT TIDE*, C.A. 92-2170 (E.D. La. 1992);

   b.   *Perforadora Central, S.A. de C.V. v. M/V BIG ORANGE XXI*, C.A. 92-1714 (S.D. Tex. 1992);

   c.   *Falcon Drilling Co. v. Perforadora Central, S.A. de C.V.*, C.A. 96CV-2518 (S.D. Tex. 1996);

   d.   *Perforadora Central, S.A. de C.V. v. Grand Prideco, Inc., et al.*, C.A. 97-CV-4155 (S.D. Tex. 1997);

   e.   *Perforadora Central, S.A. de C.V. v. Drill Pipe Industries, Inc.*, C.A. No. CV 96-2574 (W.D. La. 1997); and

f.  *Perforadora Central, S.A. de C.V. v. M/V ROSIE, et al,* C.A. 99-2722 (E.D. La. 1999).

23.  Copies of the complaints of the foregoing actions (and the notice of removal in 22(c)), above are attached hereto; and

24.  I have read the foregoing affidavit, and it is true and correct to my personal knowledge.

MICHAEL. H. BAGOT, JR.

Sworn to and Subscribed Before Me,
this 22 Day of April, 2003

NOTARY PUBLIC

718-01/59088

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PERFORADORA CENTRAL S.A. de C.V.,    *    CIVIL ACTION NO.
                                     *
            Plaintiff,               *    92-21 70
                                     *    ADMIRALTY
VERSUS                               *    SECT. H MAG. 1
                                     *
M/V GUILLOT TIDE, its engines,       *    SECTION " "
tackle, apparel, appurtenances,      *
furniture, equipment, etc. in rem,   *
TIDEWATER MARINE SERVICE, INC.,      *
SEAFARER BOAT CORPORATION and THE ABC *
INSURANCE COMPANY, in personam,      *
                                     *    MAG. DIV.
            Defendants.              *

## COMPLAINT

I.

The complaint of Perforadora Central S.A. de C.V.

("Perforadora") against M/V GUILLOT TIDE, in rem, and Tidewater

Marine Service, Inc. and Seafarer Boat Corporation, in personam,

for damages arising out of the collision of the vessel M/V GUILLOT

TIDE and Perforadora's jack-up drilling rig, USUMACINTA, with

respect represents:

II.

This is an admiralty and maritime claim within the

jurisdiction of the United States and of this Honorable Court

under Rule 9(h) of the Federal Rules of Civil Procedure.

III.

Perforadora is a corporation organized under the laws of

Mexico.

IV.

The M/V GUILLOT TIDE is a vessel, homeported in New Orleans, Louisiana, which is now or will be during the pendency or process herein, afloat on navigable waters of the State of Louisiana and within the jurisdiction of this Honorable Court.

V.

Tidewater Marine Service, Inc. is a corporation organized and existing under and by virtue of the laws of the State of Louisiana with an office and principal place of business in New Orleans, Louisiana, and is the owner and/or operator of the M/V GUILLOT TIDE.

VI.

Seafarer Boat Corporation is a corporation organized and existing under and by virtue of the laws of the State of Louisiana with an office and principal place of business in New Orleans, Louisiana, and is the owner and/or operator of the M/V GUILLOT TIDE.

VII.

ABC Insurance Company issued and/or delivered in Louisiana a policy of liability insurance insuring defendants Tidewater Marine Service, Inc. and Seafarer Boat Corporation and the M/V GUILLOT TIDE against the liabilities set forth herein. Perforadora is entitled to proceed directly against the insurance company for the obligations of defendants. Perforadora reserves the right to amend this paragraph to correctly name the insurance company.

-2-

VIII.

Venue is proper in this district and division pursuant to 28 U.S.C. 1391(b) because Tidewater Marine Service, Inc., Seafarer Boat Corporation and the M/V GUILLOT TIDE reside in this district.

IX.

Perforadora was, at all times pertinent to this litigation, and is now the owner of the jack-up drilling rig USUMACINTA.

X.

The jack-up drilling rig USUMACINTA (formerly the SABINE V) has a gross tonnage of 3,490 and has the following dimensions:  156.0 feet long, 132.0 feet wide and a depth of 17.7 feet.

XI.

On June 27, 1991, at 15:05 hours, the M/V GUILLOT TIDE was attempting to deliver grocery supplies onto Perforadora's jack-up drilling rig, USUMACINTA, that was then currently drilling on location in the Bay of Campeche.

XII.

While attempting to unload these grocery supplies, the M/V GUILLOT TIDE struck and damaged Leg No. 2 of the USUMACINTA. As the M/V GUILLOT TIDE pulled away, its mast struck and damaged the starboard escape ladder of the USUMACINTA.

XIII.

Upon information and belief, damage to Leg No. 2 of the jack-up drilling rig USUMACINTA and to the starboard escape ladder

-3-

was caused by the fault and/or unseaworthiness of the M/V GUILLOT TIDE and its negligent operation by its crew, and was in no way the fault of plaintiff.

## XIV.

Defendants have been placed on notice of Perforadora's intent to hold it responsible for all damages resulting from this June 27, 1991 collision, and has been given an opportunity to inspect, and did inspect and observe the damage and repairs.

## XV.

Partially as a result of damage to this leg and to the escape ladder, the rig had to be towed to Dos Bocos, Tabasco, Mexico, for repairs; and then back to its drilling location.

## XVI.

While being repaired, the USUMACINTA lost drilling time and thus lost profits.

## XVII.

Perforadora has incurred repair costs and related expenses arising out of damage to Leg No. 2 of the USUMACINTA and its starboard escape ladder.

## XIX.

In addition, Perforadora has incurred survey costs, court expenses, managerial and inspection charges as a direct result of the M/V GUILLOT TIDE's collision with the USUMACINTA.

## XX.

On information and belief, Perforadora's damages as a result of said collision exceed $400,000.00

-4-

XXI.

On information and belief, Perforadora has a maritime lien on the M/V GUILLOT TIDE, its engines, tackle, appurtenances, apparel, furniture, equipment, etc., in rem, for the said sum of $400,000.00, representing the sum due to plaintiff for damages arising out of the collision of said vessel with the jack-up drilling rig USUMACINTA and for interest, and attorney's fees.

XXII.

Tidewater Marine Service, Inc. and Seafarer Boat Corporation are liable in personam for the entire amount of damages in the amount of $400,000.00, more or less.

XXIII.

All of the above premises are true and correct and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court.

**WHEREFORE**, plaintiff, Perforadora, prays that:

1.    Process in due form of law, according to the rules and practices of this Court, may issue against the M/V GUILLOT TIDE, its engines, tackle, appurtenances, apparel, furniture, equipment, etc. and against any and all persons having a claim or any interest therein, and that they be cited to appear and answer, all in singular, the matters aforesaid;

2.    Perforadora may have a decree established and foreclose its maritime lien against the M/V GUILLOT TIDE, its engines, tackle, appurtenances, furniture, apparel, equipment,

etc. in the amount of $400,000.00 or such amount as may be found due, together with interest thereon from the date of demand until paid, and attorney's fees;

3. The said M/V GUILLOT TIDE, its engines, tackle, appurtenances, apparel, furniture, equipment, etc. be seized, condemned, and sold to satisfy the aforesaid decree;

4. Process in due form of law issue against defendants, Tidewater Marine Service, Inc., Seafarer Boat Corporation and ABC Insurance Company, citing them to appear and answer the Complaint herein, and after due proceedings be had, plaintiff have a judgment herein in their favor and against defendants, Tidewater Marine Service, Inc., Seafarer Boat Corporation and ABC Insurance Company, in the amount of $400,000.00, or such amount as may be found due, together with interest thereon from date of demand until paid and attorney's fees; and

5. For all equitable and general relief.

Respectfully submitted,

OF COUNSEL:

MILLING, BENSON, WOODWARD
HILLYER, PIERSON & MILLER

NEAL D. HOBSON (6885)
BENJAMIN O. SCHUPP (21074)
909 Poydras Street
Suite 2300
New Orleans, Louisiana 70112-1017
Telephone: (504) 569-7000

Attorneys for Plaintiff,
Perforadora Central S.A. de C.V.

0738X

-6-

PLEASE WITHHOLD SERVICE UNTIL FURTHER NOTICE
ON THE VESSEL:

M/V GUILLOT TIDE

PLEASE SERVE:

Tidewater Marine Service, Inc.
Through S.O.P., Inc.
1440 Canal Street, Suite 2100
New Orleans, LA  70112

Seafarer Boat Corporation
Through S.O.P., Inc.
1440 Canal Street, Suite 2100
New Orleans, LA  70112

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

JUN 09 1992

Jesse E. Clark, Clerk

| | |
|---|---|
| PERFORADORA CENTRAL S.A. de C.V. | § |
| | § |
| | § |
| Plaintiff | § |
| | § |
| vs. | § |
| | § |
| BIG ORANGE XXI, ITS | § |
| ENGINES, TACKLE, APPAREL, | § |
| APPURTENANCES, FURNITURE, | § |
| EQUIPMENT, ETC., *in rem*, AND | § |
| INTERMARINE INCORPORATED, | § |
| *in personam* | § |

C.A. No. _____
An Admiralty and Maritime
Claim Within the Meaning of
Rule 9(h)

# H 92 1714

## COMPLAINT

### I.

The Complaint of Perforadora Central S.A. de C.V. ("Perforadora") against BIG ORANGE XXI, *in rem*, and InterMarine Incorporated, *in personam*, for damages arising out of the collision of the supply boat BIG ORANGE XXI and Perforadora's jack-up drilling rig, USUMACINTA, with respect represents:

### II.

This is an admiralty and maritime claim within the jurisdiction of the United States and of this Honorable Court under Rule 9(h) of the Federal Rules of Civil Procedure.

### III.

Perforadora is a corporate organized under the laws of Mexico.

## IV.

The BIG ORANGE XXI is a vessel, homeported in Houston, Texas, which is now, or will be during the pendency or process herein, afloat on navigable waters of the State of Texas and within the jurisdiction of this Honorable Court.

## V.

InterMarine Incorporated is a corporation organized and existing under and by virtue of the laws of the State of Texas, with an office and principal place of business in Houston, Texas and is the owner and/or operator of BIG ORANGE XXI.

## VI.

Venue is proper in this District and Division pursuant to 28 U.S.C. 1391(b) because InterMarine Incorporated and the BIG ORANGE XXI reside in this District.

## VII.

Perforadora was, at all times pertinent to this litigation, and is now the owner of the jack-up drilling rig USUMACINTA.

## VIII.

The jack-up drilling rig USUMACINTA (formerly the SABINE V) has a gross tonnage of 3,490 and has the following dimensions: 156.0 feet long, 132.0 feet wide and a depth of 17.7 feet.

## IX.

On June 11, 1991, at 21:22 hours, the supply boat BIG ORANGE XXI was unloading cement onto Perforadora's jack-up drilling rig, USUMACINTA, that was then currently drilling on location in the Bay of Campeche.

## X.

While attempting to unload this cement, the BIG ORANGE XXI struck Leg No. 3 of the rig six times.

## XI.

Upon inspection, a large dent approximately 1 meter 30 cm. long and 1 meter wide was discovered in Leg No. 3.

## XII.

Upon information and belief, damage to Leg No. 3 of the jack-up drilling rig USUMACINTA was caused by the fault and/or unseaworthiness of the supply boat BIG ORANGE XXI and its negligent operation by its crew and was in no way the fault of plaintiff.

## XIII.

InterMarine Incorporated has been placed on notice of Perforadora's intent to hold it responsible for all damages resulting from the June 11, 1992 collision, and has been given an opportunity to inspect, and did inspect and observe the damage and repairs.

## XIV.

Partially as a result of the damage to this leg, the rig had to be towed to Dos Bocas, Tabasco, Mexico, for repairs; and then back out to a new drilling location.

## XV.

While being repaired, the USUMACINTA lost drilling time and thus lost profits.

## XVI.

Perforadora has incurred repair costs and related expenses arising out of the damage to Leg No. 3 of the USUMACINTA.

## XVII.

In addition, Perforadora has incurred survey costs, port expenses, managerial and inspection charges as a direct result of the BIG ORANGE XXI'S collision with the USUMACINTA.

## XVIII.

On information and belief, Perforadora's damages as a result of said collision exceed $500,000.

## XIX.

On information and belief, Perforadora has a maritime lien on the BIG ORANGE XXI, its engines, tackle, appurtenances, furniture, equipment, etc., *in rem*, for the said sum of $500,000, representing the sum due to plaintiff for damages arising out of the collision of said vessel with the jack-up drilling rig USUMACINTA and for interest, and attorneys' fees.

## XX.

InterMarine Incorporated is liable *in personam* for the entire amount of damages in an amount of $500,000 more or less.

## XXI.

All of the above premises are true and correct and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court.

L0307/0163/04LV03                               -4-

WHEREFORE, plaintiff, Perforadora, prays that:

1.    Process in due form of law, according to the rules and practices of this Court, may issue against the BIG ORANGE XXI, its engines, tackle, appurtenances, furniture, equipment, etc., and against any and all persons having a claim and any interest therein, and that they be cited to appear and answer, all and singular, the matters aforesaid.

2.    Perforadora may have a decree established and foreclose its maritime lien against BIG ORANGE XXI, its engines, tackle, appurtenances, furniture, equipment, etc., in the amount of $500,000, or such amount as may be found due, together with interest thereon from the date of demand until paid, and attorneys' fees;

3.    The said BIG ORANGE XXI, its engines, tackle, appurtenances, furniture, equipment, etc., be seized, condemned, and sold to satisfy the aforesaid decree;

4.    Process in due form of law issue against defendant, InterMarine Incorporated, citing it to appear and answer the Complaint herein, and after due proceedings be had, plaintiff have a judgment herein in their favor and against defendant, InterMarine Incorporated, in the amount of $500,000, or such amount as may be found due, together with interest thereon from date of demand until paid and attorneys' fees.

5.    For all equitable and general relief.

L0307/0163/04LV03                              -5-

Respectfully submitted,

Of Counsel:

BAKER & BOTTS

William C. Bullard
Attorney-in-Charge
Texas State Bar No. 03326000
3000 One Shell Plaza
Houston, Texas 77002
Telephone: (713) 229-1253
Telecopier: (713) 229-1522

Of Counsel:

MILLING, BENSON, WOODWARD,
HILLYER, PIERSON & MILLER

Neal D. Hobson
Louisiana State Bar No. 6885
Benjamin O. Schupp
Louisiana State Bar No. 21074
909 Poydras Street
Suite 2300
New Orleans, Louisiana 70112-1017
Telephone: (504) 569-7000
Telecopier: (504) 569-7001

Attorneys for Plaintiff,
Perforadora Central S.A. de C.V.

PLEASE WITHHOLD SERVICE UNTIL
FURTHER NOTICE:

BIG ORANGE XXI
at

_____

in Houston, Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



SOUTHERN DISTRICT OF TEXAS
FILED

AUG - 8 1996

MICHAEL N. MILBY, Clerk of Court

| | | |
|---|---|---|
| FALCON DRILLING COMPANY, INC., | § | |
| | § | |
| Plaintiff, | § | C.A. NO. __H. 96-2518__ |
| VS. | § | |
| | § | |
| INTELCO, LTD., | § | |
| | § | |
| Defendant. | § | |

### NOTICE OF REMOVAL

Defendant Intelco, Ltd. files its Notice of Removal, removing Cause No. 96-30880 from the 165th District Court, Harris County, Texas to this Court pursuant to 28 U.S.C. §1441 and §1332. The grounds for removal of this lawsuit are as follows:

### I.

On June 19, 1996, plaintiff filed its Original Petition against defendant Intelco, Ltd., in the 165th District Court, Harris County, Texas, styled *Falcon Drilling Company, Inc. v. Intelco, Ltd.*, No. 96-30880. Defendant Intelco, Ltd. was served with citation through the Texas Secretary of State on July 11, 1996. Certified copies of all process and pleadings are attached hereto.

### II.

This notice of removal is filed on behalf of and in the name of Intelco, Ltd. at the behest of Perforadora Central, S.A. de C.V., who at all times material hereto carried on the transactions made the basis of this suit under the asssumed name of "Intelco, Ltd." with the

permission of Intelco, Ltd., which fact is well known to the plaintiff herein. This notice of removal is filed by the undersigned with the specific authority of Intelco, Ltd. and by direction of Perforadora Central, S.A. de C.V.

### III.

The district courts of the United States have original jurisdiction over this action based on complete diversity of citizenship between the parties inasmuch as the defendant is now, and was at the time this action commenced, diverse in citizenship from the plaintiff. The plaintiff, Falcon Drilling Company, Inc. is a corporate citizen of the State of Texas and is not a corporate citizen of the Bahamas nor of the Republic of Mexico. At all material times, the defendant, Intelco, Ltd., was incorporated under the laws of the Bahamas and had its principal place of business in Nassau, Bahamas, as alleged in plaintiff's original petition. At all material times, Perforadora Central, S.A. de C.V. was a corporate citizen of the Republic of Mexico.

### IV.

Accordingly, because this action is wholly between citizens of different states, and because the matter in controversy the sum or value of $50,000, exclusive of interest and costs, this Court has original jurisdiction over this cause pursuant to 28 U.S.C. §1332(a)(1). Under 28 U.S.C. §1441(a) venue of the removed action is proper in this Court as the district and division embracing the place where the State action was pending.

### V.

On July 15, 1996, defendant received notice that plaintiff had filed suit in the 165th Judicial District court of Harris County, Texas, as Cause No. 96-30880. Certified copies of all process and pleadings are attached hereto. The petition named Intelco, Ltd. as defenddant.

## VI.

The thirty-day time period in which defendant is required by the laws of the United States, 28 U.S.C. §1446(b) to file this Notice of Removal has not yet expired.

## VII.

Intelco, Ltd., the removing party, will promptly give adverse parties written notice of the filing of this Notice of Removal as required by 28 U.S.C. §1446(d). Intelco, Ltd. will promptly file a copy of this Notice of Removal with the Clerk of the 165th District Court, Harris County, Texas where the action is currently pending, also pursuant to 28 U.S.C. §1446(d).

## VIII.

A true and correct copy of all process, pleadings and the orders served upon defendant Intelco, Ltd. in the state court action is being filed with this notice as required by 28 U.S.C. §1446(a) and attached hereto.

## IX.

Pursuant to 28 U.S.C. § 1446(d), defendant will file with the Clerk of the State Court, and will serve on counsel for plaintiff, a Notice of Filing of Notice of Removal.

## X.

Pursuant to Local Rules 3(A) and 3(K), this Notice of Removal is accompanied by copies of the following:

(1)    A Civil Cover Sheet (Exhibit A);

(2)    All executed process (Exhibit B);

(3)    Pleadings that assert causes of action, *e.g.*, petitions, counterclaims, cross-actions, third-party actions, interventions, and all answers to such pleadings (Exhibit C);

(4)    All orders signed by the State Court Judge (none);

(5)    A copy of the State Court Docket Sheet (Exhibit D);

(6)    An index of matters being filed (Exhibit E); and

(7)    A list of all counsel of record, including addresses, telephone numbers and parties represented (Exhibit F).

## X.

WHEREFORE, the defendant prays that this Court take jurisdiction of this action to conclusion and to final judgment to the exclusion of any further proceedings in the State Court in accordance with the law.

Respectfully submitted,

OF COUNSEL:
BAKER & BOTTS, L.L.P.

By _____
William C. Bullard
State Bar No. 03326000
Mark L. Walters
State Bar No. 00788611
3000 One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
(713) 229-1268
(713) 229-1522 (Facsimile)

Attorney for Intelco, Ltd. and
Perforadora Central S.A. de C.V.

## CERTIFICATE OF SERVICE

I certify that I have forwarded a true and correct copy of the above and foregoing by certified mail, return receipt requested to R. Bruce Hurley, Esq., Gardere Wynne Sewell & Riggs, L.L.P., 333 Clay Avenue, Suite 800, Houston, Texas 77002 this 8— day of August, 1996.

William C. Bullard

# EXHIBIT A

CAUSE NO. **96-30880**

| FALCON DRILLING COMPANY, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, T E X A S |
| | § | |
| INTELCO, LTD. | § | /65 TH JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Falcon Drilling Company, Inc., complaining of Intelco, Ltd., hereinafter called Defendant, and for cause of action would show unto this Honorable Court and the jury that:

I.

## Parties

1.   Falcon Drilling Company, Inc. ("Falcon") is a domestic corporation authorized to do business in the State of Texas with its principal place of business in Houston, Harris County, Texas.

2.   Defendant Intelco, Ltd. ("Intelco") is a Bahamian corporation with its principal place of business in Nassau, Bahamas.   Defendant may be served with citation herein by and through the Secretary of State, who will send process to Intelco's home office address, Mareva House, 4 George Street, Nassau, Bahamas.

II.

## Jurisdiction

3.   This Court has jurisdiction over this action by virtue of the fact that Defendant's broker/agent negotiated all or part of the contract in Houston, Harris County, Texas, and conducted business within the boundaries of this State.   The matter in

controversy greatly exceeds the minimum jurisdictional requirements of this Court.

III.

Venue

4.    This action is based upon a Letter of Agreement. Venue is proper as to Defendant because the parties negotiated a substantial part of the Letter of Agreement in Harris County, Texas. Pleading further, Defendant is amenable to jurisdiction here and venue is appropriate pursuant to Texas Civil Practice & Remedies Code § 15.002(a)(4).

IV.

Factual Background

5.    In August, 1994, Falcon entered into negotiations with Defendant for the purchase of three drilling barges known as Barge No. 3, Barge No. 4 and Barge No. 5. Falcon and Defendant negotiated and agreed upon a purchase price for Barge Nos. 3, 4 and 5 in the amount of $5,250,000 US. The terms of the agreement were set forth in an August 12, 1994 Letter of Agreement ("the Agreement") signed by the parties. A true and correct copy of the Agreement is attached hereto and incorporated herein for all purposes as Exhibit "A".

6.    On August 17, 1994, the parties ratified the terms of the Agreement and amended certain terms by a document entitled Addendum. A true and correct copy of the Addendum is attached hereto and incorporated herein for all purposes as Exhibit "B."

-2-

GW09\38336.2

7.  Pursuant to the terms of the Agreement and the Addendum, Defendant, as Seller, was to deliver all applicable vessel documentation, certification of deletion from Mexican documentation and proof of free and clear title, together with a bill of sale suitable for recordation, duly notarized, encounselorized by the counsel of purchaser's choice.  On or before October 31, purchaser was to deposit the full amount of the purchase price into an escrow account in a national bank in Houston, Texas.

8.  Pursuant to a Certified Resolution of the Board of Directors of Defendant, dated August 12, 1994, Neal D. Hobson, of the firm of Milling, Vinson, Woodward, Hillyer, Pierson & Miller, was appointed authorized agent to purchase, sell, charter, lease, mortgage or pledge vessels, drilling rigs, drilling equipment, marine equipment and any and all other property assets, real or personal, tangible or intangible.

9.  Pursuant to the terms of the Agreement, Falcon deposited US $500,000  down payment into an escrow account with Intelco's attorney-in-fact, Neal D. Hobson.

10.  On or about August 24, 1994, the parties entered into an escrow agreement for deposit and acknowledged receipt of the down payment in the amount of $500,000.  A true and correct copy of the escrow agreement is attached hereto and incorporated herein for all purposes as Exhibit "C".

11.  To date, Defendant has failed to meet its obligations under the agreement.  Upon information and belief, Barge No. 3, Barge No. 4 and Barge No. 5 (the "Rigs"), have not passed the

-3-

GW09\38336.2

Jalapita Bridge on the Gonzalez River in Mexico as required under the terms of the agreement. Furthermore, despite repeated demands, both orally and in writing, to deliver the rigs pursuant to the agreement, Defendant has failed to make delivery of the rigs in breach of the express terms of the Agreement and the Addendum.

12.  On June 10, 1996, written demand was made on Intelco to fulfill its obligations under the Agreement and cause the Rigs to be sold and delivered to Falcon. All conditions precedent to the filing of this action have occurred.

VI.

## Breach of Contract

13.  Falcon would show that Defendant has breached the terms of the Agreement and Addendum as complained of herein by failing to sell and deliver the Rigs to Falcon. Defendant's breach of contract is a proximate cause of damages to Plaintiff far in excess of the minimum jurisdiction requirements of this Court and for which damages Plaintiff now sues.

VII.

## Specific Performance

14.  Falcon will show that it is entitled to the equitable remedy of specific performance. Defendant failed to perform a valid contractual obligation. The Rigs in question are property which have unique value and characteristics to Plaintiff, and Falcon would not be adequately compensated for its loss by an award of monetary damages. As a result, should be required and compelled to perform that which they promised in the Agreement to sell and

-4-

GW09\38336.2

deliver the Rigs.  Falcon will show that it came into Court with clean hands and that the Agreement is fair and free from misrepresentation, misapprehension, fraud, mistake or surprise. All terms of the Agreement and the Addendum are expressed with reasonable certainty and as a result of the fundamental rule of equity the Court should grant specific performance requiring Defendant sell and delver the Rigs.

### VIII.

### Declaratory Judgment

Falcon requests that, pursuant to Section 37.001, *et seq.*, that this Court determine the rights and obligations by and between Falcon and Intelco as established by the Agreement and the Addendum.

### IX.

### Statutory Attorneys' Fees

15.  As a result of Defendant's breach of contract, Falcon has been required to retain the law firm of Gardere Wynne Sewell & Riggs, L.L.P. to prepare and prosecute this action.  Falcon seeks to recover reasonable and necessary attorneys' fees associated with preparation and prosecution of its action pursuant to Tex. Civ. Prac. & Rem. Code §38.001 and §37.009, for which damages Plaintiff hereby sues.

### X.

### Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff Falcon Drilling Company, Inc. prays that Defendant Intelco, Ltd. be cited to appear

-5-

GW09\38336.2

and answer herein, and that upon final trial of this case, it be awarded the equitable remedy of specific performance or, in the alternative, it have judgment against Defendant for actual damages as hereinabove stated in an amount far in excess of the minimum jurisdictional limits of this Court, together with pre-judgment interest as allowed by law, together with interest from the date of judgment until paid, as allowed by law, for their costs of court and for such other and further relief, both general and special, legal and equitable, to which Plaintiff may show itself justly entitled.

Respectfully submitted,

GARDERE WYNNE SEWELL & RIGGS, L.L.P.

BY: _____
R. Bruce Hurley
Texas Bar No. 10311400

333 Clay Avenue, Suite 800
Houston, Texas 77002
Telephone: (713) 308-5500
Telefax: (713) 308-5555

ATTORNEY FOR PLAINTIFF,
FALCON DRILLING COMPANY

-6-

GW09\38336.2



UNITED STATES COU TS
SOUTHERN DISTRICT OF TEXAS
FILED

EC  DEC 23 1997

Michael N. Milby, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **PERFORADORA CENTRAL, S.A. de C.V.** | * | **CIVIL ACTION NO.** |
| **VERSUS** | * | **JUDGE H-97-4155** |
| **GRANT PRIDECO, INC. and ENERGY VENTURES, INC.** | * | **MAG. DIV.** |

## COMPLAINT

Perforadora Central, S.A. de C.V. ("Perforadora") brings this action against Energy Ventures, Inc. ("Energy Ventures") and Grant Prideco, Inc. ("Grant Prideco").

### Parties

1.    Plaintiff Perforadora is the subject of a foreign state, being a corporation chartered in Mexico and having its principal place of business in Mexico City, Mexico.

2.    Defendant Energy Ventures is a Delaware corporation with its principal place of business in Houston, Texas.

3.    Defendant Grant Prideco is a Delaware corporation with its principal place of business in Houston, Texas.

4.    On or about September 4, 1996, Energy Ventures acquired Superior Tube Limited ("Superior") for approximately $16 million. Superior was then combined, integrated or merged with Energy Ventures' subsidiary, Grant Prideco.

### Subject Matter Jurisdiction

5.    This Court has jurisdiction of Perforadora's claim by virtue of 28 U.S.C. §1332(a)(2) in that there is complete diversity between the citizenship of the plaintiff and the citizenship of the

defendants, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## Venue and Personal Jurisdiction

6.      Venue is proper in this district pursuant to 28 U.S.C. 1391(a)(1) in that both defendants reside in this district.

7.      Alternatively, venue in this district is proper under 28 U.S.C. §1391(a)(3) by virtue of the fact that defendants Grant Prideco and Energy Ventures are subject to personal jurisdiction in this district in that they regularly conduct business activities in this district.

## Claim

## Drill Pipe for the Drilling Rig GRIJALVA

8.      On or about June 13, 1996, Superior sold to Perforadora, through Perforadora's purchasing agent in Houston, Texas, D-N Supply, Inc., 2,501.1 feet of 3½ inch G-105 drill pipe. The purchase price Superior was $52,898.27. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $12,000.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit A.

9.      On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 2019.6 feet of 3½ inch S135 drill pipe. The purchase price from Superior was $42,916.50. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $9,650.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit B.

10.     On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 7652.6 feet of 3½ inch E75 drill pipe. The purchase price from Superior was $155,730.41. At the time of

2

this sale Superior acknowledged receipt of a deposit in the amount of $34,500.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit C.

11.    On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 5,026.8 feet of 3½ inch X 95 drill pipe. The purchase price from Superior was $105,814.14. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $23,875.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit D.

## Drill Pipe for the Drilling Rig USUMACINTA

12.    On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply 2,501.1 feet of 3½ inch G-105 drill pipe. The purchase price Superior was $52,898.27. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $12,000.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit E. (The handwritten notation on the invoice/sale confirmation to U-038 is a correction by D-N Supply's Wayne Hibbs indicating the correct corresponding purchase order and the ultimate destination of the pipe at the USUMACINTA.)

13.    On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 2019.6 feet of 3½ inch S135 drill pipe. The purchase price from Superior was $42,916.50. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $9,650.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit F.

14.    On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 7652.6 feet of 3½ inch E75 drill pipe. The purchase price from Superior was $155,730.41. At the

3

time of this sale Superior acknowledged receipt of a deposit in the amount of $34,500.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit G.

15.    On or about June 13, 1996, Superior sold to Perforadora, through D-N Supply, 5,026.8 feet of 3½ inch X 95 drill pipe. The purchase price from Superior was $105,814.14. At the time of this sale Superior acknowledged receipt of a deposit in the amount of $23,875.00 forwarded by D-N Supply on behalf of Perforadora. A copy of the invoice/sale confirmation is attached as Exhibit H.

16.    The purchase orders for both the drill pipe for the GRIJALVA and the USUMACINTA reflect even number quantities (i.e.. 7,500.00 feet, 5,000.00 feet, 2,500.00 feet, and 2,000.00 feet). However, it is the custom in the industry to increase slightly the quantity on each order in case some of the pipe is defective. Consequently, the invoices/sale confirmations sent by Superior reflect slightly larger quantities and purchase prices.

17.    On or about September 4, 1996 Energy Ventures or Grant Prideco acquired Superior including its obligations to deliver the drill pipe ordered by Perforadora through D-N Supply, for which Superior had received over $150,000.00 in deposit money.

18.    In late 1996 D-N Supply informed Perforadora that Superior would be late in delivering the string of drill pipe for the rig USUMACINTA. Perforadora heard nothing further respecting this order until several weeks later, when it was informed by D-N Supply that Superior had been acquired by Grant Prideco and that Grant Prideco was canceling the orders and charging a cancellation fee equivalent to the deposit previously paid by Perforadora. D-N Supply also

4

informed Perforadora that Superior was taking the same position with respect to the drill pipe that had been ordered for the rig GRIJALVA.

19.    On or about November 27, 1996, D-N Supply filed a petition for protection under Chapter 11 of the federal bankruptcy laws in the United States Bankruptcy Court for the Southern District of Texas.

20.    On or about March 21, 1997, Perforadora demanded completion of the sales contracts by Grant Prideco or, alternatively a refund of the deposits. Grant Prideco informed Perforadora that it had purchased only the assets of Superior, and not its obligations, and was therefore not obliged to return Perforadora's deposit. Grant Prideco also took the position that it had dealt only with D-N Supply and therefore owed nothing to Perforadora.

21.    On or about December 12, 1997, Perforadora, with the bankruptcy court's approval, received an assignment of D-N Supply's contractual rights against Superior arising from certain purchase orders D-N Supply submitted to Superior on behalf of Perforadora and sale confirmations and invoices submitted by Superior to D-N Supply. Included in this assignment were D-N Supply's rights in the eight sales described above in paragraphs 8 through 15.

22.    Perforadora is willing and able to pay the remainder of the purchase price and is entitled to delivery of the eight orders of drill pipe alleged above in paragraphs 8 through 15 of this complaint. Perforadora has offered to complete these contracts, but Grant Prideco has refused. Perforadora is entitled as the real party in interest to an order compelling the specific performance of the eight contracts.

23.    Alternatively, Perforadora, as assignee of D-N Supply's rights in the eight sales, and standing in the shoes of D-N Supply, is entitled to enforce any and all of D-N Supply's rights to

5

compel specific performance of the contracts evidenced by the sale confirmations/invoices described above in paragraphs 8 through 15.

24.     In accordance with each of the purchases of drill pipe described above in paragraphs 8 through 15, Perforadora paid to D-N Supply, and D-N Supply in turn paid to Superior a deposit representing approximately 25% of the full purchase price. Superior's successor, Grant Prideco communicated to D-N Supply that the deposit D-N Supply had paid to Superior would not be returned because Superior had been purchased by Grant Prideco or Energy Ventures. Subsequently, D-N Supply notified Perforadora that its deposits would not be returned. None of the purchase orders or invoices involved, however, contained any terms providing for the forfeiture of deposits if the purchase orders were not completed. Further, there is no correspondence from Superior, Grant Prideco or Energy Ventures explaining why the sales were not completed or why the deposits were not returned.

25.     Accordingly, Perforadora in its own right and as assignee of D-N Supply's rights under the eight sale confirmations described above in paragraphs 8 through 15, is entitled to return of the deposits made on those purchase orders in the event specific performance is not decreed.

26.     Perforadora specifically alleges that Energy Ventures or Grant Prideco has been unjustly enriched in the amount of the deposits which it has retained. Accordingly, Perforadora is entitled to compensation from Grant Prideco or Energy Ventures for the total amount by which they have been unjustly enriched.

**WHEREFORE**, plaintiff Perforadora Central, S.A. de C.V. prays for judgment in its favor against defendants, Grant Prideco, Inc. and Energy Ventures, Inc. awarding the following relief:

6

(a)     Compelling Grant Prideco, Inc. and/or Energy Ventures to perform its obligations under the contracts alleged above by delivering the specified drill pipe to Perforadora in consideration for the price that D-N Supply, Inc. had agreed to pay Superior Tube, Ltd., which contracts were assumed by and are the responsibility of defendants.

(b)     Alternatively, in the event specific performance is not decreed, for judgment in its favor in the full amount of the deposits that Grant Prideco, Inc. and/or Energy Ventures, Inc. has retained.

(c)     For all interest on the sums wrongfully withheld by Grant Prideco, Inc. and/or Energy Ventures, Inc.

(d)     For all costs of this action.

(e)     For such further relief as justice may require.

Respectfully submitted,

OF COUNSEL:

MILLING, BENSON, WOODWARD,
HILLYER, PIERSON & MILLER, L.L.P.
NEAL D. HOBSON (La. Bar No. 6885)
BENJAMIN O. SCHUPP (LA Bar No. 21074)
909 Poydras Street, Suite 2300
New Orleans, LA 70112-1010
Telephone:  (504) 569-7000

JAMES K. IRVIN, Attorney-in-Charge
(TX Bar No. 00790145; LA Bar No. 7166)
909 Poydras Street, Suite 2300
New Orleans, LA  70112-1010
Telephone:  (504) 569-7000

Attorneys for Perforadora Central S.A. de C.V.

wp61/149058.bos:tp(#73282)

7

**SERVICE BY WAIVER OF SERVICE FORM**

# SUPERIOR TUBE
## LIMITED

9515 - 58th AVENUE
EDMONTON, ALBERTA  T6E 0B8
PHONE (403) 438-4625 • FAX (403) 438-7874

GST # R122003510

SOLD TO -

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

SHIP TO - (Same as 'SOLD TO' unless otherwise specified)

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | PURCHASE ORDER NO. | RIG OR UNIT NO | PACKING SLIP NO |
|------|------|------|------|------|------|
| 13-Jun-96 | 190 | 3508        1 | G-019/96 | D0029 | 6193 |

```
79 JTS. 3 1/2 15.5#/FT GR. G105 EU RG II      2501.100      21.15        52898.27
API 5D SUPERIOR DRILL PIPE c/w 5 OD X
2 7/16 ID 3 1/2 IF (NC38) 18 DEG
SHOULDER TOOL JTS, PINS & BOXES 2" LTS
PLASTIC PROTECTORS SUPPLIED.  EMI INSP.
TK34 INTERNAL PLASTIC COATED.

LESS DEPOSIT RECEIVED FEBRUARY 9/96          (1.000 12000.00       (12000.00)
```

EXHIBIT
A

| | |
|---|---|
| SUBTOTAL | 40,898.27 |
| GST | .00 |
| TOTAL | 40,898.27 |

FOB HOUSTON, TEXAS
PAYABLE IN US FUNDS!

CONDITIONS-
We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss.

TERMS: Net 30 Days.

INVOICE

# SUPERIOR TUBE
### LIMITED

*9515 - 58th AVENUE*
*EDMONTON, ALBERTA  T6E 0B8*
*PHONE (403) 438-4625 • FAX (403) 438-7874*

GST # R122003510

**SOLD TO -**

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

**SHIP TO - (Same as 'SOLD TO' unless otherwise specified)**

| ATE | CUSTOMER NUMBER | INVOICE NUMBER | | PURCHASE ORDER NO. | RIG OR UNIT NO. | PACKING SLIP NO |
|-----|------|------|---|------|------|------|
| 13-Jun-96 | 190 | 3509 | 1 | G-20/96 | D0030 | 6194 |

| | | | |
|---|---|---|---|
| 64 JTS. 3 1/2  15.5#/FT GR S135 RGE II API 5D SUPERIOR DRILL PIPE c/w 5 OD X 2 7/16 ID 3 1/2 IF (NC30) 18 DEG SHOULDER TOOL JTS, PINS & BOXES 2" LTS PLASTIC PROTECTORS SUPPLIED.  EMI INSP. TK34 INTERNAL PLASTIC COATING. | 2019.600 | 21.25 | 42916.50 |
| LESS DEPOSIT RECEIVED FEBRUARY 9/96 | (1.000 | 9650.00 | (9650.00) |

|  |  |
|---|---|
| SUBTOTAL | 33,266.50 |
| GST | .00 |
| TOTAL | 33,266.50 |

FOB HOUSTON, TEXAS
PAYABLE IN US FUNDS!

