UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 2 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-03-020 |
| | § | |
| PERFORADORA CENTRAL, | § | RULE 9(h) ADMIRALTY |
| S.A. de C.V., | § | |
| | § | |
| Defendant. | § | |

**THE GOVERNMENT OF MEXICO'S
AMICUS CURIAE BRIEF**

Kenneth G. Engerrand
Attorney-in-charge
Texas State Bar No. 06619500
Southern District of Texas Bar No. 2078
Michael A. Varner
Texas State Bar No. 20499425
Southern District of Texas Bar No. 15111
Tenth Floor
1177 West Loop South
Houston, Texas 77027-9007
(713) 629-1580
(713) 629-5027 (facsimile)

*Attorneys for the Government of the
United Mexican States, Amicus Curiae*

OF COUNSEL:

BROWN SIMS, P.C.

42

# TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT . . . . . iv

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, vi

RESERVATION OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     Mexico Provides an Adequate, Alternative Forum . . . . . . . . . . . . . . . . . . 5

     Mexico Provides Easy Access to the Sources of Proof . . . . . . . . . . . . . . 6

     Mexico Provides Easy Availability of Live Testimony . . . . . . . . . . . . . . . 7

     This Court's Resources Should Not Be Used, and the
     Plaintiff Will Not Suffer Significant Hardship in Mexico . . . . . . . . . . . . . . 8

     Mexico Has a Local Interest in the Controversy . . . . . . . . . . . . . . . . . . . 10

     Mexican Law Should Govern this Dispute, and
     a Mexican Forum is Intimately Familiar with that Law . . . . . . . . . . . . . . 11

     Failure to Dismiss for *Forum Non Conveniens*, and Application
     of United States Law, Would Violate Treaty Provisions . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

APPENDIX

i

## TABLE OF CITATIONS

**Cases**                                                                        **Pages**

*Alcoa S.S. Co., Inc. v. M/V Nordic Regent,*
654 F.2d 147 (2d Cir. 1980)(en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

*Bilyk v. Vessel Nair,* 754 F.2d 1541 (9th Cir. 1985) . . . . . . . . . . . . . . . . 4, 12, 15

*DeMateos v. Texaco, Inc.,* 562 F.2d 895 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . 16

*Dunham v. Hotelera Canco S.A. de C.V.,*
933 F. Supp. 543 (E.D. Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880 (2d Cir. 1978) . . . . . . . . . . . 18

*Feinstein v. Curtain Bluff Resort,*
No. 96 Civ. 8860, 1998 WL 458060 (S.D.N.Y. Aug. 5, 1998) . . . . . . . . . . 12, 15

*Fogleman v. ARAMCO,* 920 F.2d 278 (5th Cir. 1991) . . . . . . . . . . . . . . . . 12, 15

*Ford Motor Co. v. Aguiniga,*
9 S.W.3d 252 (Tex. App.–San Antonio 1999, no pet.) . . . . . . . . . . . . . . . . . . . 17

*Gonzalez v. Chrysler Corp.,* 301 F.3d 377 (5th Cir. 2002),
*cert. denied,* 123 S. Ct. 1928 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

*Gulf Oil Corp. v. Gilbert,*
330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8

*Hartford Fire Ins. Co. v. California,* 509 U.S. 764 (1993) . . . . . . . . . . . . . . . . 14

*Hellenic Lines v. Rhoditis,*
398 U.S. 306 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lauritzen v. Larsen,* 345 U.S. 571 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Mizokami Bros. of Arizona, Inc. v. Baychem Corp.,*
556 F.2d 975 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6

*Seguros Comercial Americas S.A. de C.V. v. American President Lines, Ltd.*,
933 F. Supp. 1301 (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19

*Symonette Shipyards, Ltd. v. Clark*,
365 F.2d 464 (5th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Taylor v. Daimler Chrysler Corp.*, 196 F. Supp. 2d 428 (E.D. Tex. 2001) . . . 6, 19

## Treaties

International Covenant on Civil and Political Rights,
*opened for signature* Dec. 19, 1966, 999 U.N.T.S. 171. . . . . . . . . . . . . . . 16, 17

Convention on Rights and Duties of States,
Dec. 26, 1933, 49 Stat. 3097. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

1.    Should this Court resist the imposition on its jurisdiction and dismiss this case on the ground of *forum non conveniens* in favor of a Mexican forum, where this Court has no connection with the parties, events, witnesses, and documents at issue; where all the events occurred in Mexico; where virtually all the witnesses and documents are easily accessible in Mexico; where Mexico supplies the law and remedies for the parties; and where a failure to dismiss would violate treaties between the United States and Mexico?

2.    Does Mexican law apply to an alleged maritime tort committed entirely in Mexico on a Mexican ship by Mexican citizens employed by a Mexican company headquartered in Mexico?

## SUMMARY OF THE ARGUMENT

This Court should dismiss this case on the ground of *forum non conveniens* in favor of a Mexican court. The case should be dismissed because this Court is not an appropriate forum in which to conduct the litigation and because the retention of this case would violate treaties between the United States and Mexico.

This Court has no connection with the dispute in this case, and the Plaintiff did not file suit here because of any connection. The doctrine of *forum non conveniens* was developed for just such circumstances. Under that doctrine, a court should dismiss a suit when the court is an inappropriate and inconvenient location for the litigation and when there exists an adequate alternative forum that is more appropriate. None of the events in this case occurred in the Southern District of Texas; and none of the parties, witnesses, or documents are located in the Southern District of Texas or even in the State of Texas. Rather, all of the events occurred in Mexico, the Defendant is a Mexican citizen based in Mexico, and virtually all of the witnesses and documents are in Mexico. A Mexican court is an adequate alternative forum that is more appropriate for the litigation. Moreover, Mexican law should apply to the alleged tort in this case, and a Mexican court is a more appropriate forum for the application of Mexican law. Consequently, this Court should dismiss this case in favor of litigation under Mexican law in a Mexican court.

Finally, a failure to dismiss this case on the ground of *forum non conveniens*, and an application of United States law to this dispute, would violate the terms of

treaties between the United States and Mexico. The United States and Mexico have entered into multiple treaties that provide for the equal treatment of United States citizens and Mexican citizens before the courts of both countries. A number of United States courts, including this Court and the Court of Appeals for the Fifth Circuit, have held that Mexican law should apply to claims brought by Mexican plaintiffs against United States defendants under facts very similar to those in this case, and have dismissed those claims on the ground of *forum non conveniens* in favor of a Mexican forum. In accordance with the treaties between the United States and Mexico, this Court should hold Mexican law applicable to this claim brought by a United States plaintiff against a Mexican defendant, and should dismiss this claim on the ground of *forum non conveniens* in favor of a Mexican court.

## **RESERVATION OF IMMUNITY**

Nothing contained in this brief shall be construed as a waiver of the immunities to which the Government of Mexico is entitled under international law, the Foreign Sovereign Immunities Act, and any treaty. The filing of this brief shall not imply or confer a submission by the Government of Mexico to the jurisdiction of any United States Court.

## ARGUMENT

The Government of the United Mexican States respectfully urges this Court to dismiss the Plaintiff's suit against Perforadora Central, S.A. de C.V. on the basis of *forum non conveniens* and to allow the claim to be properly litigated under Mexican law in a Mexican forum. This case involves claims properly cognizable under Mexican law against a Mexican citizen and business for activities entirely within Mexico, and should, as such, be pursued in a Mexican forum. A federal court sitting in Texas–a state having absolutely no connection with the events made the basis of this suit–is simply an inappropriate forum to litigate this case. Moreover, a failure to dismiss this case, and an application of United States law, would violate the terms of multiple treaties between the United States and Mexico. The Mexican Government therefore respectfully urges this Court to enforce fundamental principles of international comity and relinquish jurisdiction in favor of a Mexican tribunal.

The Government of Mexico is concerned about this case for several reasons. First and foremost, like any other nation Mexico seeks the just and fair treatment of its citizens. Second, Mexico seeks the appropriate respect for its laws, its courts, and its legal system. Third, Mexico seeks to enforce the requirements of the treaties between the United States and Mexico. Fourth, Mexico seeks to avoid the setting of an improper precedent for future cases.

The Mexican Government is concerned that claims against its citizens be brought in appropriate courts. This Court has no connection with the claim in this case. The Plaintiff filed suit here not because this forum has any relationship to, and is convenient for, this claim. It filed suit here because it wanted to sue only in a

United States court, because it hopes to have United States law applied to the claim, and because the Defendant may be subject to jurisdiction in this district. In fact, this is the second time that the Plaintiff has filed suit in an inappropriate forum. The Plaintiff initially filed suit against the Defendant, Perforadora, a Mexican citizen headquartered in Mexico City, in federal district court in Mississippi. As has been acknowledged by all, Mississippi had no connection whatsoever to the events made the basis of the suit. Although Perforadora urged the Mississippi court to dismiss the suit on several grounds, including lack of personal jurisdiction and *forum non conveniens*, the district court proceeded to hear the case and to apply United States law to the local events in Mexico. Because of having to try the case in Mississippi, Perforadora was severely limited as to the live witnesses it could bring in to testify and had to rely principally on a trial by deposition. It is hardly surprising that the result of that case was a sizeable and erroneous judgment against the Defendant--a judgment that was overturned on appeal.

However, instead of properly pursuing its claims under Mexican law in a Mexican forum, the Plaintiff has resorted to yet another inappropriate court. The Plaintiff has filed this suit in Brownsville, Texas, in another court that has absolutely no connection with either the parties, witnesses, exhibits, or events made the basis of the suit. Although the Plaintiff brought suit in Brownsville because it believes it can obtain jurisdiction here, that belief does not override this Court's lack of connection with the people, objects, and events at issue.

It is just these kinds of unfair circumstances that have given rise to the doctrine of *forum non conveniens*. Under that doctrine, a court may "resist

2

imposition upon its jurisdiction" when the court is an inappropriate location for the suit and when the plaintiff seeks a "trial at a most inconvenient place for an adversary, even at some inconvenience to himself." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).

In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981), the Supreme Court explained that a dismissal on *forum non conveniens* grounds "will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." The Court also stated that a dismissal may be warranted where a plaintiff chooses a particular forum to "take advantage of favorable law." *Piper*, 454 U.S. at 249.

The doctrine of *forum non conveniens* is particularly appropriate in international contexts, where issues of choice of law and international comity arise. In *Piper*, the Supreme Court upheld a dismissal on *forum non conveniens* grounds where the plaintiff, like Submersible Systems in the present case, "candidly admit[ted] that the action against [the defendants] was filed in the United States because its laws regarding liability, capacity to sue, and damages [were] more favorable to [the plaintiff's] position than are those of [the foreign country]." Also in that case, the Supreme Court noted that "[t]he doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law. . . . [and] the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'" *Piper*, 454 U.S. at 251.

3

The courts follow a structured inquiry in applying the doctrine of *forum non conveniens*. "At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum." *Piper*, 454 U.S. at 254 n.22. Next, the courts consider a series of factors, some concerning the private interest of the litigant, and some concerning the public interest. The factors particularly relevant to this case are as follows: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) the possibility of view of premises, if view would be appropriate to the action; (4) all other practical problems that make trial of a case easy, expeditious and inexpensive; (5) the local interest in having localized controversies decided at home; and (6) the appropriateness in having the trial of a case in a forum that is at home with the law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself. *Gilbert*, 330 U.S. at 508-09.

The examination of these factors points strongly to a Mexican forum, the application of Mexican law, and dismissal of this case. Numerous courts have applied these factors to situations very much like this one, and have dismissed those suits on the grounds of *forum non conveniens*. *See, e.g., Bilyk v. Vessel Nair*, 754 F.2d 1541 (9th Cir. 1985)(affirming a dismissal on *forum non conveniens* grounds where a U.S. citizen brought suit for injuries on a Mexican-flagged vessel owned by a Mexican corporation and fishing only in Mexican waters and on the high seas);

4

*Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. 1980)(en banc)(affirming a dismissal on *forum non conveniens* grounds where a U.S. corporation brought suit against a Liberian corporation for a maritime tort of property damage in Trinidad); *Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*, 556 F.2d 975, 978 (9th Cir. 1977)(affirming a dismissal on *forum non conveniens* grounds where a U.S. corporation brought an action for events arising in Mexico). The court of appeals in *Mizokami* made the following pertinent observation:

> The plaintiff falls back on its United States citizenship as the sole and only possible basis for suing these defendants in a court of the United States. This is not enough. In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere.

556 F.2d at 978.

## Mexico Provides an Adequate, Alternative Forum

The Government of Mexico first assures this Court that the Mexican courts provide an adequate, alternative forum for the Plaintiff's claims. A Mexican court and Mexican law are fully capable of handling this claim for damages based on an alleged tort in Mexican sovereign territory. In fact, the Plaintiff has admitted as much, conceding in its Response to the Motion to Dismiss that the "Mexican courts are legally available fora, which allow adequate remedies, generally." (Plaintiff's Response, pp. 13-14). The Plaintiff also concedes that if Mexican law applies, Mexican law would provide a legally adequate remedy. (Plaintiff's Response, p. 14).

5

The United States Supreme Court has specifically held that whether there exists an alternative forum is ordinarily satisfied "when the defendant is 'amenable to process' in the other jurisdiction." *Piper*, 454 U.S. at 254 n.22. That the law in the alternative forum may provide a different remedy is irrelevant, unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper*, 454 U.S. at 254. Both parties to this action acknowledge that Perforadora is amenable to process in Mexico. The Plaintiff has also admitted that Mexico does provide a remedy for its claims. Moreover, the courts have overwhelmingly acknowledged that Mexico is an adequate, available alternative forum. *See, e.g., Gonzalez v. Chrysler Corp.*, 301 F.3d 377 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 1928 (2003); *Seguros Comercial Americas S.A. de C.V. v. American President Lines, Ltd.*, 933 F. Supp. 1301 (S.D. Tex. 1996); *Taylor v. Daimler Chrysler Corp.*, 196 F. Supp. 2d 428 (E.D. Tex. 2001).

Unable to deny the adequacy of a Mexican forum, the Plaintiff has resorted to considerations that have nothing to do with whether the Mexican forum provides a remedy. The Plaintiff argues, for example, that recourse to a Mexican forum would cause an economic hardship. Because this argument more properly concerns the private and public interest factors, we will address it below.

**Mexico Provides Easy Access to the Sources of Proof**

With all due respect, the United States District Court for the Southern District of Texas in Brownsville has no relationship whatsoever with the claims in this suit

6

and does not provide easy or appropriate access to the sources of proof. Neither the Plaintiff nor the Defendant nor the witnesses nor the exhibits are located anywhere near this Court. In contrast, a Mexican forum would have easy access to the sources of proof. The Defendant is a Mexican corporation with its headquarters in Mexico. All the events made the basis of this suit occurred in Mexico. All but three or four witnesses are Mexican citizens residing in Mexico, and most of the original documents are in Spanish and located in Mexico.

## Mexico Provides Easy Availability of Live Testimony

Since the State of Texas and this Court have no connection with the events made the basis of this dispute, with the witnesses, or with the exhibits, this Court is not in a position to compel the attendance of unwilling witnesses, and both the Plaintiff and the Defendant would have to incur substantial costs to transport witnesses and documents to this Court for any live testimony. By contrast, it is undisputed that Mexico has the power to compel the attendance of virtually all the witnesses in this case. Almost all of the witnesses are Mexican citizens located in Mexico and speak Spanish as their native language. Moreover, it is more cost effective to present the Mexican witnesses live in a Mexican court than to present them live in this Court in Texas. Although this Court is certainly capable of accommodating testimony in Spanish, we believe a Mexican tribunal is still the more appropriate court for such testimony. Mexican proceedings are conducted in Spanish and there would be no necessity for official translation of the testimony.

7

The translation process, by its nature, distances the witness from the testimony, and some aspect of the testimony is always "lost in translation."  The Plaintiff has repeatedly urged a trial by deposition like the trial it managed to obtain in the improper forum of the Mississippi district court. However, the United States Supreme Court has long disapproved of the notion of trial by deposition:

> Certainly, to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants. Nor is it necessarily cured by the statement of plaintiff's counsel that he will see to getting many of the witnesses to the trial and that some of them 'would be delighted to come to [the inconvenient forum] to testify.'

*Gilbert*, 330 U.S. at 511.

### This Court's Resources Should Not Be Used, and the Plaintiff Will Not Suffer Significant Hardship in Mexico

This Court should not expend its valuable resources adjudicating a dispute that has no connection with this forum or this State. This case will require significant amounts of the Court's time, participation of the Court's personnel, and administrative costs, none of which are warranted since this Court is not the appropriate forum.

The Plaintiff complains that even though this Court is inappropriate, the Plaintiff would suffer economic hardships litigating in Mexico. However, this argument is without merit. The Plaintiff argues that it is more economical to litigate this case in Brownsville, Texas than in Mexico. However, as none of the events,

8

witnesses, or exhibits are located in Brownsville, or Texas for that matter, it is difficult to see how the expenses of lost time and the costs of transporting witnesses and documents from Louisiana to Brownsville and from Mexico to Brownsville would be significantly greater than the expenditures of time and costs of transporting witnesses and documents from Louisiana to Mexico and within Mexico itself.

The Plaintiff also argues that because there was already a trial of this case with a number of attendant depositions and the translation of some documents, it is more economical to use these materials. However, it seems inappropriate for the Plaintiff to suggest that because the Plaintiff forced a trial at one improper and inconvenient forum, the Plaintiff can now use the products of that inappropriate action to force litigation in another inappropriate forum and to foreclose litigation in the proper forum. In any case, that some depositions were taken and some documents were translated into English does not warrant the retention of this case. As mentioned above, the courts prefer trial by live testimony in the native language if possible. Moreover, the legal preparation already done in this case would still be quite useful to the Plaintiff in a Mexican forum. The deposition testimony would still be available for the Mexican litigation. There would also be no need to retranslate the documents previously translated since a Mexican court would utilize the original Spanish documents or copies of them. Furthermore, as Perforadora has pointed out, there are still many important documents that have not yet been translated from Spanish to English, and would not need to be so translated if the litigation proceeded in the Mexican forum.

9

Finally, the Plaintiff is certainly capable of utilizing Mexican law and a Mexican tribunal. The Plaintiff has previously hired counsel in Mexico, has traveled to Mexico, and has participated in the Mexican proceedings before the Ministerio Publico. In fact, the Plaintiff could long ago have avoided any *forum non conveniens* issues by simply pursuing this claim in the correct forum, before a Mexican court. Furthermore, a company like Submersible Systems that seeks work in Mexico, that engages in work in Mexico, that transports people and property to Mexico, and that interacts with Mexican companies and Mexican citizens in Mexico should and can reasonably expect the possibility of litigation under Mexican law before a Mexican tribunal.

**Mexico Has a Local Interest in the Controversy**

On the one hand, this Court in Brownsville, Texas, has no local interest in this dispute. The events made the basis of this case, and the people involved in those events, have no connection with Brownsville or the entire State of Texas. On the other hand, the Government of Mexico has a substantial local interest in having this localized controversy decided in Mexico. This case arises out of work performed exclusively in Mexico and involves a claim for an alleged tort that occurred either on a Mexican ship in Mexican territorial waters or on Mexican soil by Mexican employees of a Mexican corporation headquartered in Mexico. Moreover, the Defendant turned over the disputed property to a Mexican public official, the Ministerio Publico, who then took legal possession of the property. The resolution of the dispute in this case will require a court to assess the procedures and actions of the Mexican governmental agency. The Government of Mexico has a keen

10

interest in the actions of its public officials and in having its courts and its laws applied in the resolution of alleged torts committed by its citizens in its own sovereign territory, and the Mexican Government respectfully urges this Court to give proper effect to the policy of international comity.

**Mexican Law Should Govern this Dispute, and a**
**Mexican Forum is Intimately Familiar with that Law**

The Government of Mexico believes that Mexican law should govern the events in this case, given the overwhelming connections of this case with Mexico. Moreover, while this Court is certainly capable of applying Mexican law, a Mexican court is the more appropriate forum for applying Mexican law since it is more familiar and more at home with the applicable Mexican rights and remedies.

As with the *forum non conveniens* analysis, the United States Supreme Court has established the methodology for determining the appropriate choice of law for a maritime tort having international connections. In *Lauritzen v. Larsen*, 345 U.S. 571 (1953), and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970), the Supreme Court set out the several factors that should be considered in determining choice of law: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the adequacy of the foreign law; and (7) the shipowner's base of operations. Although the Supreme Court in *Lauritzen* also discussed the law of the forum–that is, United States law–the court concluded that the law of the forum court is essentially irrelevant in a maritime tort case.

11

All of these factors, with the lone exception of the Plaintiff's domicile, favor Mexican law. The alleged tort occurred either on a Mexican ship in Mexican waters or in Mexican territory. The vessel flew a Mexican flag and was manned by Mexican citizens. Because the flag of a vessel evidences the jurisdiction over the vessel, a ship is "deemed to be a part of the territory of that sovereignty (whose flag it flies)." *Lauritzen*, 345 U.S. at 585. The shipowner is a Mexican corporation headquartered in Mexico. No contract is at issue, although Perforadora contracted with Quantum Ingenieros, another Mexican corporation, in Mexico for the use of the vessel at issue, and it is the requirements of that contract which gave rise to the dispute in this case. Mexican law has already been seen to be adequate and available. Finally, the shipowner's base of operations is in Mexico City, Mexico.

Under very similar facts, numerous courts have applied Mexican or other foreign law to the controversy. *See, e.g., Bilyk v. Vessel Nair*, 754 F.2d 1541 (9th Cir. 1985)(holding Mexican law applicable to a U.S. citizen's maritime tort claims and affirming dismissal on grounds of failure to state a cause of action and *forum non conveniens*); *Fogleman v. ARAMCO,* 920 F.2d 278 (5th Cir. 1991)(holding Saudi Arabian law applicable to a U.S. citizen's claims and affirming a dismissal of those claims against foreign defendants); *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F. Supp. 543, 555 (E.D. Va. 1996)(holding Mexican law applicable to a U.S. citizen's claims and dismissing on *forum non conveniens grounds*); *Feinstein v. Curtain Bluff Resort*, No. 96 Civ. 8860, 1998 WL 458060, *6 (S.D.N.Y. Aug. 5, 1998)(noting the application of Antiguan law to a U.S. resident's claims and dismissing on the grounds of *forum non conveniens*)(*see* Appendix 1).

In the face of the overwhelming connections with Mexico, the Plaintiff raises three arguments for the application of United States maritime law to this dispute, each of which should be rejected. The first argument is that this Court has admiralty jurisdiction over the suit and, as a result, United States maritime law must necessarily be applied. This argument, to which the Plaintiff (appropriately) devotes just two sentences, is baseless. Neither of the two cases cited by the Plaintiff supports this argument. If the Plaintiff's argument were true, then a United States court having admiralty jurisdiction would never need to conduct any choice of law analysis: United States maritime law would always apply. Such a result would directly contravene the pronouncements of the Supreme Court in *Lauritzen* and *Rhoditis* and the pronouncements of the many lower courts. Such a result would also defy all considerations of international comity, and would embody an insular judicial policy.

The Plaintiff's second argument is perplexing at best, unintelligible at worst. First, the Plaintiff disingenuously asserts that "there is no dispute between Mexican and U.S. law relating to conversion." (Plaintiff's Response to Motion to Dismiss on Ground of Forum Non Conveniens, p. 21). This assertion is erroneous and belied by admissions within the Plaintiff's own Response brief. On page 9 of the Response, the Plaintiff itself points out some of the conflicts between Mexican law and United States law concerning an action of conversion, though refraining from "a detailed discussion of the differences between U.S. and Mexican law."

13

Next, the Plaintiff argues that since there is no conflict between Mexican and United States law, this Court "need not apply any choice of law analysis to determine which law to apply." (Plaintiff's Response, p. 21). As support for this frankly unusual argument--an argument not found in the *forum non conveniens* case law--the Plaintiff cites a single case, *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993). However, that case is factually and legally inapplicable to the circumstances of this case. The principal issue in that case was whether the district court should have declined to exercise jurisdiction under a federal statute, the Sherman Anti-Trust Act. The Supreme Court saw no reason why it should, since Congress expressly intended the Sherman Anti-Trust Act to apply to certain foreign conduct.

However, this result has no bearing on the present case. In this case, there is no Congressional statute mandating the application of United States maritime tort law to events in Mexican sovereign territory. On the contrary, the Supreme Court and the lower courts have uniformly held that in the interests of international comity, United States courts must choose between conflicting international laws in a maritime tort setting. *See, e. g., Lauritzen*, 345 U.S. at 581-583.

For its third argument, the Plaintiff contends that even if the *Lauritzen-Rhoditis* analysis is employed, that analysis results in the application of United States law. Distilled, the Plaintiff's argument is that United States law should be applied because the Plaintiff is a United States corporation and has chosen to file its lawsuit in a United States court. The Plaintiff largely dismisses all the other *Lauritzen-Rhoditis* factors.

14

However, the case law cited by the Plaintiff does not support this argument. None of the cases involved facts like those in the present case. And none of those cases held that United States law should be applied when the only connections with the United States were the residence of the Plaintiff and its choice of a United States court. For instance, the Plaintiff relies on *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464, 467 (5th Cir. 1966). In *Symonette*, not only were the plaintiffs United States citizens, but the ship's articles were signed in the United States, the contract governing the work in which the injured workers were engaged at the time of their injuries was made in the United States, and the two plaintiffs were part of a crew hired and assembled by a United States businessman. *Id.* at 466-67. Moreover, in that case, the court of appeals approved the district court's application of United States law because the evidence of the proposed foreign law, that of the Bahamas, was "vague and indefinite" and because at trial the defendant "had failed to prove the pertinent principles of Bahamian law." *Id.* at 468 & n.5.

In contrast, as discussed above, a number of cases have held that under facts very similar to those in this case, Mexican or foreign law should be applied, not United States law. *See, e.g., Bilyk v. Vessel Nair*, 754 F.2d 1541 (9th Cir. 1985); *Fogleman v. ARAMCO*, 920 F.2d 278 (5th Cir. 1991); *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F. Supp. 543, 555 (E.D. Va. 1996); *Feinstein v. Curtain Bluff Resort*, No. 96 Civ. 8860, 1998 WL 458060, *6 (S.D.N.Y. Aug. 5, 1998)(*see* Appendix 1).

15

Plaintiff's arguments seeking the exportation of American law to events transpiring in Mexico are an affront to the sovereignty of the Government of Mexico. These arguments presume "that the 'liberal purposes' of American law must be exported to wherever [American] corporations are permitted to do business." *DeMateos v. Texaco, Inc.*, 562 F.2d 895, 902 (3d Cir. 1977).

### Failure to Dismiss for *Forum Non Conveniens*, and Application of United States Law, Would Violate Treaty Provisions

The Government of Mexico is also concerned and feels compelled to point out that failure to dismiss this action on the ground of *forum non conveniens*, and application of United States law to this case, would violate the terms and provisions of treaties between Mexico and the United States.

Multiple treaties between the Government of Mexico and the United States contemplate that Mexican nationals and United States citizens will receive equal treatment under the laws and legal systems of both countries. For instance, the International Covenant on Civil and Political Rights contains the following relevant provisions:

> Article 2. 1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.
>
> Article 14. 1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and

16

public hearing by a competent, independent and impartial tribunal
established by law.

Article 26. All persons are equal before the law and are entitled without
any discrimination to the equal protection of the law. In this respect, the
law shall prohibit any discrimination and guarantee to all persons equal
and effective protection against discrimination on any ground such as
race, colour, sex, language, religion, political or other opinion, national
or social origin, property, birth or other status.

International Covenant on Civil and Political Rights, *opened for signature* Dec. 19,

1966, 999 U.N.T.S. 171 (*see* Appendix 2).

Another treaty between the United States and Mexico, the Convention of

Rights and Duties of States, contains a similar provision:

Article 9. The jurisdiction of states within the limits of national territory
applies to all the inhabitants.

