43

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| SUBMERSIBLE SYSTEMS, INC. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. B-03-020 |
| | * | |
| PERFORADORA CENTRAL, S.A. de C.V. | * | RULE 9(h) ADMIRALTY |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

### POST HEARING MEMORANDUM ON CHOICE OF LAW

Perforadora Central, S.A. de C.V. ("Perforadora") files this Post Hearing Memorandum On Choice of Law in response to the Court's questions as to whether choice of law must be decided in ruling on the motion to dismiss for *forum non conveniens*, and if so, what law should be chosen.

I.     **Choice of law should be decided at the same time as the *forum non conveniens* motion.**

Because the choice of law is so crucial to the analysis of the *forum non conveniens* public interest factors, the two issues should be decided together. Although the Fifth Circuit's former *forum non conveniens* approach, which made choice of law the predominant factor, has been rejected, "...choice of law is still an important consideration." *Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 879 (5th Cir. 1987). Relying upon *Gonzalez*, the district court in *Quintero v. Klaveness Shiplines*, 914 F.2d 717 (5th Cir. 1990) concluded that:

> [*In Re*] *Air Crash [Disaster Near New Orleans, Louisiana*, 821 F.2d
> 1147 (5th Cir. 1987] makes it clear that a district court should make
> a choice of law determination in deciding a *forum non conveniens*
> issue. *Air Crash*, 821 F.2d 1166....

See, Minute Entry of Judge McNamara dated September 29, 1989 attached as an Appendix to the

Fifth Circuit's decision. 914 F.2d at 730 (additional citations omitted). The Fifth Circuit specifically endorsed the district court's analytical approach.

> As the district court's minute entry shows, the court first determined that there was an adequate alternative forum, next considered the private interest factors, and finally considered the public interest factors, **which necessarily required a choice of law determination.** We agree wholeheartedly with district court's methodology and conclude that it neither erred as a matter of law nor abused its discretion by making a choice of law determination.

*Quintero*, 914 F.2d at 725 (emphasis added). See also *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003) (referring to the "importance of the choice of law factor" in the *forum non conveniens* context); *Bougioukas v. E.N. Bisso & Son, Inc.* 1988 WL 123355 (E.D. La. Nov. 7, 1988) ("choice of law to be applied remains an important consideration in a *forum non conveniens* analysis"); *Martin v. Vogler*, 1993 WL 462853 (N.D. Ill. Nov. 9, 1993) (choice of law is the "most important" of public factors considered in *forum non conveniens* analysis).

Of course, it is in Perforadora's interest to have the choice of law made in connection with the *forum non conveniens* decision because the choice-of-law factors so strongly support application of Mexican law. And while this Court is certainly capable of applying Mexican law, the Supreme Court and the Fifth Circuit have acknowledged that, as a general rule, courts are more "at home" with local law. As the Fifth Circuit noted in *Gonzalez*:

> There is an appropriateness, too, in having the trial of a ...case in a forum that is at home with the ...law that must govern the case, rather than having a court in some other forum untangle problems and conflicts of law, and in law foreign to itself.

*Gonzalez*, 832 F.2d at 879, fn. 2, *quoting Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843. See also *Ford v. Brown, supra*, 319 F.3d at 1307 (cases involving foreign law should be tried

in foreign countries where jurists are familiar with the applicable foreign law). It is precisely because of the difficulties described in *Gonzalez* and *Ford* that application of foreign law is so important a *forum non conveniens* factor. Thus, a proper *forum non conveniens* analysis requires a choice-of-law determination.

## II.    The Law of the Flag is of Cardinal Importance

SSI's argument that the M/V DON FRANCISCO's flag should be disregarded is borrowed from cases involving flags of convenience and has no relevance here. The M/V DON FRANCISCO was registered and documented under the laws of Mexico. Its flag was a symbol that it was genuinely a Mexican vessel; its flag was not one of convenience. *See, Fisher v. Agros Nicolaos*, 636 F.2d 1107, 1112 (5th Cir. 1981)( Magistrate's recommendations state the Mexican flag of the vessel was not one "of convenience" because its owner was a Mexican corporation owned in turn by Mexican nationals, with no United States beneficial ownership.); *see also, Ioannidis/Riga v. M/V Sea Concert*, 132 F.Supp.2d 847, 856 (D. Or. 2001); *In Re Fantome, S.A.,* 232 F.Supp.2d 1298, 1305 (S.D. Fla. 2002).

Assertions that a particular vessel's flag is one of convenience usually occur when a defendant's allegiance is at issue. *Rode v. Sedco*, 394 F.Supp. 206, 208 (E.D. Tex. 1975). In this case, there is no question that the M/V DON FRANCISCO's flying the Mexican flag was consistent with its owner's allegiance to Mexico, where the owner is domiciled and has its base of operations.

Here, there is no reason to disregard *Lauritzen*'s sound policy that "there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state who owns her." *Lauritzen v. Larsen*, 345 U.S. 584, 585, 73 S.Ct. 921, 930 (1953); *Sedco*, 394 F.Supp. at 208. SSI alleges as the basis for both subject matter jurisdiction and

3

liability the actions of the Captain aboard the M/V DON FRANCISCO. In any similar case, the law of the vessel's flag would apply; in this case the flag simply confirms the choice-of-law to which most of the other relevant factors -- place of the alleged wrong, allegiance of the defendant shipowner -- point.

At the May 23rd hearing, SSI suggested that the law of the flag is pertinent only when there is a dispute between the crew and the owner of the vessel. While it is true that *Lauritzen* was a Jones Act case involving an injured crew member, there have been many reported cases that did not involve disputes between crew members and vessel owners in which the law of the flag of the vessel has been given substantial consideration in the choice-of-law analysis. *See, e.g., Klinghoffer v. S.N.C. Achille Lauro*, 795 F.Supp. 112, 115-16 (S.D. N.Y. 1992); and *In Re Central Gulf Lines*, 176 F. Supp.2d 599, 612 (E.D. La. 2001).

**III.  Place of the Alleged Wrong was not Fortuitous and Should Be Given Considerable Weight**

SSI also discounts the Mexican situs of the allegedly wrongful conduct as fortuitous, arguing that it is of little relevance in this case. As noted in Perforadora's reply brief (pp. 9-10), however, there is no reason to discount the place of the wrongful conduct in non-traditional cases that do not involve vessels plying the waters of numerous jurisdictions. *E.g., Coats v. Penrod Drilling Co.*, 61 F.3d 1113 (5th Cir. 1995). In those cases, the place of the wrong is not fortuitous and is "considered a significant choice-of-law factor." *Neely v. Club Management Services, Inc.*, 63 F.3d 166, 191 (3d Cir. 1995), *citing Fogleman v. ARAMCO*, 920 F.2d 278, 282 (5th Cir. 1991).

Generally speaking, the importance of the vessel's flag will increase in inverse proportion to the importance of the place of the wrong. The more jurisdictions a vessel touches, the less

4

significant each jurisdiction (and the more significant the law of the flag) becomes, because injury in any particular jurisdiction will be deemed fortuitous. On the other hand, if the vessel remains principally in one jurisdiction, an accident in that jurisdiction will not be fortuitous in terms of its location, and those concerned will justifiably expect it to be governed by that jurisdiction's law. But no rationale supports disregarding the importance both of the law of the flag and the law of place of the wrong, **especially when they are the same**. Yet, this is precisely what SSI has argued here.

Thus, if one accepts SSI's attempt to catagorize these events as falling within the traditional "blue water" shipping context, the Mexican flag of the M/V Don Francisco, because it is not a flag of convenience, becomes of paramount importance. The M/V Don Francisco, however, is not an oceangoing freighter or cargo vessel. It is an offshore supply vessel. Its voyage was not dictated by bills of lading or contracts of affreightment, but rather by a voyage charter entered into with a Mexican company to support oil field inspection activities for the Mexican oil industry in Mexican territorial waters. Morgan City was not to a regular port of call of the vessel, and its stop there was ordered not by the shipowner, but by the charterer, Quantum. Accordingly, the place of the alleged wrong assumes primary importance, and the vessel's flag simply adds to the weight of consideration pointing to Mexican law.

SSI has argued that Quantum's ordering the M/V Don Francisco into U.S. waters to pick up SSI's equipment and crew somehow warrants the application of U.S. law. But this argument is unsupported by any authority. *Lauritzen* clearly acknowledged that the contacts sufficient to hale a defendant into a particular forum may not be enough to invoke that forum's law. *Lauritzen*, 345 U.S. at 590-92. Here, the trip to Morgan City was not even enough to establish personal jurisdiction over Perforadora.

5

There is, therefore, nothing fortuitous about the Mexican location of the alleged wrongs or the Mexican connection with almost all of the other circumstances surrounding this controversy. SSI has attempted to put the issues in what it asserts is the "correct context" by arguing that the start and end of the job for Quantum was Morgan City and that SSI was not working generally in Mexico. Yet, the actions of SSI itself belie its suggestion that the place of the wrong was fortuitous. SSI was not unwittingly drawn into Mexican commerce. The sole shareholder of SSI , Wolfgang Burnside,[1] a British national[2] and a self-proclaimed "industry mercenary,"[3] saw a market in Mexico and sought to "get in there and show [his] stuff."[4] Burnside signed a contract with a Mexican engineering firm to do pipeline and platform riser inspection work for the Mexican national oil company in Mexican territorial waters.[5] The Mexican government issued visas for SSI's employees to work in Mexico[6], as well as permits for Quantum to import SSI's inspection equipment.[7]

Burnside made many trips to Mexico, spent over fifty days there and routinely brought

---

[1]See excerpts of the Rule 30(b)(6) deposition of SSI from the Mississippi litigation, at page 89, lines 9-12, attached hereto as Exhibit "A" and hereafter referred to as "Burnside depo."

[2]Burnside depo. at p.8, lines 17-19.

[3]Burnside depo. at p.124, lines 15-18.

[4]Burnside depo. at p.128, lines 3-8.

[5]Burnside depo. at p.10, lines 16-21, p. 14-16, p. 76 (Note that SSI admits it made it impossible for Quantum to collect money from PEMEX by refusing to give Quantum the inspection tapes. Burnside depo. p.76, 133)

[6]Burnside depo. at p.8, lines 9-11, p. 135, line 16 - p. 136, line 1. (Note that the work permits of SSI's personnel had expired.)