**EXHIBIT**
*B*

CONDITIONS- We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss.

**TERMS: Net 30 Days.**

**INVOICE**

# SUPERIOR TUBE
### LIMITED

**9515 - 58th AVENUE**
**EDMONTON, ALBERTA  T6E 0B8**
**PHONE (403) 438-4625 • FAX (403) 438-7874**

GST # R122003510

**SOLD TO -**

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

**SHIP TO - (Same as 'SOLD TO' unless otherwise specified)**

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | | PURCHASE ORDER NO. | RIG OR UNIT NO. | PACKING SLIP NO. |
|------|-----------------|----------------|---|--------------------|-----------------|------------------|
| 13-Jun-96 | 190 | 3510 | 1 | G-17/96 | D0027 | 6206 |

| | | |
|---|---|---|
| 239 JTS. 3 1/2  15.5#/FT GR E75 RGE II<br>API 5D SUPERIOR DRILL PIPE c/w 4 3/4 OD<br>X 2 9/16 ID 3 1/2 IF (NC38) 18 DEG<br>SHOULDER TOOL JTS, PINS & BOXES 2" LTS<br>PLASTIC PROTECTORS SUPPLIED.  EMI INSP.<br>TK34 INTERNAL PLASTIC COATED. | 7652.600        20.35 | 155730.41 |
| LESS DEPOSIT RECEIVED FEBRUARY 9/96 | (1.000 34500.00 | (34500.00) |

|  |  |
|---|---|
| SUBTOTAL | 121,230.41 |
| GST | .00 |
| TOTAL | 121,230.41 |

FOB HOUSTON, TEXAS
PAYABLE IN US FUNDS!

**EXHIBIT**
**C**

CONDITIONS- We warrant goods of our own manufacture to the extent that we will repair or replace. F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss

**TERMS: Net 30 Days.**

**INVOICE**

# SUPERIOR TUBE
## LIMITED

**9515 - 58th AVENUE**
**EDMONTON, ALBERTA  T6E 0B8**
**PHONE (403) 438-4625 • FAX (403) 438-7874**

GST # R122003510

SOLD TO -

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

SHIP TO - (Same as 'SOLD TO' unless otherwise specified)

| ATE | CUSTOMER NUMBER | INVOICE NUMBER | | PURCHASE ORDER NO. | RIG OR UNIT NO | PACKING SLIP NO |
|-----|-----------------|----------------|---|--------------------|----------------|-----------------|
| 13-Jun-96 | 190 | 3511 | 1 | G-18/96 | D0028 | 6211 |

```
159 JTS. 3 1/2  15.5#/FT GR X95 EU RG II      5026.800      21.05      105814.14
API 5D SUPERIOR DRILL PIPE c/w 5 OD X
2 9/16 ID 3 1/2 IF (NC38) 18 DEG
SHOULDER TOOL JTS, PINS & BOXES 2" LTS
PLASTIC PROTECTORS SUPPLIED.  EMI INSP.
TK34 INTERNAL PLASTIC COATED.

LESS DEPOSIT RECEIVED FEBRUARY 9/96         (1.000 23875.00    (23875.00)
```

|   |   |
|---|---|
| SUBTOTAL | 81,939.14 |
| GST | .00 |
| TOTAL | 81,939.14 |

**EXHIBIT D**

FOB HOUSTON, TEXAS
PAYABLE IN US FUNDS!

CONDITIONS- We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss.

TERMS: Net 30 Days.

**INVOICE**

# SUPERIOR TUBE
### LIMITED
**9515 - 59th AVENUE
EDMONTON, ALBERTA T6E 0B8
PHONE (403) 438-4625 • FAX (403) 438-7874**

*GST # R122003510*

**SOLD TO -**

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

**SHIP TO - (Same as 'SOLD TO' unless otherwise specified)**

— *a-038*

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | | PURCHASE ORDER NO. | REG OR UNIT NO. | PACKING SLIP NO. |
|------|-----------------|----------------|---|--------------------|-----------------|------------------|
| 13-Jun-96 | 190 | 3508 | 1 | G-019/96 | D0029 | 6193 |

79 JTS. 3 1/2 15.5#/FT GR. G105 EU RG II
API 5D SUPERIOR DRILL PIPE c/w 5 OD X
2 7/16 ID 3 1/2 IF (NC38) 18 DEG
SHOULDER TOOL JTS, PINS & BOXES 2" LTS
PLASTIC PROTECTORS SUPPLIED.  EMI INSP.
TK34 INTERNAL PLASTIC COATED.

LESS DEPOSIT RECEIVED FEBRUARY 9/96

2501.100          21.15          52898.27



EXHIBIT
E

**PAYABLE IN US FUNDS!**

CONDITIONS:
We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability by express, statutory or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted are to be completed only with our demand and upon terms that will bind us from time.

**TERMS: Net 30 Days.**

**INVOICE**

05/14/96  15:36    SUPERIOR TUBE LTD + 713 859 9462                    NO.495  P025/015

# SUPERIOR TUBE
### LIMITED
9515 - 58th AVENUE
EDMONTON, ALBERTA  T6E 0B6
PHONE (403) 438-4625 • FAX (403) 438-7874

GST # R122003510

**SOLD TO -**

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

**SHIP TO - (Same as 'SOLD TO' unless otherwise specified)**

U - 039

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | | PURCHASE ORDER NO. | REQ OR UNIT NO. | PACKING SLIP NO. |
|------|------|------|------|------|------|------|
| 13-Jun-96 | 190 | 3509 | 1 | G-20/96 | D0030 | 6194 |

64 JTS. 3 1/2  15.5#/FT GR 8135 RGE II          2019.600      21.25        42916.50
API 5D SUPERIOR DRILL PIPE c/w 5 OD X
2 7/16 ID 3 1/2 IF (NC30) 18 DEG
SHOULDER TOOL JTS, PINS & BOXES 2" LTS
PLASTIC PROTECTORS SUPPLIED.  EMI INSP.
TK34 INTERNAL PLASTIC COATING.

LESS DEPOSIT RECEIVED FEBRUARY 9/96



EXHIBIT
F

PAYABLE IN US FUNDS!

CONDITIONS. We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and conditions for which they were manufactured. Save as herein mentioned, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss.

TERMS: Net 30 Days.

**INVOICE**

# SUPERIOR TUBE
## LIMITED

8515 - 58th AVENUE
EDMONTON, ALBERTA  T6E 0B8
PHONE (403) 438-4825 • FAX (403) 438-7874

GST # R122003510

SOLD TO -

D-N SUPPLY CO.
14825 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

SHIP TO - (Same as 'SOLD TO' unless otherwise specified)

SHOULD BE
U-036

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | PURCHASE ORDER NO. | RIG OR UNIT NO. | PACKING SLIP NO. |
|------|-----------------|----------------|--------------------|-----------------|------------------|
| 13-Jun-96 | 190 | 3510 | 1 G-17/96 | D0027 | 6205 |

| | | |
|---|---|---|
| 239 JTS. 3 1/2  15.5#/FT GR E75 RGE II API 5D SUPERIOR DRILL PIPE c/w 4 3/4 OD X 2 9/16 ID 3 1/2 IF (NC38) 18 DEG SHOULDER TOOL JTS, PINS & BOXES 2" LTS PLASTIC PROTECTORS SUPPLIED.  EMI INSP. TK34 INTERNAL PLASTIC COATED. | 7652.600 | 20.35 | 155730.41 |

LESS DEPOSIT RECEIVED FEBRUARY 9/96

EXHIBIT
6

PAYABLE IN US FUNDS!

CONDITIONS: We warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein contained, there is no condition, warranty or guarantee given in respect of the goods described herein, expressed or implied, and we expressly disclaim any liability for damages, consequent or otherwise, arising in connection with the use, operation or service of any goods supplied beyond the replacement of defective materials as above set forth. Orders placed and accepted are to be carried only with our consent and upon terms that will allow us from time.

TERMS: Net 30 Days.

INVOICE

# SUPERIOR TUBE
## LIMITED

9515 - 58th AVENUE
EDMONTON, ALBERTA  T6E 0B8
PHONE (403) 438-4825 • FAX (403) 438-7874

GST # R122003510

SOLD TO -

D-N SUPPLY CO.
14025 FM ROAD

HOUSTON, TEXAS USA 77041
WAYNE HIBBS

SHIP TO - (Same as "SOLD TO" unless otherwise specified)

U-034

| DATE | CUSTOMER NUMBER | INVOICE NUMBER | PURCHASE ORDER NO. | RIG OR UNIT NO. | PACKING SLIP NO. |
|------|-----------------|----------------|--------------------|-----------------|-----------------|
| 13-Jun-96 | 190 | 3511 | G-18/96 | D0028 | 6211 |

159 JTS. 3 1/2  15.5#/FT GR X95 EU RG II        5026.800        21.05        105814.14
API 5D SUPERIOR DRILL PIPE c/w 5 OD X
2 9/16 ID 3 1/2 IF (NC38) 18 DEG
SHOULDER TOOL JTS, PINS & BOXES 2" LTS
PLASTIC PROTECTORS SUPPLIED.  EMI INSP.
TK34 INTERNAL PLASTIC COATED.

LESS DEPOSIT RECEIVED FEBRUARY 9/96

EXHIBIT
H

PAYABLE IN US FUNDS!

CONDITIONS: This warrant goods of our own manufacture to the extent that we will repair or replace, F.O.B. point of manufacture, any such goods if by reason of faulty material or workmanship they prove defective under normal use and service for which they were manufactured. Save as herein expressed, there is no condition, warranty or guarantee given in respect of the goods furnished herein, expressed or implied, and we expressly disclaim any liability for damages, contingent or otherwise, arising in connection with the use, operation or service of any goods furnished beyond the replacement of defective materials as above set forth. Orders placed and accepted can be cancelled only with our consent and upon terms that will save us from loss.

TERMS: Net 30 Days.

INVOICE



| Account Number | Serial Number | Dollar Amount | Item Status | Image Status | Issue Date | Paid Date |
|---|---|---|---|---|---|---|
| 00008800596473 | 0000167651 | $5,916.66 | | Yes | 12/04/2002 | 11/25/2002 |

| CD Volume ID | Sequence Number | Additional Data |
|---|---|---|
| 20021204184601 | 0063440782 | |

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

NOV 04 1996

| | | |
|---|---|---|
| PERFORADORA CENTRAL S.A. de C.V. | * | CIVIL ACTION NO. |
| | | CV96 - 2574 |
| VERSUS | * | SECTION |
| | | |
| DRILL PIPE INDUSTRIES, INC., | * | MAG. DIV. |
| TUBOSCOPE VETCO INTERNATIONAL, | | JUDGE DOHERTY |
| INC. AND D-N SUPPLY COMPANY | * | MAGISTRATE JUDGE TYNES |

\* \* \* \* \* \* \* \* \*

## C O M P L A I N T

Perforadora Central S.A. de C.V. ("Perforadora") brings this action against Drill Pipe

Industries, Inc. ("Drill Pipe"), Tuboscope Vetco International, Inc. ("Tuboscope"), and D-N Supply

Co. ("D-N Supply").

### Parties

1.

Plaintiff, Perforadora, is the subject of a foreign state, being chartered in Mexico and having

its principal place of business in Mexico City, Mexico.

2.

Defendant, Drill Pipe, is a Texas corporation with its principal place of business in

Texarkana, Texas.

3.

Defendant, Tuboscope, is a Texas corporation with its principal place of business in Houston,

Texas.

ATTEST A TRUE COPY
ROBERT H. SHEMWELL, CLERK
USDC, WESTERN DISTRICT OF LA.
BY
DATE 4/16/03

**4.**

Defendant, D-N Supply, is a Texas corporation with its principal place of business in Harris County, Texas.

## Subject Matter Jurisdiction

**5.**

This Court has jurisdiction of Perforadora's claim by virtue of 28 U.S.C. §1332(a)(2) in that there is complete diversity between plaintiff and defendants and the matter in controversy exceeds the sum of $50,000.00, exclusive of interest and costs.

## Venue and Personal Jurisdiction

**6.**

Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to Perforadora's claim occurred in this District.  In particular, the drilling pipe that is the subject of this litigation was shipped to Tuboscope's offices in Amelia, Louisiana (St. Mary Parish), where it was coated and then sent directly to Perforadora in Mexico. It is believed that improper coating by Tuboscope or Tuboscope's failure to disclose to Perforadora the defective condition of the pipe caused or contributed to the failure of the drilling pipe and to Perforadora's damages.

**7.**

In addition, venue in this district is proper under 28 U.S.C. § 1391(a)(3) by virtue of the fact that all of the defendants are subject to personal jurisdiction in this district in that they are either present in this district or have regularly conducted business activities in this district.

2

## Claim

**8.**

In January and February of 1996, Perforadora, ordered from D-N Supply a string of new 5" API grades E, X-95, G-105 and S-135 drilling pipe for use at Perforadora's drilling rig USUMACINTA (hereinafter the USUMACINTA drilling pipe).

**9.**

D-N Supply in turn ordered drilling pipe from Drill Pipe.

**10.**

Drill Pipe, on information and belief, defectively manufactured or modified the drilling pipe. In particular, Drill Pipe undertook to have the pipe upset (modified by the attachment of joints), have tool joints added, and have the pipe coated.

**11.**

Before delivery to Mexico, the USUMACINTA drilling pipe was sent by Drill Pipe or D-N Supply to Tuboscope's yard in Amelia, Louisiana for application of a special coating by Tuboscope.

**12.**

After the coating was applied, the USUMACINTA drilling pipe was delivered to Perforadora in Mexico in March and April of 1996 pursuant to Perforadora's Purchase Orders Numbers PIPMU001/96, PIPMU002/96, PIPMU003/96 and PIPMU004/96.

**13.**

By Purchase Orders dated February 26, 1996 numbered PIPMG003/96, PIPMG004/96, PIPMG005/96 and PIPMG006/96, Perforadora ordered from D-N Supply, another string of new 5" API grades E, X-95, G-105 and S-135 drilling pipe for use with the drilling rig GRIJALVA

3

(hereinafter GRIJALVA drilling pipe). A down payment of $194,703.00 was made to D-N Supply for this pipe.

### 14.

On information and belief, the GRIJALVA drilling pipe was to have undergone the same modifications and additions by Drill Pipe, and the same coating by Tuboscope, as the USUMACINTA drilling pipe had earlier.

### 15.

All or a portion of this GRIJALVA drilling pipe, like the USUMACINTA drilling pipe, was sent to Tuboscope's yard in Amelia, Louisiana for coating.

### 16.

The first use of the USUMACINTA drilling pipe, around April or May of 1996, produced immediate and multiple failures of the drilling pipe. Almost as soon as the drilling pipe was subjected to the stress of drilling, it fractured. It became obvious that all of the product Perforadora had purchased from D-N Supply and that had been manufactured by Drill Pipe was utterly useless as drilling pipe.

### 17.

As a result of the numerous delays caused by these failures and the danger of the drill string being dropped in the hole, Perforadora's customer, Petroleos Mexicanos S.A. de C.V. ("PEMEX") rejected the entire drill string, and removed Drill Pipe from its approved supplier list, thereby making it impossible for any additional drilling pipe furnished by Drill Pipe to be used on PEMEX jobs, including both the USUMACINTA and GRIJALVA projects, in Mexico. PEMEX provides the bulk

of Perforadora's work in Mexico, by virtue of the monopoly that PEMEX enjoys as a matter of Mexican law.

## 18.

Meanwhile, the GRIJALVA drilling pipe scheduled to be delivered in April and May of 1996 had remained undelivered after three consecutive delivery postponements.

## 19.

On June 3, 1996 Drill Pipe informed Perforadora that the grade E portion of the GRIJALVA drilling pipe was ready to be delivered, but Perforadora ordered Drill Pipe to stop shipment because of PEMEX's insistence that it would not accept any products of Drill Pipe and its removal of Drill Pipe from the PEMEX-approved supplier list.

## 20.

Upon an inspection of the USUMACINTA drilling pipe it was revealed that the 5" drilling pipe had not been manufactured in accordance with Perforadora's specifications for new drilling pipe, that it was of an inferior quality (Class 2 pipe, which had not been specified by Perforadora), that it was wholly unsuitable for the purpose intended and that it was otherwise not as specified in Perforadora's Purchase Order.

## 21.

The USUMACINTA and GRIJALVA drilling pipe is useless to Perforadora, and Perforadora would not have purchased it had it known of the drilling pipe's defective condition.

## COUNT I

### (Breach of Express and Implied Warranties)

**22.**

Drill Pipe and D-N Supply breached express warranties by failing to manufacture and deliver the quality of pipe ordered by Perforadora. In particular, these defendants expressly represented that they would manufacture and deliver new drilling pipe with certain API specifications and quality standards, which, in fact, the drilling pipe did not meet.

**23.**

Defendants Drill Pipe and D-N Supply breached implied warranties of merchantability as to the quality of the pipe, Tuboscope breached such warranties as to the quality of its protective coating, its application of the coating to the drilling pipe and that it would disclose to Perforadora any pitted and corroded condition of the pipe to which the coating was applied.

**24.**

The defendants provided drilling pipe or protective coating which was not reasonably fit for its intended purpose, *i.e.,* drilling for oil in the Bay of Campeche, Mexico, or protecting drilling pipe from corrosion that would prevent it from being used for such drilling.

**25.**

D-N Supply and Drill Pipe breached express and implied warranties by the following non-exclusive acts and omissions:

> (a)     Selling the drilling pipe with cavities and pits in the interior surface, which have prevented the drilling pipe from being of any use to Perforadora in its drilling operations;

6

(b)    Delivering the drilling pipe with hidden defects in the internal surfaces, which have prevented utilization of the pipes in the drilling hole; and

(c)    Representing that the drilling pipe was of certain specification and quality grade which the drilling pipe did not meet or possess.

**26.**

Tuboscope breached implied warranties by the following nonexclusive acts and omissions:

(a)    Failing to properly apply the protective coating on the drilling pipe ordered by Perforadora;

(b)    Failing to use protective coating of sufficient suitability and quality so as to prevent the failures experienced by Perforadora; and

(c)    Failing to inform Perforadora of the pitted and corroded condition of the pipe to which the coating was applied.

## COUNT II.

### (Breach of Contract)

**27.**

D-N Supply breached its contracts with Perforadora by failing to supply pipe of a particular API specification and quality grade as required in Perforadora's Purchase Orders.

## COUNT III.

### (Negligence)

**28.**

Drill Pipe was negligent in the following non-exclusive particulars:

(a)    Failing to manufacture the drilling pipe so that it was free of pits, corrosion and other defects that contributed to its loss of tensile strength and its inability to be used as drilling pipe.

7

(b)    Failing to properly test and inspect the drilling pipe to determine its compliance with API specifications and quality grades.

(c)    Failing to insure that the drilling pipe was properly coated and failing to order coating of sufficient suitability and quality to prevent the drilling pipe failures experienced by Perforadora.

**29.**

Tuboscope was negligent in the following non-exclusive particulars:

(a)    Failing to properly coat the drilling pipe sold to Perforadora; and

(b)    Failing to use protective coating of sufficient suitability and quality to prevent the failures experienced by Perforadora.

(c)    Failing to inform Perforadora of the pitted and corroded condition of the pipe to which the coating was applied.

## COUNT IV.

### (Redhibition)

**30.**

In the event Louisiana law is deemed applicable to the facts giving rise to any of Perforadora's causes of action, Perforadora alleges that the drilling pipe manufactured or modified by Drill Pipe and sold by D-N Supply to Perforadora contained hidden defects, which rendered the pipe useless for the purpose for which it was intended (*i.e.,* the drilling for oil and gas in the Bay of Campeche, Mexico).

**31.**

Perforadora alleges that Drill Pipe and D-N Supply knew that the drilling pipe was defective at the time it was sold to Perforadora. Alternatively, Perforadora alleges that Drill Pipe, as manufacturer, is deemed to have known of the redhibitory defects in its product.

8

**32.**

The coating applied by Tuboscope also contained defects, unnoticeable at the time of purchase by Perforadora, which rendered the coating useless for the purpose for which it was intended.

**33.**

Tuboscope knew or is deemed to have known that the coating was defective at the time it was sold to Perforadora.

## DAMAGES

**34.**

In addition to the purchase price of $546,286.63 for the USUMACINTA drilling pipe and the down payment of $194,703.00 for the GRIJALVA drilling pipe, Perforadora has incurred the following charges and expenses as a result of the defective drilling pipe:

    (a)    Import duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . $127,960.00

    (b)    Expenses of transporting the pipe to the rig . . . . . . $33,166.00

    (c)    Loss time on the rig (3 days at day rate of
            $23,995.00) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $71,985.00

    (d)    Cost of returning the pipe to shore . . . . . . . . . . . . . $5,433.00

    (e)    Costs of tests and inspections . . . . . . . . . . . . . . . . $16,952.00

**35.**

Perforadora's customer, PEMEX has "renegotiated" the daily drilling rate for Perforadora's rigs by making a downward adjustment of $1,000.00 per day to reflect the lower value of the equipment furnished by Perforadora.

9

**36.**

As a result of this downward adjustment on Perforadora's drilling contracts, Perforadora will suffer approximately $1,300,000 in lost profits.

**37.**

Perforadora desires and is entitled to a rescission of the sale and the return of the purchase price, together with $2,296,485.63 to cover Perforadora's expenses and lost profits.

**38.**

To the extent Article 2545 of the Louisiana Civil Code is applicable and to the extent any defendant who was a manufacturer of the drilling pipe or coating knew or is deemed to have known of its defects at the time of sale, such defendant is also liable to Perforadora for additional damages and attorneys fees and costs of bringing this action.

**WHEREFORE**, Perforadora Central S.A. de C.V. prays that after due proceedings there be judgment herein in favor of plaintiff, Perforadora Central S.A. de C.V., and against defendants Drill Pipe Industries, Inc., D-N Supply Company, and Tuboscope Vetco International rescinding the sale of said drilling pipe, and ordering defendants to pay plaintiff the sum of $2,296,485.63, as well as attorneys fees if warranted by law, with interest from judicial demand until paid.

10

Perforadora Central S.A. de C.V. further prays for all costs of these proceedings and all equitable relief to which it is entitled.

Respectfully submitted,

OF COUNSEL:

MILLING, BENSON, WOODWARD,
HILLYER, PIERSON & MILLER, L.L.P.

NEAL D. HOBSON (#6885)
JAMES K. IRVIN (#7166)
BENJAMIN O. SCHUPP (#21074)
909 Poydras Street, Suite 2300
New Orleans, LA  70112-1017
Telephone:  (504) 569-7000

Attorneys for Perforadora Central S.A. de C.V.

wp61/115848.bos:tp(#73282)

11

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

1999 SEP -7 A 11: 39

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PERFORADORA CENTRAL, S.A. de C.V. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. **99-2722** |
| | * | |
| M/V ROSIE, ITS ENGINES, TACKLE, | * | SECTION **SECT. R MAG. 4** |
| APPAREL, APPPURTENANCES, | * | |
| FURNITURE, EQUIPMENT, ETC., *IN REM* | * | MAG. DIV. |
| AND M/V GULF FLEET 70, ITS ENGINES, | * | An Admiralty and Maritime Claim |
| TACKLE, APPAREL, APPURTENANCES, | * | Within the Meaning of Rule 9(h) |
| FURNITURE, EQUIPMENT, ETC., *IN REM*; | * | |
| TIDEWATER MARINE SERVICE, INC., | * | |
| *IN PERSONAM*, GULF FLEET SUPPLY | * | |
| VESSELS INC., *IN PERSONAM*, SOUTH | * | |
| PACIFIC FISHING INVESTMENT CO. LTD, | * | |
| *IN PERSONAM*, NAUTICA SALTAMAR, S.A. | * | |
| DE C.V., *IN PERSONAM* , AND COTEMAR, | * | |
| S.A. de C.V., *IN PERSONAM* | * | |

## VERIFIED COMPLAINT

### I.

The complaint of Perforadora Central, S.A. de C.V. (hereinafter "Central") against the M/V

ROSIE (hereinafter "ROSIE"), *in rem*, and the M/V GULF FLEET 70 (hereinafter "GULF FLEET

70"), *in rem*, and Tidewater Marine Service, Inc., *in personam*; Gulf Fleet Supply Vessels, Inc., *in

personam*; South Pacific Fishing Investment Co. Ltd., *in personam*; Nautica Saltamar, S.A. de C.V.;

Fee $150. ⁰⁰
Process
X Dktd
CtRmDep
Doc.No.

Cotemar, S.A. de C.V., *in personam*, (in personam defendants hereinafter at times collectively referred to as "Tidewater"), for damages arising out of the collision of the ROSIE and Central's jack-up drilling rig, GRIJALVA, and the collision of the GULF FLEET 70 and Central's jack-up drilling rig, GRIJALVA, with respect represents:

## PARTIES

### II.

Central is a corporation organized under the laws of Mexico.

### III.

Upon information and belief, the ROSIE is a vessel which is now, or will be during the pendency or process herein, afloat on navigable waters of the state of Louisiana and within the jurisdiction of this Honorable Court.

### IV.

The GULF FLEET 70 is a vessel which is now, or will be during the pendency or process herein, afloat on navigable waters of the state of Louisiana and within the jurisdiction of this Honorable Court.

### V.

Tidewater is a corporation organized and existing under and by virtue of the laws of the state of Louisiana. Tidewater continues to maintain an office and do business in Louisiana. Upon information and belief, Tidewater is the current owner and/or operator of the ROSIE and the GULF FLEET 70, and parent company of Gulf Fleet Supply Vessels, Inc. and South Pacific Fishing Investment Co. Ltd., and is responsible for the damages claimed herein.

2

VI.

Upon information and belief, at all times pertinent,, Nautica Saltamar, S.A. de C.V., and Cotemar, S.A. de C.V. were acting on behalf of and/or as agents for Tidewater in the operation and management of the Rosie and the Gulf Fleet 70 in Mexico and are responsible for the damages claimed herein.

## SUBJECT MATTER JURISDICTION

VII.

This Court has original jurisdiction of Central's claims by virtue of 28 U.S.C. §1333 in that Central's claims are admiralty and maritime claims within the jurisdiction of the United States and of this Honorable Court under Rule 9(h) of the Federal Rules of Civil Procedure.

## VENUE

VIII.

Venue is proper in this district and division pursuant to 28 U.S.C. §1391(b). Tidewater resides in this district and the ROSIE and GULF FLEET 70 are now, or soon will be, within this district. Upon information and belief, their home port and place of operation are the port of New Orleans.

IX.

Central was at all times pertinent to this litigation, and is now, the owner of the jack-up drilling rig GRIJALVA.

## COUNT ONE

X.

On or about September 6, 1998, the supply boat ROSIE was tied up to, and was

3

unloading supplies on to, Central's jack-up drilling rig, GRIJALVA, which was then drilling on location in the Bay of Campeche, offshore Mexico.

XI.

The captain and crew of the ROSIE were unable to control their vessel, resulting in the ROSIE's striking GRIJALVA's leg number 1.

XII.

Upon inspection, a large dent inward in an area approximately one foot in diameter or more was discovered in leg number 1 between pinholes number 1 and number 2. Such dent in a weight-bearing leg is required to be repaired by applicable law, regulations and safety rules.

XIII.

Upon information and belief, the damage to leg number 1 of the jack-up drilling rig GRIJALVA was caused by the fault and/or unseaworthiness of the supply boat ROSIE and its negligent operation by its crew and was in no way the fault of plaintiff, Central.

XIV.

Tidewater, through defendant Nautica Saltamar, S.A. de C.V., has been placed on notice of Central's intent to hold it responsible for all damages resulting from the September 6, 1998 collision.

XV.

Central has/will incur  repair cost and related expenses of approximately $100,000.00 arising out of the damage to leg 1 of the GRIJALVA including, without limitation, the following: (a) fabrication of a patch to repair the areas affected in leg 1; (b) installation of  a patch placed on the leg; (c)  examination of rig and preparation of engineering plans for repairs; (d) cost of

4

required tools and machine; (e) cost of materials paid for by Central.

### XVI.

Central has asserted and is entitled to assert a maritime lien on the ROSIE, its engines, tackle, appurtenances, furniture, equipment, etc., *in rem*, for the sums due to plaintiff for damages arising out of the collision of said vessel with the jack-up drilling rig GRIJALVA and for interest, cost and attorneys' fees.

### COUNT TWO

### XVII.

On or about September 12, 1998, the supply boat Gulf Fleet 70 was tied up to, and was unloading supplies on to, Central's jack-up drilling rig, GRIJALVA, which was then drilling on location in the Bay of Campeche, offshore Mexico.

### XVIII.

The captain and crew of the Gulf Fleet 70 were unable to control their vessel, resulting in the GULF FLEET 70's striking GRIJALVA's leg number 3.

### XIX.

Upon inspection, a large dent extending approximately two (2) or more feet laterally and one (1) or more foot (feet) longitudinally was discovered in leg number 3 in the left side of pinhole number 1. A six inch long crack extending laterally from the top left corner of the pinhole was also found. Such a dent and crack in a weight-bearing leg is required to be repaired by applicable law, regulations and safety rules.

### XX.

Upon information and belief, the damage to leg number 3 of the jack-up drilling rig

5

GRIJALVA was caused by the fault and/or unseaworthiness of the supply boat Gulf Fleet 70 and its negligent operation by its crew and was in no way the fault of plaintiff, Central.

## XXI.

Tidewater, through defendant Cotemar, S.A. de C.V., has been placed on notice of Central's intent to hold it responsible for all damages resulting from the September 12, 1998 collision.

## XXII.

Central has/will incur  repair cost and related expenses of approximately $100,000.00 arising out of the damage to leg 3 of the GRIJALVA including, without limitation, the following: (a) fabrication of a patch to repair the areas affected in leg 3; (b) installation of  a patch placed on the leg; (c)  examination of rig and preparation of engineering plans for repairs; (d) cost of required tools and machine; (e) cost of materials paid for by Central.

## XXIII.

Central has asserted and is entitled to assert a maritime lien on the GULF FLEET 70, its engines, tackle, appurtenances, furniture, equipment, etc., *in rem*, for the sums due to plaintiff for damages arising out of the collision of said vessel with the jack-up drilling rig GRIJALVA and for interest, cost and attorneys' fees.

## XXIV.

Additionally, in the process of repairing legs 1 and 3, the GRIJALVA will lose drilling time and  profits.  Central reserves the right to amend this complaint to claim the exact amount of such lost profits as soon as they are known.  These losses are estimated to approximately $50,000.00.

6

XXV.

In addition, Central has incurred, and will incur survey costs, port expenses, managerial and inspection charges as a direct result of the ROSIE's and the GULF FLEET 70's collisions with the GRIJALVA, including ABS survey and approval. Central reserves the right to amend its complaint after its full cost incurred become known.

XXVI.

Tidewater Marine Service, Inc., Gulf Fleet Supply Vessels, Inc., South Pacific Fishing Investment Co. Ltd., Nautica Saltamar, S.A. de C.V. and Cotemar, S.A. de C.V. are jointly, severally and solidarily liable *in personam* for the entire amount of damages.

XXVII.

On information and belief, ABC insurance underwriter issued the defendant vessels and corporations a policy of coverage against all liability asserted herein. Central reserves the right to amend this claim to assert them against such underwriters when their identity is known.

XXVIII.

All the above premises are true and correct and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court.

WHEREFORE, plaintiff, Perforadora Central, S.A. de C.V. prays that:

(1)     Process in due form of law according to the rules and practices of this Court may issue against the M/V ROSIE, her engines, tackle, appurtenances, furniture, equipment, etc., and against any and all persons having a claim and any interest therein, and that they be cited to appear and answer, all and singular, the matters aforesaid;

7

(2)     Process in due form of law according to the rules and practices of this Court may issue against the M/V GULF FLEET 70, her engines, tackle, appurtenances, furniture, equipment, etc., and against any and all persons having a claim and any interest therein, and that they be cited to appear and answer, all and singular, the matters aforesaid;

(3)     Perforadora Central, S.A. de C.V. may have a decree established and foreclose its maritime lien against the M/V ROSIE, her engines, tackle, appurtenances, furniture, equipment, etc., for such amount as may be found due, together with interest thereon from the date of demand until paid, and attorneys' fees;

(4)     Perforadora Central, S.A. de C.V. may have a decree established and foreclose its maritime lien against the M/V GULF FLEET 70, her engines, tackle, appurtenances, furniture, equipment, etc., for such amount as may be found due, together with interest thereon from the date of demand until paid, and attorneys' fees;

(5)     That the M/V ROSIE, her engines, tackle, appurtenances, furniture, equipment, etc., be seized, condemned, and sold to satisfy the aforesaid decree;

(6)     That the M/V GULF FLEET 70, her engines, tackle, appurtenances, furniture, equipment, etc., be seized, condemned, and sold to satisfy the aforesaid decree;

(7)     Process and due form of law issue against defendants, Tidewater Marine Service, Inc.; Gulf Fleet Supply Vessels, Inc.; South Pacific Fishing Investment Co. Ltd.; Nautica Saltamar, S.A. de C.V.; and  Cotemar, S.A. de C.V. citing them to appear and answer the complaint herein, and after due proceedings be had, plaintiff have a judgment herein in their favor and against defendants, the M/V ROSIE, her engines, tackle, appurtenances, furniture, equipment, etc.; the M/V GULF FLEET 70, her engines, tackle, appurtenances, furniture,

8

equipment, etc.; Tidewater Marine Service, Inc.; Gulf Fleet Supply Vessels, Inc.; South Pacific

Fishing Investment Co. Ltd.; Nautica Saltamar, S.A. de C.V.; and  Cotemar, S.A. de C.V.,

jointly, severally and *in solido*, for the amount of $250,000.00 U.S and/or in such amount as may

be found due, together with interest thereon from the date of demand until paid and attorneys'

fees; and

      (8)    For all equitable and general relief.


OF COUNSEL:

MILLING BENSON WOODWARD L.L.P.

Respectfully submitted,

Neal D. Hobson (#6885)
Benjamin O. Schupp (#21074)
Sergio J. Alarcon (#24740)
909 Poydras Street - Suite 2300.
New Orleans, Louisiana 70112-1010
Telephone: (504) 569-7000

Attorneys for Perforadora Central, S.A.de
C.V.

**PLEASE SERVE**
Tidewater Marine Service Inc.
      *through its agent for service of process*
S.O.P., Inc.
601 Poydras Street, Suite 1900
New Orleans, La. 70130

Gulf Fleet Supply Vessels, Inc.
      *Through Tidewater Marine Service Inc.*
S.O.P., Inc.
601 Poydras Street, Suite 1900
New Orleans, La. 70130

South Pacific Fishing Investment Co. Ltd.
      *Through Tidewater Marine Service Inc.*
S.O.P., Inc.
601 Poydras Street, Suite 1900
New Orleans, La. 70130

Nautica Saltamar, S.A. de C.V.
      *Through Tidewater Marine Service Inc.*
S.O.P., Inc.
601 Poydras Street, Suite 1900
New Orleans, La. 70130

Cotemar, S.A. de C.V.
      *Through Tidewater Marine Service Inc.*
S.O.P., Inc.
601 Poydras Street, Suite 1900
New Orleans, La. 70130

**PLEASE WITHHOLD SERVICE UNTIL FURTHER NOTICE**
M/V ROSIE

_____
_____
_____


M/V GULF FLEET 70

_____
_____
_____

/wp203512(.74683)

10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PERFORADORA CENTRAL, S.A. de C.V. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. |
| | * | |
| M/V ROSIE, ITS ENGINES, TACKLE, | * | SECTION " " |
| APPAREL, APPPURTENANCES, | * | |
| FURNITURE, EQUIPMENT, ETC., *IN REM* | * | MAG. DIV. |
| AND M/V GULF FLEET 70, ITS ENGINES, | * | An Admiralty and Maritime Claim |
| TACKLE, APPAREL, APPURTENANCES, | * | Within the Meaning of Rule 9(h) |
| FURNITURE, EQUIPMENT, ETC., *IN REM*; | * | |
| TIDEWATER MARINE SERVICE, INC., | * | |
| *IN PERSONAM*, GULF FLEET SUPPLY | * | |
| VESSELS INC., *IN PERSONAM*, SOUTH | * | |
| PACIFIC FISHING INVESTMENT CO. LTD, | * | |
| *IN PERSONAM*, NAUTICA SALTAMAR, S.A. | * | |
| DE C.V., *IN PERSONAM* , AND COTEMAR, | * | |
| S.A. de C.V., *IN PERSONAM* | * | |

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned notary, came SERGIO J. ALARCON, who did depose, state

and declare that:

1.     He is an attorney at the law firm of Milling Benson Woodward L.L.P., attorneys for the plaintiff in the above-captioned matter;

2.     That he has read the foregoing verified Complaint and believes the allegations contained therein are true; and

3.     That such belief is based upon documents and other information provided to him by the plaintiff and by his own investigation.


_Sergio J. Alarcon_
SERGIO J. ALARCON

Sworn to and subscribed
before me this _7th_ day
of _September_ , 1999.

_Benjamin O. Schupp_
NOTARY PUBLIC

My Commission expires at death

/wp203516(.74683)

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISS
FILED

JUL 19 1999

J.T. NOBLIN, CLERK
BY_____ D

SUBMERSIBLE SYSTEMS, INC.                                          PLAINTIFF

VS.                                            CIVIL ACTION NO. 1:98cv251GR

PERFORADORA CENTRAL, S.A. de C.V.                                  DEFENDANT

BENCH OPINION

This cause came on for trial before the Court without a jury on June 14, 1999. Shortly thereafter, the parties submitted proposed findings of fact and conclusions of law to the Court. The Court, having fully considered the testimonial and documentary evidence presented by both parties at trial, the arguments of counsel, the applicable law, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Findings of Fact

I.    General Background

The plaintiff, Submersible Systems, Inc. [SSI], is a Louisiana corporation[1] that owns and operates remotely operated vehicles [ROV], small unmanned submarine type vehicles used for underwater inspection, surveying and light construction. (Tr., pp. 25-28, 64-65.) During September of 1996, Quantum Ingenieros S.A. de C.V. [Quantum], a Mexican corporation, entered into an agreement with Petroleos Mexicanos [Pemex], the Mexican national oil

_____

[1]SSI resumed operations in July of 1995 and is owned by Wolfgang Burnside and his wife, who reside in Louisiana. (Tr., pp. 65, 84.)