Nationals and foreigners are under the same protection of the law and
the national authorities and the foreigners may not claim rights other or
more extensive than those of the nationals.

Convention on Rights and Duties of States, Dec. 26, 1933, 49 Stat. 3097 (*see*

Appendix 3).

Thus, before United States courts, United States nationals and Mexican

nationals are, by treaty, to be accorded equal treatment. *See Ford Motor Co. v.*

*Aguiniga*, 9 S.W.3d 252, 261-62 (Tex. App.–San Antonio 1999, no pet.)(holding that

such treaty provisions confer reciprocal access to the courts of justice in both the

United States and Mexico). And, in fact, United States courts have applied this

result in the *forum non conveniens* context. The courts have held that similar treaty

provisions require that United States nationals and foreign nationals be treated

17

equally for purposes of determining whether a dismissal for *forum non conveniens* is appropriate. *See, e.g., Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880, 882 (2d Cir. 1978)("We feel constrained to comment, however, on statements in the judge's opinion to the effect that a foreign plaintiff's 'right to sue in the United States is clearly of a lesser magnitude than that of an American citizen.' Whatever the merits of that proposition generally . . . we think it has no application where, as here, a treaty between the United States and the foreign plaintiff's country allows nationals of both countries access to each country's courts on terms no less favorable than those applicable to nationals of the court's country."); *Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 152-53 (2d Cir. 1980)(en banc). In other words, United States citizens should not be favored over Mexican nationals in the *forum non conveniens* analysis.

In numerous cases in which Mexican nationals have sued United States citizens for torts and other events that occurred entirely in Mexico, United States courts have held Mexican law applicable and have dismissed those claims on the basis of *forum non conveniens*, in favor of a Mexican forum. A number of such cases have been decided by the Fifth Circuit, this District Court, and other federal district courts of Texas. For example, in *Gonzalez v. Chrysler Corp.*, 301 F.3d 377 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 1928 (2003), a Mexican citizen filed suit against United States corporations for manufacturing and designing an air bag that caused a death in a traffic accident in Mexico. As in the present case, the plaintiff chose to file his suit in Texas, which had "a tenuous connection to the underlying dispute." *Id.*

18

at 379. The Fifth Circuit Court of Appeals affirmed Judge Tagle's dismissal on the grounds of *forum non conveniens*, specifically holding that Mexican law was adequate and that a Mexican forum was an available alternative forum. *See also Seguros Comercial Americas S.A. de C.V. v. American President Lines, Ltd.*, 933 F. Supp. 1301 (S.D. Tex. 1996); *Taylor v. Daimler Chrysler Corp.*, 196 F. Supp. 2d 428 (E.D. Tex. 2001).

A failure to dismiss the present suit brought by a United States citizen against a Mexican corporation for an alleged tort occurring entirely in Mexico, and a failure to apply Mexican law to the claim, would reflect discriminatory, unequal treatment of United States and Mexican citizens, and would violate the express terms and spirit of the treaties between the United States and Mexico.

## CONCLUSION

Mexico lies at the heart of this dispute. The Plaintiff sought out and undertook work in Mexico. The Plaintiff alleges that in connection with that work, Mexican citizens employed by a Mexican company converted its property either on a Mexican vessel in Mexican waters, or on Mexican soil. That property was subsequently turned over to a Mexican governmental official for appropriate disposition. All the operative events occurred in Mexico, and almost all the witnesses and documents are in Mexico. As a result, Mexico has a substantial interest in the resolution of this dispute. It has an interest in seeing that its citizens are treated fairly and that its laws, and its public policies underlying those laws, are applied in the appropriate courts to resolve such claims against its citizens.

19

Despite these intimate connections with Mexico, the Plaintiff seeks to litigate this claim in courts that have no relationship to the parties, events, witnesses, or documents involved. Furthermore, the Plaintiff seeks to have United States law, rather than the proper Mexican law, applied to the dispute.

Faced with these circumstances, the Government of Mexico respectfully asks this Court to honor concerns of international comity and to accord appropriate regard for the ability of Mexico's laws, courts, and legal system to accommodate this dispute. The Government of Mexico therefore respectfully urges this Court to apply the doctrine of *forum non conveniens* and dismiss this case in favor of litigation under Mexican law in a Mexican forum.

Respectfully submitted,

Kenneth G. Engerrand
Attorney-in-charge
Texas State Bar No. 06619500
Southern District of Texas Bar No. 2078
Michael A. Varner
Texas State Bar No. 20499425
Southern District of Texas Bar No. 15111
1177 West Loop South, Tenth Floor
Houston, Texas 77027-9007
OF COUNSEL:                           (713) 629-1580
BROWN SIMS, P.C.                      (713) 629-5027 (facsimile)

ATTORNEYS FOR THE GOVERNMENT
OF THE UNITED MEXICAN STATES,
AMICUS CURIAE

## CERTIFICATE OF SERVICE

I certify that on June 11th, 2003, an accurate copy of The Government of Mexico's Amicus Curiae Brief was served on the following counsel by certified mail, return receipt requested:

Michael H. Bagot, Jr.              Richard A. Stanford
Thomas A. Rayer, Jr.               Stanford Law Firm
Wagner & Bagot, L.L.P.             P.O. Box 42430
Poydras Center, Suite 2660         Houston, Texas 77242-2430
650 Poydras Street
New Orleans, Louisiana 70130-6105

Keith N. Uhles
Royston, Rayzor, Vickery & Williams, L.L.P.
P.O. Box 3509
Brownsville, Texas 78523-3509

Benjamin O. Schupp
Sergio J. Alarcon
Milling Benson Woodward L.L.P.
909 Poydras Street, Suite 2300
New Orleans, Louisiana 70112-1010

Michael A. Varner

21

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-03-020 |
| | § | |
| PERFORADORA CENTRAL, | § | RULE 9(h) ADMIRALTY |
| S.A. de C.V., | § | |
| | § | |
| Defendant, | § | |

## APPENDIX TO THE GOVERNMENT OF
## MEXICO'S AMICUS CURIAE BRIEF

**Appendices**

1    *Feinstein v. Curtain Bluff Resort*, No. 96 Civ. 8860, 1998 WL 458060
     (S.D.N.Y. Aug. 5, 1998).

2    International Covenant on Civil and Political Rights, *opened for signature* Dec.
     19, 1966, 999 U.N.T.S. 171.

3    Convention on Rights and Duties of States, Dec. 26, 1933, 49 Stat. 3097.

1998 WL 458060                                                               Page 1
(Cite as: 1998 WL 458060 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.


United States District Court, S.D. New York.

Peter A. FEINSTEIN and Jane B. Feinstein,
Plaintiffs,
v.
CURTAIN BLUFF RESORT a/k/a Curtain Bluff
Hotel, a/k/a Curtain Bluff Antigua,
a/k/a Curtain Bluff, a/k/a Curtain Bluff Antigua,
West Indies, A Resort Hotel,
Defendant.

**No. 96 Civ. 8860(RPP).**

Aug. 5, 1998.

Gair, Gair, Conason, Steigman & Mackauf, New
York, NY, By: Howard S. Hershenhorn, for
Plaintiffs.

Traub Eglin Lieberman Straus, Mid-Westchester
Executive Park, Hawthorne, NY, By: Stephen D.
Straus, for Defendant.


OPINION AND ORDER

PATTERSON, J.

*1 Defendant, Curtain Bluff Resort ("Curtain
Bluff" or the "Hotel"), brings this renewed motion
to dismiss plaintiffs' complaint on the grounds of:
(1) lack of in personam jurisdiction; and (2) forum
non conveniens. For the reasons set forth below,
defendant's renewed motion to dismiss based on
lack of in personam jurisdiction is denied, and
defendant's motion to dismiss based on forum non
conveniens is granted.

Background

Plaintiffs, Peter A. Feinstein ("Feinstein") and his
wife, Jane B. Feinstein, who are residents of
Pennsylvania, bring this action for negligence, strict
liability, breach of warranty, and breach of the Sale
of Goods Act of Antigua, as well as loss of
consortium, against Curtain Bluff, a hotel in
Antigua, West Indies. They allege that Dr. Feinstein
suffered ciguatera poisoning after eating certain fish

meals while at Curtain Bluff in January 1994.
(Compl.¶ 32.) [FN1] Feinstein seeks resultant
damages and his wife sues for loss of consortium.
On January 27, 1997, Curtain Bluff moved to
dismiss the complaint, arguing both that the Hotel is
not subject to in personam jurisdiction in this Court
and that the doctrine of forum non conveniens
mandates dismissal. (Hershenhorn Aff. ¶¶ 4, 5).
[FN2] Plaintiffs opposed the motion and cross-
moved for discovery pursuant to Federal Rules of
Civil Procedure 12(c) and 56(f). By Opinion and
Order of July 28, 1997, the Court found that there
was no personal jurisdiction under Section 302 of
the New York Civil Practice Law and Rules
("N.Y.C.P.L.R."), but allowed discovery on the
existence of personal jurisdiction under Section
301. Following the issuance of the opinion, both
parties completed discovery on the issue of Curtain
Bluff's contacts with New York, and, upon
application of defendant, on Feinstein's alleged
inability to travel by air. Curtain Bluff, thereafter,
filed this motion to renew its prior motion to
dismiss plaintiffs' complaint based on a lack of
personal jurisdiction and on the grounds of forum
non conveniens.


FN1. The complaint is attached as Exhibit
A to the Affidavit of Stephen D. Straus
("Straus Aff."), dated January 27, 1998.


FN2. "Hershenhorn Aff." refers to the
Affidavit of Howard S. Hershenhorn
attached to Plaintiffs' Affidavit in
Opposition to Defendant's Renewed
Motion to Dismiss, dated March 6, 1998.


Having gone through discovery, plaintiffs state that
they now have facts to prove that defendant's
independent agent, Ruth Herd, is actually a
representative for the defendant in New York whose
activities on behalf of defendant are sufficient for
this Court to exercise jurisdiction over the
defendant. Defendant takes issue and states that Dr.
Feinstein's prior affidavit on this action was
materially misleading concerning his inability to
travel by air.

Discussion
A. *Personal Jurisdiction*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# APPENDIX 1

1998 WL 458060
(Cite as: 1998 WL 458060 (S.D.N.Y.))

Page 2

Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits. *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc); *Pilates Inc. v. Pilates Inst., Inc.*, 891 F.Supp. 175, 179 (S.D.N.Y.1995); *Gordon v. Long Bay Ltd.*, No. 94 Civ. 2141, 1995 WL 489474, at *1 (S.D.N.Y. Aug. 16, 1995). "Where the jurisdictional issue is in dispute, the plaintiff's averment of jurisdictional facts will normally be met in one of three ways: (1) by a Rule 12(b)(2) motion, which assumes the truth of plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990). Where the parties have conducted discovery with respect to defendant's contacts with the forum state, but no evidentiary hearing has been requested, as in the instant case, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited [by the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Id.* at 197. After discovery has been conducted, plaintiffs have the burden of proving the existence of personal jurisdiction by a preponderance of the evidence, but all pleadings and affidavits must be construed in their favor. *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir.1990).

*2 To determine whether a defendant is "doing business" in New York under N.Y. C.P.L.R. 301, a court must find that the non-domiciliary defendant is " 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of its "presence" in this jurisdiction." ' *McGowan v. Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981) (quoting *Simonson v. International Bank*, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427 (1964)); *see Landoil Resources*, 918 F.2d at 1043; *Terris-Feldman v. Dan Hotels of Israel*, No. 95 Civ. 9666, 1997 WL 109441, at *2 (S.D.N.Y. Mar. 11, 1997); *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692 (1982). [FN3] Under this doctrine, several factors must be examined in

making a determination that a defendant is doing business, including the existence of an office in the jurisdiction, the solicitation of business here, the presence of bank accounts or other property, the presence of employees or agents, whether the defendant has a telephone listing, whether the defendant has any records in the state, and the extent and volume of the defendant's sales in the state. *See Landoil Resources*, 918 F.2d at 1043; *Terris-Feldman*, 1997 WL 109441, at *2; *Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1044 (S.D.N.Y.1987). Although mere solicitation of business is insufficient to support a finding of personal jurisdiction, "once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business." ' *Landoil Resources Corp.*, 918 F.2d at 1044 (quoting *Aquascutum of London, Inc. v. S.S. Am. Champion*, 426 F.2d 205, 211 (2d Cir.1970)); *see Darby v. Compagnie Nationale Air France*, 769 F.Supp. 1255, 1260 (S.D.N.Y.1991).

> FN3. The plaintiffs' cause of action need not emanate from or have any nexus to the defendant's business activity within the state. *See McGowan*, 437 N.Y.S.2d at 645, 419 N.E.2d 321.

Here the defendant is either doing business in this jurisdiction through its own activities or through the activities of its representative, Ruth Herd. Defendant contends that it does not have an "office" in New York, that Ruth Herd is an independent contractor for its advertising agency, International Advertisers Limited ("IAL"), not an employee, and that Ms. Herd works out of her own apartment and not an "office" that belongs to Curtain Bluff. However, Ruth Herd's name, telephone number, and address, namely 68 East 93rd Street, all have appeared on Curtain Bluff stationary as Curtain Bluff's "New York Office." (Hershenhorn. Aff ., Exs. E, F, G). [FN4] Curtain Bluff has also maintained a bank account and a listing in the New York telephone directory, both of which Curtain Bluff changed only after this litigation began. (*Id.*, Ex. B at 12-14, Ex. D at 22-23, 26). [FN5] Moreover, Ms. Herd was reimbursed by Curtain Bluff for all her expenses and supplies which were necessary to do her work. (*Id.*, Ex. D at 116-118, 293). [FN6]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FN4. Exhibit E consists of a flyer listing Ruth Herd's address as the New York office of Curtain Bluff and also her name and telephone number as a contact person for the hotel, a copy of Curtain Bluff letterhead, which lists Ruth Herd's name, address and phone number, and a copy of a Curtain Bluff envelope listing Ruth Herd's address as the return address. Exhibit F is a Curtain Bluff newsletter which lists Ruth Herd's address and telephone number as a contact for Curtain Bluff in the United States. Exhibit G is a Curtain Bluff brochure that lists Ruth Herd as Curtain Bluff's "New York Representative."

FN5. Exhibit B is an excerpt from the deposition of Robert Sherman, Managing Director at Curtain Bluff. Exhibit D is an excerpt from the deposition of Ruth Herd.

FN6. While Herd submitted all bills for her expenses directly to Curtain Bluff, her reimbursement checks came from IAL, a separate corporate entity. The directors of IAL, however, are also directors of Curtain Bluff. (Hershenhorn Aff., Ex. C at 6-7; Ex. D at 293). However, Curtain Bluff deposits the funds into the IAL bank account that pays Ruth Herd her salary and expenses. ( *Id.,* Ex. C at 23-24). Exhibit C is an excerpt from the deposition of Calvert Roberts, the Hotel's General Manager.

Thus, many of the traditional indicia of doing business are present in this case. Curtain Bluff held itself out as having a New York office, solicited business in New York, had a bank account and a telephone listing here, and utilized the services of a representative located in this jurisdiction. *See Landoil Resources,* 918 F.2d at 1043 (listing factors); *Rolls-Royce,* 657 F.Supp. at 1044 (same). These factors are sufficient to support a finding of jurisdiction over Curtain Bluff.

*3 Even were these activities insufficient to find that Curtain Bluff is doing business is New York, jurisdiction is proper because of the in-state activities of Curtain Bluff's New York representative, Ruth Herd. The critical case which

determined whether an agency relationship existed for the purposes of asserting jurisdiction over an agent's principal is *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967). According to the rule developed in *Frummer* and its progeny, if a foreign corporation has an "agent" performing substantial activities in the state for the benefit of the foreign corporation, acts which are so essential to the foreign corporation that if the agent did not perform them, the foreign corporation would have to, then the foreign corporation is doing business in the state. *See Terris-Feldman,* 1997 WL 109441, at *3; *Darby,* 769 F.Supp. at 1259-60; *Frummer,* 281 N.Y.S.2d at 44, 227 N.E.2d 851.

In the present case, Ruth Herd conducted certain activities with the consent of and for the benefit of Curtain Bluff as acknowledged by one of the hotel's owners, Howard Hulford, and by Ms. Herd herself. (Hershenhorn. Aff. ¶ 14; Ex. D. at 111, 132; Ex. H at 90) . [FN7] Moreover, her acts were so essential to the Hotel, that if she had not performed them the Hotel would have had to perform them here in view of the erratic telephone communications with the hotel due to its relatively isolated location. She arranged bookings with Curtain Bluff for hotel guests, [FN8] took deposits from guests, had authority to endorse checks and deposit them into Curtain Bluff's bank account in New York, (*id.,* Ex. D at 16, 18, 54, 56, 100-01, 213-16), received mail for the Hotel, (*id.* at 36, 37), and was responsible for public and press relations for the Hotel including editing and mailing brochures (*id.* at 88-93). Ms. Herd not only arranged for reservations for Curtain Bluff, but solicited business for the Hotel by insuring that it was written about and photographed for major magazines. (*Id.*). She also kept a list of 170 publications and freelance writers to whom she would send press releases. (*Id.*).

FN7. Exhibit H is an excerpt from the deposition of Howard Hulford, a director of IAL and one of the owners of Curtain Bluff.

FN8. Robert Sherman, Managing Director of Curtain Bluff, estimated that approximately 20% to 30% of the hotel's guests booked their reservation through Ruth Herd in 1996. (Hershenhorn Aff., Ex.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 458060                                                                                     Page 4
(Cite as: 1998 WL 458060 (S.D.N.Y.))

B at 22).

Plaintiffs contend that while Ruth Herd may not
have had the contractual ability to confirm
reservations, she had the practical ability to confirm
reservations, and that this practical ability is
sufficient to establish personal jurisdiction. (*Id.* ¶
19). Availability of a room was communicated via
telephone or fax by the Hotel to Ruth Herd;
confirmation of a reservation was then
communicated to Ruth Herd to the guest. (*Id.*, Ex.
D at 100-101, 213-16).

Defendants argue that Ms. Herd lacked the power
to confirm reservations, and, as such, she was not an
agent of the Hotel within New York. *Cf. Gelfand v.
Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d
Cir.1967). However, courts have ruled that a
representative's power to confirm reservations is not
a sine qua non in gaining jurisdiction over a foreign
company. *See Jayne v. Royal Jordanian Airlines
Corp.,* 502 F.Supp. 848, 857-59 (S.D.N.Y.1980). In
*Jayne,* the court ruled that confirmation of
reservations was not the only way to satisfy
*Frummer'* s requirement that the New York
representative engage in all the activities that the
foreign entity could do here by its own officials. *See
id.* at 856-59 (agent's solicitation plus significant
other activity on behalf of defendant afforded
jurisdiction).

**\*4** Considering both defendant's and plaintiffs'
arguments and reviewing all the facts and
circumstances set forth above, the activities of Ruth
Herd in New York are sufficient to establish
jurisdiction over defendant in New York under
N.Y. C.P.L.R. 301. Lastly, Curtain Bluff has
purposefully availed itself of the benefits of New
York by its activities within the state and by holding
out its New York representative as an extension of
itself, and even took steps immediately after the
institution of this suit to curtail those activities.
Thus, defendant should not be surprised that it is
subject to suit here. Curtain Bluff has minimum
contacts with New York "such that the maintenance
of the suit does not offend 'traditional notions of fair
play and substantial justice." ' *International Shoe
Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct.
154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,*
311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278
(1940)); *see World-Wide Volkswagen Corp. v.
Woodson,* 444 U.S. 286, 297 (1980). Thus, the

exercise of jurisdiction over Curtain Bluff comports
with the constitutional requirements of due process.

*B. Forum Non Conveniens*

The forum non conveniens doctrine permits a court
to "resist imposition upon its jurisdiction," *Gulf Oil
Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839,
91 L.Ed. 1055 (1947), if dismissal would " 'best
serve the convenience of the parties and the ends of
justice." ' *Murray v. British Broadcasting Corp.,*
906 F.Supp. 858, 861 (S.D.N.Y.1995) (quoting
*Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S.
518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)), *aff'd,*
81 F.3d 287 (1996); *Gilbert,* 330 U.S. at 507. A
determination pursuant to the doctrine of forum non
conveniens rests in the sound discretion of the
district court. *See Piper Aircraft Co. v. Reyno,* 454
U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419
(1981); *Blanco v. Banco Industrial de Venezuela,
S.A.* 997 F.2d 974, 978 (2d Cir.1993). Although a
"plaintiff's choice of forum should rarely be
disturbed," *Reyno,* 454 U.S. at 241, it may be if the
balance of factors weighs strongly in the defendant's
favor. *See Gilbert,* 330 U.S. at 508. "[T]he balance
must be even stronger when the plaintiff is an
American citizen and the alternative forum is a
foreign one." *Olympic Corp. v. Societe Generale,*
462 F.2d 376, 378 (2d Cir.1972); *see Nationsbank
of Florida v. Banco Exterior de Espana,* 867
F.Supp. 167, 170 (S.D.N.Y.1994). [FN9]

> FN9. This consideration would seem to
> apply although it appears that plaintiffs
> have chosen this forum because the statute
> of limitations had run on their claims if
> brought in Pennsylvania, the state of their
> residence. (Defendant's Memorandum in
> Support of Renewed Motion to Dismiss
> ("Def.Mem."), dated January 27, 1998, at
> 20.)

Before the Court may consider dismissing a case
pursuant to the doctrine of forum non conveniens, it
must determine whether there exists an adequate
alternative forum. *See Gilbert,* 330 U.S. at 506-07;
*Blanco,* 997 F.2d at 980. Then, the Court must
weigh the private interests of the litigants and the
public interests of the forum. *See Reyno,* 454 U.S.
at 241. The private interests of the litigants that are
considered in a forum non conveniens analysis are:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

"relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses ... and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained." *Gilbert,* 330 U.S. at 508. The public interests to be considered include congestion in the courts, local relation to the controversy, and the imposition of jury duty on a community that has no relation to the litigation. *See id.* at 508-509. [FN10]

> FN10. Because the New York forum non conveniens inquiry is substantially similar to the federal inquiry, there is no need to decide which source of the doctrine governs in this diversity action. *See Gilbert,* 330 U.S. at 509; *Olympic Corp.,* 462 F.2d at 378.

### Adequacy of Alternative Forum

*5 Dismissal for forum non conveniens presupposes the availability of an alternative forum in which the defendant is amenable to process and the plaintiff has an adequate remedy. *See Reyno,* 454 U.S. at 254 & n. 22. United States citizens who engage in activities abroad " 'cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to a conclusion that the site of the litigation should be elsewhere." ' *Diatronics, Inc. v. Elbit Computers, Ltd.,* 649 F.Supp. 122, 129 (S.D.N.Y.1986), (quoting *Ionescu v. E.F. Hutton & Co. (France) S.A.,* 465 F.Supp. 139, 146 (S.D.N.Y.1979)), *aff'd,* 812 F.2d 712 (2d Cir.1987). Curtain Bluff is subject to process in Antigua and the Antiguan statute of limitations has not run, as stated in the affidavit of Antiguan attorney R. Dexter Wason. (Straus Aff., Ex. O). [FN11] Antiguan law permits the recovery of damages for negligence, and applies legal principles closely related to those that would be applied by a United States court. (*Id.*); *see Linder Fund, Inc. v. Polly Peck Int'l PLC,* 811 F.Supp. 133, 135 (S.D.N.Y.1992) (legal remedies need not be precisely identical). Furthermore, Antiguan courts are familiar with the scope and purpose of the Sale of Goods Act of Antigua. Thus, there is an adequate alternative forum.

> FN11. Exhibit O is the affidavit of R. Dexter Wason, Esq., an Attorney practicing law in Antigua and Barbuda, dated January 24, 1997. In his affidavit he outlines the negligence law of Antigua.

### Private Interests

The availability and convenience of witnesses is highly significant to the forum non conveniens inquiry. *See Prapahan Byrne v. Japan Airlines, Inc.,* No. 83 Civ. 9162(JFK), 1984 WL 1343, at *2 (S.D.N.Y. Dec. 18, 1984) (forum non conveniens dismissal appropriate if access to proof is "far easier" abroad). Since most of the witnesses are residents of Antigua, access to proof is deemed "far easier" there, and a foreign forum is favored. *See Guimond v. Wyndham Hotels & Resorts,* No. 95 Civ. 0428(JFK), 1996 WL 281959, at *4 (S.D.N.Y. May 29, 1996) (dismissing to Jamaica where "most witnesses" to accident at hotel were in Jamaica); *Becker v. Club Las Velas,* No. 94 Civ. 2412(JFK), 1995 WL 267025, at *2- *3 (S.D.N.Y. May, 8 1995) (majority of witnesses in Mexico), *aff'd,* 101 F.3d 684 (2d Cir.1996); *Linder Fund Inc.,* 811 F.Supp. at 136 (where most key witnesses were located in London, that forum was preferred over New York); *Alcoa Steamship Co., v. M/V Nordic Regent,* 453 F.Supp. 10, 13 (S.D.N.Y.1978) (where the witnesses to an accident on foreign soil were residents of the foreign forum, that fact militated "most strongly" in favor of dismissal from New York.). Plaintiffs' witnesses consist of three medical doctors in New York, Pennsylvania, and Florida, respectively, and one psychologist located in Pennsylvania. The availability of doctors as witnesses at trial is problematic, but particularly when they are out of state. Accordingly, their testimony will in all likelihood be presented by videotape.

The main issue in the plaintiffs' complaint is whether Curtain Bluff was negligent in serving Dr. Feinstein fish, which caused him injury, and in allegedly failing to warn the plaintiffs of the potential for ciguatera poisoning when eating a major island food source, fish. In order for Curtain Bluff to disprove these allegations, they will require testimony from Curtain Bluff employees, food suppliers, and guests to establish defendant's exercise of due care and to corroborate or contradict plaintiffs' evidence of contracting

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 458060
(Cite as: 1998 WL 458060 (S.D.N.Y.))

Page 6

sickness while in Antigua and defendant's failure to warn about the possibility of the poisoning. A significant set of facts related to this issue, defendant states, will come · from Antiguan government officials, Antiguan wholesale food suppliers, none of whom are subject to compulsory process in this jurisdiction, and non-party Antiguan hotel guests or restaurant patrons, some of whom may be in Antigua. (Def. Mem. at 22). In addition, Antiguan witnesses would have knowledge of any breach of warranty or violation of the Sale of Goods Act of Antigua. In this case, while there are jurisdictional contacts in New York, the majority of the information and resources needed for trial is in Antigua, including witnesses and expert witnesses, such as government officers, doctors, and other health officials who will be able to provide testimony as to whether the Hotel restaurant did or did not do all it could do avoid ciguatera poisoning, the chances of contracting the sickness in the general population, and treatment procedures for ciguatera poisoning.

*6 Plaintiffs' primary concern in having this case heard in New York is the inability of plaintiff, Peter Feinstein to travel by plane. In Feinstein's initial affidavit, dated March 19, 1997, he stated

I can no longer travel by plane because I become severely ill. On Two prior occasions subsequently to being diagnosed with Ciguatera poisoning, I have travelled by plane once to Colorado, and once to Florida. In both instances I was unable to function for five days to a week that I was there, and basically spent the entire time either in bed or sitting with nausea, weakness and dizziness. Prior to Ciguatera, I had no problems with travelling whatsoever and as least four to five times per year made extensive plane rides without difficulty.

(Feinstein Aff. ¶ 8). [FN12] Defendant, however, has shown sufficient evidence that Dr. Feinstein has already travelled by plane at least seven times since his initial sickness. (Straus Aff., Ex. N). [FN13] In response Dr. Feinstein affirms that he has not travelled by air in the last year due to his physical condition and will not pursue travel by air to Antigua for a trial if the Court grants defendant's forum non conveniens motion. (Hershenhorn Aff., Ex. I). [FN14]

FN12. The Affidavit of Peter A. Feinstein, dated March 19, 1997, is attached as

Exhibit M to the Straus Affidavit.