[7]Burnside depo. at p.118.

consumables and spare parts to Mexico.[8] Burnside claims to have made over a million dollars[9] from his work in Mexico, and he sought to make more. He engaged a Mexican national on a commission basis[10] and provided him with business cards and brochures to gather information and contacts for Burnside's commercial ventures in Mexico. Burnside anticipated and negotiated for other contracts with Mexican firms for more work in Mexico.[11]

That the events came to a head in a Mexican port when Quantum breached its contractual obligations to both SSI and Perforadora Central was hardly fortuitous. That the vessel chartered by Quantum to transport SSI was owned by a Mexican company, crewed by Mexican nationals, flew the Mexican flag and sailed from a Mexican port made the application of Mexican law predictable, if not inevitable. And while it was crucial for SSI to allege a shipboard tort in order to establish admiralty jurisdiction, as its counsel made clear at the *forum non conveniens* hearing, SSI's allegations of wrongdoing extended to assertions that Perforadora misled Mexican governmental officials and misused the Mexican judicial system. It can hardly be claimed that these significant land-based contacts with Mexico were fortuitous.

SSI's argument that its U.S. incorporation creates an overriding interest in applying U.S. law

---

[8] Burnside depo. at p.9, line 18 - p.12, line 12.

[9] Burnside depo. at p.150, lines 16 - 22. Quantum never paid Burnside over $720,000. Burnside depo. at p.142, line 1 - p.143, line 2. This debt, which was already 5 months overdue before the vessel reached Dos Bocas (Burnside depo. p.151, lines 16-22), caused SSI to scale back its employees (Burnside depo. p. 15, lines 6-19, p.101, 7-10, p23, lines 8-14) and required SSI to cancel an order for an additional ROV (Burnside depo. p.34, lines 12-23, p.151, lines 12-16), all prior to any of the alleged actions of Perforadora Central. Conveniently, SSI now blames Perforadora Central for its problems.

[10] Burnside depo. at p.63, line 25 - p.65, line 8.

[11] Burnside depo. at p.143, line 25- p.147, line 7.

is not supported by any authority. In cases functionally similar to this one, U.S. domicile alone has never been held sufficient for the application of U.S. law, even in cases involving personal injury. *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F.Supp. 543 (E.D. Va. 1996); *Klinghoffer v. S.N.C. Achille Lauro*, 795 F.Supp. 112, 115 (S.D.N.Y. 1992). In Jones Act cases, where the U.S. interest has been Congressionally expressed, U.S. domicile alone has been insufficient. *Bilyk v. The Vessel NAIR*, 754 F.2d 1541, 1544-45 (9th Cir. 1984); *Fogleman v. ARAMCO*, 920 F.2d at 284. Most important, in the commercial context, U.S. citizenship alone is not only an insufficient basis for the application of U.S. law, but has also been held insufficient to justify the exercise of jurisdiction. *Cuba R. Co. v. Crosby*, 222 U.S. 473, 480, 32 S.Ct. 132, 133 (1912); *Mercier v. Sheraton International, Inc.*, 981 F.2d 1345, 1351 (1st Cir. 1992); *Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*, 556 F.2d 975, 978 (9th Cir. 1977) (per curiam) *cert denied.*, 434 U.S. 1035 (1978).

Having no legal support, SSI's argues essentially that applying Mexican law to deprive it of a large recovery would be unconscionable. But this is not an accepted basis for bending or disregarding settled choice-of-law principles.

> The assertion that something is unconscionable is little more than a distaste for the particular result. Harsh results do not necessarily eviscerate otherwise sound principles. Forgetting that maritime [choice of law] is a principle of American law that parallels international law leads to idiosyncratic judgments that undermine the predictability and reciprocity of American maritime law.

*In Re M/V Floreana,* 37 F.Supp. 2d 853, 854 (S.D. Tex. 1999)(Judge Hughes).

## IV.    The *Calhoun* case supports Perforadora's position

At oral argument, counsel for SSI relied upon *Calhoun v. Yamaha Motor Corp.*, 216 F.3d 338 (3d Cir. 2000) to support its contention that U.S. domiciliaries other than seaman are protected

by U.S. law when injured abroad.

First, *Calhoun* involved an injury in Puerto Rico, a territory of the United States, so there was no issue of a conflict between U.S. admiralty law and foreign law, and the court applied U.S. admiralty law to the liability issues arising from an accident that occurred in U.S. territorial waters. Instead, the issue was whether the law of Pennsylvania or the law of Puerto Rico applied to damages. The Court held that Pennsylvania law governed compensatory damages and that Puerto Rico law governed punitive damages.

The Third Circuit's reasoning was that Pennsylvania had a strong interest in having its compensatory damages law applied to its domiciliaries and that Puerto Rico had no such interest because the plaintiff had "virtually no connection to Puerto Rico." 216 F.3d at 347. Had Wolfgang Burnside suffered a personal injury in Mexico during a vacation, the *Calhoun* case might be more persuasive here. Unlike vacationing Natalie Calhoun, however, SSI was involved in substantial business operations with Mexican companies in Mexico, as shown above. Accordingly, SSI would be hard pressed to assert it has "virtually no connection to Mexico."

As to punitive damages, the Third Circuit was persuaded that Puerto Rico's interest in regulating activity in its territorial waters was dominant, despite the fact that Puerto Rico, like Mexico, had rejected punitive damages as a deterrent and punishment. 216 F.3d at 348.

Given *Calhoun's* application of Puerto Rican law to punitive damages and its reliance on the plaintiff's lack of connection with Puerto Rico in applying Pennsylvania compensatory damages law, the *Calhoun* case supports Perforadora's position on the issue of punitive damages, and its holding on compensatory damages is distinguishable.

**V.    Conclusion**

9

For the reasons set forth above and in prior memoranda submitted in support of the motion to dismiss, Mexican law should be applied, and the choice of Mexican law should lead to the dismissal of this case for *forum non conveniens.*

OF COUNSEL:

ROYSTON RAYZOR VICKERY
    & WILLIAMS L.L.P.

MILLING BENSON WOODWARD L.L.P.

Respectfully submitted,

_Keith Uhles / LP_
_____
KEITH UHLES (Tex Bar No. 20371100)
(S.D. Tex. No. 1936)
55 Cove Circle
Brownsville, TX 78523-3509
Telephone:  (956) 542-4377
Facsimile:   (956) 542-4370

JAMES K. IRVIN (#7166)
BENJAMIN O. SCHUPP (#21074)
SERGIO J. ALARCON (#24740)
909 Poydras Street, Suite 2300
New Orleans, LA  70112-1010
Telephone:  (504) 569-7000
Facsimile:   (504) 569-7001

Attorneys for Perforadora Central S.A. de C.V.

wp301794

10

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **Post Hearing Brief on Choice of Law** has been served upon all counsel of record by depositing same in the United States Mail, first class postage prepaid and properly addressed, this ___16th___ day of June, 2003.

Keith Uhles, up

wp301794

11

SUBMERSIBLE SYSTEMS v PERFORADORA CENTRAL, WOLFGANG BURNSIDE  8/4/98

---

**PAGE 1 - SHEET 1**

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF MISSISSIPPI

3    SOUTHERN DIVISION

4

5    SUBMERSIBLE SYSTEMS, INC.
      CIVIL ACTION

6    VERSUS        NO. 1:98CV251RG
      JUDGE WALTER J.

7    GEX, III

8    PERFORADORA CENTRAL,
      S.A. de C.V.

9

10

11     30(b)(6) Deposition of Submersible
      Systems, Inc., P.O. Box 1843, Patterson,

12    Louisiana 70392, through its designated
      representative, WOLFGANG BURNSIDE, 207

13    St. Peter Street, Patterson, Louisiana
      70392, taken in the offices of WAGNER &

14    BAGOT, Poydras Center, Suite 2660, 650
      Poydras Street, New Orleans, Louisiana

15    70130-6105, on Tuesday, the 4th day of
      August, 1998.

16

17

18    APPEARANCES:

19    WAGNER & BAGOT
      (BY: MICHAEL H. BAGOT, JR.)

20    Poydras Center - Suite 2660
      650 Poydras Street

21    New Orleans, Louisiana  70130-6105

22        COUNSEL FOR PLAINTIFF

23

24

25

---

**PAGE 2**

1    MILLING, BENSON, WOODWARD, HILLYER,
      PIERSON & MILLER

2    (BY: NEAL D. HOBSON)
      (BY: SERGIO J. ALARCON)

3    909 Poydras Street
      Suite 2300

4    New Orleans, Louisiana  70112-1017

5        COUNSEL FOR DEFENDANT

6

7    ALSO PRESENT:

8    FAUSTO A. CORREA LEPE

9

10   REPORTED BY:

11   RHONDA C. LOUPE
      CERTIFIED COURT REPORTER

12   REGISTERED PROFESSIONAL REPORTER

13

14

15

16

17

18   E X A M I N A T I O N   I N D E X
      PAGE

19   EXAMINATION BY MR. HOBSON        6

20

21

22

23

24

25

---

**PAGE 3**

1    E X H I B I T   I N D E X

2                    PAGE

3    EXHIBIT NO. 1        27

4    EXHIBIT NO. 2A       27

5    EXHIBIT NO. 2B       27

6    EXHIBIT NO. 3        27

7    EXHIBIT NO. 4        27

8    EXHIBIT NO. 5        (not attached)

9    EXHIBIT NO. 6A       29

10   EXHIBIT NO. 6B       30

11   EXHIBIT NO. 7        (not attached)  31

12   EXHIBIT NO. 8        46

13   EXHIBIT NO. 9        120

14   EXHIBIT NO. 10       122

15   EXHIBIT NO. 11       133

16   EXHIBIT NO. 12       139

17   EXHIBIT NO. 13       142

18   EXHIBIT NO. 14       149

19

20

21

22

23

24

25

**EXHIBIT**

**A**

---

**PAGE 4**

1        S T I P U L A T I O N

2

3        It is stipulated and agreed by

4    and among counsel for the parties hereto

5    that the deposition of the aforementioned

6    witness is hereby being taken for all

7    purposes allowed under the Federal Rules of

8    Civil Procedure, in accordance with law,

9    pursuant to notice;

10       That the formalities of reading

11   and signing are specifically not waived;

12       That the formalities of filing,

13   sealing and certification are specifically

14   waived;

15       That all objections, save those

16   as to the form of the question and the

17   responsiveness of the answer, are hereby

18   reserved until such time as this

19   deposition, or any part thereof, may be

20   used or sought to be used in evidence.