EXHIBIT
C

company, for the survey and inspection of Pemex's pipelines in the territorial waters of Mexico. (Tr., pp. 28, 89-90, 100.) In order to perform the contract, Quantum entered into a service agreement with SSI to provide ROVs, including the personnel to operate and maintain them. (Jt. Exh. J-3.) Quantum subsequently time-chartered the M/V DON FRANCISCO and its personnel from the defendant, Perforadora Central, S.A. de C.V. [Perforadora], another Mexican corporation, to serve as the support vessel for the oil related work. (Def.'s Exh. D-25.)

The charter between Quantum and Perforadora commenced on or about November 1, 1996, and was to originally terminate on or about February 7, 1997. (Tr., p. 587; Def.'s Exh. D-25.) On or about November 3, 1996, Perforadora's vessel arrived in Morgan City, Louisiana, to transport SSI's equipment and personnel to Carmen, Mexico, and eventually to the job site. (Tr., pp. 28-29, 92.) Three ROVs[2] belonging to SSI, as well as their respective support systems, including a work van, control vans, a generator and fuel tank,[3] were loaded aboard the vessel. (Tr., pp. 29-30, 92; Jt. Exh. J-4; Pl.'s Exh. P-3.) Additionally, seven of SSI's employees, including Burnside, boarded the vessel in Morgan City, Louisiana. (Tr., pp. 29-30, 97.) At that time, only employees of Perforadora and SSI were aboard the vessel. (Id.) During the trip to Carmen, Burnside explained how the ROVs worked to the captain of the vessel and informed him that SSI owned the equipment. (Tr., p. 98.)

---

[2] The three ROV's included the MAX ROV, the SEA OWL, and the TRITON. The MAX ROV and SEA OWL were both owned by SSI, and the TRITON was leased by SSI in order to partially perform the Quantum contract. (Tr., pp. 27, 110.) The SEA OWL was smaller than the MAX ROV and was used at the beginning of the Quantum contract. (Tr., p. 27.)

[3] The generator and fuel tank were leased by SSI from Welch Sales and Services, Inc. [Welch], another Louisiana corporation, and was clearly marked "Welch Rentals." (Tr., p. 92.) Welch also filed suit for damages against Perforadora and settled prior to trial.

Upon arrival in Carmen on November 7, 1996, Quantum placed its own control van, leased living quarters, and an additional crew of approximately 10 or 11 people aboard Perforadora's vessel. (Tr., pp. 588-90.) Notwithstanding that fact, the three companies, Perforadora, Quantum and Submersible, were easily distinguishable while aboard the vessel. Perforadora employees were blue coveralls and operated the vessel; Quantum employees wore gray overalls with a company logo and operated the survey equipment; and SSI employees wore red coveralls with a company logo and operated the ROV equipment. (Tr., pp. 31-32.) Moreover, SSI's equipment was clearly marked "SUBMERSIBLE SYSTEMS, INC."; the SSI containers were red, the same color as SSI's coveralls; and SSI's employees were the only foreigners on the vessel. (Tr., pp. 31-32, 91; Pl.'s Exhs. P-8-P-10.)

While in Carmen, Fausto Correa, Perforadora's marine operations manager, boarded the vessel and inspected the ROV equipment. (Tr., p. 302.) At that time, Burnside introduced himself as owner of SSI and identified the equipment that belonged to SSI. (Tr., pp. 101-102.) Correa admitted that the SSI containers were painted red, were operated by foreigners wearing red coveralls, and that the equipment was marked with SSI's name. (Tr., pp. 295-298, 300-01.) Correa even boarded the vessel approximately ten times during the course of the contract between Perforadora and Quantum.[4] (Tr., p. 299.)

Quantum's representative also filled out customs importation documents on SSI's equipment upon the vessel's arrival in Carmen. (Def.'s Exhs. D-1-D-4.) In order to import equipment for use on a job within Mexico or its territorial waters under Article 106, Section 2, Subsection A, a Mexican corporation was required to be listed as one of the importers. (Tr.,

---

[4]No contract existed between Perforadora and SSI.

pp. 378-80, 412-13, 459.) As a result, both Quantum and SSI were listed as importers on the customs forms. (*Id.*) A Mexican corporation importing Mexican goods, however, could not import goods under the provisions cited in the custom forms. (Tr., pp. 378-80, 459.) Thus, it was impossible to conclude from the customs forms that Quantum owned the equipment. (Tr., pp. 379-80, 412-13, 459.) Upon completion of the customs process, SSI's equipment and personnel received temporary certificates allowing them to remain in Mexico for six months, or until May of 1997. (Def.'s Exhs. D-1-D-4; Tr., pp. 30, 378.)

After Quantum's equipment and personnel were loaded aboard the vessel, the inspection of underwater oil lines began off the coast of Mexico, primarily in the Bay of Campeche. (Jt. Exh. J-2; Tr., p. 191.) On at least two occasions during the contract, Quantum fell behind on payments to Perforadora for the use of its vessel, thereby resulting in the vessel being recalled into port and the equipment aboard, including SSI's equipment, being padlocked by Perforadora in an attempt to extract payment from Quantum. (Tr., pp. 36-37, 109, 266-67, 305-06.) Once Quantum paid its balance, the equipment would be released and the inspection of oil lines would resume. (Tr., p. 37, 109.) Other than those two occasions, the contract between Perforadora and Quantum continued without event. (Tr., pp. 37-38, 102.) Although the contract was initially scheduled to end in February of 1997, the contract between Perforadora and Quantum was extended to permit the inspection work to be finished. (Tr., pp. 585-86.)

During the contract between SSI and Quantum, SSI billed its services and Quantum paid them in moderation. Specifically, from November of 1996 through February of 1997, SSI billed Quantum $729,347.15 and Quantum paid $340,000. (Jt. Exh. J-11.) Thus, Quantum's net balance as of February 1, 1997, for services rendered prior to that time was $389,347.15.

After that date, SSI invoiced Quantum at the beginning of each month for the services performed in the preceding month. (*Id.*)  Beginning March 1, 1997, through July 1, 1997, Quantum was billed for services rendered in the total amount of $1,056,403.38. (Jt. Exhs. J-11, J-12.)  Between February 19, 1997, and May 22, 1997, Quantum submitted payments on its account in the total amount of $725,000. (Jt. Exh. J-11.)  Thus, Quantum paid SSI a total of $1,065,000 for services rendered during the contract. (*Id.*)

Because SSI's contract with Quantum was initially profitable, Burnside placed an order to buy a second MAX ROV in February of 1997, and paid a deposit of $16,500 to secure its construction.[5] (Tr., pp. 107-08.)  In May of 1997, however, Quantum fell behind in its payment to both Perforadora and SSI. (Tr., p. 185; Jt. Exh. J-11.)  As a direct result of Quantum's failure to make payments, SSI returned the rented Triton ROV to its owner, which resulted in a reduction of $60,000 in monthly rental expenses, and canceled its order for the second MAX ROV. (Tr., pp. 107, 110, 179-80.)  By the end of the contract, Quantum owed SSI $720,750.53 for services rendered entirely in 1997. (Jt. Exhs. J-11, J-12.)  Further, SSI terminated most of its employees, thereby reducing its work crew aboard the vessel to two employees, Michael Carlisle and William Allen, who operated the remaining equipment belonging to SSI. (Tr., pp. 30, 39-40, 244.)  SSI's equipment aboard the vessel at that time included the MAX ROV system, a control van with technical equipment, a work van with tools, a winch, and the rented generator and fuel tank. (Tr., pp. 109-10.)

After granting Quantum numerous extensions, Perforadora terminated the Quantum charter in the latter part of June, 1997, because Perforadora had entered into a new charter of

---

[5]It takes approximately six months to construct and to customize a new ROV because it is not a piece of equipment readily available on the market. (Nicholson Depo., pp. 74-75.)

the vessel with Pemex to begin June 24, 1997. (Tr., pp. 584-86; Def.'s Exh. D-43.) At that time, Quantum had once again fallen behind on payments to Perforadora and had issued insufficient checks as payment. (Tr., p. 268.) Although the vessel was originally contracted to be returned to Carmen, Perforadora changed the termination destination to the port of Dos Bocas, Mexico, in order to save transit time and to allow Pemex to inspect the vessel. (Tr., pp. 334, 586.) Pursuant to its original charter, Quantum, not SSI, was responsible for removing all of the equipment aboard Perforadora's vessel and to return the vessel to its pre-charter condition. (Tr., p. 588; Def.'s Exh. D-25, p. 7-104.8, Part II, 2(d).) In fact, Quantum notified Mexican customs of the equipment to be unloaded and received the necessary unloading permit. (Jt. Exh. J-5.)

II.    The Seizure

When the vessel arrived in Dos Bocas during the early morning hours of June 23, 1997, Quantum personnel took their equipment off the vessel and left the dock. (Tr., p. 39.) Around 9 to 10 A.M., the captain of the vessel[6] awoke Carlisle and Allen and informed them that SSI's equipment aboard the vessel had been seized by Perforadora until Quantum paid the arrearage owed to Perforadora. (Tr., p. 40; Pl.'s Exh. P-96, pp. 73, 139; Def.'s Exh. D-54, pp. 70-72.) Thus, Carlisle and Allen moved the MAX ROV into the work van to protect it during the seizure. (Tr., pp. 40, 51.)

Contemporaneously, an agent of Perforadora, Angulo Geronimo, boarded the vessel on that morning and determined that Carlisle and Allen's work visas had expired. (Geronimo

---

[6]The captain of the vessel was an employee of Perforadora. (Tr., p. 41.) During the course of this action, neither party has been able to locate him. (Id.) The Court, however, overruled Perforadora's objection to his statement. (Tr., p. 42.)

Depo., pp. 19-21.) Geronimo notified the Mexican immigration authorities who, in turn, ordered Carlisle and Allen to the local immigration office. (Tr., p. 40; Geronimo Depo., pp. 19-20.) After Carlisle and Allen went to the immigration office to correct the visa situation, they were released and told to return later that afternoon to pay a fine. (Tr., pp. 40-41; Geronimo Depo., pp. 21-22, 27.) Carlisle and Allen then returned to the vessel and discovered that SSI's equipment was being offloaded. (Tr., pp. 41, 43.) In response, Carlisle and Allen contacted Burnside and informed him that the equipment had been seized by Perforadora. (Tr., pp. 43, 114-15.) Upon returning to the vessel a second time, the vessel's captain, acting upon instructions from Correa, allowed Carlisle and Allen to retrieve their personal effects. (Tr., pp. 43, 310.) In fact, the captain had to unlock SSI's equipment for Carlisle and Allen to retrieve those items because the locks had been switched by Perforadora while the equipment was aboard the vessel. (Tr., pp. 40, 44-45.) After the seizure, Perforadora temporarily stored SSI's equipment in Pemex's fenced yard and hired an armed guard. (Tr., pp. 52, 314-15, 322.)

III.   The Subsequent Events Including Legal Action

Upon learning of the seizure, Burnside contacted Quantum's representative to request assistance in the release of SSI's equipment. (Tr., p. 118.) Burnside also began arranging transportation of the equipment to the United States. (Tr., pp. 118, 252.) In fact, had Burnside been given the opportunity, he would have arranged for the use of a crane to unload the equipment. (Tr., pp. 251-52.) Burnside immediately left Louisiana in his truck and headed to Dos Bocas in an attempt to retrieve SSI's equipment. (Tr., p. 119.)

On or about June 26, 1997, Burnside arrived in Dos Bocas and met with Correa. (Tr., p. 119.) Again, Burnside informed Correa that SSI owned the equipment and he requested its

release. Correa told Burnside that the equipment was being held until Quantum paid Perforadora for its past due services. (Tr., pp. 120, 167.) Upon the request and representations made by Correa, Burnside signed an Acta Informativa written entirely in Spanish on June 27, 1997, describing the equipment offloaded and stating that it was done without any damage. (Tr., pp. 121-22, 314; Jtd. Exh. J-7.) More importantly, Correa released some of the delicate equipment including VCRs, monitors and a video typewriter, to Burnside on June 28, 1997, and even allowed him to take pictures. (Tr., p. 123, Jt. Exh. J-10.) After Correa refused the release of the bulk of equipment, Burnside returned to the United States. (Tr., p. 124.)

Within a week, Burnside returned to Mexico and again requested that Perforadora release SSI's equipment. (Tr., pp. 126-27.) Correa allowed Burnside to take three additional VCR's and a hand controller of the MAX ROV. (Tr., pp. 121, 223-24, 253.) Consequently, Burnside resorted to diplomatic channels by contacting his United States Congressman, Billy Tauzin, and the American Consulate in Merida, Mexico. (Tr., pp. 128; Jt. Exh. J-9.) Correa admitted that the consulate's office contacted him on July 14, 1997, and requested the release of SSI's equipment. (Tr., pp. 328-29; Pl.'s Exh. P-13.) Those efforts, however, were to no avail.

The most telling event was a meeting held on July 4, 1997, between Perforadora and Quantum representatives to discuss Quantum's outstanding debt. At the meeting, Correa was again informed, this time by Quantum, that SSI owned the equipment seized by Perforadora. (Tr., pp. 324-27; Pl.'s Exh. P-21, ¶¶ 7, 8(c).) In fact, Correa notified Perforadora's president of the meeting by a letter dated July 7, 1997, explaining that SSI owned the equipment and that the equipment would be released upon payment by Quantum of its debt to Perforadora. (Pl.'s

Exh. P-21, ¶¶ 7, 8(c).)  Contrary to this knowledge, Perforadora loaded SSI's equipment

aboard another vessel the day after the meeting and transported it to Perforadora's secured

yard in Carmen.  (Tr., p. 322.)

Prior to this meeting, Perforadora initiated a criminal investigation of Quantum on June

30, 1997.  (Jt. Exh. J-14.)  Despite Perforadora's knowledge that SSI owned the equipment,

Lino Garcia, Perforadora's attorney, filed a petition with the Mexican Ministerio Publico[7] on

August 8, 1997, requesting that the equipment be made part of the criminal investigation

against Quantum.  (Tr., pp. 390, 409-10, 424-25; Jt. Exh. J-15.)  Specifically, Perforadora

misrepresented to the Ministerio Publico that the equipment belonged to Quantum and failed to

mention SSI's claim of ownership.  (*Id.*)  As a result, Perforadora was appointed custodian of

SSI's equipment.

In response, SSI hired two Mexican attorneys, Jaimie Herrera and Braulio

Manzaneque, to obtain the release of its equipment.  Correa's daily planner proves that

Herrera contacted him on September 2, 1997, and identified himself as SSI's attorney.  (Pl.'s

Exh. P-13.)  Meanwhile, Manzaneque wrote to Perforadora on October 13, 1997, and

personally met with Correa to request the release of SSI's equipment.  (Tr., p. 359; Pl.'s Exh.

P-18.)  These efforts were also to no avail.

On October 20, 1997, SSI formally appeared before the Ministerio Publico and

submitted numerous documents and testimony conclusively establishing ownership of the

equipment.  (Jt. Exh. J-16; Garza pp. 387, 422.)  Perforadora's attorney, however, filed the

customs documents with the Ministerio Publico claiming that Quantum was the owner of the

---

[7]The Ministerio Publico is a Mexican official somewhat similar to a district attorney.  (Tr., p. 19.)

equipment as an "importer." (Tr., pp. 389-90; Def.'s Exh. D-1; Jt. Exh. J-17-J-18.) With

full knowledge that the equipment belonged to SSI,[8] Garcia requested that the equipment not be

released until the end of criminal investigation against Quantum. (*Id.*) To make matters

worse, Garcia represented to the Ministerio Publico that the equipment would be stored in

Perforadora's warehouse until conclusion of the case. (Jt. Exhs. J-15, J-17.) Contrary to this

representation, Perforadora stored SSI's equipment in its yard in Carmen, exposed to the

elements. (Tr., p. 365.)

    After the unsuccessful attempts to reclaim its property, SSI discovered that Perforadora

was constructing a drilling rig at TDI Halter in Pascagoula, Mississippi. (Ct. R., Doc. 1.) As

a result, SSI filed the instant action on May 27, 1998, seeking attachment of the rig under

Supplemental Admiralty Rule B and for damages under the general maritime law. (*Id.*) SSI

also asserted diversity of citizenship as an alternative basis of jurisdiction. (*Id.*) After

entertaining numerous pretrial motions, this Court determined that admiralty jurisdiction exists

but denied the Rule B attachment. (Ct. R., Docs. 48, 62-63, 108-09.)

    Although the criminal investigation against Quantum concluded on September 30, 1998,

SSI's attorneys requested that Perforadora assist in the release of the equipment to allow SSI to

mitigate its damages. (Garcia Depo., pp. 45-46; Pl.'s Exhs. P-90, P-91.) Apparently, those

requests were ignored. On November 19, 1998, Chief United States Magistrate Judge John M.

Roper ordered the parties to cooperate to obtain the release of SSI's equipment. (Ct. R., Doc.

59.) As a result, Perforadora submitted Garcia's affidavit to the Ministerio Publico stating that

---

[8]Perforadora's attorney knew the property did not belong to SSI at this point because *inter alia* the
articles specified in the custom forms made it impossible to conclude that Quantum was the owner of the
equipment. Thus, Perforadora submitted these documents to the Ministerio Publico solely to cause confusion and
to prevent the release of SSI's equipment.

Perforadora had no opposition to the release of SSI's equipment. (Jt. Exh. J-20.) SSI then

obtained new Mexican attorneys, Patricio Rangel Dimas and Jorge Moctezuma Torre, who

requested the release of the equipment from the Ministerio Publico. (Jt. Exh. J-19.) Without

any additional documentation, proof or testimony, other than the testimony previously

submitted in October of 1997 and Perforadora's 1999 affidavit of "no opposition," the

Ministerio Publico held that, "[SSI] clearly established that [the equipment] is not property of

Quantum, Ingenieros S.A. de C.V., nor Perforadora Central, S.A. de C.V. . . ." (Jt. Exh. J-

21.) On or about March 1, 1999, the equipment was finally released and returned to the

United States on March 15, 1999. (Pl.'s Exhs. P-69, P-71.)

IV.    Condition and Value of the Equipment

Upon its return to SSI, the equipment was inspected by experts who concluded that the

equipment, including the MAX ROV, was a total loss resulting from excessive heat and

corrosion due to its exposure to salt and water.[9] Prior to that time, neither Burnside nor SSI

knew that its property was damaged beyond repair. Moreover, it is undisputed that the

equipment was in good working order and condition prior to the seizure. (Tr., p. 34, 122;

Nicholson Depo., pp. 129-30, 137.) The testimony and evidence also indicates that the

equipment, including the MAX ROV, were not damages as a result of any fault of SSI. (Tr.,

p.38; Nicholson Depo., pp. 81-82, 133-34.)

The evidence establishes that the original and replacement values of the equipment

deemed a total loss include:

| Equipment | Original Value | Replacement Value |
|-----------|----------------|-------------------|

---

[9](Tr., pp. 143-156, 175-76; Chesshir Depo., pp. 25, 27-28, 31, 52-55; Def.'s Exh. D-24; Nicholson's
Depo., pp. 76-81, 91-92, 95, 140-41; Pl.'s Exhs. P-11, P-12, P-23.)

| | | |
|---|---|---|
| MAX ROV | $168,400.00[10] | $245,850.00[11] |
| Underwater Video Camera | $ 7,200.00[12] | $ 6,865.00[13] |
| Winch | $ 5,226.00[14] | _____[15] |
| Slip Ring Assembly | $ 2,771.00[16] | _____[17] |
| 1850 feet of Tether | $ 11,100.00[18] | $ 11,805.00[19] |
| VCR | $ 999.00[20] | _____[21] |
| Work Van | $ 1,200.00[22] | $ 36,450.00[23] |

---

[10]The MAX ROV was purchased on May 15, 1996. (Tr., p. 75; Pl.'s Exh. P-27.)

[11]This replacement value is the cost of the MAX ROV as of April 16, 1999. (Tr., p. 142; Pl.'s Exh. P-30.) The replacement value of the MAX ROV that was ordered in December of 1996, and was canceled in May of 1997, cost approximately $165,000. (Def.'s Exh. D-42.) Although a total loss, the parties agree that the MAX ROV had a $25,000 salvage value. (Pl.'s Exh. P-23; Def.'s Exh. D-24.)

[12](Tr., pp. 143-44; Pl.'s Exh. P-32.)

[13]This replacement value is the cost of the underwater video camera as of May 13, 1999. (Tr., pp. 143-44; Pl.'s Exh. P-34.)

[14](Tr., pp. 144-46; Pl.'s Exhs. P-35, P-36, P-37.)

[15]No evidence was produced on replacement value.

[16](Tr., pp. 148-49; Pl.'s Exhs. P-38, P-39.)

[17]No evidence was produced on replacement value.

[18](Tr., pp. 148-50; Pl.'s Exh. P-40, p. 2.) At $6.00 per foot, the cost of 1,850 feet is $11,100.00.

[19](Tr., p. 150-51; Pl.'s Exh. P-42.) 1 meter is 3.28 feet. Thus, 1,850 feet of tether divided by 3.28 feet equals 564.02 meters. The cost is £13 per meter. Accordingly, the replacement cost of 564.02 meters of tether is £7332.32. At $1.61 per pound, the cost in U.S. dollars is $11,805.00.

[20](Tr., pp. 151, 222-24; Pl.'s Exhs. P-43, P-44.)

[21]No evidence was presented on replacement value.

[22](Tr., pp. 152-53; Pl.'s Exh. P-46.)

[23](Tr., p. 154; Pl.'s Exh. P-47.)

| Control Van | $_____[24] | $ 37,920.00[25] |
| Various Tools | $ 1,819.13[26] | $_____[27] |

## V.    Loss of the SEA OWL and Total Destruction of SSI

Despite Quantum's inability to pay the remaining $720,000 and Perforadora's seizure of its primary ROV, the MAX ROV, SSI continued to survive as a corporation. Burnside contracted out his remaining employees, Carlisle and Allen, to other corporations such as Canyon Offshore, who operated ROVs. (Tr., pp. 42-43.) Prior to the seizure, SSI advertised the MAX ROV. (Pl.'s Exh. P-75.) An article[28] was even published in an industry journal identifying SSI and the capabilities of its MAX ROV. After the seizure, SSI had to turn down jobs because it no longer possessed the MAX ROV. In December of 1997, Carlisle and Allen were terminated because of SSI's inability to retain their services. (Tr., p. 43.)

In February of 1998, however, Burnside received a call from a company by the name of Consolidated Natural Gas [CNG] for the use of his services and the SEA OWL to inspect the structure of an oil rig that had exploded. (Tr., pp. 224-25.) Although a highly dangerous situation, Burnside agreed on behalf of SSI to perform the work. (Tr., p. 225.) During the 37-hour dive without the use of SSI's MAX ROV, the SEA OWL's tether[29] became entangled

---

[24]The SEA OWL and Control Van were purchased together in 1993 for a total of $47,500. (*See* Jt. Exh. J-22, 1997 Tax Return, Asset Depreciation List.)

[25](Tr., pp. 154; Pl.'s Exh. P-47.)

[26](Tr., pp. 154-55; Pl.'s Exhs. P-48-P-62.)

[27]No evidence of replacement value was produced on these items.

[28]Chris Stimpson, "Max Rover ROV: New Opportunities For Scientific, Commercial Groups," SEA TECHNOLOGY, December 1997, at 10-13. (Pl.'s Exh. P-74.)

[29]The tether is a cord linking the ROV to the control van aboard a vessel.

in the footing of the rig. (Tr., pp. 233-34.) Burnside attempted to retrieve the SEA OWL by cutting the tether and pulling the ROV aboard the vessel. (Tr., pp. 234-35.) At the point when the SEA OWL made it to the surface, but not aboard the vessel, the tether got caught in and was severed by the blades under the vessel and the SEA OWL fell approximately 260 feet to the bottom of the Gulf of Mexico. (Tr., pp. 236-37.)

Burnside attempted to contact other companies to use their ROVs to pinpoint and capture the SEA OWL. (Tr., pp. 237-38.) Other ROVs, however, were unable to reach the SEA OWL. (*Id.*) If SSI's MAX ROV had been available, SSI had more than a 50% chance of finding and recovering the SEA OWL. (Tr., p. 226; Chamblee Depo., p. 41.)[30] The MAX ROV had the diving ability of 3,300 feet and could find an object as little as a three-foot rod on the ocean's floor. (Tr., pp. 76, 138-39.) For the reasons above, the SEA OWL was lost as a direct result of Perforadora's seizure of the MAX ROV, thereby causing SSI to cease its operations.

Burnside further testified that if the SEA OWL could be presently recovered, it would also be a total loss. The evidence establishes that the SEA OWL was insured for $100,000 at the time it was lost. (Pl.'s Ex. P-31.) The insurance, however, excluded the loss because SSI used the ROV during an oil rig blowout. (Tr., p. 231.) Burnside admitted, over objection from his counsel, that CNG paid SSI $135,000 on August 25, 1998, for the loss of the SEA OWL during the emergency situation. (Tr., pp. 227-29, 241, 248-50.)

---

[30]The testimony of Perforadora's expert, David Chesshir, is unreliable in this respect because he was unaware of the depth, the conditions presented on that day, or the MAX ROV's capabilities. (Chesshir Depo., pp. 51-52.) Further, Chesshir had not operated an ROV in over 10 years. (*Id.*, at pp. 22-23.)

## Conclusions of Law

I.    Liability

The Court previously determined that admiralty jurisdiction exists. (Ct. R., Doc. 62.) Subsequently, the Court held that it has personal jurisdiction over Perforadora and that Perforadora waived any personal jurisdiction through its admissions and by filing its counterclaim. (Ct. R., Doc. 108, pp. 6-8.) The Court further finds that venue is appropriate under 28 U.S.C. § 1391(d). For the reasons set forth in its Memorandum Opinions, the Court exercised its discretion in declining to transfer this action to Mexico. (Ct. R., Docs. 62, 108, 129, pp. 2-3.) Based upon those prior opinions and the subsequent testimony and evidence submitted at trial, the Court renews its finding that Mexico does not provide an adequate forum in this case.

Courts have consistently recognized the tort of conversion within its admiralty jurisdiction. *The Lydia*, 1 F.2d 18, 23 (2nd Cir. 1924). To prove conversion under maritime law, the plaintiff must show an "unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner." *Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 87 (5th Cir. 1979). Moreover, "[t]he tort must have occurred on or over navigable waters." *Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 167 (5th Cir. 1994); *See also The Lydia*, 1 F.2d at 23. Based upon the testimony and evidence, the Court renews its finding that maritime law applies and specifically finds that Perforadora illegally seized SSI's property aboard its vessel in the territorial waters of Mexico. The Court further finds that Perforadora converted SSI's equipment from June 23, 1997, to March 1, 1999, in an effort to exert pressure on Quantum for the arrearage owed from Quantum to Perforadora.

Perforadora, however, submitted three defenses for its actions as follows: (1) lack of knowledge of SSI's ownership; (2) abandonment; and (3) that liability terminated once the property was turned over to the Ministerio Publico. The Court will address these arguments in seriatim.

### A.    Lack of Knowledge

Initially, Correa asserted that Perforadora had no knowledge that SSI owned the equipment that was seized on June 23, 1997. The testimony and evidence, however, indicates that Perforadora knew the equipment belonged to SSI as early as November 3, 1996. As previously stated, Perforadora picked up SSI's equipment on that date; SSI's employees wore red coveralls with SSI's logo on back; the SSI containers were painted red and were clearly marked with SSI's name; and SSI's employees were the only foreigners on the vessel. Moreover, only Perforadora and SSI employees were aboard the vessel during the initial trip to Carmen and Burnside informed Perforadora's captain that SSI owned the equipment.

Notwithstanding those facts, Correa boarded the vessel in Carmen and inspected SSI's ROVs. In addition to being notified of SSI's ownership, Correa acknowledged that he could distinguish SSI's employees and equipment. Further, Perforadora cannot rely on the customs documents originally filed on November 7, 1997, to argue lack of notice. As previously stated, the articles specifically cited on those forms could only be used to import a foreign corporations' equipment.

Additionally, SSI's employees operated its ROVs for nearly seven months in plain view of Perforadora's personnel. Under Mexican law, a person with possession of the equipment is presumed to be the owner. (Tr., p. 381, 398-400, 461.) From the testimony before the Court it is simply implausible to find that either Correa or Perforadora's crew members failed to

notice SSI's employees operating SSI's equipment.[31] Even Jorge Villalpando, assistant to the president of Perforadora, testified that he was aware that the equipment aboard the vessel belonged to several different companies, including SSI and Welch. (Tr., pp. 289-90).

On the day of the seizure, Carlisle and Allen were allowed to retrieve some of their personal belongings. Correa even permitted Burnside to take some of his delicate equipment on two different occasions shortly after the seizure. This fact alone, indicates that Correa knew that SSI owned the equipment or else he would not have agreed to release even minor pieces of the equipment to Burnside. Likewise, if there was any question as to ownership of the equipment, Correa would not have requested Burnside to sign the Acta Informativa or take pictures of the equipment.

More importantly, Correa attended a meeting on July 4, 1997, in which Quantum informed him that the equipment belonged to SSI. Correa notified his superiors by letter dated July 7, documenting this information. Correa even testified that Perforadora knew of SSI's ownership as of July 4, 1997. (Tr., p. 325; Pl.'s Exh. P-21.) Notwithstanding that knowledge, Perforadora's attorney filed a petition with the Ministerio Publico on August 8, 1997, claiming that the equipment was subject to the criminal investigation of Quantum, without mentioning that SSI claimed ownership of the equipment. The testimony is simply overwhelming that prior to the seizure, during the seizure, and after the seizure, Perforadora knew that SSI owned the MAX ROV and its related equipment. Any argument to the contrary is simply without merit.

---

[31]Correa boarded the vessel at least ten times during Perforadora's contract with Quantum; a few of Perforadora's employees on the vessel admit that they knew the equipment did not belong to Quantum; and the vessel's captain would request either Carlisle or Allen to move SSI's equipment when the vessel needed to be refueled. (Tr., p. 33; Fuentes Depo., pp. 8, 18; Rodriguez Depo., pp. 8-9; Medina Depo., p. 19.)

B.   Abandonment

Despite Perforadora's knowledge that the equipment belonged to SSI, it claims that the property was abandoned on June 23, 1997. The evidence before the Court, however, does not indicate that SSI abandoned or intended to abandon their equipment. Carlisle and Allen secured the MAX ROV in its container before being ordered to the local immigration office regarding their visas. They returned to the vessel twice that afternoon and were even allowed temporary access. One of Perforadora's employees, Victor Fuentes, also stated that Carlisle and Allen were making arrangements to take their equipment on that date. (Fuentes Depo., pp. 12, 18, 23-25.) Although they were not present when Perforadora began offloading the vessel and did not assist Perforadora in performance of that act,[32] there is no proof that they were under a duty to do so. Instead, Quantum was responsible for returning the vessel to its pre-charter condition.[33] Whether Carlisle and Allen had the means to unload SSI's heavy equipment at Dos Bocas instead of the port in Carmen is also irrelevant.[34] There is simply no evidence that either SSI or Carlisle and Allen abandoned the equipment.

C.   Ministerio Publico

Correa's testimony regarding the Ministerio Publico is riddled with inconsistencies. At trial, Correa stated that he conferred with Villalpando on June 23, 1997, who informed him to seek the advice of local counsel, Garcia, regarding the equipment. Correa further testified that

---

[32]Mendoza Izucar Depo., pp. 10, 15-16. Mendoza Izucar was one of Perforadora's marine managers who supervised the clearance of the vessel and who ultimately reported to Correa.

[33]Perforadora could have unloaded the equipment and charged Quantum for those services because their contract was with Quantum, not SSI.

[34]It is uncontradicted that Burnside could have arranged for the equipment to be unloaded in Dos Bocas had he known that Perforadora intended to seize the equipment.

after consulting with Garcia, that he instructed Garcia to turn the equipment over to the Ministerio Publico on June 23, 1997, because Perforadora did not know whether SSI or Quantum owned the equipment. (Tr., pp. 337, 339, 342, 344, 603.) In contrast, Correa also testified that he first discovered SSI's claim to ownership of the equipment on or about July 4, 1997. (Tr., p. 325.)

To add further confusion to the situation, Correa submitted an affidavit during the course of this litigation, whereby he stated that the equipment was turned over to the Ministerio Publico once it was discovered that there was a dispute concerning ownership. (Pl.'s Exh. P-95, ¶ 22.) In that affidavit, he maintained that he first learned of SSI's claim on July 7, 1997, and immediately instructed Garcia to submit the equipment to the Ministerio Publico at that time. (*Id.*) As noted above, this is contrary to his trial testimony, whereby he stated that the decision was made on June 23, 1997. (Tr., p. 342.)

Nevertheless, Perforadora was required under Mexican law to submit the equipment to the Ministerio Publico within three days if it believed the equipment to be abandoned or if there was a dispute concerning ownership. (Tr., pp. 382-83.) As previously stated, neither Perforadora nor Garcia submitted a petition regarding the equipment to the Ministerio Publico until August 8, 1997. The petition claimed that Quantum owned the equipment and failed to mention any ownership dispute. Regardless of its reason, both Mexican experts testified that Perforadora had no legal right to maintain possession of the equipment from June 23, 1997, through August 8, 1997. (Tr., pp. 384-85, 457.)

Correa's testimony regarding ownership of the equipment is further refuted because he did not obtain the Pedimento Importacion or customs documents until July 6, 1997, and did not give the documents to Garcia until October of 1997. (Tr., p. 353, 355; Garcia Depo., p. 53;

Pl.'s Exhs. P-4, P-95, ¶ 22.)  The point is, Correa did not have the document on June 23, 1997, when he allegedly instructed Garcia to submit the equipment to the Ministerio Publico to determine ownership.  Garcia even testified that he did not know of any dispute in ownership until mid-August, after he had already submitted the equipment.  (Garcia Depo., pp. 33-34.)

For the reasons above, the Court finds that Correa's testimony is inconsistent and unbelievable.  The Court further finds that despite Perforadora's knowledge of SSI's ownership of the equipment, that they misled their attorney and submitted SSI's equipment to the Ministerio Publico under misrepresented facts.  As a result, the Court finds that Perforadora acted illegally for doing so.  Perforadora's Mexican expert, Carlos Loperna, even stated that Perforadora would have acted illegally if it had submitted the equipment under misrepresented facts.  (Tr., pp. 461-63.)

More importantly, Perforadora has consistently maintained that it "has never claimed ownership of the equipment and has always been willing to turn it over to the true owner." (Pl.'s Exh. P-95, ¶ 24.)  Despite this assertion, Correa and Villalpando both testified that at the time the vessel came into Dos Bocas, they were not concerned with ownership of the equipment, only payment from Quantum.  (Tr., pp. 269, 351, 354.)  This is contrary to Perforadora's actions on October 23, 1997, when its attorney appeared before the Ministerio Publico to contest the release of SSI's equipment.  Although Perforadora knew that SSI owned the equipment, Garcia submitted an affidavit claiming for the first time that there was a dispute regarding ownership.  (Jt Exh. J-18.)

At any time, Perforadora could have relinquished its depository status and informed the Ministerio Publico that it had no objection to the release of SSI's equipment.  (Tr., pp. 385, 475-76.)  Perforadora, however, failed to do so until ordered by the Court even though it

admitted having knowledge that SSI owned the equipment as early as July 4, 1997. Instead, Perforadora took an adversary position on October 23, 1997, and filed an opposition to the release of the equipment.

For these additional reasons, the Court finds that Perforadora perpetuated its bad faith behavior when it appeared and protested on October 23, 1997, solely to prevent the lawful release of the equipment to SSI. (Tr., pp. 422-23.) Under the circumstances described above, the belated delivery to the Ministerio Publico did not absolve Perforadora of liability. (Tr., pp. 406, 409, 432, 466-473.) As a result, the Court finds that the actions taken by Perforadora were illegal from the moment the equipment was seized aboard the vessel on June 23, 1997, until March 1, 1999, the date it was released by the Ministerio Publico.

II.    Damages

A.    Actual Damages

In admiralty, the general rules for determining damages in negligence actions involving vessels are as follows:

> It is fundamental that when a vessel is lost or damaged, 'the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as if his property had not been destroyed.' *Standard Oil Company v. Southern Pacific Company*, 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1924). To further this policy courts have long held that where a vessel is a total loss the measure of damages is the market value at the time of loss. '*Id.* at 155, 45 S.Ct. at 466. Where there are insufficient sales to establish a market other evidence such as replacement cost, depreciation, expert opinion and the amount of insurance can also be considered to determine the value of the vessel.

*E.I. DuPont de Nemours & Co., Inc., v. Robin Hood Shifting & Fleeting Serv., Inc.*, 899 F.2d 377, 379-80 (5th Cir. 1990) (*citing King Fisher Marine Serv., Inc., v. NP Sunbonnet*, 724 F.2d 1181, 1185 (5th Cir. 1984). It must be noted that the instant action involved an intentional tort and did not involve a collision between vessels. Further, unlike the situation where vessels

collide and damages can be immediately assessed upon examination, SSI's equipment did not become a total loss on the day that it was seized by Perforadora. Rather, the total loss occurred at some point between June 23, 1997, and March 1, 1999, from being exposed to the elements while in Perforadora's possession. The total loss was not even discovered until after SSI's equipment was returned to the United States on March 15, 1999. Moreover, there was no readily available market for a used and customized ROV such as the MAX ROV, or its related equipment.

The Court notes that case law on maritime conversion is sparse. The United States Supreme Court, however, has recognized that admiralty courts are courts of equity. *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962). Unfortunately, the only Fifth Circuit case dealing with an intentional tort in admiralty was *Goodpasture*,[35] whereby the court found that conversion had occurred without discussing any issues of damages. Under the circumstances of this case, the Court finds that SSI is entitled to replacement costs of the equipment at the time the total loss was discovered, where proven. Otherwise, SSI is entitled to the original cost of the equipment.