FN13. Exhibit N is an excerpt from the deposition of plaintiff, Peter Alan Feinstein, dated December 16, 1997.

FN14. Exhibit I is a second affidavit of Peter A. Feinstein, dated February 25, 1998.

Ciguatera poisoning is described in the Merck Manual, an authoritative medical text, as a food poisoning that

can occur after eating any of ... 400 species of fish from the tropical reefs of Florida, the West Indies, or the Pacific.... The fish's flavor is unaffected, and no known processing procedures are protective. Symptoms may begin 2 to 8 h[ours] after eating the fish. After abdominal cramps, nausea, vomiting, and diarrhea that lasts 6 to 17 h[ours], pruritus, parathesias, headache, myalgia, reversal of the sensations of hot and cold, and face pain may occur. For months after, unusual sensory phenomena may keep a person from work.

The Merck Manual of Diagnosis and Therapy 820 (Robert Berkow ed., 16th ed.1992). In view of the evidence of Dr. Feinstein's air travel contradicting the statements in his initial affidavit and the March 1997 affidavits of his doctors concerning his ability to travel by air, and the lack of support for any claim of permanent disability from ciguatera poisoning in the Merck Manual, the Court does not give credence to Dr. Feinstein's reply affidavit. [FN15] Therefore, the private interests weigh in defendant's favor.

FN15. Moreover, there is no evidence that the Dr. Feinstein is unable to travel by boat.

3. Public Interests

The public interests also weigh in favor of an Antiguan forum. See Agyenkwa v. American Motors Corp., 622 F.Supp. 242, 247 (E.D.N.Y.1985) (where plaintiff is a non-resident of New York and accident did not occur in New York, local interest

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

in the case "is almost nonexistent"). There is a paramount public interest in trying local cases locally. *See Guimond*, 1996 WL 281959, at *5.

The public interest weighs in favor of dismissal to the foreign forum where a suit "raise[s] wider issues significantly touching" the interests of the foreign forum or its citizens. *Kaufman v. Bucherer AG Luzern*, No. 95 Civ. 3316(RPP), 1996 WL 79322, at *6 (S.D.N.Y. Feb. 23, 1996). The facts of this case inevitably implicate tourism, which is a large part of the Antiguan economy, and thus Antigua has a strong interest in deciding this case locally. *See Guimond*, 1996 WL 281959, at *5 (finding Jamaica had greater interest in adjudicating accident that occurred within its borders when that accident concerned Jamaica's tourist industry, an industry essential to its economy, and finding that it would be unfair to impose on New York jurors the duty to serve in a case devoid of local interest). The standard of care applicable to the preparation of food in view of the fact that the presence of ciguatera is undetectable clearly has implications for the entire tourist industry. In addition, an Antiguan court would have knowledge of the application of the Sale of Goods Act of Antigua. Moreover, the citizens of New York should not have the burden of serving as jurors in a case with so little relevance to this jurisdiction.

\*7 Taking both private and public interests together the Court concludes that the defendant has shown sufficient reasons why plaintiffs' choice of forum should be disturbed. Accordingly, the defendant's motion is granted, provided that, within ten days of the filing of this Opinion and Order, the defendant files with this Court a statement agreeing (1) to waive any statute of limitations defense that may be applicable in the Antiguan forum, and (2) to the presentation of the plaintiffs' medical testimony at trial by videotape.

#### Conclusion

For the reasons set forth above, defendant's renewed motion to dismiss based on lack of in personam jurisdiction is denied, and defendant's motion to dismiss based on forum non conveniens is granted pursuant to the conditions herein described.

IT IS SO ORDERED.

1998 WL 458060, 1998 WL 458060 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# No. 14668

———

## MULTILATERAL

**International Covenant on Civil and Political Rights.
Adopted by the General Assembly of the United
Nations on 19 December 1966**

**Optional Protocol to the above-mentioned Covenant.
Adopted by the General Assembly of the United
Nations on 19 December 1966**

*Authentic texts: English, French, Chinese, Russian and Spanish.*
*Registered* ex officio *on 23 March 1976.*

———

## MULTILATÉRAL

**Pacte international relatif aux droits civils et politiques.
Adopté par l'Assemblée générale des Nations Unies le
19 décembre 1966**

**Protocole facultatif se rapportant au Pacte susmentionné.
Adopté par l'Assemblée générale des Nations Unies le
19 décembre 1966**

*Textes authentiques : anglais, français, chinois, russe et espagnol.*
*Enregistrés d'office le 23 mars 1976.*

## APPENDIX 2

# INTERNATIONAL COVENANT[1] ON CIVIL AND POLITICAL RIGHTS

The States Parties to the present Covenant,

Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

[1] The Covenant, with the exception of article 41,* came into force on 23 March 1976 in respect of the following States, i.e., three months after the date of deposit with the Secretary-General of the United Nations of the thirty-fifth instrument of ratification or accession, in accordance with article 49 (1):**

| State | Date of deposit of the instrument of ratification or accession (a) |
|---|---|
| Barbados*** .................... | 5 January 1973a |
| Bulgaria*** .................... | 21 September 1970 |
| (Signature affixed on 8 October 1968.) | |
| Byelorussian Soviet Socialist Republic*** ................. | 12 November 1973 |
| (Signature affixed on 19 March 1968.) | |
| Chile ......................... | 10 February 1972 |
| (Signature affixed on 16 September 1969.) | |
| Colombia ..................... | 29 October 1969 |
| (Signature affixed on 21 December 1966.) | |
| Costa Rica .................... | 29 November 1968 |
| (Signature affixed on 19 December 1966.) | |
| Cyprus ....................... | 2 April 1969 |
| (Signature affixed on 19 December 1966.) | |
| Czechoslovakia*** .............. | 23 December 1975 |
| (Signature affixed on 7 October 1968.) | |
| Denmark***.................... | 6 January 1972 |
| (Signature affixed on 20 March 1968.) | |
| Ecuador ...................... | 6 March 1969 |
| (Signature affixed on 4 April 1968.) | |
| Finland*,***.................... | 19 August 1975 |
| (Signature affixed on 11 October 1967.) | |
| German Democratic Republic*** ... | 8 November 1973 |
| (Signature affixed on 27 March 1973.) | |
| Germany, Federal Republic of*** ... | 17 December 1973 |
| (With a declaration of application to Berlin (West).)† | |
| (Signature affixed on 9 October 1968.) | |
| Hungary*** .................... | 17 January 1974 |
| (Signature affixed on 25 March 1969.) | |
| Iran ......................... | 24 June 1975 |
| (Signature affixed on 4 April 1968.) | |

| State | Date of deposit of the instrument of ratification or accession (a) |
|---|---|
| Iraq*** ....................... | 25 January 1971 |
| (Signature affixed on 18 February 1969.) | |
| Jamaica....................... | 3 October 1975 |
| (Signature affixed on 19 December 1966.) | |
| Jordan........................ | 28 May 1975 |
| (Signature affixed on 30 June 1972.) | |
| Kenya ........................ | 1 May 1972a |
| Lebanon ...................... | 3 November 1972a |
| Libyan Arab Republic***.......... | 15 May 1970a |
| Madagascar ................... | 21 June 1971 |
| (Signature affixed on 17 September 1969.) | |
| Mali ......................... | 16 July 1974a |
| Mauritius ..................... | 12 December 1973a |
| Mongolia*** .................. | 18 November 1974 |
| (Signature affixed on 5 June 1968.) | |
| Norway*,*** ................... | 13 September 1972 |
| (Signature affixed on 20 March 1968.) | |
| Romania*** ................... | 9 December 1974 |
| Rwanda....................... | 16 April 1975a |
| Sweden*,*** ................... | 6 December 1971 |
| (Signature affixed on 29 September 1968.) | |
| Syrian Arab Republic*** .......... | 21 April 1969a |
| Tunisia ....................... | 18 March 1969 |
| (Signature affixed on 30 April 1968.) | |
| Ukrainian Soviet Socialist Republic*** .................. | 12 November 1973 |
| (Signature affixed on 20 March 1968.) | |
| Union of Soviet Socialist Republics*** ................. | 16 October 1973 |
| (Signature affixed on 18 March 1968.) | |
| Uruguay ...................... | 1 April 1970 |
| (Signature affixed on 21 February 1967.) | |
| Yugoslavia .................... | 2 June 1971 |
| (Signature affixed on 8 August 1967.) | |

(Continued on page 173)

P2

Recognizing that these rights derive from the inherent dignity of the human person,

Recognizing that, in accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights,

Considering the obligation of States under the Charter of the United Nations to promote universal respect for, and observance of, human rights and freedoms,

Realizing that the individual, having duties to other individuals and to the community to which he belongs, is under a responsibility to strive for the promotion and observance of the rights recognized in the present Covenant,

Agree upon the following articles:

## PART I

*Article 1.*   1.   All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

2.   All peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the principle of mutual benefit, and international law. In no case may a people be deprived of its own means of subsistence.

3.   The States Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of the right of self-determination, and shall respect that right, in conformity with the provisions of the Charter of the United Nations.

## PART II

*Article 2.*   1.   Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2.   Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present

---

*(Footnote continued from page 172)*

*See p. 300 of this volume for the texts of the declarations recognizing the competence of the Human Rights Committee under article 41.

**Several of the 35 instruments deposited were accompanied by reservations, about which the Covenant is silent. In this regard, the Secretary-General, on the basis of the consultations that he held in the same circumstances with respect to the International Covenant on Economic, Social and Cultural Rights (see No. I-14531 of volume 993), has considered that the States concerned did not object to the entry into force of the International Covenant on Civil and Political Rights on 23 March 1976.

***See p. 288 of this volume for the texts of the declarations and reservations made upon ratification or accession.

†The following countries made declarations regarding the declaration made upon ratification by the Federal Republic of Germany: France, German Democratic Republic, Ukrainian Soviet Socialist Republic, Union of Soviet Socialist Republics, United Kingdom of Great Britain and Northern Ireland and United States of America. For the texts of the said declarations, see No. I-14531 in volume 993.

Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3.   Each State Party to the present Covenant undertakes:

(*a*)  To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(*b*)  To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(*c*)  To ensure that the competent authorities shall enforce such remedies when granted.

*Article 3.*   The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant.

*Article 4.*   1.   In time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations under the present Covenant to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with their other obligations under international law and do not involve discrimination solely on the ground of race, colour, sex, language, religion or social origin.

2.   No derogation from articles 6, 7, 8 (paragraphs 1 and 2), 11, 15, 16 and 18 may be made under this provision.

3.   Any State Party to the present Covenant availing itself of the right of derogation shall immediately inform the other States Parties to the present Covenant, through the intermediary of the Secretary-General of the United Nations, of the provisions from which it has derogated and of the reasons by which it was actuated. A further communication shall be made, through the same intermediary, on the date on which it terminates such derogation.

*Article 5.*   1.   Nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant.

2.   There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, conventions, regulations or custom on the pretext that the present Covenant does not recognize such rights or that it recognizes them to a lesser extent.

## PART III

*Article 6.*   1.   Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

2.   In countries which have not abolished the death penalty,   sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the

Crime of Genocide.[1] This penalty can only be carried out pursuant to a final judgement rendered by a competent court.

3.    When deprivation of life constitutes the crime of genocide, it is understood that nothing in this article shall authorize any State Party to the present Covenant to derogate in any way from any obligation assumed under the provisions of the Convention on the Prevention and Punishment of the Crime of Genocide.

4.    Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

5.    Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women.

6.    Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

*Article 7.*    No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

*Article 8.*    1.    No one shall be held in slavery; slavery and the slave-trade in all their forms shall be prohibited.

2.    No one shall be held in servitude.

3.    *(a)*    No one shall be required to perform forced or compulsory labour.

*(b)*    Paragraph 3 *(a)* shall not be held to preclude, in countries where imprisonment with hard labour may be imposed as a punishment for a crime, the performance of hard labour in pursuance of a sentence to such punishment by a competent court.

*(c)*    For the purpose of this paragraph the term "forced or compulsory labour" shall not include:

(i) Any work or service, not referred to in sub-paragraph *(b)*, normally required of a person who is under detention in consequence of a lawful order of a court, or of a person during conditional release from such detention;

(ii) Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors;

(iii) Any service exacted in cases of emergency or calamity threatening the life or well-being of the community;

(iv) Any work or service which forms part of normal civil obligations.

*Article 9.*    1.    Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

2.    Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him.

3.    Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgement.

---

[1] United Nations, *Treaty Series,* vol. 78, p. 277.

4.   Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

5.   Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation.

*Article 10.*   1.   All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

2.   (*a*)  Accused persons shall, save in exceptional circumstances, be segregated from convicted persons and shall be subject to separate treatment appropriate to their status as unconvicted persons.

(*b*)  Accused juvenile persons shall be separated from adults and brought as speedily as possible for adjudication.

3.   The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status.

*Article 11.*   No one shall be imprisoned merely on the ground of inability to fulfil a contractual obligation.

*Article 12.*   1.   Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

2.   Everyone shall be free to leave any country, including his own.

3.   The above-mentioned rights shall not be subject to any restrictions except those which are provided by law, are necessary to protect national security, public order (*ordre public*), public health or morals or the rights and freedoms of others, and are consistent with the other rights recognized in the present Covenant.

4.   No one shall be arbitrarily deprived of the right to enter his own country.

*Article 13.*   An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his explusion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.

*Article 14.*   1.   All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The Press and the public may be excluded from all or part of a trial for reasons of morals, public order (*ordre public*) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

2.   Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

3.   In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality:

(*a*)  To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(*b*)  To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;

(*c*)  To be tried without undue delay;

(*d*)  To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(*e*)  To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

(*f*)  To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

(*g*)  Not to be compelled to testify against himself or to confess guilt.

4.   In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

5.   Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6.   When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

7.   No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

*Article 15.*  1.   No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time when the criminal offence was committed. If, subsequent to the commission of the offence, provision is made by law for the imposition of a lighter penalty, the offender shall benefit thereby.

2.   Nothing in this article shall prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognized by the community of nations.

*Article 16.*  Everyone shall have the right to recognition everywhere as a person before the law.

*Article 17.*  1.   No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.

2.   Everyone has the right to the protection of the law against such interference or attacks.

*Article 18.*   1.   Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.

2.   No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.

3.   Freedom to manifest one's religion or beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others.

4.   The States Parties to the present Covenant undertake to have respect for the liberty of parents and, when applicable, legal guardians to ensure the religious and moral education of their children in conformity with their own convictions.

*Article 19.*   1.   Everyone shall have the right to hold opinions without interference.

2.   Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.

3.   The exercise of the rights provided for in paragraph 2 of this article carries with it special duties and responsibilities. It may therefore be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:

(*a*) For respect of the rights or reputations of others;

(*b*) For the protection of national security or of public order (*ordre public*), or of public health or morals.

*Article 20.*   1.   Any propaganda for war shall be prohibited by law.

2.   Any advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law.

*Article 21.*   The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others.

*Article 22.*   1.   Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests.

2.   No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others. This article shall not prevent the imposition of lawful restrictions on members of the armed forces and of the police in their exercise of this right.

3.   Nothing in this article shall authorize States Parties to the International Labour Organisation Convention of 1948 concerning freedom of association and protection of the right to organize[1] to take legislative measures which would prejudice, or to apply the law in such a manner as to prejudice, the guarantees provided for in that Convention.

---

[1] United Nations, *Treaty Series,* vol. 68, p. 17.

*Article 23.*   1.   The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

2.   The right of men and women of marriageable age to marry and to found a family shall be recognized.

3.   No marriage shall be entered into without the free and full consent of the intending spouses.

4.   States Parties to the present Covenant shall take appropriate steps to ensure equality of rights and responsibilities of spouses as to marriage, during marriage and at its dissolution. In the case of dissolution, provision shall be made for the necessary protection of any children.

*Article 24.*   1.   Every child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.

2.   Every child shall be registered immediately after birth and shall have a name.

3.   Every child has the right to acquire a nationality.

*Article 25.*   Every citizen shall have the right and the opportunity, without any of the distinctions mentioned in article 2 and without unreasonable restrictions:

(*a*)  To take part in the conduct of public affairs, directly or through freely chosen representatives;

(*b*)  To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors;

(*c*)  To have access, on general terms of equality, to public service in his country.

*Article 26.*   All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

*Article 27.*   In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language.

## PART IV

*Article 28.*   1.   There shall be established a Human Rights Committee (hereafter referred to in the present Covenant as the Committee). It shall consist of eighteen members and shall carry out the functions hereinafter provided.

2.   The Committee shall be composed of nationals of the States Parties to the present Covenant who shall be persons of high moral character and recognized competence in the field of human rights, consideration being given to the usefulness of the participation of some persons having legal experience.

3.   The members of the Committee shall be elected and shall serve in their personal capacity.

*Article 29.*    1.    The members of the Committee shall be elected by secret ballot from a list of persons possessing the qualifications prescribed in article 28 and nominated for the purpose by the States Parties to the present Covenant.

2.    Each State Party to the present Covenant may nominate not more than two persons. These persons shall be nationals of the nominating State.

3.    A person shall be eligible for renomination.

*Article 30.*    1.    The initial election shall be held no later than six months after the date of the entry into force of the present Covenant.

2.    At least four months before the date of each election to the Committee, other than an election to fill a vacancy declared in accordance with article 34, the Secretary-General of the United Nations shall address a written invitation to the States Parties to the present Covenant to submit their nominations for membership of the Comittee within three months.

3.    The Secretary-General of the United Nations shall prepare a list in alphabetical order of all the persons thus nominated, with an indication of the States Parties which have nominated them, and shall submit it to the States Parties to the present Covenant no later than one month before the date of each election.

4.    Elections of the members of the Committee shall be held at a meeting of the States Parties to the present Covenant convened by the Secretary-General of the United Nations at the Headquarters of the United Nations. At that meeting, for which two thirds of the States Parties to the present Covenant shall constitute a quorum, the persons elected to the Committee shall be those nominees who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

*Article 31.*    1.    The Committee may not include more than one national of the same State.

2.    In the election of the Committee, consideration shall be given to equitable geographical distribution of membership and to the representation of the different forms of civilization and of the principal legal systems.

*Article 32.*    1.    The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. However, the terms of nine of the members elected at the first election shall expire at the end of two years; immediately after the first election, the names of these nine members shall be chosen by lot by the Chairman of the meeting referred to in article 30, paragraph 4.

2.    Elections at the expiry of office shall be held in accordance with the preceding articles of this part of the present Covenant.

*Article 33.*    1.    If, in the unanimous opinion of the other members, a member of the Committee has ceased to carry out his functions for any cause other than absence of a temporary character, the Chairman of the Committee shall notify the Secretary-General of the United Nations, who shall then declare the seat of that member to be vacant.

2.    In the event of the death or the resignation of a member of the Committee, the Chairman shall immediately notify the Secretary-General of the United Nations, who shall declare the seat vacant from the date of death or the date on which the resignation takes effect.

*Article 34.*    1.    When a vacancy is declared in accordance with article 33 and if the term of office of the member to be replaced does not expire within six months

of the declaration of the vacancy, the Secretary-General of the United Nations shall notify each of the States Parties to the present Covenant, which may within two months submit nominations in accordance with article 29 for the purpose of filling the vacancy.

2.    The Secretary-General of the United Nations shall prepare a list in alphabetical order of the persons thus nominated and shall submit it to the States Parties to the present Covenant. The election to fill the vacancy shall then take place in accordance with the relevant provisions of this part of the present Covenant.

3.    A member of the Committee elected to fill a vacancy declared in accordance with article 33 shall hold office for the remainder of the term of the member who vacated the seat on the Committee under the provisions of that article.

*Article 35.*    The members of the Committee shall, with the approval of the General Assembly of the United Nations, receive emoluments from United Nations resources on such terms and conditions as the General Assembly may decide, having regard to the importance of the Committee's responsibilities.

*Article 36.*    The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under the present Covenant.

*Article 37.*    1.    The Secretary-General of the United Nations shall convene the initial meeting of the Committee at the Headquarters of the United Nations.

2.    After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.

3.    The Committee shall normally meet at the Headquarters of the United Nations or at the United Nations Office at Geneva.

*Article 38.*    Every member of the Committee shall, before taking up his duties, make a solemn declaration in open committee that he will perform his functions impartially and conscientiously.

*Article 39.*    1.    The Committee shall elect its officers for a term of two years. They may be re-elected.

2.    The Committee shall establish its own rules of procedure, but these rules shall provide, *inter alia*, that:

(*a*)    Twelve members shall constitute a quorum;

(*b*)    Decisions of the Committee shall be made by a majority vote of the members present.

*Article 40.*    1.    The States Parties to the present Covenant undertake to submit reports on the measures they have adopted which give effect to the rights recognized herein and on the progress made in the enjoyment of those rights:

(*a*)    Within one year of the entry into force of the present Covenant for the States Parties concerned;

(*b*)    Thereafter whenever the Committee so requests.

2.    All reports shall be submitted to the Secretary-General of the United Nations, who shall transmit them to the Committee for consideration. Reports shall indicate the factors and difficulties, if any, affecting the implementation of the present Covenant.

3. The Secretary-General of the United Nations may, after consultation with the Committee, transmit to the specialized agencies concerned copies of such parts of the reports as may fall within their field of competence.

4. The Committee shall study the reports submitted by the States Parties to the present Covenant. It shall transmit its reports, and such general comments as it may consider appropriate, to the States Parties. The Committee may also transmit to the Economic and Social Council these comments along with the copies of the reports it has received from States Parties to the present Covenant.

5. The States Parties to the present Covenant may submit to the Committee observations on any comments that may be made in accordance with paragraph 4 of this article.

*Article 41.* 1. A State Party to the present Covenant may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under the present Covenant. Communications under this article may be received and considered only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration. Communications received under this article shall be dealt with in accordance with the following procedure:

(*a*) If a State Party to the present Covenant considers that another State Party is not giving effect to the provisions of the present Covenant, it may, by written communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication, the receiving State shall afford the State which sent the communication an explanation or any other statement in writing clarifying the matter, which should include, to the extent possible and pertinent, reference to domestic procedures and remedies taken, pending, or available in the matter.

(*b*) If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to the other State.

(*c*) The Committee shall deal with a matter referred to it only after it has ascertained that all available domestic remedies have been invoked and exhausted in the matter, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged.

(*d*) The Committee shall hold closed meetings when examining communications under this article.

(*e*) Subject to the provisions of sub-paragraph (*c*), the Committee shall make available its good offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for human rights and fundamental freedoms as recognized in the present Covenant.

(*f*) In any matter referred to it, the Committee may call upon the States Parties concerned, referred to in sub-paragraph (*b*), to supply any relevant information.

(*g*) The States Parties concerned, referred to in sub-paragraph (*b*), shall have the right to be represented when the matter is being considered in the Committee and to make submissions orally and/or in writing.

(*h*)   The Committee shall, within twelve months after the date of receipt of notice under sub-paragraph (*b*), submit a report:

(i) If a solution within the terms of sub-paragraph (*e*) is reached, the Committee shall confine its report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of sub-paragraph (*e*) is not reached, the Committee shall confine its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report.

In every matter, the report shall be communicated to the States Parties concerned.

2.   The provisions of this article shall come into force when ten States Parties to the present Covenant have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already transmitted under this article; no further communication by any State Party shall be received after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

*Article 42.*   1.   (*a*)   If a matter referred to the Committee in accordance with article 41 is not resolved to the satisfaction of the States Parties concerned, the Committee may, with the prior consent of the States Parties concerned, appoint an *ad hoc* Conciliation Commission (hereinafter referred to as the Commission). The good offices of the Commission shall be made available to the States Parties concerned with a view to an amicable solution of the matter on the basis of respect for the present Covenant.

(*b*)   The Commission shall consist of five persons acceptable to the States Parties concerned. If the States Parties concerned fail to reach agreement within three months on all or part of the composition of the Commission the members of the Commission concerning whom no agreement has been reached shall be elected by secret ballot by a two-thirds majority vote of the Committee from among its members.

2.   The members of the Commission shall serve in their personal capacity. They shall not be nationals of the States Parties concerned, or of a State not party to the present Covenant, or of a State Party which has not made a declaration under article 41.

3.   The Commission shall elect its own Chairman and adopt its own rules of procedure.

4.   The meetings of the Commission shall normally be held at the Headquarters of the United Nations or at the United Nations Office at Geneva. However, they may be held at such other convenient places as the Commission may determine in consultation with the Secretary-General of the United Nations and the States Parties concerned.

5.   The secretariat provided in accordance with article 36 shall also service the commissions appointed under this article.

6.   The information received and collated by the Committee shall be made available to the Commission and the Commission may call upon the States Parties concerned to supply any other relevant information.

7.    When the Commission has fully considered the matter, but in any event not later than twelve months after having been seized of the matter, it shall submit to the Chairman of the Committee a report for communication to the States Parties concerned.

(a) If the Commission is unable to complete its consideration of the matter within twelve months, it shall confine its report to a brief statement of the status of its consideration of the matter.

(b) If an amicable solution to the matter on the basis of respect for human rights as recognized in the present Covenant is reached, the Commission shall confine its report to a brief statement of the facts and of the solution reached.

(c) If a solution within the terms of sub-paragraph (b) is not reached, the Commission's report shall embody its findings on all questions of fact relevant to the issues between the States Parties concerned, and its views on the possibilities of an amicable solution of the matter. This report shall also contain the written submissions and a record of the oral submissions made by the States Parties concerned.

(d) If the Commission's report is submitted under sub-paragraph (c), the States Parties concerned shall, within three months of the receipt of the report, notify the Chairman of the Committee whether or not they accept the contents of the report of the Commission.

8.    The provisions of this article are without prejudice to the responsibilities of the Committee under article 41.

9.    The States Parties concerned shall share equally all the expenses of the members of the Commission in accordance with estimates to be provided by the Secretary-General of the United Nations.

10.    The Secretary-General of the United Nations shall be empowered to pay the expenses of the members of the Commission, if necessary, before reimbursement by the States Parties concerned, in accordance with paragraph 9 of this article.

*Article 43.*    The members of the Committee, and of the *ad hoc* conciliation commissions which may be appointed under article 42, shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.[1]

*Article 44.*    The provisions for the implementation of the present Covenant shall apply without prejudice to the procedures prescribed in the field of human rights by or under the constituent instruments and the conventions of the United Nations and of the specialized agencies and shall not prevent the States Parties to the present Covenant from having recourse to other procedures for settling a dispute in accordance with general or special international agreements in force between them.

*Article 45.*    The Committee shall submit to the General Assembly of the United Nations through the Economic and Social Council, an annual report on its activities.

## PART V

*Article 46.*    Nothing in the present Covenant shall be interpreted as impairing the provisions of the Charter of the United Nations and of the constitutions of the

[1] United Nations, *Treaty Series,* vol. 1, p. 15, and vol. 90, p. 327 (corrigendum to vol. 1, p. 18).

Vol. 999, I-14668

specialized agencies which define the respective responsibilities of the various organs of the United Nations and of the specialized agencies in regard to the matters dealt with in the present Covenant.

*Article 47.* Nothing in the present Covenant shall be interpreted as impairing the inherent right of all peoples to enjoy and utilize fully and freely their natural wealth and resources.

## PART VI

*Article 48.* 1. The present Covenant is open for signature by any State Member of the United Nations or member of any of its specialized agencies, by any State Party to the Statute of the International Court of Justice, and by any other State which has been invited by the General Assembly of the United Nations to become a party to the present Covenant.

2. The present Covenant is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3. The present Covenant shall be open to accession by any State referred to in paragraph 1 of this article.

4. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

5. The Secretary-General of the United Nations shall inform all States which have signed this Covenant or acceded to it of the deposit of each instrument of ratification or accession.

*Article 49.* 1. The present Covenant shall enter into force three months after the date of the deposit with the Secretary-General of the United Nations of the thirty-fifth instrument of ratification or instrument of accession.