21       RHONDA C. LOUPE, Certified

22   Shorthand Reporter, in and for the

23   State of Louisiana, officiated in

24   administering the oath to the witness.

25

---

CURREN & LANDRIEU, INC.                    (504) 833-3330

**5**

1      WOLFGANG BURNSIDE,
2  after having been first duly sworn by the
3  above-mentioned court reporter, did testify
4  as follows:
5  EXAMINATION BY MR. HOBSON:
6      Q.    Mr. Burnside, my name is Neal
7  Hobson. We met a moment ago. I'm one of
8  the attorneys for Perforadora Central in
9  this case, which your company has started.
10          Have you ever given a
11  deposition before?
12     A.    No.
13     Q.    In this deposition, I will be
14  asking the questions, and you will either
15  be answering or not answering, depending on
16  what your counsel tells you. I'll try not
17  to interrupt your answers if you will try
18  not to interrupt my questions. I would
19  appreciate it if you listen to my questions
20  until they are finished.
21          I will assume that you
22  understand what my question means. If you
23  have any doubts about that, I would
24  appreciate it if you would bring it up at
25  that time so we can try to straighten out

**6**

1  any confusion in your mind. I will assume
2  that if you don't ask for any explanation
3  that you fully understand the question.
4  Please don't hesitate to say that you need
5  more explanation.
6      MR. HOBSON:
7          I guess we want usual
8  stipulations, I suppose, in that we reserve
9  objections until the time some attempt is
10  made to use the testimony except as to the
11  form of the question.
12     MR. BAGOT:
13          All right. But he will want to
14  read and sign the transcript.
15     MR. HOBSON:
16          This deposition is taken for
17  all purposes.
18          In connection with that, we
19  have filed on behalf of Perforadora Central
20  objections to jurisdiction, venue, motion
21  to dismiss for forum non conveniens. We
22  will stipulate with counsel that despite
23  the fact that these motions are pending,
24  that both in Mr. Burnside's deposition and
25  Mr. Correa's deposition tomorrow, we will

**7**

1  go forward into the full aspects of this
2  case; but it's without waiver of any
3  defense or claim.
4          Further, we have brought
5  Mr. Correa to New Orleans for the
6  deposition as convenience to counsel being
7  the least expensive way to do it. That,
8  likewise, is without waiver of our defenses
9  to jurisdiction or to the reach of the
10  Court to Perforadora Central in this
11  matter. I believe that's correct.
12     MR. BAGOT:
13          That's correct.
14     MR. HOBSON:
15          Any other preliminaries?
16     MR. BAGOT:
17          I don't think so. We agree not
18  to serve any papers on Mr. Correa while he
19  is here.
20  BY MR. HOBSON:
21     Q.    Mr. Burnside, attached to the
22  Notice of Deposition was an Exhibit B,
23  which were documents which we asked to be
24  produced. Counsel and I have agreed that
25  these are kind of last minute. We know

**8**

1  it's maybe too late to get everything.
2          You have brought some documents
3  in response to the notice in this Exhibit
4  B?
5      A.    I have, yes.
6      Q.    The first I see is your
7  passport for '96, '97, and '98. Is this
8  your passport here (indicating)?
9      A.    Yes. That's my passport there
10  with the FM3 work visa that was issued to
11  me in Mexico.
12     MR. HOBSON:
13          What I'd probably like to do
14  is get a copy of at least the essentials of
15  this passport.
16  BY MR. HOBSON:
17     Q.    This is a British passport.
18  Are you a British citizen?
19     A.    That's correct.
20     Q.    And you live where now?
21     A.    In Patterson, Louisiana.
22     Q.    How long have you lived in
23  Louisiana?
24     A.    Approximately 10 years.
25     Q.    What is your immigration status

SUBMERSIBLE SYSTEMS v PERFORADORA CENTRAL WOLFGANG BURNSIDE 8/4/98

---

PAGE 9 SHEET 3

9

1 in the United States?

2 A. I'm a resident alien with a
3 green card.

4 Q. This passport has been in
5 effect since '53. We have to change them
6 every 10 years.

7 A. That's only valid for 10
8 years. My date of birth is '53.

9 Q. I'm sorry.
10 Your passport, Mr. Burnside,
11 does not appear to show any entries into
12 Mexico in the last several years.

13 A. I believe there's one entry in
14 there in my passport.

15 Q. Perhaps I missed that. If you
16 could find that, please.

17 A. (Indicating.)

18 Q. So this is December '96. How
19 long did you stay in Mexico on that
20 occasion?

21 A. Well, it was a varied amount of
22 time. This requires explanation. The
23 nature of the work was that I had to
24 transit back and forth between Louisiana
25 and Mexico not only to bring spare parts

---

PAGE 10

10

1 but consumables, etc., that we used for
2 work. I wasn't present on the job site the
3 entire time for contract. I only went down
4 to initially start off the contract, and I
5 went down to --

6 MR. BAGOT:
7 Let me just caution.

8 Mr. Hobson's question is with respect to
9 your entry into Mexico in December of '96.
10 How long were you there at that time?

11 A. I can't say.

12 MR. BAGOT:
13 He may have further questions
14 based on what you have just said.

15 BY MR. HOBSON:
16 Q. I take it from part of your
17 answer that you have made numerous trips
18 into and out of Mexico in connection with
19 the contract which your company had with
20 Quantum Engineering?

21 A. That's correct.

22 Q. How did you generally go into
23 Mexico?

24 A. The majority of the time, I
25 drove with my personal truck, the company

---

PAGE 11

11

1 truck.

2 Q. What size truck is that?

3 A. It's a GMC extended cab with a
4 350 V-8, full size.

5 Q. Is there any estimate of how
6 many trips you made down there over the
7 period of this contract?

8 A. The contract?

9 Q. Yes, or in connection with
10 getting the contract or, perhaps, dealing
11 with things after the contract.

12 A. I can't answer that
13 accurately. Several trips.

14 Q. More than 10, you suppose?

15 A. Less.

16 Q. Less than 10?

17 A. Yes.

18 Q. I take it that every time you
19 crossed the border, then, you don't have to
20 get your passport or your visa stamped, a
21 record of that?

22 A. It wasn't a requirement because
23 I have a green card with a driver's
24 license. That was all the identification
25 they asked for at the border.

---

PAGE 12

12

1 Q. Do you have any estimate of how
2 many actual days or nights that you spent
3 in Mexico in connection with this
4 contract? I say that's from the time you
5 were bidding for the contract through the
6 performance of the contract and trips you
7 may have made down there after the contract
8 but dealing with it, the aftermath?

9 A. Accurately, I can't say
10 exactly how many days I was there.

11 Q. More than 50?

12 A. Yes.

13 Q. About how long a trip is it to
14 drive from Patterson down to Carmen?

15 A. Forty hours.

16 Q. Forty?

17 A. Forty, nonstop.

18 Q. How many employees does
19 Submersible Systems, Inc., have? By
20 "employee," I will include officers who may
21 not draw necessarily a salary?

22 A. At this time?

23 Q. Yes.

24 A. Two.

25 Q. Who are they?

---

CURREN & LANDRIEU, INC.                    (504) 833-3330

13

1  A.  My wife and myself.

2  Q.  What is your position with the

3 company?

4  A.  I'm the owner and president of

5 the company.

6  Q.  What is your wife's position

7 with the company?

8  A.  I believe on paper, she is

9 classified as a vice president or

10 secretary.

11  Q.  What does she actually do in

12 connection with the company?

13  A.  She does the payroll and normal

14 business affairs apart from accounting.

15  Q.  Apart from accounting?  Who

16 does the accounting?

17  A.  We have an accountant in

18 Lafayette. It's Moore & Rolfes.

19  Q.  How do you spell Moore?

20  A.  M-O-O-R-E, and Rolfes,

21 R-O-L-F-E-S or something.  Our accountant

22 is actually Lou Rolfes.

23  Q.  What is the largest number of

24 employees that the company has ever had?

25  A.  At one time?

14

1  Q.  Yes.

2  A.  Ten.

3  Q.  What were those ten people

4 engaged in, generally?

5  A.  In ROV operations, the

6 operations and maintenance of underwater

7 vehicles.

8  MR. BAGOT:

9  Just for the completeness of

10 the record, if you could tell us just once

11 what ROV stands for?

12  THE WITNESS:

13  It's remotely-operated

14 vehicle. It's a small underwater robot.

15 BY MR. HOBSON:

16  Q.  When you had 10 employees, were

17 they all engaged in some sense in the

18 contract that you had with Quantum?

19  A.  Yes. Primarily, yes.

20  Q.  How many of those employees

21 were present in Mexico or Mexican waters?

22  MR. BAGOT:

23  Over the --

24 BY MR. HOBSON:

25  Q.  During the period of this

15

1 contract, you had ten employees.  Were they

2 all in Mexico or half of them in Mexico?

3  A.  It calls for explanation again.

4  MR. BAGOT:

5  You can explain.

6  A.  The initial contract called for

7 seven people to be on board at all times.

8 In fact, we ended up with eight people on

9 board at some point.  When there were eight

10 people on board, I was present because I

11 was the overall project manager.

12  However, during the course of

13 the contract, due to Quantum's

14 inconsistency of payment, we were incurring

15 very large overhead having all of these

16 people on board.  To cut my overhead, I had

17 to scale down the crew, which didn't really

18 affect the operations as such but, however,

19 affected our revenue.

20  So if the contract could have

21 went well with Quantum, we would have had

22 eight people on board at all times to allow

23 24-hour operations.

24 BY MR. HOBSON:

25  Q.  Did the crews on board, if all

16

1 was going well, operate more or less 12

2 hours on and 12 hours off?