As a result, SSI is entitled to the replacement value of the following equipment: (1) the MAX ROV in the amount of $245,850; (2) the underwater video camera in the amount of $6,865; (3) 1850 feet of tether in the amount of $11,805; (4) the work van in the amount of $36,450; and (5) the control van in the amount of $37,920. SSI is also entitled to the original cost of the following equipment: (1) a winch in the amount of $5,226; (2) a slip ring assembl in the amount of $2,771; (3) a VCR in the amount of $999; and (4) various tools in the amou

---

[35]*Supra*, 602 F.2d 84.

of $1,819.13. Thus, the total initial assessment of actual damages is $349,705.13.

Because the MAX ROV was purchased in May of 1996 and the control van in 1993, the Court must determine depreciation value for the total loss of the equipment when replacement cost is assessed. *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 764-65 (E.D. La. 1989). The testimony and evidence indicates that the average ROV has a work life expectancy of 10 years and a depreciation value of 10% per year. (Nicholson Depo., pp. 30, 146-48; Chamblee Depo., p. 33.) Because some of the equipment was purchased within a year of the seizure and the other equipment purchased earlier, the Court finds that the actual damages due SSI should be reduced by 10% to offset depreciation of the equipment for one-year prior to the seizure. Applying that rational, the amount of actual damages due SSI from Perforadora after the offset of depreciation is $314,734.62. After applying the $25,000 salvage value of the MAX ROV, the Court finds that the total amount of actual damages due SSI from Perforadora is $289,734.62.

B.   Prejudgment Interest

In admiralty cases, prejudgment interest is awarded unless "peculiar circumstances" make it inequitable. *Cantieri Navali Riuniti v. M/V Skyptron*, 802 F.2d 160, 165 (5th Cir. 1986) (citation omitted). Prejudgment interest is not awarded "as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). Because peculiar circumstances do not exist in the instant action, the Court finds that SSI is entitled to prejudgment interest at the rate of 8% per annum resulting from the conversion of SSI's equipment. The Court therefore finds that SSI is entitled to prejudgment interest from

Perforadora in the amount of $48,211.84.[36]

C.    Consequential Damages

Generally, admiralty does not allow loss of use[37] or consequential damages in negligence actions involving collisions between vessels or barges.[38] As previously stated, however, the instant action involved an intentional tort unrelated to a negligent collision between a vessel or a barge.  Even in negligence cases, parties can recover other damages that could be reasonably anticipated, such as those incurred by the negligent repair of the initial damage. *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 761 F.2d 229, 233-34 (5th Cir. 1985).  Under the unique circumstances of this case, the Court finds that equity entitles SSI to consequential damages resulting from Perforadora's intentional tort.

1.    The SEA OWL

As previously stated, SSI lost the SEA OWL as a direct result of Perforadora's seizure of SSI's MAX ROV.  Thus, the SEA OWL is considered a total loss in February of 1998.  The Court finds that there was no readily available market for a used ROV such as the SEA OWL. As a result, replacement value, depreciation, expert opinion or the amount of insurance can be used when market value is inconclusive.  Because SSI failed to show the replacement value of the SEA OWL, the amount of insurance is used to assess the value of that particular ROV. The insurance value of the SEA OWL was $100,000.  While Perforadora argued that a

---

[36]Prejudgment interest at a rate of 8% per annum from June 23, 1997, to June 23, 1998, is $23,178.77. After compounding that interest to the principal amount of $289,734.62, the prejudgment interest from June 23, 1998, to the date of judgment results is an additional $25,033.07.

[37]Loss of use will be discussed below under similar principles.

[38]*Pillsbury Co., supra*, 715 F. Supp. at 763 n. 72 (*citing Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir. 1988)); (*see also King Fisher, supra*, 724 F.2d at 1186-87.)

payment from CNG to SSI is not a collateral source, the Court disagrees. The Fifth Circuit has stated that, "[t]he collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). The payment from CNG to SSI was independent of any contribution by Perforadora, and is therefore excluded from consideration by the collateral source doctrine. As a result, SSI is entitled to consequential damage to the SEA OWL in the amount of $100,000.

    2.   The Second MAX ROV

From the testimony and evidence presented, the second MAX ROV that SSI ordered in February of 1997, and canceled in May of 1997, directly resulted from Quantum's lack of payment. There is no conclusive evidence to establish that SSI would have been able to purchase that ROV prior to the end of 1997, even if its original MAX ROV had not been seized. The Court therefore finds that Perforadora cannot be held liable for SSI's inability to acquire a second MAX ROV, or the deposit paid on behalf of that ROV.

    3.   Cost of Release of the Equipment

SSI also seeks to recover other expenses which it incurred as a result of Perforadora's actions. Those expenses include the following: (1) $10,000 paid to its initial Mexican attorneys, Herrera and Manzaneque, who attempted to obtain release of SSI's equipment on October 20, 1997; (2) $3,500 which SSI sent to Oscar Olivera in Mexico in order to pay an official to release the MAX ROV system; (3) $12,300 for customs fines and fees; (4) $3,000 for the law firm to obtain the release of SSI's equipment through customs; (5) $5,068 for shipping and customs charges to return the equipment to the United States; and (6) $11,175

charged by SSI's subsequent Mexican attorneys, Dimas and Torre, who finally obtained the release of SSI's equipment from the Ministerio Publico on March 1, 1999. (Tr., pp. 160-168; Pl.'s Exhs. P-63-69, P-72, P-73.)

The custom charges were initially incurred upon the expiration of SSI's temporary import permit. The custom charges began on May 11, 1997, and continued until March 26, 1999. (Tr., pp. 391-92; Pl.'s Exh P-67.) The charges were calculated every 15 days at $135 per period[39] and there were a total of 45 periods. (*Id.*) Because 3 of the 15-day periods elapsed between May 11 and June 23, 1997, and would have occurred regardless of the illegal detention, the remaining 42 periods resulted from Perforadora's seizure of the equipment for a total expense of $5,670. A 15% tax added to that expense under Mexican law brings the total customs charge attributable to Perforadora's detention to $6,520.50. (Tr., pp. 394-95.) SSI has failed to prove that any of the other custom charges were attributable solely to the detention.

Because Quantum failed to pay for SSI's shipping charges to the United States as they were required to do, SSI would have incurred those charges regardless of the illegal detention. Thus, SSI cannot recover for the shipping charges. Likewise, SSI cannot recover the $3,000 in attorneys' fees incurred to release the equipment from customs. The $3,500 expended by SSI in an effort to pay a Mexican official to release the equipment was simply a bad idea, for which Perforadora should not be held accountable. Although SSI hired Mexican counsel in order to obtain the release of its equipment, those fees will be discussed, *infra*, in conjunction with SSI's general request for attorneys' fees.

---

[39]1350 pesos per period at the exchange rate of 10 pesos per dollar.

D.   Loss of Profits/Loss of Use

As noted above, damages for loss of use are generally not recognized in admiralty cases involving negligence actions between vessels or barges. The rationale behind that rule is that a vessel owner has a duty to mitigate his damages by immediately replacing the vessel when it is a total loss due to collision. *Barger v. Hanson*, 426 F.2d 640, 642 (9th Cir. 1970). In the instant action, the equipment was not a total loss upon seizure. Moreover, neither party can conclusively demonstrate when the total loss actually occurred, except to show that it occurred while in Perforadora's possession exposed to the elements. It only follows that SSI did not know that the equipment was a total loss until it was returned from Mexico on March 15, 1999. The Fifth Circuit has even affirmed a district court's finding limiting the loss of use period to the time when the owner of a barge knew or should have known that its barge was a total loss. *E.I. DuPont, supra*, 899 F.2d at 382.

Although a party is generally made whole in a total loss case by market value plus interest, equity mandates that SSI be awarded lost profits. SSI's business simply folded as a direct result of the unlawful seizure of its equipment. Further, it will take approximately three years to return to its pre-seizure status.

SSI, however, must prove lost profits with reasonable certainty. *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984) (citation omitted). This does not require a showing of specific contracts which were lost during the detention period. *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194-95 (5th Cir. 1994). Proof of an active market, rather than loss of a specific opportunity, is sufficient to recover lost profits. *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140-41 (5th Cir. 1994)). A ready market can be established through testimony that the equipment was active before the incident. *Delta S.S.*

*Lines, Inc.*, 747 F.2d at 1001.

After resuming its operations in July of 1995, SSI's income tax returns for that year illustrated gross receipts for sales of $161,664, and ordinary income of $1,920. (Jt. Exh. J-22.) SSI's income tax returns further show the following: (1) in 1996, gross receipts for sales of $443,955, and ordinary income of $65,595; (2) in 1997, gross receipts for sales of $907,686, and ordinary income of $14,845; and (3) in 1998, gross receipts of $244,031, and ordinary loss of $78,596. (Jt. Exh. J-22.)

Perforadora's expert accountant, John Theriot, testified that the Generally Acceptable Accounting Principles [GAAP] require that, "the earning process is not complete until collection of the sales price is assured reasonably." (Tr., p. 540.) Theriot, however, testified at his deposition that income is considered earned when "services [were] performed and billed." (Tr., p. 563.) Regardless, Theriot failed to match income and expenses by excluding the $720,750.53 invoiced to Quantum in 1997, without excluding the costs associated with those services. (Tr., pp. 484-85, 492-95, 558-60.) Although Quantum was SSI's only bad debt, Theriot's also assumed that SSI would have further significant bad debt expenses. (Tr., pp. 174-75, 547.) Further, Theriot used a three-year base period, without adjustment for the fact that SSI did not begin its operation until July of 1995. (Tr., pp. 556-57.) Finally, Theriot's analysis and projections were based on the earnings of companies which were not similar to SSI. (Tr., pp. 171-74, 565-572.)

Cliff Chamblee, the vice-president of Canyon Offshore,[40] testified by deposition concerning the growth of Canyon from the time it was founded in March of 1997, with 15

---

[40]When SSI was actively using its MAX ROV and SEA OWL, Canyon Offshore was one of its main competitors.

employees and 2 leased ROVs, to its present status of at least 60 employees and 10 ROVs. (Chamblee Depo., pp. 18, 21.) Chamblee further testified that the market for ROVS was good between March of 1997, until the early part of 1999. (*Id.* at p. 26.) In his opinion, however, the future of the market would increase by the summer of 1999 until the end of the year. (*Id.* at p. 39.) Similarly, until Quantum failed to pay its outstanding debt and SSI's equipment was seized on June 23, 1997, the evidence indicates that SSI had substantial growth in revenues since resuming operations in July of 1995. Burnside also testified that SSI's inspection work related to government mandated inspections would continue regardless of construction activity in the oil and gas industry. (Tr., pp. 77-78.)

Because SSI did not fully operate in 1995, it would be inappropriate to use the entire three-year history in ascertaining SSI's loss of earning, as suggested by Theriot. As previously stated, Quantum owed SSI $720,750.53 for services rendered entirely in 1997. Theriot admitted that his analysis would be misleading if the outstanding debt was earned and invoiced in 1997, without matching the expenses associated with that debt. (Tr., pp. 559-60.) Theriot also failed to compare Canyon's coincidental rise in the ROV business at about the identical time that Perforadora seized SSI's equipment, yet he purportedly compared SSI to similar businesses. (Tr., pp. 568-71, 578-79.) Theriot's opinion is therefore inconsistent with the evidence presented at trial.

On the other hand, Panzeca used six-month periods and provided numerous scenarios, both including and excluding Quantum's outstanding debt of $720,000. In order to be certain that Quantum's debt does not effect SSI's earning capacity, the Court finds that Panzeca's projections in his second chart, including the extension of SSI's loss period until December 31, 2002, to accurately reflect SSI's loss of profits. (Tr., pp. 496-98; Pl.'s Exh. P-86, Chart 2.)

In that analysis, Panzeca eliminated the expenses and revenues associated with Quantum's outstanding debt that was accumulated entirely in 1997. (*Id.*) Panzeca further indicated that if a second MAX ROV was not considered, that it could be subtracted from the total lost profits by simply identifying the amount listed under "base loss profits." (Tr., pp. 487-88; Pl.'s Exh. P-86, Chart 2.) Based on SSI's earning capacity, the exclusion of the purchase of a second MAX ROV, and the exclusion of Quantum's outstanding debt and expenses in 1997, the Court finds that SSI is entitled to total loss earnings of $2,311,140 from Perforadora resulting from the seizure.

E.    Punitive Damages

Unlike typical admiralty cases involving a breach of contract or a personal injury, punitive damages remain an appropriate recovery in intentional property damage cases. *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 702 (1st Cir. 1995). In order to be awarded punitive damages, SSI must show "intentional or wanton and reckless conduct [amounting] to a conscious disregard of the rights of others." (*Id.* at 699) (*citing The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 558 (1818)); (*see also Protectus Alpha Navigation Co., Ltd. v. North Pac. Grain Growers*, 767 F.2d 1379, 1385 (9th Cir. 1985).)

Under the circumstances of this case, punitive damages are appropriate. Perforadora[41] seized SSI's equipment with full knowledge that the equipment belonged to SSI. Perforadora converted SSI's equipment in an effort to exert pressure on Quantum to pay its arrearage to Perforadora. Further, Perforadora refused to return SSI's equipment to Burnside despite its

--------

[41]The evidence illustrates that Correa had knowledge of SSI's ownership and relayed that information on numerous occasions to Villalpandro, assistant to Perforadora's president. Thus, Perforadora is considered the wrongdoer. (*See In Re P&E Boat Rentals, Inc.*, 872 F.2d 642, 652 (5th Cir. 1989) (punitive damages may be imposed against a corporation when its top managerial employees are involved).)

knowledge that SSI owned the equipment. Instead, Perforadora misrepresented SSI's ownership to its attorney and Perforadora illegally submitted SSI's equipment under false pretenses to the Ministerio Publico over a month after the seizure. After SSI further demonstrated its ownership, Perforadora perpetuated its actions by appearing before the Ministerio Publico to illegally oppose the lawful return of SSI's property. In fact, Perforadora could have advised the Ministerio Publico at any time that it had no objection to the release of SSI's equipment.

The Court has reviewed Perforadora's financial status *in camera*. (Pl.'s Exh. P-92.) As a result of Perforadora's intentional and egregious conduct, the Court finds that SSI is entitled to punitive damages in the amount of $1,500,000, which amount will not substantially affect Perforadora's net worth.

F.    Attorneys' Fees

Attorneys' fees are generally not recoverable in admiralty suits absent a contract or a statute granting this type of recovery. *Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996) (*citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255-57 (1975); *Delta S.S. Lines, Inc.*, 747 F.2d at 1011). In *Galveston*, the Fifth Circuit addressed the history of attorneys' fees typically awarded in admiralty cases for abuse of the litigation process. (*Id.* at 356-59.) The court ultimately held that, "[n]ot acting 'in an equitable manner' does not support an award of attorneys' fees." (*Id.* at 359.) While an argument could be made that Perforadora abused the litigation process by fraudulently submitting SSI's equipment to the Ministerio Publico and refusing to file an affidavit of "no opposition" prior to this Court's order, the Court finds that Perforadora's actions contributed to the underlying tort action. In other words, Perforadora's subsequent

actions taken after the initial seizure were taken into account when the Court assessed punitive damages above.

Furthermore, there is no evidence that Perforadora's present counsel abused the litigation process. As a result, the Court finds that SSI, as the prevailing party, is not entitled to attorneys' fees for pursuing a tort action in admiralty.

<u>Conclusion</u>

For the reasons above, the Court finds that the accepted facts and law support a finding in favor of the plaintiff in the total amount of $4,255,606.96 resulting from the defendant's conversion of the plaintiff's property while aboard the defendant's vessel. The itemized damages against the defendant include: (1) $289,734.62 in actual damages; (2) $48,211.84 in prejudgment interest; (3) consequential damages in the amount of $100,000 for the loss of the SEA OWL and $6,520.50 for additional custom charges; (4) $2,311,140 for loss of use/loss of earnings; and (5) $1,500,000 in punitive damages.

Each party shall bear their respective costs. A separate Final Judgment in accordance with this Bench Opinion shall issue this date.

DATED this the 19th day of July, A.D., 1999.

UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUBMERSIBLE SYSTEMS, INC.                                    PLAINTII

VS.                                                 CIVIL ACTION NO. 1:98cv251C

PERFORADORA CENTRAL, S.A. de C.V.                           DEFENDAN

## MEMORANDUM OPINION

This cause comes before the Court on the motions for a new trial [144-1]; for an Order

permitting the depositions of Captain Fernando Toledo Zepeda [Captain Toledo],[1] Juan Antonio

de la Torre Magdaleno and Miguel Angel Bauza Zumoya [144-2]; to substitute the original

affidavits of Captain Toledo, de la Torre, Bauza, and Fausto A. Correa Lepe[2] [145-1] [147-i]; to

leave to file additional supporting translations [148-1]; and to open judgment and take additional

testimony in connection with the motion for new trial [154-1], filed by the defendant,

Perforadora Central, S.A. de C.V [Perforadora], pursuant to Rule 59 of the Federal Rules of

Civil Procedure. Also, before the Court is Perforadora's *ex parte* motion to supplement the

record [125-1]. Further, before the Court is a renewed motion for a writ of attachment [140-1]

and a motion for an expedited hearing on the renewed motion for a writ of attachment [141-1],

filed by the plaintiff, Submersible Systems, Inc. [SSI]. After due consideration of the evidence

of record, the briefs of counsel, the applicable law, and being otherwise fully advised in the

---

[1]Captain Toledo was the captain of Perforadora's vessel at the time Perforadora seized SSI's equipment.

[2]Correa was the manager of Perforadora's marine operations at the time Perforadora seized SSI's
equipment.



**EXHIBIT**

E

premises, the Court finds as follows.

Legal Analysis

I.   Motions to Supplement the Record and for a Writ of Attachment

Prior to trial, Perforadora filed the instant *ex parte* motion to supplement the record with regard to SSI's application for an order of attachment. (Ct. R., Doc. 125.) After a Final Judgment was entered in favor of SSI, SSI filed the instant renewed motion for a writ of attachment and a motion for an expedited hearing on the matter. (Ct. R., Docs. 140, 141.) In response, Perforadora filed a motion to approve the appeal bond and stay execution of the Final Judgment. (Ct. R., Doc. 142.) Perforadora subsequently posted an appeal bond staying the execution of the Final Judgment pending the disposition of its motion for a new trial and the appellate process (Ct. R., Doc 146.) The Court therefore finds that Perforadora's motion to supplement the record and SSI's motions for a writ of attachment and an expedited hearing should be denied as moot.

II.   Perforadora's Motions to Substitute the Original Affidavits of Captain Toledo, de la Torre, Bauza and Correa in Support of Motion for New Trial and for Leave to File Additional Supporting Translations

Rule 59(c) of the Federal Rules of Civil Procedure requires affidavits in support of a motion for a new trial to be filed with the motion. Upon filing the motion for a new trial, Perforadora simultaneously filed a motion to file faxed copies of Captain Toledo, de la Torre, Bauza and Correa's affidavits in support of its motion for a new trial. (Ct. R., Docs. 143, 144.) Within three days of the motion for a new trial, Perforadora filed the instant motion to substitute the original affidavits of Captain Toledo, de la Torre and Bauza. (Ct. R., Doc. 145.) Five days later, Perforadora filed the instant motion to substitute the original affidavit of Correa. (Ct. R.,

2

Doc. 147.) Thereafter, Perforadora filed the instant motion for leave to file additional supporting translations of the notarial certification and corporate charter of "Oceatec" contained in de la Torre's affidavit. (Ct. R., Doc. 148.) The Court subsequently entered an Order denying Perforadora's motion to file faxed copies of the affidavits in support of its motion for a new trial. (Ct. R., Doc. 149.)

Upon further review of the unique circumstances of this case, the Court finds that Perforadora should be allowed to substitute the original affidavits in place of the previously stricken faxed affidavits to be considered in connection with Perforadora's motion for a new trial. The Court therefore finds that Perforadora's motion to substitute the original affidavits of Captain Toledo, de la Torre, Bauza and Correa should be granted. The Court further finds that Perforadora's motion to file additional supporting translations with regard to de la Torre's affidavit should be granted.

III      Perforadora's Motion for a New Trial

Rule 59(a) of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

> On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Perforadora has the burden to show that a new trial is warranted. *Diaz v. Methodist Hosp.*, 46 F.3d 492, 495 (5th Cir 1995).

As a basis for its new trial, Perforadora suggests that SSI presented false testimony. (Def.'s Mem. in Sup of Mot. for New Trial, pp. 1-5.) In support, Perforadora submits the affidavits of Captain Toledo, de la Torre and Bauza, and requests that the Court reopen the Final

3

Judgment in order to allow the depositions of those witnesses. Thus, Perforadora argues that their testimony constitutes newly discovered evidence.

A.    Newly Discovered Evidence

When determining whether to grant or deny a new trial based upon newly discovered evidence, the Court must consider whether the moving party was excusably ignorant of facts that existed at the time of trial "despite using due diligence to learn about them;" whether the evidence "is merely cumulative or impeaching;" and more importantly, whether such evidence would probably change the outcome of the prior trial. *Diaz*, 46 F.3d at 492; *See also* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2808 pp 86-94 (1995). The Court has wide discretion in deciding whether to grant or deny a new trial, and will only be reversed for "a clear abuse of discretion." *Diaz*, 46 F 3d at 495 (citations omitted).

1.    Testimony of de la Torre and Bauza

Perforadora initially alleges that the President and owner of SSI, Wolfgang Burnside, "testified falsely, or perhaps even perjuriously, when he claimed that SSI had contracted with Oceatec ... but that 'the contract didn't come through' because of the unavailability of the MAX ROV." (Def.'s Mem. in Sup. of Mot. for New Trial, pp. 1-2 *citing* Tr., pp. 105-06, 191-94; Pl.'s Exh. P-80.) In support, Perforadora offers the affidavits of de la Torre and Bauza, employees of Oceatec, claiming that the contract between Oceatec and SSI did not materialize because Oceatec did not ultimately win a bid for inspection services related to a drilling contract with another Mexican corporation. (Ct. R., Doc. 145, Exh. 1, pp. 1-2; Exh. 2, pp. 1-2.) Thus, Perforadora claims that SSI's accounting expert, George Panzeca, incorrectly calculated SSI's lost profits by

4

basing his "high case scenario" on the existence of the Oceatec contract. (Def.'s Mem. in Sup. of Mot. for New Trial, p. 2 *citing* Tr., pp. 511-12.)

In contrast, the evidence before the Court indicates that Burnside testified consistently at both his deposition and at trial that SSI submitted a formal quote to Oceatec in February of 1997 that never materialized into a formal contract because the MAX ROV was being utilized on the Quantum contract. (Ct. R., Doc. 151, Exh. A, pp. 144-147; Tr., pp. 105-06, 191-195; Pl.'s Exh. P-80; Def.'s Exh. D-34.) Perforadora failed to question Burnside's interpretation of events at either his deposition or at trial. Nevertheless, the Court finds that the testimony of de la Torre and Bauza should have been obtained after Burnside's deposition and prior to trial. Even if the contract between SSI and Oceatec failed to materialize solely as a result of Oceatec's failure to receive a winning bid, de la Torre and Bauza's testimony is merely cumulative in that it confirms Burnside's testimony that the Oceatec contract was not awarded to SSI. At best, the testimony would only be used to impeach Burnside's recollection of events. Such impeachment, by itself, is not a ground for awarding a new trial. *Diaz*, 46 F 3d at 495-96.

More importantly, Panzeca testified at trial that he did not base his loss profit calculations "upon an analysis of contracts either past, pending or future." (Tr., p. 512.) Instead, he based the calculations "upon the actual historical results of operations of [SSI] and the time period immediately prior to the seizure." (*Id.*) After Panzeca gave the Court a high and low range for calculating lost profits, the Court awarded SSI lost profit damages under the lowest case scenario. (*See* Ct. R., Doc. 138, pp. 29-30 *citing* Tr., pp. 496-98; Pl.'s Exh. P-86, Chart 2.) Assuming *arguendo* that Panzeca considered SSI's proposal to Oceatec as a contract, such consideration would only affect the high range calculations which the Court did not use.

5

Thus, de la Torre and Bauza's affidavits do not change the ultimate outcome of the Court's finding regarding lost profits. Likewise, any deposition testimony of de la Torre and Bauza, even if consistent with their depositions, would not alter the outcome of the Court's finding on lost profits. For the reasons above, the Court finds that de la Torre and Bauza's testimony is insufficient to warrant a new trial.

2.    Testimony of Captain Toledo

Perforadora further alleges that Michael Carlisle, SSI's former employee, falsely testified at trial that Captain Toledo informed him that SSI's equipment had been seized for the purpose of bringing pressure against Quantum for payment of money due Perforadora. (Def.'s Mem. in Sup of Mot. for New Trial, p. 4 *citing* Tr., pp. 40, 43.) In support, Perforadora now offers the affidavit of Captain Toledo whereby he denies that he made such a statement to Carlisle. (Ct. R., Doc. 145, Exh. 5, p. 4.) Perforadora also refers to excerpts from Carlisle's deposition testimony indicating that he was initially unsure of who told him that the equipment had been seized. (Def.'s Exh. D-54, pp. 70-72.) Thus, Perforadora suggests that Carlisle changed his testimony at trial when he discovered that the captain could not be found. (Def.'s Mem. in Sup. of Mot. for Summ. J., pp. 4-5.) The Court finds to the contrary.

In its post-trial memorandum, Perforadora argued that Carlisle inconsistently testified at his deposition regarding the incidents surrounding the seizure of SSI's equipment. The Court rejected this argument in its Bench Opinion by finding Carlisle's testimony to be consistent and credible. For instance, SSI initially submitted Carlisle's affidavit on or about September 4, 1998, whereby Carlisle claimed that Perforadora had seized SSI's equipment. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4.) At his deposition in February of 1999,

6

Carlisle testified that he thought the captain was the Perforadora employee who woke him and informed him of the seizure. (Pl.'s Exh. P-96, pp. 73, 139; Def.'s Exh. D-54, pp. 70-72.) During the trial in June of 1999, Carlisle's testimony went unrefuted[3] and was consistent with his previous affidavit and deposition testimony. (*See* Tr., p. 40.) A subsequent review of the evidence of record reveals no inconsistency in Carlisle's testimony.

Throughout the course of this action, Perforadora failed to present Captain Toledo as a witness claiming that he was nowhere to be found. Ironically, Correa was able to locate Captain Toledo on July 26, 1999, within seven days of the Bench Opinion and Final Judgment being rendered by this Court. (Ct. R., Doc. 138; Doc. 139, Doc. 147, Exh. 1, ¶ 8.) Thereafter, Correa submitted an affidavit in connection with the instant motion for a new trial, whereby he now claims that he diligently attempted to locate Captain Toledo prior to trial but his efforts were to no avail. (Ct. R., Doc. 147, Exh. 1, p. 2.)[4] Not only is the timing and substance of Correa's affidavit highly suspicious but the Court previously found Correa's testimony to lack any credibility. After reviewing the records and Correa's affidavit, the Court finds his efforts to locate Captain Toledo to be insufficient. More importantly, Perforadora knew about Carlisle's testimony since September of 1998, and therefore could not have been excusably ignorant of his testimony at the time of trial.

Like Correa's testimony at trial, Captain Toledo's affidavit also lacks any credibility because he states that he believed the equipment belonged to Quantum. This assertion is

---

[3]Perforadora did not cross Carlisle on this issue at trial.

[4]Correa provided telephone records and a telegram transmittal form as purported evidence of his due diligence. (*Id.* at pp. 4-9.)

7

contrary to the multitude of evidence indicating otherwise, *i.e.* the color and logos on SSI's coveralls and equipment, the SSI employees aboard the ship, *et cetera*. Further, a glaring omission in Captain Toledo's affidavit is that he does not deny that SSI's equipment was seized by Perforadora's personnel while aboard Perforadora's vessel. Instead, Captain Toledo claims that "he" neither informed Carlisle of the seizure nor ordered the padlocks to be placed on SSI's equipment. The Court finds that Captain Toledo's affidavit and potential testimony are simply cumulative of Perforadora's denial of the seizure. Even if Captain Toledo's testimony were true, such testimony would not alter the ultimate outcome of the trial because the overwhelming evidence indicates that SSI's equipment was seized and retained by Perforadora as a means of seeking payment from Quantum. For these reasons, the Court finds that Captain Toledo's untimely testimony is insufficient to warrant a new trial.

3    Conclusion Regarding Perforadora's Purported Newly Discovered Evidence

Perforadora simply does not have any newly discovered evidence that would warrant a new trial. As stated above, the plaintiff did not exercise due diligence in obtaining the testimony of Captain Toledo, de la Torre or Bauza. More importantly, even if their testimony were true, such testimony would not change the ultimate outcome of the Court's Final Judgment. The Court therefore finds that Perforadora's motion for a new trial based upon newly discovered evidence is without merit, and should be denied.

B.    Additional Reasons in Support of Perforadora's Motion for a New Trial

1.    Prejudgment Interest

The Court previously awarded SSI the reasonable replacement value of its equipment. Perforadora argues that the Court erred in awarding SSI prejudgment interest after granting the

8

replacement value.  As noted in the Court's Bench Opinion, the general rule in admiralty cases is that prejudgment interest is awarded unless "peculiar circumstances" make it inequitable. *Cantieri Navali Riuniti v. M/V SKYPTRON*, 802 F.2d 160, 165 (5ᵗʰ Cir. 1986); *Ryan Walsh Stevedoring Co., Inc. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986) (citations omitted).  Prejudgment interest may even be awarded when damages are based on the replacement value of property.  *Interpool Ltd. v. Bernuth Agencies, Inc.*, 959 F. Supp. 644, 651 (S.D N.Y.) *aff'd* 129 F 3d 113 (1997); *CEH, Inc. v. F V SEAFARER*, 880 F. Supp. 940, 951-54 (D R.I.) *aff'd* 70 F 3d 694 (1995).  Thus, Perforadora has failed to identify any peculiar circumstances which would justify a departure from the general rule

Moreover, the Court has broad discretion to determine how much prejudgment interest should be awarded.  *Cantieri, supra*, 802 F 2d at 165 (citation omitted).  In its Bench Opinion, the Court exercised its discretion and awarded SSI prejudgment interest at a rate of 8% per annum from the date Perforadora seized SSI's equipment until the date of judgment.  Perforadora has failed to demonstrate how this Court erred in exercising its discretion.  Regardless, the Court finds that its award of prejudgment interest to SSI is an insufficient reason to grant Perforadora a new trial.

2.      Applicability of Mexican Law

Once again, Perforadora's suggests that this Court is attempting to regulate the internal affairs of the Republic of Mexico  The Court has previously rejected this argument on numerous occasions.  As noted in the Bench Opinion, Perforadora illegally seized SSI's property while aboard its vessel and converted the equipment in an effort to exert pressure on Quantum for the arrearage owed from Quantum to Perforadora.  Perforadora argues that under Mexican law, ever

9

if the original seizure was improper, that turning the equipment over to the Ministerio Publico exonerated Perforadora from further liability. (Def.'s Mem. in Sup. of Mot. for New Trial, pp. 6-7.) The Court finds this defense to be without merit.

The legal experts on Mexican law for both parties testified that Perforadora acted illegally by untimely submitting the equipment to the Ministerio Publico, and would have acted illegally by submitting the equipment upon misrepresented facts. (Tr., pp. 384-85, 406, 408, 431-33, 457, 461-63, 466-473 ) In its Bench Opinion, this Court specifically found that Perforadora untimely submitted the equipment to the Ministerio Publico under false pretenses  The Court's finding only reinforces the fact that Perforadora intentionally and maliciously seized and converted SSI's equipment solely as a means of receiving payment from Quantum. It is simply not an attempt by this Court to delve into the internal affairs of the Republic of Mexico.

3.    Punitive Damages

The Court also awarded SSI punitive damages as a result of Perforadora's intentional and malicious behavior with regard to SSI's property. Perforadora argues that punitive damages are not recoverable because Mexican law does recognize such recovery  The Court has previously addressed this issue and found that punitive damages are allowed under American law for admiralty actions involving torts. (*See* Ct. R., Doc. 129, p. 3.) The Court therefore finds that Perforadora's argument is without merit.

Perforadora also asserts that the intentional actions of Correa should not be imputed to the company because he was not part of the upper echelon of management. As support, Perforadora cites a case whereby the Fifth Circuit refused to award punitive damages against Chevron when two of its "lower echelon" employees, a construction foreman and a transportation

10

foreman, ordered Chevron chartered boats to run in the fog and an accident subsequently occurred. *In Re P&E Rentals, Inc.*, 872 F 2d 642, 652-53 (5ᵗʰ Cir. 1989). The Court held that liability could not be imputed to Chevron because the two employees neither exercised policy making authority on behalf of the company nor were their acts ratified by Chevron. (*Id.*)

Unlike the two foremen in *P&E Boat Rentals*, Correa was the manager of Perforadora's marine operations who reported daily to Jorge Villalpando, assistant to Perforadora's president. (Tr., pp. 263-64, 293-94 ) Correa had knowledge of SSI's ownership and relayed that information to Villalpando on numerous occasions  (Tr , pp. 272-74, 289, 325, Pl.'s Exh. P-21.) Villalpando admitted that he spoke directly with Perforadora's president about an interoffice memorandum submitted by Correa that identified SSI as the true owner of the equipment. (Tr., p 284 ) A review of the evidence also indicates that Correa was given direct authority to act on Perforadora's behalf. (Tr., pp. 272, 287 ) At the very least, Perforadora ratified the acts of Correa by filing an opposition to SSI's request to release the equipment with full knowledge that the equipment belonged to SSI.

Simply put, this case is not even remotely analogous to *P&E Boat Rentals.* Correa was not lower echelon management. His actions were ratified by Perforadora through Villalpando and Perforadora's president. More importantly, Perforadora had direct knowledge of the wrongful seizure and failed to correct their actions. Instead, Perforadora continued the wrongful seizure by instituting false and misleading pleadings. The Court therefore finds that the intentional and malicious acts of Correa, Villalpando, Perforadora's president and its attorney, are attributable to Perforadora and justify an award of punitive damages against Perforadora.

11

4.    Lost Profits

Perforadora asserts that Panzeca failed to follow generally accepted accounting principles for his use of a profit figure which ignored SSI's bad debt of $700,000 and relied on the Oceatec contract. The Court finds Perforadora's argument to be without merit. As noted in the Bench Opinion, the Court accepted Panzeca's loss of profit calculations which excluded both the bad debt and the expenses associated with that debt. (Ct. R., Doc. 138, pp 29-30.) As previously stated, Panzeca did not rely on the Oceatec contract, and even if he did, it only affected the higher case scenario which the Court did not use. For these reasons, the Court finds that Perforadora's argument is without merit.

5.    Loss of the Sea Owl

Perforadora further asserts that the Court should not have awarded damages attributed to the loss of the SEA OWL. Perforadora appears to argue that it cannot be held liable because it did not physically cause the SEA OWL's tether to break. That argument simply misses the point. Without the MAX ROV on location, SSI could not retrieve the SEA OWL. Burnside testified without any reliable opposition that if SSI's MAX ROV had been available, the SEA OWL would have been recovered. (Tr., p. 226 ) The Court therefore reiterates its finding that SSI lost the SEA OWL as a direct result of Perforadora's seizure of SSI's MAX ROV.

6.    Venue

Finally, Perforadora argues that the Court erred in holding that Perforadora's filing of a counterclaim waived its objection to venue. The Court notes that venue is an issue for appeal, not a new trial. Regardless, the Court previously found that jurisdiction and venue are proper in the Southern District of Mississippi based upon Perforadora's contacts and admissions. Thus,

12

the Court properly exercised its jurisdiction over this case in this district.

       7.     Conclusion Regarding Perforadora's Additional Reasons

Perforadora has failed to offer any other valid reason for the Court to grant a new trial. Instead, Perforadora has offered several meritless arguments that have previously been addressed and are inconsistent with the record before the Court. The Court therefore finds that Perforadora's motion for a new trial should be denied.

IV.    Motions to Open Judgment and to Take the Depositions of Captain Toledo, de la Torre, and Bauza

As noted above, Perforadora was allowed to supplement the record with the original affidavits of Captain Toledo, de la Torre and Bauza in support of its motion for a new trial. After reviewing the affidavits, the Court finds that any possible testimony from these witnesses would not alter the ultimate outcome of the case and would only prolong the inevitable. The Court therefore finds that Perforadora's motions to open the Final Judgment and to take additional testimony, including the depositions of Captain Toledo, de la Torre and Bauza, should be denied.

### Conclusion

For the reasons above, the Court finds that Perforadora's motion to supplement the record and SSI's motions for a writ of attachment and for an expedited hearing should be denied as moot. Also, the Court finds that Perforadora's motions to substitute the original affidavits of Captain Toledo, de la Torre, Bauza and Correa, and to file additional supporting translations with regard to de la Torre's affidavit, should be granted.

More importantly, the Court finds that Perforadora's motion for a new trial should be denied. The Court further finds that Perforadora's motion to open the Final Judgment and to take

13

additional testimony should be denied.  Thus, the Court finds that Perforadora's motion for an order permitting the depositions of Captain Toledo, de la Torre and Bauza, should be denied. Each party shall bear their respective costs.

A separate Order in accordance with this Memorandum Opinion shall issue this date.

THIS the 18th day of February, A.D., 2000.