2. For each State ratifying the present Covenant or acceding to it after the deposit of the thirty-fifth instrument of ratification or instrument of accession, the present Covenant shall enter into force three months after the date of the deposit of its own instrument of ratification or instrument of accession.

*Article 50.* The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions.

*Article 51.* 1. Any State Party to the present Covenant may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General of the United Nations shall thereupon communicate any proposed amendments to the States Parties to the present Covenant with a request that they notify him whether they favour a conference of States Parties for the purpose of considering and voting upon the proposals. In the event that at least one third of the States Parties favours such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of the States Parties present and voting at the conference shall be submitted to the General Assembly of the United Nations for approval.

2. Amendments shall come into force when they have been approved by the General Assembly of the United Nations and accepted by a two-thirds majority of the States Parties to the present Covenant in accordance with their respective constitutional processes.

3.    When amendments come into force, they shall be binding on those States Parties which have accepted them, other States Parties still being bound by the provisions of the present Covenant and any earlier amendment which they have accepted.

*Article 52.*    Irrespective of the notifications made under article 48, paragraph 5, the Secretary-General of the United Nations shall inform all States referred to in paragraph 1 of the same article of the following particulars:

(*a*)  Signatures, ratifications and accessions under article 48;

(*b*)  The date of the entry into force of the present Covenant under article 49 and the date of the entry into force of any amendments under article 51.

*Article 53.*    1.    The present Covenant, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited in the archives of the United Nations.

2.    The Secretary-General of the United Nations shall transmit certified copies of the present Covenant to all States referred to in article 48.

IN FAITH WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed the present Covenant, opened for signature at New York, on the nineteenth day of December, one thousand nine hundred and sixty-six.

For Afghanistan:
Pour l'Afghanistan:
阿富汗：
За Афганистан:
Por el Afganistán:

For Albania:
Pour l'Albanie:
阿爾巴尼亞：
За Албанию:
Por Albania:

For Algeria:
Pour l'Algérie:
阿爾及利亞：
За Алжир:
Por Argelia:

TEWFIK BOUATTOURA
10 December 1968

For Argentina:
Pour l'Argentine:
阿根廷：
За Аргентину:
Por la Argentina:

RUDA
19 febrero 1968[1]

For Australia:
Pour l'Australie:
澳大利亞：
За Австралию:
Por Australia:

LAURENCE RUPERT McINTYRE
18 December 1972

---

[1] 19 February 1968 — 19 février 1968.

FOR AUSTRIA:
POUR L'AUTRICHE:
奥地利:
За Австрию:
POR AUSTRIA:

> PETER JANKOWITSCH
> 10 décembre 1973

FOR BARBADOS:
POUR LA BARBADE:
巴贝多:
За Барбадос:
POR BARBADOS:

FOR BELGIUM:
POUR LA BELGIQUE:
比利時:
За Бельгию:
POR BÉLGICA:

> C. SCHUURMANS
> 10 décembre 1968

FOR BOLIVIA:
POUR LA BOLIVIE:
玻利維亞:
За Боливию:
POR BOLIVIA:

FOR BOTSWANA:
POUR LE BOTSWANA:
波扎郡:
За Ботсвану:
POR BOTSWANA:

FOR BRAZIL:
POUR LE BRÉSIL:
巴西：
За Бразилию:
POR EL BRASIL:


FOR BULGARIA:
POUR LA BULGARIE:
保加利亞：
За Болгарию:
POR BULGARIA:

МИЛКО ТАРАБАНОВ[1]
8 octobre 1968


FOR BURMA:
POUR LA BIRMANIE:
緬甸：
За Бирму:
POR BIRMANIA:


FOR BURUNDI:
POUR LE BURUNDI:
布隆提：
За Бурунди:
POR BURUNDI:


FOR THE BYELORUSSIAN SOVIET SOCIALIST REPUBLIC[2]:
POUR LA RÉPUBLIQUE SOCIALISTE SOVIÉTIQUE DE BIÉLORUSSIE[2]:
白俄羅斯蘇維埃社會主義共和國：
За Белорусскую Советскую Социалистическую Республику:
POR LA REPÚBLICA SOCIALISTA SOVIÉTICA DE BIELORRUSIA:

ГЕРАДОТ ГАУРЫЛАВІЧ ЧАРНУШЧАНКО[3]
19 марта 1968[4]

---

[1] Milko Tarabanov.
[2] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[3] Geradot Gavrilovich Chernushchenko — Geradote Gavrilovitch Tchernuchtchenko.
[4] 19 March 1968 — 19 mars 1968.

For Cambodia:
Pour le Cambodge:
柬埔寨：
За Камбоджу:
Por Camboya:


For Cameroon:
Pour le Cameroun:
喀麥隆：
За Камерун:
Por el Camerún:


For Canada:
Pour le Canada:
加拿大：
За Канаду:
Por el Canadá:


For the Central African Republic:
Pour la République centrafricaine:
中非共和國：
За Центральноафриканскую Республику:
Por la República Centroafricana:


For Ceylon:
Pour Ceylan:
錫蘭：
За Цейлон:
Por Ceilán:


For Chad:
Pour le Tchad:
乍德：
За Чад:
Por el Chad:

For Chile:
Pour le Chili:
智利：
За Чили:
Por Chile:

José Piñera Carvallo
Sept. 16, 1969

For China:
Pour la Chine:
中國：
За Китай:
Por China:

[Signed — Signé][1,2]

For Colombia:
Pour la Colombie:
哥倫比亚：
За Колумбию:
Por Colombia:

Evaristo Sourdis
Dic. 21 de 1966[3]

For the Congo (Brazzaville):
Pour le Congo (Brazzaville):
剛果（布拉薩市）：
За Конго (Бразавиль):
Por el Congo (Brazzaville):

---

[1] Signature affixed by Liu Chieh on 5 October 1967 — La signature a été apposée par Liu Chieh le 5 octobre 1967.

[2] The following countries made declarations relating to the signature on behalf of the Government of the Republic of China: Bulgaria, Byelorussian Soviet Socialist Republic, Czechoslovakia, Mongolia, Romania, Ukrainian Soviet Socialist Republic, Union of Soviet Socialist Republics and Yugoslavia. For the texts of the said declarations, see No. I-14531 in volume 993 — Les pays suivants ont fait des déclarations relatives à la signature au nom du Gouvernement de la République de Chine : la Bulgarie, la République socialiste soviétique de Biélorussie, la Tchécoslovaquie, la Mongolie, la Roumanie, la République socialiste soviétique d'Ukraine, l'Union des Républiques socialistes soviétiques et la Yougoslavie. Pour les textes desdites déclarations, voir n° I-14531 dans le volume 993.

[3] 21 December 1966 — 21 décembre 1966.

FOR THE CONGO (DEMOCRATIC REPUBLIC OF):
POUR LE CONGO (RÉPUBLIQUE DÉMOCRATIQUE DU):
剛果 (民主共和國):
За Демократическую Республику Конго:
POR EL CONGO (REPÚBLICA DEMOCRÁTICA DE):


FOR COSTA RICA:
POUR LE COSTA RICA:
哥斯大黎加:
За Коста-Рику:
POR COSTA RICA:

         LUIS D. TINOCO


FOR CUBA:
POUR CUBA:
古巴:
За Кубу:
POR CUBA:


FOR CYPRUS:
POUR CHYPRE:
塞特勒斯:
За Кипр:
POR CHIPRE:

        ZENON ROSSIDES


FOR CZECHOSLOVAKIA [1]:
POUR LA TCHÉCOSLOVAQUIE [1]:
捷克斯拉夫:
За Чехословакию:
POR CHECOSLOVAQUIA:

        VÁCLAV PLESKOT
        7.10.1968[2]

---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature—Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[2] 7 October 1968 — 7 octobre 1968.

FOR DAHOMEY:
POUR LE DAHOMEY:
達荷美：
За Дагомею：
POR EL DAHOMEY:


FOR DENMARK:
POUR LE DANEMARK:
丹麥：
За Данию：
POR DINAMARCA:

OTTO ROSE BORCH
March 20, 1968


FOR THE DOMINICAN REPUBLIC:
POUR LA RÉPUBLIQUE DOMINICAINE:
多明尼加共和國：
За Доминиканскую Республику：
POR LA REPÚBLICA DOMINICANA:


FOR ECUADOR:
POUR L'EQUATEUR:
厄瓜多：
За Эквадор：
POR EL ECUADOR:

HUGO FÁTIVA ORTIZ
Abril 4 de 1968[1]


FOR EL SALVADOR:
POUR EL SALVADOR:
薩爾瓦多：
За Сальвадор：
POR EL SALVADOR:

ALFREDO MARTÍNEZ MORENO
Septiembre 21, 1967[2]

---

[1] 4 April 1968 — 4 avril 1968.
[2] 21 September 1967 — 21 septembre 1967.

FOR ETHIOPIA:
POUR L'ETHIOPIE:
农索比班:
За Эфиопию:
POR ETIOPÍA:


FOR THE FEDERAL REPUBLIC OF GERMANY:
POUR LA RÉPUBLIQUE FÉDÉRALE D'ALLEMAGNE:
德意志聯邦共和國:
За Федеративную Республику Германии:
POR LA REPÚBLICA FEDERAL DE ALEMANIA:

      WILLY BRANDT
      9/10-1968[1]


FOR FINLAND:
POUR LA FINLANDE:
分闌:
За Финляндию:
POR FINLANDIA:

      AHTI KARJALAINEN
      11/10/67[2]


FOR FRANCE:
POUR LA FRANCE:
法蘭西:
За Францию:
POR FRANCIA:


FOR GABON:
POUR LE GABON:
加彭:
За Габон:
POR EL GABÓN:

---

[1] 9 October 1968 — 9 octobre 1968.
[2] 11 October 1967 — 11 octobre 1967.

FOR GAMBIA:
POUR LA GAMBIE:
岡比亞:
За Гамбию:
POR GAMBIA:


FOR THE GERMAN DEMOCRATIC REPUBLIC: ·
POUR LA RÉPUBLIQUE DÉMOCRATIQUE ALLEMANDE:
德意志民主共和国
Германская Демократическая Республика:
POR LA REPÚBLICA DEMOCRÁTICA ALEMANA:

HURST GRUNERT
27.3.73[1]


FOR GHANA:
POUR LE GHANA:
迦納:
За Гану:
POR GHANA:


FOR GREECE:
POUR LA GRÈCE:
希臘:
За Грецию:
POR GRECIA:


FOR GUATEMALA:
POUR LE GUATEMALA:
瓜地馬拉:
За Гватемалу:
POR GUATEMALA:


[1] 27 March 1973 — 27 mars 1973.

FOR GUINEA:
POUR LA GUINÉE:
幾內亞:
За Гвинеею:
POR GUINEA:

MAROF ACHKAR
Le 28 février 1967


FOR GUYANA:
POUR LA GUYANE:
圭亞那:
За Гвиану:
POR GUYANA:

ANNE JARDIM
August 22, 1968


FOR HAITI:
POUR HAÏTI:
海地:
За Гаити:
POR HAITÍ:


FOR THE HOLY SEE:
POUR LE SAINT-SIÈGE:
教廷:
За Святейший престол:
POR LA SANTA SEDE:


FOR HONDURAS:
POUR LE HONDURAS:
宏都拉斯:
За Гондурас:
POR HONDURAS:

H. LÓPEZ VILLAMIL

FOR HUNGARY:[1]
POUR LA HONGRIE:[1]
匈牙利：
За Венгрию:
POR HUNGRÍA:

KÁROLY CSATORDAY
March 25, 1969


FOR ICELAND:
POUR L'ISLANDE:
冰島：
За Исландию:
POR ISLANDIA:

HANNES KJARTANSSON
30 Dec. 1968


FOR INDIA:
POUR L'INDE:
印度：
За Индию:
POR LA INDIA:


FOR INDONESIA:
POUR L'INDONÉSIE:
印度尼西亞：
За Индонезию:
POR INDONESIA:


FOR IRAN:
POUR L'IRAN:
伊朗：
За Иран:
POR EL IRÁN:

Subject to ratification[2]
MEHDI VAKIL
4 April 1968

---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[2] Sous réserve de ratification.

FOR IRAQ: [1]
POUR L'IRAK: [1]
伊拉克：
За Ирак:
POR EL IRAK:

ADNAN PACHACHI
Feb. 18, 1969


FOR IRELAND:
POUR L'IRLANDE:
愛爾蘭：
За Ирландию:
POR IRLANDA:

JANET FITZGERALD
1st October 1973


FOR ISRAEL:
POUR ISRAËL:
以色列：
За Израиль:
POR ISRAEL:

MICHAEL COMAY


FOR ITALY:
POUR L'ITALIE:
義大利：
За Италию:
POR ITALIA:

PIERO VINCI
18 January 1967


FOR THE IVORY COAST:
POUR LA CÔTE-D'IVOIRE:
牙象海岸：
За Берег Слоновой Кости:
POR LA COSTA DE MARFIL:

---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.

FOR JAMAICA:
POUR LA JAMAÏQUE:
牙買加:
За Ямайку:
POR JAMAICA:

E. R. RICHARDSON

FOR JAPAN:
POUR LE JAPON:
日本:
За Японию:
POR EL JAPÓN:

FOR JORDAN:
POUR LA JORDANIE:
約旦:
За Иорданию:
POR JORDANIA:

SHARIF ABDUL-HAMID SHARAF
June 30, 1972

FOR KENYA:
POUR LE KENYA:
肯亞:
За Кению:
POR KENIA:

FOR KUWAIT:
POUR LE KOWEÏT:
科威特:
За Кувейт:
POR KUWAIT:

FOR LAOS:
POUR LE LAOS:
寮國：
За Лаос:
POR LAOS:


FOR LEBANON:
POUR LE LIBAN:
黎巴嫩：
За Ливан:
POR EL LÍBANO:


FOR LESOTHO:
POUR LE LESOTHO:
賴索托：
За Лесото:
POR LESOTHO:


FOR LIBERIA:
POUR LE LIBÉRIA:
賴比瑞亞：
За Либерию:
POR LIBERIA:

NATHAN BARNES
18th April 1967


FOR LIBYA:
POUR LA LIBYE:
利比亞：
За Ливию:
POR LIBIA:

For Liechtenstein:
Pour le Liechtenstein:
列支敦斯登：
За Лихтенштейн:
Por Liechtenstein:


For Luxembourg:
Pour le Luxembourg:
盧森堡：
За Люксембург:
Por Luxemburgo:

Jean Rettel
Le 26 novembre 1974


For Madagascar:
Pour Madagascar:
馬達加斯加：
За Мадагаскар:
Por Madagascar:

Blaise Rabetafika
17 septembre 1969


For Malawi:
Pour le Malawi:
馬拉威：
За Малави:
Por Malawi:


For Malaysia:
Pour la Malaisie:
馬來亞聯邦：
За Малайскую Федерацию:
Por Malasia:

FOR THE MALDIVE ISLANDS:
POUR LES ÎLES MALDIVES:
馬爾代夫羣島:
За Мальдивские острова:
POR LAS ISLAS MALDIVAS:


FOR MALI:
POUR LE MALI:
馬利:
За Мали:
POR MALI:


FOR MALTA:
POUR MALTE:
馬耳他:
За Мальту:
POR MALTA:


FOR MAURITANIA:
POUR LA MAURITANIE:
茅利塔尼亞:
За Мавританию:
POR MAURITANIA:


FOR MEXICO:
POUR LE MEXIQUE:
墨西哥:
За Мексику:
POR MÉXICO:


FOR MONACO:
POUR MONACO:
摩納哥:
За Монако:
POR MÓNACO:

272        United Nations — Treaty Series  •  Nations Unies — Recueil des Traités        1976

FOR MONGOLIA:[1]
POUR LA MONGOLIE:[1]
蒙古:
За Монголию:
POR MONGOLIA:

        JH. BANZAR
        1968.VI.5[2]


FOR MOROCCO:
POUR LE MAROC:
摩洛哥:
За Марокко:
POR MARRUECOS:


FOR NEPAL:
POUR LE NÉPAL:
尼泊爾:
За Непал:
POR NEPAL:


FOR THE NETHERLANDS:
POUR LES PAYS-BAS:
荷蘭:
За Нидерланды:
POR LOS PAÍSES BAJOS:

        D. G. E. MIDDELBURG
        25 June 1969


FOR NEW ZEALAND:
POUR LA NOUVELLE-ZÉLANDE:
紐西蘭:
За Новую Зеландию:
POR NUEVA ZELANDIA:

        FRANK HENRY CORNER
        12 November 1968

---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[2] 5 June 1968 — 5 juin 1968.

For Nicaragua:
Pour le Nicaragua:
尼加拉瓜：
За Никарагуа:
Por Nicaragua:


For the Niger:
Pour le Niger:
奈及爾：
За Нигер:
Por el Níger:


For Nigeria:
Pour la Nigéria:
奈及利亞：
За Нигерию:
Por Nigeria:


For Norway:
Pour la Norvège:
挪威：
За Норвегию:
Por Noruega:

                        Edvard Hambro
                        March 20, 1968


For Pakistan:
Pour le Pakistan:
巴基斯坦：
За Пакистан:
Por el Pakistán:


For Panama:
Pour le Panama:
巴拿馬：
За Панаму:
Por Panamá:

FOR PARAGUAY:
POUR LE PARAGUAY:
巴拉圭:
За Парагвай:
POR EL PARAGUAY:


FOR PERU:
POUR LE PÉROU:
祕魯:
За Перу:
POR EL PERÚ:


FOR THE PHILIPPINES:
POUR LES PHILIPPINES:
菲律賓:
За Филиппины:
POR FILIPINAS:

SALVADOR P. LÓPEZ


FOR POLAND:
POUR LA POLOGNE:
波蘭:
За Польшу:
POR POLONIA:

B. TOMOROWICZ
2.III.1967[1]


FOR PORTUGAL:
POUR LE PORTUGAL:
葡萄牙:
За Португалию:
POR PORTUGAL:


---

[1] 2 March 1967 — 2 mars 1967.

FOR THE REPUBLIC OF KOREA:
POUR LA RÉPUBLIQUE DE CORÉE:
大韓民國：
За Корейскую Республику:
POR LA REPÚBLICA DE COREA:


FOR THE REPUBLIC OF VIET-NAM:
POUR LA RÉPUBLIQUE DU VIET-NAM:
越南共和國：
За Республику Вьетнам:
POR LA REPÚBLICA DE VIET-NAM:


FOR ROMANIA: [1]
POUR LA ROUMANIE: [1]
羅馬尼亞：
За Румынию:
POR RUMANIA:

GHEORGHE DIACONESCU
27 June 1968


FOR RWANDA:
POUR LE RWANDA:
盧安達：
За Руанду:
POR RWANDA:


FOR SAN MARINO:
POUR SAINT-MARIN:
聖馬利諾：
За Сан-Марино:
POR SAN MARINO:


---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir
p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.

FOR SAUDI ARABIA:
POUR L'ARABIE SAOUDITE:
沙烏地阿拉伯:
За Саудовскую Аравию:
POR ARABIA SAUDITA:


FOR SENEGAL:
POUR LE SÉNÉGAL:
塞內加爾:
За Сенегал:
POR EL SENEGAL:

IBRAHIMA BOYE
Ambassadeur du Sénégal à l'ONU
New York, le 6 juillet 1970


FOR SIERRA LEONE:
POUR LE SIERRA LEONE:
獅子山:
За Сьерра-Леоне:
POR SIERRA LEONA:


FOR SINGAPORE:
POUR SINGAPOUR:
新加坡:
За Сингапур:
POR SINGAPUR:


FOR SOMALIA:
POUR LA SOMALIE:
索馬利亞:
За Сомали:
POR SOMALIA:

**For South Africa:**
**Pour l'Afrique du Sud:**
南非:
За Южную Африку:
**Por Sudáfrica:**


**For Spain:**
**Pour l'Espagne:**
西班牙:
За Испанию:
**Por España:**


**For the Sudan:**
**Pour le Soudan:**
苏丹:
За Судан:
**Por el Sudán:**


**For Sweden:**
**Pour la Suède:**
瑞典:
За Швецию:
**Por Suecia:**

TORSTEN NILSSON
29 September 1967

**For Switzerland:**
**Pour la Suisse:**
瑞士:
За Швейцарию:
**Por Suiza:**

For Syria:
Pour la Syrie:
叙利亞:
За Сирию:
Por Siria:


For Thailand:
Pour la Thaïlande:
泰國:
За Таиланд:
Por Tailandia:


For Togo:
Pour le Togo:
多哥:
За Того:
Por el Togo:


For Trinidad and Tobago:
Pour la Trinité et Tobago:
千里達及托貝哥:
За Тринидад и Тобаго:
Por Trinidad y Tabago:


For Tunisia:
Pour la Tunisie:
突尼西亞:
За Тунис:
Por Túnez:

MAHMOUD MESTIRI
Le 30 avril 1968


For Turkey:
Pour la Turquie:
土耳其:
За Турцию:
Por Turquía:

For Uganda:
Pour l'Ouganda:
烏干達：
За Уганду:
Por Uganda:


For the Ukrainian Soviet Socialist Republic:[1]
Pour la République socialiste soviétique d'Ukraine:[1]
烏克蘭蘇維埃社會主義共和國：
За Украинскую Советскую Социалистическую Республику:
Por la República Socialista Soviética de Ucrania:

Сергій Тимофійович Шевченко[2]
20. III.68[3]


For the Union of Soviet Socialist Republics:[1]
Pour l'Union des Républiques socialistes soviétiques:[1]
蘇維埃社會主義共和國聯邦：
За Союз Советских Социалистических Республик:
Por la Unión de Repúblicas Socialistas Soviéticas:

Яков Александрович Малик[4]
18.3.68


For the United Arab Republic:[1]
Pour la République arabe unie:[1]
阿拉伯聯合共和國：
За Объединенную Арабскую Республику:
Por la República Árabe Unida:

[Illegible — Illisible]
4th August 1967


---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[2] Sergei Timofeyevich Shevchenko — Serguei Timofeyevitch Chevtchenko.
[3] 20 March 1968 — 20 mars 1968.
[4] Yakov Aleksandrovich Malik — Yakov Aleksandrovitch Malik.

For the United Kingdom of Great Britain and Northern Ireland: [1]
Pour le Royaume-Uni de Grande-Bretagne et d'Irlande du Nord: [1]
大不列顛及北愛爾蘭聯合王國:
За Соединенное Королевство Великобритании и Северной Ирландии:
Por el Reino Unido de Gran Bretaña e Irlanda del Norte:

CAREDON
16th September 1968


For the United Republic of Tanzania:
Pour la République-Unie de Tanzanie:
坦尚尼亞聯合共和國:
За Объединенную Республику Танзания:
Por la República Unida de Tanzania:


For the United States of America:
Pour les Etats-Unis d'Amérique:
美利堅合眾國:
За Соединенные Штаты Америки:
Por los Estados Unidos de América:


For the Upper Volta:
Pour la Haute-Volta:
上伏塔:
За Верхнюю Вольту:
Por el Alto Volta:


For Uruguay:
Pour l'Uruguay:
烏拉圭:
За Уругвай:
Por el Uruguay:

PEDRO P. BERRO
Febrero 21, 1967[2]


---

[1] See p. 282 of this volume for the texts of the declarations and reservations made upon signature — Voir p. 282 du présent volume pour les textes des déclarations et réserves faites lors de la signature.
[2] 21 February 1967 — 21 février 1967.

FOR VENEZUELA:
POUR LE VENEZUELA:
委內瑞拉：
За Венесуэлу:
POR VENEZUELA:

GERMÁN NAVA CARRILLO
24 junio 1969[1]


FOR WESTERN SAMOA:
POUR LE SAMOA-OCCIDENTAL:
西薩摩亞：
За Западное Самоа:
POR SAMOA OCCIDENTAL:


FOR YEMEN:
POUR LE YÉMEN:
也門：
За Йемен:
POR EL YEMEN:


FOR YUGOSLAVIA:
POUR LA YOUGOSLAVIE:
南斯拉夫：
За Югославию:
POR YUGOSLAVIA:

ANTON VRATUŠA
Aug. 8, 1967


FOR ZAMBIA:
POUR LA ZAMBIE:
尙比亞：
За Замбию:
POR ZAMBIA:


---

[1] 24 June 1969 — 24 juin 1969.

DECLARATIONS AND RESERVA-
TIONS MADE UPON SIGNATURE

*BYELORUSSIAN SOVIET
SOCIALIST REPUBLIC*

DÉCLARATIONS ET RÉSERVES
FAITES LORS DE LA SIGNATURE

*RÉPUBLIQUE SOCIALISTE
SOVIÉTIQUE DE BIÉLORUSSIE*

[BYELORUSSIAN TEXT — TEXTE BIÉLORUSSE]

«Беларуская Савецкая Сацыялістычная Рэспубліка заяўляе, што палажэнні пункта 1 артыкула 26 Пакта аб эканамічных, сацыяльных і культурных правах і пункта 1 артыкула 48 Пакта аб грамадзянскіх і палітычных правах, згодна з якімі рад дзяржаў не можа стаць удзельнікамі гэтых Пактаў, носяць дыскрымінацыйны характар, і лічыць, што Пакты ў адпаведнасці з прынцыпам суверэннай роўнасці дзяржаў павінны быць адкрыты для ўдзелу ўсіх зацікаўленых дзяржаў без якой-небудзь дыскрымінацыі і абмежавання.»

[RUSSIAN TEXT — TEXTE RUSSE]

«Белорусская Советская Социалистическая Республика заявляет, что положения пункта 1 статьи 26 Пакта об экономических, социальных и культурных правах и пункта 1 статьи 48 Пакта о гражданских и политических правах, согласно которым ряд государств не может стать участниками этих Пактов носят дискриминационный характер, и считает, что Пакты в соответствии с принципом суверенного равенства государств должны быть открыты для участия всех заинтересованных государств без какой-либо дискриминации и ограничения.»

[TRANSLATION]

The Byelorussian Soviet Socialist Republic declares that the provisions of paragraph 1 of article 26 of the International Covenant on Economic, Social and Cultural Rights[1] and of paragraph 1 of article 48 of the International Covenant on Civil and Political Rights, under which a number of States cannot become parties to these Covenants, are of a discriminatory nature and considers that the Covenants, in accordance with the principle of sovereign equality of States, should be open for participation by all States concerned without any discrimination or limitation.

[TRADUCTION]

La République socialiste soviétique de Biélorussie déclare que les dispositions du paragraphe 1 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] et celles du paragraphe 1 de l'article 48 de Pacte international relatif aux droits civils et politiques, aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et considère que, conformément au principe de l'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats intéressés sans aucune discrimination ou limitation.

---

[1] United Nations, *Treaty Series*, vol. 993, No. I-14531.

Vol. 999, I-14668

[1] Nations Unies, *Recueil des Traités*, vol. 993, n° I-14531.

| *CZECHOSLOVAKIA* | *TCHÉCOSLOVAQUIE* |

[CZECH TEXT — TEXTE TCHÈQUE]

«Československá socialistická republika prohlašuje, že ustanovení článku 48, odstavec 1 Mezinárodního paktu o občanských a politických právech je v rozporu se zásadou, že všechny státy mají právo stát se smluvními stranami mnohostranných smluv, jež upravují otázky obecného zájmu.»

[TRANSLATION[1] — TRADUCTION[2]]

The Czechoslovak Socialist Republic declares that the provisions of article 48, paragraph 1, of the International Covenant on Civil and Political Rights are in contradiction with the principle that all States have the right to become parties to multilateral treaties governing matters of general interest.