3  A.  That's correct.

4  Q.  How long did they remain in

5 Mexico?

6  A.  Personnel?

7  Q.  Yes.

8  A.  I don't really understand.

9  MR. BAGOT:

10  You mean from the start of the

11 job until it was over?

12 BY MR. HOBSON:

13  Q.  Did they rotate every 30 days

14 or every 15 days, or did they just stay

15 there for the length of the contract or

16 something else?

17  A.  There were two personnel that

18 were there for almost the entire contract,

19 except for a small break in the middle of

20 the trip, the entire contract. But the

21 rest of the personnel were there for a

22 month or two, and then they departed. We

23 changed them out.

24  Q.  Who were the personnel who

25 stayed down there just about the entire

**21**

1 we referred to earlier. You say he lives
2 in Birmingham?
3   A.   Correct.
4   Q.   Here he's listed as Morgan
5 City, Louisiana.
6   A.   Yeah. He just recently married
7 and moved to Birmingham.
8   Q.   Terri Burnside is your wife?
9   A.   Correct.
10   Q.   Wolfgang Burnside is you, of
11 course.
12      Is that everyone who was
13 involved in this job?
14   A.   No.
15   MR. BAGOT:
16      If you refer to the first page,
17 there's a sticky there with some additional
18 names on it.
19 BY MR. HOBSON:
20   Q.   I see names here. It says
21 Alan, A-L-A-N. Is that not any of the
22 names -- was there some further
23 explanation?
24   MR. BAGOT:
25      Yes. From what the client has

---

**22**

1 told me, these are -- well, Sharma we
2 have. You have already referred to that.
3 William Allan and then Craig and Willy. I
4 don't think he can read the handwriting.
5 You need to tell him why there are no
6 payroll records for them.
7   A.   The reason that we do not show
8 any payroll records for those four people
9 is the fact that they are exports. Three
10 of them are British, one Australian. They
11 don't require to have taxes withheld from
12 their payroll, and they are employed as
13 contract labor on this contract with
14 Quantum. So basically, we pay them cash in
15 hand. That's why there's no payroll
16 records for them.
17 BY MR. HOBSON:
18   Q.   So William Allan?
19   A.   William Allan, correct.
20   Q.   And Craig was whom?
21   A.   Alan and Craig -- Alan is
22 the father, and Craig is the son. The
23 surname, the last name is Hanratty, which
24 is H-A-N-R-A-T-T-Y.
25   Q.   Where are they from?

---

**23**

1   A.   Aberdeen, Scotland.
2   Q.   They have no U.S. address?
3   A.   No, they do not.
4   Q.   What jobs did they hold?
5   A.   Alan Hanratty was the
6 superintendent on board. Craig Hanratty
7 was a trainee pilot technician.
8   Q.   Which of these people were on
9 board, let's say, during the period from
10 June 15th on?
11   A.   Only two of Submersible
12 Systems' were on board, one of which was
13 William Allan; the other one, Michael
14 Carlisle.
15   Q.   Now, the Hanrattys, as far as
16 you know, are in Aberdeen, Scotland, today,
17 unless they are off working on some other
18 job?
19   A.   Correct.
20   Q.   I had asked as Item 2 on
21 Exhibit B for any and all documents
22 reflecting the negotiations for the entry
23 into and the actual contract between
24 Submersible Systems, Inc., and Quantum
25 Engineers, if I can use that term, or

---

**24**

1 relating to the performance of such
2 contract.
3   MR. BAGOT:
4      I think the documents that we
5 have that detail that are attached to
6 No. 26 disclosure as parts of, I believe,
7 2, 3, 4, and 5. Do you have your set with
8 you? We can refer to it.
9   MR. HOBSON:
10      Yes.
11   MR. BAGOT:
12      Document 2 is a November 4, '96
13 letter from Mr. Burnside to Quantum.
14 Number 3 is the list of articles exported
15 by Submersible. Number 4 is the November
16 5, '96 letter to Mr. Burnside from
17 Quantum. Number 5, I believe, is the
18 contract itself. I think Item 8 is a June
19 4, 1997 letter signed by certain principals
20 of Quantum to SSI.
21      In addition, I believe there is
22 another letter on the amended Rule 26
23 Disclosure which is marked as No. 25, which
24 is a letter from Quantum to Mr. Burnside,
25 January 8, 1998.

PAGE 33   SHEET 9

**33**

1 International, Inc., to SSI for MAXROVER.

2  A.   Yes.

3  Q.   That indicates that the

4 purchase price was $168,400?

5  A.   That's correct.

6  Q.   Then Item 13 confirms the

7 purchase of a MAXROVER MARK I?

8  A.   Yes.

9  Q.   I guess that shows the initial

10 price of $152,850; and then as Item 2,

11 additional components, which are not added

12 up, are somewhere between 2 and $300,000, I

13 take it?

14  A.   That's correct.

15  Q.   What is the difference between

16 the MAXROVER described in this attachment

17 No. 1 and then MAXROVER MARK I referred to

18 as No. 13?

19  A.   It's the same vehicle. Their

20 only difference is that some of the spare

21 parts that were going to be included in the

22 original invoice were decided against. So

23 there's a little price differential there

24 between the two. It's exactly the same

25 vehicle.

PAGE 34

**34**

1  Q.   Did you buy one or two?

2  A.   I purchased one, and we ordered

3 the second one at a later date.

4  Q.   Is Item 13, then, the second

5 one that you ordered; or does 13 and 1

6 refer to the very same purchase?

7  A.   It's the same purchase, the

8 same vehicle.

9  Q.   And the second one you ordered,

10 that was also used on the job with Quantum,

11 was it?

12  A.   I never received the second

13 vehicle. I had to cancel the order due to

14 lack of funding. The deposit was paid, but

15 I had to cancel it because of the lack of

16 funds from the client that we are working

17 for in Mexico.

18  Q.   And you are speaking there of

19 Quantum?

20  A.   Yes, sir.

21  Q.   When was that that you

22 cancelled it?

23  A.   Approximately April of '97.

24  Q.   Was this No. 13, this letter

25 dated September 25th, that was the order

PAGE 35

**35**

1 for the second one that you cancelled? I

2 am confused.

3  A.   This letter here is dated

4 September 25th, 1997, which was a letter

5 that was made for me by Deep Sea Systems, a

6 manufacturer of the MAXROV. The Mexican

7 authorities did not deem that this original

8 invoice was proof enough that I owned the

9 MAXROV in question.

10  MR. BAGOT:

11       When you say that, you mean

12 Document No. 1?

13  A.   Document No. 1 was not

14 sufficient. So we requested further proof

15 from Deep Sea Systems, the manufacturer, to

16 further prove that we actually owned a

17 MAXROV system. So they furnished us with

18 this information, knowing full well all the

19 auxiliary equipment that accompanied the

20 MAXROV.

21  Q.   When did they provide that to

22 you?

23  A.   On the date shown, September

24 25th, '97.

25  Q.   Which officials was that

PAGE 36

**36**

1 provided for? You said the Mexican

2 officials didn't consider the original

3 invoice sufficient proof. Which officials

4 are you talking about?

5  A.   I am not clear as to what

6 officials. This was given to my legal

7 counsel in Mexico City for them to take it

8 further from there.

9  Q.   When was that given to your

10 legal representatives?

11  A.   Within a day or two of us

12 receiving this. We faxed it to our Mexican

13 counsel in Mexico City.

14  MR. BAGOT:

15       When you refer to "this," you

16 refer to No. 13?

17  THE WITNESS:

18       No. 13, yes.

19 BY MR. HOBSON:

20  Q.   At one time, wasn't there a

21 second boat, a utility vessel, furnished by

22 Quantum in connection with its performance

23 of this job?

24  A.   I am not aware of a second

25 vessel.

PAGE 61 · SHEET 16

**61**

1   A.   Again, I'm not sure. I think
2   it's covered under seizure.
3   MR. BAGOT:
4       We have attached something, and
5   that may refer to it specifically. It's
6   going to be Item No. 26, I believe.
7   BY MR. HOBSON:
8   Q.   Who is your basic insurance
9   agency?
10  A.   Fisk Insurance here in New
11  Orleans. It's a broker.
12  Q.   Did they ever discuss with you
13  what I will call political risk insurance?
14  That's the normal term used for that type
15  of policy to cover the things I mentioned
16  earlier.
17  A.   Prior to us departing from
18  Mexico, I asked for an insurance policy to
19  make sure my insurance encompassed every
20  eventuality. I trusted him to make sure it
21  was done.
22  Q.   Mr. Burnside, what's your
23  understanding of who has custody of the
24  remaining equipment down there at the
25  present time?

PAGE 62

**62**

1   A.   I don't understand what you
2   mean by "has custody."
3   Q.   Do you understand that whatever
4   equipment is there -- and I'm not sure
5   what's there -- has been turned in to a
6   Mexican tribunal to determine who is
7   entitled to ownership of the equipment?
8   A.   I am aware something of that
9   nature has happened and only very recently,
10  because I was not made aware of it
11  beforehand.
12  Q.   You have retained an attorney
13  in Mexico?
14  A.   Yes.
15  Q.   You indicated earlier that this
16  Attachment 13 to your Rule 26 Disclosure
17  was given to your attorney so that he could
18  hopefully convince the Mexican authorities
19  that this was your equipment?
20  A.   Yes, as well as other
21  documents.
22  Q.   What other documents did you
23  furnish to him?
24  A.   Just the magazine advertising,
25  you know, just little pieces that we had,

PAGE 63

**63**

1   the brochures, as you can see, my
2   photograph in the brochures, which clearly
3   show that I own the equipment.
4   Q.   Did you attend any hearings in
5   Mexico dealing with your attempts to prove
6   ownership?
7   A.   No.
8   Q.   Did anyone representing your
9   company other than your attorney attend?
10  A.   Other than my attorney?
11  Q.   Yes.
12  A.   No one that was employed by
13  Submersible Systems, no.
14  Q.   Did anyone else acting in some
15  capacity for Submersible Systems, Inc.,
16  attend?
17  A.   There is one person in del
18  Carmen who is just a colleague friend,
19  associate, basically, Mr. Oscar Olivera and
20  his wife both, I believe, testified on my
21  behalf stating that I actually own the
22  equipment.
23  Q.   To whom did they testify?
24  A.   I'm not sure.
25  Q.   Mr. Oscar Olivera and his wife