UNITED STATES DISTRICT JUDGE

14



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUBMERSIBLE SYSTEMS, INC.                                                    PLAINTIFF

VS.                                                      CIVIL ACTION NO. 1:98cv251G

PERFORADORA CENTRAL, S.A. de C.V.                                           DEFENDANT

ORDER

        This cause comes before the Court on the *ex parte* motion to supplement the record [125-

1]; the motions for a new trial [144-1]; for an Order permitting the depositions of Captain

Fernando Toledo Zepeda [Captain Toledo], Juan Antonio de la Torre Magdaleno and Miguel

Angel Bauza Zumoya [144-2]; to substitute the original affidavits of Captain Toledo, de la Torre,

Bauza, and Fausto A. Correa Lepe [145-1] [147-1]; for leave to file additional supporting

translations [148-1]; to open judgment and take additional testimony in connection with the motion

for new trial [154-1] filed by the defendant, Perforadora Central, S.A. de C.V. Further, before the

Court is a renewed motion for a writ of attachment [140-1] and a motion for an expedited hearing

on the renewed motion for a writ of attachment [141-1], filed by the plaintiff, Submersible

Systems, Inc. Pursuant to the Memorandum Opinion entered in this cause, this date, incorporated

herein by reference, it is hereby,

        ORDERED AND ADJUDGED that the defendant's *ex parte* motion to supplement the

record [125-1] be, and is hereby, denied as moot. It is further,

        ORDERED AND ADJUDGED that the plaintiff's renewed motion for a writ of attachment

[140-1] and its motion for an expedited hearing on the renewed motion for a writ of attachment

[141-1] be, and are hereby, denied as moot. It is further,

ORDERED AND ADJUDGED that the defendant's motion for a new trial [144-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the defendant's motion for an Order permitting the depositions of Captain Toledo, de la Torre and Bauza [144-2] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the defendant's motion to open judgment and take additional testimony in connection with the motion for new trial [154-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the defendant's motion to substitute the original affidavits of Captain Toledo, de la Torre and Bauza [145-1] be, and is hereby, granted. It is further,

ORDERED AND ADJUDGED that the defendant's motion to substitute the original affidavit of Correa [147-1] be, and is hereby, granted. It is further,

ORDERED AND ADJUDGED that the defendant's motion for leave to file additional supporting translations [148-1] with regard to the notarial certification and corporate charter of "Oceatec" contained in de la Torre's affidavit be, and is hereby, granted. It is further,

ORDERED AND ADJUDGED that each party shall bear their respective costs in connection with these motions.

SO ORDERED AND ADJUDGED this the 18th day of February, A.D., 2000.

_____
UNITED STATES DISTRICT JUDGE

2

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **SUBMERSIBLE SYSTEMS, INC.** | § | |
| | § | |
| **VS** | § | **C.A. NO.  B-03-020** |
| | § | |
| **PERFORADORA CENTRAL, S.A. de C.V.** | § | **RULE 9(h) ADMIRALTY** |

STATE OF LOUISIANA

PARISH OF ORLEANS

<u>**AFFIDAVIT**</u>

APPEARED BEFORE ME, the undersigned authority in and for the above jurisdiction.

**THOMAS A. RAYER, JR.**, who did depose and state that:

1.    He is a person of the full age of majority and is domiciled in the State of Louisiana;

2.    He is an attorney for Submersible Systems, Inc. in the captioned matter;

3.    He spoke with Sergio J. Alarcon, counsel for Perforadora Central, S.A. de C.V., on or about April 4, 2003 regarding additional depositions to be taken in Mexico;

4.    Mr. Alarcon has indicated that he expects that no more than six depositions need to be taken in Mexico;

1



EXHIBIT

F

5.   Mr. Alarcon further advised that the depositions can be taken in two to three days; and

6.   He, the deponent, has read the foregoing affidavit, and it is true and correct to his personal knowledge.

_____
THOMAS A. RAYER, JR.

SWORN TO AND SUBSCRIBED BEFORE ME this _22___ day of _April_, 2003.

_____
NOTARY PUBLIC

718-01/59264

2

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO.  B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

## <u>AFFIDAVIT</u>

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

     **BEFORE ME**, the undersigned authority, a Notary Public in and for the Parish and State aforesaid, personally came and appeared:

<strong>WOLFGANG BURNSIDE,</strong>

who after being duly sworn, did depose and say that:

    1.    I am the president and an owner of Submersible Systems, Inc. ("Submersible");

    2.    I have been advised that Perforadora Central, S.A. de C.V. ("Perforadora"), the defendant in the captioned matter, has filed a motion to dismiss Submersible's suit in Brownsville, Texas, on the grounds that it would be more convenient to try the case in Mexico;



EXHIBIT

G

3.   It is more convenient and less expensive for me to travel to Brownsville, Texas, than to Mexico;

4.   Moreover, I am aware that numerous depositions were taken while Submersible's suit pending in the United States District Court for the Southern District of Mississippi against Perforadora based on the same facts, and I understand that those depositions may be used if this case is transferred to Mexico, but at a minimum they have to be translated into Spanish;

5.   In addition, if this case is transferred to Mexico, I understand that Submersible will have to retain Mexican counsel to represent it;

6.   None of Submersible's witnesses that I know of (except Enrique Garza) are residents of Mexico; most of the witnesses are residents of the United States who can travel to Brownsville more easily and less expensively than to Mexico;

7.   It would create a tremendous financial hardship on Submersible if forced to hire Mexican lawyers, translate documents into Spanish, and pay for the travel and translator expenses of its witnesses; further, if the case is transferred to Mexico Submersible would cease operations during the period that I would attend the Mexican proceedings because I personally supervise and work on most jobs; and

8.   I have read the foregoing affidavit, and it is true and correct to my personal knowledge.

WOLFGANG BURNSIDE

Sworn to and Subscribed Before Me,
this 22" Day of _____ April _____, 2003

NOTARY PUBLIC
718-01/59082

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO.  B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

## <u>AFFIDAVIT</u>

**STATE OF LOUISIANA**

**PARISH OF JEFFERSON**

  **BEFORE ME**, the undersigned authority, a Notary Public in and for the Parish and State aforesaid, personally came and appeared:

## GEORGE J. PANZECA,

who after being duly sworn, did depose and say that:

  1.  I am the accountant retained by Submersible Systems, Inc. in "Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V." while said action was pending in the United States District Court for the Southern District of Mississippi;

  2.  I have been retained as an accountant by Submersible again in the captioned matter;



3.      I am aware that Perforadora have moved to dismiss this case in Brownsville, Texas and refile it in a Mexican court;

4.      It is much more convenient for me to give my testimony in a court in Brownsville, Texas than in Mexico;

5.      If I am required to testify in a Mexican court, not only would it take more time for me to travel to and from the court than to Brownsville, but my testimony would also have to be translated from English into Spanish, because I am not fluent in Spanish;

6.      Moreover, the earlier opinion I gave in the Mississippi proceedings was not premised on any earnings which Submersible may have had under a proposed contract with Oceatec;

7.      Moreover, I do not intend to rely on any proposed contract with Oceatec in rendering an opinion as to Submersible's damages in this case; and

8.      I have read the foregoing affidavit, and it is true and correct to my personal knowledge.

GEORGE J. PANZECA

**Sworn to and Subscribed Before Me,**
**this 22 Day of April, 2003**

**NOTARY PUBLIC**

718-01/59081

MARSHALL G. WEAVER
NOTARY PUBLIC
Parish of Orleans, State of Louisiana
My Commission is issued for Life.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| VS | § | C.A. NO. B-03-020 |
| | § | |
| PERFORADORA CENTRAL, S.A. de C.V. | § | RULE 9(h) ADMIRALTY |

DECLARATION OF ENRIQUE GARZA RUIZ ESPARZA

Pursuant to 28 U.S.C. § 1746, I make the following declaration:

1. I obtained my law degree from the Universidad Iberoamericana in Mexico City in 1991. Since then, I have practiced in both federal and local courts throughout Mexico, primarily in the fields of maritime and insurance law, representing foreign and national companies in cases involving major transactions and casualties in the United Mexican States. I am a member of the Mexican Maritime Law Association and the Mexican Insurance Law Association. I have spoken at numerous international conferences on how to conduct business in the United Mexican States in the maritime, energy and insurance industries

2. I have been retained as an expert on Mexican law and procedure in the following cases: U.S. District Court of the Southern District of Texas Laredo Division in the matter of "Summit Machine Tool Manufacturing Corp. v. Warren Transport, et al." Civil Action No. L-93-E2, U.S. District Court of the Southern District of Texas Laredo Division in the

1

EXHIBIT

I

matter of "Summit Machine Tool Manufacturing Corp. v. LCS Professional Forwarders, et al." Civil Action No. L-94-15, U.S. District Court of the Southern District of Texas Houston Division in the matter of "Acceros Monterrey S.A. de C.V. and Seguros Comercial America, S.A. de C.V. v. M/V AKADAN BULK, *in rem* Her Engines Tackles, etc. v. Transoceanic Navigation Corp. and Perfamos Shipping Co. S.A.," Civil Action No. H-95-0179, U.S. District Court of the Southern District of Texas Houston Division in the matter of "Industria Fotografica Interamericana v. M/V IALIACO, *in rem*, Her Engines, Tackles, etc. v. Transportacion Maritima Mexican S.A. de C.V. and Compania Maritima Nacional Ltda.," Civil Action No. H-94-3512, U.S. District Court of the Southern District of Texas Houston Division in the manner of "Industria Fotografica Interamericana v. M/V MERIDA, *in rem*, Her Engines, Tackles, etc. v. Transportacion Maritima Mexican, S.A. de C.V. and Compania Maritima Nacional Ltda.," Civil Action No. H-94-3414; High Court of Justice Queen's Bench Division, Commercial Court United Kingdom in the matter of "Huyton S.A. v. Distribuidora Internacional de Productos Agricolas S.A de C.V.", 1998 folio No. 1805.

3. I have also been retained as an expert on Mexican law in the matter of "Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.," Civil Action 1:98CV251GR in the U.S. District Court for the Southern District of Mississippi, Southern Division and submitted a declaration in that case, which is attached hereto as Exhibit "1";

4. Since then, I have been retained as an expert in Mexican law in this case and have been asked specifically to render my opinion concerning certain issues that have been raised in connection with Perforadora's Motion to Dismiss on the Ground of *Forum Non Conveniens* :

2

5. In connection with this declaration, I have reviewed various pleadings and documents which have been filed in the United States District Court for the Southern District of Mississippi in connection with the case alluded to above. I have also had an opportunity to review the affidavit of Carlos Loperena filed in support of Perforadora's Motion to Dismiss on the Ground of *Forum Non Conveniens*;

6. If this case were to be dismissed and refiled in a Mexican court, it is my opinion that all the depositions that were taken in connection with the case when it was pending in the United States District Court for the Southern District of Mississippi will only be admitted by the Mexican courts as documentary evidence, which will have to be apostilled and translated into Spanish at substantial cost;

7. Because the depositions would only be documentary evidence in Mexico, any party could call any of the previously-deposed witnesses for the purpose of rendering testimony before the Mexican court and in the case of none Spanish speaking witnesses, the court will order the hiring of an official translator duly authorized by the Superior Court of Justice of the Federal District, which will represent a significant costs.

8. The above will also be applicable in the case of the reports and testimony rendered by the experts appointed by the parties before the United States District Court for the Southern District of Mississippi, since Mexican law provides for a specific procedure for the rendering of expert opinions before a court of law, and consequently such evidence will have to be rendered once again before the Mexican court.

3

9. Furthermore, if the opinions of the experts appointed by the parties are contradictory, this will force the Mexican court to appoint a third expert, which fees will have to be paid by the parties. Additionally, any of the parties, as well as the Mexican court will be entitled to request the appearance of any of the experts before the court for questioning, which will again represent additionally costs to the parties.

10. I estimate it will take at least two to three months, in the best of circumstances to present the testimony of all the witnesses involved in this matter before a Mexican court, specially since a considerable amount of testimony will have to be taken through letters rogatory pursuant to the Inter-American Convention on the Taking of Evidence Abroad and probably much longer;

11. Any and all exhibits which the parties wish to use in Mexico that were used in the prior action would have to be apostilled and translated from English in to Spanish, at substantial costs;

12. In the event that any party wishes to use the transcript of the three day trial in Mississippi in Mexico, the transcript would have to be translated, at substantial cost;

13. Accordingly, in my opinion, there would be substantial costs incurred in transforming this case from a U.S. case to a Mexican case;

14. Because of the translation requirements, the rendering of testimony abroad and scheduling, the case in all likelihood could not be concluded in a court of first instance in

4

Mexico for ten months in the best of circumstances;

15. In my experience, it is very unlikely that the case would be concluded in that time; in all likelihood, it would take a year and a half to conclude the case in the court of first instance;

16. Testimony can be obtained from witnesses in Mexico by deposition transcribed, translated and then submitted as evidence in the U.S. courts through letters rogatory pursuant to the Inter-American Convention on Letters Rogatory or the Hague Convention which have been ratified by Mexico;

17. In my opinion, it is entirely unnecessary that the record of the earlier Mexican criminal proceeding, referred to in paragraph 16 of Mr. Loperena's affidavit, be used in this proceeding in the United States;

18. The earlier Mexican criminal proceeding did not involve Submersible, but only Perforadora and Quantum Ingenieros;

19. Moreover, the "selective translation of excerpts of the records" which is referred to by Mr. Loperena were provided by Perforadora itself in the Mississippi proceeding;

20. The Mexican courts will allow the introduction of the trial transcript from the Mississippi proceeding, which would have to be translated into Spanish, at significant costs;

5

21. Given that this case is a private dispute between Perforadora and Submersible, I do not believe that Mexico would have any interest in requiring that the dispute be litigated in its courts as opposed to courts in the United States;

22. In fact, I personally have been involved in litigation on behalf of the Tidewater interests when Perforadora itself filed suit in the U.S. District Court for a tort when a Tidewater vessel allegedly allided with a Perforadora rig in the territorial waters of the United Mexican States. I know that Perforadora asserted claims under the United States admiralty and maritime jurisdiction and substantive U.S. admiralty law despite the fact that (a) the claims arose in the territorial waters of the United Mexican States and (b) that most of the witnesses, including experts, were Mexican;

23. Although I do not think that the comments raised by Mr. Loperena in Paragraph 23 are particularly relevant, I did comment in Paragraph I of my September 4, 1998 declaration that if Perforadora would "renounce its depository status and manifest that it did not have an objection to the release of the equipment to Submersible" the criminal court would have released the equipment to Submersible. As I understand it, Perforadora did withdraw its opposition to the release of the equipment to Submersible upon order by the U.S. Magistrate Judge for the Southern District of Mississippi, following which the equipment was released and returned to Submersible, albeit in a deteriorated state due to Perforadora's failure to maintain the equipment;

24. In my opinion, if U.S. substantive law is to be applied in this case, a U.S. District Court is readily able to apply that law instead of a court of Mexico;

25. I understand that the captioned matter is set for trial in December 2003 in Brownsville, Texas, and have no problem traveling to Brownsville to testify at trial; and

26. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 22, 2003, at Mexico City, Mexico.

ENRIQUE GARZA RUIZ ESPARZA

# Garza Tello & Asociados
## ABOGADOS   ATTORNEYS

Insurgentes Sur 4126- 201
México    D.F.      14000
tel.       (525)  573.6188
fax.      (525)  655.2136

December 14, 1998

WAGNER & BAGOT
Podryas Center Suite 2660
630 Poydras Street
New Orleans, Louisiana 70130-6105
VIA TELEFAX (504) 523 1587
ORIGINAL VIA DHL

    RE : SUBMERSIBLE SYSTEMS, INC.
        versus
        PERFORADORA CENTRAL, S.A. de C.V.
        CIVIL ACTION No. 1 :98CV251RG

Att'n : Thomas A. Rayer Jr. Esq.

Dear Sir :


Enclosed please find the undersigned declaration dated September 4, 1998, which I adapt as my expert report in connection with the above captioned matter.

In addition, I hereby enclose as exhibits A, B and C which are copies of all the supporting documents reviewed by the undersigned to issue the opinion in question.

EXHIBIT
1

EXHIBIT
P-19

WAGNER & BAGOT
PAGE 2.

Finally, I would like to point out that the undersigned charges on an hourly bases of  USD$135 per hour.

Sincerely Yours
Garza Tello & Asociados

Enrique Garza

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION

| | |
|---|---|
| SUBMERSIBLE SYSTEMS, INC. | CIVIL ACTION |
| | No. 1:98CV2SIRG |
| versus | |
| PERFORADORA CENTRAL, S.A. de C.V. | |

DECLARATION OF ENRIQUE GARZA RUIZ ESPARZA
CONCERNING MEXICAN LAW

I have been requested to render an opinion concerning Mexican law and actions taken by Perforadora Central, S.A. de C.V. ("Perforadora") with respect to certain equipment reportedly aboard Perforadora's vessel, the DON FRANCISCO, on or about June 23, 1997 and subsequently.

I obtained my law degree from Universidad Iberoamericana in Mexico City in 1991. Since then, I have practiced in both federal and local courts throughout Mexico, primarily in the fields of maritime and insurance law, representing foreign and national companies in cases involving major transactions and casualties in the United Mexican States. I am a member of the Mexican Maritime Law Association and the Mexican Insurance Law Association. I have spoken at numerous international conferences on how to conduct business in the United Mexican States in the maritime, energy and insurance industries.

1

2

I have been retained as an expert on Mexican law in the following cases: US District Court of the Southern District of Texas Laredo Division in the matter of Summit Machine Tool Manufacturing Corp. Vs. Warren Transport Et. Al. C.A. No. L-93-82, US District Court of the Southern District of Texas Laredo Division in the matter of Summit Machine Tool Manufacturing Corp. Vs. LCS Professional Forwarders Et. Al. C.A. No. L-94-15, US District Court of the Southern District of Texas Houston Division in the matter of Aceros Monterrey S.A. de C.V. and Seguros Comercial America S.A Vs. M/V Aladan Bulk, in rem, Her Engines Tackles, etc. Vs. Transoceanic Navigation Corp. and Pergamos Shipping Co. S.A. C.A. H-95-0179, US District Court of the Southern District of Texas Houston Division in the matter of Industria Fotografica Interamericana Vs. M/V Jalisco, in rem, Her Engines Tackles, etc. Vs. Transportación Maritima Mexican S.A. de C.V. and Compañia Maritima Nacional Ltda. C.A. H-94-3512, US District Court of the Southern District of Texas Houston Division in the matter of Industria Fotografica Interamericana Vs. M/V Merida, in rem, Her Engines Tackles, etc. Vs. Transportación Maritima Mexican S.A. de C.V. and Compañia Maritima Nacional Ltda. C.A. H-94-3414.

I have been asked to assume the following facts in rendering my opinion:

1.      Submersible Systems, Inc. ("Submersible") is a Louisiana corporation with its principal place of business in Patterson, Louisiana.

2.      Submersible entered into a contract with Quantum Ingenieros, S.A. de C.V. ("Quantum"), a Mexican company, to provide personnel and ROV equipment in connection with a job Quantum had to inspect pipe lines for PEMEX in or about the Bay of Campeche, Mexico.

2

3. The Submersible/Quantum contract was executed in Louisiana, and called for arbitration and/or litigation in the State of Louisiana.

4. Quantum also entered into a contract with Perforadora whereby Perforadora supplied a vessel and crew for use in these same inspection operations.

5. There was no contractual relationships between Perforadora and Submersible at any time.

6. The ROV equipment and personnel supplied by Submersible were loaded in Morgan City, Louisiana on Perforadora's vessel, the DON FRANCISCO, on November 7, 1996 for shipment to Mexico.

7. All the equipment loaded in Morgan City was marked or in containers marked "Submersible Systems, Inc." or "Welch Rentals."

8. Welch Rentals rented a fuel tank and generator to Submersible for this job.

9. The customs declaration stamped November 11, 1996, when the equipment passed customs in Mexico, indicated that the equipment was imported by Submersible/Quantum, that it was provided by Submersible, that the equipment could remain in Mexico for six (6) months, and referred to Article 106, Section 11 of the Mexican customs law and Article 136 of the Regulatory law of the Mexican customs law. A copy of the declaration is attached hereto.

10. On or about June 23, 1997, after Perforadora and Submersible have worked for Quantum for six or seven months, Quantum was behind on its payments to both companies.

11. On or about the aforesaid date, the DON FRANCISCO docked late at night in the Port of Dos Bocas, Tabasco United Mexican States.

3

12.   At that time, when at dock, Quantum personnel left the DON FRANCISCO, possibly taking equipment belonging to Quantum.

13.   The following morning, the Submersible personnel who were still aboard the vessel left the vessel either because of some passport problem or because they ordered off of the vessel by Perforadora personnel.

14.   When the Submersible personnel left the vessel, Submersible's ROV equipment had been padlocked by Perforadora personnel on the deck of the DON FRANCISCO.

15.   Submersible's personnel were allowed only to retrieve a few personal items from certain containers, but not to remove the ROV equipment.

16.   Perforadora moved the equipment from its vessel to the dock in Dos Bocas, Tabasco and then had the equipment locked in a secured area on PEMEX's facility.

17.   Shortly thereafter, the principal of Submersible, Wolfgang Burnside, appeared in Dos Bocas, Tabasco indicating that Submersible owned the ROV equipment and requesting the ROV equipment from Perforadora, but Perforadora refused to release it.

18.   Perforadora was advised by representatives of Quantum on July 4, 1997 that the equipment was owned by Submersible.

19.   On or about July 5, 1997, Perforadora then moved the equipment from Dos Bocas to its own facility in Ciudad del Carmen, Campeche, United Mexican States.

20.   Mr. Burnside again requested the release of the equipment, but Perforadora refused to release it.

21.   On August 8, 1997, Perforadora filed a request with the Ministerio Publico of Ciudad del Carmen, Campeche indicating that there was some dispute as to the ownership of the

4

ROV equipment (i.e. a question as to whether or not it was owned by Quantum or Submersible) and asking the Ministerio Publico to take custody of same.

    22.    At that time, the Ministerio Publico appointed Perforadora as custodian of the equipment.

    23.    Submersible subsequently attempted to obtain the release of the equipment and presented certain evidence, apparently including invoices, to the Ministerio Publico, but the equipment was not released.

    24.    Perforadora remains as custodian of the aforesaid equipment.

    25.    Submersible has filed suit against Perforadora in the United States District Court of Biloxi, Mississippi seeking to recover damages from Perforadora as a result of its alleged conversion, theft or piracy of Submersible's equipment.

    Based on the foregoing assumptions, my opinions are as follows:

A.- Pursuant to Articles 136 section I of the Regulatory Law of the Custom Law the custom form ( Pedimento de Importación), used for the importation to the United Mexican States of equipment owned or supplied by foreign nationals, must contain the name of a citizen or company of the United Mexican States in addition to the equipment owner or supplier. Furthermore, the citizen or company of the United Mexican States named in the customs form, must filed a letter before the customs authorities undertaking to respond for the payment of the importation taxes in the event the equipment is not exported from the United Mexican States before the six (6) months authorization expires.

5

B.- The customs form that was completed at the time of the importation of the equipment in question to the United Mexican States, listed Quantum because Quantum was the Mexican Company that was to be responsible for the payment of the importation taxes in the event that the equipment was not returned within the term granted by the Custom Authorities i.e. six (6) months.

C.- The same form listed Submersible because Submersible was the owner and/or provider of the equipment, and was the party requesting the temporary importation of the equipment.

D.- In accordance with the terms of the customs form, it is clear that the equipment was imported in accordance with the provisions of Articles 106, Section II of the Mexican Custom Law and Article 136 Sections I, II and III of the Regulatory Law of the Custom Law, an importation regime granted exclusively to foreign companies for the temporary importation of equipment that they will use to provide services to a Mexican company, consequently it is clear that it is impossible to assume from the custom form that Quantum had ownership or any title over the equipment in question. ( a free translation of Articles 106, Section II of the Mexican Custom Law and Article 136 Sections I, II and III of the Regulatory Law of the Custom Law is enclosed hereto as exhibit A).

E.- The importation of equipments owned by Quantum could not be made under the importation regime granted by Articles 106, Section II of the Mexican Custom Law and Article 136 Sections I, II and III of the Regulatory Law of the Custom Law.

F.- In accordance with Article 332 of the Criminal Code for the State of Campeche, Perforadora Illegally took possession of Submersible's equipment when it padlocked the equipment on board the vessel, locked up the equipment at Pemex's dock, transfer the aforesaid equipment from Pemex's dock in Dos Bocas, Tabasco to its own facility in Ciudad del Carmen, Campeche on or about July 5, 1997 and prevent Submersible from having the equipment. ( A free translation of Article 332 of the Criminal Code of the State of Campeche is attached hereto as exhibit B).

J. There was no legal impediment to prevent Perforadora from returning the equipment to Submersible before August 8, 1997. After August 8, 1997 when Perforadora advised the District Attorney of Ciudad del Carmen ("DA"), of the existence of Submersible's equipment and place same under the jurisdiction of the DA, the DA allowed Perforadora to keep Submersible's equipment as depository.

H.- Even after the DA allowed Perforadora to keep the equipment as depository, Perforadora could have renounced its depository status and manifested that they did not have any objection to the release of the equipment by the DA to Submersibles, without any legal liabilities or effects to the criminal charges filed by Perforadora against Quantum.

I.- Even today, if Perforadora was to advise the criminal court of the State of Campeche based at Ciudad del Carmen ("Criminal Court"), which is presently hearing Perforadora's case against Quantum, that they renounce to its depository status and manifest that they did not have any objection to the release of the equipment to Submersible, based on the fact that Submersible has apparently presented evidence of its ownership of the equipment, the Criminal Court would release the equipment to Submersible.

7

3.- I have seen no records to support Perforadora's suggestion that the equipment in question belongs to Quantum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 4, 1998.

ENRIQUE GARZA RUIZ ESPARZA

Exhibit "A"

Customs Law.

Article 106 .- It is understood as temporary importation regimen, the entrance to the country of merchandise for a limited time and with an specific purpose, to be returned to a foreign country with in the following terms:

II.- Upon 6 months, in the following cases:

a)    The ones made by foreigners, handled by them or other person having a labor relationship with them, except vehicles.

Regulatory Law to the Customs Law.

Article 136 .- For the importations referred in the paragraph a) of the section II of the Article 106 of the law, the following requirements must be accomplished:

I.        The importation permit must mention the names of the person resident in a foreign country and the person resident in Mexico. Further more a writ of the person resident in Mexico, must be attached to the importation permit, assuming a joint responsibility as mentioned in the section VIII of the provision 26 of the Federal Tax Law, for the tax credits that may be caused by not returning the merchandises to a foreign country in time.

II.        The residents of a foreign country must have a working relationship with the person that will use the temporary imported goods, unless that they are used by them.

III.        The foreign country residents or the person having a joint responsibility with them, before the presentation of the importation permit must give a written notice to the customs authority of the place were the imported goods will be used.

Exhibit "B"

Criminal Code of the State of Campeche.

Article 352.- Commits the crime of theft the one who take's possession of another's good, with out any right or authorisation from the person who can dispose of the good according to the law.

Exhibit "A"

- Article 106 of the Customs Law and
  translation.

- Article 136 of the Regulatory Law of the
  Customs Law and translation.

II. Se cumplirán las demás obligaciones en materia de regulaciones y restricciones no arancelarias y formalidades para el despacho de las mercancías destinadas a este régimen.

**NO SERA OBJETO DE TRANSFERENCIA O ENAJENACION LA PROPIEDAD DE LAS MERCANCIAS DESTINADAS AL REGIMEN DE IMPORTACION TEMPORAL**

ARTICULO 105. La propiedad o el uso de las mercancías destinadas al régimen de importación temporal no podrá ser objeto de transferencia o enajenación, excepto entre maquiladoras, empresas con programas de exportación autorizados por la Secretaría de Comercio y Fomento Industrial y empresas de comercio exterior que cuenten con registro de esta misma dependencia, cuando cumplan con las condiciones que establezca el Reglamento.

## II. PARA RETORNAR AL EXTRANJERO EN EL MISMO ESTADO

**QUE SE ENTIENDE POR REGIMEN DE IMPORTACION TEMPORAL**

ARTICULO 106. Se entiende por régimen de importación temporal, la entrada al país de mercancías para permanecer en él por tiempo limitado y con una finalidad específica, siempre que retornen al extranjero en el mismo estado, por los siguientes plazos:

I. Hasta por un mes, las de remolques y semirremolques, incluyendo aquellos diseñados y utilizados exclusivamente para el transporte de contenedores, siempre que transporten en territorio nacional las mercancías que en ellos se hubieran introducido al país o las que se conduzcan para su exportación.

II. Hasta por seis meses, en los siguientes casos:

a) Las que realicen los residentes en el extranjero, siempre que sean utilizados directamente por ellos o por personas con las que tengan relación laboral, excepto tratándose de vehículos.

b) Las de envases de mercancías, siempre que contengan en territorio nacional las mercancías que en ellos se hubieran introducido al país.

c) Derogado.

d) Las de muestras o muestrarios destinados a dar a conocer mercancías.

(R) e) Las de vehículos siempre que la importación sea efectuada por mexicanos residentes en el extranjero, se trate de un solo vehículo en cada período de doce meses y, se cumpla con los requisitos que señale el Reglamento. Los vehículos podrán ser conducidos en territorio nacional por el cónyuge, los ascendientes o descendientes del importador siempre y cuando sean residentes en el extranjero, o por un extranjero con las calidades migratorias indicadas en el inciso a) de la fracción IV de este artículo. Cuando sea conducido por alguna persona distinta de las autorizadas, invariablemente deberá viajar a bordo el propietario del vehículo.

56

**III.** Hasta por un año, cuando no se trate de las señaladas en las fracciones I y IV de este artículo, y siempre que se reúnan las condiciones de control que establezca el Reglamento, en los siguientes casos:

**a)** Las destinadas a convenciones y congresos internacionales.

**b)** Las destinadas a eventos culturales o deportivos, patrocinados por entidades públicas, nacionales o extranjeras, así como por universidades o entidades privadas, autorizadas para recibir donativos deducibles en los términos de la Ley del Impuesto sobre la Renta.

**c)** Las de enseres, utilería y demás equipo necesario para la filmación, siempre que se utilicen en la industria cinematográfica y su internación se efectúe por residentes en el extranjero. En este caso el plazo establecido se podrá ampliar por un año más.

**d)** Las de vehículos de prueba, siempre que la importación se efectúe por un fabricante autorizado, residente en México.

**IV.** Por el plazo que dure su calidad migratoria, incluyendo sus prórrogas, en los siguientes casos:

**(R) a)** Las de vehículos que sean propiedad de turistas, visitantes, visitantes locales y distinguidos, estudiantes e inmigrantes rentistas, siempre que los mismos sean de su propiedad a excepción de turistas y visitantes locales. Cuando no sean de su propiedad deberán cumplirse los requisitos que establezca el Reglamento. Los vehículos podrán ser conducidos en territorio nacional por un extranjero que tenga alguna de las calidades migratorias a que se refiere este inciso, por el cónyuge, los ascendientes o descendientes del importador, aun cuando estos últimos no sean extranjeros, o por un nacional, siempre que en este último caso, viaje a bordo del mismo cualquiera de las personas autorizadas para conducir el vehículo.

Los vehículos a que se refiere este inciso, deberán cumplir con los requisitos que señale el Reglamento.

**(R) b)** Los menajes de casa de mercancía usada propiedad de visitantes, visitantes distinguidos, estudiantes e inmigrantes, siempre y cuando cumplan con los requisitos que señale el Reglamento.

**V.** Hasta por veinte años, en los siguientes casos:

**a)** Contenedores.

**b)** Aviones y helicópteros, destinados a ser utilizados en las líneas aéreas con concesión o permiso para operar en el país, así como aquéllos de transporte público de pasajeros, siempre que, en este último caso, proporcionen, en febrero de cada año y en medios magnéticos, la información que señale mediante reglas la Secretaría.

57

*c) Embarcaciones, siempre y cuando cumplan con los requisitos y condiciones que establezca el Reglamento.

(R) *d) Las casas rodantes que sean propiedad de residentes en el extranjero, siempre y cuando cumplan con los requisitos y condiciones que establezca el Reglamento.

e) Carros de ferrocarril.

También podrán efectuar importaciones temporales las empresas que sean maquiladoras, de conformidad con lo que establezca el Reglamento, así como las empresas que tengan programas de exportación autorizados por la Secretaría de Comercio y Fomento Industrial. En los casos en que residentes en el país les enajenen productos a las empresas antes señaladas, así como a las empresas de comercio exterior que cuenten con registro de la Secretaría de Comercio y Fomento Industrial, se considerarán efectuadas en importación temporal y perfeccionada la exportación definitiva de las mercancías del enajenante, siempre que se cuente con constancia de exportación.

. Se podrá permitir la importación temporal de mercancías destinadas al mantenimiento y reparación de los bienes importados temporalmente conforme a este artículo, siempre que se incorporen a los mismos y no sean para automóviles o camiones, de conformidad con lo que establezca el Reglamento.

El Reglamento establecerá los casos y condiciones en los que deba garantizarse el pago de las sanciones que llegaran a imponerse en el caso de que las mercancías no se retornen al extranjero dentro de los plazos máximos autorizados por este artículo.

(A) Las mercancías que hubieran sido importadas temporalmente de conformidad con este artículo, deberán retornar al extranjero en los plazos previstos, en caso contrario, se entenderá que las mismas se encuentran ilegalmente en el país, por haber concluido el régimen de importación temporal al que fueron destinadas.

SEÑALAMIENTO DE LA FINALIDAD A LA QUE SE DESTINARAN LAS MERCANCIAS, EN LAS IMPORTACIONES TEMPORALES QUE SE SEÑALAN

(R) ARTICULO 107. Tratándose de las importaciones temporales a que se refieren los incisos a), b) y d) de la fracción II, la fracción III y el inciso b) de la fracción IV del artículo 106 de esta Ley, en el pedimento se señalará la finalidad a la que se destinarán las mercancías y, en su caso, el lugar en donde cumplirán la citada finalidad y mantendrán las propias mercancías.

En los demás casos, no se requerirá pedimento para la importación temporal de mercancías ni para su retorno, asimismo, no será necesario utilizar los servicios de agente o apoderado aduanal, pero se deberá presentar la forma oficial que mediante reglas establezca la Secretaría.

* Ver Artículo Noveno Transitorio para 1996.

58

cancías que se encuentran sujetas a regulaciones y restricciones no arancelarias y no se cuente con la documentación que acredite su cumplimiento, se procederá al embargo precautorio de las mercancías y al inicio del procedimiento administrativo en materia aduanera.

**COMO PUEDEN PRESENTAR EL PEDIMENTO LAS EMPRESAS QUE EFECTUEN IMPORTACIONES AL AMPARO DEL ARTICULO 98 DE LA LEY**

.ARTICULO 134. Las empresas que efectúen importaciones al amparo del artículo 98 de la Ley, podrán presentar el pedimento respectivo sin que sea necesario consignar los datos que establezca la Secretaría.

Las empresas deberán presentar en la aduana de que se trate, en un plazo no mayor de diez días, contados a partir de la presentación del pedimento correspondiente, uno nuevo identificado con el número del anterior, que contenga los datos omitidos. Las contribuciones causadas se deberán enterar al presentar el primer pedimento.

## CAPITULO IV
## TEMPORALES DE IMPORTACION Y EXPORTACION

### SECCION PRIMERA
### IMPORTACIONES Y EXPORTACIONES TEMPORALES

**CUALES SON LAS MERCANCIAS DISEÑADAS Y UTILIZADAS EXCLUSIVAMENTE PARA EL TRANSPORTE DE CONTENEDORES**

ARTICULO 135. Para efectos de lo dispuesto por la fracción I del artículo 106 de la Ley, las mercancías diseñadas y utilizadas exclusivamente para el transporte de contenedores, son aquellas plataformas adaptadas al medio de transporte, en las cuales los contenedores son colocados para su desplazamiento.

**REQUISITOS PARA REALIZAR LAS IMPORTACIONES A QUE SE REFIERE EL ARTICULO 106 FRACCION II INCISO a) DE LA LEY**

ARTICULO 136. Para realizar las importaciones a que se refiere el inciso a) de la fracción II del artículo 106 de la Ley, se deberán cumplir los siguientes requisitos:

I. El pedimento de importación señalará el nombre de la persona residente en el extranjero y el de una persona residente en territorio nacional. Además, se deberá acompañar a dicho pedimento un escrito en el que esta última, asuma la responsabilidad solidaria a que se refiere la fracción VIII del artículo 26 del Código Fiscal de la Federación, por los créditos fiscales que lleguen a derivarse por no retornar las mercancías al extranjero dentro del plazo establecido en la Ley;

II. Los residentes en el extranjero deberán tener relación laboral con quien utilizará los bienes importados temporalmente, salvo que sean utilizados por ellos mismos, y

III. Los residentes en el extranjero o los responsables solidarios, con anterioridad a que presenten el pedimento, darán aviso por es-

crito a la autoridad aduanera que corresponda a la localidad en la cual se vayan a utilizar los bienes que se importen.

## QUE SE ENTIENDE POR CONVENCIONES Y CONGRESOS INTERNACIONALES

**ARTICULO 137.** Para efectos del inciso a) de la fracción III del artículo 106 y de la fracción III del 116 de la Ley, se entiende por convenciones y congresos internacionales a las conferencias, simposios, encuentros y eventos similares, que tengan como finalidad reunir en fechas preestablecidas a un determinado número de personas.

## REQUISITOS PARA IMPORTAR MERCANCIAS TEMPORALMENTE PARA CONVENCIONES Y CONGRESOS INTERNACIONALES

**ARTICULO 138.** De conformidad con el inciso a) de la fracción III del artículo 106 de la Ley, podrán importarse temporalmente mercancías para destinarse a convenciones y congresos internacionales, siempre que se cumplan los siguientes requisitos:

I. Que la convención o congreso internacional se organice por residentes en el extranjero o residentes en el territorio nacional, siempre que en este último caso se trate de eventos en los que se verifique una participación mayoritaria de personas morales extranjeras, y

II. Que las mercancías importadas al amparo de este artículo que se vayan a distribuir gratuitamente entre los asistentes o participantes al evento, sean identificadas mediante sellos o marcas que las distingan individualmente como destinadas a la convención o congreso internacional de que se trate. No se requerirá comprobar el retorno al extranjero de dichas mercancías, cuando su valor unitario no exceda del que señale la Secretaría mediante reglas.

Las mercancías importadas al amparo de este artículo, deberán cumplir con las regulaciones y restricciones no arancelarias aplicables al régimen de importación temporal.

Cuando con motivo de la convención o congreso internacional se importen mercancías que no se encuentren identificadas en los términos de la fracción II de este artículo, deberán ser retornadas al extranjero, una vez concluido el evento, o bien, importadas en forma definitiva, siempre que se paguen las contribuciones correspondientes y se cumplan las regulaciones y restricciones no arancelarias aplicables a dicho régimen.