[TRADUCTION — TRANSLATION]

Le Gouvernement de la République socialiste tchécoslovaque déclare que les dispositions de l'article 48, paragraphe 1, du Pacte international relatif aux droits civils et politiques ne sont pas en concordance avec le principe selon lequel tous les Etats ont le droit de devenir parties aux traités multilatéraux réglementant les questions d'intérêt général.

| *HUNGARY* | *HONGRIE* |

[TRADUCTION — TRANSLATION]

"The Government of the Hungarian People's Republic declares that Paragraph 1 of Article 26 of the International Covenant on Economic, Social and Cultural Rights[3] and Paragraph 1 of Article 48 of the International Covenant on Civil and Political Rights according to which certain states may not become signatories to the said Conventions are of discriminatory nature and are contrary to the basic principle of international law that all states are entitled to become signatories to general multilateral treaties. These discriminatory provisions are incompatible with the objectives and purposes of the Covenants."

Le Gouvernement de la République populaire hongroise déclare que le paragraphe 1 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] et le paragraphe 1 de l'article 48 du Pacte international relatif aux droits civils et politiques, aux termes desquels certains Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et sont contraires au principe fondamental du droit international selon lequel tous les Etats ont le droit de devenir parties aux traités multilatéraux généraux. Ces dispositions discriminatoires sont incompatibles avec les buts des Pactes.

---

[1] Translation supplied by the Government of Czechoslovakia.
[2] Traduction fournie par le Gouvernement tchécoslovaque.
[3] United Nations, *Treaty Series*, vol. 993, No. I-14531.

[1] Nations Unies, *Recueil des Traités*, vol. 993, no I-14531.

*IRAQ*                                    *IRAQ*

[ARABIC TEXT — TEXTE ARABE]

" أن اقضاء الجمهورية العراقية الى هذين الدوليين الدوليين بشؤون الاقتصادية والاجتماعية وبالاجتماعية بشؤون وبالقانونية والثقافية والدولية الدولية بشؤون المدنية والسياسية لا يعني الاعتراف باسرائيل ولا يشكل ان الدولية بجميع احكام هذه الاتفاقيتين تجاه اسرائيل "

" أن هذا الاقضاء الى هذين اقضاء الجمهورية العراقية الهذه الى البروتوكول الاختياري الدولي الدولية الدولية بشؤون المدنية والسياسية " .

[TRANSLATION[1] — TRADUCTION[2]]    [TRADUCTION — TRANSLATION]

"The entry of the Republic of Iraq as a party to the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights[3] shall in no way signify recognition of Israel nor shall it entail any obligations towards Israel under the said two Covenants."

"The entry of the Republic of Iraq as a party to the above two Covenants shall not constitute entry by it as a party to the Optional Protocol to the International Covenant on Civil and Political Rights."

Le fait que la République d'Iraq devienne partie au Pacte international relatif aux droits économiques, sociaux et culturels[1] et au Pacte international relatif aux droits civils et politiques ne signifie en rien qu'elle reconnaît Israël ni qu'elle assume des obligations à l'égard d'Israël en vertu desdits Pactes.

Le fait que la République d'Iraq devienne partie aux deux Pactes susmentionnés ne signifie pas qu'elle devient partie au Protocole facultatif se rapportant au Pacte international relatif aux droits civils et politiques.

*MONGOLIA*                              *MONGOLIE*

[TRADUCTION — TRANSLATION]

"The Mongolian People's Republic declares that the provisions of paragraph 1 of article 26 of the International Covenant on Economic, Social and Cultural Rights[3] and of paragraph 1 of article 48 of the International Covenant on Civil and Political Rights, under which a number of States cannot become parties to these Covenants, are of discriminatory nature and considers that the Covenants, in accordance with the prin-

La République populaire mongole déclare que les dispositions du paragraphe 1 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] et celles du paragraphe 1 de l'article 48 du Pacte international relatif aux droits civils et politiques, aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et considère que,

[1] Translation supplied by the Government of Iraq.
[2] Traduction fournie par le Gouvernement iraquien.
[3] United Nations, *Treaty Series,* vol. 993, No. I-14531.

[1] Nations Unies, *Recueil des Traités,* vol. 993, n° I-14531.

ciple of sovereign equality of States, should be open for participation by all States concerned without any discrimination or limitation."

conformément au principe de l'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats intéressés sans aucune discrimination ou limitation.

### ROMANIA

[Translation — Traduction]

The Government of the Socialist Republic of Romania declares that the provisions of article 48, paragraph 1, of the International Covenant on Civil and Political Rights are at variance with the principle that all States have the right to become parties to multilateral treaties governing matters of general interest.

### ROUMANIE

«Le Gouvernement de la République Socialiste de Roumanie déclare que les dispositions de l'article 48, paragraphe 1 du Pacte international relatif aux droits civils et politiques ne sont pas en concordance avec le principe selon lequel tous les Etats ont le droit de devenir parties aux traités multilatéraux réglementant les questions d'intérêt général.»

### UKRAINIAN SOVIET SOCIALIST REPUBLIC

### RÉPUBLIQUE SOCIALISTE SOVIÉTIQUE D'UKRAINE

[Ukrainian text — Texte ukrainien]

«Українська Радянська Соціалістична Республіка заявляє, що положення пункту 1 статті 26 Міжнародного пакту про економічні, соціальні і культурні права та пункту 1 статті 48 Міжнародного пакту про громадянські і політичні права, згідно з якими ряд держав не може стати учасниками цих пактів, мають дискримінаційний характер, і вважає, що пакти відповідно до принципу суверенної рівності держав повинні бути відкриті для участі всіх заінтересованих держав без будь-якої дискримінації та обмеження.»

[Russian text — Texte russe]

«Украинская Советская Социалистическая Республика заявляет, что положения пункта 1 статьи 26 Международного пакта об экономических, социальных и культурных правах и пункта 1 статьи 48 Международного пакта о гражданских и политических правах, в соответствии с которыми ряд государств не может стать участниками этих пактов, имеют дискриминационный характер, и считает, что пакты в соответствии с принципом суверенного равенства государств должны быть открыты для участия всех заинтересованных государств без какой-либо дискриминации и ограничения.»

[Translation]

The Ukrainian Soviet Socialist Republic declares that the provisions of paragraph 1 of article 26 of the International Covenant on Economic, Social and Cul-

[Traduction]

La République socialiste soviétique d'Ukraine déclare que les dispositions du paragraphe 1 de l'article 26 du Pacte international relatif aux droits économi-

tural Rights[1] and of paragraph 1 of article 48 of the International Covenant on Civil and Political Rights, under which a number of States cannot become parties to these Covenants, are of a discriminatory nature and considers that the Covenants, in accordance with the principle of sovereign equality of States, should be open for participation by all States concerned without any discrimination or limitation.

ques, sociaux et culturels[1] et celles du paragraphe 1 de l'article 48 du Pacte international relatif aux droits civils et politiques, aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et considère que, conformément au principe de l'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats intéressés sans aucune discrimination ou limitation.

### UNION OF SOVIET SOCIALIST REPUBLICS

### UNION DES RÉPUBLIQUES SOCIALISTES SOVIÉTIQUES

[RUSSIAN TEXT — TEXTE RUSSE]

«Союз Советских Социалистических Республик заявляет, что положения пункта 1 статьи 26 Международного пакта об экономических, социальных и культурных правах и пункта 1 статьи 48 Международного пакта о гражданских и политических правах, согласно которым ряд государств не может стать участниками этих Пактов, носят дискриминационный характер, и считает, что Пакты в соответствии с принципом суверенного равенства государств должны быть открыты для участия всех заинтересованных государств без какой-либо дискриминации и ограничения.».

[TRANSLATION]

The Union of Soviet Socialist Republics declares that the provisions of paragraph 1 of article 26 of the International Covenant on Economic, Social and Cultural Rights[1] and of paragraph 1 of article 48 of the International Covenant on Civil and Political Rights, under which a number of States cannot become parties to these Covenants, are of a discriminatory nature and considers that the Covenants, in accordance with the principle of sovereign equality of States, should be open for participation by all States concerned without any discrimination or limitation.

[TRADUCTION]

L'Union des Républiques socialistes soviétiques déclare que les dispositions du paragraphe 1 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] et celles du paragraphe 1 de l'article 48 du Pacte international relatif aux droits civils et politiques, aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et considère que, conformément au principe de l'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats intéressés sans aucune discrimination ou limitation.

---

[1] United Nations, *Treaty Series,* vol. 993, No. I-14531.

[1] Nations Unies, *Recueil des Traités,* vol. 993, nº I-14531.

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

ROYAUME-UNI DE GRANDE-BRETAGNE ET D'IRLANDE DU NORD

[Traduction — Translation]

"First, the Government of the United Kingdom declare their understanding that, by virtue of Article 103 of the Charter of the United Nations, in the event of any conflict between their obligations under Article 1 of the Covenant and their obligations under the Charter (in particular, under Articles 1, 2 and 73 thereof) their obligations under the Charter shall prevail.

"Secondly, the Government of the United Kingdom declare that:

"(a) In relation to Article 14 of the Covenant, they must reserve the right not to apply, or not to apply in full, the guarantee of free legal assistance contained in sub-paragraph (d) of paragraph 3 in so far as the shortage of legal practitioners and other considerations render the application of this guarantee in British Honduras, Fiji and St. Helena impossible;

"(b) In relation to Article 23 of the Covenant, they must reserve the right not to apply the first sentence of paragraph 4 in so far as it concerns any inequality which may arise from the operation of the law of domicile;

"(c) In relation to Article 25 of the Covenant, they must reserve the right not to apply:

" (i) Sub-paragraph (b) in so far as it may require the establishment of an elected legislature in Hong Kong and the introduction of equal suffrage, as between different electoral rolls, for elections in Fiji; and

Premièrement, le Gouvernement du Royaume-Uni déclare qu'il considère qu'en vertu de l'Article 103 de la Charte des Nations Unies, en cas de conflit entre ses obligations aux termes de l'article premier du Pacte et ses obligations aux termes de la Charte (aux termes notamment de l'Article premier et des Articles 2 et 73 de ladite Charte), ses obligations aux termes de la Charte prévaudront.

Deuxièmement, le Gouvernement du Royaume-Uni déclare que :

a) En ce qui concerne l'article 14 du Pacte, il doit se réserver le droit de ne pas appliquer ou de ne pas appliquer intégralement la garantie d'assistance judiciaire gratuite énoncée à l'alinéa d du paragraphe 3, dans la mesure où le manque d'hommes de loi et d'autres considérations rendent l'application de cette garantie impossible au Honduras britannique, aux Fidji et à Sainte-Hélène;

b) En ce qui concerne l'article 23 du Pacte, le Gouvernement du Royaume-Uni doit se réserver le droit de ne pas appliquer la disposition énoncée dans la première phrase du paragraphe 4, dans la mesure où ladite phrase vise une inégalité quelconque pouvant résulter de l'application de la loi sur le domicile;

c) En ce qui concerne l'article 25 du Pacte, le Gouvernement du Royaume-Uni doit se réserver le droit de ne pas appliquer :

i) L'alinéa b, dans la mesure où cette disposition peut impliquer l'institution à Hong-kong d'un organe législatif élu et l'introduction du suffrage égal, pour les différents collèges électoraux, pour les élections aux Fidji; et

"(ii) Sub-paragraph (*c*) in so far as it applies to jury service in the Isle of Man and to the employment of married women in the Civil Service of Northern Ireland, Fiji, and Hong Kong.

"Lastly, the Government of the United Kingdom declare that the provisions of the Covenant shall not apply to Southern Rhodesia unless and until they inform the Secretary-General of the United Nations that they are in a position to ensure that the obligations imposed by the Covenant in respect of that territory can be fully implemented."

## DECLARATIONS AND RESERVATIONS MADE UPON RATIFICATION OR ACCESSION(*a*)

### BARBADOS(a)

"The Government of Barbados states that it reserves the right not to apply in full, the guarantee of free legal assistance in accordance with paragraph 3(*d*) of Article 14 of the Covenant, since, while accepting the principles contained in the same paragraph, the problems of implementation are such that full application cannot be guaranteed at present."

### BULGARIA

ii) L'alinéa *c*, dans la mesure où il concerne l'exercice des fonctions de juré dans l'île de Man et l'emploi de femmes mariées dans la fonction publique en Irlande du Nord, aux Fidji et à Hong-kong.

Enfin, le Gouvernement du Royaume-Uni déclare que les dispositions du Pacte ne s'appliqueront pas à la Rhodésie du Sud tant qu'il n'aura pas fait savoir au Secrétaire général de l'Organisation des Nations Unies qu'il était à même de garantir que les obligations que lui impose le Pacte quant à ce territoire peuvent être intégralement remplies.

## DÉCLARATIONS ET RÉSERVES FAITES LORS DE LA RATIFICATION OU DE L'ADHÉSION(*a*)

### BARBADE(a)

[TRADUCTION — TRANSLATION]

Le Gouvernement de la Barbade déclare qu'il se réserve le droit de ne pas appliquer intégralement la garantie concernant l'assistance judiciaire gratuite visée à l'alinéa *d* du paragraphe 3 de l'article 14 du Pacte; en effet, bien qu'il souscrive aux principes énoncés dans ledit paragraphe, il ne peut, étant donné l'ampleur des difficultés d'application, garantir actuellement la mise en œuvre intégrale de cette disposition.

### BULGARIE

[BULGARIAN TEXT — TEXTE BULGARE]

«Народна република България смята за необходимо да подчертае, че член 48 точки 1 и 3 от Международния пакт за граждански и политически права и член 26 точки 1 и 3 от Международния пакт за икономически, социални и културни права, като изключват известен брой държави от възможността да участвуват в пактовете, имат дискриминационен характер. Тези разпоредби са несъвместими със самото естество на пактовете, които имат универсален характер и трябва да бъдат открити за присъединяване на всички държави. По силата на принципа на суверенното равенство никоя държава няма право да възпрепятствува други държави да участвуват в такива пактове.»

[TRADUCTION — TRANSLATION]

"The People's Republic of Bulgaria deems it necessary to underline that the provisions of Article 48, paragraphs 1 and 3, of the International Covenant on Civil and Political Rights, and Article 26, paragraphs 1 and 3, of the International Covenant on Economic, Social and Cultural Rights,[1] under which a number of States are deprived of the opportunity to become parties to the Covenants, are of a discriminatory nature. These provisions are inconsistent with the very nature of the Covenants, which are universal in character and should be open for accession by all States. In accordance with the principle of sovereign equality, no State has the right to bar other States from becoming parties to a covenant of this kind."

La République populaire de Bulgarie estime nécessaire de souligner que les dispositions des paragraphes 1 et 3 de l'article 48 du Pacte international relatif aux droits civils et politiques et des paragraphes 1 et 3 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1], aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire. Ces dispositions ne sont pas en concordance avec la nature même de ces Pactes, dont le caractère est universel et qui devraient être ouverts à la participation de tous les Etats. Conformément au principe de l'égalité souveraine des Etats, aucun Etat n'a le droit d'interdire à d'autres Etats de devenir parties à un Pacte de ce type.

### BYELORUSSIAN SOVIET SOCIALIST REPUBLIC

### RÉPUBLIQUE SOCIALISTE SOVIÉTIQUE DE BIÉLORUSSIE

[Confirming the declaration made upon signature. For the text, see p. 282 of this volume.]

[Avec confirmation de la déclaration faite lors de la signature. Pour le texte, voir p. 282 du présent volume.]

### CZECHOSLOVAKIA

### TCHÉCOSLOVAQUIE

[CZECH TEXT — TEXTE TCHÈQUE]

«Prozkoumavše tento Pakt a vědouce, že Federální shromáždění Československé socialistické republiky s ním souhlasí, schvalujeme a přijímáme jej. Přijímajíce tento Pakt prohlašujeme, že ustanovení článku 48 odstavce 1 je v rozporu se zásadou, že všechny státy mají právo stát se stranou mnohostranných smluv upravujících záležitosti obecného zájmu.»

---

[1] United Nations, Treaty Series, vol. 993, No. I-14531.

[1] Nations Unies, Recueil des Traités, vol. 993, no I-14531.

[TRANSLATION[1] — TRADUCTION[2]]

"Having examined this Covenant and knowing that the Federal Assembly of the Czechoslovak Socialist Republic has given its consent thereto, we hereby approve and confirm it. Confirming this Covenant, we declare that the provision of Article 48, paragraph 1, is in contradiction with the principle that all States have the right to become parties to multilateral treaties regulating matters of general interest."

### DENMARK

"1.   The Government of Denmark makes a reservation in respect of Article 10, paragraph 3, second sentence. In Danish practice, considerable efforts are made to ensure appropriate age distribution of convicts serving sentences of imprisonment, but it is considered valuable to maintain possibilities of flexible arrangements.

"2.   (a).   Article 14, paragraph 1, shall not be binding on Denmark in respect of public hearings.

"In Danish law, the right to exclude the press and the public from trials may go beyond what is permissible under this Covenant, and the Government of Denmark finds that this right should not be restricted.

"(b).   Article 14, paragraphs 5 and 7, shall not be binding on Denmark.

[TRADUCTION — TRANSLATION]

Ayant examiné le présent Pacte et sachant que l'Assemblée fédérale de la République socialiste tchécoslovaque y a donné son assentiment, nous l'approuvons et le confirmons. En le confirmant, nous déclarons que les dispositions du paragraphe 1 de l'article 48 du Pacte sont en contradiction avec le principe selon lequel tous les Etats ont le droit de devenir parties aux traités multilatéraux régissant les questions d'intérêt général.

### DANEMARK

[TRADUCTION — TRANSLATION]

1.   Le Gouvernement danois fait une réserve en ce qui concerne la seconde phrase du paragraphe 3 de l'article 10. Au Danemark, on ne néglige aucun effort, dans la pratique, pour assurer une répartition appropriée, suivant leur âge, des personnes condamnées à des peines d'emprisonnement, mais on estime qu'il convient de se réserver la possibilité d'adopter des solutions souples.

2.   a)   Le Danemark ne sera pas tenu par les dispositions du paragraphe 1 de l'article 14 concernant la publicité des procédures judiciaires.

En droit danois, la faculté de prononcer le huis clos pendant un procès peut être plus large que celle qui est prévue dans le Pacte, et le Gouvernement danois estime que cette faculté ne doit pas être restreinte.

b)   Le Danemark ne sera pas tenu par les dispositions des paragraphes 5 et 7 de l'article 14.

---

[1] Translation supplied by the Government of Czechoslovakia.
[2] Traduction fournie par le Gouvernement tchécoslovaque.

"The Danish Administration of Justice Act contains detailed provisions regulating the matters dealt with in these two paragraphs. In some cases, Danish legislation is less restrictive than the Covenant (e.g. a verdict returned by a jury on the question of guilt cannot be reviewed by a higher tribunal, cf. paragraph 5); in other cases, Danish legislation is more restrictive than the Covenant (e.g. with respect to resumption of a criminal case in which the accused party was acquitted, cf. paragraph 7).

"3.   Reservation is further made to Article 20, paragraph 1. This reservation is in accordance with the vote cast by Denmark in the XVI General Assembly of the United Nations in 1961 when the Danish Delegation, referring to the preceding article concerning freedom of expression, voted against the prohibition against propaganda for war."

Au Danemark, la loi relative à l'administration de la justice contient des dispositions détaillées concernant les questions traitées dans ces deux paragraphes. Dans certains cas, la législation danoise est moins restrictive que le Pacte (par exemple, un verdict rendu par un jury en ce qui concerne la culpabilité ne peut pas être réexaminé par une juridiction supérieure; voir le paragraphe 5), tandis que dans d'autres cas elle est plus restrictive que le Pacte (par exemple, en ce qui concerne la réouverture d'un procès criminel ayant abouti à l'acquittement de l'accusé; voir le paragraphe 7).

3.   Le Gouvernement danois fait également une réserve en ce qui concerne le paragraphe 1 de l'article 20. Cette réserve est conforme au vote exprimé par le Danemark à la seizième session de l'Assemblée générale des Nations Unies, en 1961, lorsque la délégation danoise, compte tenu de l'article précédent du Pacte concernant la liberté d'expression, a voté contre l'interdiction de la propagande en faveur de la guerre.

### FINLAND

### FINLANDE

[TRADUCTION — TRANSLATION]

"1.   With respect to Article 9 paragraph 3 of the Covenant Finland declares that according to the present Finnish legislation the administrative authorities may take decisions concerning arrest or imprisonment, in which event the case is taken up for decision in court only after a certain time lapse;

"2.   With respect to Article 10 paragraphs 2 b) and 3 of the Covenant, Finland declares that although juvenile offenders are, as a rule, segregated from adults, it does not deem [it] appropriate to adopt an absolute prohibition not allowing for more flexible arrangements;

1.   En ce qui concerne le paragraphe 3 de l'article 9 du Pacte, la Finlande déclare que, conformément à la législation finlandaise actuelle, les autorités administratives peuvent prendre des décisions concernant l'arrestation ou l'emprisonnement, auquel cas un tribunal n'est saisi de l'affaire et ne se prononce qu'après un certain délai;

2.   Pour ce qui est des paragraphes 2, b, et 3 de l'article 10 du Pacte, la Finlande déclare que bien qu'en règle générale les jeunes délinquants soient séparés des adultes elle n'estime pas souhaitable d'instituer une interdiction absolue qui ne permettrait pas d'arrangements plus souples;

"3.    With respect to Article 13 of the Covenant, Finland declares that the Article does not correspond to the present Finnish legislation regarding an alien's right to be heard or lodge a complaint in respect of a decision concerning his expulsion;

"4.    With respect to Article 14 paragraph 1 of the Covenant, Finland declares that under Finnish law a sentence can be declared secret if its publication could be an affront to morals or endanger national security;

"5.    With respect to Article 14 paragraph 3 d) of the Covenant, Finland declares that the contents of this paragraph do not correspond to the present legislation in Finland inasmuch as it is a question of the defendant's absolute right to have legal assistance already at the stage of preliminary investigations;

"6.    With respect to Article 14 paragraph 7 of the Covenant, Finland declares that it is going to pursue its present practice, according to which a sentence can be changed to the detriment of the convicted person, if it is established that a member or an official of the court, the prosecutor or the legal counsel have through criminal or fraudulent activities obtained the acquittal of the defendant or a substantially more lenient penalty, or if false evidence has been presented with the same effect, and according to which an aggravated criminal case may be taken up for reconsideration if within a year until then unknown evidence is presented, which would have led to conviction or a substantially more severe penalty;

"7.    With respect to Article 20 paragraph 1 of the Covenant, Finland declares that it will not apply the provisions of this paragraph, this being compatible with the standpoint Finland already expressed at the 16th United Nations

3.    Quant à l'article 13 du Pacte, la Finlande déclare que cet article ne correspond pas à la législation finlandaise actuelle concernant le droit d'un étranger de se faire entendre ou de porter plainte à propos d'une décision d'expulsion;

4.    En ce qui concerne le paragraphe 1 de l'article 14 du Pacte, la Finlande déclare qu'en vertu du droit finlandais un jugement peut être prononcé à huis clos si sa publication doit offenser la morale ou mettre en danger la sécurité nationale;

5.    Pour ce qui est du paragraphe 3, d, de l'article 14 du Pacte, la Finlande déclare que sa teneur ne correspond pas à la législation actuelle en Finlande dans la mesure où le défendeur a le droit absolu d'avoir un défenseur dès le stade de l'enquête préliminaire;

6.    Au sujet du paragraphe 7 de l'article 14 du Pacte, la Finlande déclare qu'elle poursuivra sa pratique actuelle, selon laquelle une peine peut être aggravée s'il est établi qu'un membre ou un fonctionnaire du tribunal, le procureur ou l'avocat de la défense ont obtenu l'acquittement du défendeur ou une peine beaucoup plus légère par des moyens délictueux ou frauduleux, ou si de faux témoignages ont été présentés avec le même résultat, et selon laquelle un délit qualifié peut être jugé à nouveau si, dans un délai d'un an, de nouvelles preuves sont présentées qui, si elles avaient été connues, auraient entraîné une condamnation ou une peine beaucoup plus sévère;

7.    En ce qui concerne le paragraphe 1 de l'article 20 du Pacte, la Finlande déclare qu'elle n'appliquera pas ses dispositions, celles-ci étant incompatibles avec le point de vue que la Finlande a déjà exprimé à la seizième Assemblée

General Assembly by voting against the prohibition of propaganda for war, on the grounds that this might endanger the freedom of expression referred in Article 19 of the Covenant."

générale de l'Organisation des Nations Unies en votant contre l'interdiction de la propagande en faveur de la guerre, faisant valoir que cela risque de compromettre la liberté d'expression mentionnée à l'article 19 du Pacte.

### FEDERAL REPUBLIC OF GERMANY

### RÉPUBLIQUE FÉDÉRALE D'ALLEMAGNE

[GERMAN TEXT — TEXTE ALLEMAND]

,,1. Artikel 19, 21 und 22 in Verbindung mit Artikel 2 Abs. 1 des Paktes werden in dem Artikel 16 der Konvention zum Schutze der Menschenrechte und Grundfreiheiten vom 4. November 1950 entsprechenden Rahmen angewandt.

,,2. Artikel 14 Abs. 3 Buchstabe *d* des Paktes wird derart angewandt, dass die persönliche Anwesenheit eines nicht auf freiem Fuss befindlichen Angeklagten zur Revisionshauptverhandlung is das Ermessen des Gerichts gestellt wird.

,,3. Artikel 14 Abs. 5 des Paktes wird derart angewandt, dass

*a)* ein weiteres Rechtsmittel nicht in allen Fällen allein deshalb eröffnet werden muss, weil der Beschuldigte in der Rechtsmittelinstanz erstmals verurteilt worden ist, und

*b)* bei Straftaten von geringer Schwere die Überprüfung eines nicht auf Freiheitsstrafe lautenden Urteils durch ein Gericht höherer Instanz nicht in allen Fällen ermöglicht werden muss.

,,4. Artikel 15 Abs. 1 des Paktes wird derart angewandt, dass im Falle einer Milderung der zur Zeit in Kraft befindlichen Strafvorschriften in bestimmten Ausnahmefällen das bisher geltende Recht auf Taten, die vor der Gesetzesänderung begangen wurden, anwendbar bleiben kann. "

[TRADUCTION — TRANSLATION]

"1. Articles 19, 21 and 22 in conjunction with Article 2 (1) of the Covenant shall be applied within the scope of Article 16 of the Convention of 4 November 1950 for the Protection of Human Rights and Fundamental Freedoms.[1]

"2. Article 14 (3) (*d*) of the Covenant shall be applied in such manner that it is for the court to decide whether an accused person held in custody has to appear in person at the hearing before the court of review (*Revisionsgericht*).

"3. Article 14 (5) of the Covenant shall be applied in such manner that

1. Les articles 19, 21, et 22, en conjonction avec l'article 2, paragraphe 1, du Pacte seront appliqués dans le contexte de l'article 16 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales du 4 novembre 1950[1].

2. L'alinéa *d* du paragraphe 3 de l'article 14 du Pacte sera appliqué comme suit : il incombe à la juridiction de révision de décider si l'accusé qui n'est pas en liberté doit assister personnellement à ses débats.

3. Le paragraphe 5 de l'article 14 du Pacte sera appliqué de la manière suivante :

---

[1] United Nations, *Treaty Series*, vol. 213, p. 221.

[1] Nations Unies, *Recueil des Traités*, vol. 213, p. 221.

(a) a further appeal does not have to be instituted in all cases solely on the grounds the accused person — having been acquitted by the lower court — was convicted for the first time in the proceedings concerned by the appellate court.

(b) in the case of criminal offences of minor gravity the review by a higher tribunal of a decision not imposing imprisonment does not have to be admitted in all cases.

"4.    Article 15(1) of the Covenant shall be applied in such manner that when provision is made by law for the imposition of a lighter penalty the hitherto applicable law may for certain exceptional categories of cases remain applicable to criminal offences committed before the law was amended."

a) La possibilité d'un recours devant une juridiction supérieure ne doit pas être ouverte dans tous les cas par le simple fait que l'inculpé a été condamné pour la première fois par la juridiction d'appel.

b) Lors d'infractions mineures, le pourvoi devant une juridiction supérieure n'est pas nécessairement admis dans tous les cas de condamnation à une peine non privative de liberté.