PAGE 64

**64**

1   are both citizens of Carmen?
2   A.   I believe so, yes.
3   Q.   He was employed by your company
4   at one time, was he not?
5   A.   He was never employed by
6   Submersible Systems. He was made -- I
7   printed some cards for Mr. Olivera as a
8   marketing manager in the event that if he
9   was awarded any contracts, ROV contracts in
10  Mexico, then he was to be paid on a
11  commission basis only. He had no authority
12  to do anything on behalf of SSI without my
13  permission.
14  Q.   Who is or who was Mr. Olivera?
15  Was he ever employed by Quantum?
16  A.   I know that he was actually
17  employed by Quantum in the early stages of
18  the contract, and I believe he terminated
19  his employment with Quantum on or around
20  the end of the year '96.
21  Q.   So you think it was around
22  December of '96, January of '97, somewhere
23  in that frame?
24  A.   Yes, sir.
25  Q.   After that, was he acting in

SUBMERSIBLE SYSTEMS v PERFORADORA CENTRAL  WOLFGANG BURNSIDE   8/4/98

PAGE 65 SHEET 17

**65**

1 some capacity as marketing representative
2 for you?
3    A.    He was assisting us from time
4 to time.
5    Q.    Doing what?
6    A.    Basically just a liaison. He
7 was a contact. He knew a lot of people;
8 so he would just feed me information.
9    Q.    Did he get any compensation for
10 that from SSI?
11    A.    No, he did not. Although, I
12 did send some of $3,500 into his account,
13 which was supposed to be utilized to try
14 and recover the MAXROV.
15    Q.    Has he ever made any accounting
16 to you for what happened to those funds?
17    A.    I think he bought a car.
18    MR. BAGOT:
19       I think his question is a
20 little -- well, never mind.
21    MR. HOBSON:
22       I think that answers my
23 question, probably.
24 BY MR. HOBSON:
25    Q.    What did you understand he was

PAGE 66

**66**

1 supposed to use that money for?
2    A.    It was to give somebody the
3 money to try and prompt a release.
4    Q.    Do you know who that money was
5 supposed to go to?
6    A.    No. I still don't know, no.
7    Q.    Did Mr. Olivera ever give any
8 report to you of what happened in the court
9 in Mexico when he and his wife went to
10 testify?
11    A.    I believe just verbally, just
12 to inform me that he had actually did that.
13    Q.    What did he report happened?
14    A.    That himself and his wife gave
15 testimony on my behalf, and that was all.
16    Q.    He didn't report any decision
17 by the tribunal to not release the
18 equipment?
19    MR. BAGOT:
20       Let me just object to the form
21 of the question. I think the earlier
22 testimony was that he wasn't sure to whom
23 he gave testimony. I think now we are
24 suggesting it's the tribunal or court. I'm
25 not sure if this witness knows that as a

PAGE 67

**67**

1 matter of fact.
2       Subject to that objection, you
3 can respond.
4 BY MR. HOBSON:
5    Q.    I am really trying to find out
6 what Mr. Olivera reported to you.
7    A.    Mr. Olivera was very vague.
8 All I know is that he and his wife both
9 testified on my behalf. That was all,
10 just testified that I owned the equipment.
11 He was just trying to assist me in getting
12 my seized equipment returned to me.
13    Q.    Did you ever talk to
14 Mr. Olivera's wife about that?
15    A.    His wife doesn't speak English,
16 and I do not speak Spanish.
17    Q.    Mrs. Olivera, did she ever do
18 any work for you or SSI in Mexico?
19    A.    None.
20    Q.    Do you have any idea what the
21 basis of her knowledge to testify might be?
22    A.    Just like other people that
23 were involved with the contract. Everyone
24 down there knew that I owned the
25 equipment. I was there personally. I was

PAGE 68

**68**

1 the owner of Submersible Systems. Two of
2 the three vehicles, the ROVs on board the
3 DON FRANCISCO, were my belongings, my
4 equipment. Nobody disputed that at any
5 time throughout the whole contract.
6    Q.    Did anyone else give testimony
7 or evidence as to your ownership in
8 attempts to get possession of this
9 equipment?
10    A.    I'm not sure. Maybe my legal
11 counsel there, possibly. I'm not sure.
12    Q.    Who is your legal counsel
13 there?
14    A.    Well, it was my legal counsel.
15 They are no longer. It was a Mr. Jamie
16 Herrera and a Mr. Braulio Manzaneque
17 Rodriguez.
18    Q.    Now, you also contacted, I
19 guess, the Representative Tauzin's office.
20 Was it a consulate or ambassador in
21 Mexico? I guess we are looking at
22 documents that identify it.
23    MR. BAGOT:
24       Number 4, I think.
25 BY MR. HOBSON:

SUBMERSIBLE SYSTEMS v PERFORADORA CENTRAL WOLFGANG BURNSIDE  8/4/98

PAGE 73 —SHEET 19

73
1    A.    A two-pronged approach: first
2 of all, to recover my equipment that
3 Central was in possession of; and,
4 secondly, to recover the funds owed to me
5 by Quantum, a client in Mexico.
6    Q.    Did anyone ever report to you
7 that Perforadora was holding the equipment
8 under the appointment from a Court or
9 tribunal of some sort?
10    A.    I was just made aware of that
11 very lately.
12    Q.    Have your lawyers down there
13 commenced any legal proceeding against
14 Quantum?
15    A.    Communication with my counsel
16 in Mexico City --
17    MR. BAGOT:
18        He wants to -- no, he doesn't
19 want to know what you have communicated to
20 them or they to you. He wants to know if
21 they have commenced any proceedings against
22 Quantum.
23    A.    I don't know if they have.
24 BY MR. HOBSON:
25    Q.    In the documents which your

PAGE 74

74
1 counsel produced today, the supplemental
2 disclosure, there is a copy of a letter
3 addressed to Submersible Systems, Inc., on
4 the letterhead of Quantum dated January
5 8th, 1998 signed by Mr. Galvan, who is Luis
6 Miguel Galvan Cavazos.
7        Have you made any attempts to
8 contact Quantum or any of their personnel
9 since July of 1997?
10    A.    Yes.
11    Q.    What attempts have you made?
12    A.    With all the numbers I know,
13 all the telephones numbers and addresses I
14 know, I either telephoned, personally went
15 there; and I have not been able to track
16 anyone down.
17    Q.    Do you know what prompted --
18    MR. BAGOT:
19        I don't think that's accurate.
20 You did speak to Mr. Galvan.
21    THE WITNESS:
22        That was by accident, not by --
23    MR. BAGOT:
24        Yeah. But you need to tell
25 him.

PAGE 75

75
1 BY MR. HOBSON:
2    Q.    Tell us about speaking to
3 Mr. Galvan.
4    MR. BAGOT:
5        He wants to know about any
6 communications that you have had.
7        I think that's your question,
8 is any communication with any
9 representatives of Quantum at any time
10 since July of '97.
11        So you need to tell him about
12 that.
13    A.    I accidentally, fortunately,
14 bumped into Luis Miguel Galvan while I was
15 en route to go down to Mexico City to see
16 my lawyers.
17 BY MR. HOBSON:
18    Q.    Approximately what date?
19    A.    Early January, possibly.
20    Q.    Of this year?
21    A.    Of this year.
22        Do you want to know what the
23 conversation was about?
24    Q.    Yes. If I haven't asked that,
25 certainly.

PAGE 76

76
1    A.    I asked him, you know, if he's
2 ever going to pay me. He said that he's
3 still waiting payment from PEMEX and that
4 he had other contracts they were working
5 for PEMEX in the northern sector. As soon
6 as he got money, he would pay me.
7 Seemingly, the contract for PEMEX that we
8 had undertaken, he said to me that he had
9 submitted all the invoices to PEMEX, which
10 I questioned him as to why and how he
11 managed to do that. As Submersible Systems
12 had not received payment, we sent a letter
13 to Quantum stating that we would retain all
14 the videotapes for the second part of the
15 job until we were paid. And by us
16 retaining these videotapes, we would not
17 allow Quantum to submit the reports to
18 PEMEX and thereby get paid. So in other
19 words, we are trying to apply pressure.
20        So upon telling Luis Miguel
21 Galvan this, this fax that is -- would you
22 reference this as 25?
23    MR. BAGOT:
24        Right.
25    A.    This fax was sent to us, to our

CURREN & LANDRIEU, INC.                    (504) 833-3330

**89**

1 Systems Inc., is a Louisiana corporation?

2     A.    That's correct, an S Corp.

3     Q.    An S Corporation?

4     A.    Yes.

5     Q.    You file tax returns, then --

6     A.    Yes, sir.

7     Q.    -- in the United States?

8     A.    Yes, sir.

9     Q.    Who are the officers and

10 shareholders of that company?

11     A.    I am 100 percent shareholder,

12 and the officers are my wife and myself.

13     Q.    How long has that company been

14 in business? When was it incorporated?

15     A.    Incorporated in 1990.

16     Q.    What did it do between 1990 and

17 1996?

18     A.    In 1990, I had a certain amount

19 of savings, and I started design and

20 construction of three of my own design ROVs

21 built in my backyard, basically. When I

22 was happy that they were operational, I

23 started working with Submersible Systems

24 for McDermott.

25        Eventually, American Oilfield

---

**90**

1 Divers bought my ROVs and me, and I started

2 off an ROV department for American Oilfield

3 Divers. After a couple of years working

4 for them as an ROV manager, we just grew

5 apart basically. I just got actively

6 involved with Submersible Systems, once

7 again starting operations with the SEA OWL

8 MARK III. Then it went on and on from

9 there.

10     Q.    When was that that you went

11 back into operation?

12     A.    In '94, I believe.

13     Q.    You purchased the SEA OWL at

14 that time?

15     A.    I did.

16     Q.    Was that owned by you or by the

17 company?

18     A.    It was owned by the company.

19     Q.    Did you have to advance funds

20 to the company to make that purchase?