## OBLIGACION DE LOS INTERESADOS DE PRESENTAR SOLICITUD DE IMPORTACION TEMPORAL DE VEHICULOS PARA EFECTOS DEL ARTICULO 106 FRACCION IV INCISO a)

**ARTICULO 139.** Para efectos de lo dispuesto en el inciso a) de la fracción IV del artículo 106 de la Ley, los interesados deberán presentar solicitud de importación temporal de vehículos, anexando:

I. La documentación que acredite su calidad migratoria, conforme a la legislación aplicable;

II. La documentación que acredite la legal propiedad del vehículo o, en su caso, la carta de crédito o carta factura otorgada por la

46

Exhibit "B"

- Article 332 of the Criminal Code for the State
of Campeche and translation.

I.- Para obtener rescate o causar daño o perjuicio a la persona privada de la libertad o a otra persona relacionada con aquélla;

II.- Si se hace uso de amenazas graves, de maltrato o de tormentos;

III.- Si se detiene en calidad de rehén a una persona y se amenaza con privarla de la vida o con causarle un daño, sea aquélla o a terceros, si la autoridad no realiza o deja de realizar un acto de cualquier naturaleza;

IV.- Si la detención se hace en camino público o en paraje solitario, y

V.- Si se comete el robo de infante menor de doce años, por quien sea extraño a su familia y no ejerza la tutela sobre el menor.

Cuando el delito lo cometa un familiar del menor que no ejerza sobre él la patria potestad o que ejerciendo ésta, a virtud de desavenencias conyugales o familiares, no esté encargado de su guarda y custodia por mandato judicial, de carácter provisional o definitivo, la pena será de uno a nueve años de prisión.

Si espontáneamente se pone en libertad a la persona antes de tres días y sin causar ningún perjuicio, sólo se aplicará la sanción correspondiente a la privación ilegal de la libertad de acuerdo con el Artículo 329. Este beneficio no opera en el caso de la fracción III del presente artículo.



# TITULO VIGESIMOQUINTO

## DELITOS EN CONTRA DE LAS PERSONAS EN SU PATRIMONIO

### CAPITULO I

### ROBO

ARTICULO 332.- Comete el delito de robo el que se apodera de una cosa ajena mueble, sin derecho y sin consen-

124

timiento de la persona que pueda disponer de ella con arreglo a la ley.

ARTICULO 333.- Se equiparan al robo y se castigarán como tal:

I.- La disposición, apoderamiento o destrucción de una cosa mueble, ejecutada dolosamente por su dueño, si la cosa se haya en poder de otro a título de prenda o de depósito decretado por una autoridad judicial o hecho con su intervención, o mediante contrato público o privado, y

II.- El aprovechamiento de energía eléctrica o de cualquier otro fluído, ejecutado sin derecho y sin consentimiento de la persona que legalmente pueda disponer de él.

ARTICULO 334.- Para la aplicación de la sanción, se dará por consumado el robo desde el momento en que el ladrón tiene en su poder la cosa robada, aun cuando la abandone o lo desapoderen de ella.

ARTICULO 335.- El delito de robo se sancionará en los términos siguientes:

I.- Cuando el valor de lo robado no exceda de doscientas veces al monto del salario mínimo diario general aplicable en el Estado, con prisión de tres meses a dos años y multa que podrá ascender hasta el valor de lo robado;

II.- Cuando exceda de doscientas veces, pero no de cuatrocientas, al monto del salario de referencia, con prisión de uno a tres años y multa que podrá ascender hasta el valor de lo robado;

III.- Cuando exceda de cuatrocientas veces, pero no de seiscientas, al monto del propio salario, con prisión de cuatro a diez años y multa que podrá ascender hasta el valor de lo robado, y

IV.- Cuando exceda de seiscientas veces el monto del salario mínimo aludido, con prisión de cinco a trece años y multa que podrá ascender hasta el valor de lo robado.

125

Exhibit "C"

- Court Resolutions and translations.

| Tesis | ROBO. MOMENTO EN QUE SE CONSUMA EL DELITO. |
|---|---|
| Fuente | Semanario Judicial de la Federación |
| Epoca | Octava Epoca |
| Sala/Tribunal | Tribunal Colegiado de Circuito |
| Jurisprudencia | No |
| Volumen | III |
| Página | 730 |
| Contradicción | NO |
| Parte | Segunda Parte-2 |
| Folio | 85881 |

**ROBO. MOMENTO EN QUE SE CONSUMA EL DELITO.**
El elemento material del delito de robo consistente en el apoderamiento de la cosa mueble, queda consumado en el preciso momento en que el activo de la infracción se apodera de la cosa aun cuando después la haya abandonado o arrojado y se haya recuperado, pues el apoderamiento quedó consumado desde el momento en que el acusado tomó el objeto del ilícito y lo colocó bajo su poder de hecho, ya que desde ese instante se atacó el bien jurídico tutelado.

TRIBUNAL COLEGIADO DEL DECIMO TERCER CIRCUITO.

Amparo en revisión 543/88 -Mario Montaño García.-5 de enero de 1989.-Unanimidad de votos.-Ponente: Agustín Romero Montalvo.- Secretaria: María Guadalupe Gama Casas.

Véase:

Jurisprudencia 240, Primera Sala, Segunda Parte, página 534, del Apéndice al Semanario Judicial de la Federación 1917-1985.

ROBO DELITO CONSUMACION ELEMENTO UNANIMIDAD MONTANO GARCIA MARIO , AGRAVIADO ROMERO MONTALVO AGUSTIN , MAGISTRADO

Copyright © 1992-1995 Información Selectiva  S A. de C.V. Todos los derechos reservados.

| | |
|---|---|
| Thesis: | MOMENT IN WHICH THE LARCENY IS COMMITTED |
| Source: | Federation Judicial Weekly Publication |
| Epoch: | Eighth Epoch |
| Court: | Circuit Court |
| Jurisprudence: | No |
| Volume: | III |
| Page: | 730 |
| Contradiction: | No |
| Part: | Second Part-2 |
| Folio: | 85881 |

## MOMENT IN WHICH THE LARCENY IS COMMITTED

The material element of the larceny consists in the taking of a mobile property, the felony is consummated at the moment that felon takes away the property even though later on it's through away or abandon and being recovered, in fact the taking was consummated within the moment that the felon took the object of the felony and in fact sheltered it under his power, since the property was attacked.

## COURT OF THE THIRTEENYH CIRCUIT.

| Tesis | ROBO. |
|---|---|
| Fuente | Semanario Judicial de la Federación |
| Epoca | Sexta Epoca |
| Sala/Tribunal | Primera Sala |
| Jurisprudencia | NO |
| Volumen | VI |
| Páginas | 240 |
| Folio | 158311 |

## ROBO.

El elemento esencial del delito de robo está constituido por el apoderamiento que realiza el agente, con ánimo de apropiación, de un objeto ajeno, sin el consentimiento de la persona que podía disponer del mismo con arreglo a Derecho, de tal manera que, una vez que el agente o agentes realizan la aprehensión de la cosa, substrayéndola del sitio en que se encontraba y en que la tenía su dueño, y la desplazan a otro diferente, aun en el supuesto de que pudieran ser desapoderados de los objetos materia de la acción, de todas formas el delito de robo se habría consumado, siendo reprochable penalmente tal conducta.

Amparo directo 2979/56.- Héctor Jaques Javalera y coag.- 3 de octubre de 1957.- Unanimidad de 4 votos.- Ponente: Luis Chico Goerne.

Copyright © 1955-1995 Información Jurídica, S.A. de C.V. Todos los derechos reservados.

| | |
|---|---|
| Thesis: | LARCENY |
| Source: | Federation Judicial Weekly Publication |
| Epoch: | Sixth Epoch |
| Court: | First Court |
| Jurisprudence: | No |
| Volume: | VI |
| Page: | 240 |
| Folio: | 158311 |

## LARCENY

The essential element of the larceny is constituted by the taking with the intent of appropriation, of another's object, with out the consent of the person who is entitled to the lawfully possession of the object, consequently, the felon who takes the object, subtracting it from the place in which the owner placed it, carrying it to an other place, even though the felon can be dispossessed of the object, the larceny would be consummated, being that conduct punishable by criminal law.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
 2                  SOUTHERN DIVISION

 3    SUBMERSIBLE SYSTEMS, INC.    *
 4           PLAINTIFF            *
      VS.                         *    CIVIL ACTION
 5                                *    NO. 1:98cv25TRG
      PERFORADORA CENTRAL, S.A.   *    BILOXI, MS
 6    de C.V.                     *    JUNE 14-17, 1999
           DEFENDANT             *
 7
 8    * * * * * * * * * * * * * * *

 9

10

11

12       COURT REPORTER'S TRANSCRIPT OF
                   TRIAL
13                 before
      THE HONORABLE WALTER J. GEX, III
14     UNITED STATES DISTRICT COURT JUDGE

15

16

17              CONDENSE COPY

18

19    APPEARANCES:

20
      FOR THE PLAINTIFF:
21       MICHAEL H. BAGOT, JR. ESQ.
         THOMAS A. RAYER, JR. ESQ.
22       POYDRAS CENTER, SUITE 2660
         650 POYDRAS STREET
23       NEW ORLEANS, LA 70130-6105

24       DAVID W. STEWART, ESQ.
         2223 14th STREET
25       GULFPORT, MS 39502
```

```
 1                     INDEX
                    June 14, 1999
 2
      OPENING STATEMENT:
 3    By Mr. Bagot: p.7
      By Mr. Brown: p.14
 4                         Direct  Cross  Redirect  Recross
      WITNESSES FOR THE
 5    PLAINTIFF:
      Michael Joseph Carlise    23    45
 6    Wolfgang Burnside         59

 7                    June 15, 1999
      Wolfgang Burnside              176    251
 8    Jorge Villalpando (adverse)    261
      Fausto Correa (adverse)        293
 9
                      June 16, 1999
10    Enrique Garza
      VOIR DIRE:
11    By Mr. Rayer: p. 370
      By Mr. Hobson: p. 374
12    Enrique Garza          375    391    430

13                 INDEX (continued)
      WITNESS FOR THE
14    DEFENDANT:
      Carlos Loperena
15    VOIR DIRE:
      By Mr. Hobson: p. 434
16    By Mr. Rayer: p. 439
                           Direct  Cross  Redirect  Recross
17    Carlos Loperena        440    456
      WITNESSES FOR THE
18    PLAINTIFF:
      George John Panzeca
19    VOIR DIRE:
      By Mr. Bagot: p. 480
20    George John Panzeca    482    500    519

21                    June 17, 1999
      MOTION:
22    By Mr. Bagot: p. 525
      Ruling: p. 525
23    PLAINTIFF RESTS: p. 526
      MOTION:
24    By Mr. Brown: p. 526
      Ruling: p. 526
25
```

```
 2              APPEARANCES (continued)

 1

 2

 3    FOR THE DEFENDANT:
 4       NEAL D. HOBSON, ESQ.
         SERGIO J. ALARCON, ESQ.
 5       909 POYDRAS STREET
         SUITE 2300
 6       NEW ORLEANS, LA 70112-1010

 7
         RAYMOND L. BROWN, ESQ.
 8       3112 CANTY STREET
         P.O. BOX 2220
 9       PASCAGOULA, MS 39569-2220

10

11

12    COURT REPORTER:
         CHRIS SCHMITT, RPR, CSR
13       FEDERAL COURT REPORTER
         POST OFFICE BOX 4471
14       BILOXI, MS 39535-4471

15
```

```
 4                INDEX (continued)
      WITNESSES FOR THE
 1    DEFENDANT:
 2                         Direct  Cross  Redirect  Recross
 3    John Theriot          528    551
      Fausto Correa         582    613
 4    DEFENSE RESTS: p. 627
```

EXHIBIT

J

39

1   Dos Bocas or ride the boat back to Del Carmen, offload it
2   there, or if the new contracts that we had heard about with
3   Quantum were going to start right away, or if the ROV was
4   going to be taken back to the States and brought back down
5   later. At that point all we knew was a bunch of rumors.
6   Q  Okay. One other question-- to back track in time--
7   when the-- when you lost the key-- I think you said you
8   lost the keys at one time?
9   A  Yes.
10  Q  How did you get the locks off?
11  A  A grinder.
12  Q  And whose grinder was it?
13  A  The boat's.
14  Q  Okay. Why don't you tell us then what happened as you
15  guys were coming into Dos Bocas?
16  A  Well we arrived in port, tied up to the port, and at
17  that point Quantum-- some of their people from the office
18  had come up and they were offloading their equipment. They
19  got-- well, they had some of our VCRs they were using for
20  the recording of the pipelines, so we got our equipment
21  back from them. They loaded their equipment and they left.
22  Cut off the hydrophone pole and basically we just secured
23  the ROV system for the night and went to sleep.
24  Q  You're saying "we", can you tell me who else was with
25  you?

40

1   A  Willie Allan.
2   Q  And he was a Submersible employee?
3   A  Yes.
4   Q  Why don't you go ahead and continue? I'm sorry to
5   interrupt.
6   A  At that point, like I said, we went to sleep. We made
7   sure everything secured for the night-- went to sleep.
8   Woke up the next morning, the captain informed us that we
9   were-- the equipment again was being seized and that there
10  was some problems with the paperwork or the way the
11  paperwork was filed and we had to go into town to see the
12  immigration officer.
13  Q  What did you do then?
14  A  We basically got everything packed up, put the ROV in
15  the van, got everything packed up just in case-- just got
16  it ready for them to lock everything up. Then Willie and I
17  went into town to meet with the immigration officer.
18  Q  Do you know-- do you have any idea about what time
19  this is?
20  A  Morning. The hour, I don't know.
21  Q  When did the vessel arrive in port?
22  A  It was-- it was dark-- late evening.
23  Q  Okay. All right, so why don't you tell us what
24  happened then, when you got to Immigration, I assume--
25  A  We arrived at Immigration, we were informed that our

41

1   paperwork had not been filed correctly and that we were
2   going to have to pay a fine, and that upon paying the fine
3   we could receive our passports back, but we couldn't pay
4   the fine until after 5:00. So at that point we went, had
5   some lunch, then went back to the boat. And when we got
6   back to the boat they had started removing the equipment
7   off the boat. And talking to the captain to find out what
8   was going on he said that--
9       MR. BROWN: May it please the Court? I want
10  object to this as hearsay partly for the reason that the
11  captain is nowhere to be found and we can't find him. We
12  think it's hearsay even though the captain was our employee
13  at that time. We can't locate to refute the statements
14  that are being made about what the captain said. And we'd
15  like to object to any testimony of what the captain told
16  the witness.
17      THE COURT: All right. What? Go ahead.
18      MR. RAYER: You want to hear how I address that?
19      THE COURT: Yes.
20      MR. RAYER: Anticipating that very objection--
21      THE COURT: I can't imagine that you anticipated
22  that.
23      MR. RAYER: Rule 803, if you look at the
24  availability of declaring a material we would cite the
25  present sense impression, excited utterance, then existing

42

1   mental, emotional, or physical condition which specifically
2   discusses intent, plan, motive, design. And then probably
3   the most on point one is under the other exceptions which
4   speak specifically of a statement not covered by any of the
5   foregoing exceptions but having equivalent circumstantial
6   guarantees of trustworthiness if the Court determines that:
7       A) The statement is offered as evidence of a material
8   fact-- they don't get much more material than this.
9       B) The statement is more probative on the point for
10  which it is offered than any other evidence which the
11  proponent can procure through reasonable efforts.
12      As they pointed out, the captain's gone. Mr. Carlisle
13  is all we've got. And;
14      C) The general purpose of these rules in the interest
15  of justice will best be served by admission of this
16  statement into evidence.
17      Mr. Carlisle is no longer employed by Submersible. In
18  fact, he's employed by a competitor. I submit to the Court
19  that of all witnesses today, his is probably the most
20  credible.
21      THE COURT: Okay. Overruled. Let's go.
22      MR. RAYER: Oh, and the statement against
23  interest, too, as an agent for the defendant, as well.
24  BY MR. RAYER:
25  Q  Okay, continue, Mr. Carlisle. You were-- do you want

43

1  to tell him where he was? You were talking about when you
2  came back–
3  A   Oh, okay, when we had arrived back to port, like I
4  said, the equipment had started being offloaded and that's
5  when we found out that it had been seized. And at this
6  point, Willie and I realized it wasn't common like the
7  ones, that this was actually– it seemed something more
8  because it was the first time the equipment had ever been
9  removed from the vessel. Willie and I hung around the dock
10 long enough to make sure everything had been offloaded
11 correctly and no damage that we could see. Then we went
12 back into town and called Wolfgang and told him what was
13 going on. At that point he said for us to check into a
14 hotel, that he was going to fly us out the next day, and he
15 would do whatever he could do to get his equipment. So we
16 went back to the boat, the captain let us get some of our
17 personal equipment out, and we went back to the hotel.
18 Q   When did you leave Mexico?
19 A   It– that was the 23rd that we came in, it would have
20 been the 25th.
21 Q   And you continued on working until when, with
22 Submersible?
23 A   December '97.
24 Q   Okay. What did you do during that period of time?
25 A   During that period we were again doing general

44

1  inspection work and Wolfgang was contracting us out to
2  Canyon Offshore.
3  Q   Did you and Mr. Burnside ever talk about expanding the
4  business?
5  A   Yes, he talked about it.
6  Q   And when was that?
7  A   About the time he got the MAX ROVER.
8  Q   And what in particular were y'all discussing?
9  A   He was talking about getting a second MAX ROVER and
10 increasing the inventory so that he could now offer two
11 systems, and with two systems you can usually get larger
12 contracts because there's times when you'll have both ROVs
13 in the water which requires two crews, which generally, is
14 a bigger bottom line.
15 Q   And when was this discussion?
16 A   From about when he initially was buying the MAX ROVER,
17 through part of Mexico.
18      MR. RAYER:   If I could check with–
19      THE COURT:   Yes.
20 BY MR. RAYER:
21 Q   One quick question. When you went back and asked the
22 captain for your personal effects, could you please tell me
23 how it was that you had go about getting them or what you
24 had to do to go about getting them?
25 A   The captain just walked over to the van with us,

45

1  unlocked the door for us. He let us get our personal
2  effects.
3  Q   The locks on the van at that time, in your opinion,
4  were Central's locks?
5  A   Yes.
6  Q   Would Central have had the keys to your locks?
7  A   No.
8      MR. RAYER:   That's all I have.
9      THE COURT:   All right, Mr. Brown.
10         CROSS-EXAMINATION
11 BY MR. BROWN:
12 Q   At the time this occurred that you were just asked
13 about, the vans were in the PEMEX yard on land, not far
14 from the dock, weren't they?
15 A   When we got our personal effects?
16 Q   Yes.
17 A   Yes, sir.
18 Q   When you came into Dos Bocas, whatever that date was
19 in late June, and I'm going to say it was June 23, did you
20 know that charter of the Don Francisco by Quantum had ended
21 or was ending at that point?
22 A   No, sir, not for sure.
23 Q   So as far as you knew it might be going back out
24 again?
25 A   Yes, sir.

46

1  Q   When you came into the dock at Dos Bocas at that time,
2  do I understand correctly that all of the Quantum people
3  left the boat?
4  A   Yes, sir.
5  Q   When you went– I believe you did say you stayed that
6  night on the boat?
7  A   Yes, sir.
8  Q   The following morning, did any of them come back, any
9  of the Quantum people that you saw?
10 A   No, sir.
11 Q   So they were gone.
12 A   Yes, sir.
13 Q   Earlier in your testimony you mentioned some federal
14 regulation?
15 A   Yes, sir.
16 Q   What federal regulation are you talking about?
17 A   I can't quote them. I just know–
18 Q   Relative to what?
19 A   As far as it's an ABS Coast Guard regulation, it says,
20 all vessels have to be inspected within a certain amount of
21 time, like a– for instance, a jack-up, I believe, is every
22 five years.
23 Q   Okay. So you were in the process of doing some of
24 that kind of work?
25 A   Yes, sir.

51

1  expired some days before you got into Dos Bocas?
2  A  I don't know how long the visa was good for.
3  Q  Okay.  On either the crates or the equipment there
4  were some names either painted or stenciled on them, like
5  Bofors?
6  A  Yes, sir.
7  Q  Sutech?
8  A  Yes, sir.
9  Q  Along with the Submersible name.
10  A  Yes.
11  Q  Who put the MAX ROV in the work van that morning?
12  A  That morning, Willie and myself.
13  Q  Okay.  Why did you do that?
14  A  Because, as I said, we were under the impression it
15  was being seized so we just did that for protection of the
16  vehicle.
17  Q  Okay.
18  Q  Did you see what else was offloaded in addition to the
19  two vans that you had worked with?
20  A  Yes, sir.
21  Q  Was there— was there like a sleeping unit?
22  A  Yes, sir.
23  Q  Did you stay in that unit on board?
24  A  No, sir.
25  Q  Okay.  But some did?

52

1  A  Yes, a Quantum personnel.
2  Q  Quantum personnel sleep in that?
3  A  Some of them did, yes.
4  Q  It was like a container trailer?
5  A  Yes.
6  Q  Okay.  And there was a generator, and cable, and other
7  such that was removed?
8  A  Yes, sir.
9  Q  All of it was put behind a fence or a gate at PEMEX?
10  A  Yes, sir.
11  Q  On those vans— let's say the work van— was there
12  more than one entrance to it?
13  A  No, sir.
14  Q  The control van?
15  A  Yes, sir.
16  Q  How many?
17  A  Well, there's two sets of doors; one is into the
18  control van area, and then there's a back door that would
19  be more of a storage area.
20  Q  Okay.  And one of those doors had to be big enough to
21  move the unit into, the MAX ROV.
22  A  Yes.
23  Q  Now the Sea Owl had not been with you for quite some
24  time when you went in in June in Dos Bocas?
25  A  Yes, sir.

53

1  Q  And the Triton had not been with you for quite some
2  time.
3  A  Correct.
4  Q  Two or three months before?
5  A  Yes, but I don't— like I said, I don't remember the
6  date that it was removed, but two or three months, if not
7  more.
8  Q  So for that period of time you were working with the
9  one ROV, the MAX ROV.
10  A  Yes, sir.
11        MR. BROWN:  Excuse me just a moment, Your Honor.
12        THE COURT:  Yes.
13  BY MR. BROWN:
14  Q  A couple of questions about those tapes.  Do you know
15  why you and Willie whats-his-name took the tapes?
16  A  The exact reason, no, sir.
17  Q  Did you understand it had something to do with using
18  them to try to get paid by Quantum?
19  A  It was my understanding that we were releasing tapes
20  as we were paid.
21  Q  These are tapes—
22  A  But for sure, I don't know.
23  Q  These are tapes of the monitoring that had been done.
24  A  Yes, sir.
25  Q  And you took them and you were going to release them

54

1  to Quantum— your understanding— as you got paid or if you
2  got paid by Quantum.
3  A  Yes, sir.
4        MR. BROWN:  Excuse me, Your Honor.
5        THE COURT:  Yes.
6  BY MR. BROWN:
7  Q  Was that understanding something Willie told you?
8  A  Willie or Wolfgang— exactly who told me, I don't
9  recall.
10  Q  You felt it was all right to take and hold Quantum's
11  tapes?
12        MR. RAYER:  Objection, Your Honor.
13        THE COURT:  Overruled.  Come on, let's go.
14        THE WITNESS:  Technically they're not Quantum's
15  tape until we're paid for them.
16  BY MR. BROWN:
17  Q  All right.
18        MR. BROWN:  Excuse me one more time, Your Honor.
19  BY MR. BROWN:
20  Q  Toward the end of the charter— toward the end of the
21  work, the last month or two—
22  A  Yes.
23  Q  — who purchased those tapes in their original form?
24  A  Who supplied them to us?
25  Q  Yes.

111

1  '97.
2  Q  Through, let's say, mid Janu-- excuse me, strike that.
3  Through mid June, of 1997, what were the relations between
4  Submersible and Perforadora like?
5  A  We had no problems with Central.  We all got on well
6  together.  We all helped one another.  I didn't see any
7  problems with us.  They helped us repair our cranes.
8  Q  Did you have discussions with representatives of
9  Perforadora at any time about working together in the
10  future?
11  A  Yes.  We had a discussion on a possible contract in
12  the southern region of the Gulf of Mexico where we were
13  already working.  Central wanted to bid on a inspection
14  contract using one of their vessels and they wanted to use
15  the Sea Owl ROV or the MAX ROV, whichever was available.
16  And they wanted me to give them a quote on that.
17  Q  What-- what-- when was this that they wanted that
18  quote?
19  A  That was probably in the first half '97.
20  MR. BROWN:  Your Honor, that's the same thing;
21  speculative, future, unrelated.
22  THE COURT:  Well, we'll let it in what it's
23  worth.  I don't disagree with you.  Go ahead.
24  BY MR. BAGOT:
25  Q  Who did you speak with at Perforadora about that?

112

1  A  That was Mr. Fausto Correa.
2  Q  When did you first learn of any problem aboard the Don
3  Francisco?
4  THE COURT:  That's probably a good time to break
5  for the afternoon.
6  MR. BAGOT:  Yes, Your Honor.
7  THE COURT:  We'll break until-- let's make it at
8  10:00 in the morning.  We'll go tomorrow probably until
9  5:00 so if you can plan on whatever you need to plan on.
10  MR. BAGOT:  And we'll have an hour or so for
11  lunch?
12  THE COURT:  Yes, somewhere in there.
13  MR. BAGOT:  Thank you, Your Honor.
14  THE COURT:  I may have something-- I've got a
15  fairness hearing at 10:00 but I'm going to see if Judge
16  Roper will take that.
17  (Whereupon, court is recessed for the day.)
18       June 15, 1999
19  (Whereupon, the following is heard:)
20  THE COURT:  Mr. Burnside, come on back up.
21  MR. HOBSON:  Judge, we have a brief return on a
22  subpoena--
23  THE COURT:  All right.
24  MR. BAGOT:  Your Honor, was there a plea this
25  morning, or is that?

113

1  THE COURT:  No, it's a fairness hearing on a
2  class action.  Judge Roper is going to do it for me.
3  MR. BAGOT:  Okay.  May I proceed, Your Honor?
4  THE COURT:  Yes, go ahead.
5  MR. BAGOT:  Okay.
6  THE COURT:  I think we were going into the
7  instance concerning the equipment on the Don Francisco.
8  MR. BAGOT:  Right.
9  THE COURT:  Wait just a minute.  Do you have a
10  problem on the return?
11  MR. HOBSON:  Judge, we do have a-- they have
12  produced some papers about an insurance settlement
13  concerning-- a settlement concerning this lost ROV and the
14  letter mentions that-- submitted along with it are two
15  briefs which are not attached.  I was just asking about
16  those.
17  THE COURT:  You got those?
18  MR. RAYER:  I sure don't.  Your Honor, before, I
19  guess, we get into this, we would have objected-- we do
20  object to this.  We're willing to produce this to them but
21  as far as admissibility, none of this is admissible.
22  THE COURT:  I understand.  It's just-- this is
23  production.
24  MR. RAYER:  Right, and discovery is over but
25  we're willing to give them a little latitude on that as

114

1  well.
2  THE COURT:  I understand.  Do you have access to
3  the--
4  MR. RAYER:  I can talk to Ms. Burnside and see if
5  we can get that, if it exists.
6  THE COURT:  If you can get it, bring it to them,
7  let them see it.  We'll talk about admissibility later.
8  MR. RAYER:  Okay.
9  THE COURT:  All right, go ahead.
10  BY MR. BAGOT:
11  Q  Mr. Burnside, when did you first learn of any problem
12  aboard the Don Francisco with respect to your equipment?
13  A  At-- I believe it was on the 23rd of June.
14  Q  How did you learn about it?
15  A  Via telephone conversation from William Allan, my
16  diving superintendent-- my ROV superintendent on board.
17  THE COURT:  What's his name?
18  MR. BAGOT:  Willie Allan.
19  THE WITNESS:  I first learned of the seizure from
20  William Allan during a telephone conversation during the
21  23rd of June, I believe, of '97.
22  BY MR. BAGOT:
23  Q  What was Mr. Allan's position?
24  A  He was the ROV superintendent on board the vessel.
25  Q  What did he tell you about it?

115

1  A  He told me that--
2  MR. BROWN: Objection. May it please the Court?
3  Object to what someone who was ROV superintendent on the
4  vessel told him.
5  THE COURT: I sustain.
6  MR. BAGOT: Your Honor, if you'll give me a
7  little latitude I think I can introduce this through an
8  exception to the hearsay rule.
9  THE COURT: All right, well let's go ahead and
10  develop it.
11  BY MR. BAGOT:
12  Q  Tell the Court what he said.
13  A  He informed me that he had been told to get off the
14  vessel. He was kicked off the vessel with Michael
15  Carlisle. He had to then walk into Parisio, which is a
16  short distance away, I believe. And that the equipment had
17  been seized.
18  Q  When you spoke with him about it, did he tell you how
19  long it was since those events, before he called you?
20  A  It happened shortly-- just before the telephone call,
21  I believe.
22  Q  Could you tell anything from his voice or the way he
23  spoke with you on the telephone?
24  A  Yes, it was-- he was out breath and very excited and
25  upset.

116

1  MR. BAGOT: Your Honor, we would ask that this
2  information be introduced notwithstanding the hearsay rule,
3  pursuant to Rule 803 of the Federal Rules of Civil
4  Procedure, and more particularly, Subsection 1, dealing
5  with present sense impression which allows the introduction
6  of a statement describing or explaining any event or
7  condition made while the declarant was perceiving the event
8  or condition, or immediately thereafter. And alternatively