4.    Le paragraphe 1 de l'article 15 du Pacte sera appliqué comme suit : dans le cas d'un adoucissement des dispositions pénales en vigueur, dans certains cas exceptionnels précis, le droit en vigueur antérieurement reste applicable à des actes commis avant la modification de la loi.

### GERMAN DEMOCRATIC REPUBLIC

### RÉPUBLIQUE DÉMOCRATIQUE ALLEMANDE

[GERMAN TEXT — TEXTE ALLEMAND]

,,Die Deutsche Demokratische Republik ist der Auffassung, daß Artikel 48 Absatz 1 der Konvention im Widerspruch zu dem Prinzip steht, wonach alle Staaten, die sich in ihrer Politik von den Zielen und Grundsätzen der Charta der Vereinten Nationen leiten lassen, das Recht haben, Mitglied von Konventionen zu werden, die die Interessen aller Staaten berühren."

[TRANSLATION[1] — TRADUCTION[2]]

"The German Democratic Republic holds the view that Article 48, paragraph 1 of the Covenant is in contradiction to the principle according to which all States, which are guided in their policy by the aims and principles of the United Nations Charter, have the right to become members of covenants which affect the interests of all States."

"The GDR has ratified the two covenants in accordance with the policy it has so far pursued with the view to

[TRADUCTION — TRANSLATION]

La République démocratique allemande estime que le paragraphe 1 de l'article 48 du Pacte est en contradiction avec le principe selon lequel tous les Etats dont la politique est guidée par les buts et principes de la Charte des Nations Unies ont le droit de devenir partie à des conventions qui touchent les intérêts de tous les Etats.

[TRADUCTION — TRANSLATION]

La République démocratique allemande a ratifié les deux Pactes conformément à la politique qu'elle a menée

[1] Translation supplied by the Government of the Federal Republic of Germany.
[2] Traduction fournie par le Gouvernement de la République fédérale d'Allemagne.

safeguarding human rights. It is convinced that these covenants promote the world-wide struggle for the enforcement of human rights, which is an integral part of the struggle for the maintenance and strengthening of peace. On the occasion of the 25th anniversary of the Universal Declaration of Human Rights it thus contributes to the peaceful international cooperation of states, to the promotion of human rights and to the joint struggle against their violation by aggressive policies, colonialism and apartheid, racism and other forms of assaults on the right of the peoples to self-determination.

"The Constitution of the GDR guarantees the political, economic, social and cultural rights to every citizen independent of race, sex and religion. Socialist democracy has created the conditions for every citizen not only to enjoy these rights but also take an active part in their implementation and enforcement.

"Such fundamental human rights as the right to peace, the right to work and social security, the equality of women, and the right to education have been fully implemented in the GDR. The government of the GDR has always paid great attention to the material prerequisites for guaranteeing above all the social and economic rights. The welfare of the working people and its continuous improvement are the leitmotiv of the entire policy of the government of the GDR.

"The government of the GDR holds that the signing and ratification of the two human rights covenants by further member states of the United Nations would be an important step to imple-

jusqu'ici en vue de sauvegarder les droits de l'homme. Elle est convaincue que ces Pactes favorisent la lutte menée à l'échelle mondiale pour assurer la réalisation des droits de l'homme, lutte qui s'inscrit elle-même dans le cadre de celle engagée en vue du maintien et du renforcement de la paix. A l'occasion du vingt-cinquième anniversaire de la Déclaration universelle des droits de l'homme, la République démocratique allemande participe ainsi à la coopération pacifique entre les Etats, à la promotion des droits de l'homme et à la lutte commune contre la violation de ces droits par des politiques agressives, le colonialisme et l'*apartheid,* le racisme et tous autres types d'atteintes au droit des peuples à disposer d'eux-mêmes.

La Constitution de la République démocratique allemande garantit les droits politiques, économiques, sociaux et culturels de tout citoyen sans distinction de race, de sexe et de religion. La démocratie socialiste a créé les conditions voulues pour que tout citoyen non seulement jouisse de ses droits mais s'attache activement à les exercer et à les faire respecter.

Les droits fondamentaux de l'homme, tels que le droit à la paix, le droit au travail et à la sécurité sociale, l'égalité des femmes et le droit à l'éducation, sont pleinement exercés en République démocratique allemande. Le Gouvernement de la République démocratique allemande a toujours accordé beaucoup d'attention aux conditions matérielles qu'il faut créer au préalable pour garantir essentiellement les droits sociaux et économiques. La nécessité d'assurer et d'améliorer continuellement le bien-être des travailleurs a toujours été l'élément de base de l'ensemble de la politique du Gouvernement de la République démocratique allemande.

Le Gouvernement de la République démocratique allemande estime que la signature et la ratification des deux Pactes relatifs aux droits de l'homme par d'autres Etats Membres de l'*Organisa-*

ment the aims for respecting and promoting the human rights, the aims proclaimed in the United Nations Charter."

tion des Nations Unies représenteraient un pas important vers la réalisation des objectifs que sont le respect et la promotion des droits de l'homme et qui sont énoncés dans la Charte des Nations Unies.

### HUNGARY

### HONGRIE

[TRADUCTION — TRANSLATION]

"The Presidential Council of the Hungarian People's Republic declares that the provisions of article 48, paragraphs 1 and 3, of the International Covenant on Civil and Political Rights, and article 26, paragraphs 1 and 3, of the International Covenant on Economic, Social and Cultural Rights[1] are inconsistent with the universal character of the Covenants. It follows from the principle of sovereign equality of States that the Covenants should be open for participation by all States without any discrimination or limitation."

Le Conseil présidentiel de la République populaire de Hongrie déclare que les dispositions des paragraphes 1 et 3 de l'article 48 du Pacte international relatif aux droits civils et politiques et celles des paragraphes 1 et 3 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] sont incompatibles avec le caractère universel des Pactes. Selon le principe d'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats sans aucune discrimination ni limitation.

### IRAQ

### IRAQ

[ARABIC TEXT — TEXTE ARABE]

« ان ايران العراق للعهد الدولي للحقوق الاقتصادية والاجتماعية والثقافية والعهد الدولي للحقوق المدنية والسياسية لا يعني بأي حال من الأحوال الاعتراف بإسرائيل ولا يؤدي الى الدخول معها في المعاملات التي ينظمها هذه الاتفاقية »

[TRANSLATION[2]]

[TRADUCTION[2]]

Ratification by Iraq . . . shall in no way signify recognition of Israel nor shall it be conducive to entry with her into such dealings as are regulated by the said [Covenant].

La ratification pour l'Irak . . . ne signifie nullement que l'Irak reconnaît Israël ni qu'il établira avec Israël les relations [que régit ledit Pacte].

### LIBYAN ARAB JAMAHIRIYA(a)

### JAMAHIRIYA ARABE LIBYENNE(a)

[TRADUCTION — TRANSLATION]

"The acceptance and the accession to this Covenant by the Libyan Arab Re-

L'approbation et l'adhésion de la République arabe libyenne touchant le

---

[1] United Nations, *Treaty Series*, vol. 993, No. I-14531.
[2] Translation supplied by the Government of Iraq.

[1] Nations Unies, *Recueil des Traités*, vol. 993, nᵒ I-14531.
[2] Traduction fournie par le Gouvernement iraquien.

public shall in no way signify a recognition of Israel or be conducive to entry by the Libyan Arab Republic into such dealings with Israel as are regulated by the Covenant."

Pacte dont il s'agit ne signifient nullement que la République arabe libyenne reconnaît Israël ni qu'elle établira avec Israël les relations que régit ledit Pacte.

### *MONGOLIA*

*MONGOLIE*

[Mongolian text — Texte mongol]

«Эдийн засаг, Нийгэм, Соёлын эрхийн тухай олон улсын Пакт"-ын 26 дугаар зүйл (1) Иргэний ба Улс төрийн эрхийн тухай олон улсын Пакт"-ын 48 дугаар зүйл (1) нь уг Пактуудад оролцогч улсуудын хүрээг тодорхой заалтаар хязгаарласнаар зарим улсыг ялгаварлан гадуурхаж байна гэж БНМАУ-ын Засгийн газар үзээхийн хамт улс бүр тэгш эрхтэй байх зарчмын үндсэн дээр сонирхож байгаа бүх улс эдгээр Пактад ямар нэгэн ялгаваргүй - гээр оролцох эрх эдлэх ёстой гэж мэдэгдэж байна.»

[Traduction — Translation]

"The Mongolian People's Republic declares that the provisions of paragraph 1 of article 26 of the International Covenant on Economic, Social and Cultural Rights[1] and of paragraph 1 of article 48 of the International Covenant on Civil and Political Rights, under which a number of States cannot become parties to these Covenants, are of discriminatory nature and considers that the Covenants, in accordance with the principle of sovereign equality of States, should be open for participation by all States concerned without any discrimination or limitation."

La République populaire mongole déclare que les dispositions du paragraphe 1 de l'article 26 du Pacte international relatif aux droits économiques, sociaux et culturels[1] et celles du paragraphe 1 de l'article 48 du Pacte international relatif aux droits civils et politiques, aux termes desquelles un certain nombre d'Etats ne peuvent pas devenir parties auxdits Pactes, ont un caractère discriminatoire et considère que, conformément au principe de l'égalité souveraine des Etats, les Pactes devraient être ouverts à la participation de tous les Etats intéressés sans aucune discrimination ou limitation.

### *NORWAY*

*NORVÈGE*

[Traduction — Translation]

"Norway enters reservations with respect to:
— Article 6, paragraph 4,
— Article 10, paragraph 2(*b*) and paragraph 3, with regard to the

La Norvège fait des réserves à l'égard de :
— L'article 6, paragraphe 4,
— L'article 10, paragraphe 2, *b*, et paragraphe 3, en ce qui concerne

---

[1] United Nations, *Treaty Series*, vol. 993, No. I-14531.

[1] Nations Unies, *Recueil des Traités*, vol. 993, nᵒ I-14531.

obligation to keep accused juvenile persons and juvenile offenders segregated from adults,
— Article 14, paragraphs 5 and 7, and
— Article 20, paragraph 1."

### ROMANIA

[TRANSLATION — TRADUCTION]

(a)   The State Council of the Socialist Republic of Romania considers that the provisions of article 48 (1) of the International Covenant on Civil and Political Rights are inconsistent with the principle that multilateral international treaties whose purposes concern the international community as a whole must be open to universal participation.

(b)   The State Council of the Socialist Republic of Romania considers that the maintenance in a state of dependence of certain territories referred to in article 1 (3) of the International Covenant on Civil and Political Rights is inconsistent with the Charter of the United Nations and the instruments adopted by the Organization on the granting of independence to colonial countries and peoples, including the Declaration on Principles of International Law concerning Friendly Relations and Co-operation among States in accordance with the Charter of the United Nations, adopted unanimously by the United Nations General Assembly in its resolution 2625 (XXV) of 1970,[1] which solemnly proclaims the duty of States to promote the realization of the principle of equal rights and self-determination of peoples in order to bring a speedy end to colonialism.

l'obligation de séparer les jeunes prévenus et les jeunes délinquants des adultes,
— L'article 14, paragraphes 5 et 7, et
— L'article 20, paragraphe 1.

### ROUMANIE

«a)   Le Conseil d'Etat de la République socialiste de Roumanie considère que les provisions de l'article 48, point 1er, du Pacte international relatif aux droits civils et politiques, ne sont pas en concordance avec le principe selon lequel les traités internationaux multilatéraux dont l'objet et le but intéressent la communauté internationale dans son ensemble doivent être ouverts à la participation universelle.

«b)   Le Conseil d'Etat de la République socialiste de Roumanie considère que le maintien de l'état de dépendance de certains territoires auxquels se réfère l'article premier, point 3, du Pacte international relatif aux droits civils et politiques n'est pas en concordance avec la Charte des Nations Unies et les documents adoptés par cette organisation sur l'octroi de l'indépendance aux pays et aux peuples coloniaux, y compris la Déclaration relative aux principes du droit international touchant les relations amicales et la coopération entre les Etats conformément à la Charte des Nations Unies, adoptée à l'unanimité par la résolution de l'Assemblée générale de l'Organisation des Nations Unies no 2625 (XXV) de 1970[1], qui proclame solennellement le devoir des Etats de favoriser la réalisation du principe de l'égalité de droits des peuples et de leur droit à disposer d'eux-mêmes, dans le but de mettre rapidement fin au colonialisme.»

---

[1] United Nations, *Official Records of the General Assembly, Twenty-fifth Session, Supplement No. 28* (A/8028), p. 121.

[1] Nations Unies, *Documents officiels de l'Assemblée générale, vingt-cinquième session, Supplément no 28* (A/8028), p. 131.

*SWEDEN*                                                    *SUÈDE*

[SWEDISH TEXT — TEXTE SUÉDOIS]

"Sverige förbehåller sig rätten att icke tillämpa bestämmelserna i artikel 10 mom. 3 såvitt avser kravet på att ungdomsbrottslingar skola hållas åtskilda från vuxna, artikel 14 mom. 7 och artikel 20 mom. 1 i konventionen."

[TRANSLATION — TRADUCTION]                    [TRADUCTION[1] — TRANSLATION[2]]

. . . Sweden reserves the right not to apply the provisions of article 10, paragraph 3, with regard to the obligation to segregate juvenile offenders from adults, the provisions of article 14, paragraph 7, and the provisions of article 20, paragraph 1, of the Covenant.

« . . . la Suède se réserve le droit de ne pas appliquer les dispositions du paragraphe 3 de l'article 10 en ce qui concerne l'obligation de séparer les jeunes délinquants des adultes, du paragraphe 7 de l'article 14 et du paragraphe 1 de l'article 20 du Pacte.»

*SYRIAN ARAB REPUBLIC* (a)              *RÉPUBLIQUE ARABE SYRIENNE* (a)

[TRANSLATION — TRADUCTION]

1. The accession of the Syrian Arab Republic to these two Covenants shall in no way signify recognition of Israel or entry into a relationship with it regarding any matter regulated by the said two Covenants.

2. The Syrian Arab Republic considers that paragraph 1 of article 26 of the Covenant on Economic, Social and Cultural Rights[1] and paragraph 1 of article 48 of the Covenant on Civil and Political Rights are incompatible with the purposes and objectives of the said Covenants, inasmuch as they do not allow all States, without distinction or discrimination, the opportunity to become parties to the said Covenants.

«1. Il est entendu que l'adhésion de la République Arabe Syrienne à ces deux Pactes ne signifie en aucune façon la reconnaissance d'Israël ou l'entrée avec lui en relation au sujet d'aucune matière que ces deux Pactes réglementent.

«2. La République Arabe Syrienne considère que le paragraphe 1 de l'article 26 du Pacte relatif aux droits économiques, sociaux et culturels[3] ainsi que le paragraphe 1 de l'article 48 du Pacte relatif aux droits civils et politiques ne sont pas conformes aux buts et objectifs desdits Pactes puisqu'ils ne permettent pas à tous les Etats, sans distinction et discrimination, la possibilité de devenir parties à ces Pactes.»

---

[1] United Nations, *Treaty Series,* vol. 993, No. I-14531.

[1] Traduction fournie par le Gouvernement suédois.
[2] Translation supplied by the Government of Sweden.
[3] Nations Unies, *Recueil des Traités,* vol. 993, nᵒ I-14531.

*UKRAINIAN SOVIET SOCIALIST REPUBLIC*

[*Confirming the declaration made upon signature. For the text, see p. 282 of this volume.*]

*UNION OF SOVIET SOCIALIST REPUBLICS*

[*Confirming the declaration made upon signature. For the text, see p. 282 of this volume.*]

DECLARATIONS RECOGNIZING THE COMPETENCE OF THE HUMAN RIGHTS COMMITTEE UNDER ARTICLE 41

*FINLAND*

"Finland declares, under Article 41 of the International Covenant on Civil and Political Rights that it recognizes the competence of the Human Rights Committee referred to in Article 28 of the said Covenant, to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligation under this Covenant."

*NORWAY*

"... pursuant to article 41 of the Covenant, ... Norway recognizes the competence of the Human Rights Committee referred to in article 28 of the Covenant, to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under the Covenant."

*RÉPUBLIQUE SOCIALISTE SOVIÉTIQUE D'UKRAINE*

[*Avec confirmation de la déclaration faite lors de la signature. Pour le texte, voir p. 282 du présent volume.*]

*UNION DES RÉPUBLIQUES SOCIALISTES SOVIÉTIQUES*

[*Avec confirmation de la déclaration faite lors de la signature. Pour le texte, voir p. 282 du présent volume.*]

DÉCLARATIONS RECONNAISSANT LA COMPÉTENCE DU COMITÉ DES DROITS DE L'HOMME EN VERTU DE L'ARTICLE 41

*FINLANDE*

« La Finlande déclare, en vertu de l'article 41 du Pacte international relatif aux droits civils et politiques, qu'elle reconnaît la compétence du Comité des droits de l'homme dénommé à l'article 28 du Pacte, pour recevoir et examiner des communications dans lesquelles un Etat partie prétend qu'un autre Etat partie ne s'acquitte pas de ses obligations au titre du présent Pacte. »

*NORVÈGE*

[TRADUCTION — TRANSLATION]

En vertu de l'article 41 du Pacte, la Norvège reconnaît la compétence du Comité des droits de l'homme visé à l'article 28 du Pacte pour recevoir et examiner des communications dans lesquelles un Etat partie prétend qu'un autre Etat partie ne s'acquitte pas de ses obligations au titre du Pacte.

## SWEDEN

"... pursuant to article 41 of the Covenant, ... Sweden recognizes the competence of the Human Rights Committee referred to in article 28 of the Covenant to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under the Covenant."

## SUÈDE

[TRADUCTION — TRANSLATION]

En vertu de l'article 41 du Pacte, la Suède reconnaît la compétence du Comité des droits de l'homme énoncé dans l'article 28 du Pacte pour recevoir et examiner des communications dans lesquelles un Etat partie prétend qu'un autre Etat partie ne s'acquitte pas de ses obligations au titre du présent Pacte.

# OPTIONAL PROTOCOL[1] TO THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

The States Parties to the present Protocol,

Considering that in order further to achieve the purposes of the Covenant on Civil and Political Rights (hereinafter referred to as the Covenant) and the implementation of its provisions it would be appropriate to enable the Human Rights Committee set up in part IV of the Covenant (hereinafter referred to as the Committee) to receive and consider, as provided in the present Protocol, communications from individuals claiming to be victims of violations of any of the rights set forth in the Covenant,

Have agreed as follows:

*Article 1.*    A State Party to the Covenant that becomes a party to the present Protocol recognizes the competence of the Committee to receive and consider communications from individuals subject to its jurisdiction who claim to be victims of a violation by that State Party of any of the rights set forth in the Covenant. No communication shall be received by the Committee if it concerns a State Party to the Covenant which is not a party to the present Protocol.

*Article 2.*    Subject to the provisions of article 1, individuals who claim that any of their rights enumerated in the Covenant have been violated and who have exhausted all available domestic remedies may submit a written communication to the Committee for consideration.

*Article 3.*    The Committee shall consider inadmissible any communication under the present Protocol which is anonymous, or which it considers to be an abuse

[1] Came into force on 23 March 1976 in respect of the following States, i.e., three months after the date of the deposit with the Secretary-General of the United Nations of the tenth instrument of ratification or accession (the Covenant of 19 December 1966 on Civil and Political Rights having itself entered into force), in accordance with article 9 (1):*

| State | Date of deposit of the instrument of ratification or accession (a) | State | Date of deposit of the instrument of ratification or accession (a) |
|---|---|---|---|
| Costa Rica ....................... | 29 November 1968 | Denmark** ....................... | 6 January 1972 |
| (Signature affixed on 19 December 1966.) | | (Signature affixed on 20 March 1968.) | |
| Ecuador ......................... | 6 March 1969 | Norway** ......................... | 13 September 1972 |
| (Signature affixed on 4 April 1968.) | | (Signature affixed on 20 March 1968.) | |
| Colombia ........................ | 29 October 1969 | Barbados ........................ | 5 January 1973a |
| (Signature affixed on 21 December 1966.) | | Mauritius ........................ | 12 December 1973a |
| Uruguay ......................... | 1 April 1970 | Finland .......................... | 19 August 1975 |
| (Signature affixed on 21 February 1967.) | | (Signature affixed on 11 December 1967.) | |
| Madagascar ...................... | 21 June 1971 | Jamaica.......................... | 3 October 1975 |
| (Signature affixed on 17 September 1969.) | | (Signature affixed on 19 December 1966.) | |
| Sweden** ........................ | 6 December 1971 | | |
| (Signature affixed on 29 September 1967.) | | | |

* Same procedure, *mutatis mutandis*, as for the Covenant itself: see note**, p. 173.

** See p. 346 of this volume for the texts of the declarations and reservations made upon ratification or accession.

of the right of submission of such communications or to be incompatible with the provisions of the Covenant.

*Article 4.*   1.   Subject to the provisions of article 3, the Committee shall bring any communications submitted to it under the present Protocol to the attention of the State Party to the present Protocol alleged to be violating any provision of the Covenant.

2.   Within six months, the receiving State shall submit to the Committee written explanations or statements clarifying the matter and the remedy, if any, that may have been taken by that State.

*Article 5.*   1.   The Committee shall consider communications received under the present Protocol in the light of all written information made available to it by the individual and by the State Party concerned.

2.   The Committee shall not consider any communication from an individual unless it has ascertained that:

(a)  The same matter is not being examined under another procedure of international investigation or settlement;

(b)  The individual has exhausted all available domestic remedies. This shall not be the rule where the application of the remedies is unreasonably prolonged.

3.   The Committee shall hold closed meetings when examining communications under the present Protocol.

4.   The Committee shall forward its views to the State Party concerned and to the individual.

*Article 6.*   The Committee shall include in its annual report under article 45 of the Covenant a summary of its activities under the present Protocol.

*Article 7.*   Pending the achievement of the objectives of resolution 1514 (XV) adopted by the General Assembly of the United Nations on 14 December 1960[1] concerning the Declaration on the Granting of Independence to Colonial Countries and Peoples, the provisions of the present Protocol shall in no way limit the right of petition granted to these peoples by the Charter of the United Nations and other international conventions and instruments under the United Nations and its specialized agencies.

*Article 8.*   1.   The present Protocol is open for signature by any State which has signed the Covenant.

2.   The present Protocol is subject to ratification by any State which has ratified or acceded to the Covenant. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3.   The present Protocol shall be open to accession by any State which has ratified or acceded to the Covenant.

4.   Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

5.   The Secretary-General of the United Nations shall inform all States which have signed the present Protocol or acceded to it of the deposit of each instrument of ratification or accession.

---

[1] United Nations, *Official Records of the General Assembly, Fifteenth Session, Supplement No. 16* (A/4684), p. 66.

*Article 9.*  1.  Subject to the entry into force of the Covenant, the present Protocol shall enter into force three months after the date of the deposit with the Secretary-General of the United Nations of the tenth instrument of ratification or instrument of accession.

2.  For each State ratifying the present Protocol or acceding to it after the deposit of the tenth instrument of ratification or instrument of accession, the present Protocol shall enter into force three months after the date of the deposit of its own instrument of ratification or instrument of accession.

*Article 10.*  The provisions of the present Protocol shall extend to all parts of federal States without any limitations or exceptions.

*Article 11.*  1.  Any State Party to the present Protocol may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General shall thereupon communicate any proposed amendments to the States Parties to the present Protocol with a request that they notify him whether they favour a conference of States Parties for the purpose of considering and voting upon the proposal. In the event that at least one third of the States Parties favours such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of the States Parties present and voting at the conference shall be submitted to the General Assembly of the United Nations for approval.

2.  Amendments shall come into force when they have been approved by the General Assembly of the United Nations and accepted by a two-thirds majority of the States Parties to the present Protocol in accordance with their respective constitutional processes.

3.  When amendments come into force, they shall be binding on those States Parties which have accepted them, other States Parties still being bound by the provisions of the present Protocol and any earlier amendment which they have accepted.

*Article 12.*  1.  Any State Party may denounce the present Protocol at any time by written notification addressed to the Secretary-General of the United Nations. Denunciation shall take effect three months after the date of receipt of the notification by the Secretary-General.

2.  Denunciation shall be without prejudice to the continued application of the provisions of the present Protocol to any communication submitted under article 2 before the effective date of denunciation.

*Article 13.*  Irrespective of the notifications made under article 8, paragraph 5, of the present Protocol, the Secretary-General of the United Nations shall inform all States referred to in article 48, paragraph 1, of the Covenant of the following particulars:

(*a*) Signatures, ratifications and accessions under article 8;

(*b*) The date of the entry into force of the present Protocol under article 9 and the date of the entry into force of any amendments under article 11;

(*c*) Denunciations under article 12.

*Article 14.*  1.  The present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited in the archives of the United Nations.

2.   The Secretary-General of the United Nations shall transmit certified copies of the present Protocol to all States referred to in article 48 of the Covenant.

IN FAITH WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed the present Protocol, opened for signature at New York, on the nineteenth day of December, one thousand nine hundred and sixty-six.

FOR AFGHANISTAN:
POUR L'AFGHANISTAN:
阿富汗：
За Афганистан:
POR EL AFGANISTÁN:


FOR ALBANIA:
POUR L'ALBANIE:
阿爾巴尼亞：
За Албанию:
POR ALBANIA:


FOR ALGERIA:
POUR L'ALGÉRIE:
阿爾及利亞：
За Алжир:
POR ARGELIA:


FOR ARGENTINA:
POUR L'ARGENTINE:
阿根廷：
За Аргентину:
POR LA ARGENTINA:


FOR AUSTRALIA:
POUR L'AUSTRALIE:
澳大利亞：
За Австралию:
POR AUSTRALIA:

322          United Nations — Treaty Series  •  Nations Unies — Recueil des Traités          1976

FOR AUSTRIA:
POUR L'AUTRICHE:
奥地利：
За Австрию:
POR AUSTRIA:

PETER JANKOWITSCH
10 décembre 1973


FOR BARBADOS:
POUR LA BARBADE:
巴貝多：
За Барбадос:
POR BARBADOS:


FOR BELGIUM:
POUR LA BELGIQUE:
比利時：
За Бельгию:
POR BÉLGICA:


FOR BOLIVIA:
POUR LA BOLIVIE:
玻利維亞：
За Боливию:
POR BOLIVIA:


FOR BOTSWANA:
POUR LE BOTSWANA:
波扎那：
За Ботсвану:
POR BOTSWANA:

For Brazil:
Pour le Brésil:
巴西:
За Бразилию:
Por el Brasil:


For Bulgaria:
Pour la Bulgarie:
保加利亚:
За Болгарию:
Por Bulgaria:


For Burma:
Pour la Birmanie:
緬甸:
За Бирму:
Por Birmania:


For Burundi:
Pour le Burundi:
布隆提:
За Бурунди:
Por Burundi:


For the Byelorussian Soviet Socialist Republic:
Pour la République socialiste soviétique de Biélorussie:
白俄羅斯蘇維埃社會主義共和國:
За Белорусскую Советскую Социалистическую Республику:
Por la República Socialista Soviética de Bielorrusia:


For Cambodia:
Pour le Cambodge:
柬埔寨:
За Камбоджу:
Por Camboya:

FOR CAMEROON:
POUR LE CAMEROUN:
咯麥際:
За Камерун:
POR EL CAMERÚN:


FOR CANADA:
POUR LE CANADA:
加余大:
За Канаду:
POR EL CANADÁ:


FOR THE CENTRAL AFRICAN REPUBLIC:
POUR LA RÉPUBLIQUE CENTRAFRICAINE:
中非共和國:
За Центральноафриканскую Республику:
POR LA REPÚBLICA CENTROAFRICANA:


FOR CEYLON:
POUR CEYLAN:
錫蘭:
За Цейлон:
POR CEILÁN:


FOR CHAD:
POUR LE TCHAD:
在德:
За Чад:
POR EL CHAD:


FOR CHILE:
POUR LE CHILI:
智利:
За Чили:
POR CHILE:

For China:
Pour la Chine:
中國：
За Китай:
Por China:

[Signed — Signé][1, 2]

For Colombia:
Pour la Colombie:
哥倫比亞：
За Колумбию:
Por Colombia:

EVARISTO SOURDIS
Dic. 21 de 1966[3]

For the Congo (Brazzaville):
Pour le Congo (Brazzaville):
剛果（布拉薩市）：
За Конго (Браззавиль):
Por el Congo (Brazzaville):

For the Congo (Democratic Republic of):
Pour le Congo (République démocratique du):
剛果（民主共和國）：
За Демократическую Республику Конго:
Por el Congo (República Democrática de):

---

[1] Signature affixed by Liu Chieh on 5 October 1967 — La signature a été apposée par Liu Chieh le 5 octobre 1967.