21     A.    No. Initially, the SEA OWL

22 belonged to Tennessee Valley Authority. I

23 had a contract with Tennessee Valley

24 Authority to do their dams for them.

25        At some point along the lines

---

**91**

1 in this contract, I suggested they should

2 utilize this ROV in the Gulf of Mexico. So

3 we started using the SEA OWL in the Gulf of

4 Mexico under TVA auspices. They were

5 funding Submersible Systems' operations, in

6 other words.

7        Then TVA and I grew apart, and

8 the SEA OWL MARK III was part of that

9 contract. It was mine then after

10 completing the work for Tennessee Valley

11 Authority.

12     Q.    In one sense, I suppose, then,

13 you paid nothing for that?

14     A.    A minimal amount, yes.

15     Q.    Did the contract recite any

16 purchase price for the SEA OWL?

17     A.    There was an end-of-contract

18 purchase price of approximately $40,000, a

19 minimal amount. All the work there

20 received was gratis, free.

21     Q.    Do you know when it was first

22 built, the particular SEA OWL?

23     A.    I believe it was built in '92.

24     Q.    It was lost, I think you said,

25 in '98?

---

**92**

1     A.    Yes.

2     Q.    Do you know how many years you

3 used to depreciate that equipment on the

4 books?

5     A.    Usually 10 years.

6     MR. BAGOT:

7        I think we have the income tax

8 returns attached. That might give you a

9 specific -- I am not sure if you can tell

10 from looking at it.

11 BY MR. HOBSON:

12     Q.    I am looking at the 1997 term,

13 and I see a Depreciation Amortization

14 Schedule, Form 4562.

15     MR. HOBSON:

16        Have you found that yet?

17     MR. BAGOT:

18        I found one.

19     MR. HOBSON:

20        This is the '97 return, Form

21 4562.

22     MR. BAGOT:

23        Yeah.

24 BY MR. HOBSON:

25     Q.    Can you tell which of those

---

## PAGE 101

101

1 the company or for the SEA OWL?

2    A.   Numerous inspection contracts

3 for the SEA OWL up until the point it was

4 lost.

5    Q.   How many employees did the

6 company have, say, after July of 1997?

7    A.   After July '97, we scaled down

8 basically to about three people because the

9 Quantum didn't pay us. We couldn't afford

10 the overhead.

11    Q.   Who were the three people?

12    A.   Michael Carlisle; Todd Hayne,

13 Clifford Todd Hayne; and another chap that

14 isn't with us any longer. I can't remember

15 his name.

16    Q.   Do you remember any part of his

17 name?

18    A.   Well, we had several people

19 that came on board and left. They only

20 came in for a short period, and they didn't

21 want to do this work and just left us.

22 Let's look at the payroll just to get

23 names. These are the guys that were not in

24 Mexico but these were the other employees

25 after June of '97, to answer your question.

## PAGE 102

102

1    Q.   You have Donald Lee Jones, II,

2 listed at Post Office Box 2641, Morgan

3 City, Louisiana. I notice he has a payroll

4 as of 6/27/97, although only $114.

5    Did he work on the Quantum job?

6    A.   No.

7    Q.   What did he do?

8    A.   He was just a trainee pilot

9 technician.

10    Q.   Where was he training?

11    A.   At our base in Patterson,

12 on-the-job training if we went offshore

13 with the SEA OWL.

14    Q.   So the SEA OWL was back in

15 Patterson at that time?

16    A.   Yes.

17    Q.   And then you have a Christopher

18 Gnatzy. He's at 137 Nini Road, Morgan

19 City, 70380. He appears to have been

20 employed from 8/20/97 through 4/15/98.

21 Douglas J. Franklin of 1114 Julia Street,

22 No. 4, New Iberia, Louisiana 70560. He

23 appears to have been employed in January

24 and February of 1998.

25    Mr. Franklin was employed in

## PAGE 103

103

1 what capacity?

2    A.   As trainee pilot technician.

3    Q.   And Mr. Gnatzy?

4    A.   A trainee pilot technician.

5    Q.   Now, how did you first learn

6 that Perforadora Central was having a

7 drilling rig being constructed?

8    A.   I heard it from a third party.

9 I think it may have been Mr. Oscar Olivera

10 who heard it from someone else. I can't

11 remember explicitly where I heard it first,

12 but I think it was from Oscar.

13    Q.   And what inquiries did you make

14 after you heard that?

15    A.   At some point, I just wanted to

16 confirm it to see if I could find out where

17 it was, and I called Halter and spoke to

18 someone there.

19    Q.   Do you know who you spoke to

20 there?

21    A.   I don't, no. He confirmed

22 that, yes, the rig was being built; and

23 that was it.

24    Q.   When was that?

25    A.   I can't remember exactly. It

## PAGE 104

104

1 was just a cursory telephone call just to

2 see if actually it was fact.

3    Q.   Was this someone you knew at

4 Halter?

5    A.   No, sir. It was just someone

6 at Halter. I just called Halter and asked

7 for information.

8    Q.   Which office of Halter did you

9 call?

10    A.   I believe it was the one in

11 Pascagoula.

12    Q.   Did you ask to speak to anyone

13 from Perforadora Central?

14    A.   No.

15    Q.   You don't remember the date

16 that was done?

17    A.   No, sir.

18    Q.   At some point, you threatened

19 to seize Perforadora's drilling rig, did

20 you not?

21    A.   I'm sorry? Can you repeat

22 that?

23    Q.   Did you not threaten to seize

24 Perforadora's drilling rig in a

25 conversation with someone from Halter?

PAGE 117  SHEET 30

117

1  A.  Possibly the Quantum office
2  because Quantum had all of this associated
3  paperwork. This is the temporary
4  importation order for equipment.
5      Q.  That shows that that equipment
6  was imported by whom?
7      A.  By Submersible Systems via
8  Quantum. Because any foreign company
9  cannot bring goods in to work into Mexico
10  unless it's through a Mexican third party.
11     Q.  When you say "via Quantum,"
12  specifically, what the form says, it says,
13  "Quantum Engineers, slash, Submersible
14  Systems, Inc."
15     MR. BAGOT:
16         Let me just object to the
17  question. This document is obviously in
18  Spanish, and there are certain references,
19  as you have referred to, as to Submersible
20  Systems Inc., slash, Quantum and other
21  references that appear to be separately to
22  Submersible Systems. I'm looking at this,
23  and I don't know what it says in Spanish;
24  so I'm not sure he can testify as to what
25  it says.

PAGE 118

118

1  BY MR. HOBSON:
2      Q.  When you said "Submersible
3  Systems, Inc., via Quantum," that doesn't
4  appear anywhere in this document, does it?
5      A.  No. I said it was Submersible
6  Systems via Quantum, meaning that
7  Submersible Systems' equipment went down
8  via Quantum's name, because you have to use
9  a Mexican company to get the equipment in.
10  It clearly shows that here also on this
11  form. It states, "Submersible Systems,
12  Inc., slash, Quantum," secondary, because
13  they are actually responsible for the
14  temporary importation of that equipment.
15     Q.  Quantum is?
16     A.  Yes, sir, for all the fines and
17  fees and to ensure that this equipment is
18  returned intact to USA. That is why they
19  are mentioned there on this form, as is
20  with the FM3 visa. It clearly shows
21  Quantum.
22     Q.  That shows that someone has an
23  obligation to reexport that equipment after
24  six months, does it not?
25     A.  I believe it does. But it's in

PAGE 119

119

1  Spanish, and I am not -- as Mr. Bagot said,
2  I can't read it.
3      Q.  Did you understand that the
4  equipment should have been reexported
5  within six months?
6      A.  Yeah. And I was concerned,
7  because I am aware of the fines and fees
8  that are accruing daily. I have spoken to
9  the customs in del Carmen about that fact.
10     Q.  Did this importation permit
11  enter into those discussions at all?
12     A.  Yes, sir.
13     Q.  Tell me how that came about.
14     A.  I went down to the customs
15  office in del Carmen and spoke to a customs
16  official there. I went there with one
17  purpose in mind, to try and find out
18  exactly how much the fines and fees had
19  accrued to. Because at that time, we had
20  received a correspondence from Fausto
21  Correa via our lawyers to say, "Come and
22  get the equipment."
23         So I was ready to go down and
24  get the equipment, and I had to think about
25  how much money I had to pay here and trucks

PAGE 120

120

1  and how to get it all back. So I asked the
2  customs guy about that, and that's how we
3  found out about the fees and fines and how
4  Quantum was responsible for the return of
5  the equipment, not myself.
6      Q.  Did you find out anything about
7  how many fines and fees might be imposed?
8      A.  Well, sir, what he told me was
9  that he couldn't give me a figure because
10  until the date of release of the equipment,
11  it's calculated on to the final day. So I
12  have no understanding of how much it is,
13  and he couldn't give me an approximate
14  figure.
15     Q.  And the release he was talking
16  about was the release by the prosecutor?
17     A.  Yes, sir.
18     Q.  In connection with that
19  testimony, I'd like to mark this two-page
20  document, which says at the top "Pedimento
21  de Importacion" as Exhibit No. 9.
22  BY MR. HOBSON:
23     Q.  Mr. Burnside, when we
24  reconvened this afternoon just after lunch,
25  your counsel gave me two pages. I guess

PAGE 121

121

1 it's an invoice in the name of Higgins
2 International Services, Inc.
3        Can you tell me what this is in
4 particular?
5    A.    That's the charges you
6 requested for shipping the TRITON from Como
7 to Morgan City, Louisiana, and returning it
8 from Morgan City, Louisiana, to Como.
9 That's the airfreight charges.
10    Q.    Page 1, I guess the invoice
11 date is 111296, which I take to be
12 11/12/96, which could either be November
13 12th or December 11th. And that shows
14 $18,100.52. Then the second page has an
15 invoice date of 050697, which I take to be
16 either May 6th or June 5th, '97, depending
17 on whether you use the American or
18 continental system, for $20,227.20.
19        So that indicates that those
20 were the figures, 18,000 plus a little bit,
21 to ship the TRITON here to the United
22 States from Como?
23    A.    Correct.
24    Q.    And $20,000, roughly, to ship
25 it back?