9  under 803-2, excited utterance, a statement related to a
10  startling event or condition made while the declarant was
11  under the stress of excitement caused--
12  THE COURT: Let me ask you this, how far are you
13  going with this?
14  MR. BAGOT: That's basically--
15  THE COURT: I'll overrule the objection and let
16  it in. Mr. Carlisle has already testified in person. All
17  this does is cumulative to what transpired up to this
18  point, and I'm going to allow it in for whatever it's
19  worth. Mr. Carlisle testified to almost the identical
20  testimony and in the first person; I was there, this is
21  what happened, this is what we did.
22  MR. BAGOT: Yes, Your Honor.
23  THE COURT: Is Willie Allan going to testify?
24  MR. BAGOT: No, Your Honor.
25  THE COURT: Is he not available or you just

117

1  didn't--
2  MR. BAGOT: He's in the Philippines as far as we
3  know.
4  MR. BROWN: Judge, honoring your ruling, I just
5  wanted to point out that I believe he's offering it for the
6  truth of it as well.
7  THE COURT: I understand but-- it's cumulative is
8  what I'm saying, Raymond. I'll let it in for whatever it's
9  worth. I mean, I may or may not use it. At this juncture,
10  Mr. Carlisle's testimony is uncontradicted to the identical
11  situation. I don't know what we're going to hear from the
12  other side about anything or what's going to develop. But
13  I'll let it in for whatever it's worth.
14  MR. BAGOT: Okay, thank you.
15  THE COURT: With the caveat that it's cumulative
16  at this point.
17  MR. BAGOT: Right. Thank you, Your Honor.
18  THE COURT: All right.
19  BY MR. BAGOT:
20  Q  Following your discussions-- or your discussion with
21  Mr. Allan, what did you do?
22  A  I instructed him to return to the vessel and to
23  attempt to talk with the people there to see if he could
24  resolve the situation.
25  Q  Mr. Burnside, following your discussion with Mr.

118

1  Allan, what did you do?
2  A  I contacted Angel Cantu who was a Quantum
3  representative to see if he could help us in some form.
4  THE COURT: You contacted who?
5  THE WITNESS: This is one of the Quantum people.
6  THE COURT: Do you know their name?
7  THE WITNESS: It's Angel Cantu, C-a-n-t-u.
8  THE COURT: Okay, thank you.
9  BY MR. BAGOT:
10  Q  And what else did you do? What did you do after
11  contacting Angel Cantu?
12  A  I just asked William Allan to return to the vessel to
13  attempt to see exactly what the problem was and I'd try and
14  line up the transportation for the equipment, calling
15  various trucking companies to see if we could get the
16  system back to the U.S.A. and returned.
17  Q  Did you make arrangements for trucking the equipment
18  back?
19  A  Yes, we called several trucking companies. American
20  trucks are not allowed to cross the Mexican border, that's
21  why I had to talk to Mr. Angel Cantu, who then arranged for
22  the further transportation from the Mexican border to Del
23  Carmen.
24  Q  Did you-- after these discussions-- did you then
25  travel down to Mexico?

307

1    Q   Do you remember if that was in conjunction with
2    shutting down the vessel or stopping operations?
3    A   Well, it was to stop the vessel from being at sea,
4    offshore.  So they came to the port.
5    Q   So they padlocked the equipment when it's coming to
6    shore?
7    A   No, when it was at the port because the people from
8    Quantum leave the vessel.
9    Q   And who padlocks it when that happens--
10   representatives of Perforadora?
11   A   Yes, at the request of Quantum, yes.
12   Q   So when the vessel came to shore and the Quantum
13   people would leave, then Perforadora's people would padlock
14   the equipment on the deck?
15   A   In Dos--
16   Q   In Del Carmen or--
17   A   In Del Carmen, yes.
18   Q   Did that also happen in Dos Bocas?
19   A   No, sir.
20   Q   When the equipment was padlocked in Del Carmen, whose
21   padlocks were those?
22   A   They were Quantum's padlocks.
23   Q   And Quantum maintained the locks-- Quantum would
24   unlock and lock the equipment?
25   A   Yes, they just said that they would like to have them

308

1    locked in order to don't let anybody to get in those
2    containers.
3    Q   When the-- when the Don Francisco arrived in Dos Bocas
4    in late June, of 1997, you were aware that some foreigners
5    were aboard?
6    A   No, I was not aware of it.
7    Q   You was aware before that time that there were people
8    from North America or from America who were aboard
9    operating some of the equipment, were you not?
10   A   Yes, I was.
11   Q   When did you first learn that there were people from
12   America aboard the vessel when it was in Dos Bocas?
13   A   In the morning on June the 23.
14   Q   Okay.
15   A   About 10 o'clock in the morning.
16   Q   It was your understanding, wasn't it, Mr. Correa, that
17   the Quantum people had left the vessel on the evening of
18   June 22, the night before, as soon as the vessel got into
19   Dos Bocas; is that correct?
20   A   Yes, in the morning of-- in the morning of the 23 of
21   June, 1997, early morning, 1 o'clock in the morning-- 3
22   o'clock in the morning.
23   Q   So the Quantum people left between 1:00 and 3:00 a.m.
24   on June the 23rd?
25   A   That was reported to me, if I'm not-- if I remember,

309

1    yes.
2    Q   But the Submersible people were still aboard and they
3    remained aboard; is that correct?
4    A   That was reported, yes they were.
5    Q   And they were still aboard at 10 o'clock that morning?
6    A   That was reported that, yes.
7    Q   Now you understood that-- or-- did you give orders for
8    certain equipment to be removed from the Don Francisco on
9    June the 23rd?
10   A   Yes, I did.
11   Q   Who did you communicate those instructions to?
12   A   To my operations superintendent Alberto Mendoza
13   Izucar.  A-l-b-e-r-t-o M-e-n-d-o-z-o I-z-u-c-a-r.
14       THE COURT:  Thank you.
15   BY MR. BAGOT:
16   Q   Now the Submersible people were still aboard that
17   morning, and is it correct that at that time that they were
18   told that they-- that certain equipment was not going to be
19   released to them?  Equipment on the deck of the Don
20   Francisco.  Did you have your people tell the Americans
21   that they would not be able to remove some equipment from
22   the Don Francisco on June 23rd?
23   A   No, I don't-- I did not.
24   Q   I want to refer you to, I think, it's Page 112.
25       THE COURT:  Well, go get it and show it to him.

310

1        MR. BAGOT:  Yes, Your Honor.
2    BY MR. BAGOT:
3    Q   Of your deposition.
4        MR. BAGOT:  It's 113, Your Honor.  Starting at
5    Line 10.
6    BY MR. BAGOT:
7    Q   And the question is:  "Were you aware that before the
8    SSI people left the Don Francisco that they asked for
9    permission to get some equipment out of containers, out of
10   the SSI containers?"  And your answer was:  "I think I was,
11   yes."  And the question was:  "And that they were allowed
12   to get some of their personal items out of containers?"
13   And your answer was:  "Yes."  And the question was:  "But
14   they were not allowed to take out any of the ROV equipment,
15   were you aware of that?"  And your answer was:  "There was
16   a request to do that from that people but not in particular
17   from mentioning what parts they wanted to take, I-- their
18   personal belongings or something else.  I just allowed them
19   to do that."  Was your testimony at your deposition on
20   these points-- is this testimony correct?
21   A   Can I have time to read it, please?
22   Q   Yes, sir, I'm sorry.
23   A   Yes, I think it was, yes.
24   Q   So they had requested to take some equipment off and
25   you only allowed them to take their personal belongings; is

311

1  that correct?
2  A   No, it was just equipment, they never mentioned what
3  kind or how many or whatever pieces they wanted to take.
4  Q   But is it correct that the only thing you allowed them
5  to take off the vessel was their personal belongings?
6  A   No, I didn't say any particular belongings.  I didn't
7  know even what kind of pieces they wanted to take.
8  Q   Did you speak to a representative, one of the
9  Americans, representative of SSI or Submersible, on June
10  23-- on June 23rd and advise him that he could not remove
11  the ROV equipment from the Don Francisco?
12  A   I did not spoke to anybody from SSI on the 23 of June,
13  1997.
14  Q   Your first contact with the representative of SSI then
15  was on June the 26th or 27th; is that correct?
16  A   Yes, that was my first contact.
17  Q   And who did you meet at that time?
18  A   I met Mr. Oscar Olivera in Carmen and we drove all the
19  way down to Dos Bocas, the port of Dos Bocas.
20  Q   Who else did you meet with?
21  A   We met Mr. Burnside and another man in-- Dos Bocas on
22  that date.
23  Q   Is it-- during that discussion or during that meeting,
24  what took place?  Did you-- did Mr. Burnside tell you that
25  the equipment that was being held at PEMEX's facility was

312

1  Submersible's equipment or his equipment?
2  A   No, I was not speaking to him.  I was with Mr. Oscar
3  Olivera.
4  Q   Oh, you didn't meet with Mr. Burnside?
5  A   Yes, I met him, I saw him there.
6  Q   But you didn't discuss--
7  A   Because it was a request from Mr. Oscar Ollivera to be
8  there in order to check the equipment, to see the
9  equipment, or where the equipment was located.
10  Q   Was Mr. Oscar Olivera serving as the spokesman for Mr.
11  Burnside for this meeting?
12  A   Yes, he was.
13  Q   Did Mr. Olivera tell you that the equipment belonged
14  to Submersible that being head at PEMEX's facility?
15  A   No, he did not, sir.
16  Q   He did not say that?
17  A   No.
18  Q   Did they request to remove the equipment?
19  A   He had requested to see the equipment-- where that
20  equpment was placed.
21  Q   Is it your testimony today that the only thing he
22  requested was to see the equipment and where it was placed?
23  A   To go over there, yes.
24  Q   Did they say why they had any interest in even
25  observing the equipment?

313

1  A   They wanted to be sure that equipment was in the
2  safest place-- safe place.
3  Q   Did you have any understanding as to why they had an
4  interest in the equipment?
5  A   Well, when we got there they were-- Mr. Burnside was
6  looking at the containers, inside the containers, so I got
7  mad and left.
8  Q   You got mad because he was looking inside the
9  containers?
10  A   Yes, I was, sir.
11  Q   But my question is, did you know why they had any
12  interest in even looking at the equipment?
13  A   Mr. Oscar Olivera says that there were some business
14  inside those containers that they would like to take a look
15  at them.
16  Q   And were you present or was it on that same day that
17  the Acta Informativa was filled out or presented to Mr.
18  Burnside?  And I'm going to refer you to that, that's
19  Exhibit J-7.  During that meeting with Mr. Oscar Olivera
20  and Mr. Burnside, was Mr. Burnside presented with this Acta
21  Informativa, which is marked as J-7?
22  A   We show it to him.
23  Q   Why did you show it to him?
24  A   He requested that.
25  Q   Oh, he requested it?

314

1  A   Yes.
2  Q   Okay.  And as I appreciate this Acta Informativa
3  indicates the equipment that was offloaded from the Don
4  Francisco?
5  A   Yes.
6  Q   And it suggests or it indicates a condition on which
7  it was removed from a vessel; is that correct?
8  A   Right.
9  Q   And the request was made to him to sign this; isn't
10  that right?
11  A   He requested a copy of it so I have him sign that he
12  did receive a copy of it, after his request of--
13  Q   Okay.  Now, on-- as I appreciate it, the equipment was
14  then in a locked facility at PEMEX's-- at PEMEX's yard in
15  Dos Bocas; is that correct?
16  A   If it was locked?
17  Q   Yes, on that date, June the 26th or 27th, when you met
18  with Mr. Olivera and Mr. Burnside and they wanted to
19  inspect the equipment, the equipment was still at PEMEX's
20  facility in Dos Bocas; is that right?
21  A   Yes, sir.
22  Q   And you had hired two armed guards to watch over the
23  equipment; is that correct?
24  A   Yes, sir.
25  Q   And it was behind a fence; is that correct?

315

1   A   Yes, that is correct.

2   Q   To get access to that equipment they had to go get

3   permission from you; is that correct?

4   A   Not really.  From PEMEX, sir.

5   Q   PEMEX was holding the equipment for you as a favor to

6   Perforadora.

7   A   They were allowed in house to have the equipment in

8   that place because we thought that was the safest place.

9   That was the safest place for it.

10  Q   Okay.  And if you told PEMEX that you didn't want

11  anybody to get in there, they wouldn't let them in; is that

12  correct?

13  A   That's why we had those two people watching.  It was

14  just one people-- they watched 24 hours a day so one stays

15  during the day time and the other by night time.

16  Q   Now while the equipment-- or while the containers were

17  at this location they were locked; is that correct?

18  A   Well when I got there he-- like I said, Mr. Burnside

19  was inside the containers so they were opened, at least a

20  couple of them.

21  Q   Do you know how they were opened?

22  A   I don't know, sir.  They were opened and he and Mr.

23  Burnside and the other man were looking inside those

24  containers.

25  Q   At the time that you arrived, were other

316

1   representatives of Perforadora present?

2   A   Mr. Mendoza Izucar got there later after we-- about a

3   half an hour later than we arrived on the same place, yes.

4   Q   Okay.  So you were the first-- is it correct that you

5   were the first Perforadora employee to arrive there?

6   A   Yes.

7   Q   Okay.  And at that point the containers were already

8   open?

9   A   Yes, sir.

10  Q   Did the guards who you had posted there, they had keys

11  for the locks?

12  A   I don't know.

13  Q   Now, you indicate that-- what-- when was the next time

14  that you saw Mr. Burnside after this inspection?  I'm

15  sorry, I'm getting ahead of myself.  Let me withdraw that

16  question and ask another question.  You released certain

17  equipment to Mr. Burnside; is that correct?

18  A   Yes, I did.

19  Q   And that was on June the 28th?

20  A   No, on the same date you-- we were talking before

21  that-- tied at Dos Bocas.

22  Q   And you gave certain-- you gave him a receipt or he

23  gave you receipt for the equipment?

24  A   He signed a receipt for those goods he took from the

25  containers.

317

1   Q   That's marked as, I think, Joint Exhibit 10, J-10.

2   Can you find that?

3   A   Yes, sir, I have it.

4   Q   There are two pages of receipts; is that correct?

5   A   Yes, that's a transfer of materials.

6   Q   So this indicates that you had allowed Mr. Burnside

7   on-- and I'm looking at the date at the top, it says June

8   the 28th, 1997; is that correct to your recollection today?

9   A   Yes, sir.

10  Q   You allowed him to pick up this equipment on that day?

11  A   Not to pick up, to take it.

12  Q   To take, I'm sorry.  Was it your understanding at that

13  time that he was picking it up to safeguard it because it

14  was sensitive equipment?

15  A   Like I said before, I was very mad because he got

16  already inside those containers, he don't supposed to do

17  that.  So he-- he-- Mr.-- I don't even spoke to him.  I was

18  mad and so I told Mr. Olivera that was not the reason why

19  we were there.

20  Q   So you were mad at time so you let him take the

21  equipment?

22  A   No, when Mr. Olivera's claiming that that equipment

23  was just minor business, not very important, and it will

24  not affect the whole equipment that was there.  So he

25  was-- he did ask in a nice way so I said, well, I'm going

318

1   to do that as an act of good faith.

2   Q   Okay.  At that point you knew it was Mr. Burnside's

3   equipment or Submersible's equipment; is that correct?

4   A   Can you repeat the question, please?

5   Q   You knew at the time you released this equipment and

6   let him take it, it was his equipment, didn't you?

7   A   No, sir, I did not know that.

8   Q   So you were releasing this equipment to somebody who

9   might not have any interest in it-- might not own it?

10  A   Because Mr. Olivera says that he will respond to that

11  to Quantum.

12  Q   So as of this time, as of June the 28th, Mr. Burnside

13  made no statement to you that he owned all of the equipment

14  that was sitting in that PEMEX facility?

15  A   Mr.-- who did you say?

16  Q   Mr. Burnside.

17  A   No, I didn't spoke to Mr. Burnside.

18  Q   Okay.  Mr. Olivera--

19  A   I was so mad against him.  So I didn't want to speak

20  to him.

21  Q   Now at this time, you're saying that Mr. Olivera

22  vouched for the equipment that Mr. Burnside was taking, but

23  at that time Mr. Olivera didn't work for Quantum, did he?

24  A   I don't know if he was working for Quantum.  He was

25  part of Quantum, so.

319

1    Q    Look, if you would, to Exhibit P-13 and the entry for
2    July 7th. I'm particularly interested in your entry for
3    July the 7th. This is from your daily log as I appreciate
4    it; is that correct?
5    A    (Witness reviews exhibit.) Yes, it is correct, it's
6    from my daily log.
7    Q    And that's a log that you keep in your office making
8    notes of important events that you want to keep track of;
9    is that correct?
10   A    Relevant things, yes.
11   Q    And on July 7th there's an entry, isn't there, that
12   says Submersible Systems wants their equipment or they will
13   not allow Quantum to comply and complete the contract with
14   PEP, thus they can not collect and Central will not collect
15   from there; is that correct?
16   A    Yes, it is correct.
17   Q    So at least as of this date, you were aware that this
18   equipment belonged to Submersible, from a representative of
19   Submersible; is that correct?
20   A    It's not my saying, sir, it's what Olivera says.
21   Q    So Olivera told you at least as of July the 7th that
22   the equipment belonged to Submersible.
23   A    He was claiming it was Submersible Systems' equipment.
24   Q    Now, on June 19th, if you'll look-- I think there's
25   another entry. I say June 19th, I mean August the 19th,

320

1    there's another entry in your log. At that point it says
2    that Wolfgang Burnside was proposing a joint venture; is
3    that correct?
4    A    Can you repeat the-- what is it?
5    Q    On June 19th there's an entry in your log indicating
6    that Wolfgang Burnside was proposing a joint venture.
7         MR. HOBSON: August 19th.
8         MR. BAGOT: I'm sorry, I keep-- I apologize.
9    BY MR. BAGOT:
10   Q    I mean August the 19th.
11   A    Yes, he did say that.
12   Q    What was the purpose of the joint venture that Mr.
13   Burnside was proposing?
14   A    In order to collect-- the debt.
15   Q    That's the debt that he and the debt-- excuse me-- the
16   debt that Quantum owed Submersible as well as the debt that
17   it owed Perforadora?
18   A    Can you repeat the question, please?
19   Q    That was to collect the money that Quantum owed both
20   Submersible and Perforadora; is that correct?
21   A    Yes, this-- yes.
22   Q    Now, this note indicates that Wolfgang Burnside
23   himself proposed the joint venture. As of this date,
24   August the 19th, were you communicating directly with
25   Wolfgang Burnside?

321

1    A    No, I was not, sir.
2    Q    So how did you get this information?
3    A    From Mr. Olivera.
4    Q    Now, as of this date, August the 19th, you had already
5    met on at lease one occasion yourself with representatives
6    of Quantum, had you not?
7    A    Repeat the question, please.
8    Q    Did you meet with representatives of Quantum in Villa
9    Hermosa on July the 4th, 1997, about Quantum's debt?
10   A    Yes, I did.
11   Q    And at that meeting, they indicated that they would
12   give certain promissory notes to Perforadora to secure
13   their debt, did they not?
14   A    Yes.
15   Q    And that they were intending to pay those notes by
16   July the 23rd and by sometime in August of 1997.
17   A    Yes, that was the due date of those papers, yes.
18   Q    And they also indicated at that time that they would
19   give you a guarantee or a pledge of land that was located
20   in the capital city, Mexico; is that correct?
21   A    Yes, they were-- Mr. Galvan was-- did propose that.
22   Q    They also indicated to you at that time that the
23   equipment that was used for inspection of submarine lines
24   that was being held by Perforadora from the Don Francisco
25   was the property of Submersible Systems, did they not?

322

1    A    First of all, it was not held by Perforadora Central,
2    sir.
3    Q    Who was holding it?
4    A    In that location, Mr. Miguel Galvan says that he was
5    leaving the equipment as a guarantee of the payment. And
6    he was expecting to have that done in those few days.
7    That's why he did sign those papers. So he was expecting
8    to have everything set with PEMEX for those due dates on
9    the paper.
10   Q    From June the 23rd, 1997, until July the 5th, 1997,
11   the containers and other equipment that was taken from the
12   Don Francisco was stored at PEMEX's facilities with guards
13   that were employed by Perforadora; is that correct?
14   A    Yes, until the 5th of July, yes, they were there at
15   PEMEX's facilities in Dos Bocas.
16   Q    And at that point they were transferred from Dos Bocas
17   on the Don Rodrigo, Perforadora's other supply boat back to
18   Del Carmen; is that correct?
19   A    Yes, they were transferred to.
20   Q    Did you at any time have any court authorization to
21   remove the equipment from the Don Francisco and secure it
22   at PEMEX's facility in Dos Bocas?
23   A    I don't think I understand your question, sir,
24   completely.
25   Q    The first time that Perforadora Central involved the

## In The Matter Of:

*Submersible Systems, Inc.   v.*
*Perforadora Central, S.A.*

---

*JUAN LUIS ANGULO GERONIMO*
*February 24, 1999*

---

*GAUDET, KAISER & PEPPER, L.L.C.*
*BOARD-CERTIFIED COURT REPORTERS*
*601 POYDRAS STREET*
*SUITE 2003, PAN-AMERICAN LIFE CENTER*
*NEW ORLEANS, LA   USA   70130-6044*
*(504) 525-9100    FAX: (504) 525-9109*

*Original File 0224GER1.V1, 45 Pages*
*Min-U-Script® File ID: 1004091152*

## Word Index included with this Min-U-Script®

Page 19

[1] ETA to Dos Bocas.

[2] **Q:** Now, did you actually board

[3] the vessel in Dos Bocas?

[4] **A:** Yes, when it got to the dock.

[5] **Q:** And what time did you go

[6] aboard the vessel?

[7] **A:** At 0915.

[8] **Q:** And that's reflected in this

[9] logbook, that is, Exhibit number 1?

[10] **A:** Yes.

[11] **Q:** Would you show us where it is,

[12] please, in your entry?

[13] **A:** Yes. It is right here, 9:15.

[14] (Indicating)

[15]         MR. HOBSON:

[16]    The witness is showing us the

[17] fourth page of this five-page document.

[18]         THE WITNESS:

[19]    Here I check the vessel and I

[20] found out that there were two foreigners on

[21] board. Then I told immigration office, and

[22] then at 1005 immigration got on board, and

[23] at 1025 immigration left the vessel.

[24]        EXAMINATION BY MR. HOBSON:

[25] **Q:** Now, why did you call

Page 20

[1] immigration to tell them that there were

[2] foreigners on the vessel?

[3] **A:** Because according to law,

[4] that's what immigration has to do, to check

[5] all the foreigners who get to Dos Bocas.

[6] **Q:** Now, if you had gone on the

[7] vessel and there were only Mexicans on

[8] there, would you have called immigration?

[9] **A:** No. No, I wouldn't.

[10] **Q:** And can you tell me what

[11] happened when the immigration came aboard?

[12] **A:** Okay. The immigration got on

[13] board and asked the captain for the

[14] documents of these foreign men, of these

[15] foreigners.

[16] **Q:** Okay. You have some more

[17] answer. Go ahead.

[18] **A:** The captain gave him two

[19] passports, one of them FM-3.

[20]         THE INTERPRETER:

[21]    It's a kind of visa, I

[22] suppose.

[23]        EXAMINATION BY MR. HOBSON:

[24] **Q:** One F entry.

[25] **A:** One of them didn't have the

Page 21

[1] FM-3, and immigration retain the documents

[2] of them.

[3] **Q:** Of both of them?

[4] **A:** Both of them.

[5] **Q:** Do you know how it happened

[6] that the captain had the passports of the

[7] two foreigners?

[8] **A:** Because the captain has to

[9] have all the documents of the persons on

[10] board, because he's responsible for the

[11] vessel and the personnel on board.

[12] **Q:** Now, is that a customary

[13] situation on all vessels that come into

[14] port?

[15]         MR. RAYER:

[16]    Object to form.

[17]         THE WITNESS:

[18]    Yes, it is, by law.

[19]        EXAMINATION BY MR. HOBSON:

[20] **Q:** Do you know if those personnel

[21] ever got their passports back?

[22] **A:** Yes. Yes. They were given

[23] the passports back.

[24] **Q:** Do you know when they got

[25] their passports back?

Page 22

[1] **A:** The same day. The same day

[2] they were given back to them in immigration

[3] office.

[4] **Q:** At what time?

[5] **A:** It's here. The time is here.

[6] 2000. (Indicating)

[7] **Q:** And 2000 would be 8:00 p.m.;

[8] wouldn't it?

[9] **A:** Yeah, of June 24th.

[10] **Q:** Of June — Which date?

[11] **A:** Of June 24th.

[12] **Q:** 24th?

[13] **A:** Yes.

[14] **Q:** And which day did they take

[15] the passports?

[16] **A:** No. I'm sorry. It's June

[17] 23rd. Yeah.

[18] **Q:** Now, is it customary for

[19] immigration to take passports of any

[20] foreigners on their vessel — on a vessel?

[21]         THE INTERPRETER:

[22]    Could you —

[23]        EXAMINATION BY MR. HOBSON:

[24] **Q:** I said is it customary for

[25] immigration to take the passports of any

**Page 27**

[1] you to give to the foreigners?

[2] **A:** No. The passports were kept

[3] by the immigration office. And the

[4] immigration officer — Sorry — the

[5] immigration office gave it back to them.

[6] **Q:** Now, did you have anything to

[7] do with checking the equipment that was on

[8] the deck of the vessel?

[9] **A:** No.

[10] **Q:** Did you have anything to do

[11] with unloading equipment from the vessel?

[12] **A:** No.

[13] **Q:** Did you do anything to assist

[14] the foreigners in getting their passports

[15] back from immigration?

[16] **A:** Well, in this case we helped

[17] them, but it's not our obligation to do so.

[18] But we were told by the company, Central, to

[19] help them so that they didn't have any

[20] problem with the immigration office.

[21] So we called with the

[22] immigration officials, and then they

[23] didn't — They neither fined them nor jailed

[24] them, so they were given their documents

[25] back.

**Page 28**

[1] **Q:** Whose obligation — Or do you

[2] know whose obligation it should have been to

[3] take care of these foreign personnel?

[4] **MR. RAYER:**

[5] Object to the form.

[6] **THE WITNESS:**

[7] It was the obligation of the

[8] employers, okay, that these persons were

[9] working for.

[10] **EXAMINATION BY MR. HOBSON:**

[11] **Q:** Did the employer do anything

[12] to take care of those functions?

[13] **MR. RAYER:**

[14] Object.

[15] **THE WITNESS:**

[16] No.

[17] **EXAMINATION BY MR. HOBSON:**

[18] **Q:** Why not?

[19] **MR. RAYER:**

[20] I'll object to that question.

[21] **THE WITNESS:**

[22] I don't know. They

[23] disappeared. They didn't write.

[24] **EXAMINATION BY MR. HOBSON:**

[25] **Q:** Did the foreigners ever ask

**Page 29**

[1] permission to take any equipment — ever ask

[2] you for permission to take any of the

[3] equipment with them?

[4] **A:** No.

[5] **Q:** Did the foreigners, to your

[6] knowledge, ever assist in unloading the

[7] equipment from the vessel?

[8] **A:** No. I don't know.

[9] **Q:** Did anyone from the vessel or

[10] from Perforadora ever force the foreigners

[11] to leave the vessel?

[12] **MR. RAYER:**

[13] Object to the form.

[14] **THE INTERPRETER:**

[15] Did anyone —

[16] **EXAMINATION BY MR. HOBSON:**

[17] **Q:** From the vessel or from

[18] Perforadora Central —

[19] **THE INTERPRETER:**

[20] Force them to —

[21] **MR. HOBSON:**

[22] Force the foreigners to leave

[23] the vessel.

[24] **THE WITNESS:**

[25] No.

**Page 30**

[1] In the log it says that the

[2] captain of the vessel told me that these two

[3] persons — that these two persons, by the

[4] time they got to Dos Bocas, his contract was

[5] going to be finished and they were going to

[6] go back to their country.

[7] **MR. HOBSON:**

[8] Thank you very much.

[9] Would you answer Mr. Rayer's

[10] questions?

[11] **EXAMINATION BY MR. RAYER:**

[12] **Q:** As Neal said, I represent

[13] Submersible Systems, Inc., the owners of

[14] some of the equipment that was aboard the

[15] DON FRANCISCO on June 23rd.

[16] What time did you leave the

[17] dock on that day? If you need to look at

[18] your notes, you're welcome to.

[19] **A:** I left the vessel along with

[20] the immigration officials at 1025, and then

[21] I didn't go back to the vessel.

[22] **Q:** Had they started offloading

[23] any equipment by the time you left or when

[24] you left?

[25] **A:** No.