[2] The following countries made declarations relating to the signature on behalf of the Government of the Republic of China: Bulgaria, Byelorussian Soviet Socialist Republic, Czechoslovakia, Mongolia, Romania, Ukrainian Soviet Socialist Republic, Union of Soviet Socialist Republics and Yugoslavia. For the texts of the said declarations, see No. I-14531 in volume 993. — Les pays suivants ont fait des déclarations relatives à la signature au nom du Gouvernement de la République de Chine : la Bulgarie, la République socialiste soviétique de Biélorussie, la Tchécoslovaquie, la Mongolie, la Roumanie, la République socialiste soviétique d'Ukraine, l'Union des Républiques socialistes soviétiques et la Yougoslavie. Pour les textes desdites déclarations, voir n° I-14531 dans le volume 993.

[3] 21 December 1966 — 21 décembre 1966.

FOR COSTA RICA:
POUR LE COSTA RICA:
哥斯大黎加：
За Коста-Рику:
POR COSTA RICA:

LUIS D. TINOCO


FOR CUBA:
POUR CUBA:
古巴：
За Кубу:
POR CUBA:


FOR CYPRUS:
POUR CHYPRE:
塞普勒斯：
За Кипр:
POR CHIPRE:

ZENON ROSSIDES


FOR CZECHOSLOVAKIA:
POUR LA TCHÉCOSLOVAQUIE:
捷克斯拉夫：
За Чехословакию:
POR CHECOSLOVAQUIA:


FOR DAHOMEY:
POUR LE DAHOMEY:
達荷美：
За Дагомею:
POR EL DAHOMEY:

FOR DENMARK:
POUR LE DANEMARK:
丹麥：
За Данию:
POR DINAMARCA:

OTTO ROSE BORCH
March 20, 1968

FOR THE DOMINICAN REPUBLIC:
POUR LA RÉPUBLIQUE DOMINICAINE:
多明尼加共和國：
За Доминиканскую Республику:
POR LA REPÚBLICA DOMINICANA:

FOR ECUADOR:
POUR L'EQUATEUR:
厄瓜多：
За Эквадор:
POR EL ECUADOR:

HUGO FÁTIVA ORTIZ
Abril 4 de 1968[1]

FOR EL SALVADOR:
POUR EL SALVADOR:
薩爾瓦多：
За Сальвадор:
POR EL SALVADOR:

ALFREDO MARTÍNEZ MORENO
Septiembre 21, 1967[2]

FOR ETHIOPIA:
POUR L'ETHIOPIE:
衣索比亞：
За Эфиопию:
POR ETIOPÍA:

---

[1] 4 April 1968 — 4 avril 1968.
[2] 21 September 1967 — 21 septembre 1967.

FOR THE FEDERAL REPUBLIC OF GERMANY:
POUR LA RÉPUBLIQUE FÉDÉRALE D'ALLEMAGNE:
德意志聯邦共和國:
За Федеративную Республику Германии:
POR LA REPÚBLICA FEDERAL DE ALEMANIA:


FOR FINLAND:
POUR LA FINLANDE:
芬蘭:
За Финляндию:
POR FINLANDIA:

MAX JAKOBSON
December 11, 1967


FOR FRANCE:
POUR LA FRANCE:
法蘭西:
За Францию:
POR FRANCIA:


FOR GABON:
POUR LE GABON:
加彭:
За Габон:
POR EL GABÓN:


FOR GAMBIA:
POUR LA GAMBIE:
阿比亞:
За Гамбию:
POR GAMBIA:

FOR GHANA:
POUR LE GHANA:
迦納：
За Гану:
POR GHANA:


FOR GREECE:
POUR LA GRÈCE:
希臘：
За Грецию:
POR GRECIA:


FOR GUATEMALA:
POUR LE GUATEMALA:
瓜地馬拉：
За Гватемалу:
POR GUATEMALA:


FOR GUINEA:
POUR LA GUINÉE:
幾內亞：
За Гвинею:
POR GUINEA:

JEANNE MARTIN CISSE
19 mars 1975


FOR GUYANA:
POUR LA GUYANE:
藍亞那：
За Гвиану:
POR GUYANA:

For Haiti:
Pour Haïti:
海地：
За Гаити:
Por Haití:


For the Holy See:
Pour le Saint-Siège:
教廷：
За Святейший престол:
Por la Santa Sede:


For Honduras:
Pour le Honduras:
宏都拉斯：
За Гондурас:
Por Honduras:

H. López Villamil


For Hungary:
Pour la Hongrie:
匈牙利：
За Венгрию:
Por Hungría:


For Iceland:
Pour l'Islande:
冰島：
За Исландию:
Por Islandia:

FOR INDIA:
POUR L'INDE:
印度：
За Индию:
POR LA INDIA:


FOR INDONESIA:
POUR L'INDONÉSIE:
印度尼西亞：
За Индонезию:
POR INDONESIA:


FOR IRAN:
POUR L'IRAN:
伊朗：
За Иран:
POR EL IRÁN:


FOR IRAQ:
POUR L'IRAK:
伊拉克：
За Ирак:
POR EL IRAK:


FOR IRELAND:
POUR L'IRLANDE:
愛爾蘭：
За Ирландию:
POR IRLANDA:


FOR ISRAEL:
POUR ISRAËL:
以色列：
За Израиль:
POR ISRAEL:

For Italy:
Pour l'Italie:
羲大利:
За Италию:
Por Italia:


For the Ivory Coast:
Pour la Côte-d'Ivoire:
牙象海岸:
За Берег Слоновой Кости:
Por la Costa de Marfil:


For Jamaica:
Pour la Jamaïque:
牙买加:
За Ямайку:
Por Jamaica:

E. R. Richardson


For Japan:
Pour le Japon:
日本:
За Японию:
Por el Japón:


For Jordan:
Pour la Jordanie:
約旦:
За Иорданию:
Por Jordania:

1976     **United Nations — Treaty Series • Nations Unies — Recueil des Traités**     333

FOR KENYA:
POUR LE KENYA:
肯亞：
За Кению:
POR KENIA:


FOR KUWAIT:
POUR LE KOWEÏT:
科威特：
За Кувейт:
POR KUWAIT:


FOR LAOS:
POUR LE LAOS:
寮國：
За Лаос:
POR LAOS:


FOR LEBANON:
POUR LE LIBAN:
黎巴嫩：
За Ливан:
POR EL LÍBANO:


FOR LESOTHO:
POUR LE LESOTHO:
賴索托：
За Лесото:
POR LESOTHO:


FOR LIBERIA:
POUR LE LIBÉRIA:
賴比瑞亞：
За Либерию:
POR LIBERIA:

FOR LIBYA:
POUR LA LIBYE:
利比亞:
За Ливию:
POR LIBIA:


FOR LIECHTENSTEIN:
POUR LE LIECHTENSTEIN:
列支敦斯登:
За Лихтенштейн:
POR LIECHTENSTEIN:


FOR LUXEMBOURG:
POUR LE LUXEMBOURG:
盧森堡:
За Люксембург:
POR LUXEMBURGO:


FOR MADAGASCAR:
POUR MADAGASCAR:
馬達加斯加:
За Мадагаскар:
POR MADAGASCAR:

BLAISE RABETAFIKA
17 septembre 1969


FOR MALAWI:
POUR LE MALAWI:
馬拉威:
За Малави:
POR MALAWI:

For Malaysia:
Pour la Malaisie:
馬來亞聯邦:
За Малайскую Федерацию:
Por Malasia:


For the Maldive Islands:
Pour les îles Maldives:
馬爾代夫羣島:
За Мальдивские острова:
Por las Islas Maldivas:


For Mali:
Pour le Mali:
馬利:
За Мали:
Por Malí:


For Malta:
Pour Malte:
馬耳他:
За Мальту:
Por Malta:


For Mauritania:
Pour la Mauritanie:
茅利塔尼亞:
За Мавританию:
Por Mauritania:


For Mexico:
Pour le Mexique:
墨西哥:
За Мексику:
Por México:

For Monaco:
Pour Monaco:
摩納哥:
За Монако:
Por Mónaco:


For Mongolia:
Pour la Mongolie:
蒙古:
За Монголию:
Por Mongolia:


For Morocco:
Pour le Maroc:
摩洛哥:
За Марокко:
Por Marruecos:


For Nepal:
Pour le Népal:
尼泊爾:
За Непал:
Por Nepal:


For the Netherlands:
Pour les Pays-Bas:
荷蘭:
За Нидерланды:
Por los Países Bajos:

D. G. E. Middelburg
25 June 1969

FOR NEW ZEALAND:
POUR LA NOUVELLE-ZÉLANDE:
紐西蘭:
За Новую Зеландию:
POR NUEVA ZELANDIA:


FOR NICARAGUA:
POUR LE NICARAGUA:
尼加拉瓜:
За Никарагуа:
POR NICARAGUA:


FOR THE NIGER:
POUR LE NIGER:
奈及爾:
За Нигер:
POR EL NÍGER:


FOR NIGERIA:
POUR LA NIGÉRIA:
奈及利亞:
За Нигерию:
POR NIGERIA:


FOR NORWAY:
POUR LA NORVÈGE:
挪威:
За Норвегию:
POR NORUEGA:

EDVARD HAMBRO
March 20, 1968

FOR PAKISTAN:
POUR LE PAKISTAN:
巴基斯坦：
За Пакистан:
POR EL PAKISTÁN:


FOR PANAMA:
POUR LE PANAMA:
巴拿馬：
За Панаму:
POR PANAMÁ:


FOR PARAGUAY:
POUR LE PARAGUAY:
巴拉圭：
За Парагвай:
POR EL PARAGUAY:


FOR PERU:
POUR LE PÉROU:
祕魯：
За Перу:
POR EL PERÚ:


FOR THE PHILIPPINES:
POUR LES PHILIPPINES:
菲律賓：
За Филиппины:
POR FILIPINAS:

SALVADOR P. LÓPEZ

FOR POLAND:
POUR LA POLOGNE:
波蘭：
За Польшу:
POR POLONIA:


FOR PORTUGAL:
POUR LE PORTUGAL:
葡萄牙：
За Португалию:
POR PORTUGAL:


FOR THE REPUBLIC OF KOREA:
POUR LA RÉPUBLIQUE DE CORÉE:
大韓民國：
За Корейскую Республику:
POR LA REPÚBLICA DE COREA:


FOR THE REPUBLIC OF VIET-NAM:
POUR LA RÉPUBLIQUE DU VIET-NAM:
越南共和國：
За Республику Вьетнам:
POR LA REPÚBLICA DE VIET-NAM:


FOR ROMANIA:
POUR LA ROUMANIE:
羅馬尼亞：
За Румынию:
POR RUMANIA:


FOR RWANDA:
POUR LE RWANDA:
盧安達：
За Руанду:
POR RWANDA:

FOR SAN MARINO:
POUR SAINT-MARIN:
聖馬利諾:
За Сан-Марино:
POR SAN MARINO:

FOR SAUDI ARABIA:
POUR L'ARABIE SAOUDITE:
沙烏地阿拉伯:
За Саудовскую Аравию:
POR ARABIA SAUDITA:

FOR SENEGAL:
POUR LE SÉNÉGAL:
塞內加爾:
За Сенегал:
POR EL SENEGAL:

IBRAHIMA BOYE
Ambassadeur du Sénégal à l'ONU
New York, le 6 juillet 1970

FOR SIERRA LEONE:
POUR LE SIERRA LEONE:
獅子山:
За Сьерра-Леоне:
POR SIERRA LEONA:

FOR SINGAPORE:
POUR SINGAPOUR:
新加坡:
За Сингапур:
POR SINGAPUR:

FOR SOMALIA:
POUR LA SOMALIE:
索馬利亞:
За Сомали:
POR SOMALIA:


FOR SOUTH AFRICA:
POUR L'AFRIQUE DU SUD:
南非:
За Южную Африку:
POR SUDÁFRICA:


FOR SPAIN:
POUR L'ESPAGNE:
西班牙:
За Испанию:
POR ESPAÑA:


FOR THE SUDAN:
POUR LE SOUDAN:
蘇丹:
За Судан:
POR EL SUDÁN:


FOR SWEDEN:
POUR LA SUÈDE:
瑞典:
За Швецию:
POR SUECIA:

TORSTEN NILSSON
29 September 1967

FOR SWITZERLAND:
POUR LA SUISSE:
瑞士：
За Швейцарию:
POR SUIZA:


FOR SYRIA:
POUR LA SYRIE:
叙利亞：
За Сирию:
POR SIRIA:


FOR THAILAND:
POUR LA THAÏLANDE:
泰國：
За Таиланд:
POR TAILANDIA:


FOR TOGO:
POUR LE TOGO:
多哥：
За Того:
POR EL TOGO:


FOR TRINIDAD AND TOBAGO:
POUR LA TRINITÉ ET TOBAGO:
千里達及托貝哥：
За Тринидад и Тобаго:
POR TRINIDAD Y TABAGO:


FOR TUNISIA:
POUR LA TUNISIE:
突尼西亞：
За Тунис:
POR TÚNEZ:

FOR TURKEY:
POUR LA TURQUIE:
土耳其:
За Турцию:
POR TURQUÍA:


FOR UGANDA:
POUR L'OUGANDA:
烏干達:
За Уганду:
POR UGANDA:


FOR THE UKRAINIAN SOVIET SOCIALIST REPUBLIC:
POUR LA RÉPUBLIQUE SOCIALISTE SOVIÉTIQUE D'UKRAINE:
烏克蘭蘇維埃社會主義共和國:
За Украинскую Советскую Социалистическую Республику:
POR LA REPÚBLICA SOCIALISTA SOVIÉTICA DE UCRANIA:


FOR THE UNION OF SOVIET SOCIALIST REPUBLICS:
POUR L'UNION DES RÉPUBLIQUES SOCIALISTES SOVIÉTIQUES:
蘇維埃社會主義共和國聯邦:
За Союз Советских Социалистических Республик:
POR LA UNIÓN DE REPÚBLICAS SOCIALISTAS SOVIÉTICAS:


FOR THE UNITED ARAB REPUBLIC:
POUR LA RÉPUBLIQUE ARABE UNIE:
阿拉伯聯合共和國:
За Объединенную Арабскую Республику:
POR LA REPÚBLICA ARABE UNIDA:


FOR THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND:
POUR LE ROYAUME-UNI DE GRANDE-BRETAGNE ET D'IRLANDE DU NORD:
大不列顛及北愛爾蘭聯合王國:
За Соединенное Королевство Великобритании и Северной Ирландии:
POR EL REINO UNIDO DE GRAN BRETAÑA E IRLANDA DEL NORTE:

FOR THE UNITED REPUBLIC OF TANZANIA:
POUR LA RÉPUBLIQUE-UNIE DE TANZANIE:
坦尚尼亞聯合共和國：
За Объединенную Республику Танзания:
POR LA REPÚBLICA UNIDA DE TANZANIA:


FOR THE UNITED STATES OF AMERICA:
POUR LES ETATS-UNIS D'AMÉRIQUE:
美利堅合衆國：
За Соединенные Штаты Америки:
POR LOS ESTADOS UNIDOS DE AMÉRICA:


FOR THE UPPER VOLTA:
POUR LA HAUTE-VOLTA:
上伏塔：
За Верхнюю Вольту:
POR EL ALTO VOLTA:


FOR URUGUAY:
POUR L'URUGUAY:
烏拉圭：
За Уругвай:
POR EL URUGUAY:

PEDRO P. BERRO
Febrero 21, 1967[1]


FOR VENEZUELA:
POUR LE VENEZUELA:
委內瑞拉：
За Венесуэлу:
POR VENEZUELA:

---

[1] 21 February 1967—21 février 1967.

FOR WESTERN SAMOA:
POUR LE SAMOA-OCCIDENTAL:
西薩摩亞：
За Западное Самоа:
POR SAMOA OCCIDENTAL:


FOR YEMEN:
POUR LE YÉMEN:
也門：
За Йемен:
POR EL YEMEN:


FOR YUGOSLAVIA:
POUR LA YOUGOSLAVIE:
南斯拉夫：
За Югославию:
POR YUGOSLAVIA:


FOR ZAMBIA:
POUR LA ZAMBIE:
尚比亞：
За Замбию:
POR ZAMBIA:

DECLARATIONS AND RESERVATIONS MADE UPON RATIFICATION OR ACCESSION

*DENMARK*

"With reference to Article 5, paragraph 2 (*a*), the Government of Denmark makes a reservation with respect to the Competence of the Committee to consider a communication from an individual if the matter has already been considered under other procedures of international investigation."

*NORWAY*

"Norway enters a reservation to article 5, paragraph 2, to the effect that the Committee shall not have competence to consider a communication from an individual if the same matter has already been examined under other procedures of international investigation or settlement."

DÉCLARATIONS ET RÉSERVES FAITES LORS DE LA RATIFICATION OU DE L'ADHÉSION

*DANEMARK*

[TRADUCTION — TRANSLATION]

S'agissant de l'alinéa *a* du paragraphe 2 de l'article 5, le Gouvernement danois fait une réserve en ce qui concerne la compétence du Comité pour examiner une communication soumise par un particulier si la même question a déjà été examinée dans le cadre d'autres procédures d'enquête internationale.

*NORVÈGE*

[TRADUCTION — TRANSLATION]

La Norvège a fait, à l'égard du paragraphe 2 de l'article 5, une réserve aux termes de laquelle le Comité ne sera pas compétent pour examiner une communication d'un particulier si la même question a déjà été examinée par d'autres instances internationales d'enquête ou de règlement.

*SWEDEN*                                     *SUÈDE*

[SWEDISH TEXT — TEXTE SUÉDOIS]

". . . med förbehåll för att bestämmelserna i artikel 5 mom. 2 i protokollet innebära att den kommitté för de mänskliga rättigheterna som nämnes i artikel 28 i sagda internationella konvention, icke skall pröva någon framställning från enskild person med mindre den utrönt att samma ärende icke är eller har varit föremål för internationell undersökning eller reglering i annan form."

[TRANSLATION — TRADUCTION]

. . . on the understanding that the provisions of article 5, paragraph 2, of the Protocol signify that the Human Rights Committee provided for in article 28 of the said Covenant shall not consider any communication from an individual unless it has ascertained that the same matter is not being examined or has not been examined under another procedure of international investigation or settlement.

«. . . sous réserve que les dispositions du paragraphe 2 de l'article 5 du Protocole signifient que le Comité des droits de l'homme prévu par l'article 28 dudit Pacte ne devra examiner aucune communication émanant d'un particulier sans s'être assuré que la même question n'est pas en cours d'examen ou n'a pas été examinée devant une autre instance internationale d'enquête ou de règlement.»

      

HOME | PARTI DECLA | NOTES | CHAPT  PREV  NEXT

# 4. International Covenant on Civil and Political Rights

## New York, 16 December 1966

| | |
|---|---|
| **Entry into force:** | 23 March 1976, in accordance with article 49 , for all provisions except those of article 41; 28 March 1979 for the provisions of article 41 (Human Rights Committee), in accordance with paragraph 2 of the said article 41. |
| **Registration:** | 23 March 1976, No. 14668. |
| **Status:** | Signatories: 66 ,Parties: 149. |
| **Text:** | United Nations, *Treaty Series*, vol. 999, p. 171 and vol. 1057, p. 407 (procès-verbal of rectification of the authentic Spanish text); depositary notification C.N.782.2001.TREATIES-6 of 5 October 2001 [Proposal of correction to the original of the Covenant (Chinese authentic text)] and C.N.8.2002.TREATEIS-1 of 3 January 2002 [Rectification of the original of the Covenant (Chinese authentic text)]. |

**Note:** The Covenant was opened for signature at New York on 19 December 1966.

## PARTICIPANTS

| Participant | Signature | Ratification, Accession (a), Succession (d) |
|---|---|---|
| Afghanistan | | 24 Jan 1983 a |
| Albania | | 4 Oct 1991 a |
| Algeria | 10 Dec 1968 | 12 Sep 1989 |
| Andorra | 5 Aug 2002 | |
| Angola | | 10 Jan 1992 a |
| Argentina | 19 Feb 1968 | 8 Aug 1986 |
| Armenia | | 23 Jun 1993 a |
| Australia | 18 Dec 1972 | 13 Aug 1980 |
| Austria | 10 Dec 1973 | 10 Sep 1978 |
| Azerbaijan | | 13 Aug 1992 a |
| Bangladesh | | 6 Sep 2000 a |
| Barbados | | 5 Jan 1973 a |
| Belarus | 19 Mar 1968 | 12 Nov 1973 |
| Belgium | 10 Dec 1968 | 21 Apr 1983 |
| Belize | | 10 Jun 1996 a |
| Benin | | 12 Mar 1992 a |
| Bolivia | | 12 Aug 1982 a |

P93

| | | |
|---|---|---|
| Bosnia and Herzegovina[1] | | 1 Sep 1993 d |
| Botswana | 8 Sep 2000 | 8 Sep 2000 |
| Brazil | | 24 Jan 1992 a |
| Bulgaria | 8 Oct 1968 | 21 Sep 1970 |
| Burkina Faso | | 4 Jan 1999 a |
| Burundi | | 9 May 1990 a |
| Cambodia[2,3] | 17 Oct 1980 | 26 May 1992 a |
| Cameroon | | 27 Jun 1984 a |
| Canada | | 19 May 1976 a |
| Cape Verde | | 6 Aug 1993 a |
| Central African Republic | | 8 May 1981 a |
| Chad | | 9 Jun 1995 a |
| Chile | 16 Sep 1969 | 10 Feb 1972 |
| China[4,5,13] | 5 Oct 1998 | |
| Colombia | 21 Dec 1966 | 29 Oct 1969 |
| Congo | | 5 Oct 1983 a |
| Costa Rica | 19 Dec 1966 | 29 Nov 1968 |
| Côte d'Ivoire | | 26 Mar 1992 a |
| Croatia[1] | | 12 Oct 1992 d |
| Cyprus | 19 Dec 1966 | 2 Apr 1969 |
| Czech Republic[6] | | 22 Feb 1993 d |
| Democratic People's Republic of Korea[7] | | 14 Sep 1981 a |
| Democratic Republic of the Congo | | 1 Nov 1976 a |
| Denmark | 20 Mar 1968 | 6 Jan 1972 |
| Djibouti | | 5 Nov 2002 a |
| Dominica | | 17 Jun 1993 a |
| Dominican Republic | | 4 Jan 1978 a |
| Ecuador | 4 Apr 1968 | 6 Mar 1969 |
| Egypt | 4 Aug 1967 | 14 Jan 1982 |
| El Salvador | 21 Sep 1967 | 30 Nov 1979 |
| Equatorial Guinea | | 25 Sep 1987 a |
| Eritrea | | 22 Jan 2002 a |
| Estonia | | 21 Oct 1991 a |
| Ethiopia | | 11 Jun 1993 a |
| Finland | 11 Oct 1967 | 19 Aug 1975 |
| France | | 4 Nov 1980 a |
| Gabon | | 21 Jan 1983 a |
| Gambia | | 22 Mar 1979 a |
| Georgia | | 3 May 1994 a |
| Germany[8,9] | 9 Oct 1968 | 17 Dec 1973 |
| Ghana | 7 Sep 2000 | 7 Sep 2000 |
| Greece | | 5 May 1997 a |
| Grenada | | 6 Sep 1991 a |
| Guatemala | | 5 May 1992 a |
| Guinea | 28 Feb 1967 | 24 Jan 1978 |
| Guinea-Bissau | 12 Sep 2000 | |

P94

| | | |
|---|---|---|
| Guyana | 22 Aug 1968 | 15 Feb 1977 |
| Haiti | | 6 Feb 1991 a |
| Honduras | 19 Dec 1966 | 25 Aug 1997 |
| Hungary | 25 Mar 1969 | 17 Jan 1974 |
| Iceland | 30 Dec 1968 | 22 Aug 1979 |
| India | | 10 Apr 1979 a |
| Iran (Islamic Republic of) | 4 Apr 1968 | 24 Jun 1975 |
| Iraq | 18 Feb 1969 | 25 Jan 1971 |
| Ireland | 1 Oct 1973 | 8 Dec 1989 |
| Israel | 19 Dec 1966 | 3 Oct 1991 |
| Italy | 18 Jan 1967 | 15 Sep 1978 |
| Jamaica | 19 Dec 1966 | 3 Oct 1975 |
| Japan | 30 May 1978 | 21 Jun 1979 |
| Jordan | 30 Jun 1972 | 28 May 1975 |
| Kenya | | 1 May 1972 a |
| Kuwait | | 21 May 1996 a |
| Kyrgyzstan | | 7 Oct 1994 a |
| Lao People's Democratic Republic | 7 Dec 2000 | |
| Latvia | | 14 Apr 1992 a |
| Lebanon | | 3 Nov 1972 a |
| Lesotho | | 9 Sep 1992 a |
| Liberia | 18 Apr 1967 | |
| Libyan Arab Jamahiriya | | 15 May 1970 a |
| Liechtenstein | | 10 Dec 1998 a |
| Lithuania | | 20 Nov 1991 a |
| Luxembourg | 26 Nov 1974 | 18 Aug 1983 |
| Madagascar | 17 Sep 1969 | 21 Jun 1971 |
| Malawi | | 22 Dec 1993 a |
| Mali | | 16 Jul 1974 a |
| Malta | | 13 Sep 1990 a |
| Mauritius | | 12 Dec 1973 a |
| Mexico | | 23 Mar 1981 a |
| Monaco | 26 Jun 1997 | 28 Aug 1997 |
| Mongolia | 5 Jun 1968 | 18 Nov 1974 |
| Morocco | 19 Jan 1977 | 3 May 1979 |
| Mozambique | | 21 Jul 1993 a |
| Namibia | | 28 Nov 1994 a |
| Nauru | 12 Nov 2001 | |
| Nepal | | 14 May 1991 a |
| Netherlands[10] | 25 Jun 1969 | 11 Dec 1978 |
| New Zealand[11] | 12 Nov 1968 | 28 Dec 1978 |
| Nicaragua | | 12 Mar 1980 a |
| Niger | | 7 Mar 1986 a |
| Nigeria | | 29 Jul 1993 a |
| Norway | 20 Mar 1968 | 13 Sep 1972 |
| Panama | 27 Jul 1976 | 8 Mar 1977 |
| Paraguay | | 10 Jun 1992 a |

P95

| | | |
|---|---|---|
| Philippines | 19 Dec 1966 | 23 Oct 1986 |
| Poland | 2 Mar 1967 | 18 Mar 1977 |
| Portugal[5] | 7 Oct 1976 | 15 Jun 1978 |
| Republic of Korea | | 10 Apr 1990 a |
| Republic of Moldova | | 26 Jan 1993 a |
| Romania | 27 Jun 1968 | 9 Dec 1974 |
| Russian Federation | 18 Mar 1968 | 16 Oct 1973 |
| Rwanda | | 16 Apr 1975 a |
| Saint Vincent and the Grenadines | | 9 Nov 1981 a |
| San Marino | | 18 Oct 1985 a |
| Sao Tome and Principe | 31 Oct 1995 | |
| Senegal | 6 Jul 1970 | 13 Feb 1978 |
| Serbia and Montenegro[1] | | 12 Mar 2001 d |
| Seychelles | | 5 May 1992 a |
| Sierra Leone | | 23 Aug 1996 a |
| Slovakia[6] | | 28 May 1993 d |
| Slovenia[1] | | 6 Jul 1992 d |
| Somalia | | 24 Jan 1990 a |
| South Africa | 3 Oct 1994 | 10 Dec 1998 |
| Spain | 28 Sep 1976 | 27 Apr 1977 |
| Sri Lanka | | 11 Jun 1980 a |
| Sudan | | 18 Mar 1986 a |
| Suriname | | 28 Dec 1976 a |
| Sweden | 29 Sep 1967 | 6 Dec 1971 |
| Switzerland | | 18 Jun 1992 a |
| Syrian Arab Republic | | 21 Apr 1969 a |
| Tajikistan | | 4 Jan 1999 a |
| Thailand | | 29 Oct 1996 a |
| The Former Yugoslav Republic of Macedonia[1] | | 18 Jan 1994 d |
| Togo | | 24 May 1984 a |
| Trinidad and Tobago | | 21 Dec 1978 a |
| Tunisia | 30 Apr 1968 | 18 Mar 1969 |
| Turkey | 15 Aug 2000 | |
| Turkmenistan | | 1 May 1997 a |
| Uganda | | 21 Jun 1995 a |
| Ukraine | 20 Mar 1968 | 12 Nov 1973 |
| United Kingdom of Great Britain and Northern Ireland[12,13] | 16 Sep 1968 | 20 May 1976 |
| United Republic of Tanzania | | 11 Jun 1976 a |
| United States of America | 5 Oct 1977 | 8 Jun 1992 |
| Uruguay | 21 Feb 1967 | 1 Apr 1970 |
| Uzbekistan | | 28 Sep 1995 a |
| Venezuela | 24 Jun 1969 | 10 May 1978 |
| Viet Nam | | 24 Sep 1982 a |
| Yemen[14] | | 9 Feb 1987 a |
| Zambia | | 10 Apr 1984 a |
| Zimbabwe | | 13 May 1991 a |

P96

# DECLARATIONS

## Declarations and Reservations

**(Unless otherwise indicated, the declarations and reservations were made upon ratification, accession or succession.**

**For objections thereto and declarations recognizing the competence of the Human Rights Committee**

**under article 41, see hereinafter.)**

# Mexico[26]

Interpretative statements:
Article 9, paragraph 5
Under the Political Constitution of the United Mexican States and the relevant implementing legislation, every individual enjoys the guarantees relating to penal matters embodied therein, and consequently no person may be unlawfully arrested or detained. However, if by reason of false accusation or complaint any individual suffers an infringement of this basic right, he has, *inter alia*, under the provisions of the appropriate laws, an enforceable right to just compensation.
Article 18
Under the Political Constitution of the United Mexican States, every person is free to profess his preferred religious belief and to practice its ceremonies, rites and religious acts, with the limitation, with regard to public religious acts, that they must be performed in places of worship and, with regard to education, that studies carried out in establishments designed for the professional education of ministers of religion are not officially recognized. The Government of Mexico believes that these limitations are included among those established in paragraph 3 of this article.
Reservations:
*Article 13*
The Government of Mexico makes a reservation to this article, in view of the present text of article 33 of the Political Constitution of the United Mexican States.
Article 25, subparagraph (b)
The Government of Mexico also makes a reservation to this provision, since article 130 of the Political Constitution of the United Mexican States provides that ministers of religion shall have neither a passive vote nor the right to form associations for political purposes.