PAGE 122

122

1    A.    Correct.
2    Q.    And it went back on either --
3 do you know whether it was May 6th or
4 June 5th.
5    A.    I think that may be May,
6 actually.
7    Q.    I notice the page stamp says
8 617, which would indicate June 17th.
9        Was the TRITON taken off of the
10 DON FRANCISCO before or after the SEA OWL?
11 I am just trying to get some chronology.
12    A.    After.
13    Q.    TRITON was after the SEA OWL?
14    A.    Yes.
15    MR. HOBSON:
16        In connection with that
17 testimony, I want to mark that as Exhibit
18 10, being two pages, Higgins International
19 Services, Inc., invoice.
20 BY MR. HOBSON:
21    Q.    What's your educational
22 background, Mr. Burnside?
23    A.    I have a B.S. in electronic
24 engineering.
25    Q.    From what institution of

PAGE 123

123

1 learning was that?
2    A.    That's Herriot Watt in
3 Edinburgh.
4    Q.    How do you spell that?
5    A.    H-E-R-R-I-O-T, Watt, W-A-T-T.
6    Q.    Did you have any further
7 education related to the operation of this
8 equipment?
9    A.    No. It was a new field. It
10 was experimental, and it just developed. I
11 have been with ROVs since its early days.
12    Q.    What was the year that you got
13 that B.S. in electrical engineering?
14    A.    1972.
15    Q.    You were born in '53?
16    A.    Yes.
17    Q.    So you were 19 when you
18 received that?
19    A.    Yes.
20    Q.    What was your work experience
21 after that?
22    A.    I worked for Marconi Space and
23 Defense as a part-time -- not part time. I
24 worked at Marconi Space and Defense as an
25 electrical engineer for a short period of

PAGE 124

124

1 time. I didn't like it. I left.
2    Q.    Where are they located?
3    A.    They are located in were in
4 Hillend, Fife, Scotland.
5    Q.    Next affiliation?
6    A.    Then I went to Wharton
7 Williams in November 1976 and started there
8 as systems technician.
9    Q.    Where were they located?
10    A.    That's Aberdeen, Scotland.
11    Q.    How long were you with Wharton
12 Williams?
13    A.    Approximately two to three
14 years.
15    Q.    Then what was your next
16 connection, professionally?
17    A.    We were all mercenaries in
18 those days. I went to Comex after that.
19 They were based in Marseille, France. They
20 had an office in Aberdeen, Scotland, as
21 well. Then I started work for Solus Ocean
22 Systems. I went to work -- I went --
23 Oceaneering bought over Solus Ocean Systems
24 in 1984, and I went to work for
25 Oceaneering. I was Oceaneering's technical

### 125

1 manager.

2 Q. That was where for Oceaneering?

3 A. The corporate head office was

4 in Aberdeen, Scotland.

5 Q. So you were still in Aberdeen?

6 A. Yes, sir. But I was living

7 all over the world.

8 Q. You went out for particular

9 jobs?

10 A. Yeah, high profile jobs,

11 training inspection, checking up on various

12 equipment worldwide up until 1987.

13 Q. Then you went where?

14 A. Then in '87, I worked as a

15 consultant all over, basically, from

16 Pakistan to Brazil, North Sea -- I did some

17 work there -- Holland. Then 1990 came

18 along, and I started Submersible Systems.

19 Q. That's when you went with

20 Tennessee Valley Authority, a job with

21 Tennessee Valley Authority?

22 A. That was after 1990.

23 Q. A job you were working as a

24 contractor with TVA, when did that

25 commence?

### 126

1 A. Approximately '93.

2 Q. That ended when?

3 A. When we purchased the SEA OWL

4 in '94.

5 Q. Did you then carry on jobs

6 using basically the SEA OWL?

7 A. Yes, sir.

8 Q. Who were some of the people

9 that you had jobs with with the SEA OWL?

10 A. We had -- well, the invoices

11 here reflect that: NCS, Cal Div,

12 Oceaneering, Phillips Petroleum, numerous

13 amounts of --

14 Q. How many employees did you have

15 during that period?

16 A. When we first started?

17 Q. When you were working only with

18 the SEA OWL.

19 A. Just three others, three

20 people.

21 Q. Who were they?

22 A. We had -- I'm terrible with

23 names -- Dupre. I'm terrible with names,

24 but I can get this information for you.

25 Q. It's none of the people we

### 127

1 talked about?

2 A. No, sir.

3 Q. None of those people were

4 involved in the Quantum job with you?

5 A. No.

6 Q. So when you acquired the

7 MAXROV, this gave you a great deal more

8 capacity than you had before?

9 A. Yes, sir.

10 Q. So you were looking to get new

11 and bigger jobs?

12 A. Well, it's always nice to hope

13 you would, yes. But we would take anything

14 that came along as long as we could do it

15 within our scope of work.

16 Q. So when the Quantum job came

17 along, that was shortly after you got the

18 MAXROV?

19 A. Yes, sir.

20 Q. And that seemed like a good,

21 new opportunity for you?

22 A. Yes and no. It was -- we were

23 just starting -- well, yes. Sorry.

24 MR. BAGOT:

25 Subsequently, no.

### 128

1 A. We found out later, no.

2 BY MR. HOBSON:

3 Q. But you were interested in

4 getting, for instance, into the Mexican

5 market?

6 A. Yes, sir. I believe there was

7 a market there as well. I was attempting

8 to get in there and show my stuff.

9 Q. As I recall, when you signed

10 this contract with Quantum, you required

11 them to deposit, I believe it was, a

12 million dollars into an escrow account?

13 A. That never happened, sir. They

14 wouldn't do it. I believe we received

15 $90,000. I should have known then.

16 Q. So what looked to be a very

17 good contract with financial guarantees

18 didn't have the financial guarantees?

19 A. No.

20 Q. In your Rule 26 Disclosure,

21 most of the names we have talked about, I

22 believe, we have mentioned today. What

23 does Al Lippman have to do with this case?

24 A. What does Al Lippman have to

25 do? My father-in-law is the mayor in

**133**

1  MR. HOBSON:
2    We will mark that Exhibit
3  No. 11.
4  BY MR. HOBSON:
5    Q.   Earlier, you mentioned that
6  when Quantum either ceased paying you or
7  got delayed in paying you, you removed a
8  number of tapes. Are we talking about
9  videotapes?
10   A.   Yes. This is at the very end
11 of the contract, only at the very end of
12 the contract.
13   Q.   Now, precisely when at the end
14 of the contract?
15   A.   At the very end. The contract
16 was actually split into two areas: the one
17 around del Carmen, which is called the
18 southeast zone; and the northwest region.
19 What I said to Quantum was that we would
20 retain all the videotapes for the northwest
21 region. So when the vessel came to Dos
22 Bocas, my men left with the tapes. I still
23 have them.
24   Q.   Did they have them in their
25 duffel bags or suitcases or something?

**134**

1    A.   Exactly.
2    Q.   Your purpose in doing that was
3  to try to have some bargaining room between
4  Quantum and PEMEX?
5    A.   Yes, sir. Well, Quantum and
6  myself, not PEMEX.
7    Q.   The objective was to get money
8  that, as far as you knew, was due by PEMEX
9  to Quantum --
10   A.   Yes, sir.
11   Q.   -- in the hope that you would
12 get some of it?
13   A.   Well, I had hoped, yes.
14   Q.   That hasn't worked, I gather?
15   A.   No.
16   Q.   None of that is reflected on
17 this receipt?
18   A.   No. That receipt is only for
19 the equipment that Mr. Correa allowed me to
20 remove from the van.
21   Q.   Your people had already taken
22 these tapes?
23   A.   Yes, sir. When I collected my
24 personnel, they had the tapes with them.
25   Q.   So they took them off the boat

**135**

1  when they left?
2    A.   Yes.
3    Q.   Did they take anything else?
4  Do you know?
5    A.   No, sir, only their belongings.
6    Q.   You mentioned your people
7  having passports, I think you said, lifted
8  by an agent in Dos Bocas?
9    A.   Yes, sir.
10   Q.   Were you aware that under the
11 terms of the immigration arrangements that
12 there were supposed to be Mexican citizens
13 who were to be trained to do the same job
14 that your personnel was doing?
15   A.   No, I was not aware of that.
16   Q.   Did you know that your
17 personnel had a six-month limitation on how
18 long they could stay?
19   A.   Yes, I am.
20   Q.   Hadn't these people actually
21 already exceeded the six months?
22   A.   Yes, sir. But new visas were
23 issued to them, or in the process of being
24 issued to them.
25   Q.   Who was doing that?

**136**

1    A.   Quantum.
2    Q.   Have you ever seen those new
3  visas?
4    A.   I personally have not.
5    Q.   Have you considered the
6  possibility that these passports were
7  lifted because these personnel had exceeded
8  their six-month visas?
9    A.   No, sir.
10   Q.   Did anyone mention that to you?
11   A.   No, sir.
12   Q.   You don't know the name of the
13 agent who took these?
14   A.   I don't, no.
15   Q.   In this Exhibit 11 that you
16 have given me, I am just going to show
17 you -- I think one of these is in the
18 packet I gave you over there. I haven't
19 seen these until last night. What I have
20 here are two receipts, if we can call it
21 that. The top one seems to be the same as
22 you have sent here. The bottom lists, I
23 think, five additional items. I don't
24 think that there's a duplication on them.
25   MR. BAGOT:

PAGE 141  SHEET 36

141

1 this." I couldn't read it, obviously. I
2 signed it with scribbled -- they gave me
3 some photographs of it, of a system as it
4 was in Dos Bocas.
5    Q.   You already said you do not
6 speak Spanish?
7    A.   Yeah. But I trusted him at
8 that time.
9    Q.   But you don't know what this
10 was?
11   A.   I know, and I signed it.
12   Q.   Is that together with these
13 other two items? Did you also get one of
14 these from Oscar Olivera?
15   A.   I think looking at it now, I
16 think I got all of this from Fausto. I
17 can't remember exactly where all the
18 paperwork came from. It was a mass of
19 paperwork as time went on.
20   Q.   But you probably got these
21 three sheets at the same time?
22   A.   Probably, yes.
23   MR. HOBSON:
24       I think we will make copies and
25 put Exhibit 13 on these two sheets.