```
1          Q.      And then what happened?
2          A.      We asked the captain what was
3   going on.  He told us that it was his
4   understanding that Perforadora Central had
5   not been paid by Quantum, therefore, the
6   equipment was being seized and we had to
7   depart the vessel.
8          Q.      And you don't remember who told
9   you that?
10       MR. BAGOT:
11              Objection.  Asked and answer.
12   You can respond.
13       MR. HOBSON:
14              There's no such objections.  You
15   picked that up from Tom Wagner, you
16   learned that from L.A. Law.  There's no
17   such objection in the law.
18       MR. BAGOT:
19              You can respond in any event.
20       MR. SAMSON:
21              Cumulative questions.
22       THE WITNESS:
23              As far as exactly who told us,
24   no, I don't recall.
25   EXAMINATION BY MR. HOBSON:
```

1  after this, you know, we wouldn't be

2  allowed back on the boat and that the

3  equipment was seized.

4      Q.    What do you mean it was

5  "seized"? You were told it was being

6  seized?

7      A.    If that's the exact term they

8  used, I can't remember, but that's what I

9  took it to mean.

10     Q.    Well, was this the captain that

11 told you that?

12     A.    I believe it was the boat

13 captain. Like I said, I can't say for

14 sure, but I believe it was the boat

15 captain.

16     Q.    Could it have been the mate?

17     A.    Possibly.

18     Q.    Do you speak Spanish at all?

19     A.    Very little. But not enough to

20 hold a conversation.

21     Q.    Well, these conversations, then,

22 were told to you in what language?

23     A.    In English. Most of the boat

24 crew spoke some English, some more than

25 others, but -- and yeah, a lot of, I'd say

1       Q.      And that because of the salt air

2   that you replaced those with another set

3   of padlocks?

4       A.      Uh-huh (affirmative response).

5       Q.      The padlock that you referred to

6   that the captain opened, was that one that

7   you and Willie had?

8       A.      No, sir.  Those were, I would

9   assume, the boat's.

10      Q.      Did you have keys to those

11  padlocks?

12      A.      No, sir.

13      Q.      Who had a key that opened up

14  that padlock to let you in?

15      A.      The boat captain.

16      Q.      When did you first noticed that

17  there were padlocks on the Submersible

18  equipment that were not Submersible

19  padlocks?

20      A.      That morning when he had

21  informed us about seizing the equipment

22  and us having to depart the vessel.  We

23  got up and walked outside and they were

24  padlocked.

25      Q.      And when you notice that they

CURREN & LANDRIEU, INC.
Certified Court Reporters
(504) 833-3330



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUBMERSIBLE SYSTEMS, INC.                                    PLAINTIFF

VS.                                        CIVIL ACTION NO. 1:98cv251GR

PERFORADORA CENTRAL, S.A. de C.V.                           DEFENDANT

## MEMORANDUM OPINION

This cause is before the Court on the motion to dismiss for lack of admiralty jurisdiction [21-1];

the motion to dismiss for lack of personal jurisdiction [22-1]; and the motion to dismiss for *forum non*

*conveniens* [23-1]; all filed by the defendant, Perforadora Central, S.A. de C.V. [Perforadora],

pursuant to Rule 12 of the Federal Rules of Civil Procedure. Also, before the Court is a motion for

attachment [6-1] pursuant to Rule B of the Federal Rules of Civil Procedure, or, in the alternative, a

motion for attachment [6-1] pursuant to Rule 64 of the Federal Rules of Civil Procedure and

Mississippi Code Annotated § 11-31-1, *et seq.*, filed by the plaintiff, Submersible Systems, Inc.

[Submersible]. After due consideration of the evidence of record, the briefs of counsel, the applicable

law, and being otherwise fully advised in the premises, the Court finds as follows:

### Statement of Facts

Perforadora, a Mexican corporation, entered into a contract with Quantum Incorporated

[Quantum], another Mexican corporation, whereby Perforadora would supply a boat in order for

Quantum to perform oil related work. (Ct. R., Doc. 1, p. 3; Def.'s Mot. to Dismiss Admiralty Juris.,

Exh. A.) Quantum subsequently subcontracted with Submersible, an American corporation, for

underwater surveying services. (Ct. R., Doc. 1, p. 3.) Perforadora sent their boat and crew to

Morgan City, Louisiana to transport Submersible's men and equipment into Mexican waters. (*Id.* at p.

4; Def.'s Motion to Dismiss Admiralty Juris., Correa Aff., p. 5.)



EXHIBIT

K

Quantum continually fell behind in payments to Perforadora for the use of Perforadora's vessel (Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. C, p. 106.) Perforadora's agent, Fausto Correa, stated that he threatened to shut down Quantum's operations on at least three occasions as a result of Quantum's sluggish payments. (Pl.'s Supp. Mem. in support of Attachment, Exh. A, p. 104.) After roughly eight months of work, Perforadora ultimately terminated its contract with Quantum on the basis of Quantum's deficient payments and because Perforadora contracted the vessel' use for another job. (Ct. R., Doc. 1, p. 4; Correa Aff., p. 6.) Once docked in the Port of Dos Bocas, Mexico on June 23, 1997, Perforadora allegedly seized Submersible's equipment without judicial process while the equipment was aboard Perforadora's boat in an alleged retaliation against Quantum for the arrearage owed by Quantum to Perforadora. (Ct. R., Doc. 1, p. 5; Pl.'s Supp. Mem. in support of Attachment, Exh. B, p. 3; Exh. C, p. 2.)

Specifically, Submersible's former employee, Michael Carlisle, stated that when he and his fellow co-worker, Willie Allen, awoke on June 23, 1997, their equipment was padlocked by Perforadora's employees aboard the deck of the vessel; that he and Allen were only allowed to retrieve their personal items; and that they were allegedly ordered to leave the vessel and told not to take Submersible's equipment. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4.) Thereafter, Submersible's employee hitchhiked into a nearby town and notified Wolfgang Burnside, the President of Submersible, about the incident. (Id. at p. 4.) Submersible contends that the "tort occurred when Submersible's personnel were denied access to the [equipment] and instructed to leave the vessel without it." (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., p. 6.) As further support, both Carlisle and Allen have asserted that the equipment was marked with Submersible's name and Submersible's rented equipment was marked "Welch."[1] (Id. at p. 4.)

---

[1]Correa admits that Submersible's equipment was loaded in Morgan City, Louisiana and marked with big letters "Submersible Systems, Inc." and "Welch Rentals." (Correa Aff., p. 5; Pl.'s

2

Burnside appeared in Mexico on or about June 26, 1997, to retrieve his company's equipment. He was allegedly told by Correa at that time that the equipment was being held until Quantum paid the arrearage owed to Perforadora. (Def.'s Mot. to Dismiss Admiralty Juris., p. 4; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.) Burnside protested the seizure of his company's equipment which was being held under lock and key on a dock in Dos Bocas, and was guarded by armed men. (Pl.'s Supp. Mem. in support of Attachment, Exh. C, p. 2; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.)

Thereafter, on or about July 4, 1997, Perforadora's representative entered into negotiations with Quantum's representatives to resolve the financial dispute between them. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exhs. D-1, D-2, p. 2.) Perforadora admits through an interoffice memorandum from Correa dated July 7, 1997, in which Correa notifies his superior of the July 4, 1997, meeting, that it had possession of Submersible's equipment and that the equipment was being held until Quantum paid Perforadora for the past due services. (*Id.* at pp. 2-3.) The very next day, Perforadora loaded the equipment by boat and transported it to a land based warehouse in Carmen, Mexico. (Correa Aff., p. 6.)

On July 7, 1997, Burnside traveled to Carmen with a Quantum representative, Oscar Olivera, who reiterated that the equipment belonged to Submersible. (Correa Aff., p. 7.) Burnside was allowed to inspect the equipment which he discovered was stored outside and exposed to the elements. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. A, p. 5.) Once again he protested the wrongful seizure, and Correa testified that Burnside was allowed to remove incidental parts of the equipment at that time. (Correa Aff., p. 7; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83.) Perforadora, however, retained the bulk of the equipment including the

---

Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. B, pp. 71-72, 74-75, 115-116.)

rented "Welch" equipment as apparent leverage for payment from Quantum. (*Id.*)

On or about August 8, 1997, after Perforadora had been notified repeatedly of ownership of the equipment, Perforadora placed the equipment with the Agente Del Ministerio Publico Del Fuero Comun Adscrito a La Primera Delegacion, and have maintained that the Mexican tribunal must decide who owns the equipment. (Correa Aff., pp. 8, 10.) Burnside appeared with his Mexican attorney to protest the seizure and to show proof of ownership. (*Id.* at p. 9.) Even after showing proof of ownership, the Mexican court allowed Perforadora to retain the property as a depository apparently for Quantum's reluctance in paying the debt owed Perforadora. (*Id.*; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 7; Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B, p. 2.) Before bringing the instant action, Burnside attempted to regain the property for nearly a year in the Mexican system, but his attempts were futile. (Pl.'s Supp. Mem. in support of Attachment, Burnside Aff., p. 5.) Ironically, Perforadora maintains that it "has never claimed ownership of the equipment and has always been willing to turn it over to the true owner." (Correa Aff., p. 9.)

As a result of the alleged seizure of equipment, Submersible alleges that it has had to shut down its business. (Burnside Aff., p. 5.) Eight of nine employees have been released from employment; Submersible has had to pay Mexican tariffs on the property being located in Mexico longer than six months; and Submersible has had to continue to pay rental fees to Welch. (*Id.* at pp. 5-6.) Due to these losses, Submersible brings this action not to recover the property that was allegedly seized and is now worthless, but to seek damages and restitution for the alleged act of conversion, theft, or piracy committed by Perforadora on June 23, 1997. (Ct. R., Doc. 1, p. 5.)

Burnside discovered that Perforadora had entered into a contract with Halter Marine, Inc. [Halter], a Mississippi Corporation located in Pascagoula, Mississippi, whereby Halter would build an oil rig at a cost of roughly 65 million dollars to Perforadora. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. A, pp. 103, 105.) Burnside contacted Halter Marine to confirm the

4

contract and was told that the rig was due for release at some point in 1999. (*Id.* at p. 104.)

Thereafter, Submersible's counsel contacted the Mississippi Secretary of State and were informed that

Perforadora was not registered to do business in Mississippi nor did they have a registered agent for

service of process. (Pl.'s Rebut. in support of Attachment, p. 4.) The attorneys then checked the local

phone directories and found no listing for Perforadora in the State of Mississippi. (*Id.*) Submersible

subsequently brought suit in May of 1998 for attachment under Rule B of the Federal Rules of Civil

Procedure, or in the alternative, Rule 64 of the Federal Rules of Civil Procedure of Perforadora's

property located in Mississippi as a result of Perforadora's alleged "theft, piracy and/or conversion."

(Ct. R., Doc. 1, p. 5.)

Perforadora, however, had three employees stationed in an office located at Halter since

September of 1997. (Correa Aff., p. 2; Pl.'s Supp. Mem. in support of Attachment, Exh. E.) A

phone list from Halter also indicates that two of Perforadora's employees were listed as "Owner

Representatives," and Perforadora states that Alejandro Castro, a registered engineer, was the officer in

charge. (Correa Aff., p. 2; Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp.

21-22; Exh. C.) There is no indication that Burnside or his attorneys attempted to discover the

whereabouts of any Perforadora employees or office located at Halter. (Def.'s Resp. to Pl.'s Supp.

Mem. in support of Attachment, Exh. A, pp. 103-109.) After suit was filed and upon Perforadora

discovering the lawsuit apparently through Halter, Perforadora appointed an agent for acceptance of

process. (Pl.'s Supp. Mem. in support of Attachment, Exh. E.)

Furthermore, Perforadora submitted a brief to the Court on July 31, 1998, in an attempt to

explain Mexican law while using a forum shopping technique to supply an expert's opinion nearly a

month after the fact. (Ct. R., Doc. 33.) Specifically, Perforadora stated to the Court that:

> All parties can be brought within the jurisdiction of the Mexican court. Opinion of ____
> ____. Perforadora is a Mexican corporation that does business in Dos Bocas, Mexico
> and maintains its principal place of business in Mexico City, Mexico. As shown in the

> opinion of Mexican law expert, _____, the courts of Mexico are open to non-citizens such as SSI, who may in those courts seek redress for the alleged wrongdoing of both Perforadora and Quantum.  If any sums remain due from Pemex to Quantum, those funds may be subject to attachment.  Mexican law recognizes the tort of conversion and provides an adequate remedy.  Opinion of _____, p. ____.

(Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3-4.)  The Court notes that Perforadora was required to file the *forum non conveniens* motion by July 31, 1998, and that its Mexican legal expert was unable to deliver his opinion by that date.  (*Id.* at p. 3.)  The Court further notes, however, that Perforadora did not supply the name of its expert until August 21, 1998, at which time Perforadora submitted the opinion of Carlos R. Loperena pursuant to the Court's order.  (Ct. R., Docs. 29, 33.)

Loperena testified that Mexican law allows Submersible a fair and reasonable opportunity to seek their equipment.  (Def.'s Mot. to Dismiss on Forum Non Conveniens, Loperena Aff., pp. 3-4.)  Further, Perforadora's expert after the fact testified that charges could be brought in Mexico for conversion or theft and that any such action would take no longer than 20 months to conclude.[2] (Loperena Aff., pp. 2, 4.)

In sum, there was no contract between Perforadora and Submersible.  The first action to retrieve the property began on August 8, 1997, when Burnside and his attorney presented proof of ownership to the Mexican tribunal.  (Correa Aff., pp. 8-10.)  Since then, the property remains in the hands of Perforadora as apparent collateral against Quantum.  (*Id.* at p. 9; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 7.)

### Standard of Review

A motion for lack of subject matter jurisdiction "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle [it] to relief."

---

[2] Submersible offers the affidavit of Enrique Garza who supplies the Court with the *criminal* act by which Perforadora could be held liable for theft or conversion.  (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. C, p. 10.)

6

*Home Builders Assoc. of Miss., Inc., v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998)

(*citing Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).) The case can be properly dismissed

for lack of subject matter jurisdiction if the Court lacks statutory or constitutional power to adjudicate

the cause of action. *Id.* (citation omitted). "When a nonresident defendant presents a motion to dismiss

for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's

jurisdiction over the nonresident." *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997)

(citations omitted). Furthermore, a *forum non conveniens* determination is discretionary within the

district court, and will be overruled only for abuse of discretion. *Command-Aire Corp., v. Ontario*

*Mechanical Sales and Service Inc.*, 963 F.2d 90, 95 (5th Cir. 1992).

Legal Analysis

I.    Subject Matter Jurisdiction

Federal maritime tort jurisdiction is defined by a two-party "locality-plus-nexus" test as

follows:  (1) "[t]he tort must have occurred on or over navigable waters," and (2) "the wrong alleged

must 'bear a significant relationship to traditional maritime activity.'" *Gaspard v. Amerada Hess Corp.*,

13 F.3d 165, 167 (5th Cir. 1994) (*citing Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S.

249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).) The Court will separately analyze the situs test of whether

the alleged acts occurred upon land or water and the nexus test of whether "theft, piracy, and/or

conversion" of the transportation of cargo or equipment is a traditional maritime activity.

A.    Situs/Locality Test

Perforadora contends that any alleged acts, if proven, occurred upon land because they

unloaded the vessel's cargo pursuant to the charter entered into between Quantum and Perforadora.

(Def.'s Mot. to Dismiss Admiralty Juris., p. 7, Exhs. B, C, Part II, Clause 2(d).) Perforadora

maintains that the right to unload the cargo was lawful. Correa testified, however, that "[w]hen the

boat returned to Dos Bocas on June 23, 1997, no representatives of SSI or Quantum were present."

7

(Correa Aff., p. 6.)

Perforadora's argument is in direct conflict with the sworn affidavits of Submersible's former employees, Michael Carlisle and Willie Allen. (Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp. 3-4; Exh. C, p. 2.) A summation of Carlisle's testimony indicates that he and Allen were ordered to leave Perforadora's vessel and that they were not allowed to take Submersible's equipment that was on the deck and padlocked by Perforadora's employees. (*Id.* at Exh. B, pp. 3-4.) Furthermore, Submersible alleges in the complaint that, "[o]n or about June [23], [1997], plaintiff's equipment was seized by Perforadora without judicial process while aboard the DON FRANCISCO at the port in Dos Bocas, Mexico ostensibly as security for or in retaliation against Quantum for arrearages owed by Quantum to Perforadora." (Ct. R., Doc. 1, p. 5.)

As a result of Submersible's description of how the property was moved from Dos Bocas to Carmen, Perforadora states that, "[Submersible's] complaint alleges land-based torts and damages." (Def.'s Mot. to Dismiss Admiralty Juris., p. 8.) Perforadora attempts to persuade the Court that any alleged conversion could only have occurred after the property was located upon land. The Court does not agree. The Court finds that Submersible has presented sufficient proof and facts to warrant a finding that the alleged acts of conversion, theft, or piracy actually occurred over water.

Alternatively, Perforadora relies upon the argument that one of the reasons for locking up the equipment is because it was unsure whether the property belonged to Quantum or Submersible. (Def.'s Mot. to Dismiss Admiralty Juris., p. 4; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 106-107.) As support, the customs forms, as required by Mexican Law, listed Quantum as the importer of the equipment. (Ct. R., Doc. 25, Exh. G; Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. C, pp. 6, 9.) Again, Submersible has sufficiently plead and presented facts to show that Perforadora was aware of the ownership of the equipment at all times. (Ct. R., Doc. 1, p. 6.)

8

Correa admitted that he sent Perforadora's vessel and crew to Morgan City, Louisiana to pick up Submersible's men and equipment, and that the equipment was clearly marked "Submersible Systems, Inc." and "Welch Rentals." (Correa Aff., p. 5; Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. B, pp. 71-72, 74-75, 115-116.) Furthermore, Perforadora and Correa allowed Submersible's employees to retrieve their personal belongings out of the equipment that was detained. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4.)

Both Burnside and Allen state that Correa knew that the equipment belonged to Submersible, yet Perforadora retained possession as leverage against Quantum. (Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83; Pl.'s Supp. Mem. in support of Attachment, Exh. C, p. 2.) To further reiterate Perforadora's knowledge of ownership, the evidence indicates that Perforadora was notified of Submersible's ownership by Submersible's former employees on June 23, 1997, by Burnside on June 26, 1997, by Quantum on July 4, 1997, and again by Burnside on July 7, 1997. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exh. A, pp. 3-4; Exhs. D-1, D-2, p. 2; Def.'s Rebut. in support of Mot. to Dismiss Admiralty Juris., Exh. B, pp. 82-83; Correa Aff., p. 7.) The most telling evidence is an interoffice memorandum written by Correa to his superiors referring to the July 4, 1997, meeting with Quantum officials in which Correa specifically states, "support equipment for inspection of submarine lines, property of Submersible Systems, Inc." (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., Exhs. D-1, D-2, p. 2.) The Court therefore finds Perforadora's lack of knowledge argument suspect, and that Submersible has sufficiently articulated that the alleged action took place upon water.

B.    Nexus Relationship to Traditional Maritime Activity

Perforadora and Submersible did not have a contract for the transportation of Submersible's men or equipment, nor did the parties supply the Court with a bill of lading. Perforadora did contract, however, with Quantum to supply a vessel to transport Submersible's men and equipment into waters

9

located outside Mexico. (Ct. R., Doc. 1, p. 3; Def.'s Mot. to Dismiss Admiralty Juris., Exh. A.) The United States Supreme Court sets out a two-part test concerning nexus relationship as follows: (1) "whether the incident has a potentially disruptive impact on maritime commerce;" and (2) whether "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (*quotation marks and internal citations omitted.*)

Perforadora argues that there is no disruptive impact on maritime commerce. (Def.'s Mot. to Dismiss Admiralty Juris., p. 10.) Perforadora reasons that this case does not involve the collision of vessels, goods under bills of lading, marine insurance, or personal injuries which are the usual bases for maritime law suits. (*Id.*) The Court, however, finds that there is a sufficient impact on maritime commerce occurring when underwater surveying equipment was allegedly converted to Perforadora's own use thereby: (1) preventing Submersible from completing other underwater surveying contracts; and (2) hindering Welch Rentals from further rentals of oceanographic equipment. Further, the Court finds that the carriage of equipment is similar to the carriage of goods under a bill of lading in that Perforadora contracted with Quantum to transport the equipment in question prior to the alleged location where the act of piracy was ultimately committed.

Concerning whether there is a substantial relationship to traditional maritime activity, Submersible offers support that conversion committed upon the high seas is a maritime activity. (Pl.'s Resp. to Def.'s Mot. to Dismiss Admiralty Juris., p. 7.) Specifically, the Second Circuit has stated, "[t]he reason for the exercise of admiralty jurisdiction is that conversion is a tort, and a tort so elementary in its nature that it may be maintained even against an infant (*Vasse v. Smith*, 6 Cranch, 226, 3 L.Ed.207), and if that tort is committed on navigable waters, admiralty has jurisdiction." *The Lydia*, 1 F.2d 18, 23 (2nd Cir. 1924).

In a similar case, the seller of wheat contracted with a buyer, whereby the buyer chartered a

10

third party to supply a vessel, POLLUX, for the carriage of the wheat to the buyer's destination. *Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 85 (5th Cir. 1979). After the third party vessel owner placed a maritime lien on the wheat located aboard the vessel, the Fifth Circuit stated, "whatever right to payment for the use of the POLLUX [third party vessel owner] may have had against [buyer], did not run against [seller] or its wheat." (*Id.* at p. 87.) The Court found that the third party vessel owner committed conversion as a result of an "unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner." (*Id.*) (*citations omitted.*) Thus, even though Perforadora and Submersible did not have a bill of lading for the carriage of goods, Perforadora allegedly converted Submersible's equipment in retaliation against Quantum for the arrearages owed by Quantum to Perforadora. (Ct. R., Doc. 1, p. 5; Pl.'s Supp. Mem. in support of Attachment, Exh. B, p. 3; Exh. C, p. 2.)

Alternatively, Perforadora argues that underwater surveying of pipelines are collateral to the oil and gas industry and fall outside the admiralty jurisdiction of this Court. (Def.'s Mot. to Dismiss Admiralty Juris., p. 10.) (*citing Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 955 (5th Cir. 1988).) The Courts, however, have continuously held that "[a]n agreement to transport people and supplies in a vessel to and from a well site on navigable waters is clearly a maritime contract." *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692, 696 (S.D. Tex. 1997) (*citing Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231-1232 (5th Cir. 1985); *see also, Hale v. Co-Mar Offshore Corp.*, 588 F. Supp. 1212, 1215 (W.D. La. 1984); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1111 (5th Cir. 1982) ("transporting person[s] over the seas is a maritime-type function").)

In *Grubart*, 513 U.S. at 541, the Court found that "[t]he substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." The Court finds that Perforadora performed a traditional maritime activity of transporting Submersible's men and

11

equipment much like the transportation of goods as described above, therefore, satisfying the substantial relationship test and conferring admiralty jurisdiction upon the Court.

Perforadora's final argument is that "the admiralty jurisdiction of the federal courts may not extend into the territorial waters of a foreign nation." (Def.'s Mot. to Dismiss Admiralty Juris., p. 12.) This proposition is simply not true. The Fifth Circuit has exercised jurisdiction over a personal injury action which occurred in the United Arab Emirates' territorial waters. *Coats v. Penrod Drilling*, 61 F.3d 1113 (5th Cir. 1995). Additionally, another court has held:

> [t]he term 'navigable waters' is not anywhere expressly limited to the navigable territorial waters of the United States and the high seas. . . The fact that the navigable waters at issue here are not within the territorial waters of the United States but are foreign territorial waters is only relevant to the determination of whether U.S. maritime law should be applied, not whether the tort is a maritime tort.

*Sevison v. Cruise Ship Tours, Inc.*, 1997 WL 530267, p. 6 (D.V.I. 1997). That court rejected the proposition that foreign territorial waters are outside the federal court's admiralty jurisdiction but found the fact relevant concerning what law should be applied. (*Id.*) The Court therefore finds that admiralty jurisdiction may extend into territorial waters of foreign nations. The Court further finds that Perforadora's motion to dismiss for lack of admiralty jurisdiction should be denied.

II.  *Forum Non Conveniens*

The United States Supreme Court has stated, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843 (1947). There are three steps in a *forum non conveniens* analysis. *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir. 1993) The first step is whether there is an alternate forum. (*Id.* citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981).) If so, then the second and third steps involve an evaluation of private and public interest factors. (*Baumgart*, 981 F.2d at pp. 835-837.)

Additionally, Perforadora bears the burden of persuasion which extends to all the elements of

12

the *forum non conveniens* analysis. *In re Air Crash Disaster Near New Orleans, La. v. Pan American World Airways, Inc.*, 821 F.2d 1147, 1164 (5th Cir. 1987), *vacated on other grounds, Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989). If Perforadora meets its initial burden of establishing an adequate and available forum, then it must prove that the "private and public interests weigh heavily on the side of trial in the foreign forum." (*Id.*) Consequently, Perforadora "must provide enough information to enable the district court to balance the parties interests." (*Id.* at p. 1165 *citing Reyno*, 454 U.S. at p. 258.) The alternate forum, private interest, and public interest factors are individually analyzed below.

A.     Alternate Forum

For an alternate forum to be feasible, it must be both available and adequate. (*Baumgart*, 981 F.2d at p. 835.)

> A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum . . . A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly . . . even though they may not enjoy the same benefits as they might receive in an American court.

(*Id. citing In re Air Crash*, 821 F.2d at p. 1165.) The United States Supreme Court further states, "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." (*Reyno*, 454 U.S. at p. 254.)

1.     Available Forum

"The defendant's submission to the jurisdiction of an alternative forum renders that forum available for purposes of forum non conveniens analysis." *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728 (5th Cir. 1990) (*citations omitted*.) As a result of Perforadora's residence in Mexico and their arguments that Mexican law is applicable, Perforadora is apparently willing to submit to the jurisdiction of the Mexican courts. (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3-4.) Perforadora's

13

expert, Loperena, claims that the courts in Mexico have the authority and power to subpoena all of the witnesses located in Mexico under Articles 1261 and 1262 of the Mexican Code of Commerce. Loperena further provides the Court with the relevant provisions. (Loperena Aff., pp. 2-3.) The Court therefore finds that an alternate forum is available.

       2.    Adequate Forum

Perforadora continually asserts that the equipment in question has been turned over to the Public Attorney and, as a result, Mexico is the proper forum to resolve any dispute over the ownership of the equipment. (Loperena Aff., pp. 3-4; Correa Aff., pp. 8-9.) As previously stated, Submersible attempted to regain its property through the Mexican court system. Because Submersible's efforts were to no avail even after showing proof of ownership, and even though Perforadora had knowledge of the true ownership, Submersible brought this action. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B, p. 2; Correa Aff., pp.8-9; Ct. R., Doc. 1.)

Perforadora made the blind assertion on July 31, 1998, that "Mexican law recognizes the tort of conversion and provides an adequate remedy." (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 4.) In support, Loperena makes a general conclusion that "the laws of Mexico provide for recovery for 'theft, conversion or piracy' in the event such claims could be proved" and that "SSI . . . would have an adequate remedy under Mexican law." (Loperena Aff., p. 4.) Perforadora, however, fails to provide the Court with applicable provisions under Mexican law which purport to allow Submersible a civil action for "theft, piracy, and/or conversion."

On the other hand, Submersible offers the declaration of their legal expert, Enrique Garza, who supplies the Court with the criminal act by which Perforadora could be held liable for theft. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, Exh. B.) The Court finds that a criminal remedy is clearly inadequate, effectively leaving Submersible with no remedy at all. (*See Piper*, 454 U.S. at p. 254 n. 22 *citing Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445 (Del. 1978).

The Court finds that Perforadora has failed to establish that the Mexican court system would provide an adequate civil remedy of recovery to Submersible. The Court further finds that an adequate alternate forum does not exist and the defendant's motion for *forum non conveniens* should be denied. In an abundance of caution, however, the Court will address and balance the relevant factors of public and private interests in order to avoid the examples of abuse of discretion as outlined by the Fifth Circuit. (*In re Air Crash*, 821 F.2d 1147 at pp. 1166-1167.)

B.    Private Interests

"If the court determines that there is an available and adequate forum, then the court must consider the private interest factors." (*Quintero*, 914 F.2d at p. 727.) The factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; (3) probability of an opportunity to view the premises, if view would be appropriate to the action; and (4) other factors affecting the ease, speed, and expense of trial or the enforceability of a judgment if obtained. (*Baumgart*, 981 F.2d at pp. 835-836 *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).) To the list, the Fifth Circuit has added that deference to be given to the plaintiff's choice of forum. (*In re Air Crash*, 821 F.2d at p. 1165.)

Perforadora maintains that the action occurred in Mexico; that possible witnesses from Quantum, the Mexican Department of Customs, and Pemex[3] are located in Mexico; and that documents and the equipment in question are in Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.) Submersible, however, claims that testimony by Pemex employees is not needed because the relationship between Quantum and Pemex has no bearing on the claim of Submersible against Perforadora. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 6.)

---

[3]Pemex is a Mexican government owned oil company for which Quantum was working.

15

Submersible further argues that testimony of Mexican custom officials is unnecessary because the custom documents have already been produced to the Court and the legal experts have attested to their relevance. (*Id.*)  Most importantly, Correa stated that the relevant Quantum representatives are nowhere to be found even though they allegedly reside in Mexico. (*Id.* at Exh. D, pp. 111-112; Correa Aff., pp. 10-11.)

Perforadora's only independent witness, Nicolas Morales, is a third-party marine agent who represented Quantum in Mexico.  (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.) Submersible submits that any Mexican witnesses that may not be available to give depositions or trial testimony in the United States, "can be required to give testimony in Mexico by Letters Rogatory as per the Inter-American Convention on the Taking of Evidence Abroad which was ratified by Mexico." (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 11; Loperena Aff., p. 2.) Submersible's independent witnesses include their former employees, Allen and Carlisle, who are willing to travel to a United States court, and Welch employees who are located in the United States. (Pl.'s Resp. to Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 4-5; Exh. B, p. 2.)  In further support, there is no indication that any outstanding documents are not within the control of the Court. The Court, therefore, finds that the relative ease of access to sources of proof favor Submersible.

Concerning the second factor, Perforadora argues that witnesses not employed by Perforadora or Submersible, and hence not subject to the control of the parties, will be needed to testify at trial.[4] (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 5.)  Both Mexico and the United States courts have the power to compel witnesses only in their respective jurisdictions.  As noted above, Perforadora's possible independent witnesses are either irrelevant, cannot be found, or could be

---

[4]Specifically, Perforadora continues to maintain that Pemex employees, custom officials, and former Quantum employees who cannot be found, are possible witnesses whom neither party can compel to testify.  (*Id.* at p. 6.)

16

deposed in Mexico pursuant to the process described above.  Considering Submersible's former employees apparent reluctance to travel to a Mexican court and the possibility of discovering the whereabouts of the Quantum witnesses, the Court finds that the compulsory process factor is neutral on behalf of both parties.

The Court finds the need to view the premises irrelevant because the equipment was either seized and converted while aboard Perforadora's vessel or it was not.  Any possible argument of a need to view the equipment is only relevant to mitigation of damages in the unlikely probability that Submersible's equipment is eventually returned.  Upon the unforseen return of the equipment, the calculation of damages could be provided to the Court by experts.  The Court finds the third factor neutral.

Perforadora contends that the ease, speed, and expense of trial are less burdened in Mexico on two bases:  (1) Perforadora's inability to implead Quantum as a third party, and (2) the cost of obtaining and translating evidence.  (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 6-7.) Perforadora reasons that a Mexican court can implead Quantum with "[t]he possibility of attaching any amounts due to Quantum by Pemex, or of attaching other property of Quantum located in Mexico." (*Id.*)

As previously stated, the present action by Submersible is against Perforadora for the alleged conversion that occurred on June 23, 1997, and is not an action to recover the equipment itself; nor is this an action to recover any amounts from Quantum by either party.  Perforadora's inclusion of Quantum for the purposes of obtaining a possible judgment for the unpaid amount owed by Quantum to Perforadora has no bearing on whether Perforadora committed an admiralty tort against Submersible. The Court finds that Quantum is not a necessary third party for the purposes of this action which would affect the ease, speed, and expense of this trial.

Concerning the translation of testimony and evidence from Spanish into English, the proof

17

shows that custom and court documents have already been translated into English and that Correa has

already testified in English. (Ct. R., Doc. 25, Exhs. A--H-5; Correa Aff., p. 3; Pl.'s Resp. to Def.'s

Mot. to Dismiss on Forum Non Conveniens, Exh. D.)  Translation would be needed to facilitate

Submersible in either a Mexican or United States court while Correa is apparently fluent in English and

will be acting on behalf of Perforadora at a trial in this court. (Pl.'s Resp. to Def.'s Mot. to Dismiss

on Forum Non Conveniens, p. 13; Correa Aff., p. 3.)

Perforadora offers cases where the courts have found the need for translation overwhelming,

however, this Court finds that the only translation required would be of  Perforadora's possible Spanish

speaking witnesses.  Consequently, the Court finds that while translation from Spanish to English will

affect the expense and speed of trial, the factor favors Submersible.

Perforadora does not address the factor that Submersible could obtain an attachment in

Mississippi as is the case in Mexico, if a judgment were obtained in the jurisdiction of the United States

or Mexican courts, respectively. (Loperena Aff., p. 3.)  Perforadora has property located in both

Pascagoula, Mississippi, and has its principal place of business in Mexico City, Mexico. (Def.'s Mot.

to Dismiss on Forum Non Conveniens, pp. 1-3.)  Furthermore, the Court finds that there is a strong

presumption in favor of Submersible's choice of forum as a result of it being an American corporation.

(*See Baumgart,* 981 F.2d at p. 836 n. 12 *citing Reyno,* 454 U.S. at p. 256.)  The Court finds that the

private factors are either neutral or favor Submersible.

C.    Public Interest Factors

If the private interests do not favor dismissal, the Court is mandated to consider the public

interest factors. *Empresa Lineas Maritimas v. Schihau-Unterweser,* 955 F.2d 368, 376 (5th Cir. 1992)

(*citing In re Air crash,* 821 F.2d at p. 1165.)  As noted above, however, the Court finds that an

alternative and adequate forum does not exist in addition to the private interest factors favoring

Submersible.  The Court will nevertheless consider the public interest factors which include: "(1) the

18

administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the interest in having the trial of a diversity case in the forum that is familiar with the law that must govern the action; (4) the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." (*Baumgart*, 981 F.2d at p. 827 *citing In re Air Crash*, 821 F.2d at pp. 1162-1163; *citing Gulf Oil*, 330 U.S. at p. 508.)

Perforadora asserts that the Mexican forum is not congested and could handle this matter in an expeditious manner. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 8.) Specifically, Loperena is of the opinion that an average commercial case in Mexico would take no longer than 20 months to conclude. (Loperena Aff., p. 2.) The Court, however, finds that the docket in the Southern District of Mississippi is no more congested than the docket of any Mexican tribunal and that the case can be heard in this Court by no later than February of 1999. The Court therefore finds that the administrative factor favors Submersible.

Concerning the local interest factor, Perforadora argues that the events occurred in Mexican territorial waters and that most of its witnesses reside in Mexico, thereby justifying having the controversy resolved in Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, p. 9.) Perforadora goes on to state, "Mexican courts have an even greater interest in assessing the liability, if any, of Perforadora given the *potential criminal allegations* of conversion alleged by [Submersible]." (*Id.*) (emphasis added.) Perforadora's assertion that Submersible has the option of bringing criminal charges against Perforadora only reiterates the proposition that this Court has previously made: that there is no adequate forum in Mexico to address the civil remedy of conversion for which Submersible brings this action. While the actions may have occurred in Mexican territorial waters, there is no local interest in having the dispute resolved in Mexico and there is a strong interest for the United States in ensuring that its citizens are compensated for harms done to them. (*See Baumgart*, 981 F.2d at p. 837

19

n. 15.)

"Choice of law is one of the *Gulf Oil* public interest factors; therefore choice of law is an integral part of the *forum non conveniens* determination." 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 6-13 at pp. 284-285 (2d ed. 1994); (*See also Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 880 (5th Cir. 1987).) In order to determine the third and fourth public factors described above, the choice of law must first be determined. Under the *Lauritzen-Rhoditis*[5] test, the following factors are to be considered: "(1) the place of the wrongful act, (2) the law of the flag; (3) allegiance or domicile of the injured party; (4) allegiance of the ship owner; (5) place of contract; (6) accessibility of a foreign forum; (7) law of the forum; (8) shipowner's base operations." (*Quintero*, 914 F.2d at p. 730.)

The act allegedly occurred in Mexican territorial waters while aboard a Mexican owned vessel bearing a Mexican flag with its principal base of operations in Mexico City, Mexico. (Def.'s Mot. to Dismiss on Forum Non Conveniens, pp. 3, 10-11.) The neutral factor is that there is no contract between the parties. As the injured party, Submersible's allegiance is to the United States. As previously stated above, the law of the Mexican forum is totally inadequate to the action complained of, thereby, alienating the accessibility of a foreign forum. The Court therefore finds that American maritime law should apply where the parties have not contracted to submit to an alternate forum and the appropriate law is that of the United States.

The final public interest factor is inapplicable because no jury trial has been prayed for and this cause of action is to be decided by the Court. (Ct. R., Doc. 1.) The Court finds that the public interest factors favor Submersible. As a result of an inadequate alternate forum and both the private and public

---

[5]The test is derived from *Lauritzen v. Larsen*, 345 U.S. 571 (1953) and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970), and initially applied to actions involving injuries to foreign seaman under the Jones Act.

interest factors favoring Submersible, the Court finds that Perforadora's motion for *forum non conveniens* should be denied and jurisdiction should be retained by the Court.

III.    Rule B Attachment

As a result of the Court having admiralty jurisdiction, Submersible seeks a Rule B attachment of Perforadora's property located in Mississippi in order to satisfy any possible judgment that may be granted and because Perforadora's oil rig is due for completion in April of 1999. (Ct. R., Doc. 6.) Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims provides:

> With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or the plaintiff's attorney that, to the affiant's knowledge, or to the best of the affiant's information and belief, the defendant cannot be found within the district. The verified complaint and affidavit shall be reviewed by the court and, if the conditions set forth in this rule appear to exist, an order so stating and authorizing process of attachment and garnishment shall issue.

(FED.R.CIV.P. B.) Rule B essentially applies in cases where a maritime lien exists for a maritime tort which would support an *in personam* claim against the defendant when the defendant is not found within the district, but has property within the district. *See Jarvis, An Introduction to Maritime Attachment Practice Under Rule B,* 20 J. Mar. L. & Com. 521, 526-530 (1989).

As previously stated, Perforadora's property is located at Halter. (Ct. R., Doc. 1.) A Rule B attachment, however, can be granted only if Perforadora "cannot be found within the district" when Submersible initiated the action. *Heidmar, Inc. v. Anomina Ravennate Di Armamento SP.A. Of Ravenna,* 132 F.3d 264, 268 (5th Cir. 1998). "A defendant is present in the district if 1) the defendant can be found within the district in terms of jurisdiction, and 2) the defendant can be found within the district for service of process." (*Id. citing LaBanca v. Ostermunchner,* 664 F.2d 65, 67 (5th Cir. 1981).) "If the answer to both questions is affirmative, then the defendant can be found "within the

21

district" for the purposes of Rule B(1), and the process of attachment and garnishment is not available to the plaintiff." (*Id.* at p. 267.) Due to Perforadora's motion to dismiss for lack of personal jurisdiction and its relation to the first requirement cited above, the Court will discuss the two requirements separately.

> A.    Personal Jurisdiction

Perforadora contradicts itself in an attempt to escape a Rule B attachment by claiming that it is "present" within the state while maintaining that the Court lacks personal jurisdiction for state purposes. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 6; Def.'s Mot. to Dismiss Personal Juris., pp. 5, 9-10.) Perforadora admits that "the presence of the rig in the district itself is sufficient to satisfy general personal jurisdiction in the district for purposes of Rule B." (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 6.) Perforadora, however, maintains that "Rule B is not subject to common law due process constraints." (*Id.*)

In order to resolve any doubt, the Mississippi minimum contacts statute for nonresident defendants provides:

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

MISS. CODE ANN. § 13-3-57. As previously discussed, Perforadora is doing business within Mississippi by paying a Mississippi corporation for the construction of an oil rig, by providing three full-time employees for oversight of that project, and by maintaining an office in Pascagoula since September of 1997. (Correa Aff., p. 2; Pl.'s Supp. Mem. in support of Attachment, Exh. E.)

Additionally, Perforadora stated that they are "present within the Southern District of

22

Mississippi by virtue of an office located at the Halter Marine shipyard in Pascagoula." (Pl.'s Resp. to Def.'s Mot. to Dismiss Personal Juris., Exh. A.) The Court finds that Perforadora maintains sufficient contacts with Mississippi so as to be "found within the district." Alternatively, the Court finds that the contacts confer personal jurisdiction in the subsequent event that a state law attachment is granted. The Court therefore finds that Perforadora's motion to dismiss for lack of personal jurisdiction should be denied.

### B.   Service of Process

In the memorandums of law provided to the Court, Submersible mentions that its counsel conducted a search for Perforadora in the State of Mississippi and were informed that: (1) Perforadora had no phone listing in either the 228 or 601 area codes; (2) that Perforadora was not licensed to do business in the State of Mississippi; (3) that Perforadora had no agent for service of process appointed within the state; and (4) that Perforadora did not maintain an office within the Southern District of Mississippi. (Pl.'s Rebut. in support of Attachment, p. 4; Pl.'s Supp. Mem. in support of Attachment, pp. 3–4.) After a careful review of the record, the Court finds that Submersible inadvertently failed to file an affidavit in the Court record verifying that the defendant could not be found within the district. Submersible consistently refers to the affidavit of Michael H. Bagot, Jr., one of the attorneys representing Submersible, allegedly filed on March 27, 1998, in connection with the complaint. (*Id.*) Because Rule B requires an affidavit in the record, and there being no affidavit found, the Court finds that a Rule B attachment should be denied.

Alternatively, even with an appropriate affidavit, Submersible's motion for a Rule B attachment must fail. Perforadora must be "susceptible to service" in order to be found within the district. (*LaBanca*, 664 F.2d at p. 68.) Rule 4(h) of the Federal Rules of Civil Procedure provides that service upon a corporation may be made by "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to

23

receive service of process." (FED.R.CIV.P. 4(h)(1).)  The Fifth Circuit has stated, "[i]f a corporation's business is so substantial as to render the corporation amenable to suit in the state, its principal agent in charge of activities within that state meets the test of a 'managing agent.'" *Lone Star Package Car Co., Inc. v. Baltimore & O.R. Co.*, 212 F.2d 147, 152 (5th Cir. 1954); (*See also, Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582-583 (2nd Cir. 1963).)

Perforadora maintains that its chief operating engineer, Castro, is the officer in charge of the construction at Halter and that he resides in South Mississippi. (Correa Aff., p. 2; Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, Exh. B, pp. 21-22.)  Because the Court finds that personal jurisdiction exists over Perforadora, it follows that the Court finds that Castro was a managing agent within the meaning provided by Rule 4(h) and *Lone Star*.

Even though Submersible discovered a rig being constructed by a Mississippi corporation on behalf of Perforadora, Submersible and its counsel failed to diligently search for an office or employees of Perforadora located within the state in order to effect service. (Def.'s Resp. to Pl.'s Supp. Mem. in support of Attachment, p. 7, Exh. A, pp. 103-109; *See Jarvis*, 20 J. Mar. L. & Com. 521 at pp. 521, 531 n. 31, 52 (1989); *Unites States of America v. CIA. Naviera Continental S.A.*, 178 F. Supp. 561, 565 (S.D.N.Y. 1959).)  If Submersible had diligently searched, the Court finds that it would have discovered that Perforadora was within the district in order to serve process through Castro.  The Court therefore finds that Submersible's motion for a Rule B attachment should be denied.

The argument proposed by Submersible, however, is that Perforadora appointed an agent for service of process on June 10, 1998, after the suit was filed. (Pl.'s Supp. Mem. in support of Attachment, p. 6; Exh. E, p. 1.)  They analyze a Fifth Circuit case where the defendant appointed an agent for service of process within 15 minutes of the complaint being filed; the Court reasoned that the sole purpose was to defeat a Rule B attachment. (*Heidmar*, 132 F.3d at p. 268.)  The distinguishing difference, as discussed above, is that Perforadora actually had an agent who could have been served

24

with process on the date that Submersible filed the complaint. The Court therefore finds that Submersible's argument is without merit.

IV.     Federal Rule 64/State Law Attachment

Submersible alternatively moved for an attachment under state law pursuant to Rule 64 of the Federal Rules of Civil Procedure. (Ct. R., Doc. 6.) Rule 64 allows the Court to use state law where the district court is held in order to grant an attachment of collateral for any possible judgment to Submersible. (FED.R.CIV.P. 64.) The relevant state law provisions for attachment of a nonresident defendant is Mississippi Code Annotated § 11-31-1, *et seq.* The conversion of the equipment in question is allegedly worth $600,000 and Submersible's suit for damages is $3,500,000. (Ct. R., Doc. 1.) The Court therefore finds that Submersible can attach Perforadora's property pursuant to state law upon proper application to the Court and the posting of a $1,000,000 bond.

Conclusion

For the above reasons, the Court finds that Submersible has successfully alleged conversion of equipment committed over navigable waters thereby conferring admiralty jurisdiction upon the Court. Further, the Court finds that an adequate alternative forum does not exist, and that both private and public interest factors favor Submersible. The Court further finds that Perforadora could be found within the district which nullifies a Rule B attachment, because personal jurisdiction exists over Perforadora and the fact that Perforadora's managing agent could have accepted process on behalf of Perforadora at the time the suit was filed by Submersible. The Court also finds that Submersible can attach Perforadora's property pursuant to state law upon proper application to the Court and the posting of a $1,000,000 bond.

The Court therefore finds that Perforadora's motions to dismiss for lack of admiralty jurisdiction, lack of personal matter jurisdiction, and *forum non conveniens* should be denied. The Court further finds that Submersible's motion for a Rule B attachment should be denied and that

25

Submersible's motion for a Rule 64 attachment pursuant to state law should be granted upon proper application to the Court.

A separate Order in accordance with this Memorandum Opinion shall issue this date.

DATED this the 23rd day of November, A.D., 1998.

UNITED STATES DISTRICT JUDGE

26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

NOV 2 3 1999

J.T. NOBLIN, CLERK

BY_____
DEPUTY

SUBMERSIBLE SYSTEMS, INC.                                              PLAINTIFF

VS.                                               CIVIL ACTION NO. 1:98cv251GR

PERFORADORA CENTRAL, S.A. de C.V.                                      DEFENDANT

O R D E R

This cause comes before the Court on the motion to dismiss for lack of admiralty jurisdiction [21-1]; the motion to dismiss for lack of personal jurisdiction [22-1]; and the motion to dismiss for *forum non conveniens* [23-1]; all filed by the defendant, Perforadora Central, S.A. de C.V. [Perforadora], pursuant to Rule 12 of the Federal Rules of Civil Procedure. Also, before the Court is a motion for attachment [6-1] pursuant to Rule B of the Federal Rules of Civil Procedure, or, in the alternative, a motion for attachment [6-1] pursuant to Rule 64 of the Federal Rules of Civil Procedure and Mississippi Code Annotated § 11-31-1, *et seq.*, filed by the plaintiff, Submersible Systems, Inc. [Submersible]. Pursuant to the Memorandum Opinion entered in this cause, this date, incorporated herein by reference, it is hereby,

ORDERED AND ADJUDGED that the defendant's motion to dismiss for lack of admiralty jurisdiction [21-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the defendant's motion to dismiss for lack of personal jurisdiction [22-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the defendant's motion to dismiss for *forum non conveniens* [23-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the plaintiff's motion for Federal Rule B Attachment [6-1] be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that the plaintiff's motion for attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure and Mississippi Code Annotated § 11-31-1, *et seq.*, [6-1] be, and is hereby, granted. It is further,

ORDERED AND ADJUDGED that the plaintiff must post a $1,000,000 bond in order to secure an attachment under Rule 64 of the Federal Rules of Civil Procedure and Mississippi Code Annotated § 11-31-1, *et seq.*

SO ORDERED AND ADJUDGED this the 23rd day of November, A.D., 1998.


UNITED STATES DISTRICT JUDGE

2

# CONTRACT

This agreement ("Contract") is made, entered into and binding between **Quantum Ingenieros, S.A. DE C.V.** ("Quantum"), a corporation organized under the laws of the Republic of Mexico, herein represented by and appearing through Ing. Eduardo Fortoul, its duly authorized executive officer and managing director, and **Submersible Systems, Inc.** ("SSI"), a corporation organized under the laws of the State of Louisiana, herein represented by Wolfgang Burnside, its duly authorized President.

SSI is to provide to Quantum those services, personnel and equipment (collectively, "services") in accordance with the terms and conditions set out in a letter from SSI to Quantum dated November 4, 1996 and a letter from Quantum to SSI dated November 5, 1996, both attached hereto, made a part hereof and incorporated herein by reference thereto and all taken together form one document. In the event of conflict between the attachments and this agreement, this agreement shall prevail.

The following additional terms and conditions shall be part of and govern this Contract and the agreement between Quantum and SSI for the providing of SSI's services to Quantum and payment to SSI by Quantum for such services:

1. All payments provided for in this Contract are to be made by Quantum to SSI in U.S. Dollars without discount payable by wire-transfer to SSI's Account No. 84622802 at Patterson State Bank, Patterson, Louisiana, U.S.A., ABA Routing No. 065200803.

2. As part payment of the total sum to be due SSI under the Contract, Quantum has previously wire-transferred to the account of SSI the sum of approximately Ninety Thousand and No/100 ($90,000.00) Dollars. In addition, Quantum does hereby agree to wire-transfer to SSI, in the manner described in paragraph 1 above, on or before the close of business on November 15, 1996, the sum of One Million and No/100 ($1,000,000.00 U.S.) Dollars U.S. This total sum shall be held in SSI's account and utilized to pay SSI's invoices as hereinbelow described; such sums so held shall be considered SSI's funds, shall not be subject to withdrawal or lien by Quantum or seizure by Quantum's creditors or any third party and shall be dedicated solely to the payment of SSI's invoices in accordance with the terms of this Contract.

3. Quantum does hereby agree that the minimum amount that SSI shall received under the terms of this Contract shall be the sum of One Million Ninety Thousand and No/100 ($1,090,000.00) Dollars U.S. and in the event that the services provided by SSI does not result in SSI's invoices amounting to at least $1,090,000.00 nevertheless, SSI shall be entitled to retain as its property the sum of $1,090,000.00 as a minimum payment due it under the terms of this Contract; this minimum payment is part of the consideration for SSI's entering into this Contract (and without which SSI would not have so entered same) and the utilization and mobilization by SSI of substantially all of its assets for the performance of this Contract and the losses as SSI may sustain as a result of the loss of other jobs and work that may otherwise be available to it.



EXHIBIT

L

_____



EXHIBIT

J-3

4.    SSI shall prepare its invoices detailing the services provided by SSI to Quantum in accordance with the terms of this Contract; said invoices shall be submitted to any Quantum employee or representative on the job location as often as SSI deems appropriate.  Upon such submission of the invoice(s), SSI shall be entitled, in a sum equivalent to the amount of the invoice(s), to payment, usage and withdrawal from the amount Quantum has deposited as described in paragraph 2 above; if there is a dispute about the amount or content of the invoices or services provided by SSI, SSI shall nevertheless be entitled to be paid and then shall settle such issues by negotiation with Quantum or upon the failure thereof, by arbitration as described elsewhere herein.

5.    Once the funds are deposited as described in paragraph 2 above are exhausted, and SSI still continues to provide services to Quantum under the terms of this Contract, Quantum shall pay by wire-transfer the amount of SSI's invoice(s) immediately upon the invoice(s) being presented to Quantum.

6.    In the event that all of the funds described in paragraph 3 above are not timely wire-transferred by Quantum into SSI's account as described in paragraph 2 above, or in the event that SSI is not promptly paid for the services provided by it upon its rendering an invoice(s) to Quantum as provided in paragraph 5 above, or in the event that Quantum otherwise breaches its agreements under this Contract, then SSI may immediately stop providing the services described in this Contract and may remove immediately its personnel and equipment from the location thereof, all with no notice of default or other notice to Quantum, all of which are waived by Quantum; in such latter event, SSI shall not be hindered by Quantum or others in such removal.  SSI shall not be responsible or liable to Quantum or any other party (including Pemex) for any losses or damages as the result of SSI's removal of its personnel and equipment from the job location or its failure to provide, in whole or part, the services.  In the event such cessation of providing services by SSI, SSI shall be under no obligation to complete the work and services under the Contract and may refuse to do so at its sole discretion.  Payment of the invoices of SSI are not dependent upon whether Quantum is reimbursed or paid any sum(s) from any other party (including Pemex).  Quantum agrees, at its costs and expense to reasonably cooperate and assist SSI in complying with any applicable laws of Mexico or in dealing with any officials thereof as SSI may reasonably request including the obtaining of any permits or authorizations required by the Republic of Mexico or any other government (which shall be obtained at the cost and expense of Quantum).

7.    The interpretation of the Pemex contract shall be in the reasonable opinion of SSI.  The English language shall solely be utilized in the construction and interpretation of this Contract.  SSI shall be excused in the timely performance of the services if such performance is hindered, delayed or wholly or partially stopped by any act of God, civil unrest, labor dispute or strike, inclement weather, act or failure to timely act of any government or agency thereof, failure or breach of Quantum under this Contract, or failure to obtain, for any reason, necessary goods, supplies, equipment, or labor to provide the services.

8.    If there is any dispute regarding this Contract that is not settled by negotiation between

2

the parties hereto, same shall be settled, resolved and decided by binding arbitration in accordance with the rules of the American Arbitration Association meeting to be held in Lafayette, Louisiana by and before a panel of three arbitrators, one appointed by Quantum, one appointed by SSI and the third arbitrator appointed by the other two arbitrators. The decision of the arbitrators shall be final and binding. If it is necessary to enforce the arbitrators' award in a court, the parties agree that the 16th Judicial District Court in and for St. Mary Parish, Louisiana shall be the exclusive forum and shall have exclusive jurisdiction (the parties hereby explicitly agreeing to such jurisdiction and waiving any objections thereto) for such proceedings, recognition and enforcement of the arbitrators' decision and award. If the parties hereto do not have a registered agent in the State of Louisiana for service of process, then such party(ies) appoints the Secretary of State of the State of Louisiana as its registered agent only for service of process in such proceeding.

    **THUS DONE AND PASSED** by the parties hereto at Morgan City, St. Mary Parish, Louisiana on this _6th_ day of November, 1996, after due reading of the whole.

WITNESSES:                         QUANTUM INGENIEROS, S.A. DE C.V.

                              BY:                                        
                                            ING. EDUARDO FORTOUL

                              SUBMERSIBLE SYSTEMS, INC.

                              BY:                                        
                                            WOLFGANG BURNSIDE, PRESIDENT

3

November 4, 1996

To: Mr. Luis Miguel Galvan - Quantum Ingenieros, S.A. de C.V.

Submersible Systems, Inc. will provide to Quantum at the stated cost the following ROV equipment and personnel required for the Pemex pipeline inspection Survey in Ciudad del Carmen commencing in November 8 th, 1996 and approximate completion date on February 15 th, 1997:

Job description:       Provision of equipment and personnel required to undertake the specific contract of Pemex mentioned above:

Phase 1: Mobilization from Morgan city to Ciudad del Carmen (3 days)
Phase 2: Oil seepage survey (duration approx. 15 days)
Phase 3: Pipeline surveys of various lengths (duration approx. 90 days)
Phase 4: Various riser inspections
Phase 5: Demobilization from Ciudad del Carmen to Morgan City (3 days)

Total Contract Value: 1,200,000.00 Dollars (One Million Two Hundred Thousand Dollars)\

Personnel included:       1 Project manager
2 Supervisors
4 Pilots Technicians

Equipment included:       1 Max Rover Remotely Operated Vehicle
1 Sea Owl Remotely Operated Vehicle
1 Triton 100 HP Remotely Operated Vehicle
1 Sucker/Blower/Cutter Unit
5 Underwater Video Cameras Systems
1 Generator
1 Track Point System
1 Work Shop Van
2 Control Vans
1 Hydrophone Pole
2 Winches of Umbilical Cable

Terms:       60 Days Upon receipt of invoice.
Partial invoicing allowed per completion of each pipe.

Regards,
Submersible Systems, Inc.

Wolfgang Burnside
President