*26. On 15 March 2002, the Government of Mexico notified the Secretary-General of a partial withdrawal of its reservation to article 25 (b) made upon accession. The reservation made upon accession read as follows:*
*Article 25, subparagraph (b):*
*The Government of Mexico also makes a reservation to this provision, since article 130 of the Political Constitution of the United Mexican States provides that ministers of religion shall have neither an active nor a passive vote, nor the right to form associations for political purposes.*

# United States of America

Reservations:
"(1) That article 20 does not authorize or require legislation or other action by the United States that would restrict the right of free speech and association protected by the Constitution and laws of the United States.

"(2) That the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

"(3) That the United States considers itself bound by article 7 to the extent that `cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States.

"(4) That because U.S. law generally applies to an offender the penalty in force at the time the offence was committed, the United States does not adhere to the third clause of paragraph 1 of article 15.

"(5) That the policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2 (b) and 3 of article 10 and paragraph 4 of article 14. The United States further reserves to these provisions with respect to States with respect to individuals who volunteer for military service prior to age 18."

Understandings:

"(1) That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status - as those terms are used in article 2, paragraph 1 and article 26 - to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in paragraph 1 of article 4 upon discrimination, in time of public emergency, based `solely' on the status of race, colour, sex, language, religion or social origin, not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

"(2) That the United States understands the right to compensation referred to in articles 9 (5) and 14 (6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

"(3) That the United States understands the reference to `exceptional circumstances' in paragraph 2 (a) of article 10 to permit the imprisonment of an accused person with convicted persons where appropriate in light of an individual's overall dangerousness, and to permit accused persons to waive their right to segregation from convicted persons. The United States further understands that paragraph 3 of article 10 does not diminish the goals of punishment, deterrence, and incapacitation as additional legitimate purposes for a penitentiary system.

"(4) That the United States understands that subparagraphs 3 (b) and (d) of article 14 do not require the provision of a criminal defendant's counsel of choice when the defendant is provided with court-appointed counsel on grounds of indigence, when the defendant is financially able to retain alternative counsel, or when imprisonment is not imposed. The United States further understands that paragraph 3 (e) does not prohibit a requirement that the defendant make a showing that any witness whose attendance he seeks to compel is necessary for his defense. The United States understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgment of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit, as is seeking a new trial for the same cause.

"(5) That the United States understands that this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriate measures for the fulfillment of the Covenant."

Declarations:

"(1) That the United States declares that the provisions of articles 1 through 27 of the Covenant are not self-executing.

"(2) That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, article 5, paragraph 2, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to article 19, paragraph 3 which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.

"(3) That the United States declares that the right referred to in article 47 may be exercised only in accordance with international law."

49 Stat. 3097                                                                  Page 1
1935 WL 30023 (U.S. Treaty)

Multilateral

Convention between the United States of America and other American Republics on
Rights and Duties of States.

Signed at Montevideo, December 26, 1933;
Ratification advised by the Senate, with a reservation, June 15, 1934;
Ratified by the President, with the said reservation, June 29, 1934;
Ratification of the United States of America deposited with the Pan American
Union, July 13, 1934;
Proclaimed, January 18, 1935.


BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

CONVENTION ON RIGHTS AND DUTIES OF STATES

ARTICLE 1

ARTICLE 2

ARTICLE 3

ARTICLE 4

ARTICLE 5

ARTICLE 6

ARTICLE 7

ARTICLE 8

ARTICLE 9

ARTICLE 10

ARTICLE 11

ARTICLE 12

ARTICLE 13

ARTICLE 14

ARTICLE 15

ARTICLE 16

RESERVATIONS

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# APPENDIX 3

49 Stat. 3097                                                                              Page 2
1935 WL 30023 (U.S. Treaty)

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION


WHEREAS a convention on rights and duties of States was adopted by the Seventh
International Conference of American States at Montevideo, Uruguay, and signed on
December 26, 1933, by plenipotentiaries of the United States of America with a
reservation which the delegation of the United States of America had presented to
the plenary session of the conference on December 22, 1933, and by
plenipotentiaries of Honduras, El Salvador, Dominican Republic, Haiti, Argentina,
Venezuela, Uruguay, Paraguay, Mexico, Panama, Guatemala, Brazil with a
reservation, Ecuador, Nicaragua, Colombia, Chile, Peru with a reservation, and
Cuba, the English and Spanish texts of which convention are word for word as
follows:


CONVENTION ON RIGHTS AND DUTIES OF STATES


The Governments represented in the Seventh International Conference of American
States:

Wishing to conclude a Convention on Rights and Duties of States, have appointed
the following Plenipotentiaries:
     Honduras:
          MIGUEL PAZ BARAONA
          AUGUSTO C. COELLO
          LUIS BOGRÁN.
     United States of America:
          CORDELL HULL
          ALEXANDER W. WEDDELL
          J. REUBEN CLARK
          J. BUTLER WRIGHT
          SPRUILLE BRADEN
          Miss SOPHONISBA P. BRECKINRIDGE.
     El Salvador:
          HÉCTOR DAVID CASTRO
          ARTURO RAMÓN AVILA
          J. CIPRIANO CASTRO.
     Dominican Republic:
          TULIO M. CESTERO.
     Haiti:
          JUSTIN BARAU
          FRANCIS SALGADO
          ANTOINE PIERRE-PAUL
          EDMOND MANGONÉS.
     Argentina:
          CARLOS SAAVEDRA LAMAS
          JUAN F. CAFFERATA
          RAMÓN S. CASTILLO
          CARLOS BREBBIA
          ISIDORO RUIZ MORENO

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097
1935 WL 30023 (U.S. Treaty)

```
     LUIS A. PODESTÁ COSTA
     RAÚL PREBISCH
     DANIEL ANTOKOLETZ
Venezuela:
     CÉSAR ZUMETA
     LUIS CHURION
     JOSÉ RAFAEL MONTILLA
Uruguay:
     ALBERTO MAÑÉ
     JUAN JOSÉ AMÉZAGA
     JOSÉ G. ANTUÑA
     JUAN CARLOS BLANCO
     Señora SOFÍA A. V. DE DEMICHELI
     MARTÍN R. ECHEGOYEN
     LUIS ALBERTO DE HERRERA
     PEDRO MANINI RÍOS
     MATEO MARQUES CASTRO
     RODOLFO MEZZERA
     OCTAVIO MORATÓ
     LUIS MORQUIO
     TEÓFILO PIÑEYRO CHAIN
     DARDO REGULES
     JOSÉ SERRATO
     JOSÉ PEDRO VARELA
Paraguay:
     JUSTO PASTOR BENÍTEZ
     GERÓNIMO RIART
     HORACIO A. FERNÁNDEZ
     Señorita MARÍA F. GONZÁLEZ
Mexico:
     JOSÉ MANUEL PUIG CASAURANC
     ALFONSO REYES
     BASILIO VADILLO
     GENARO V. VASQUEZ
     ROMEO ORTEGA
     MANUEL J. SIERRA
     EDUARDO SUÁREZ
Panama:
     J. D. AROSEMENA
     EDUARDO E. HOLGUÍN
     OSCAR R. MULLER
     MAGÍN PONS
Bolivia:
     CASTO ROJAS
     DAVID ALVÉSTEGUI
     ARTURO PINTO ESCALIER
Guatemala:
     ALFREDO SKINNER KLEE
     JOSÉ GONZÁLEZ CAMPO
     CARLOS SALAZAR
     MANUEL ARROYO
Brazil:
     AFRANIO DE MELLO FRANCO
```

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097
1935 WL 30023 (U.S. Treaty)

```
        LUCILLO A DA CUNHA BUENO
        FRANCISCO LUIS DA SILVA CAMPOS
        GILBERTO AMADO
        CARLOS CHAGAS
        SAMUEL RIBEIRO
    Ecuador:
        AUGUSTO AGUIRRE APARICIO
        HUMBERTO ALBORNOZ
        ANTONIO PARRA
        CARLOS PUIG VILASSAR
        ARTURO SCARONE
    Nicaragua:
        LEONARDO ARGÜELLO
        MANUEL CORDERO REYES
        CARLOS CUADRA PASOS
    Colombia:
        ALFONSO LÓPEZ
        RAIMUNDO RIVAS
        JOSÉ CAMACHO CARREÑO.
    Chile:
        MIGUEL CRUCHAGA TOCORNAL
        OCTAVIO SEÑORET SILVA
        GUSTAVO RIVERA
        JOSÉ RAMÓN GUTIÉRREZ
        FÉLIX NIETO DEL RÍO
        FRANCISCO FIGUEROA SÁNCHEZ
        BENJAMÍN COHEN.
    Peru:
        ALFREDO SOLF Y MURO
        FELIPE BARREDA LAOS
        LUIS FERNÁN CISNEROS.
    Cuba:
        ANGEL ALBERTO GIRAUDY
        HERMINIO PORTELL VILÁ
        ALFREDO NOGUEIRA.
```

Who, after having exhibited their Full Powers, which were found to be in good and due order, have agreed upon the following:

ARTICLE 1

The state as a person of international law should possess the following qualifications: a) a permanent population; b) a defined territory; c) government; and d) capacity to enter into relations with the other states.

ARTICLE 2

The federal state shall constitute a sole person in the eyes of international law.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097                                                                                          Page 5
1935 WL 30023 (U.S. Treaty)

ARTICLE 3

   The political existence of the state is independent of recognition by the other
states. Even before recognition the state has the right to defend its integrity
and independence, to provide for its conservation and prosperity, and consequently
to organize itself as it sees fit, to legislate upon its interests, administer its
services, and to define the jurisdiction and competence of its courts.

   The exercise of these rights has no other limitation than the exercise of the
rights of other states according to international law.

ARTICLE 4

   States are juridically equal, enjoy the same rights, and have equal capacity in
their exercise. The rights of each one do not depend upon the power which it
possesses to assure its exercise, but upon the simple fact of its existence as a
person under international law.

ARTICLE 5

   The fundamental rights of states are not susceptible of being affected in any
manner whatsoever.

ARTICLE 6

   The recognition of a state merely signifies that the state which recognizes it
accepts the personality of the other with all the rights and duties determined by
international law. Recognition is unconditional and irrevocable.

ARTICLE 7

   The recognition of a state may be express or tacit. The latter results from any
act which implies the intention of recognizing the new state.

ARTICLE 8

   No state has the right to intervene in the internal or external affairs of
another.

ARTICLE 9

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097
1935 WL 30023 (U.S. Treaty)

The jurisdiction of states within the limits of national territory applies to all the inhabitants.

Nationals and foreigners are under the same protection of the law and the national authorities and the foreigners may not claim rights other or more extensive than those of the nationals.

ARTICLE 10

The primary interest of states is the conservation of peace. Differences of any nature which arise between them should be settled by recognized pacific methods.

ARTICLE 11

The contracting states definitely establish as the rule of their conduct the precise obligation not to recognize territorial acquisitions or special advantages which have been obtained by force whether this consists in the employment of arms, in threatening diplomatic representations, or in any other effective coercive measure. The territory of a state is inviolable and may not be the object of military occupation nor of other measures of force imposed by another state directly or indirectly or for any motive whatever even temporarily.

ARTICLE 12

The present Convention shall not affect obligations previously entered into by the High Contracting Parties by virtue of international agreements.

ARTICLE 13

The present Convention shall be ratified by the High Contracting Parties in conformity with their respective constitutional procedures. The Minister of Foreign Affairs of the Republic of Uruguay shall transmit authentic certified copies to the governments for the aforementioned purpose of ratification. The instrument of ratification shall be deposited in the archives of the Pan American Union in Washington, which shall notify the signatory governments of said deposit. Such notification shall be considered as an exchange of ratifications.

ARTICLE 14

The present Convention will enter into force between the High Contracting Parties in the order in which they deposit their respective ratifications.

ARTICLE 15

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097
1935 WL 30023 (U.S. Treaty)

The present Convention shall remain in force indefinitely but may be denounced by means of one year's notice given to the Pan American Union, which shall transmit it to the other signatory governments. After the expiration of this period the Convention shall cease in its effects as regards the party which denounces but shall remain in effect for the remaining High Contracting Parties.

ARTICLE 16

The present Convention shall be open for the adherence and accession of the States which are not signatories. The corresponding instruments shall be deposited in the archives of the Pan American Union which shall communicate them to the other High Contracting Parties.

In witness whereof, the following Plenipotentiaries have signed this Convention in Spanish, English, Portuguese and French and hereunto affix their respective seals in the city of Montevideo, Republic of Uruguay, this 26th day of December, 1933.

RESERVATIONS

The Delegation of the United States of America, in signing the Convention on the Rights and Duties of States, does so with the express reservation presented to the Plenary Session of the Conference on December 22, 1933, which reservation reads as follows:

The Delegation of the United States, in voting "yes" on the final vote on this committee recommendation and proposal, makes the same reservation to the eleven articles of the project or proposal that the United States Delegation made to the first ten articles during the final vote in the full Commission, which reservation is in words as follows:

"The policy and attitude of the United States Government toward every important phase of international relationships in this hemisphere could scarcely be made more clear and definite than they have been made by both word and action especially since March 4. I have no disposition therefore to indulge in any repetition or rehearsal of these acts and utterances and shall not do so. Every observing person must by this time thoroughly understand that under the Roosevelt Administration the United States Government is as much opposed as any other government to interference with the freedom, the sovereignty, or other internal affairs or processes of the governments of other nations.

"In addition to numerous acts and utterances in connection with the carrying out of these doctrines and policies, President Roosevelt, during recent weeks, gave out a public statement expressing his disposition to open negotiations with the Cuban Government for the purpose of dealing with the treaty which has existed since 1903. I feel safe in undertaking to say that under our support of the general principle of non-intervention as has been suggested, no government need fear any intervention on the part of the United States under the Roosevelt Administration. I think it unfortunate that during the brief period of this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097                                                                                              Page 8
1935 WL 30023 (U.S. Treaty)

Conference there is apparently not time within which to prepare interpretations
and definitions of these fundamental terms that are embraced in the report. Such
definitions and interpretations would enable every government to proceed in a
uniform way without any difference of opinion or of interpretations. I hope that
at the earliest possible date such very important work will be done. In the
meantime in case of differences of interpretations and also until they (the
proposed doctrines and principles) can be worked out and codified for the common
use of every government, I desire to say that the United States Government in all
of its international associations and relationships and conduct will follow
scrupulously the doctrines and policies which it has pursued since March 4 which
are embodied in the different addresses of President Roosevelt since that time and
in the recent peace address of myself on the 15th day of December before this
Conference and in the law of nations as generally recognized and accepted".

The delegates of Brazil and Peru recorded the following private vote with regard
to article 11: "That they accept the doctrine in principle but that they do not
consider it codifiable because there are some countries which have not yet signed
the Anti-War Pact of Rio de Janeiro of which this doctrine is a part and therefore
it does not yet constitute positive international law suitable for codification".

Honduras: M. PAZ BARAONA.-AUGUSTO C. COELLO.-LUIS BOGRÁN.

United States of America: ALEXANDER W. WEDDELL.-J. BUTLER WRIGHT.

El Salvador: HÉCTOR DAVID CASTRO.-ARTURO R. AVILA.

Dominican Republic: TULIO M. CESTERO.

Haiti: J. BARAU.-F. SALGADO.-EDMOND MANGONÉS.-A. PRRE. PAUL.

Argentina: CARLOS SAAVEDRA LAMAS.-JUAN F. CAFFERATA.-RAMÓN S. CASTILLO.-I. RUIZ
MORENO.-L. A. PODESTÁ COSTA.-D. ANTOKOLETZ.

Venezuela: LUIS CHURION.-J. R. MONTILLA.

Uruguay: A. MAÑÉ.-JOSÉ PEDRO VARELA.-MATEO MARQUES CASTRO.-DARDO REGULES.- SOFÍA
ALVAREZ VIGNOLI DE DEMICHELI.-TEÓFILO PIÑEYRO CHAIN.-LUIS A. DE HERRERA.-MARTÍN R.
ECHEGOYEN.-JOSÉ G. ANTUÑA.-J. C. BLANCO.-PEDRO MANINI RÍOS.-RODOLFO
MEZZERA.-OCTAVIO MORATÓ.-LUIS MORQUIO.-JOSÉ SERRATO.

Paraguay: JUSTO PASTOR BENÍTEZ.-MARÍA F. GONZÁLEZ.

Mexico: B. VADILLO.-M. J. SIERRA.-EDUARDO SUÁREZ.

Panama: J. D. AROSEMENA.-MAGIN PONS.-EDUARDO E. HOLGUIN.

Guatemala: M. ARROYO.

Brazil: LUCILLO A. DA CUNHA BUENO.-GILBERTO AMADO.

Ecuador: A. AGUIRRE APARICIO.-H. ALBORNOZ.-ANTONIO PARRA V.-C. PUIG V.-ARTURO
SCARONE.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097                                                                              Page 9
1935 WL 30023 (U.S. Treaty)

Nicaragua: LEONARDO ARGÜELLO.-M. CORDERO REYES.-CARLOS CUADRA PASOS.

Colombia: ALFONSO LÓPEZ.-RAIMUNDO RIVAS.

Chile: MIGUEL CRUCHAGA.-J.RAMÓN GUTIÉRREZ.-F.FIGUEROA.-F. NIETO DEL RÍO.-B. COHEN.

Peru: (con la reserva establecida) ALFREDO SOLF Y MURO.

Cuba: ALBERTO GIRAUDY.-HERMINIO PORTELL VILÁ.-Ing. NOGUEIRA.

AND WHEREAS the said convention, as signed, was duly ratified by the United
States of America, and the instrument of ratification of the United States of
America embracing the aforesaid reservation made by its delegation at the
conference, as follows:

"The delegation of the United States, in voting 'yes' on the final vote on this
committee recommendation and proposal, makes the same reservation to the eleven
articles of the project or proposal that the United States delegation made to the
first ten articles during the final vote in the full Commission, which reservation
is in words as follows:

"The policy and attitude of the United States Government toward every important
phase of international relationships in this hemisphere could scarcely be made
more clear and definite than they have been made by both word and action
especially since March 4. I have no disposition therefore to indulge in any
repetition or rehearsal of these acts and utterances and shall not do so. Every
observing person must by this time thoroughly understand that under the Roosevelt
administration the United States Government is as much opposed as any other
government to interference with the freedom, the sovereignty, or other internal
affairs or processes of the governments of other nations.

"In addition to numerous acts and utterances in connection with the carrying out
of these doctrines and policies, President Roosevelt, during recent weeks, gave
out a public statement expressing his disposition to open negotiations with the
Cuban Government for the purpose of dealing with the treaty which has existed
since 1903. I feel safe in undertaking to say that under our support of the
general principle of nonintervention as has been suggested, no government need
fear any intervention on the part of the United States under the Roosevelt
administration. I think it unfortunate that during the brief period of this
conference there is apparently not time within which to prepare interpretations
and definitions of these fundamental terms that are embraced in the report. Such
definitions and interpretations would enable every government to proceed in a
uniform way without any difference of opinion or of interpretations. I hope that
at the earliest possible date such very important work will be done. In the
meantime in case of differences of interpretations and also until they (the
proposed doctrines and principles) can be worked out and codified for the common
use of every government, I desire to say that the United States Government in all
of its international associations and relationships and conduct will follow
scrupulously the doctrines and policies which it has pursued since March 4, which
are embodied in the different addresses of President Roosevelt since that time and
in the recent peace address of myself on the 15th day of December before this
conference and in the law of nations as generally recognized and accepted.",

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

49 Stat. 3097                                                                    Page 10
1935 WL 30023 (U.S. Treaty)

was deposited with the Pan American Union on July 13, 1934,

   AND WHEREAS, the said convention has been duly ratified also by the Dominican
Republic, whose ratification thereof was deposited with the Pan American Union on
December 26, 1934, on which day the convention, pursuant to a provision in Article
14 thereof, entered into force between the United States of America and the
Dominican Republic;

   NOW, THEREFORE, be it known that I, Franklin D. Roosevelt, President of the
United States of America, have caused the said convention to be made public to the
end that the same and every article and clause thereof may be observed and
fulfilled with good faith by the United States of America and the citizens thereof
subject to the reservation aforesaid.

   IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the
United States of America to be affixed.
      DONE at the city of Washington this eighteenth day of January, in the year of
   our Lord one thousand nine hundred and thirty-five and of the Independence of
   the United States of America the one hundred and fifty-ninth.


FRANKLIN D ROOSEVELT

[SEAL]


By the President:


CORDELL HULL

Secretary of State.

49 Stat 3097, 1935 WL 30023 (U.S. Treaty)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# BROWN SIMS, P.C.

### ATTORNEYS AT LAW

G. BYRON SIMS' '''
KENNETH G. ENGERRAND
JAMES N. ISBELL
MICHAEL D. WILLIAMS
MARK C. CLEMER
MONICA FEKETE MARKOVICH
PHILIP ROBERT BRINSON
NELSON D. SKYLER
CYNTHIA A. GALVAN
JAMES R. KOECHER
P. MICHAEL BOWDOIN
MICHAEL A. VARNER
JEROMY D. HUGHES
JOHN G. H. DAVIS
POLLY A. KINNIBRUGH

' BOARD CERTIFIED · PERSONAL INJURY TRIAL LAW
'' BOARD CERTIFIED · CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
''' LICENSED IN THE STATE OF LOUISIANA
'''' ALSO LICENSED IN THE STATE OF WISCONSIN

TENTH FLOOR
1177 WEST LOOP SOUTH
HOUSTON, TEXAS 77027-9007
TELEPHONE: (713) 629-1580
TELECOPIER: (713) 629-5027

E-MAIL: FIRM@BROWNSIMS.COM
URL: HTTP://WWW.BROWNSIMS.COM

ADRIAN V. VILLACORTA
ANDREW B. COOPER'''
LEIGH E. ARNEMANN
JASON M. YACUK
KRISTOPHER M. STOCKBERGER
KARA L. KELLOGG
SHAWN R. REDMAN '''
BRIAN E. WHITE
CLINTON J. DAVIS
EDWARD R. MCCOY
RANDOLPH JAMES AMARO, JR. ''''
JACOB A. DE LEON
ALLEN D. HEMPHILL
CHRIS D. COLLINGS

OF COUNSEL
DAVID C. REDFORD

THOMAS A. BROWN
(1932-1997)

June 11, 2003

Honorable Michael N. Milby
District Clerk
United States District Court for
  the Southern District of Texas
600 East Harrison Street
Brownsville, Texas 78520

*Via Federal Express*

Re:    Civil Action No. B-03-020; *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*; In the United States District Court for the Southern District of Texas, Brownsville Division; Our File No. 1684.036228

Dear Mr. Milby:

Enclosed for filing in the referenced matter is the original and two copies of *The Government of Mexico's Amicus Curiae Brief*.

Please process these documents in your usual manner, returning the file-stamped copies to the undersigned in the enclosed stamped envelope. By copy of this letter, all counsel of record have received a copy of this filing. Thank you for your assistance.

Very truly yours,

BROWN SIMS, P.C.

By: Michael A. Varner

MAV/ck
enclosures

Honorable Michael N. Milby
June 11, 2003
Page 2


cc:    Michael H. Bagot, Jr.        *via Certified Mail-RRR No. 7001 0360 0000 0048 0069*
       Thomas A. Rayer, Jr.         *and e-mail*
       Wagner & Bagot, L.L.P.
       Poydras Center, Suite 2660
       650 Poydras Street
       New Orleans, Louisiana 70130-6105


       Keith N. Uhles              *via Certified Mail-RRR No. 7001 0360 0000 0048 0076*
       Royston, Rayzor, Vickery & Williams, L.L.P.
       P.O. Box 3509
       Brownsville, Texas 78523-3509


       Benjamin O. Schupp         *via Certified Mail-RRR No. 7001 0360 0000 0048 0083*
       Sergio J. Alarcon          *and e-mail*
       Milling Benson Woodward L.L.P.
       909 Poydras Street, Suite 2300
       New Orleans, Louisiana 70112-1010


       Richard A. Stanford        *via Certified Mail-RRR No. 7001 0360 0000 0048 0090*
       Stanford Law Firm
       P.O. Box 42430
       Houston, Texas 77242-2430