PAGE 142

142

1 BY MR. HOBSON:
2    Q.   Now, your Item No. 11 in your
3 disclosure, it's a two-page invoice for
4 Quantum Engineers dated July 14th and
5 showing a total due of $720,750.53. When
6 was that prepared?
7    A.   That was the last invoice that
8 we had sent to Quantum and dated July
9 14th. That was when it was prepared and
10 sent out.
11   Q.   Did Quantum ever acknowledge
12 that they owed that money to you?
13   A.   Yes, sir.
14   Q.   When?
15   A.   On a letter of guarantee from
16 them, which is --
17   MR. BAGOT:
18       I think the letter of guarantee
19 predates that. I think that's No. 8.
20       Is this what you are referring
21 to (indicating)?
22   THE WITNESS:
23       Yes, sir. If you read it,
24 "until we conclude the contract." In other
25 words, pay all of this. It shows that we

PAGE 143

143

1 paid incrementally. None of those payments
2 were made either. (Indicating.)
3 BY MR. HOBSON:
4    Q.   So on June 4th, they promised
5 to pay everything due, as least until that
6 time, on this particular schedule shown on
7 this letter?
8    A.   Yeah.
9    Q.   Is that the last letter you got
10 from them before the January 1998 letter?
11   A.   Yes, before the '98 letter.
12   Q.   Now, your Item No. 16 are,
13 obviously, Xerox copies of some
14 photographs?
15   A.   Yes.
16   Q.   Who took those, the originals
17 of those photographs?
18   A.   Are these the ones in Dos Bocas
19 or in del Carmen? I can see now. This is
20 the ones in Dos Bocas. These were the
21 photographs given to me by Mr. Fausto
22 Correa at the same time as I signed this.
23 That says the photographs were given to me.
24 (Indicating.)
25   Q.   As this job with Quantum wound

PAGE 144

144

1 down, you were interested in picking up
2 other work in Mexico, were you not?
3    A.   Yes, sir.
4    Q.   What steps did you take to try
5 to find other work?
6    A.   Through Oscar Olivera. He had
7 a lot of contacts, and I gave him free rein
8 and brochures to hand out and just
9 generally try and find work.
10   Q.   Did he ever come up with any
11 live leads, as far as you could tell?
12   A.   Yes, sir. Two.
13   Q.   What happened?
14   A.   Well, we didn't get the work
15 because we didn't have the system.
16   Q.   Which were those leads?
17   A.   One company was called
18 Oceanografia. Another one is Oceatec.
19   Q.   They are both Mexican
20 companies?
21   A.   Yes, they are.
22   Q.   Do you know where they are
23 located?
24   A.   In del Carmen.
25   Q.   What sort of equipment was

PAGE 145

145

1 needed for those jobs?

2    A.    Basically, a drill support-type

3 vehicle, a vehicle that's actually larger

4 than the MAXROV. However, the MAXROV could

5 do the job. They were quite happy because

6 the system was already in Mexico. They

7 wouldn't have incurred any transit charges,

8 and they were quite prepared to utilize the

9 MAXROV in the contract. And it was

10 cheaper.

11    Q.    Did you quote any jobs to them?

12 Did you make any formal quotes to them?

13    A.    Yes, sir.

14    MR. BAGOT:

15        It's on 6B. They may have

16 multiple copies of those, I think.

17 BY MR. HOBSON:

18    Q.    Is Oceatec the same as

19 Oceanografia?

20    A.    No. Separate companies.

21    Q.    I don't see any response from

22 Oceatec. I notice a letter quoting rates

23 and then a draft of a contract, both dated

24 in February.

25        When did you learn that you

PAGE 146

146

1 were not going to get that job?

2    A.    Just at the same time as the

3 Quantum contract, at the end of the Quantum

4 contract when I couldn't get my equipment.

5 It's all about the same time.

6    Q.    You had no other correspondence

7 from Oceatec?

8    A.    I think there might actually be

9 a few other sheets at the office. It was

10 just a rush trying to get stuff together.

11    MR. HOBSON:

12        I would like to see those.

13    MR. BAGOT:

14        Make a note to locate any other

15 records relating to the contract or

16 potential contract.

17    THE WITNESS:

18        Okay.

19 BY MR. HOBSON:

20    Q.    Were you ever awarded a

21 contract by Oceatec?

22    A.    No, except this one

23 (indicating). They were concerned about

24 the Quantum contract running on and on and

25 on, just waiting for it to finish before

PAGE 147

147

1 they used it.

2    Q.    Did they ever award this

3 contract to you?

4    A.    Yes.

5    Q.    You have something on that?

6    A.    We should have that for you,

7 yes.

8    Q.    Now, this Oceanografia document

9 dated 8, July, '97, appears to be, in

10 effect, a joint venture for setting up a

11 new company?

12    A.    Yes, sir.

13    Q.    Was that new company ever

14 established?

15    A.    No. Because we didn't have the

16 equipment. They backed out at the last

17 minute because we couldn't go through with

18 it, obviously.

19    Q.    Then who is Mr. Joseph O'Brien

20 at Diavaz?

21    A.    Diavaz is as Quantum was to

22 Submersible Systems. John Chance &

23 Associates worked through Diavaz and

24 del Carmen. We rent our office space from

25 John Chance. So it's a very good

PAGE 148

148

1 relationship.

2    Q.    This was a schedule of rates

3 you were quoting on 12/09/97?

4    A.    Yes.

5    Q.    Is that December 9th?

6    A.    That's the American.

7    Q.    September 12th?

8    A.    Yes.

9    Q.    At that time, you already knew

10 that there was some problem in getting the

11 MAXROV released from the court in Mexico,

12 did you not?

13    A.    Well, I knew there were some

14 problem getting the MAXROV released. I

15 didn't know about the court at that time,

16 whether they were made aware of the

17 situation. At the time of that court, the

18 MAXROV was about to be released; but it

19 wasn't.

20    Q.    Who told you that it was about

21 to be released?

22    A.    I think it was Oscar Olivera or

23 the lawyers in Mexico City.

24    MR. HOBSON:

25        I understand there seems to be

PAGE 149  SHEET 38

PAGE 150

**149**
1 a further copy of the -- I see there must
2 be more than one copy of these.
3     If it's all right, since they
4 are multiple copies of these documents that
5 we have just been looking at, I will mark
6 this as Exhibit 14.
7     Let's take a quick break.
8     (Whereupon, there was a brief recess.)
9 BY MR. HOBSON:
10    Q.   Mr. Burnside, I am looking at
11 your tax return for the year 1997. I
12 realize you are not the accountant and may
13 not be able to answer some questions.
14        Do you know if your company
15 reported income on a cash basis or on a
16 accumulated income basis?
17    MR. BAGOT:
18        You mean accrued?
19 BY MR. HOBSON:
20    Q.   Accrued.
21    A.   I can't answer that, I am
22 afraid.
23    MR. BAGOT:
24        The difference is: Do you
25 report income as cash comes in or as you

**150**
1 bill before you receive the money?
2    A.   As it comes in, yeah.
3    MR. BAGOT:
4        I think that's the question.
5 BY MR. HOBSON:
6    Q.   How much cash did you receive
7 from Quantum in 1997?
8    MR. BAGOT:
9        I don't think it's going to be
10 on the income tax return.
11    THE WITNESS:
12        It won't.
13 BY MR. HOBSON:
14    Q.   I don't think it's directly
15 shown here.
16        Do you know what your total
17 billings to Quantum were out of this job?
18    A.   Approximately?
19    Q.   Yes.
20    A.   $1,800,000, U.S.,
21 approximately. I believe we were paid in
22 total of just over a million dollars.
23    Q.   I take it some of that was
24 received in '96 and some in '97?
25    A.   Yes.

PAGE 151

PAGE 152

**151**
1    Q.   Do you have any idea of how
2 much income the company had from customers
3 other than Quantum in 1997?
4    A.   We can add up these invoices
5 here. These are all the invoices. So we
6 can pull out '97 and add them up. I
7 couldn't tell you off the top of my head.
8    Q.   Most of your customers paid
9 relatively promptly, I take it?
10    A.   Yes, they did. Normally, it
11 was within 30 days.
12    Q.   When was it that you decided to
13 cancel your order of the second MAXROV?
14    A.   When?
15    Q.   Yes.
16    A.   Approximately April of '97.
17    Q.   That was essentially because
18 Quantum wasn't paying you?
19    A.   Yes.
20    Q.   About how far behind was
21 Quantum at that time in payments due you?
22    A.   Approximately four months.
23    Q.   Does your wife keep the sort of
24 day-to-day books, or is that all done by
25 your accountant? Does he come in to

**152**
1 reconstruct your --
2    A.   My wife sends everything to
3 him.
4    Q.   He has all the records --
5    A.   Yes, sir.
6    Q.   -- which would show deposits
7 and expenditures?
8    A.   Yes.
9    (Whereupon, there was a brief
10 recess.)
11    MR. HOBSON:
12        I think that probably covers
13 this deposition.
14
15
16    (Whereupon, this concluded the
17 deposition.)
18
19
20    *   *   *   *   *
21
22
23
24
25

**153**

1     WITNESS'S CERTIFICATE

2

3

4    I have read or have had the foregoing

5  testimony read to me and hereby certify

6  that it is a true and correct transcription

7  of my testimony with the exception of any

8  attached corrections or changes.

9

10

11

12

13    --------------------

14    (Witness's signature)

15

16

17

18

19

20

21

22

23

24

25

---

**154**

1    REPORTER'S CERTIFICATE

2    I, RHONDA C. LOUPE, Certified

3  Shorthand Reporter, Registered Professional

4  Reporter, do hereby certify that the

5  above-named witness, after having been

6  first duly sworn by me to testify to the

7  truth, did testify as hereinabove set

8  forth;

9    That the testimony was reported by me

10  in computer shorthand and transcribed under

11  my personal direction and supervision;

12    That the preceding 152 pages are a

13  true and correct transcription of the

14  testimony to the best of my ability and

15  understanding;

16    That I am not of counsel, not related

17  to counsel or the parties hereto, and not

18  in any way interested in the outcome of

19  this matter.

20

21

22    --------------------

23  RHONDA C. LOUPE
    CERTIFIED SHORTHAND REPORTER

24  REGISTERED PROFESSIONAL
    REPORTER

25